Filed with Court Security Office 7/3/08
Cleared for Public Filing 7/7/08

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: | ) | Misc. No. 08-442 (TFH) |
|  | ) |  |
| **GUANTANAMO BAY DETAINEE** | ) |  |
| **LITIGATION** | ) | Civil Action No. 05-CV-2386 (RBW) |

|  |  |  |
|---|---|---|
| **ABDUL AZIZ NAJI,** | ) |  |
| a/k/a **AZIZ ABDUL NAJI,** | ) |  |
|  | ) |  |
| *Petitioner,* | ) |  |
|  | ) |  |
| *v.* | ) | CIVIL ACTION NO. 05-CV-2386 (RBW) |
|  | ) |  |
| **GEORGE W. BUSH**, *et al.,* | ) |  |
|  | ) |  |
| *Respondents.* | ) |  |

## SUBSTANTIVE MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH 30-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO

**Counsel for Petitioner respectfully submits this *substantive* motion and requests that it be heard before Judge Walton.**

1.    Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioner (ISN #744) respectfully moves for an immediate order requiring Respondents to provide counsel for Petitioner and the Court with thirty (30) days' advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Base in Cuba. Within the past two days, Respondents have transferred two Algerian detainees from Guantanamo to Algeria, which is also Petitioner's home country and, upon information and belief, Respondents have

contemplated or are contemplating removal of Petitioner from Guantánamo to Algeria or other foreign territories. Petitioner has significant reason to believe that such a transfer could result in his being subjected to torture or indefinite imprisonment without due process of law.

2.      In support of this request, Petitioner relies on the statement of facts set forth below and on the reasons set forth in his *Motion for Order Requiring Respondents to Provide Counsel for Petitioner and the Court with 60 Days' Advance Notice before any Intended Transfer of Petitioner from Guantanamo* and *Notice Regarding Decision Not to File DTA Petition*, filed with this Court on August 7, 2007 (Attachment 1). Petitioner is requesting the advance notice to enable his counsel to contest any such removal from Guantánamo and preserve the jurisdiction of the Court in this matter.

## STATEMENT OF FACTS

3.      Petitioner is a citizen of Algeria who has been detained as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba since 2002. As detailed in the *habeas* petition he has filed, he denies being an "enemy combatant" and contends he is being detained in violation of the Constitution, treaties, and laws of the United States.

4.      On June 12, 2008, the U.S. Supreme Court reversed the decision of the United States Court of Appeals for the District of Columbia Circuit, ruling that prisoners at Guantánamo have *habeas corpus* rights protected under the U.S. Constitution; the review procedures of the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 ("DTA") are not an adequate substitute for *habeas corpus*; and the Military Commissions Act of 2006, Pub. L. No. 109-366, § 7, 120 Stat. 2600, 2636-37 (2006) ("MCA"), insofar as it purported to strip the courts of *habeas corpus* jurisdiction, was unconstitutional. *Boumediene v. Bush*, ___ S.Ct. ___, 2008 WL 2369628 (June 12, 2008). The Supreme Court stated that it was now up to the District Courts to

resolve questions regarding "the legality of . . . detention" of Guantánamo detainees. Id. at *8. The Supreme Court stated that the "detainees in these cases are entitled to a prompt habeas corpus hearing." Id. at *44.

5.    Petitioner has significant reason to fear he will be transferred to a country where he will be tortured and/or detained indefinitely without due process of law, particularly his native Algeria, a country known to treat repatriated prisoners harshly, having codified the right to hold such a person without charges up to 20 years in Article 87 of the Algerian criminal code.

6.    According to Western diplomats and intelligence sources, since Sept. 11, 2001, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities. These people have been taken to countries such as Egypt, Pakistan, Afghanistan, and Kuwait, where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States. *See, e.g.,* Hearings of the Foreign Affairs Subcommittee on International Organizations, Human Rights, and Oversight on the Hearings and Briefings on The Use of Diplomatic Assurances in Renditions, June, 2008. Chairman Delahunt's panel heard testimony on a number of specific cases of rendition to torture, including but not limited to the case of Maher Arar, a Canadian of Syrian origin who was stopped at JFK Airport and on the basis of assurances that he would not be tortured, was sent to Syria. Mr. Arar was subsequently tortured during his one year detention there. A newly released report from the Department of Homeland Security's Inspector General raises fresh questions about the sufficiency of those assurances. According to State Department reports, torture has been widely used on prisoners in a number of Middle Eastern countries. *See, e.g.,* Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture,* L.A. Times, Jan. 13, [2005], at A1 ("News accounts, congressional tes-

timony and independent investigations suggests that [the CIA] has covertly delivered at least 18

terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations.").

