## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
IN RE:                                  )        Misc. No. 08-442 (TFH)
                                        )
GUANTANAMO BAY                          )        Civil Action No. 02-CV-0828 (CKK)
DETAINEE LITIGATION                     )
_____ )

## OPPOSITION TO PETITIONERS' MOTION FOR AN EMERGENCY INJUNCTION

### INTRODUCTION

Respondents hereby oppose the motion of Fayiz Mohammed Ahmed Al Kandari and Fouad Mahmoud Al Rabiah ("petitioners") for an emergency injunction prohibiting personnel associated with the Office of Military Commissions ("OMC") from having any communications with Petitioners relating to the grounds for their confinement at the United States Naval Base at Guantanamo Bay, Cuba ("Guantanamo Bay"), including any matters for which military commission charges may be brought.  *See* Petitioners' Emergency Motion ("Pets. Mot.") at 1. Petitioners allege that such contacts violate the so-called "no-contacts" rule set forth in Rule 4.2. *See id.* at 7-15.

Petitioners' motion should be denied for several independent jurisdictional reasons.  First, the Court lacks jurisdiction to consider the petitioners' motion because it seeks to enjoin an aspect of the military commission process for which Congress withdrew jurisdiction under section 3 of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, § 3, 120 Stat. 2600.  Congress, in enacting the MCA, funneled challenges such as Petitioners' claims here, into a forum that is fully competent to consider these claims:  first, the military court itself, with military appeals; and second, review by an Article III court, the District of Columbia Circuit, with an opportunity, of course, to petition the Supreme Court for certiorari review.  In doing so,

1

Congress precluded this Court from considering claims, including claims couched as a collateral

attack under habeas, "relating to the prosecution, trial, or judgment of a military commission . . .

including challenges to the lawfulness of procedures of military commissions."  10 U.S.C. §

950j(b).  Second, Congress expressly withdrew jurisdiction in this Court over challenges wholly

outside of the core habeas function of challenging the legality of detention and over which the

MCA § 7(a), 120 Stat. 2600 (codified at 28 U.S.C. § 2241(e), withdrew jurisdiction.  This

remains so notwithstanding the Supreme Court's decision in *Boumediene v. Bush*, 128 S.Ct. 2229

(June 12, 2008).  Finally, jurisdiction is lacking to provide interim injunctive relief of a character

beyond the allegations in the initiating pleading, here the operative petition.[1]

    Notably, Petitioners' focus is on a separate proceeding ancillary or collateral to the instant

habeas proceeding—the military commission process—and persons associated with that separate

proceeding—personnel of the OMC or "anyone else acting on behalf or the direction of the

Office of the Chief Prosecutor of Military Commissions"—rather than the instant habeas case.

Indeed, Petitioners make no allegations of why an injunction is necessary to protect Petitioners'

core habeas rights in *this* case.  But even putting aside the serious jurisdictional questions, an

---

[1]  Given the exigencies of the accelerated briefing schedule set by the Court and the clear authority establishing the lack of jurisdiction and because "the requirement that jurisdiction be established as a threshold matter 'springs from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception,'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)), Respondents have not addressed the merits of Petitioners' request for injunctive relief. Indeed, the Court should not entertain the merits of the emergency motion because "[w]ithout jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  *Id.* at 94 (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868).  In the event the Court finds (contrary to all authority) that it does have jurisdiction to entertain the instant motion, Respondents respectfully request the opportunity to file a supplemental brief addressing the merits *vel non* of Petitioners' motion.

injunction would be inappropriate here because: (i) petitioner has made no specific allegations of irreparable harm or any effect on in this habeas proceeding coming from these alleged communications; (ii) without accepting that the Government has acted improperly with regard to communications with Petitioners, the Court would have the inherent authority to take whatever corrective measures may be appropriate in this habeas case, should the court find (contrary to any evidence suggested by Petitioners) that Petitioners' habeas case has been prejudiced; and (iii) while the court lacks jurisdiction over the military commission process, should the petitioner be charged in the future, the military commission would have the same authority to review petitioners' claims and take whatever action is appropriate. Petitioners' motion should clearly be denied.[2]

---

[2] Moreover, respondents note, in any event, that at least some of the facts underlying the purported "emergency motion" as related in Petitioners' papers are many weeks, if not months, old given Petitioners' acknowledgment that "Petitioners filed an Emergency Petition for Writ of Mandamus in the U.S. Court of Military Commission Review," a motion that was denied in March 2008, *see* Pets. Mot. at 4-5, and that Petitioners did not engage in consultation before filing the emergency motion. The timing of these events presents a serious question of whether equity would appropriately aid Petitioners in any event. *See, e.g.*, *Tenacre Found. v. INS*, 892 F. Supp. 289, 294 n.5 (D.D.C.) ("[P]laintiff waited seven months after receiving the denial notice from the AAU before filing suit, and plaintiff waited another month after filing suit to file a motion for preliminary injunction . . . the time lapse undermines any assertions that plaintiff will suffer irreparable harm if the Court does not grant preliminary injunctive relief."). Nor do Petitioners identify imminent threatened harm. Finally, the Government disputes Petitioners' reading of Rule 4.2 on the merits and notes that many courts have recognized in the criminal context that prosecutors may engage in communications with unindicted criminal defendants, even if they otherwise have counsel in other matters. *See, e.g.*, *United States v. Balter*, 91 F.3d 427, 435 (3d Cir. 1996) (holding that Rule 4.2 would not prevent government attorneys from "communicat[ing] with a suspect as part of a pre-indictment criminal investigation"); *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) ("[T]he Texas State Bar Rule and the American Bar Association Model Rule that prohibits a prosecutor from contacting someone known to be represented by an attorney . . . do not apply to government conduct prior to indictment . . . ."); *United States v. Ford*, 176 F.3d 376, 382 (6th Cir. 1999) (recognizing that prosecutors are "authorized by law" to place an undercover informant in the cell of a represented suspect to investigate an uncharged matter); *United States v. Escobar*, 842 F. Supp. 1519, 1527 (E.D.N.Y. 1994) (holding that custodial communications prior to indictment did not violate Rule

## BACKGROUND

The petitioners are two Kuwaiti nationals who have been detained as enemy combatants at Guantanamo Bay since 2002. This action was initiated on May 1, 2002, with the filing of a Complaint on behalf of twelve Kuwaiti nationals detained as enemy combatants at the United States Naval Base at Guantanamo Bay. On July 8, 2002, petitioners filed an Amended Complaint raising three claims for relief under the Fifth Amendment, the Alien Tort Statute, and the Administrative Procedure Act. Notably, the Amended Complaint did not seek petitioners' release from custody. Instead, it requested only that petitioners "meet with their families," "be informed of the charges, if any, against them," "designate and consult with counsel of their choice," and "have access to the courts or some other impartial tribunal." *See* Amended Complaint ¶ 40.[3] Petitioners also filed Applications for Writs of Habeas Corpus on July 27, 2004. *See* Dkt. no. 44.

The instant motion for a preliminary injunction concerns Petitioners' allegations that OMC personnel (and others), who engage in the investigation, prosecution, and trials of alien unlawful enemy combatants, are communicating with Petitioners outside of the presence of Petitioners' counsel in the separate habeas proceedings. On March 12, 2008, Petitioners sought a writ of mandamus from the United States Court of Military Commission Review to enjoin the OMC Prosecutor and other personnel from engaging in such communications. *See* Exhibit A hereto. That court dismissed the writ on jurisdictional grounds on March 21, 2008. *See* Pets.

4.2); *New Jersey v. Porter*, 510 A.2d 49, 54 (N.J. Super. App. Div. 1986). These factors counsel against granting the present motion however the merits might otherwise be resolved.

[3] The Court, however, has always construed the Amended Complaint "as a petition for writ of habeas corpus." *Rasul v. Bush*, 215 F. Supp. 2d 55, 63-64 (D.D.C. 2002) ("Plaintiffs cannot escape having the Court convert their action into writs for habeas corpus . . . .").

4

Mot. at 5 and attachment thereto.  Petitioners allege an additional communication occurred in

May 2008 between Petitioners and an individual who identified herself as being with the

Criminal Investigation Task Force.  *Id.*  Petitioners filed the instant motion on July 1, 2008.

**ARGUMENT**

**THIS COURT LACKS JURISDICTION TO CONSIDER THE PETITIONERS'
CHALLENGES TO ASPECTS OF THEIR DETENTION, AND THEIR MOTION
SHOULD ACCORDINGLY BE DENIED.**

This Court lacks jurisdiction to consider the petitioners' motion for injunctive relief for

three independent reasons.  First, through section 3 of the MCA, Congress removed from this

Court jurisdiction to enjoin aspects of the military commission process, which would necessarily

include Petitioners' proposed injunction against the communications with OMC personnel.

Piecemeal ancillary litigation in the federal district court over every aspect of the miliary

commission process is precisely what Congress sought to avoid in section 3.  Second, both 28

U.S.C. § 2241(e)(1), as applied to Petitioners' ancillary challenge, and a distinct provision, 28

U.S.C. § 2241(e)(2), bar this Court's consideration of anything other than the core habeas

function, *i.e.* inquiring into a detention's lawfulness.  This remains so notwithstanding the

Supreme Court's *Boumediene* decision, which addressed only the constitutional right to habeas

as applied to challenge legality of detention in the face of Congress' withdrawal of statutory

habeas jurisdiction under 28 U.S.C. § 2241(e)(1).  Finally, it is well established that a Court may

only grant preliminary injunctive relief of the same character as the final relief sought in an

initiating pleading such as a complaint or petition.

**I.     Section 3 Of The MCA Withdraws This Court's Jurisdiction Over Claims Related
        To Military Commissions, Including Communications By OMC Personnel.**

Section 3 of the MCA includes a channeling provision, 10 U.S.C. § 950j(b), that deprives

5

this Court of jurisdiction to consider the claims raised in Petitioners' emergency motion.

Section 950j(b) provides that "no court, justice, or judge shall have jurisdiction to hear or

consider any claim or cause of action whatsoever . . . *relating to the prosecution, trial, or*

*judgment of a military commission* under this chapter, including challenges to the lawfulness of

procedures of military commissions under this chapter." 10 U.S.C. § 950j(b) (emphasis added).

The provision specifies that it applies "notwithstanding any other provision of law (including

section 2241 of title 28 or any other habeas corpus provision)." *Id.* Congress did not simply

deprive the courts of jurisdiction over such claims without recourse. Instead, section 950j(b) is a

familiar statutory provision that serves to channel claims such as the ones raised by petitioner

into the military commission process itself. *Cf. INS v. St. Cyr*, 533 U.S. 289, 313 (2001)

(referring to exclusive review provision "as a 'zipper clause'" designed to "consolidate 'judicial

review' of immigration proceedings into one action in the court of appeals"). Accordingly,

claims that are subject to Section 3 are first to be considered by the military commission, *see*,

*e.g.*, 10 U.S.C. §§ 949d(a), 949*l*(b); next such claims are reviewed in the Court of Military

Commissions Review, 10 U.S.C. §§ 950c, 950f(c); and finally exclusive judicial review is

available in the D.C. Circuit, with possible *certiorari* review by the Supreme Court. *See* 10

U.S.C. § 950g(c), (d). Congress' intent to limit district court jurisdiction over any claim "relating

to" to military commission proceedings, such as the one here, cannot be clearer.

