

# UNITED STATES COURT
# OF
# MILITARY COMMISSION REVIEW

FAWZI KHALID ABDULLAH            )
FAHAD AL ODAH,                   )
                                 )
FAYIZ MOHAMMED AHMED             )
AL KANDARI,                      )
                                 )
KHALID ABDULLAH MISHAL           )
AL MUTAIRI,                      )
                                 )      DOCKETING ORDER
    and                          )
                                 )      CMCR Case No. 08-001
FOUAD MAHMOUD AL RABIAH          )
                                 )      14 March 2008
              Petitioners        )
                                 )
        v.                       )
                                 )
LAWRENCE MORRIS, Colonel, USA    )
Chief Prosecutor of              )
Military Commissions             )
                                 )
              Respondent         )

By order of the Chief Judge, the Motion for Leave to File Emergency Petition for
Writ of Mandamus and for Other Appropriate Relief and Motion for Leave to Attach
Declaration of Matthew J. MacLean, the Declaration of Matthew J. MacLean, and
the Emergency Petition for Writ of Mandamus and for Other Appropriate Relief in
the above-captioned case are assigned to Panel Two, composed of Chief Judge
Williams, Judge Walburn, and Judge Geiser.

FOR THE COURT:

LEROY F. FOREMAN
Clerk of Court

| | |
|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, | IN THE COURT OF MILITARY COMMISSION REVIEW |
| FAYIZ MOHAMMED AHMED AL KANDARI, | MOTION FOR LEAVE TO FILE EMERGENCY PETITION FOR |
| KHALID ABDULLAH MISHAL AL MUTAIRI, | WRIT OF MANDAMUS AND FOR OTHER APPROPRIATE RELIEF |
| and | AND MOTION FOR LEAVE TO ATTACH DECLARATION OF |
| FOUAD MAHMOUD AL RABIAH, | MATTHEW J. MACLEAN |
| Petitioners, | Case No. ○8 -○○ \ |
| v. | |
| LAWRENCE MORRIS, Colonel, U.S. Army, Chief Prosecutor of Military Commissions, | |
| Respondent. | |

## TO THE HONORABLE, THE JUDGES OF THE
## COURT OF MILITARY COMMISSION REVIEW

Petitioners Fawzi Khalid Abdullah Fahad Al Odah, Fayiz Mohammed Ahmed Al

Kandari, Khalid Abdullah Mishal Al Mutairi, and Fouad Mahmoud Al Rabiah, by counsel,

hereby move this honorable Court for leave to file their Emergency Petition for Writ of

Mandamus and for Other Appropriate Relief, submitted herewith, for the reasons stated therein.

Petitioners further move for leave to attach the Declaration of Matthew J. MacLean and

its exhibits, submitted herewith, which provides the factual basis for the Petition.

March /2, 2008                                    Respectfully submitted,

David J. Cynamon
  david.cynamon@pillsburylaw.com
Matthew J. MacLean
  matthew.maclean@pillsburylaw.com
Osman Handoo
  osman.handoo@pillsburylaw.com
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
2300 N Street, NW
Washington, DC 20037
Telephone: 202-663-8000
Facsimile: 202-663-8007

Counsel for Petitioners

PANEL No. _____

MOTION FOR LEAVE TO FILE EMERGENCY PETITION FOR
WRIT OF MANDAMUS AND FOR OTHER APPROPRIATE RELIEF

        GRANTED (signature) _____

        DENIED (signature) _____

MOTION FOR LEAVE TO ATTACH DECLARATION OF MATTHEW J. MACLEAN

        GRANTED (signature) _____

        DENIED (signature) _____

## Certificate of Service

I certify that a copy of the foregoing was mailed to Respondent Lawrence Morris, Chief

Prosecutor of Military Commissions, on March $\underline{12}$, 2008.

Matthew J. MacLean
Counsel for Petitioners

| | |
|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, | IN THE COURT OF MILITARY COMMISSION REVIEW |
| FAYIZ MOHAMMED AHMED AL KANDARI, | DECLARATION OF MATTHEW J. MACLEAN |
| KHALID ABDULLAH MISHAL AL MUTAIRI, | |
| and | Case No. ○ Ⅹ − ○ ○ ＼ |
| FOUAD MAHMOUD AL RABIAH, | |
| Petitioners, | |
| v. | |
| LAWRENCE MORRIS, Colonel, U.S. Army, Chief Prosecutor of Military Commissions, | |
| Respondent. | |

## TO THE HONORABLE, THE JUDGES OF THE COURT OF MILITARY COMMISSION REVIEW

I, Matthew J. MacLean, hereby declare as follows:

1.      I am a litigation partner at the firm of Pillsbury Winthrop Shaw Pittman LLP. Along

with David J. Cynamon, another partner at Pillsbury Winthrop Shaw Pittman LLP, I represent

Fawzi Khalid Abdullah Fahad Al Odah, Fayiz Mohammed Ahmed Al Kandari, Khalid Abdullah

Mishal Al Mutairi, and Fouad Mahmoud Al Rabiah (collectively, "Petitioners") and their next

friends. Mr. Cynamon and I maintain our principal offices in the District of Columbia. We are

both members of the bar of the District of Columbia and other federal and state courts. Neither

of us has been the subject of any disqualifying action by any court. We both have security

clearances at the Secret level, and we have both signed the agreement prescribed by the Secretary

of Defense pursuant to 10 U.S.C. § 949c(b)(e)(E).

1

2. The Petitioners are four Kuwaiti nationals who have been detained by the U.S. military in Guantanamo for approximately the past six years. On May 1, 2002, the Petitioners, through their next friends, filed a complaint in the U.S. District Court for the District of Columbia in *Al Odah, et al. v. United States*, 02-cv-0828 (D.D.C.) seeking a writ of habeas corpus and other relief. Although the District Court initially dismissed their petitions for lack of jurisdiction, the U.S. Supreme Court reversed in *Rasul v. Bush*, 542 U.S. 466 (2004), to which the Petitioners were parties.

3. The Petitioners' case was remanded to the District Court, and the government filed factual returns setting forth allegations in support of the government's contention that the Petitioners are enemy combatants. The factual returns consist of the Petitioners' partial records of Combatant Status Review Tribunal ("CSRT") proceedings, including unclassified and classified summaries of the government's allegations against the Petitioners. True and correct copies of each Petitioner's Unclassified Summary of Basis for Tribunal Decision and each Petitioner's Summary of Evidence for CSRT are attached hereto as Exhibits 2 through 5. The classified summaries are not attached.