7.      By way of example, Guantánamo detainee Mamdouh Habib was rendered to Egypt by the

United States. During his six months in Egyptian custody, Mr. Habib was allegedly tortured

without mercy:

> He said that he was beaten frequently with blunt instruments, including an
> object that he likened to an electric "cattle prod." And he was told that if
> he didn't confess to belonging to Al Qaeda he would be anally raped by
> specially trained dogs. . . . Habib said that he was shackled and forced to
> stand in three torture chambers: one room was filled with water up to his
> chin, requiring him to stand on tiptoe for hours; another chamber, filled
> with water up to his knees, had a ceiling so low that he was forced into a
> prolonged, painful stoop; in the third, he stood in water up to his ankles,
> and within sight of an electric switch and a generator, which his jailers
> said would be used to electrocute him if he didn't confess.

Mayer, *Outsourcing Torture* at [¶ 54.] The credibility of Mr. Habib's account is bolstered by the

State Department, which has consistently identified the Egyptian government as a practitioner of

torture. In a report released on February 28, 2005, for example, the State Department found that

"there were numerous, credible reports that security forces tortured and mistreated detainees"

and that "torture and abuse of detainees by police, security personnel, and prison guards re-

mained common and persistent." Dep't of State, *Country Reports on Human Rights Practices,*

*Egypt 2004*, at http://www.state.gov/g/drl/rls/hrrpt/2004/41720.htm, § 1(c).

## ARGUMENT

8.      Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue

injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291

(D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner's

request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the

status quo between the parties pending a final determination of the merits of the action." 13

Moore's Federal Practice 3d, § 65.20 (2004).

9.      Each of the four factors to be weighed in awarding preliminary injunctive relief favors the

requested injunction here: (i) Petitioner will suffer irreparable harm if the injunction is denied; (ii)

no harm will be suffered by Respondents if the injunction is granted; (iii) Petitioner is likely to

succeed on the merits of his claims; and (iv) there is a clear public interest in preventing the U. S.

government from rendering individuals to foreign countries for detention and torture. *See Al-*

*Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d

1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir.

1998).

i)   Petitioner stands to suffer immeasurable and irreparable harm – from to torture to possible

     death – at the hands of a foreign government.  Transfer to another country, even if "only"

     for continued imprisonment, also circumvents Petitioner's right to adjudicate the legality

     of their detention in this Court, per *Boumedienne*.

ii)  By contrast, Respondents, who have already held Petitioner for over six years, are asked

     only to provide counsel and the Court with adequate notice of any intended removal of Pe-

     titioner from Guantánamo.  Respondents can suffer no conceivable harm from complying

     with such a request.

iii) Petitioner is likely to succeed on the merits of his claims.  Petitioner has properly invoked

     the jurisdiction of this Court under *Boumediene,* and for the U. S. government to remove

     Petitioner to a country that would afford no such protections would be to flout *Boumedi-*

     *enne* and defeat the jurisdiction the Supreme Court just affirmed. Under such circum-

     stances, a preemptive transfer would also violate basic international legal norms embodied

not only in the Geneva Conventions but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment.

iv) Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioner from the Court's jurisdiction. No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant – properly before the Court, represented by counsel, and wishing to implement the judicial branch's admonition that the other two branches no longer unconstitutionally deny him his day in court – be provided a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely.

## CONCLUSION

10.    For the reasons discussed above, the motion for an order requiring Respondents to provide counsel for Petitioner and the Court with thirty (30) days' advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Base should be granted.