      Petitioners do not dispute that these special channeling procedures apply. Indeed,

Petitioners raised the precise issue presented here concerning communications with OMC

personnel in the U.S. Court of Military Commission Review ("CMCR"), which dismissed the

motion for lack of jurisdiction in March 2008. *See* Exhibit A hereto; *see also* Pets. Mot. at 4-5 &

Exhibit 2 thereto. Petitioners' decision, months after the CMCR decision, to file a similar

6

"emergency motion" with this Court, does not avoid section 3's limitations.  Congress spoke in broad terms in prohibiting "any claim . . . whatsoever" that "relat[es] to the prosecution, trial, or judgment of a military commission."  A challenge, such as Petitioners' here, to the propriety of Petitioners' communications with OMC personnel plainly "relat[es] to" the commission's proceedings.  Indeed, Petitioners' own allegations assert that the OMC is preparing to formally charge them and thus the communications must relate to those proceedings for the obvious reason that neither the prosecution nor trial can commence unless the commission first establishes its jurisdiction over the defendant.  Indeed, the relief sought here—an injunction barring certain communications with OMC personnel—cannot plausibly be treated as a claim unrelated to the military commission proceedings.  Jurisdiction is therefore lacking over Petitioners' claims because they relate to such proceedings.[4]

The MCA "allow[s] the [defendants] to assert . . . all[] of the legal claims they seek to advance" before an Article III court.  *Boumediene*, 128 S. Ct. at 2271.  Petitioners nowhere allege that they cannot bring their claims concerning the propriety of communications in the military commission in the event that they are charged or that, if convicted, they can then appeal any decision of the military commission through the courts.  Indeed, the court of appeals has

_____

[4] The absence of formal charges against Petitioners does not allow this Court to exercise original jurisdiction and thereby oust the court of appeals of its eventual jurisdiction to review any ultimate decision that may be rendered on Petitioners' claim.  To the contrary, the D.C. Circuit has held that "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals." *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984).  A contrary rule would defeat the court of appeals' exclusive statutory authority to review the merits of military commission's ruling in conflict with congressional intent.  *See id.* at 76.  The D.C. Circuit's jurisdiction thus "cuts off original jurisdiction in other courts in all cases covered by that statute," *id.* at 77, including Petitioners' challenges to the communications with OMC personnel.

jurisdiction to consider "matters of law," including whether any conviction is consistent with

military commission "standards and procedures"; whether the conviction is consistent with the

"laws of the United States"; and whether the conviction is consistent with the "the Constitution."

10 U.S.C. § 950g(b) & (c).  Ultimately, the military commission—and thereafter the U.S. Court

of Military Commission Review and D.C. Circuit (if a conviction results)—can directly consider

Petitioners' claims concerning the propriety of the alleged communications between OMC

personnel and Petitioners.  Indeed, given Petitioners' allegations those forums are the most

appropriate ones to address those claims rather than to have this Court, in habeas proceedings

separate from any future the military commission proceedings, address the issue in the first

instance.  Review of Petitioners' challenge, however, would not be ripe until the conclusion of

the military commission process because it will depend on actions that may or may not be taken

during the commission, including actions with respect to actual evidence used at trial and the

prospect of possible acquittal.[5]

---

[5] Indeed, the rationale for abstention is particularly strong in this case.  *See New v. Cohen*, 129 F.3d 639, 644 (D.C. Cir. 1997) (*Schlesinger v. Councilman*, 420 U.S. 738 (1975), bars federal courts from "entertain[ing] habeas petitions by military prisoners unless all available military remedies have been exhausted").  As *Hamdan* recently explained, abstention is called for because "federal courts should respect the balance that Congress struck between military preparedness and fairness to individual service members when it created 'and integrated system of military courts and review procedures, a critical element of which is the Court of Military Appeals, consisting of civilian judges 'completely removed from all military influence or persuasion.'" *Hamdan*, 126 U.S. at 2770.  Here, of course, where Congress has created a review structure, including review in the D.C. Circuit, that policy choice is reflected in the strongest terms and "should [be] respect[ed]." *Id.*  Further this case does not involve the sort of constitutionally-based challenge to the military court's personal jurisdiction over the petitioner that might make abstention inappropriate. *See New*, 129 F.3d at 644 (*Councilman* abstention doctrine requires a federal court to await the final outcome of court-martial proceedings in the military justice system before entertaining an action by the subject of the court-martial absent "substantial arguments" denying the right of the military to try him at all). The alleged ethical issue arising out of OMC communications with Petitioners cannot be characterized as jurisdictional in any respect and thus abstention would apply in any event over Petitioners'

Moreover, the Supreme Court's recent decision in *Boumediene*, which concerned part of section 7 of the MCA, does not alter this conclusion. *Boumediene* has no application for the simple reason that it addresses only the sufficiency of the combination of CSRT proceedings and the review accorded under the Detainee Treatment Act. Section 3 of the MCA, however, sets forth wholly separate procedures for military commission proceedings, which afford greater substantive and procedural safeguards, that are then combined with more rigorous direct and judicial review provisions. Indeed, to the extent that *Boumediene* has any application to the alternate section 3 track, *Boumediene*'s reasoning strengthens the conclusion that those procedures are constitutional. *See*, *e.g.*, *Boumediene*, 128 S.Ct. at 2270-71.

Indeed, with respect to military prosecutions, the MCA provides the adequate, alternative remedy for considering the claims barred by section 950j(b) that was lacking in its provisions governing review of enemy combatant determinations. The primary difference between the two regimes is the presence of counsel—and much more robust adversary proceedings—in the military commission provisions that work to cure the defects identified by the Court in *Boumediene*. *Boumediene* recognized that Congress could limit access to the habeas writ, citing *Felker v. Turpin*, 518 U.S. 651, 662-64 (1996), in circumstances where a "trial has been held." 128 S. Ct. 2264; *id.* at 2267 ("habeas court's role" is "most extensive" in "cases of pretrial and noncriminal detention"). Like other provisions designed to channel and streamline prisoner claims, section 950j(b) does not "eliminate[] traditional habeas corpus relief." 128 S. Ct. at 2265. Instead, it limits – by precluding collateral attack – the claims it identifies that can be brought in the military commission forum itself. *See id.* at 2268 ("the necessary scope of habeas

clearly unripe claims.

review depends in part upon the rigor of earlier proceedings," an idea that "accords with our test for procedural adequacy in the due process context").

Military commission proceedings, in conjunction with review by an Article III court, comprise a sufficient habeas substitute for considering the covered claims. The touchstone for an adequate substitute is to provide "the prisoner . . . a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene*, 128 S. Ct. at 2266 (quoting *St. Cyr*, 533 U.S. at 302). The most "relevant consideration in determining the [habeas] courts' role is whether there are suitable alternative processes in place to protect against the arbitrary exercise of governmental power." *Id.* at 2275. "What matters is the sum total of procedural protections afforded to the detainee at all stages, direct and collateral." *Id.* at 2269. Here, Congress put such processes in place in authorizing the military commissions.

First, petitioner has the tools needed in the military commission proceedings "to rebut the factual basis for the Government's" charges. *Id.* at 2269. Unlike the process at issue in *Boumediene*, the defendant has "the assistance of counsel." *Id.*; *see* 10 U.S.C. § 949c(b) (accused "shall be represented by military counsel" and "may be represented by civilian counsel if retained by the accused"). Further, unlike the process at issue in *Boumediene*, the defendant in military commission proceedings is "aware of the most critical allegations" against him, *i.e.*, the criminal charges and the proof submitted to establish them. *Boumediene*, 128 S. Ct. at 2269; *see* 10 U.S.C. § 948q(b) ("the accused shall be informed of the charges against him"); *see also* 10 U.S.C. § 949d(f) (procedures for using classified information at trial). Moreover, unlike the procedures at issue in *Boumediene*, where there were "in effect no limits on the admission of hearsay," *Boumediene*, 128 S. Ct. at 2269, the defendant in military commission proceedings is

given an opportunity to challenge the use of hearsay evidence. *See* 10 U.S.C. § 949a(b)(2)(E)

(hearsay evidence may be admitted only after it is "ma[de] known to the adverse party,

sufficiently in advance to provide the adverse party with a fair opportunity to meet the evidence"

and will not be admitted if "the party opposing the admission of the evidence demonstrates that

the evidence is unreliable or lacking in probative value"). In sum, the proceedings are not

"'closed and accusatorial,'" *Boumediene*, 128 S. Ct. at 2270, but are open and adversary. *See* 10

U.S.C. § 949d(d) (proceedings may only be "close[d] to the public" in certain limited

circumstances). As the *Boumediene* Court recognized, military courts like the commissions

"ha[ve] an adversarial structure that [was] lacking" in the CSRT process. 128 S. Ct. at 2271.

Second, the review procedures confer upon an Article III court "some authority to assess

the sufficiency of the Government's evidence against the detainee." *Boumediene*, 128 S. Ct. at

2270. Specifically, in conducting its legal review, the court of appeals can evaluate the legal

sufficiency of the evidence – it is authorized to consider whether the commission's "final

decision was consistent with the standards and procedures" for military commissions (10 U.S.C.

§ 950g(c)(1)), including the standard that the "accused . . . be presumed to be innocent until his

guilt is established by legal and competent evidence beyond a reasonable doubt." 10 U.S.C. §

949*l*(c)(1).[6] In providing for review by an Article III court, Congress provided protection to the

accused that goes above and beyond the procedures in the UCMJ, which do not provide for such

review as of right. *See* 10 U.S.C. §§ 867-867a. This direct appellate review in a "court of

---

[6] The D.C. Circuit may also be authorized to review factual sufficiency pursuant to the
Detainee Treatment Act, as amended by the MCA. *See* DTA § 1005(e)(3)(D) (scope of review).
While the MCA limits review by the D.C. Circuit to "matters of law," the DTA contains no
similar limitation. *Cf. Boumediene*, 128 S. Ct. at 2272 ("[a]ssuming" that similar review
language in DTA with respect to enemy combatant determinations "can be construed to allow the
Court of Appeals to review or correct the CSRT's factual determinations").

record," *i.e.*, and Article III court of general jurisdiction, is a critical factor in determining

whether Congress has provided an adequate habeas substitute.  *See Boumediene*, 128 S. Ct. at

2268 (placing importance on whether "relief is sought from a sentence that resulted from the

judgment of a court of record").

Third, the court of appeals has ample authority to order the defendant released from

criminal custody.  The court of appeals is charged with "determin[ing] the validity of a final

judgment rendered by a military commission."  10 U.S.C. § 950g.  Because it is that judgment of

conviction (10 U.S.C. § 949m(a)) which forms the basis of criminal detention, there is no doubt

that the court of appeals has the authority to terminate criminal detention.  Likewise, if the court

of appeals were to determine that the commission lacked jurisdiction, it would necessarily vacate

the judgment of conviction which would also work to terminate criminal detention.

## II.    Notwithstanding *Boumediene*, Section 7 Of The MCA Deprives This Court Of Jurisdiction To Consider Any Challenge Other Than To The Core Habeas Inquiry Over The Lawfulness of Detention.

Through section 7 of the MCA, Congress expressly withdrew from this Court's

jurisdiction two independent and enumerated types of actions that individuals detained by the

United States as enemy combatants could bring.  Specifically, Congress carved out of this

Court's jurisdiction claims concerning statutory habeas corpus generally:

> No court, justice, or judge shall have jurisdiction to hear or consider an
> application for a writ of habeas corpus filed by or on behalf of an alien detained
> by the United States who has been determined by the United States to have been
> properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1).  Congress separately withdrew federal court jurisdiction concerning any

other aspects of the detention outside of the core habeas function, such that:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other
> action against the United States or its agents relating to *any aspect of the*

> *detention, transfer, treatment, trial, or conditions of confinement of an alien* who
> is or was detained by the United States and has been determined by the United
> States to have been properly detained as an enemy combatant . . . .

28 U.S.C. § 2241(e)(2) (emphasis added).  Under the recent decision in *Boumediene*, it is clear that the Supreme Court did not invalidate the MCA except to the extent that it precluded courts from exercising core habeas functions, *i.e.*, challenging the legality of the detention itself. Petitioners' claims here indisputably fall outside the *Boumediene* holding because they do not concern the core habeas function.  They do not challenge the legality of petitioners' detention, but rather an issue ancillary to that detention—communications with OMC personnel. Jurisdiction is therefore lacking and the motion must be denied.