4. Mr. Cynamon and I were engaged to represent Petitioners in the summer of 2006 with respect to the government's allegations that they are unlawful enemy combatants, including the government's allegations that they have committed offenses under the laws of war. Mr. Cynamon and I have traveled to Guantanamo on multiple occasions to meet with the Petitioners, and have received authorization to represent the Petitioners from each of them or their next friends. In connection with our representation of the Petitioners, we each entered our appearances on the Petitioners' behalf in the U.S. District Court for the District of Columbia and

in the U.S. Court of Appeals for the D.C. Circuit, where the Petitioners' habeas corpus cases were pending at that time on an interlocutory appeal by the government.

5.     Subsequently, we have filed briefs on Petitioners' behalf in the United States Supreme Court, where their habeas corpus cases are now pending on a writ of certiorari (*Al Odah v. United States*, No. 06-1196, consolidated with *Boumediene v. Bush*, No. 06-1195). We have also filed petitions for review under the Detainee Treatment Act of 2005 in the D.C. Circuit on behalf of each of the Petitioners, challenging the CSRT determinations that they are properly detained as enemy combatants (*Al Odah v. Gates*, No. 07-1134 (D.C. Cir.); *Al Kandari v. Gates*, No. 07-1135 (D.C. Cir.); *Al Mutairi v. Gates*, No. 07-1136 (D.C. Cir.); *Al Rabiah v. Gates*, No. 07-1137 (D.C. Cir.)).

6.     The scope of my representation of the Petitioners, along with Mr. Cynamon, encompasses the government's allegations that the Petitioners are unlawful enemy combatants, including the government's allegations of crimes under the laws of war.

7.     On January 12, 2008, we were informed that the President of the United States publicly announced during a visit to Kuwait that the U.S. government is in the process of charging two of the four Petitioners under the Military Commissions Act. The President did not state which of the four Petitioners were being charged.

8.     Following the President's announcement, Mr. Cynamon and I consulted with the Petitioners' next friends in Kuwait. Mr. Cynamon and another attorney for the Petitioners traveled to Guantanamo to discuss the impending charges with the Petitioners. Neither the Petitioners nor their next friends expressed any doubt that the scope of our representation of the Petitioners extended to the government's war crime allegations, which are necessarily contained within the allegations that the Petitioners are enemy combatants.

3

9.      I contacted Colonel Lawrence Morris, the Chief Prosecutor for Military Commissions. In a telephone conversation with me on January 24, 2008, Colonel Morris confirmed that his office had placed two of the four Petitioners on "hold" for consideration of charges, but he stated that he did not know if he was authorized to tell me which two were on "hold." He told me that he would find out what more he was authorized to say, and would contact me in the following week. Colonel Morris also invited me to call again if he did not call back first.

10.     Colonel Morris did not call me the following week. Over the next two weeks, I left several telephone messages for him, but none was returned. Finally, on February 21, 2008, I sent Colonel Morris an e-mail requesting to speak to somebody in his office about the two Petitioners. A true and correct copy of the e-mail chain between me and Colonel Morris is attached hereto as Exhibit 1.

11.     Colonel Morris wrote back saying, "We remain in the prep stages of charging the two we discussed." When I requested to know what the Petitioners were being charged with, Colonel Morris replied, "war crimes / offenses delineated in Military Commissions Act of 06."

12.     I pointed out that the reply did not answer the question, and I reiterated my request to speak with somebody familiar with the cases. Colonel Morris replied with an e-mail denying that I was the Petitioners' counsel "for commissions purposes."

13.     I wrote back, repeating that I was counsel for the Petitioners, and reminding Colonel Morris that, "pursuant to AR 27-26, Rule 4.2 and other applicable rules of professional conduct, neither you nor any person acting under your direction or control may have any communication with the Kuwaiti detainees without my consent."

4

14.     Colonel Morris replied, "Not so. Government can certainly have communications with your client on commissions-related issues independent of your representation of them, which are strictly for habeas/DTA purposes."

15.     Effectuating our attorney-client relationship with the Petitioners has been difficult. The Petitioners have been detained in near-isolation for over six years. As a result of the remote location of the place of detention and the government's restrictive procedures for allowing attorney visits, it is difficult for Mr. Cynamon and me to see our clients without significant advance preparation and notice. There is no telephone contact, and mail is slow, unreliable and subject to review and censorship by government personnel.

16.     The Petitioners' access to their attorneys is governed by the Amended Protective Order in *Al Odah v. United States*, 02-cv-828 (D.D.C) (Amended Protective Order). Attached hereto as Exhibit 6 is a true and correct copy of Exhibit A of the Amended Protective Order, the Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay.

17.     Government agents have affirmatively attempted to undermine the Petitioners' relationships with their attorneys. The Petitioners' prior attorney, Thomas Wilner, filed a declaration in the U.S. District Court for the District of Columbia recounting several such instances ("Wilner Dec."). A true and correct copy of the Wilner Dec. is attached hereto as Exhibit 7. For example, an interrogator told Petitioner Al Kandari, "[D]on't trust your lawyers. … [D]id you know your lawyers are Jews?" Wilner Dec. at ¶ 7. Another interrogator told Petitioner Al Rabiah, "How could you trust Jews? Throughout history, Jews have betrayed Muslims. Don't you think your lawyers, who are Jews, will betray you?" *Id.* at ¶ 11. On another occasion, Petitioner Al Rabiah's interrogator asked him, "What will other Arabs and Muslims think of you Kuwaitis when they know the only help you can get is from Jews?" *Id.* at

¶ 14. Petitioner Al Rabiah's interrogator also warned him that if he consented to be represented by an attorney, he would be kept in Guantanamo forever. *See id.* at ¶ 9.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 12, 2008.