Respectfully submitted,                      Dated: July 3, 2008


Counsel for Petitioner:


_____
Ellen Lubell, Esq.


_____
Doris Tennant, Esq.

TENNANT LUBELL, LLC
288 Walnut St., Suite 500
Newton, MA  02460
Tel: (617) 969-9610
Fax: (617) 969-9611

J. Wells Dixon
(Pursuant to LCvR83-2(g))
CENTER FOR CONSTUTIONAL
RIGHTS
666 Broadway, 7th Fl.
New York, NY 10012
Tel: (212) 614-6439
Fax: (212)614-6499

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing instrument has been served on Respondents through the Court Security Officer in accordance with the Standard Protective Orders:

Mr. Terry Henry
US DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 7226
Washington, DC 20529-0001


/s/ Ellen Lubell


Dated:  July 3, 2008

# ATTACHMENT  1

Filed with Court Security Officer 8/02/07
Cleared for Public Filing 8/7/07

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABDUL AZIZ NAJI,<br>a/k/a AZIZ ABDUL NAJI,<br><br>*Petitioner,*<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>*Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 05-CV-2386 (RBW) |

## MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH 60 DAYS' ADVANCE NOTICE BEFORE ANY INTENDED TRANSFER OF PETITIONER FROM GUANTANAMO, AND NOTICE REGARDING DECISION NOT TO FILE DTA PETITION

Pursuant to Rule 65 of the Federal Rule of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioner Abdul Aziz Naji ("Petitioner Naji"), through his counsel, respectfully moves for an Order requiring Respondents to provide his counsel and the Court with advance notice before any intended transfer of him from Guantanamo Bay Naval Station in Cuba.

Petitioner Naji is one of the Mohammon petitioners, which petitioners on May 3, 2007, 2007, filed a Joint Opposition to Respondents' Motion to Dismiss, Joint Motion for Stay-and-Abey Order, and Joint Notice of Intent to File Petition Under the Detainee Treatment Act, requesting, *inter alia*, that this Court (1) stay the Mohammon habeas action pending Petitioners' exhaustion of their remedies in the Court of Appeals under the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 ("DTA"), and (2) hold the habeas action in abeyance pending Petitioners' exhaustion of remedies and the filing of a renewed petition for certiorari with the Supreme Court to review the Court of Appeals' jurisdictional holding in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007) ("*Boumediene*"), or the Supreme Court's resolution of the same

jurisdictional issue as presented in a pending original habeas petition in *In re Ali*, No. 06-1194. When the Supreme Court initially denied certiorari in the *Boumediene* case, it indicated that exhaustion under the DTA is necessary before Petitioner Naji's habeas claims can be addressed. Thus, Petitioner Naji, together with all other Mohammon petitioners, noted his intention to file for relief under the DTA in his May 3, 2007, motion.

However, on June 29, 2007, before Petitioner Naji filed a petition for relief under the DTA, the Supreme Court reconsidered its earlier decision and granted the renewed petitions for certiorari in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007). (*Boumediene* and *Al Odah* are consolidated.) Presumably because it granted certiorari in *Boumediene*, the Supreme Court has also withheld action on the original habeas petition in *In re Ali*, S. Ct. No. 06-1194, which also challenges the Court of Appeals' decision in *Boumediene*.

The grant of certiorari in *Boumediene* means that the Supreme Court may resolve the jurisdictional issues presented by the Guantanamo cases without requiring Petitioner Naji to pursue a DTA filing—a process that Petitioner contends violates his right of habeas corpus and constitutional protections—and thus may obviate Petitioner's reasons for filing for relief under the DTA. The procedures afforded Petitioner Naji under the DTA of 2005 are and will always be a fundamentally inadequate substitute for habeas corpus. Petitioner believes that the procedures set out in the DTA are so flawed that he cannot receive a fair determination of whether he is properly held by the United States government.

Thus, in light of the Supreme Court's action, Petitioner Naji does not intend to file for relief under the DTA at this time. Instead, Petitioner respectfully submits this notice of recent activity and moves this Court to issue an order requiring Respondents to provide his counsel and the Court with 60 days' notice of any intended transfer of Petitioner Naji from Guantanamo.

This relief will maintain the status quo between the parties and protect Petitioner until the issues central to this habeas case are resolved.

Counsel has received information through a credible source in the Algerian government that several Algerian detainees, who could include Petitioner Naji, an Algerian national, will be transferred from Guantanamo to Algeria in the near future. This information and recent press developments regarding diplomatic negotiations between the U.S. and Algeria regarding the re-patriation of Algerian detainees, and the uncertainty of Guantanamo's future, cause Petitioner to reasonably believe that he may be at immediate risk of being transferred either to Algeria or to an unknown location where he could be held indefinitely, without due process of law, and poten-tially tortured or otherwise treated in an abusive manner. The requested order and 60 days' no-tice will allow Petitioner Naji to seek relief from this Court if necessary and allow this Court to preserve its jurisdiction pending Supreme Court review of the *Boumediene* and *Al Odah* cases.