> **A.    *Boumediene* Did Not Invalidate The MCA Except To The Extent That It Precluded Courts From Exercising Core Habeas Functions.**

In *Boumediene*, the Supreme Court held that Guantanamo Bay detainees have a constitutional right to seek habeas corpus protected by the Suspension Clause, and that, as applied to detainees who are being held on the basis of an enemy combatant determinations by a CSRT and whose habeas challenge goes to the legality of their detention, section 7 operates as an unconstitutional suspension of the writ.  This holding is limited in two important respects.

First, *Boumediene* holds that the first part of Section 7 of the MCA, 28 U.S.C. § 2241(e)(1), is unconstitutional in some circumstances, but only insofar as it denies habeas review to detainees who have available to them only the CSRT process and their who raise a core habeas challenge, *i.e.*, to challenge the legality of their *detention*.  *See Boumediene*, 128 S.Ct. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power *to detain*.") (emphasis added).  Put another way, to the extent a petitioner seeks habeas relief concerning collateral or ancillary issues not

directly connected to the legality of detention, *Boumediene*'s holding does not invalidate the jurisdiction limiting provision of § 2241(e)(1). The result in *Boumediene* thus can be read not as a facial invalidation of § 2241(e)(1), but an invalidation of § 2241(e)(1) only as applied to the particular factual situation presented, as it was never established that "no set of circumstances exists under which [section 7] would be valid." *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Indeed, it is indisputable that the challenge presented by the *Boumediene* petitioners was not the right to raise a habeas challenge to some ancillary issue, such as the Petitioners here seek to do, but rather to challenge to the legality to the fact of their detention at all. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 328-29 (2006) ("[T]he 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'").

Indeed, with regard to how much of § 2241(e)(1) remains operative following *Boumediene*, a reviewing court has an obligation to preserve as much of a statute as is legally permissible. Thus, "a court should refrain from invalidating more of the statute than is necessary," and "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of [the] court to so declare, and to maintain the act in so far as it is valid." *Wyoming v. Oklahoma*, 502 U.S. 437, 460 (1992) (quoting *Regan v. Time*, 468 U.S. 641, 652 (1984) (plurality opinion).[7] Thus, because Acts of Congress are valid to the extent they operate constitutionally, the Court's holding must be applied with an eye to

---

[7] Additionally, *Boumediene*'s reasoning does not necessarily require the conclusion that Section 7 is invalid with respect to those charged by a military commission, who have much broader, and fully adequate, administrative proceedings available to them under the Military Commissions Act. *See supra* Part I (arguing that military commission procedures are sufficient to constitute an adequate substitute for habeas as to claims covered by Section 950j(b) and raised by petitioner in his motion).

14

"limit[ing] the solution to the problem." *Ayotte*, 546 U.S. at 328-39.  At bottom, because the problem alleged in *Boumediene* as to § 2241(e)(1) concerned only a core habeas challenge to the legality of detention made by a petitioner with access only to the CSRT process, and not to an ancillary issue not dealing with the legality of detention and related to a possible future military commission proceeding that is separate from the habeas proceeding, § 2241(e)(1) remains operative here and removes jurisdiction with regard to the instant challenge.

Second, *Boumediene*'s holding does not invalidate the second part of section 7.  Indeed, the Court expressly noted that it was not deciding whether Guantanamo detainees have a constitutional right to bring non-core habeas type claims, such as conditions of confinement claims—one type of claim barred by § 2241(e)(2).  *See Boumediene*, 128 S.Ct. at 2274 ("[W]e need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement.").  But even after *Boumediene*, Congress' withdrawal of federal court jurisdiction over "any other action . . . relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement" remains operative to deprive this Court of jurisdiction over petitioners' claims, which are ancillary to the core habeas issue.

The Supreme Court's rationale for invalidating § 2241(e)(1), as applied, has no application to § 2241(e)(2).  The *Boumediene* majority discusses the detainees' constitutional right to bring only core *habeas* actions—challenging the lawfulness of detention—as opposed to the broader class of "any other action . . . relating to any aspect of the detention."  *See, e.g., id.* at 2262 ("Petitioners, therefore, are entitled to the privilege of habeas corpus *to challenge the legality of their detention*.") (emphasis added).  Unlike § 2241(e)(1) however, § 2241(e)(2) does not impair the Guantanamo detainees' ability to pursue a writ of habeas corpus.  Rather, it expressly limits *other* types of actions that Guantanamo detainees might bring.  Indeed, the Court

explicitly distinguished between habeas actions governed by § 2241(e)(1), and *other*, *non-habeas* actions governed by § 2241(e)(2), by recognizing that "[t]he structure of the two paragraphs [i.e. (e)(1) and (e)(2)] implies that habeas actions are a type of action 'relating to an aspect of the detention, transfer, treatment, trial, or conditions of confinement'" *See id.* at 2243. Because § 2241(e)(2) addresses "other action[s]" and not any constitutional habeas right the detainees may hold, the Suspension Clause provides no basis for invalidating it.

Additional evidence that *Boumediene* did not reach § 2241(e)(2) comes from the Court's discussion of what is constitutionally required in habeas proceedings. That discussion does not suggest that Guantanamo detainees have a right to challenge "other action[s]" related to "aspects" of their detention. Instead, the Court's discussion is phrased in terms limiting a detainee's habeas action narrowly to a challenge of his status or custody. *See*, *e.g.*, *Boumediene*, 128 S.Ct. at 2266 ("We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law."); *id.* at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain."); *id.* at 2273 (detainee must have opportunity to present "reasonably available evidence demonstrating there is no basis for his continued detention"). None of the language suggests that a petitioner's *constitutional* habeas rights include a right to challenge any other aspect related to their detention beyond its legality. Thus, the Court's holding that the Suspension Clause requires invalidation of section 7 of the MCA as applied to aliens detained at Guantanamo should be read to apply only to the first part of section

7, *i.e.,* § 2241(e)(1), and only as discussed above, *see supra* pp. 13-14.[8]

A contrary conclusion would require this Court to conclude that while the Supreme Court *expressly* held that § 2241(e)(1) is unconstitutional as applied to Guantanamo detainees, who have only had the benefit of CSRT procedures, it determined *sub silentio* the constitutionality of 28 U.S.C. § 2241(e)(2). But if the Court had intended to pass on § 2241(e)(2)'s constitutionality, the only rationale that might have supported that conclusion would have been if the Court had determined that conditions of confinement claims are encompassed in the detainees' constitutional right to habeas, so that elimination of jurisdiction over those claims jeopardized their constitutional habeas right. But, as noted above, the Court expressly stated that it was *not* deciding that issue.[9]  *See Boumediene*, 128 S.Ct. at 2274.

While the continuing vitality of § 2242(e)(2) is therefore clear, if any doubt remained as noted above, the Court must consider its duty to preserve as much of a statute as is constitutional.

---

[8]  Although the Court's opinion refers generally to section 7, without identifying a particular subsection of 28 U.S.C. § 2241(e), *see, e.g.*, *Boumediene*, 128 S.Ct. at 2274 ("MCA § 7 thus effects an unconstitutional suspension of the writ."); *id.* at 2274 ("The only law we identify as unconstitutional is MCA §7, 28 U.S.C.A. § 2241(e) (Supp. 2007)"), that is an insufficient basis for construing the Court's opinion to invalidate *all* of section 7. This is particularly so because the Court's rationale for invalidating § 2241(e)(1) has no application to § 2241(e)(2). In fact, at one point in its opinion, the Court seems to acknowledge that its reference generally to section 7 is simply short-hand for referring to § 2241(e)(1). *See id.* at 2265 (stating that § 7 is the source of the relevant "jurisdiction-stripping language," but citing specifically to subsection § 2241(e)(1)).

[9]  Moreover, the fact that the constitutionality of § 2241(e)(2) was never challenged in *Boumediene* further supports the argument that the Court's holding does not invalidate that provision. *See Belbacha* v. *Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008) ("In [the court of appeals' decision in] *Boumediene* we held that § 7(a)(1) [28 U.S.C. § 2241(e)(1)] of the MCA does not violate the Suspension Clause of the Constitution"). It would be odd to interpret the Court's decision in *Boumediene* as not only having reached the constitutionality of § 2241(e)(2), *sua sponte* and for the first time on appeal, but also to have determined that the provision is unconstitutional, without any explanation as to why.

*See Tilton* v. *Richardson*, 403 U.S. 672, 684 (1971) ("'The unconstitutionality of a part of an act

does not necessarily defeat . . . the validity of its remaining provisions.  Unless it is evident that

the Legislature would not have enacted those provisions which are within its power . . . the

invalid part may be dropped if what is left is fully operative as a law.'")).  Indeed, because §

2241(e)(2) is severable, there is no obstacle to continuing to apply that provision, despite

*Boumediene*'s holding that § 2241(e)(1) cannot validly withdraw the privilege of the writ of

habeas corpus as applied to detainees at Guantanamo who have only the benefit of CSRT

procedures.  *See Ayotte*, 546 U.S. at 330 ("After finding an application or portion of a statute

unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute

to no statute at all?").[10]  Section 2241(e)(2) is thus severable and should remain in force.  *Alaska*

*Airlines, Inc.* v. *Brock*, 480 U.S. 678, 685 (1987) ("[T]he unconstitutional provision must be

severed unless the statute created in its absence is legislation that Congress would not have

enacted"); *News America Pub., Inc.* v. *F.C.C.*, 844 F.2d 800, 802 (D.C. Cir. 1988) (presumption

is in favor of severability).

---

[10]  The text and history of section 7 of the MCA demonstrate that Congress surely
intended § 2241(e)(2) to survive, even if the elimination of habeas jurisdiction in § 2241(e)(1)
could not.  In enacting the MCA, Congress sought to eliminate jurisdiction over ancillary issues,
precisely to prevent the Executive Branch from having to divert significant resources during the
duration of an armed conflict to respond to those claims.  *See, e.g.*, 152 Cong Rec. S10403 (daily
ed. Sept. 28, 2006) (Sen. Cornyn) ("[O]nce . . . section 7 is effective, Congress will finally
accomplish what it sought to do through the [DTA] last year.  It will finally get the lawyers out of
Guantanamo Bay.  It will substitute the blizzard of litigation instigated by *Rasul v. Bush* with a
narrow DC Circuit-only review of the [CSRT] hearings."); 152 *id.* at S10367 (Sen. Graham)
(citing one petitioner's motion for preliminary injunction regarding conditions of confinement as
an examples of a claim that should be barred); *see also* 151 *id.* at 12656–57 (daily ed. Nov. 10,
2005) (Sen. Graham) (noting that DTA was intended to limit detainees' right to "challenge their
status"); 151 *id.* at S12659-60 (Sen. Kyl) (stating that DTA would grant detainees "substantial
rights to contest their status but not the right to clog up Federal courts" with medical malpractice
claims and complaints about food).

**B.** **The Right to Seek a Writ of Habeas Corpus Recognized in *Boumediene* Does Not Encompass a Right to Challenge Ancillary Issues, Such as Petitioners' Challenge to the OMC Communications at Issue.**

Section 2241(e)(1) still validly removes jurisdiction of issues ancillary to and beyond the core habeas function of challenging legality of detention and section 2241(e)(2) remains fully operative. Consequently, there is no federal court jurisdiction over "any other action" concerning "any aspect" of Petitioners' detention, treatment or confinement, including this action concerning who in the OMC may or may not communicate with Petitioners or over the subject of any such communications, except insofar as such actions may be constitutionally protected under *Boumediene*'s interpretation of the Suspension Clause. Therefore, under § 2241(e)(1) as applied to this claim and under § 2241(e)(2), Petitioners cannot state cognizable habeas claims, such as a challenge to communications with OMC personnel, unless their constitutional right to habeas corpus encompasses those claims.

The elimination of jurisdiction over such ancillary claims, however, could not constitute a Suspension Clause violation because they do not go to the core of habeas—legality of detention—challenge addressed by the Supreme Court in *Boumediene*. A habeas action has historically been understood as a vehicle for challenging one thing only—the fact of detention or its duration. Nothing else. That is, the Great Writ concerns only relief that, if granted, will result in the petitioner's *release* from confinement, not with other ancillary issues. Petitioners' claims here, which concern communications between OMC personnel and Petitioners, are far from the heart of habeas—a remedy for unlawful detention—and do not seek release from confinement. Jurisdiction is therefore lacking to consider them.