_____
Matthew J. MacLean

| | | |
|---|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, | ) ) | IN THE COURT OF MILITARY COMMISSION REVIEW |
| | ) | |
| FAYIZ MOHAMMED AHMED AL KANDARI, | ) ) | EMERGENCY PETITION FOR WRIT OF MANDAMUS AND FOR |
| KHALID ABDULLAH MISHAL AL MUTAIRI, | ) ) | OTHER APPROPRIATE RELIEF |
| and | ) ) ) | Case No. ○ 8 - ○ ○ 1 |
| FOUAD MAHMOUD AL RABIAH, | ) ) | |
| Petitioners, | ) ) ) | |
| v. | ) ) | |
| LAWRENCE MORRIS, Colonel, U.S. Army, Chief Prosecutor of Military Commissions, | ) ) ) | |
| Respondent. | ) ) | |

## TO THE HONORABLE, THE JUDGES OF THE
## COURT OF MILITARY COMMISSION REVIEW

David J. Cynamon
Matthew J. MacLean
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
2300 N Street, NW
Washington, DC 20037
Telephone: 202-663-8000
Facsimile: 202-663-8007

Counsel for Petitioners

## Table of Contents

Table of Contents .................................................................. i

Table of Authorities ............................................................... ii

Introduction ....................................................................... 1

Issue Presented .................................................................... 1

Statement of Statutory Jurisdiction ................................................ 2

Statement of the Case .............................................................. 3

Statement of Facts ................................................................. 4

Argument ........................................................................... 7

I.      Standard of Review ........................................................ 8

II.     The Chief Prosecutor Is Prohibited from Communicating
        with Represented Parties. ................................................ 8

III.    A Violation of the No-Contact Rule Will Cause Irreparable
        Harm to the Petitioners' Attorney-Client Relationship..................... 12

Conclusion ......................................................................... 16

## Table of Authorities

### Statutes, Rules, and Regulations

10 U.S.C. § 948d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 11

10 U.S.C. § 949c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10 U.S.C. § 950f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

10 U.S.C. § 950j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

28 U.S.C. § 1651 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Coast Guard Military Justice Manual,
COMDTINST M5810.1D Art. 6.C.1 (Aug. 17, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Manual for Military Commissions, Part IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Rule 1.2, District of Columbia Rules of Professional Conduct . . . . . . . . . . . . . . . . . . . . . 12

Rule 4.2, Air Force Rules of Professional Conduct (2005) . . . . . . . . . . . . . . . . . . . . . . . . 8

Rule 4.2, Army Rules of Professional Conduct for Lawyers, AR 27-26 (1992) . . . . . *passim*

Rule 4.2, Rules of Professional Conduct,
U.S. Navy, JAG Inst: 5803.1B (Feb. 11, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Rule 9, Court of Military Commission Review Rules of Practice . . . . . . . . . . . . . . 1, 3, 8

Rule 501, Rules for Military Commissions 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

### Case Law

*13th Regional Corp. v. U.S. Dep't of Interior*, 654 F.2d 758 (D.C. Cir. 1980) . . . . . . . . . 8

*ABC, Inc. v. Powell*, 47 M.J. 363 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Am. Home Assur. Co. v. Unauthorized Practice of Law Comm.*,
121 S.W.3d 831 (Tex. Ct. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Clinton v. Goldsmith*, 526 U.S. 529 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Cohen v. Hurley*, 366 U.S. 117 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*F.T.C. v. Dean Foods Co.*, 384 U.S. 597 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Haneke v. Secretary of HEW*, 535 F.2d 1291 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . 8

*Harris v. Talao*, 222 F.3d 1133 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Criminal Investigation of John Doe, Inc.*, 194 F.R.D. 375 (D. Mass. 2000) . . . . . . . 3

*In re Pyle*, 91 P.3d 1222 (Kan. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kessenich v. Commodity Futures Trading Com.*, 684 F.2d 88 (D.C. Cir. 1982) . . . . . . . . 3

*Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693 (8th Cir. 2003) . . . . . . . . . 11

*Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.*,
144 F. Supp. 2d 1147 (D.S.D. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Minnesota v. Miller*, 600 N.W.2d 457 (Minn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Mustang Enters. v. Plug-In Storage Sys.*, 874 F. Supp. 881 (N.D. Ill. 1995) . . . . . . . . . . 11

*Noyd v. Bond*, 395 U.S. 683 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pleasant Mgmt., LLC v. Carrasco*, 870 A.2d 443 (R.I. 2005) . . . . . . . . . . . . . . . . . . . . . 11

*Rasul v. Bush*, 542 U.S. 466 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Telecommunications Research an Action Center v. F.C.C.*,
750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Unger v. Ziemniak*, 27 M.J. 349 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States ex rel. McLennan v. Wilbur*, 283 U.S. 414 (1931) . . . . . . . . . . . . . . . . . . . 8

*United States v. Balter*, 91 F.3d 427 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Bowman*, 277 F. Supp. 2d 1239 (N.D. Ala. 2003) . . . . . . . . . . . . . . . 11, 12

*United States v. Durham*, 475 F.2d 208 (7th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Evans*, 39 M.J. 613 (A.C.M.R. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Hammad*, 858 F.2d 834 (2nd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States v. Khadr*, CMCR 07-001 (Sept. 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . 3, 10

*United States v. Killain*, 639 F.2d 206 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

iii

*United States v. King*, No. 00-8007/NA, 2000 CAAF LEXIS 321 (Mar. 16, 2000) . . . . . . 2

*United States v. Lemonakis*, 485 F.2d 941 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Massiah*, 307 F.2d 62 (2nd Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Meek*, 44 M.J. 1 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Thomas*, 474 F.2d 110 (10th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Wheat v. United States*, 486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## Other Sources

American Bar Association ("ABA"), Standing Committee on Ethics and
Professional Responsibility, Formal Op. 95-396 (1995) . . . . . . . . . . . . . . . . . . . . . . . 9-12

Raymond Bonner, "Terror Case Prosecutor Assails Defense Lawyer",
New York Times, Mar. 5, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Morris Davis, "AWOL Military Justice", L.A. Times, Dec. 10, 2007 . . . . . . . . . . . . . . 15

Bruce Green, A Prosecutor's Communications with Defendants:
What Are the Limits?, 24 Crim. L. Bull. 283 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

David Luban, Lawfare and Legal Ethics in Guantanamo,
60 Stanford L. Rev. __ (Feb. 2008) (forthcoming) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Joseph Margulies, *Guantanamo and the Abuse of
Presidential Power* (Simon & Schuster 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Introduction