## 60 Days' Notice of Transfer is Appropriate to Protect Petitioner Against Rendition and Abuse and to Preserve the Status Quo

Petitioner Naji requests that his counsel be given 60 days' advance notice of any intended transfer to provide his counsel with an opportunity to contest his transfer from Guantanamo and to preserve the jurisdiction of this Court in this matter. On information and belief, Respondents have contemplated or are contemplating removing Petitioner Naji either to Algeria or other for-eign territories where he could be tortured or held indefinitely without due process of law. The requested relief will allow Petitioner Naji to seek relief from this Court if necessary and allow this Court to preserve its jurisdiction pending Supreme Court review of the *Boumediene* and *Al Odah* cases.

### A. Petitioner Naji Is in Danger of Being Transferred to a Location Where He Faces Possible Torture and Indefinite Detention without Due Process of Law

Petitioner Naji is an Algerian national who has been held at Guantanamo for more than five years. Respondents may at any time transfer Petitioner Naji to a foreign jurisdiction where he may be detained indefinitely, abused, or even tortured.

Petitioner's home country of Algeria is known as a place where torture and human rights violations are common.[1] However, that is not the only reason Petitioner Naji has to fear being returned there; in fact, he is in a double bind. In interviews with counsel in Guantanamo on February 1, 2007, and on May 24, 2007, Petitioner stated to counsel that he served in the Algerian army for more than two years during the 1990s, and that during that time he fought fundamentalist terrorists who were opposed to the Algerian government. If returned to his home country of Algeria, he will be faced with a double threat: on the one hand, the fact of his service in the Algerian Army will make him a target of insurgent Algerian terrorists who are currently fighting the Algerian government;[2] on the other hand, Petitioner Naji's imprisonment by the U.S. as a terrorist suspect will make him a target of the Algerian government—a country that has been en-

---

[1] *See* Associated Press, *Group Requests Fates of Terror Suspects*, New York Times, February 27, 2007. Human Rights Watch identifies countries to which terror suspects may have been returned, including Algeria, "where torture is common."

[2] *See* the website of the Council on Foreign Relations, http://www.cfr.org/publication/9154: The paramilitary wing of the Islamic Salvation Front (FIS), banned by the controlling socialist party (FLN) after winning a round of elections, began targeting security forces in the early 1990's, with several radical FIS splinter factions continuing to fight against FLN and, now, the current Algerian leadership. (Updated: October 2005). *See also* the website of Human Rights Watch, Report 2001: Algeria: Human Rights and Developments at http://www.hrw.org.wr2kl/Mideast/Algeria.html: The Armed Islamic Group (GIA) denounce the Algerian president's amnesty efforts for organizations which voluntarily give up violence and continue to mount attacks on civilians, as well as security posts and military patrols.

gaged in counter-terrorism for well over a decade—and greatly increase the likelihood that he will be tortured or killed.[3]

In meetings with counsel on February 1, 2007, and again on May 24, 2007, Petitioner Naji described his very credible fear of being returned to Algeria. He stated that he met several months ago with an Algerian delegation granted permission to visit Guantanamo and was told that they had looked at his file in Algeria, noted his military service, and asked if he was a member of GIA (Groupes Islamiques Armés, a militant Algerian organization). Although he assured them he was not a member of GIA, he did not receive any assurance whatsoever from them that he would be protected if he were to be returned to Algeria.

During the time Petitioner Naji served in the Algerian Army and afterwards, he became aware of fliers posted in mosques and around neighborhoods—presumably distributed by insurgent terrorists—warning people not to join the Algerian military. He knew of specific instances in which insurgent terrorists, hiding in the mountainous areas outside his home city of Batna, attacked both civilians and military personnel. In one such instance, the insurgents, wearing military uniforms, attacked a Batna suburb late at night, forcing people into homes and demanding identification papers. They specifically targeted two Algerian citizens, one who had recently served in the Algerian Army, and the other currently serving. These men were captured and slaughtered.