The Supreme Court has been unwilling to water down the constitutional writ from its core purpose to cover ancillary issues in the way Petitioners seek such as, for example,

19

conditions of confinement. *See Bell* v. *Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to

another day the question of the propriety of using a writ of habeas corpus to obtain review of the

conditions of confinement, as distinct from the fact or length of the confinement itself."); *see*

*also Wilkinson v. Dotson*, 125 S. Ct. 1242, 1250 (2005) (Scalia, J., concurring) (condition-of-

confinement claims in habeas would "utterly sever the writ from its common-law roots"); *Brown*

*v. Plaut*, 131 F.3d 163, 168-69 (D.C. Cir. 1997) (indicating that requiring the use of habeas

corpus for conditions claims would extend the writ beyond its core). Indeed, the courts of

appeals have expressly held that such ancillary claims that do not seek accelerated release from

custody are not within the scope of the writ. *See, e.g.*, *Pischke* v. *Litscher*, 178 F.3d 497, 499

(7th Cir. 1999) (stating that habeas action is proper "only if the prisoner is seeking to 'get out' of

custody in a meaningful sense") *Doe* v. *Pennsylvania Bd. of Probation & Parole*, 513 F.3d 95,

100 n.3 (3d Cir. 2008) (noting that habeas is limited to "[a]ttacks on the fact or duration of the

confinement"); *Hutcherson* v. *Riley*, 468 F.3d 750, 754 (11th Cir. 2006) (same). Similarly, in

*Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953), the D.C. Circuit recognized that a habeas

action "is not the correct remedy" for challenging "discipline or treatment," *id.* at 419-20.

Thus, even before the MCA, a detainee could not have challenged ancillary issues, such

as Petitioners' claims here concerning communications, under statutory habeas jurisdiction. And

if statutory habeas jurisdiction prior to the MCA did not encompass such challenges, *a fortiori*

the writ as it existed at common-law in 1789 would not have permitted such claims. *See Rasul*,

542 U.S. at 474 ("habeas statute clearly has expanded habeas corpus 'beyond the limits that

obtained during the 17th and 18th centuries'"). Although the Supreme Court in *Boumediene*

noted that the Court has not "foreclose[d] the possibility that the protections of the Suspension

Clause have expanded along with post-1789 developments," *Boumediene*, Slip Op. at 15, there is

20

nothing in the Court's opinion to suggest that the detainees' constitutional habeas rights extend beyond the common-law writ as it existed in 1789, or require them to be able to challenge their conditions of confinement.  Indeed, the Supreme Court expressly declined to address whether the constitutional writ of habeas corpus encompasses claims regarding unlawful conditions of confinement.  *See id.* at 64.  Thus, the Suspension Clause should be read, at most, to protect the common-law writ as it existed in 1789.  In any event, however, even if the writ protected by the Suspension Clause has expanded along with the habeas statute, the habeas statute has not been interpreted to allow challenges to ancillary issues, as explained above.[11]  Accordingly, the MCA's elimination of jurisdiction over ancillary claims or claims collateral to the core habeas function challenging lawfulness of detention brought by Guantanamo detainees does not implicate the Suspension Clause.

The Court's decision in *Munaf v. Geren*, No. 06-1666 (Jun. 12, 2008)—decided the same day as *Boumediene*—further supports this understanding of the writ's scope.  In *Munaf*, the Court emphasized that "[h]abeas is at its core a remedy for unlawful detention. . . . They typical remedy is, of course, release."  *Munaf*, Slip Op. at 16 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion)); *see also Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973), *cited in Munaf*, Slip Op. at 16 ("[T]he traditional function of the writ is to secure release from illegal custody.").  Accordingly, the Court refused to extend the relief that a habeas court could grant to the *Munaf* petitioners' collateral challenge to their transfer to Iraqi custody.  *Munaf*, Slip Op. at

---

[11] And even if the habeas statute were to permit ancillary claims, the Guantanamo detainees have no rights under the habeas statute.  *See* MCA, § 7, 28 U.S.C. § 2241(e)(1); *Boumediene*, Slip Op. at 1 (Souter, J., concurring) ("Subsequent legislation eliminated the statutory habeas jurisdiction over these claims, so that now there must be constitutionally based jurisdiction or none at all.").  There is absolutely no authority for the proposition that *constitutional* habeas corpus encompasses challenges to the conditions of confinement.

28 ("Habeas corpus does not require the United States to shelter such fugitives from the criminal justice system of the sovereign with authority to prosecute them.").  As with the collateral claims at issue in *Munaf*, the Petitioners' pleas for relief here concern ancillary issues related to whether particular communications with OMC personnel are permissible and thus clearly fall well outside the core of a habeas corpus proceeding, and request a form of relief that may not be granted in habeas.  Jurisdiction is therefore lacking and the motion should be denied.

## III.    Petitioners' Motion For An Injunction To Halt Communications With OMC Personnel Is Beyond The Scope Of The Initiating Pleading.

Even beyond the jurisdiction limiting provisions at issue, an additional response to the demanded injunctive relief is that it is plainly beyond the scope of the initiating pleading in this case.  The law is clear that preliminary injunction motions must seek relief consistent with and of the same character as the allegations in the initiating pleading, such as a Complaint or in this case the Petition, before the Court.  *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (a "preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally").  "The purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed through the illegality alleged in the complaint." *Omega World Travel v. TWA*, 111 F.3d 14, 16 (4th Cir. 1997).  In *Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir.1997), for example, the Eleventh Circuit denied a preliminary injunction to protect plaintiff's First Amendment rights in a fraud case after concluding that the injunction "deals with a matter lying wholly outside the issues in the suit" and the requested preliminary relief "not of the same character that could be granted finally."  *See also Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (denying a preliminary injunction

because the "new assertions of mistreatment that are entirely different from the claim raised and

the relief requested in his inadequate medical treatment lawsuit.").  Recently, for example,

plaintiffs challenging a terrorist designation imposed by the Department of the Treasury asked

the U.S. District Court for the District of Oregon to enjoin alleged surveillance of plaintiffs and

counsel that, if it existed, plaintiffs asserted would violate both attorney-client privilege and

ethics rules.  *See Al-Haramain Islamic Found. Inc. v. United States Dep't of Treasury*, 2008 WL

2381640, (D. Or. June 5, 2008).  The *Al-Haramain* Court rejected the requested injunction, in

part, because plaintiffs there sought an "injunction on matters 'lying wholly outside the issues in

the suit.'"  *Id.* at * 6.

The same is true here.  The operative petition in this action does not seek injunctive relief

as to communications with OMC personnel or, indeed, any other aspect of the military

commission process.  Rather, Petitioners' in this case seek a range of relief directed not at

petitioners' release from custody, but only that Petitioners be permitted to meet with their

families, informed of the charges, if any, against them, have access to the courts or some other

impartial tribunal, and meet with counsel with regard to the *habeas* case.  *See* Amended

Complaint at ¶ 40.[12]  That is to say that because the gravamen of the petition seeks final relief

only against purported habeas proceedings and nothing with regard to the potential future

military commission proceedings, which are separate and independent, the Court may only issue

preliminary relief to the extent the equitable character of that relief is consistent with the final

relief in the context of the habeas case.  Accordingly, because the requested preliminary

---

[12] Indeed, it is noteworthy that because of the extant jurisdictional limitations of the MCA, petitioners could not properly add allegations concerning the allegedly inappropriate contacts regarding the military commissions where the results of military commission proceedings would not be reviewed in this Court.

injunctive relief is wholly outside the ambit of the requested final relief, and indeed directly relates to military commission proceedings that have not formally commenced and may never commence that are separate and independent from the instant habeas proceedings, the Court cannot issue the preliminary injunction because it is "not of the same character that could be granted finally." *See Kaimowitz*, 122 F.3d at 43; *see Reebok Intern. v. Marnatech Enterprises*, 970 F.2d 552, 560-61 (9th Cir. 1992) (noting that courts may issue preliminary injunctions where they are "a provisional remedy of the same equitable character as the final relief").

<u>CONCLUSION</u>

For the reasons stated above, respondents respectfully request that the Petitioners' motion for preliminary injunction be denied for lack of jurisdiction. If the Court concludes that jurisdiction exists, it should provide Respondents additional time from the date of its resolution of the jurisdictional issue to provide briefing on the merits of Petitioners' motion.

Dated:  July 8, 2008                     Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General

JOSEPH H. HUNT (D.C. Bar No. 431134)
Director

VINCENT M. GARVEY (D.C. Bar No. 127191)
Deputy Director

 */s/ Alexander K. Haas*                     
JUDRY SUBAR
TERRY M. HENRY
Senior Trial Counsel
ANDREW I. WARDEN
PAUL E. AHERN
ALEXANDER K. HAAS

24

Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, DC  20530
Tel:  (202) 514-4107—Fax:  (202) 616-8470

*Attorneys for Respondents*



# UNITED STATES COURT
# OF
# MILITARY COMMISSION REVIEW

| | |
|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, ) | |
| ) | |
| FAYIZ MOHAMMED AHMED AL KANDARI, ) | |
| ) | |
| KHALID ABDULLAH MISHAL AL MUTAIRI, ) | |
| ) | DOCKETING ORDER |
| and ) | |
| ) | CMCR Case No. 08-001 |
| FOUAD MAHMOUD AL RABIAH ) | |
| ) | 14 March 2008 |
| Petitioners ) | |
| ) | |
| v. ) | |
| ) | |
| LAWRENCE MORRIS, Colonel, USA ) | |
| Chief Prosecutor of ) | |
| Military Commissions ) | |
| ) | |
| Respondent ) | |

By order of the Chief Judge, the Motion for Leave to File Emergency Petition for Writ of Mandamus and for Other Appropriate Relief and Motion for Leave to Attach Declaration of Matthew J. MacLean, the Declaration of Matthew J. MacLean, and the Emergency Petition for Writ of Mandamus and for Other Appropriate Relief in the above-captioned case are assigned to Panel Two, composed of Chief Judge Williams, Judge Walburn, and Judge Geiser.

FOR THE COURT:

LEROY F. FOREMAN
Clerk of Court

| | |
|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, ) ) | IN THE COURT OF MILITARY COMMISSION REVIEW |
| ) | |
| FAYIZ MOHAMMED AHMED AL KANDARI, ) ) | MOTION FOR LEAVE TO FILE EMERGENCY PETITION FOR |
| KHALID ABDULLAH MISHAL AL MUTAIRI, ) ) | WRIT OF MANDAMUS AND FOR OTHER APPROPRIATE RELIEF |
| and ) ) | AND MOTION FOR LEAVE TO ATTACH DECLARATION OF |
| FOUAD MAHMOUD AL RABIAH, ) | MATTHEW J. MACLEAN |
| ) | |
| Petitioners, ) ) | Case No. 08-001 |
| v. ) | |
| ) | |
| LAWRENCE MORRIS, Colonel, U.S. Army, ) Chief Prosecutor of Military Commissions, ) | |
| ) | |
| Respondent. ) ) | |

## TO THE HONORABLE, THE JUDGES OF THE
## COURT OF MILITARY COMMISSION REVIEW

Petitioners Fawzi Khalid Abdullah Fahad Al Odah, Fayiz Mohammed Ahmed Al

Kandari, Khalid Abdullah Mishal Al Mutairi, and Fouad Mahmoud Al Rabiah, by counsel,

hereby move this honorable Court for leave to file their Emergency Petition for Writ of

Mandamus and for Other Appropriate Relief, submitted herewith, for the reasons stated therein.

Petitioners further move for leave to attach the Declaration of Matthew J. MacLean and

its exhibits, submitted herewith, which provides the factual basis for the Petition.