Petitioners Fawzi Khalid Abdullah Fahad Al Odah, Fayiz Mohammed Ahmed Al Kandari, Khalid Abdullah Mishal Al Mutairi, and Fouad Mahmoud Al Rabiah (collectively, "Petitioners"), by counsel, hereby petition this honorable Court for a writ of mandamus or other appropriate order prohibiting Respondent Colonel Lawrence Morris, Chief Prosecutor of Military Commissions, and his prosecution staff, or anyone else acting on his behalf, from having any communications with the Petitioners relating to military commission charges or the underlying allegations without the consent of the Petitioners' counsel. The Petitioners further move for such other relief as may be appropriate to effectuate the remedy sought herein. The Chief Prosecutor has asserted to counsel for the Petitioners that he and his staff are entitled to communicate directly with the Petitioners without their attorneys' consent. Such communications would violate Rule 4.2 of the Army Rules of Professional Conduct for Lawyers, AR 27-26, other applicable service regulations, state rules of professional conduct, and Rule 9 of this Court's Rules of Practice, and would cause irreparable injury to the Petitioners' relationship with their attorneys and to their rights before military commissions.

## Issue Presented

> WHETHER A PROSECUTOR OF MILITARY COMMISSIONS
> MAY COMMUNICATE DIRECTLY WITH A REPRESENTED
> DETAINEE IN GUANTANAMO CONCERNING A MATTER
> WITHIN THE SCOPE OF THE REPRESENTATION WITHOUT
> THE CONSENT OF THE DETAINEE'S COUNSEL.

## Statement of Statutory Jurisdiction

This Court has appellate jurisdiction under 10 U.S.C. § 950f over cases under the

Military Commissions Act of 2006 ("MCA").[1] Under the All Writs Act, 28 U.S.C. § 1651, this

Court has authority to issue all writs necessary or appropriate in aid of its jurisdiction, including

a writ of mandamus.

The authority of an appellate court under the All Writs Act is not confined to issuance of

writs in aid of jurisdiction already acquired by appeal, but extends to those cases that are within

its appellate jurisdiction although no appeal has been perfected. *F.T.C. v. Dean Foods Co.*, 384

U.S. 597 (1966); *Telecommunications Research an Action Center v. F.C.C.*, 750 F.2d 70 (D.C.

Cir. 1984). *See also Noyd v. Bond*, 395 U.S. 683, 695 n. 7 (1969) (Court of Military Appeals has

jurisdiction to issue extraordinary writs in cases "which may ultimately be reviewed by that

court"). In the military context, where there are no standing trial-level courts, an appellate

court's authority under the All Writs Act has been held to extend to regulation of pretrial

investigations even prior to referral of charges. *ABC, Inc. v. Powell*, 47 M.J. 363 (1997); *United

States v. King*, No. 00-8007/NA, 2000 CAAF LEXIS 321 (Mar. 16, 2000). In *Unger v.

Ziemniak*, 27 M.J. 349, 353 (1989) the Court of Military Appeals held that it may issue

extraordinary writs in cases governed by the Uniform Code of Military Justice as part of its

supervision of an "integrated" military justice system.[2] The court's concern in *Unger* is

heightened in the military commissions context where the MCA purports to strip other federal

---

[1] Petitioners reserve the right to challenge the jurisdiction or other aspects of any military commission.

[2] In *Clinton v. Goldsmith*, 526 U.S. 529 (1999), the Supreme Court reversed an extraordinary writ prohibiting the President and the Department of Defense from administratively discharging a soldier whose court-martial was complete, reaffirming that "the CAAF's independent statutory jurisdiction is narrowly circumscribed." 526 U.S. at 535. That case involved the CAAF's assertion of jurisdiction over an administrative action unrelated to the military justice system and not controlled by the UCMJ. In Petitioners' case, in contrast, the Chief Prosecutor is acting in the course of his duties under the MCA and the Manual for Military Commissions in cases that both he and the President have acknowledged are in the process of being brought before military commissions. The Supreme Court in *Goldsmith* also relied upon the existence of remedies in federal courts not available to Petitioners in this case. 526 U.S. at 537-38. *See* 10 U.S.C. § 950j.

courts of their jurisdiction over cases "relating to the prosecution, trial, or judgment of a military commission ..." 10 U.S.C. § 950j.

In this case, although formal charges have not yet been referred to a military commission, the President and the Chief Prosecutor have both acknowledged that two of the Petitioners are in the process of being charged. Moreover, all four of the Petitioners are in detention and have received Combatant Status Review Tribunals ("CSRTs"), which are proceedings with potential jurisdictional consequences in military commissions. *See* 10 U.S.C. § 948d(c); *United States v. Khadr*, CMCR 07-001, at 8-9 (Sept. 24, 2007). Accordingly, this case falls within this Court's jurisdiction within the meaning of the All Writs Act.

Moreover, this Court has inherent authority to enforce the rules of professional conduct applicable to members of its bar. *See* Rule 9(a), Court of Military Commission Review Rules of Practice. *See also Cohen v. Hurley*, 366 U.S. 117, 123-24 (1961); *Kessenich v. Commodity Futures Trading Com.*, 684 F.2d 88, 94 n. 6 (D.C. Cir. 1982). "[F]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession ...." *Wheat v. United States*, 486 U.S. 153, 160 (1988). Federal courts have the authority to regulate a prosecutor's conduct under Rule 4.2 in cases even before formal charges have been brought. *See, e.g., In re Criminal Investigation of John Doe, Inc.*, 194 F.R.D. 375, 378 (D. Mass. 2000).

## Statement of the Case

According to the Chief Prosecutor of Military Commissions, the government is currently "in the prep stages of charging" two of the four Petitioners with "war crimes" and "offenses delineated in [the] Military Commissions Act of [20]06." *See* Declaration of Matthew J. MacLean ("MacLean Dec.") at Ex. 1. The Petitioners are represented by counsel with respect to

3

the government's allegations that they are enemy combatants, a necessary component of the government's charges under the MCA and of any pre-charging actions by the Chief Prosecutor regarding Petitioners. *See* MacLean Dec. at ¶ 4. Those allegations are set forth in the government's factual returns to the Petitioners' habeas corpus petitions in *Al Odah, et al. v. United States*, 02-cv-0828 (D.D.C.).[3]

## Statement of Facts

This matter involves the assertion by the Chief Prosecutor for Military Commissions that he and his prosecution staff are entitled to communicate directly with the Petitioners concerning military commission charges outside the presence and without the consent of the Petitioners' counsel.