Amnesty International has concluded, after closely monitoring the human rights situation in Algeria and investigating dozens of cases of torture and other ill-treatment in that country be-

---

[3] *See* website of Amnesty International, Algeria: Torture in the War on Terror: A Memorandum to the Algerian President, http://web.amnesty.org/library/index/engmade280082006: Due to consistent breaches by Algeria to international treaties prohibiting torture, Amnesty International considers anyone returned under diplomatic assurance that they will not be tortured or subject to other human rights violations, will remain at risk of torture and other ill-treatment.

tween 2002 and 2006, that the main reason why individuals are detained by the Algerian Department for Information and Security (the force in that country currently associated with torture and ill treatment) is that they are thought to possess information about armed groups in Algeria and/or alleged terrorist activities abroad.[4] Despite the fact that Petitioner Naji fought against terrorists while serving in the Algerian Army and that he was neither a soldier nor engaged in any hostility at the time of his capture by the U.S., his detention in Guantanamo marks him, along with the other detainees, as "enemy combatants being detained because they have waged war against our nation and they continue to pose a threat." [5] It is likely that Petitioner Naji would be detained by the Algerian government and subjected to detention without the knowledge of judicial authorities[6] or to long-term imprisonment, simply because he has been accused by the U.S., the most prominent anti-terrorist ally of Algeria, as being associated with terrorism.[7]

The U.S. bears responsibility for any torture or other serious human rights violation that may occur as a consequence of having taken away Petitioner Naji's liberty for more than five years. The U.S. must ensure that Petitioner will not be forcibly returned to Algeria, even if the U.S. is given "diplomatic assurances" by that government that he will not be mistreated.[8]

---

[4] Id.

[5] Department of Defense News Release, June 16, 2006 ("Detainees are held at JTF Guantánamo because they are dangerous and continue to pose a threat to the U.S. and our allies. They have expressed a commitment to kill Americans and our friends if released. These are not common criminals, they are enemy combatants being detained because they have waged war against our nation and they continue to pose a threat.").

[6] Algeria: Unrestrained Powers: Torture by Algeria's Military Security, July 10, 2006, http://web.amnesty.org/library/Index/ENGMDE280042006. "Amnesty International believes that individuals suspected of links with armed groups inside Algeria, or with alleged terrorist networks abroad, continue to be at risk of arrest and detention by the DRS and are liable to be tortured or otherwise ill-treated, regardless of whether or not they have been exempted from prosecution in the context of "national reconciliation" measures, and of any assurances given by the civilian authorities."

[7] Id. "Membership of a terrorist group abroad, whatever its form, is punishable by up to 20 years' imprisonment, regardless of whether or not the activities were directed against Algerian interests."

[8]: Id.. "Such bilateral agreements between governments...are not binding in international law, unlike the treaties prohibiting torture to which Algeria is a party but has consistently breached. Amnesty International has fundamental (continued...)

In addition to Petitioner Naji's very credible fears that he will be transferred to Algeria to be tortured and/or detained indefinitely without due process of law, he fears that he may be transferred to another country where he could suffer the same fate.  On information and belief, a number of detainees have been removed to countries—including Pakistan and Kuwait—where they have been imprisoned and denied access to the courts.[9]  On information and belief, the U.S. has secretly removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process.  This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," is understood to be used to facilitate interrogation by subjecting detainees to torture.

According to reports by American and foreign news organizations, including the *Washington Post*, the *Los Angeles Times* and the British Broadcasting Corporation, the U.S. government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques.  According to an article in the *New Yorker*, the "rendition" process was originally "a program aimed at a small, discrete set of suspects—people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'"

---

concerns about the use of "diplomatic assurances" (or "diplomatic contacts") in returning foreign nationals who are considered to be a security threat. In the case of Algeria, however, Amnesty International is also concerned that the civilian authorities, in practice, exercise no control over the conduct and activities of the DRS [Department for Information and Security, an intelligence agency which specializes in interrogating individuals who are believed to have information about terrorist activities] who would most likely be responsible for detaining such returnees.

[9] *See also* Dana Priest, *Long-Term Plan Sought For Terror Suspects*, Wash. Post, Jan. 2, 2005, at A1. Recent news reports indicate that the United States government has contemplated transferring "large numbers of Afghan, Saudi and Yemeni detainees from the military's Guantánamo Bay, Cuba, detention center into new U.S.-built prisons in their home countries."