March *13*, 2008                                         Respectfully submitted,

                                                         David J. Cynamon
                                                           david.cynamon@pillsburylaw.com
                                                         Matthew J. MacLean
                                                           matthew.maclean@pillsburylaw.com
                                                         Osman Handoo
                                                           osman.handoo@pillsburylaw.com
                                                         PILLSBURY WINTHROP
                                                           SHAW PITTMAN LLP
                                                         2300 N Street, NW
                                                         Washington, DC 20037
                                                         Telephone: 202-663-8000
                                                         Facsimile: 202-663-8007

                                                         Counsel for Petitioners

PANEL No. _____

MOTION FOR LEAVE TO FILE EMERGENCY PETITION FOR
WRIT OF MANDAMUS AND FOR OTHER APPROPRIATE RELIEF

            GRANTED (signature) _____

            DENIED (signature) _____

MOTION FOR LEAVE TO ATTACH DECLARATION OF MATTHEW J. MACLEAN

            GRANTED (signature) _____

            DENIED (signature) _____

## Certificate of Service

I certify that a copy of the foregoing was mailed to Respondent Lawrence Morris, Chief

Prosecutor of Military Commissions, on March 12, 2008.

Matthew J. MacLean
Counsel for Petitioners

| | | |
|---|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, | ) ) | IN THE COURT OF MILITARY COMMISSION REVIEW |
| | ) | |
| FAYIZ MOHAMMED AHMED AL KANDARI, | ) ) | DECLARATION OF MATTHEW J. MACLEAN |
| KHALID ABDULLAH MISHAL AL MUTAIRI, | ) ) | |
| and | ) ) | Case No. $\bigcirc \nmid - \bigcirc \bigcirc \backslash$ |
| FOUAD MAHMOUD AL RABIAH, | ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | |
| LAWRENCE MORRIS, Colonel, U.S. Army, Chief Prosecutor of Military Commissions, | ) ) ) | |
| Respondent. | ) ) | |

### TO THE HONORABLE, THE JUDGES OF THE COURT OF MILITARY COMMISSION REVIEW

I, Matthew J. MacLean, hereby declare as follows:

1.       I am a litigation partner at the firm of Pillsbury Winthrop Shaw Pittman LLP. Along

with David J. Cynamon, another partner at Pillsbury Winthrop Shaw Pittman LLP, I represent

Fawzi Khalid Abdullah Fahad Al Odah, Fayiz Mohammed Ahmed Al Kandari, Khalid Abdullah

Mishal Al Mutairi, and Fouad Mahmoud Al Rabiah (collectively, "Petitioners") and their next

friends. Mr. Cynamon and I maintain our principal offices in the District of Columbia. We are

both members of the bar of the District of Columbia and other federal and state courts. Neither

of us has been the subject of any disqualifying action by any court. We both have security

clearances at the Secret level, and we have both signed the agreement prescribed by the Secretary

of Defense pursuant to 10 U.S.C. § 949c(b)(e)(E).

1

2.      The Petitioners are four Kuwaiti nationals who have been detained by the U.S. military in Guantanamo for approximately the past six years. On May 1, 2002, the Petitioners, through their next friends, filed a complaint in the U.S. District Court for the District of Columbia in *Al Odah, et al. v. United States*, 02-cv-0828 (D.D.C.) seeking a writ of habeas corpus and other relief. Although the District Court initially dismissed their petitions for lack of jurisdiction, the U.S. Supreme Court reversed in *Rasul v. Bush*, 542 U.S. 466 (2004), to which the Petitioners were parties.

3.      The Petitioners' case was remanded to the District Court, and the government filed factual returns setting forth allegations in support of the government's contention that the Petitioners are enemy combatants. The factual returns consist of the Petitioners' partial records of Combatant Status Review Tribunal ("CSRT") proceedings, including unclassified and classified summaries of the government's allegations against the Petitioners. True and correct copies of each Petitioner's Unclassified Summary of Basis for Tribunal Decision and each Petitioner's Summary of Evidence for CSRT are attached hereto as Exhibits 2 through 5. The classified summaries are not attached.

4.      Mr. Cynamon and I were engaged to represent Petitioners in the summer of 2006 with respect to the government's allegations that they are unlawful enemy combatants, including the government's allegations that they have committed offenses under the laws of war. Mr. Cynamon and I have traveled to Guantanamo on multiple occasions to meet with the Petitioners, and have received authorization to represent the Petitioners from each of them or their next friends. In connection with our representation of the Petitioners, we each entered our appearances on the Petitioners' behalf in the U.S. District Court for the District of Columbia and

2

in the U.S. Court of Appeals for the D.C. Circuit, where the Petitioners' habeas corpus cases were pending at that time on an interlocutory appeal by the government.

5.      Subsequently, we have filed briefs on Petitioners' behalf in the United States Supreme Court, where their habeas corpus cases are now pending on a writ of certiorari (*Al Odah v. United States*, No. 06-1196, consolidated with *Boumediene v. Bush*, No. 06-1195). We have also filed petitions for review under the Detainee Treatment Act of 2005 in the D.C. Circuit on behalf of each of the Petitioners, challenging the CSRT determinations that they are properly detained as enemy combatants (*Al Odah v. Gates*, No. 07-1134 (D.C. Cir.); *Al Kandari v. Gates*, No. 07-1135 (D.C. Cir.); *Al Mutairi v. Gates*, No. 07-1136 (D.C. Cir.); *Al Rabiah v. Gates*, No. 07-1137 (D.C. Cir.)).

6.      The scope of my representation of the Petitioners, along with Mr. Cynamon, encompasses the government's allegations that the Petitioners are unlawful enemy combatants, including the government's allegations of crimes under the laws of war.

7.      On January 12, 2008, we were informed that the President of the United States publicly announced during a visit to Kuwait that the U.S. government is in the process of charging two of the four Petitioners under the Military Commissions Act. The President did not state which of the four Petitioners were being charged.

8.      Following the President's announcement, Mr. Cynamon and I consulted with the Petitioners' next friends in Kuwait. Mr. Cynamon and another attorney for the Petitioners traveled to Guantanamo to discuss the impending charges with the Petitioners. Neither the Petitioners nor their next friends expressed any doubt that the scope of our representation of the Petitioners extended to the government's war crime allegations, which are necessarily contained within the allegations that the Petitioners are enemy combatants.

9.      I contacted Colonel Lawrence Morris, the Chief Prosecutor for Military Commissions. In a telephone conversation with me on January 24, 2008, Colonel Morris confirmed that his office had placed two of the four Petitioners on "hold" for consideration of charges, but he stated that he did not know if he was authorized to tell me which two were on "hold." He told me that he would find out what more he was authorized to say, and would contact me in the following week. Colonel Morris also invited me to call again if he did not call back first.

10.     Colonel Morris did not call me the following week. Over the next two weeks, I left several telephone messages for him, but none was returned. Finally, on February 21, 2008, I sent Colonel Morris an e-mail requesting to speak to somebody in his office about the two Petitioners. A true and correct copy of the e-mail chain between me and Colonel Morris is attached hereto as Exhibit 1.

11.     Colonel Morris wrote back saying, "We remain in the prep stages of charging the two we discussed." When I requested to know what the Petitioners were being charged with, Colonel Morris replied, "war crimes / offenses delineated in Military Commissions Act of 06."

12.     I pointed out that the reply did not answer the question, and I reiterated my request to speak with somebody familiar with the cases. Colonel Morris replied with an e-mail denying that I was the Petitioners' counsel "for commissions purposes."

13.     I wrote back, repeating that I was counsel for the Petitioners, and reminding Colonel Morris that, "pursuant to AR 27-26, Rule 4.2 and other applicable rules of professional conduct, neither you nor any person acting under your direction or control may have any communication with the Kuwaiti detainees without my consent."

4

14.    Colonel Morris replied, "Not so. Government can certainly have communications with your client on commissions-related issues independent of your representation of them, which are strictly for habeas/DTA purposes."

15.    Effectuating our attorney-client relationship with the Petitioners has been difficult. The Petitioners have been detained in near-isolation for over six years. As a result of the remote location of the place of detention and the government's restrictive procedures for allowing attorney visits, it is difficult for Mr. Cynamon and me to see our clients without significant advance preparation and notice. There is no telephone contact, and mail is slow, unreliable and subject to review and censorship by government personnel.

16.    The Petitioners' access to their attorneys is governed by the Amended Protective Order in *Al Odah v. United States*, 02-cv-828 (D.D.C) (Amended Protective Order). Attached hereto as Exhibit 6 is a true and correct copy of Exhibit A of the Amended Protective Order, the Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay.

17.    Government agents have affirmatively attempted to undermine the Petitioners' relationships with their attorneys. The Petitioners' prior attorney, Thomas Wilner, filed a declaration in the U.S. District Court for the District of Columbia recounting several such instances ("Wilner Dec."). A true and correct copy of the Wilner Dec. is attached hereto as Exhibit 7. For example, an interrogator told Petitioner Al Kandari, "[D]on't trust your lawyers. ... [D]id you know your lawyers are Jews?" Wilner Dec. at ¶ 7. Another interrogator told Petitioner Al Rabiah, "How could you trust Jews? Throughout history, Jews have betrayed Muslims. Don't you think your lawyers, who are Jews, will betray you?" *Id.* at ¶ 11. On another occasion, Petitioner Al Rabiah's interrogator asked him, "What will other Arabs and Muslims think of you Kuwaitis when they know the only help you can get is from Jews?" *Id.* at

5

¶ 14. Petitioner Al Rabiah's interrogator also warned him that if he consented to be represented by an attorney, he would be kept in Guantanamo forever. *See id.* at ¶ 9.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 12, 2008.

Matthew J. MacLean

| | | |
|---|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, | ) ) | IN THE COURT OF MILITARY COMMISSION REVIEW |
| | ) | |
| FAYIZ MOHAMMED AHMED AL KANDARI, | ) ) | EMERGENCY PETITION FOR WRIT OF MANDAMUS AND FOR |
| KHALID ABDULLAH MISHAL AL MUTAIRI, | ) ) | OTHER APPROPRIATE RELIEF |
| and | ) ) | Case No. $\underline{O\,8 - O\,9\,1}$ |
| FOUAD MAHMOUD AL RABIAH, | ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | |
| LAWRENCE MORRIS, Colonel, U.S. Army, Chief Prosecutor of Military Commissions, | ) ) ) | |
| Respondent. | ) ) | |

## TO THE HONORABLE, THE JUDGES OF THE
## COURT OF MILITARY COMMISSION REVIEW

David J. Cynamon
Matthew J. MacLean
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
2300 N Street, NW
Washington, DC 20037
Telephone: 202-663-8000
Facsimile: 202-663-8007

Counsel for Petitioners

## Table of Contents

Table of Contents ...................................................... i

Table of Authorities .................................................... ii

Introduction ........................................................... 1

Issue Presented ........................................................ 1

Statement of Statutory Jurisdiction ..................................... 2

Statement of the Case .................................................. 3

Statement of Facts ..................................................... 4

Argument .............................................................. 7

I.      Standard of Review ............................................. 8

II.     The Chief Prosecutor Is Prohibited from Communicating
        with Represented Parties. ...................................... 8

III.    A Violation of the No-Contact Rule Will Cause Irreparable
        Harm to the Petitioners' Attorney-Client Relationship ......... 12

Conclusion ........................................................... 16

## Table of Authorities

### Statutes, Rules, and Regulations

10 U.S.C. § 948d .................................................... 3, 10, 11

10 U.S.C. § 949c ....................................................... 11

10 U.S.C. § 950f ........................................................ 2

10 U.S.C. § 950j ..................................................... 2, 3

28 U.S.C. § 1651 ....................................................... 2

Coast Guard Military Justice Manual,
COMDTINST M5810.1D Art. 6.C.1 (Aug. 17, 2000) ........................... 8

Manual for Military Commissions, Part IV ..................................... 12

Rule 1.2, District of Columbia Rules of Professional Conduct ..................... 12