The Petitioners are four Kuwaiti nationals who have been detained by the U.S. military in Guantanamo for approximately the past six years. On May 1, 2002, the Petitioners, through their next friends, filed a complaint in the U.S. District Court for the District of Columbia in *Al Odah, et al. v. United States*, 02-cv-0828 (D.D.C.) seeking a writ of habeas corpus and other relief. Although the District Court initially dismissed their petitions for lack of jurisdiction, the U.S. Supreme Court reversed in *Rasul v. Bush*, 542 U.S. 466 (2004), to which the Petitioners were parties. Their case was remanded to the District Court, and the government filed factual returns setting forth allegations in support of the government's contention that the Petitioners are enemy combatants. The factual returns consist of the Petitioners' partial records of CSRT proceedings, including unclassified and classified summaries of the government's allegations against the Petitioners.

---

[3] The government's unclassified summaries of allegations against the Petitioners are provided at MacLean Dec. at Exs. 2 through 5. The classified portions are not attached.

Attorneys David J. Cynamon and Matthew J. MacLean were engaged to represent
Petitioners in the summer of 2006 with respect to the government's allegations that they are
unlawful enemy combatants, including the government's allegations that they have committed
offenses under the laws of war. Both attorneys have traveled to Guantanamo on multiple
occasions to meet with the Petitioners, and have received authorization to represent the
Petitioners from each of them or their next friends. In connection with their representation of the
Petitioners, the attorneys entered their appearances on the Petitioners' behalf in the U.S. District
Court for the District of Columbia and in the U.S. Court of Appeals for the D.C. Circuit, where
their habeas corpus cases were pending on an interlocutory appeal by the government.
Subsequently, the Petitioners' attorneys have filed briefs on Petitioners' behalf in the United
States Supreme Court, where their habeas corpus cases are now pending on a writ of certiorari
(*Al Odah v. United States*, No. 06-1196, consolidated with *Boumediene v. Bush*, No. 06-1195).
The Petitioners' attorneys have also filed petitions for review under the Detainee Treatment Act
of 2005 in the D.C. Circuit on behalf of each of the Petitioners, challenging the CSRT
determinations that they are properly detained as enemy combatants.

In short, there is no question that Mr. Cynamon and Mr. MacLean are counsel for the
Petitioners, and they have been recognized as the Petitioners' counsel in several federal courts,
including the United States Supreme Court and the D.C. Circuit. There is also no question that
the scope of the attorneys' representation of the Petitioners is broad enough to encompass the
government's allegations that the Petitioners are unlawful enemy combatants, including the
government's allegations of crimes under the laws of war.

On January 12, 2008, the President of the United States publicly announced during a visit
to Kuwait that the U.S. government is in the process of charging two of the four Petitioners

under the Military Commissions Act. *See* Diana Elias, "Bush says 2 Kuwaitis at Guantanamo prison will be charged", Associated Press Worldstream, January 12, 2008. The President did not state which of the four Petitioners were being charged.

Following the President's announcement, counsel for the Petitioners consulted with the Petitioners' next friends in Kuwait, and traveled to Guantanamo to discuss the impending charges with the Petitioners. Neither the Petitioners nor their next friends expressed any doubt that the scope of the attorneys' representation of the Petitioners extended to the government's war crime allegations, which are necessarily contained within the allegations that the Petitioners are enemy combatants.

Mr. MacLean, one of the Petitioners' attorneys, contacted Respondent Morris, the Chief Prosecutor for Military Commissions. In a telephone conversation on January 24, 2008, the Chief Prosecutor confirmed that his office had placed two of the four Petitioners on "hold" for consideration of charges, but he stated that he did not know if he was authorized to tell Mr. MacLean which two were on "hold." He told Mr. MacLean that he would find out what more he was authorized to say, and would contact him in the following week. Respondent Morris also invited Mr. MacLean to call again if he did not call back first. *See* MacLean Dec. at ¶ 9.

Respondent Morris did not call Mr. MacLean the following week. Over the next two weeks, Mr. MacLean left several telephone messages for him, but none was returned. Finally, on February 21, 2008, Mr. MacLean sent Respondent Morris an e-mail requesting to speak to somebody in his office about the two Petitioners. *Id.* at Ex. 1.

Respondent Morris wrote back saying, "We remain in the prep stages of charging the two we discussed." When Mr. MacLean requested to know what the Petitioners were being charged

6

with, Respondent Morris replied, "war crimes / offenses delineated in Military Commissions Act of 06." *Id.*

Mr. MacLean pointed out that the reply did not answer the question, and he reiterated his request to speak with somebody familiar with the cases. Respondent Morris replied with an e-mail denying that Mr. MacLean was the Petitioners' counsel "for commissions purposes." *Id.*

Mr. MacLean wrote back, repeating that he was counsel for the Petitioners, and reminding the Chief Prosecutor that, "pursuant to AR 27-26, Rule 4.2 and other applicable rules of professional conduct, neither you nor any person acting under your direction or control may have any communication with the Kuwaiti detainees without my consent." *Id.*

The Chief Prosecutor replied, "Not so. Government can certainly have communications with your client on commissions-related issues independent of your representation of them, which are strictly for habeas/DTA purposes." *Id.* Because of the likelihood that military commission prosecutors will contact the Petitioners directly (or may already be contacting the Petitioners) concerning military commission charges or the government's underlying allegations without counsel's consent, the refusal of the Chief Prosecutor even to disclose the identities of the two Petitioners who will be charged, and the isolation and practical inability of Petitioners to communicate with their counsel except during counsel's visits to Guantanamo, counsel for the Petitioners bring this emergency petition.

## Argument

> A PROSECUTOR OF MILITARY COMMISSIONS MAY NOT
> COMMUNICATE DIRECTLY WITH A REPRESENTED
> DETAINEE IN GUANTANAMO WITHOUT THE CONSENT
> OF THE DETAINEE'S COUNSEL CONCERNING A MATTER
> WITHIN THE SCOPE OF THE REPRESENTATION.