Jane    Mayer,    *Outsourcing    Torture*,    New    Yorker,    Feb.    14,    2005,    at
http://www.newyorker.com/fact/content/?050214fa_fact6, ¶ 7.   According to the *Washington Post*,

> Since Sept. 11, the U.S. government has secretly transported dozens of people
> suspected of links to terrorists to countries other than the United States, bypassing
> extradition procedures and legal formalities, according to Western diplomats and
> intelligence sources.  The suspects have been taken to countries . . . whose intelli-
> gence services have close ties to the CIA and where they can be subjected to in-
> terrogation tactics – including torture and threats to families – that are illegal in
> the United States, the sources said.  In some cases, U.S. intelligence agents remain
> closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post,
Mar. 11, [2002], at A1.[10]  The countries to which detainees may be brought are known to prac-
tice torture.[11]

For years, the press has reported on Pentagon plans to transfer more than half of the de-
tainees at Guantanamo to countries having abominable human rights records, such as Saudi Ara-
bia, Afghanistan, and Yemen.[12]  The government now appears to be executing that plan.  Recent
press reports regarding mounting internal pressures to close the detention facilities at Guan-
tanamo place Petitioner Naji in grave danger of being moved to an undisclosed location.[13]

---

[10] *See also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations*, Wash. Post, Dec. 26, 2002, at A1.

[11] *See, e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture*, L.A. Times, Jan. 13, [2005], at A1 ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners.").

[12] See Douglas Jehl, Pentagon Seeks to Transfer More Detainees from Base in Cuba, New York Times, March 11, 2005.

[13] *See* AP, *Democrats Plan to Close Guantanamo*, June 29, 2007 ("The White House says Bush has already decided to close the U.S. prison in Cuba and transfer more than 370 terrorism suspects elsewhere.").

Within the last eight months, dozens of detainees were transferred to foreign governments, including Saudi Arabia, Afghanistan, and Yemen, among others.[14]

**B.    Petitioner Naji Is Entitled to an Order Requiring Respondents to Notify His Counsel and the Court 60 Days Prior to Any Intended Transfer of Him from Guantanamo**

Petitioner Naji's request should be granted because he faces a clear and present threat of severe and irreparable harm if transferred. He faces prospective harm of two types: personal bodily harm and legal harm. *First*, Petitioner Naji may suffer immeasurable and irreparable personal bodily harm—from detention to torture to possible death—at the hands of a foreign government. *Second*, and without doubt, Petitioner Naji will be harmed legally if transferred, as transfer to another country circumvents his right to adjudicate the legality of his detention in this Court. Transfer would "eliminate any opportunity for [Petitioner] to ever obtain a fair adjudication of [his] 'fundamental right to test the legitimacy of [his] executive detention.'" Memorandum Opinion [Granting Motion for 30 Days' Notice], Civil Action No. 04-1254 (HHK), Doc. No. 11 (D.C. Dist., June 3, 2005). The severity of the harm Petitioner Naji would suffer if transferred weighs heavily in favor of granting his request for 60 days notice.

By contrast, Respondents, who have already held Petitioner Naji for several years, need only to provide counsel and the Court with adequate notice of any intended removal of Petitioner Naji from Guantanamo. This request does not place a substantial burden on Respondents, and Respondents can suffer no conceivable harm from complying with this request.

---

[14] *See* Press Releases, Dep't of Defense, Detainee Transfer Announced (Dec. 14, 2006; Dec. 17, 2006; Feb. 21, 2007; Mar. 1, 2007; Mar. 26, 2007; Mar. 30, 2007; Apr. 26, 2007; May 19, 2007).

Petitioner has properly invoked the jurisdiction of this Court.[15] *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004). *See also* Order in *Mohammed Rajeb Abu Ghanem v. George W. Bush, et al*, Civil Action No. 05-1638, (D.D.C. July 10, 2007) (J. Kollar-Kotelly). ("Petitioner and Respondents having submitted themselves to the jurisdiction of this Court, and the Court having asserted *in personam* jurisdiction, see *Rasul v. Bush*, 542 U.S. 466 (2004), the stay issued by the Court on October 19, 2005, is amended to now include the Court's receipt of notice from Respondents 30 days in advance of any release, repatriation, or rendition that would remove Petitioner from the Court's jurisdiction.")