Rule 4.2, Air Force Rules of Professional Conduct (2005) ........................ 8

Rule 4.2, Army Rules of Professional Conduct for Lawyers, AR 27-26 (1992) ..... *passim*

Rule 4.2, Rules of Professional Conduct,
U.S. Navy, JAG Inst. 5803.1B (Feb. 11, 2000) ................................. 8

Rule 9, Court of Military Commission Review Rules of Practice .............. 1, 3, 8

Rule 501, Rules for Military Commissions 501 ................................. 11

### Case Law

*13th Regional Corp. v. U.S. Dep't of Interior*, 654 F.2d 758 (D.C. Cir. 1980) .......... 8

*ABC, Inc. v. Powell*, 47 M.J. 363 (1997) ...................................... 2

*Am. Home Assur. Co. v. Unauthorized Practice of Law Comm.*,
121 S.W.3d 831 (Tex. Ct. App. 2003) ......................................... 11

*Clinton v. Goldsmith*, 526 U.S. 529 (1999) .................................... 2

*Cohen v. Hurley*, 366 U.S. 117 (1961) ........................................ 3

*F.T.C. v. Dean Foods Co.*, 384 U.S. 597 (1966) ................................ 2

ii

*Haneke v. Secretary of HEW*, 535 F.2d 1291 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . 8

*Harris v. Talao*, 222 F.3d 1133 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Criminal Investigation of John Doe, Inc.*, 194 F.R.D. 375 (D. Mass. 2000) . . . . . . . 3

*In re Pyle*, 91 P.3d 1222 (Kan. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kessenich v. Commodity Futures Trading Com.*, 684 F.2d 88 (D.C. Cir. 1982) . . . . . . . . 3

*Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693 (8th Cir. 2003) . . . . . . . . . 11

*Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.*,
144 F. Supp. 2d 1147 (D.S.D. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Minnesota v. Miller*, 600 N.W.2d 457 (Minn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Mustang Enters. v. Plug-In Storage Sys.*, 874 F. Supp. 881 (N.D. Ill. 1995) . . . . . . . . . . 11

*Noyd v. Bond*, 395 U.S. 683 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pleasant Mgmt., LLC v. Carrasco*, 870 A.2d 443 (R.I. 2005) . . . . . . . . . . . . . . . . . . . . . . 11

*Rasul v. Bush*, 542 U.S. 466 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Telecommunications Research an Action Center v. F.C.C.*,
750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Unger v. Ziemniak*, 27 M.J. 349 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States ex rel. McLennan v. Wilbur*, 283 U.S. 414 (1931) . . . . . . . . . . . . . . . . . . . 8

*United States v. Balter*, 91 F.3d 427 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Bowman*, 277 F. Supp. 2d 1239 (N.D. Ala. 2003) . . . . . . . . . . . . . . . 11, 12

*United States v. Durham*, 475 F.2d 208 (7th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Evans*, 39 M.J. 613 (A.C.M.R. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Hammad*, 858 F.2d 834 (2nd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States v. Khadr*, CMCR 07-001 (Sept. 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . 3, 10

*United States v. Killain*, 639 F.2d 206 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. King*, No. 00-8007/NA, 2000 CAAF LEXIS 321 (Mar. 16, 2000) . . . . . .  2

*United States v. Lemonakis*, 485 F.2d 941 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . .  10

*United States v. Massiah*, 307 F.2d 62 (2nd Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*United States v. Meek*, 44 M.J. 1 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*United States v. Thomas*, 474 F.2d 110 (10th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Wheat v. United States*, 486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

## Other Sources

American Bar Association ("ABA"), Standing Committee on Ethics and
Professional Responsibility, Formal Op. 95-396 (1995) . . . . . . . . . . . . . . . . . . . . . . . .  9-12

Raymond Bonner, "Terror Case Prosecutor Assails Defense Lawyer",
New York Times, Mar. 5, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Morris Davis, "AWOL Military Justice", L.A. Times, Dec. 10, 2007 . . . . . . . . . . . . . .  15

Bruce Green, A Prosecutor's Communications with Defendants:
What Are the Limits?, 24 Crim. L. Bull. 283 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

David Luban, Lawfare and Legal Ethics in Guantanamo,
60 Stanford L. Rev. __ (Feb. 2008) (forthcoming) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Joseph Margulies, *Guantanamo and the Abuse of*
*Presidential Power* (Simon & Schuster 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Introduction

Petitioners Fawzi Khalid Abdullah Fahad Al Odah, Fayiz Mohammed Ahmed Al Kandari, Khalid Abdullah Mishal Al Mutairi, and Fouad Mahmoud Al Rabiah (collectively, "Petitioners"), by counsel, hereby petition this honorable Court for a writ of mandamus or other appropriate order prohibiting Respondent Colonel Lawrence Morris, Chief Prosecutor of Military Commissions, and his prosecution staff, or anyone else acting on his behalf, from having any communications with the Petitioners relating to military commission charges or the underlying allegations without the consent of the Petitioners' counsel. The Petitioners further move for such other relief as may be appropriate to effectuate the remedy sought herein. The Chief Prosecutor has asserted to counsel for the Petitioners that he and his staff are entitled to communicate directly with the Petitioners without their attorneys' consent. Such communications would violate Rule 4.2 of the Army Rules of Professional Conduct for Lawyers, AR 27-26, other applicable service regulations, state rules of professional conduct, and Rule 9 of this Court's Rules of Practice, and would cause irreparable injury to the Petitioners' relationship with their attorneys and to their rights before military commissions.

## Issue Presented

WHETHER A PROSECUTOR OF MILITARY COMMISSIONS
MAY COMMUNICATE DIRECTLY WITH A REPRESENTED
DETAINEE IN GUANTANAMO CONCERNING A MATTER
WITHIN THE SCOPE OF THE REPRESENTATION WITHOUT
THE CONSENT OF THE DETAINEE'S COUNSEL.

1

## Statement of Statutory Jurisdiction

This Court has appellate jurisdiction under 10 U.S.C. § 950f over cases under the Military Commissions Act of 2006 ("MCA").[1] Under the All Writs Act, 28 U.S.C. § 1651, this Court has authority to issue all writs necessary or appropriate in aid of its jurisdiction, including a writ of mandamus.

The authority of an appellate court under the All Writs Act is not confined to issuance of writs in aid of jurisdiction already acquired by appeal, but extends to those cases that are within its appellate jurisdiction although no appeal has been perfected. *F.T.C. v. Dean Foods Co.*, 384 U.S. 597 (1966); *Telecommunications Research an Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984). *See also Noyd v. Bond*, 395 U.S. 683, 695 n. 7 (1969) (Court of Military Appeals has jurisdiction to issue extraordinary writs in cases "which may ultimately be reviewed by that court"). In the military context, where there are no standing trial-level courts, an appellate court's authority under the All Writs Act has been held to extend to regulation of pretrial investigations even prior to referral of charges. *ABC, Inc. v. Powell*, 47 M.J. 363 (1997); *United States v. King*, No. 00-8007/NA, 2000 CAAF LEXIS 321 (Mar. 16, 2000). In *Unger v. Ziemniak*, 27 M.J. 349, 353 (1989) the Court of Military Appeals held that it may issue extraordinary writs in cases governed by the Uniform Code of Military Justice as part of its supervision of an "integrated" military justice system.[2] The court's concern in *Unger* is heightened in the military commissions context where the MCA purports to strip other federal

---

[1] Petitioners reserve the right to challenge the jurisdiction or other aspects of any military commission.

[2] In *Clinton v. Goldsmith*, 526 U.S. 529 (1999), the Supreme Court reversed an extraordinary writ prohibiting the President and the Department of Defense from administratively discharging a soldier whose court-martial was complete, reaffirming that "the CAAF's independent statutory jurisdiction is narrowly circumscribed." 526 U.S. at 535. That case involved the CAAF's assertion of jurisdiction over an administrative action unrelated to the military justice system and not controlled by the UCMJ. In Petitioners' case, in contrast, the Chief Prosecutor is acting in the course of his duties under the MCA and the Manual for Military Commissions in cases that both he and the President have acknowledged are in the process of being brought before military commissions. The Supreme Court in *Goldsmith* also relied upon the existence of remedies in federal courts not available to Petitioners in this case. 526 U.S. at 537-38. *See* 10 U.S.C. § 950j.

courts of their jurisdiction over cases "relating to the prosecution, trial, or judgment of a military
commission ..." 10 U.S.C. § 950j.

In this case, although formal charges have not yet been referred to a military commission,
the President and the Chief Prosecutor have both acknowledged that two of the Petitioners are in
the process of being charged. Moreover, all four of the Petitioners are in detention and have
received Combatant Status Review Tribunals ("CSRTs"), which are proceedings with potential
jurisdictional consequences in military commissions. *See* 10 U.S.C. § 948d(c); *United States v.
Khadr*, CMCR 07-001, at 8-9 (Sept. 24, 2007). Accordingly, this case falls within this Court's
jurisdiction within the meaning of the All Writs Act.

Moreover, this Court has inherent authority to enforce the rules of professional conduct
applicable to members of its bar. *See* Rule 9(a), Court of Military Commission Review Rules of
Practice. *See also Cohen v. Hurley*, 366 U.S. 117, 123-24 (1961); *Kessenich v. Commodity
Futures Trading Com.*, 684 F.2d 88, 94 n. 6 (D.C. Cir. 1982). "[F]ederal courts have an
independent interest in ensuring that criminal trials are conducted within the ethical standards of
the profession ...." *Wheat v. United States*, 486 U.S. 153, 160 (1988). Federal courts have the
authority to regulate a prosecutor's conduct under Rule 4.2 in cases even before formal charges
have been brought. *See, e.g., In re Criminal Investigation of John Doe, Inc.*, 194 F.R.D. 375,
378 (D. Mass. 2000).

## Statement of the Case

According to the Chief Prosecutor of Military Commissions, the government is currently
"in the prep stages of charging" two of the four Petitioners with "war crimes" and "offenses
delineated in [the] Military Commissions Act of [20]06." *See* Declaration of Matthew J.
MacLean ("MacLean Dec.") at Ex. 1. The Petitioners are represented by counsel with respect to

3

the government's allegations that they are enemy combatants, a necessary component of the

government's charges under the MCA and of any pre-charging actions by the Chief Prosecutor

regarding Petitioners. *See* MacLean Dec. at ¶ 4. Those allegations are set forth in the

government's factual returns to the Petitioners' habeas corpus petitions in *Al Odah, et al. v.

United States*, 02-cv-0828 (D.D.C.).[3]

## Statement of Facts

This matter involves the assertion by the Chief Prosecutor for Military Commissions that

he and his prosecution staff are entitled to communicate directly with the Petitioners concerning

military commission charges outside the presence and without the consent of the Petitioners'

counsel.

The Petitioners are four Kuwaiti nationals who have been detained by the U.S. military in

Guantanamo for approximately the past six years. On May 1, 2002, the Petitioners, through their

next friends, filed a complaint in the U.S. District Court for the District of Columbia in *Al Odah,

et al. v. United States*, 02-cv-0828 (D.D.C.) seeking a writ of habeas corpus and other relief.

Although the District Court initially dismissed their petitions for lack of jurisdiction, the U.S.

Supreme Court reversed in *Rasul v. Bush*, 542 U.S. 466 (2004), to which the Petitioners were

parties. Their case was remanded to the District Court, and the government filed factual returns

setting forth allegations in support of the government's contention that the Petitioners are enemy

combatants. The factual returns consist of the Petitioners' partial records of CSRT proceedings,

including unclassified and classified summaries of the government's allegations against the

Petitioners.

---

[3]    The government's unclassified summaries of allegations against the Petitioners are provided at MacLean Dec. at
Exs. 2 through 5.  The classified portions are not attached.