Petitioners seek a writ of mandamus, or other appropriate order, prohibiting the Chief

Prosecutor and his prosecution staff, or anyone else working on his behalf, from having any

direct communications with Petitioners concerning military commission charges or the

government's underlying allegations without the consent of Petitioners' counsel.

## I. Standard of Review

"A writ of mandamus will issue 'only where the duty to be performed is ministerial and

the obligation to act peremptory, and clearly defined. The law must not only authorize the

demanded action, but require it; the duty must be clear and undisputable.'" *13th Regional Corp.*

*v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel.*

*McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)). However, "[t]he requirement that a duty be

'clearly defined' to warrant issuance of a writ does not rule out mandamus actions in situations

where the interpretation of the controlling [law] is in doubt." *Id.* "As long as the statute, once

interpreted, creates a peremptory obligation for the officer to act, a mandamus action will lie."

*Id.* (citing *Haneke v. Secretary of HEW*, 535 F.2d 1291, 1296 n.16 (D.C. Cir. 1976)). In this

case, the controlling authorities leave no doubt that, unless counsel for detainees consent,

military prosecutors may not communicate with those detainees concerning any matters within

the scope of counsel's representation, including matters concerning military commission charges.

## II. The Chief Prosecutor Is Prohibited from Communicating with Represented Parties.

Rule 4.2 of the Army Rules of Professional Responsibility for Lawyers, AR 27-26

(1992), sets forth the "no-contact" rule, prohibiting attorneys from communicating with

represented parties in a matter.[4] The rule provides:

---

[4] As a judge advocate in the U.S. Army, Respondent Morris is governed by Rule 4.2 of the Army Rules of Professional Conduct for Lawyers, AR 27-26 (1992). *See* Rule 9, Court of Military Commission Review Rules of Practice. Some members of his prosecution staff may be governed by the rules of professional conduct of the Air Force, Navy, or Coast Guard. The Air Force and Navy both have Rules of Professional Conduct containing rules

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the same matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The no-contact rule "operates in a criminal matter to protect a represented party against harmful admissions and waivers of privilege that may result from interference with the client-lawyer relationship." American Bar Association ("ABA"), Standing Committee on Ethics and Professional Responsibility, Formal Op. 95-396 (1995) ("ABA Formal Op. 95-396"). In the military context, the U.S. Court of Appeals for the Armed Forces has determined that Rule 4.2 is applicable to prosecutors in courts-martial under the Uniform Code of Military Justice. *United States v. Meek*, 44 M.J. 1, 8 n. 7 (1995); *see also United States v. Evans*, 39 M.J. 613, 615 (A.C.M.R. 1994).

The Respondent, however, apparently takes the position that Rule 4.2 has no application to military commission prosecutors prior to referral of charges to a military commission. His contention is without support. For one thing, the Comment to Rule 4.2 specifically anticipates that the rule applies even in the absence of a formal proceeding: "This Rule also covers any person, whether or not a party to the formal proceeding, who is represented by counsel concerning the matter in question." The courts have followed the Comment, and for good reason. "The timing of an indictment's return lies substantially within the control of the prosecutor. Therefore, were we to construe the [no-contact rule] as dependent upon indictment, a government attorney could manipulate grand jury proceedings to avoid its encumbrances."

---

substantially identical to Rule 4.2 of the Army Rules. *See* Air Force Rules of Professional Conduct, Rule 4.2 (2005); U.S. Navy, JAG Inst. 5803.1B, Rules of Professional Conduct, Rule 4.2 (Feb. 11, 2000). The Coast Guard applies the ABA Model Rules of Professional Conduct "[a]s far as practicable and when not inconsistent with law." Coast Guard Military Justice Manual, COMDTINST M5810.1D Art. 6.C.1 (Aug. 17, 2000). Moreover, military attorneys are subject to the rules of professional conduct of their state bars. The District of Columbia and all fifty states have adopted no-contact rules substantially equivalent to Rule 4.2 of the Model Rules of Professional Conduct. *See* Bruce Green, A Prosecutor's Communications with Defendants: What Are the Limits?, 24 Crim. L. Bull. 283, 284 (1988).

*United States v. Hammad*, 858 F.2d 834, 839 (2nd Cir. 1988). *See also* ABA Formal Op. 95-396 at 9. Similarly, the Chief Prosecutor should not be permitted to evade the no-contact rule simply by delaying the bringing of formal charges. This is particularly true in this case, where each of the Petitioners is in detention and has already received a CSRT, a proceeding with potential jurisdictional significance in a military commission. *See* 10 U.S.C. § 948d(c); *United States v. Khadr*, CMCR 07-001, at 8-9 (Sept. 24, 2007).

Every federal circuit to have addressed the issue has concluded that the no-contact rule prohibits a prosecutor or his agents from communicating with a person in custody whom he knows to be represented in the matter by an attorney. *See, e.g., United States v. Killain*, 639 F.2d 206, 210 (5th Cir. 1981); *United States v. Durham*, 475 F.2d 208, 211 (7th Cir. 1973); *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir. 1973). As the Petitioners are confined in Guantanamo, and are represented particularly with respect to the government's allegations underlying their confinement, Rule 4.2 prevents Respondent Morris and his staff from having any communications with them concerning military commission charges or the underlying allegations.[5]

The ABA also has concluded that the no-contact rule applies to prosecutors, even before formal charges have been brought. Interpreting Rule 4.2 of the Model Rules of Professional

---

[5] Even in the non-custodial setting, courts have held that the no-contact rule prohibits a prosecutor or his "alter-ego" from communicating with a party who has retained counsel in the matter. *See Hammad*, 858 F.2d at 839; *Harris v. Talao*, 222 F.3d 1133, 1139 (9th Cir. 2000); *Minnesota v. Miller*, 600 N.W.2d 457, 467 (Minn. 1999). The circuits are split on this point, with some courts ruling that pre-indictment, non-custodial communications by prosecutors are not covered by the no-contact rule. *Compare Hammad*, 858 F.2d at 839 (no-contact rule prohibits pre-indictment communications) *with United States v. Balter*, 91 F.3d 427, 436 (3rd Cir. 1996) (no-contact rule does not prevent non-custodial, pre-indictment contact by government investigator). The U.S. Court of Appeals for the D.C. Circuit, however, appears to be in accord with the line of cases holding that the no-contact rule prohibits a prosecutor from communicating with a represented party, pre-indictment, even in a non-custodial setting. *See United States v. Lemonakis*, 485 F.2d 941, 955-56 (D.C. Cir. 1973) (no-contact rule "would prohibit an investigator's acting as the prosecuting attorney's alter ego ...") (quoting *United States v. Massiah*, 307 F.2d 62, 66 (2nd Cir. 1962), *rev'd on other grounds*, 377 U.S. 201 (1964)). In any event, these cases are inapplicable because Petitioners are in custody.