The Supreme Court has ruled that detainees have stated actionable claims under the Due Process Clause and the Geneva Conventions. *See Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006). For the U.S. to transfer Petitioner Naji to a country that would afford no such legal protections would be to flout the Supreme Court's rulings and defeat jurisdiction over Petitioner. Such a transfer would also violate basic international legal norms embodied in the Geneva Conventions, the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment.

### Conclusion

For the foregoing reasons, Petitioner Naji respectfully moves for an order requiring Respondents to provide his counsel and the Court with no less than 60 days' advance notice before any intended transfer of him from Guantanamo Bay Naval Station in Cuba.

---

[15] The Military Commissions Act, which became law after this case was filed, does not apply to this pending case. But this issue has been extensively briefed elsewhere and will be addressed by the Supreme Court in the *Boumediene* and *Al Odah* cases soon. The Court need not address this complicated issue to grant this simple request for 60 days notice of transfer, particularly when the severity of harm factor weighs so heavily in favor of granting it.

Dated:  August  7, 2007.                    Respectfully submitted,

                                            Counsel for Petitioner:

                                            /s/  _____

                                            Ellen Lubell
                                            Doris Tennant
                                            **TENNANT LUBELL, LLC**
                                            288 Walnut St., Suite 500
                                            Newton, MA  02460
                                            Tel: (617) 969-9610
                                            Fax: (617) 969-9611

                                            Wells Dixon (Pursuant to LCvR 83.2(g))
                                            CENTER FOR CONSTITUTIONAL RIGHTS
                                            66 Broadway, 7th Floor
                                            New York, New York 10012
                                            Tel: (212) 614-6464
                                            Fax: (212) 614-6499

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ABDUL AZIZ NAJI,**
**a/k/a AZIZ ABDUL NAJI,**

   *Petitioner,*

    *v.*

**GEORGE W. BUSH,** *et al.,*

   *Respondents.*

)
)
)
)
)
)
)
)
)
)
)
)

**CIVIL ACTION NO. 05-CV-2386 (RBW)**

### CERTIFICATE OF SERVICE

I hereby certify that, on this 7th day of August, 2007, I caused a true and correct copy of the **MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH 60 DAYS' ADVANCE NOTICE BEFORE REMOVAL OF PETITIONER FROM GUANTANAMO, AND NOTICE REGARDING DECISION NOT TO FILE DTA PETITION** to be served by filing with the Court Security Officer, with notice of filing on the ECF system provided to:

TERRY M. HENRY
ANDREW WARDEN
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel: (202) 514-4107
Fax: (202) 616-8470
Counsel for Respondents

/s/ Doris Tennant
Doris Tennant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN RE:** | ) | **Misc. No. 08-442 (TFH)** |
| | ) | |
| **GUANTANAMO BAY DETAINEE** | ) | |
| **LITIGATION** | ) | **Civil Action No. 05-CV-2386 (RBW)** |
| | ) | |

| | | |
|---|---|---|
| **ABDUL AZIZ NAJI,** | ) | |
| a/k/a **AZIZ ABDUL NAJI,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| *v.* | ) | **CIVIL ACTION NO. 05-CV-2386 (RBW)** |
| | ) | |
| **GEORGE W. BUSH,** *et al.,* | ) | |
| | ) | |
| *Respondents.* | ) | |

### [PROPOSED] ORDER GRANTING
### SUBSTANTIVE MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE
### COUNSEL FOR PETITIONER AND THE COURT WITH 30-DAYS' ADVANCE
### NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO

For the reasons set forth in Petitioner's Motion For Order Requiring Respondents to Provide Counsel for Petitioner and the Court with 30-Days' Advance Notice of Any Intended Removal of Petitioner From Guantanamo, the motion is hereby granted. Accordingly, it is hereby **ORDERED** that Respondents provide Counsel for Abdul Aziz Naji (ISN #744) and this Court with thirty (30) days' advance notice of any intended removal of petitioner from Guantanamo.

**SO ORDERED** this _____ day of July, 2008.

_____
REGGIE B. WALTON
United States District Judge

_____
THOMAS F. HOGAN
United States District Judge