4

Attorneys David J. Cynamon and Matthew J. MacLean were engaged to represent

Petitioners in the summer of 2006 with respect to the government's allegations that they are

unlawful enemy combatants, including the government's allegations that they have committed

offenses under the laws of war. Both attorneys have traveled to Guantanamo on multiple

occasions to meet with the Petitioners, and have received authorization to represent the

Petitioners from each of them or their next friends. In connection with their representation of the

Petitioners, the attorneys entered their appearances on the Petitioners' behalf in the U.S. District

Court for the District of Columbia and in the U.S. Court of Appeals for the D.C. Circuit, where

their habeas corpus cases were pending on an interlocutory appeal by the government.

Subsequently, the Petitioners' attorneys have filed briefs on Petitioners' behalf in the United

States Supreme Court, where their habeas corpus cases are now pending on a writ of certiorari

(*Al Odah v. United States*, No. 06-1196, consolidated with *Boumediene v. Bush*, No. 06-1195).

The Petitioners' attorneys have also filed petitions for review under the Detainee Treatment Act

of 2005 in the D.C. Circuit on behalf of each of the Petitioners, challenging the CSRT

determinations that they are properly detained as enemy combatants.

In short, there is no question that Mr. Cynamon and Mr. MacLean are counsel for the

Petitioners, and they have been recognized as the Petitioners' counsel in several federal courts,

including the United States Supreme Court and the D.C. Circuit. There is also no question that

the scope of the attorneys' representation of the Petitioners is broad enough to encompass the

government's allegations that the Petitioners are unlawful enemy combatants, including the

government's allegations of crimes under the laws of war.

On January 12, 2008, the President of the United States publicly announced during a visit

to Kuwait that the U.S. government is in the process of charging two of the four Petitioners

5

under the Military Commissions Act. *See* Diana Elias, "Bush says 2 Kuwaitis at Guantanamo
prison will be charged", Associated Press Worldstream, January 12, 2008. The President did not
state which of the four Petitioners were being charged.

Following the President's announcement, counsel for the Petitioners consulted with the
Petitioners' next friends in Kuwait, and traveled to Guantanamo to discuss the impending
charges with the Petitioners. Neither the Petitioners nor their next friends expressed any doubt
that the scope of the attorneys' representation of the Petitioners extended to the government's
war crime allegations, which are necessarily contained within the allegations that the Petitioners
are enemy combatants.

Mr. MacLean, one of the Petitioners' attorneys, contacted Respondent Morris, the Chief
Prosecutor for Military Commissions. In a telephone conversation on January 24, 2008, the
Chief Prosecutor confirmed that his office had placed two of the four Petitioners on "hold" for
consideration of charges, but he stated that he did not know if he was authorized to tell Mr.
MacLean which two were on "hold." He told Mr. MacLean that he would find out what more he
was authorized to say, and would contact him in the following week. Respondent Morris also
invited Mr. MacLean to call again if he did not call back first. *See* MacLean Dec. at ¶ 9.

Respondent Morris did not call Mr. MacLean the following week. Over the next two
weeks, Mr. MacLean left several telephone messages for him, but none was returned. Finally, on
February 21, 2008, Mr. MacLean sent Respondent Morris an e-mail requesting to speak to
somebody in his office about the two Petitioners. *Id.* at Ex. 1.

Respondent Morris wrote back saying, "We remain in the prep stages of charging the two
we discussed." When Mr. MacLean requested to know what the Petitioners were being charged

6

with, Respondent Morris replied, "war crimes / offenses delineated in Military Commissions Act of 06." *Id.*

Mr. MacLean pointed out that the reply did not answer the question, and he reiterated his request to speak with somebody familiar with the cases. Respondent Morris replied with an e-mail denying that Mr. MacLean was the Petitioners' counsel "for commissions purposes." *Id.*

Mr. MacLean wrote back, repeating that he was counsel for the Petitioners, and reminding the Chief Prosecutor that, "pursuant to AR 27-26, Rule 4.2 and other applicable rules of professional conduct, neither you nor any person acting under your direction or control may have any communication with the Kuwaiti detainees without my consent." *Id.*

The Chief Prosecutor replied, "Not so. Government can certainly have communications with your client on commissions-related issues independent of your representation of them, which are strictly for habeas/DTA purposes." *Id.* Because of the likelihood that military commission prosecutors will contact the Petitioners directly (or may already be contacting the Petitioners) concerning military commission charges or the government's underlying allegations without counsel's consent, the refusal of the Chief Prosecutor even to disclose the identities of the two Petitioners who will be charged, and the isolation and practical inability of Petitioners to communicate with their counsel except during counsel's visits to Guantanamo, counsel for the Petitioners bring this emergency petition.

**Argument**

> A PROSECUTOR OF MILITARY COMMISSIONS MAY NOT
> COMMUNICATE DIRECTLY WITH A REPRESENTED
> DETAINEE IN GUANTANAMO WITHOUT THE CONSENT
> OF THE DETAINEE'S COUNSEL CONCERNING A MATTER
> WITHIN THE SCOPE OF THE REPRESENTATION.

7

Petitioners seek a writ of mandamus, or other appropriate order, prohibiting the Chief

Prosecutor and his prosecution staff, or anyone else working on his behalf, from having any

direct communications with Petitioners concerning military commission charges or the

government's underlying allegations without the consent of Petitioners' counsel.

## I.    Standard of Review

"A writ of mandamus will issue 'only where the duty to be performed is ministerial and

the obligation to act peremptory, and clearly defined. The law must not only authorize the

demanded action, but require it; the duty must be clear and undisputable.'" *13th Regional Corp.*

*v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel.*

*McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)). However, "[t]he requirement that a duty be

'clearly defined' to warrant issuance of a writ does not rule out mandamus actions in situations

where the interpretation of the controlling [law] is in doubt." *Id.* "As long as the statute, once

interpreted, creates a peremptory obligation for the officer to act, a mandamus action will lie."

*Id.* (citing *Haneke v. Secretary of HEW*, 535 F.2d 1291, 1296 n.16 (D.C. Cir. 1976)). In this

case, the controlling authorities leave no doubt that, unless counsel for detainees consent,

military prosecutors may not communicate with those detainees concerning any matters within

the scope of counsel's representation, including matters concerning military commission charges.

## II.    The Chief Prosecutor Is Prohibited from Communicating with Represented Parties.

Rule 4.2 of the Army Rules of Professional Responsibility for Lawyers, AR 27-26

(1992), sets forth the "no-contact" rule, prohibiting attorneys from communicating with

represented parties in a matter.[4] The rule provides:

---

[4] As a judge advocate in the U.S. Army, Respondent Morris is governed by Rule 4.2 of the Army Rules of
Professional Conduct for Lawyers, AR 27-26 (1992). *See* Rule 9, Court of Military Commission Review Rules of
Practice. Some members of his prosecution staff may be governed by the rules of professional conduct of the Air
Force, Navy, or Coast Guard. The Air Force and Navy both have Rules of Professional Conduct containing rules

8

> In representing a client, a lawyer shall not communicate about the subject
> of the representation with a party the lawyer knows to be represented by
> another lawyer in the same matter, unless the lawyer has the consent of the
> other lawyer or is authorized by law to do so.

The no-contact rule "operates in a criminal matter to protect a represented party against harmful

admissions and waivers of privilege that may result from interference with the client-lawyer

relationship." American Bar Association ("ABA"), Standing Committee on Ethics and

Professional Responsibility, Formal Op. 95-396 (1995) ("ABA Formal Op. 95-396"). In the

military context, the U.S. Court of Appeals for the Armed Forces has determined that Rule 4.2 is

applicable to prosecutors in courts-martial under the Uniform Code of Military Justice. *United

States v. Meek*, 44 M.J. 1, 8 n. 7 (1995); *see also United States v. Evans*, 39 M.J. 613, 615

(A.C.M.R. 1994).

The Respondent, however, apparently takes the position that Rule 4.2 has no application

to military commission prosecutors prior to referral of charges to a military commission. His

contention is without support. For one thing, the Comment to Rule 4.2 specifically anticipates

that the rule applies even in the absence of a formal proceeding: "This Rule also covers any

person, whether or not a party to the formal proceeding, who is represented by counsel

concerning the matter in question." The courts have followed the Comment, and for good

reason. "The timing of an indictment's return lies substantially within the control of the

prosecutor. Therefore, were we to construe the [no-contact rule] as dependent upon indictment,

a government attorney could manipulate grand jury proceedings to avoid its encumbrances."

___

substantially identical to Rule 4.2 of the Army Rules. *See* Air Force Rules of Professional Conduct, Rule 4.2
(2005); U.S. Navy, JAG Inst. 5803.1B, Rules of Professional Conduct, Rule 4.2 (Feb. 11, 2000). The Coast
Guard applies the ABA Model Rules of Professional Conduct "[a]s far as practicable and when not inconsistent
with law." Coast Guard Military Justice Manual, COMDTINST M5810.1D Art. 6.C.1 (Aug. 17, 2000).
Moreover, military attorneys are subject to the rules of professional conduct of their state bars. The District of
Columbia and all fifty states have adopted no-contact rules substantially equivalent to Rule 4.2 of the Model
Rules of Professional Conduct. *See* Bruce Green, A Prosecutor's Communications with Defendants: What Are
the Limits?, 24 Crim. L. Bull. 283, 284 (1988).

9

*United States v. Hammad*, 858 F.2d 834, 839 (2nd Cir. 1988). *See also* ABA Formal Op. 95-396 at 9. Similarly, the Chief Prosecutor should not be permitted to evade the no-contact rule simply by delaying the bringing of formal charges. This is particularly true in this case, where each of the Petitioners is in detention and has already received a CSRT, a proceeding with potential jurisdictional significance in a military commission. *See* 10 U.S.C. § 948d(c); *United States v. Khadr*, CMCR 07-001, at 8-9 (Sept. 24, 2007).

Every federal circuit to have addressed the issue has concluded that the no-contact rule prohibits a prosecutor or his agents from communicating with a person in custody whom he knows to be represented in the matter by an attorney. *See, e.g., United States v. Killain*, 639 F.2d 206, 210 (5th Cir. 1981); *United States v. Durham*, 475 F.2d 208, 211 (7th Cir. 1973); *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir. 1973). As the Petitioners are confined in Guantanamo, and are represented particularly with respect to the government's allegations underlying their confinement, Rule 4.2 prevents Respondent Morris and his staff from having any communications with them concerning military commission charges or the underlying allegations.[5]

The ABA also has concluded that the no-contact rule applies to prosecutors, even before formal charges have been brought. Interpreting Rule 4.2 of the Model Rules of Professional

---

[5] Even in the non-custodial setting, courts have held that the no-contact rule prohibits a prosecutor or his "alter-ego" from communicating with a party who has retained counsel in the matter. *See Hammad*, 858 F.2d at 839; *Harris v. Talao*, 222 F.3d 1133, 1139 (9th Cir. 2000); *Minnesota v. Miller*, 600 N.W.2d 457, 467 (Minn. 1999). The circuits are split on this point, with some courts ruling that pre-indictment, non-custodial communications by prosecutors are not covered by the no-contact rule. *Compare Hammad*, 858 F.2d at 839 (no-contact rule prohibits pre-indictment communications) *with United States v. Balter*, 91 F.3d 427, 436 (3rd Cir. 1996) (no-contact rule does not prevent non-custodial, pre-indictment contact by government investigator). The U.S. Court of Appeals for the D.C. Circuit, however, appears to be in accord with the line of cases holding that the no-contact rule prohibits a prosecutor from communicating with a represented party, pre-indictment, even in a non-custodial setting. *See United States v. Lemonakis*, 485 F.2d 941, 955-56 (D.C. Cir. 1973) (no-contact rule "would prohibit an investigator's acting as the prosecuting attorney's alter ego ...") (quoting *United States v. Massiah*, 307 F.2d 62, 66 (2nd Cir. 1962), *rev'd on other grounds*, 377 U.S. 201 (1964)). In any event, these cases are inapplicable because Petitioners are in custody.

10

Conduct, the ABA has determined that although "legitimate investigative techniques" such as use of informants in a non-custodial setting may be permitted, a prosecutor or his alter-ego is prohibited from contact with a represented client even before the bringing of formal charges. ABA Formal Op. 95-396 at 7-8.