Conduct, the ABA has determined that although "legitimate investigative techniques" such as

use of informants in a non-custodial setting may be permitted, a prosecutor or his alter-ego is

prohibited from contact with a represented client even-before the bringing of formal charges.

ABA Formal Op. 95-396 at 7-8.

"ABA Formal Opinions are not binding authority ... [but] it must be recognized that

opinions as to the meaning of the Rules that are promulgated by the group responsible for

drafting those Rules -- a group that devotes itself entirely to issues of professional responsibility

-- should be viewed as persuasive." *Mustang Enters. v. Plug-In Storage Sys.*, 874 F. Supp. 881,

888 n. 7 (N.D. Ill. 1995).[6] ABA Formal Op. 95-396 has been cited with approval by multiple

federal and state courts.[7] This Court likewise should apply Rule 4.2 and the ABA's formal

opinion to conduct by military commission prosecutors.

The Chief Prosecutor's suggestion that military commission charges are outside the scope

of the attorneys' representation of the Petitioners also should be rejected. The Petitioners'

entitlement to retain civilian counsel at no expense to the government is a matter of right, not of

grace, and there is no limitation on their right to retain counsel prior to referral of charges. *See*

10 U.S.C. § 949c(b)(3). The Petitioners' attorneys are both members of the Bar of the District of

Columbia, as well as other state and federal court bars, and they indisputably meet the

---

[6] *See also Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.*, 144 F. Supp. 2d 1147, 1159 (D.S.D. 2001), *aff'd* 347 F.3d 693 (8th Cir. 2003) ("Although the American Bar Association's Formal Opinions do not carry precedential weight, courts look to them for guidance in interpreting the Model Rules"); *Am. Home Assur. Co. v. Unauthorized Practice of Law Comm.*, 121 S.W.3d 831, 837 (Tex. Ct. App. 2003) ("[F]ormal opinions of the ABA's Committee on Ethics and Professional Responsibility are persuasive authority unless the [local] Rule differs from the Model Rule in a material respect").

[7] *See, e.g., Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693, 698 (8th Cir. 2003); *United States v. Bowman*, 277 F. Supp. 2d 1239, 1242, *vacated on other grounds*, 2003 U.S. Dist. LEXIS 24817 (N.D. Ala. 2003); *In re Pyle*, 91 P.3d 1222, 1228 (Kan. 2004); *Pleasant Mgmt., LLC v. Carrasco*, 870 A.2d 443, 446 (R.I. 2005).

11

qualifications to be civilian defense counsel under Rule for Military Commissions 502(d)(3).[8] The scope of their representation of the Petitioners is determined between the lawyer and the client, and is not subject to the approval or the control of the Chief Prosecutor.[9]

Lest there be any doubt as to whether the scope of the attorneys' representation extends to the government's allegations of crimes under the law of war and the Military Commissions Act, it should be noted that both of the Petitioners' attorneys have entered their appearances before the U.S. District Court for the District of Columbia, the D.C. Circuit, and the U.S. Supreme Court in cases challenging, among other things, the government's allegations that the Petitioners are "enemy combatants." Under the MCA, these allegations are a necessary factual predicate for a military commission's jurisdiction (*see* 10 U.S.C. § 948d). To the extent those allegations establish that the Petitioners' alleged conduct was "associated with armed conflict," they are also an element to every single substantive crime under the MCA (other than perjury or obstruction of justice in a military commission). *See* Manual for Military Commissions, Part IV ¶¶ 6(1) through (29). There is no charge that could be brought in a military commission against the Petitioners that would not already be at issue in their pending federal cases. *Cf. United States v. Bowman*, 277 F. Supp. 2d 1239, 1243 (N.D. Ala. 2003) (holding that Rule 4.2 applies to a prosecutor's contact, pre-indictment, with a party who is represented in an "identical matter in a contemporaneous civil proceeding").

---

[8] Each of the Petitioners' attorneys is a member of the bar of a federal court or of the highest court of a state or the District of Columbia; is a United States citizen; has not been the subject of disqualifying action by a bar or other competent authority; and has obtained a security clearance at the level of secret or higher, and has signed the agreement prescribed by the Secretary pursuant to 10 U.S.C. § 949c(b)(e)(E). *See* Rule for Military Commissions 501(d)(3).

[9] Petitioners' attorneys all practice in the District of Columbia, and the scope of their representation is governed by Rule 1.2 of the District of Columbia Rules of Professional Conduct. The Comment to Rule 1.2 provides, "Both lawyer and client have authority and responsibility in the objectives and means of representation. The client has ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations."

**III. A Violation of the No-Contact Rule Will Cause Irreparable Harm to the Petitioners' Attorney-Client Relationship.**

As shown above, the purpose of the no-contact rule is to prevent an attorney from interfering with his opponent's attorney-client relationship. *See* ABA Formal Op. 95-396 at 4. The prospect of interference with the Petitioners' attorney-client relationship is particularly acute; the Petitioners have been detained in near-isolation for over six years under circumstances that make an attorney-client relationship extremely difficult at best. As a result of the remote location of the place of detention and the government's restrictive procedures for allowing attorney visits, it is difficult for attorneys to see their clients without significant advance preparation and notice. Moreover, other potential means of attorney-client communication are nonexistent or burdened. There is no telephone contact, and mail is slow, unreliable and subject to review and censorship by government personnel.

The Petitioners' access to their attorneys is governed by the Amended Protective Order in *Al Odah v. United States*, 02-cv-828 (D.D.C) (Amended Protective Order). Prior to each visit, attorneys are required to get approval from the Department of Justice for the timing of the visit, and are required to obtain country and theater clearances, which require at least twenty days to process. Amended Protective Order, Ex. A at ¶ III.D.4. It ordinarily takes a full day of travel to reach Guantanamo, and a full day of travel to return. For all of these reasons, attorney visits to Petitioners are necessarily relatively infrequent.