"ABA Formal Opinions are not binding authority ... [but] it must be recognized that opinions as to the meaning of the Rules that are promulgated by the group responsible for drafting those Rules -- a group that devotes itself entirely to issues of professional responsibility -- should be viewed as persuasive." *Mustang Enters. v. Plug-In Storage Sys.*, 874 F. Supp. 881, 888 n. 7 (N.D. Ill. 1995).[6]  ABA Formal Op. 95-396 has been cited with approval by multiple federal and state courts.[7]  This Court likewise should apply Rule 4.2 and the ABA's formal opinion to conduct by military commission prosecutors.

The Chief Prosecutor's suggestion that military commission charges are outside the scope of the attorneys' representation of the Petitioners also should be rejected. The Petitioners' entitlement to retain civilian counsel at no expense to the government is a matter of right, not of grace, and there is no limitation on their right to retain counsel prior to referral of charges. *See* 10 U.S.C. § 949c(b)(3). The Petitioners' attorneys are both members of the Bar of the District of Columbia, as well as other state and federal court bars, and they indisputably meet the

---

[6]  *See also Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.*, 144 F. Supp. 2d 1147, 1159 (D.S.D. 2001), *aff'd* 347 F.3d 693 (8th Cir. 2003) ("Although the American Bar Association's Formal Opinions do not carry precedential weight, courts look to them for guidance in interpreting the Model Rules"); *Am. Home Assur. Co. v. Unauthorized Practice of Law Comm.*, 121 S.W.3d 831, 837 (Tex. Ct. App. 2003) ("[F]ormal opinions of the ABA's Committee on Ethics and Professional Responsibility are persuasive authority unless the [local] Rule differs from the Model Rule in a material respect").

[7]  *See, e.g., Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693, 698 (8th Cir. 2003); *United States v. Bowman*, 277 F. Supp. 2d 1239, 1242, *vacated on other grounds*, 2003 U.S. Dist. LEXIS 24817 (N.D. Ala. 2003); *In re Pyle*, 91 P.3d 1222, 1228 (Kan. 2004); *Pleasant Mgmt., LLC v. Carrasco*, 870 A.2d 443, 446 (R.I. 2005).

11

qualifications to be civilian defense counsel under Rule for Military Commissions 502(d)(3).[8]
The scope of their representation of the Petitioners is determined between the lawyer and the
client, and is not subject to the approval or the control of the Chief Prosecutor.[9]

Lest there be any doubt as to whether the scope of the attorneys' representation extends
to the government's allegations of crimes under the law of war and the Military Commissions
Act, it should be noted that both of the Petitioners' attorneys have entered their appearances
before the U.S. District Court for the District of Columbia, the D.C. Circuit, and the U.S.
Supreme Court in cases challenging, among other things, the government's allegations that the
Petitioners are "enemy combatants." Under the MCA, these allegations are a necessary factual
predicate for a military commission's jurisdiction (*see* 10 U.S.C. § 948d). To the extent those
allegations establish that the Petitioners' alleged conduct was "associated with armed conflict,"
they are also an element to every single substantive crime under the MCA (other than perjury or
obstruction of justice in a military commission). *See* Manual for Military Commissions, Part IV
¶¶ 6(1) through (29). There is no charge that could be brought in a military commission against
the Petitioners that would not already be at issue in their pending federal cases. *Cf. United States
v. Bowman*, 277 F. Supp. 2d 1239, 1243 (N.D. Ala. 2003) (holding that Rule 4.2 applies to a
prosecutor's contact, pre-indictment, with a party who is represented in an "identical matter in a
contemporaneous civil proceeding").

---

[8]  Each of the Petitioners' attorneys is a member of the bar of a federal court or of the highest court of a state or the
District of Columbia; is a United States citizen; has not been the subject of disqualifying action by a bar or other
competent authority; and has obtained a security clearance at the level of secret or higher, and has signed the
agreement prescribed by the Secretary pursuant to 10 U.S.C. § 949c(b)(e)(E). *See* Rule for Military Commissions
501(d)(3).

[9]  Petitioners' attorneys all practice in the District of Columbia, and the scope of their representation is governed by
Rule 1.2 of the District of Columbia Rules of Professional Conduct. The Comment to Rule 1.2 provides, "Both
lawyer and client have authority and responsibility in the objectives and means of representation. The client has
ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by
law and the lawyer's professional obligations."

**III.    A Violation of the No-Contact Rule Will Cause Irreparable Harm to the Petitioners' Attorney-Client Relationship.**

As shown above, the purpose of the no-contact rule is to prevent an attorney from interfering with his opponent's attorney-client relationship. *See* ABA Formal Op. 95-396 at 4. The prospect of interference with the Petitioners' attorney-client relationship is particularly acute; the Petitioners have been detained in near-isolation for over six years under circumstances that make an attorney-client relationship extremely difficult at best. As a result of the remote location of the place of detention and the government's restrictive procedures for allowing attorney visits, it is difficult for attorneys to see their clients without significant advance preparation and notice. Moreover, other potential means of attorney-client communication are nonexistent or burdened. There is no telephone contact, and mail is slow, unreliable and subject to review and censorship by government personnel.

The Petitioners' access to their attorneys is governed by the Amended Protective Order in *Al Odah v. United States*, 02-cv-828 (D.D.C) (Amended Protective Order). Prior to each visit, attorneys are required to get approval from the Department of Justice for the timing of the visit, and are required to obtain country and theater clearances, which require at least twenty days to process. Amended Protective Order, Ex. A at ¶ III.D.4. It ordinarily takes a full day of travel to reach Guantanamo, and a full day of travel to return. For all of these reasons, attorney visits to Petitioners are necessarily relatively infrequent.

All legal correspondence between the Petitioners and their attorneys is subject to search by a government "privilege team." *See id.* at ¶ IV.A.3. Although the privilege team is required to review mail and forward to the Petitioners within two days (*see id.*), this rarely happens within the required timeframe. All letters from the detainees and all information learned from the detainees in meetings are presumptively classified. *See id.* at ¶ VII.A. Counsel must submit all

13

such communications and information for a classification review by the privilege team before they can be treated in any unclassified manner. This classification review interferes with counsel's ability to act and communicate on behalf of Petitioners. Until such a classification review is complete, all letters from the Petitioners and attorney notes from meetings may only be stored or viewed in a classified facility. *See id.* at ¶ IX.B.

Government agents have affirmatively attempted to undermine the Petitioners' relationships with their attorneys. For example, an interrogator told Petitioner Al Kandari, "[D]on't trust your lawyers. ... [D]id you know your lawyers are Jews?" Declaration of Thomas Wilner ("Wilner Dec.") at ¶ 7, attached as Ex. 7 to the MacLean Dec. Another interrogator told Petitioner Al Rabiah, "How could you trust Jews? Throughout history, Jews have betrayed Muslims. Don't you think your lawyers, who are Jews, will betray you?" *Id.* at ¶ 11. On another occasion, Petitioner Al Rabiah's interrogator asked him, "What will other Arabs and Muslims think of you Kuwaitis when they know the only help you can get is from Jews?" *Id.* at ¶ 14. Petitioner Al Rabiah's interrogator also warned him that if he consented to be represented by an attorney, he would be kept in Guantanamo forever. *See id.* at ¶ 9.

In other instances, interrogators have impersonated attorneys. *See* Joseph Margulies, Guantanamo and the Abuse of Presidential Power at 204 (Simon & Schuster 2006). Interrogators have also told detainees that their attorneys are homosexual. *See* David Luban, Lawfare and Legal Ethics in Guantanamo, 60 Stanford L. Rev. __ (Feb. 2008) (forthcoming) (available at http://lsr.nellco.org/Georgetown/fwps/papers/53/). As word of events such as these spread through the prison population, the barriers to establishing trust with clients rise even higher.

14

Unfortunately, tactics of interference and intimidation have been employed even by

attorneys in the government. In a radio broadcast on January 11, 2007, then-Deputy Assistant

Secretary of Defense for Detainee Affairs Charles "Cully" Stimson, a licensed attorney, called

for a corporate boycott of law firms representing Guantanamo detainees. The first firm he listed

was the law firm of the Petitioners' attorneys:

> [Y]ou know what, it's shocking. The major law firms in this country --
> Pillsbury Winthrop, … all the rest of them -- are out there representing
> detainees, and I think, quite honestly, when corporate CEOs see that those
> firms are representing the very terrorists who hit their bottom line back in
> 2001, those CEOs are going to make those law firms choose between
> representing terrorists or representing reputable firms ….

*See* Luban, *supra*, at 1.

The military commission system is infected with such intimidating tactics as well. For

example, Respondent Morris's predecessor as Chief Prosecutor, Colonel Morris Davis, publicly

stated that a detainee's military defense counsel could be prosecuted under Article 88 of the

UCMJ for saying that the military commissions were unfair and intentionally rigged. *See*

Raymond Bonner, "Terror Case Prosecutor Assails Defense Lawyer", New York Times, Mar. 5,

2007. Ironically, Colonel Davis later resigned as Chief Prosecutor after concluding that "full,

fair and open trials were not possible under the current system." *See* Morris Davis, "AWOL

Military Justice", L.A. Times, Dec. 10, 2007.

But the Chief Prosecutor's assertion of authority to communicate directly with the

Petitioners without their counsel's consent is perhaps more troubling than any of the examples of

interference cited above. He and his prosecution staff would have far easier access to the

Petitioners than their own attorneys have, and they would have the opportunity to drive a wedge

directly between the Petitioners and their attorneys under circumstances completely outside their

attorneys' control. Taking advantage of the Petitioners' confinement, isolation and lack of

15

familiarity with U.S. military commissions, prosecutors could extract admissions or waivers of rights that would badly undermine the Petitioners' cases and the public's confidence in the military commission process.

Once the damage is done, it will be virtually impossible to undo. Even if a military commission were to exclude improperly obtained evidence, it could not restore damage to the Petitioners' relationship with their counsel. The Petitioners have been detained in Guantanamo for six years with essentially no contact with friends, family members, or others in their lives whose judgment they trusted before their imprisonment in Guantanamo. Building trust is one of the biggest and most important challenges faced by attorneys in these cases. That trust must be protected zealously.

To prevent the irreparable harm that would undoubtedly occur – and, indeed, that may already be occurring – if the Chief Prosecutor carries out his assertion of authority to communicate directly with the Petitioners about the charges he is preparing against them, this Court should immediately issue a writ of mandamus prohibiting such contact. Only an order from this Court can protect the military commission process from improperly obtained evidence and safeguard Petitioners' relationship with their attorneys from unlawful and unethical interference by the government.

## Conclusion

For the foregoing reasons the Petitioners respectfully request this Court to issue a writ of mandamus or other order prohibiting the Chief Prosecutor and his prosecution staff, or anyone else acting on his behalf, from communicating with the Petitioners about the military commission charges or the underlying allegations without the consent of Petitioners' counsel.

March 12, 2008                              Respectfully submitted,


David J. Cynamon
   david.cynamon@pillsburylaw.com
Matthew J. MacLean
   matthew.maclean@pillsburylaw.com
PILLSBURY WINTHROP
   SHAW PITTMAN LLP
2300 N Street, NW
Washington, DC 20037
Telephone: 202-663-8000
Facsimile: 202-663-8007

Counsel for Petitioners


## Certificate of Compliance with Rule 14

1.      This brief complies with the type-volume limitation of Rule 14(i) because this brief contains 8,398 words.

2.      This brief complies with the typeface and type style requirements of Rule 14(e) because this brief has been prepared in a monospace typeface using Microsoft Office Word 2003 in 12-point font, Times New Roman.


Matthew J. MacLean
Counsel for Petitioners


## Certificate of Service

I certify that a copy of the foregoing was mailed to Respondent Lawrence Morris, Chief

Prosecutor of Military Commissions, on March 12, 2008.


Matthew J. MacLean
Counsel for Petitioners