All legal correspondence between the Petitioners and their attorneys is subject to search by a government "privilege team." *See id.* at ¶ IV.A.3. Although the privilege team is required to review mail and forward to the Petitioners within two days (*see id.*), this rarely happens within the required timeframe. All letters from the detainees and all information learned from the detainees in meetings are presumptively classified. *See id.* at ¶ VII.A. Counsel must submit all

13

such communications and information for a classification review by the privilege team before they can be treated in any unclassified manner. This classification review interferes with counsel's ability to act and communicate on behalf of Petitioners. Until such a classification review is complete, all letters from the Petitioners and attorney notes from meetings may only be stored or viewed in a classified facility. *See id.* at ¶ IX.B.

Government agents have affirmatively attempted to undermine the Petitioners' relationships with their attorneys. For example, an interrogator told Petitioner Al Kandari, "[D]on't trust your lawyers. … [D]id you know your lawyers are Jews?" Declaration of Thomas Wilner ("Wilner Dec.") at ¶ 7, attached as Ex. 7 to the MacLean Dec. Another interrogator told Petitioner Al Rabiah, "How could you trust Jews? Throughout history, Jews have betrayed Muslims. Don't you think your lawyers, who are Jews, will betray you?" *Id.* at ¶ 11. On another occasion, Petitioner Al Rabiah's interrogator asked him, "What will other Arabs and Muslims think of you Kuwaitis when they know the only help you can get is from Jews?" *Id.* at ¶ 14. Petitioner Al Rabiah's interrogator also warned him that if he consented to be represented by an attorney, he would be kept in Guantanamo forever. *See id.* at ¶ 9.

In other instances, interrogators have impersonated attorneys. *See* Joseph Margulies, Guantanamo and the Abuse of Presidential Power at 204 (Simon & Schuster 2006). Interrogators have also told detainees that their attorneys are homosexual. *See* David Luban, Lawfare and Legal Ethics in Guantanamo, 60 Stanford L. Rev. __ (Feb. 2008) (forthcoming) (available at http://lsr.nellco.org/Georgetown/fwps/papers/53/). As word of events such as these spread through the prison population, the barriers to establishing trust with clients rise even higher.

14

Unfortunately, tactics of interference and intimidation have been employed even by attorneys in the government. In a radio broadcast on January 11, 2007, then-Deputy Assistant Secretary of Defense for Detainee Affairs Charles "Cully" Stimson, a licensed attorney, called for a corporate boycott of law firms representing Guantanamo detainees. The first firm he listed was the law firm of the Petitioners' attorneys:

> [Y]ou know what, it's shocking. The major law firms in this country --
> Pillsbury Winthrop, … all the rest of them -- are out there representing
> detainees, and I think, quite honestly, when corporate CEOs see that those
> firms are representing the very terrorists who hit their bottom line back in
> 2001, those CEOs are going to make those law firms choose between
> representing terrorists or representing reputable firms ….

*See* Luban, *supra*, at 1.

The military commission system is infected with such intimidating tactics as well. For example, Respondent Morris's predecessor as Chief Prosecutor, Colonel Morris Davis, publicly stated that a detainee's military defense counsel could be prosecuted under Article 88 of the UCMJ for saying that the military commissions were unfair and intentionally rigged. *See* Raymond Bonner, "Terror Case Prosecutor Assails Defense Lawyer", New York Times, Mar. 5, 2007. Ironically, Colonel Davis later resigned as Chief Prosecutor after concluding that "full, fair and open trials were not possible under the current system." *See* Morris Davis, "AWOL Military Justice", L.A. Times, Dec. 10, 2007.

But the Chief Prosecutor's assertion of authority to communicate directly with the Petitioners without their counsel's consent is perhaps more troubling than any of the examples of interference cited above. He and his prosecution staff would have far easier access to the Petitioners than their own attorneys have, and they would have the opportunity to drive a wedge directly between the Petitioners and their attorneys under circumstances completely outside their attorneys' control. Taking advantage of the Petitioners' confinement, isolation and lack of

15

familiarity with U.S. military commissions, prosecutors could extract admissions or waivers of rights that would badly undermine the Petitioners' cases and the public's confidence in the military commission process.

Once the damage is done, it will be virtually impossible to undo. Even if a military commission were to exclude improperly obtained evidence, it could not restore damage to the Petitioners' relationship with their counsel. The Petitioners have been detained in Guantanamo for six years with essentially no contact with friends, family members, or others in their lives whose judgment they trusted before their imprisonment in Guantanamo. Building trust is one of the biggest and most important challenges faced by attorneys in these cases. That trust must be protected zealously.

To prevent the irreparable harm that would undoubtedly occur – and, indeed, that may already be occurring – if the Chief Prosecutor carries out his assertion of authority to communicate directly with the Petitioners about the charges he is preparing against them, this Court should immediately issue a writ of mandamus prohibiting such contact. Only an order from this Court can protect the military commission process from improperly obtained evidence and safeguard Petitioners' relationship with their attorneys from unlawful and unethical interference by the government.

## Conclusion

For the foregoing reasons the Petitioners respectfully request this Court to issue a writ of mandamus or other order prohibiting the Chief Prosecutor and his prosecution staff, or anyone else acting on his behalf, from communicating with the Petitioners about the military commission charges or the underlying allegations without the consent of Petitioners' counsel.

March 12, 2008                                    Respectfully submitted,

David J. Cynamon
  david.cynamon@pillsburylaw.com
Matthew J. MacLean
  matthew.maclean@pillsburylaw.com
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
2300 N Street, NW
Washington, DC 20037
Telephone: 202-663-8000
Facsimile: 202-663-8007

Counsel for Petitioners

## Certificate of Compliance with Rule 14

1.    This brief complies with the type-volume limitation of Rule 14(i) because this brief contains 8,398 words.

2.    This brief complies with the typeface and type style requirements of Rule 14(e) because this brief has been prepared in a monospace typeface using Microsoft Office Word 2003 in 12-point font, Times New Roman.

Matthew J. MacLean
Counsel for Petitioners

## Certificate of Service

I certify that a copy of the foregoing was mailed to Respondent Lawrence Morris, Chief

Prosecutor of Military Commissions, on March 12, 2008.

Matthew J. MacLean
Counsel for Petitioners

17