## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, AS NEXT FRIEND OF<br>    ABDUSABUR DOE, et al.,<br><br>        Petitioners,<br>        v.<br><br>GEORGE W. BUSH, et al.,<br>        Respondents. | Civil Action No. 05-1509 (RMU) |

## HUZAIFA PARHAT'S MOTION FOR JUDGMENT ON HIS *HABEAS* PETITION ORDERING RELEASE INTO THE CONTINENTAL UNITED STATES

Huzaifa Parhat, a civilian determined by the D.C. Circuit Court of Appeals not to be an enemy combatant, yet wrongfully imprisoned at Guantánamo Bay, moves for judgment on his *habeas corpus* petition ordering his release into the continental United States. As grounds therefor, Parhat relies his memorandum of points and authorities in support hereof and the July 21, 2008 Declaration of Sabin Willett, submitted herewith.

**WHEREFORE**, Huzaifa Parhat requests that:

1.    The Court convene a hearing on Parhat's motion for judgment, at which the government should be ordered to produce Parhat. The court should permit testimony and/or other proffer of information from the parties as to the logistical support necessary to effectuate release.

2.    At hearing, the Court should order Parhat released and enter such conditions for reporting and monitoring as are reasonable in the circumstances.

3.    The Court should enter such other and further relief as may be just and proper.

Respectfully submitted,

DATED:  July 22, 2008

Susan Baker Manning
susan.manning@bingham.com
Catherine R. Murphy
catherine.murphy@bingham.com
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006
Telephone:    (202) 373-6000
Facsimile:    (202) 373-6001

Sabin Willett
sabin.willett@bingham.com
Neil McGaraghan
neil.mcgaraghan@bingham.com
Rheba Rutkowski
rheba.rutkowski@bingham.com
Jason S. Pinney
jason.pinney@bingham.com
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
Telephone:    (617) 951-8000
Facsimile:    (617) 951-8736

*Counsel for Huzaifa Parhat*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, AS NEXT FRIEND OF ABDUSABUR DOE, et al.,<br><br>    Petitioners,<br><br>    v.<br><br>GEORGE W. BUSH, et al.,<br><br>    Respondents. | Civil Action No. 05-1509 (RMU) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HUZAIFA PARHAT'S MOTION FOR JUDGMENT ON HIS *HABEAS* PETITION ORDERING RELEASE INTO THE CONTINENTAL UNITED STATES

Susan Baker Manning
Catherine R. Murphy
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006

Sabin Willett
Neil McGaraghan
Rheba Rutkowski
Jason S. Pinney
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA 02110-1726

A/72598848.1

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PROCEDURAL HISTORY ....................................................................................1

FACTUAL HISTORY ............................................................................................4

    A.    Parhat's Capture, Imprisonment, And CSRT Proceedings.........................4

    B.    Conditions Of Parhat's Confinement ........................................................5

    C.    The Impact On Parhat Of Further Imprisonment ......................................7

ARGUMENT...........................................................................................................8

    A.    The Court Has A Duty To Give An Effective Remedy...............................8

    B.    Parhat Is Entitled To Release Into The Continental United States...............9

        1.    *Boumediene v. Bush*................................................................9

        2.    *Parhat v. Gates* ...................................................................10

        3.    "Release," in this case, can only mean release into the United States........................................................................................11

    C.    The Government Can Offer No Legal Or Equitable Basis To Resist A Release Order .........................................................................................11

        1.    The Executive has no residual Article II authority to continue Parhat's imprisonment.......................................................12

        2.    The government cannot justify further delay on the basis of a potential "do-over." ..............................................................13

        3.    No immigration power bars release...........................................16

            a.    Qassim has been mooted .............................................17

            b.    There was and is no impediment to release into the United States in any event ..................................................17

                i.    In law, Parhat is already here...........................17

                ii.    As a matter of law, detained deportable aliens must presumptively be released into American society after six months. ...............................................19

        4.    Geneva IV obligates the United States to tolerate Parhat's presence in the continental United States. ......................................................22

        5.    Prudential concerns cannot defeat Parhat's release right ........................22

CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ahrens v. Clark*, 335 U.S. 188 (1948) ................................................................18

*Bismullah v. Gates*, 501 F.3d 178 (D.C. Cir. 2007) ............................................15

*Bismullah v. Gates*, 503 F.3d 137 (D.C. Cir. 2007) ............................................15

*Bismullah v. Gates*, 514 F.3d 1291 (D.C. Cir. 2008) ...........................................2

*Boumediene v. Bush*, 553 U.S.___, 128 S. Ct. 2229 (2008)................3, 9, 10, 12, 13, 17, 21

*Bowen v. Johnston*, 306 U.S. 19 (1939) ................................................................9

*Braden v. 30th Judicial Circuit Court*, 410 U.S. 484 (1973) ..............................17

*Carafas v. LaVallee*, 391 U.S. 234 (1968) ...........................................................9

*Clark v. Martinez*, 543 U.S. 371 (2005) ...............................................19, 20, 23

*District of Columbia v. Heller*, 554 U.S. ___, 128 S. Ct. 2783 (2008) ...............23

*Frank v. Mangum*, 237 U.S. 309 (1915) ..............................................................21

*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992)........................8

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) ....................................................12

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ...........................................................13

*Harris v. Nelson*, 394 U.S. 286 (1969) .................................................................9

*Hernandez-Carrera v. Carlson*, 546 F. Supp. 2d 1185 (D. Kan. 2008) ............21

*INS v. St. Cyr*, 533 U.S. 289 (2001)....................................................................18

*Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005)................20

*Kendall v. United States*, 12 U.S. (Pet.) 524 (1838)..............................................8

*Kendzierski v. Brantley*, 447 U.S. 806 (7th Cir. 1971) .......................................16

*Ledesma-Valdez v. Sava*, 604 F. Supp. 675 (S.D.N.Y. 1985) ............................18

*Lee Fong Fook v. Wixon*, 170 F.2d 245 (9th Cir. 1948).......................................19

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) .......................................8, 13

*Morales-Fernandez v. INS*, 418 F.3d 1116 (10th Cir. 2005)..............................20

*Murray v. Carrier*, 477 U.S. 478 (1986) ..............................................................8

A/72598848.1

*Muskrat v. United States*, 219 U.S. 346 (1911) ................................................................. 8

*Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006) ..................................................... 20

*National Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689 (D.C. Cir. 1971) ........................................................................................................ 8

*National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ................. 8

*Parhat v. Gates*, --- F.3d ---, No. 06-1397, 2008 WL. 2576977 (D.C. Cir. June 20, 2008) ............................................................. 1-5, 10, 11, 13-16, 18

*Qassim v. Bush*, 407 F. Supp. 2d 198 (D.D.C. 2005) ..................................... 2, 12, 16, 17

*Rasul v. Bush*, 542 U.S. 466 (2004) .......................................................................... 5, 18

*Schlup v. Delo*, 513 U.S. 298 (1995) ................................................................................ 9

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) ................................... 23

*Stewart v. Overholser*, 186 F.2d 339 (D.C. Cir. 1950) .................................................... 16

*Swain v. Pressley*, 430 U.S. 372 (1977) ............................................................................ 9

*Tran v. Mukasey*, 515 F.3d 478 (5th Cir. 2008) .............................................................. 20

*United States v. Nixon*, 418 U.S. 683 (1974) .................................................................. 13

*Wingo v. Wedding*, 418 U.S. 461 (1974) ........................................................................... 9

*Yong v. INS*, 208 F.3d 1116 (9th Cir. 2000) .................................................................... 15

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .......................................................................... 20

## UNPUBLISHED CASES

*Baez v. Bureau of Immigration & Customs Enforcement*, 150 Fed. Appx. 311, 2005 WL 2436835 (5th Cir. 2005) ...................................................................... 20

*Perez-Aquillar v. Ashcroft*, 130 Fed. Appx. 432, 2005 WL 1074339 (11th Cir. 2005) ......................................................................................................... 20

## DOCKETED CASES

*In re Ali*, No. 06-1194 (U.S. Feb. 13, 2007) .................................................................. 14

*Gates v. Bismullah*, No. 07-1054 (U.S. June 23, 2008) ................................................... 15

*Kiyemba v. Bush*, No. 05-1509 (D.D.C. Sept. 13, 2005) ................................................... 2

## FEDERAL CONSTITUTIONAL PROVISIONS, STATUTES, REGULATIONS

U.S. CONST. art. I, § 8, cl.10 ........................................................................................... 16

A/72598848.1

U.S. Const. art. II, § 2 .............................................................................. 12

28 U.S.C. § 2241 .................................................................................... 17

28 U.S.C. § 2241(c)(3) ........................................................................... 22

28 U.S.C. § 2243 (cl. 2) .......................................................................... 15

28 U.S.C. § 2243 (cl. 5) ..................................................................... 16, 17

Authorization to Use Military Force, 115 Stat. 224 (Sept. 18, 2001) ............... 16

8 C.F.R. § 212.5(a) (2004)....................................................................... 19

## TREATIES AND COMMENTARY

Geneva Convention relative to the Protection of Civilian Persons in Time of War,
Aug. 12, 1949, 75 U.N.T.S. 973 ............................................................. 22

Geneva Convention relative to the Protection of Civilian Persons in Time of War,
Aug. 12, 1949, 75 U.N.T.S. 973, art. 135 cmt. .......................................... 22

## MISCELLANEOUS

3 W. Blackstone, Commentaries 23 (1783)................................................. 8

Amnesty International, China Report 2005 ................................................. 11

Carol Rosenberg, *Closing Terror Prison Tricky for U.S.*, Miami Herald, June
12, 2005 ............................................................................................ 14

Demetri Sevastopulo, *Cheney Backs Guantánamo Prison Amid Growing Unease*,
Financial Times, June 13, 2005.............................................................. 14

Demitri Sevastopulo, *Uighurs face return from Guantánamo*, Financial Times,
Mar. 16, 2005..................................................................................... 14

Editorial, *Detention Dilemma*, Wash. Post, May 3, 2005 ............................ 14

*Locked Up Alone – Detention Conditions and Mental Health at Guantánamo*,
Human Rights Watch (June 2008)......................................................... 6, 7

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment
and Punishment, The International Covenant on Civil and Political Rights,
Dec. 19, 1966, S. Exec. No. Doc. E, 95-2, 999 U.N.T.S. 171 ....................... 11

Lawrence E. Hinkle, Jr. & Harold G. Wolff, Communist Interrogation And
The Indoctrination of "Enemies of the States" (1956)............................. 6

Navy Secretary Gordon England, U.S. Dep't of Defense News Transcript –
Defense Department Special Briefing on Combatant Status Review Tribunals
(Mar. 29, 2005)................................................................................... 14

A/72598848.1

Neil A. Lewis, *Freedom for Chinese Hinges on Finding a New Homeland*, N.Y. TIMES, Nov. 8, 2004 ...................................................................................... 14

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325 (2006) ...................................................................................... 6-7

Tim Golden, *For Guantánamo Review Boards, Limits Abound*, N.Y. TIMES, Dec. 31, 2006 ...................................................................................... 14

U.S. Dep't of State, Country Reports on Human Rights Practices – 2004 – China, § 1(c) (2005) ...................................................................................... 11

U.S. State Dep't Daily Press Briefing (May 13, 2004) ...................................... 14

National Public Radio, Morning Edition, "Chinese detainees at Guantanamo get hearing" (Aug. 25, 2005) ...................................................................................... 23

A/72598848.1

## INTRODUCTION

All that is left of this *habeas* case is the elemental question of *habeas corpus* itself – remedy.

Huzaifa Parhat[1] is a stateless refugee who fled Chinese communism eight years ago. Respondents brought him to the Guantánamo Bay prison in 2002. For more than six years he was imprisoned under the legal theory that he is an "enemy combatant" of this Nation. Since June 20, 2008, he has been held under no legal authority whatsoever. On that day, the D.C. Circuit Court of Appeals, after a close review of his DTA case, concluded that the government's record does not support the conclusion that he is an enemy combatant. *Parhat v. Gates*, No. 06-1397, 2008 WL 2576977, *1 (D.C. Cir. June 20, 2008). It held that he had the right "to seek release immediately" in this Court, *id.*, observing that in this *habeas* proceeding, "*there is no question but that the court will have the power to order him released*," *id.* at *15 (emphasis supplied).

All other potential remedies for Parhat's grinding and illegal imprisonment were exhausted years ago. He is entitled to relief, and there is no relief – except an order that he be released into the continental United States.

## PROCEDURAL HISTORY

Parhat was transported to Guantánamo Bay in 2002. In 2003, a military officer recommended that he be released. *Parhat*, 2008 WL 2576977 at *3. In 2004, a Combatant Status Review Tribunal ("CSRT") panel determined that there was no evidence to show that he had committed any hostile acts against the United States or its coalition partners, or that he had joined any group hostile to the U.S., but nevertheless deemed him an "enemy combatant." Other CSRT panels ruled that five of his companions in Afghanistan were not enemy combatants. *See*

---

[1] Parhat is one of the *Kiyemba* petitioners. He submits this memorandum of points and authorities in support of his Motion for Immediate Release ("Motion"). Twelve other petitioners in these consolidated cases are factually situated precisely as was Parhat, and the legal situation of all the Uighur petitioners is identical. Only Parhat's case under the Detainee Treatment Act of 2005 ("DTA") has been decided.

*Qassim v. Bush*, 407 F. Supp. 3d 198, 199 (D.D.C. Dec. 22, 2005).

*The Habeas Corpus Petition.*  On July 29, 2005, Parhat and eight other Uighurs imprisoned at Guantánamo sought *habeas corpus* relief in *Kiyemba v. Bush*, No. 05-1509 RMU. This Court directed that the government not transfer Parhat out of its jurisdiction without giving advance notice, but otherwise stayed the case.  Mem. Order at 2-3 (D.D.C. Sept. 13, 2005) [Dkt. No. 8].  The government never provided any factual return to justify his imprisonment.  On July 10, 2008, Judge Hogan ordered the *Kiyemba* case and the *habeas corpus* cases of other Uighurs consolidated before Judge Urbina.  Dkt. No. 123.

*The DTA Litigation.*  On December 4, 2006, Parhat filed a petition under the DTA.  A year of litigation ensued over the record.  Nominally Parhat prevailed, *see Bismullah v. Gates*, 514 F.3d 1291 (D.C. Cir. 2008), but in the looking-glass world of Guantánamo litigation, victory was meaningless.  The government never provided him with the record as defined by the Court of Appeals, and indeed provided no record at all until October 29, 2007.  On January 4, 2008, relying on the government's version of the record, Parhat moved for judgment, arguing that it contained no evidence justifying his detention as an enemy combatant.  On June 20, 2008, the D.C. Circuit agreed.  *Parhat*, 2008 WL 2576977 at *5.

The government's case was premised on a theory that Parhat *allegedly* was affiliated with a group (the "East Turkistan Islamic Movement" or "ETIM") that *allegedly* was associated with al Qaida or the Taliban and *allegedly* engaged in hostilities against the U.S. or its allies.  *Parhat*, 2008 WL 2576977 at *7.  Noting the CSRT's conclusion that there was no source evidence that Parhat had ever joined ETIM, the Court declined to reach that question because of fundamental flaws in the other elements of the government's theory.  *Id.* at *17-18.  Specifically, the Court noted that the government's "evidence" was derived entirely from four intelligence reports describing ETIM's "activities and relationships as having 'reportedly' occurred, as being 'said to' or 'reported to' have happened, and as things that are 'suspected of' having taken place."  *Id.*

A/72598848.1

at *23.[2]  But because the reports failed to identify any underlying source[3] for who may have "reported," "said," or "suspected" such things, the Court found the reports inherently unreliable. *Id.* at *24.  The Court held that, as a matter of law, the government's "bare assertions cannot sustain the determination that Parhat is an enemy combatant." *Id.* at *24.

Turning to the question of remedy, and noting that the DTA provides no explicit remedy, the Court ordered the government to release or to transfer[4] Parhat, or to expeditiously hold a new CSRT consistent with its opinion.  2008 WL 2576977 at *14.  The Court was at pains, however, to note that *this* Court, as a *habeas* court, had power to order release, and that Parhat could seek that remedy immediately, *regardless of whether the government sought another CSRT. Id.* at *18.

Eight days earlier, the Supreme Court had decided *Boumediene v. Bush*, 553 U.S.__, 128 S. Ct. 2229 (2008), holding that Guantánamo prisoners "have the constitutional privilege of *habeas corpus.*" *Id.* at 2240.  Accordingly, the Court of Appeals noted that its disposition in *Parhat v. Gates* "is without prejudice to Parhat's right to seek release immediately through a writ of *habeas corpus* in the district court, pursuant to the Supreme Court's decision in *Boumediene*, slip op. at 65-66."  2008 WL 2576977 at *15.

Release is the relief sought by the Motion.

---

[2] At oral argument, the government suggested that the assertions were reliable because they were repeated in multiple reports.  Invoking Lewis Carroll, the Court of Appeals observed that "the fact that the government has 'said it thrice' does not make an allegation true."  2008 WL 2576977 at *28 (quoting LEWIS CARROLL, THE HUNTING OF THE SNARK 3 (1876)).

[3] Indeed, the Court of Appeals noted that Parhat had provided "substantial support" for the notions that (i) the source was the communist Chinese government, and (ii) "Chinese reporting on the subject of the Uighurs cannot be regarded as objective."  2008 WL 2576977 at *26.

[4] The Court of Appeals acknowledged the continuing force of this Court's notice order: "The government is under district court order to give 30 days' notice of intent to remove Parhat from Guantánamo."  *Parhat*, 2008 WL 2576977, *15 n.19, *18 n.21 (citing *Kiyemba v. Bush*, No. 05-1509, Mem. Order at 2-3 (D.D.C. Sept. 13, 2005)).

# FACTUAL HISTORY

### A.    Parhat's Capture, Imprisonment, And CSRT Proceedings

*Parhat's Capture and Imprisonment.*  Parhat is an ethnic Uighur who fled his home in the far-western Xinjiang Uyghur Autonomous Region, a province of the People's Republic of China (also referred to as "East Turkistan"). *Parhat*, 2008 WL 2576977 at *2. Parhat fled to escape the oppression of the Chinese government. *Id.* In June 2001, he made his way to what the government would characterize (a characterization accepted by the D.C. Circuit) as a "training camp" in Afghanistan. *Id.* As we will see, however, there was no evidence that Parhat, or any group with which he is alleged to have affiliated himself, ever trained to engaged in hostilities against the United States. After the war began, Parhat and seventeen other unarmed Uighurs fled to Pakistan. *Id.* at *3. Local villagers subsequently handed them over to Pakistani officials, who then turned them over to the U.S. military. *Id.* The U.S. transferred Parhat and the other Uighurs to Guantánamo in June 2002. *Id.*

For over two years after he arrived in Guantánamo, Parhat (like the other men imprisoned at Guantánamo) was held without a hearing of any sort. In 2003, a military officer of the Criminal Investigation Task Force ("CITF"), U.S. Department of Defense ("DoD"), who was charged with reviewing Parhat's case, "'recommend[ed] the release of Parhat under a conditional release agreement.'" 2008 WL 2576977 at *3 (quoting CSRT Decision, encl. 2, at 2).

*The CSRT Order and Procedures.* In July, 2004, the DoD issued an "Order Establishing Combatant Status Review Tribunal" ("CSRT Order"). 2008 WL 2576977, *3. Three weeks later, the Secretary of the Navy issued a memorandum entitled "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants detained at Guantánamo Naval Base, Cuba" ("CSRT Procedures"). *Id.* The CSRT Procedures defined an "enemy combatant" as:

> an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

*Id.* (quoting CSRT Order at 1).

*Parhat's CSRT Proceedings.* The Tribunal held a hearing for Parhat on December 6,

2004.   2008 WL 2576977, *3   Parhat's own interview and testimony comprised the only evidence concerning the circumstances of Parhat's background and capture. *Id.* He testified that he had gone to Afghanistan solely to join the resistance against China, and stated that he regarded China alone, and not the United States, as his enemy. *Id.* The Tribunal did not find Parhat to be "'an individual who was part of or supporting Taliban or al Qaida forces.'" *Id.* at *3 (quoting CSRT Order at 1), but based its enemy-combatant determination on the theory that Parhat was allegedly affiliated with an alleged organization known as the "East Turkestan Islamic Movement," or "ETIM."   The Tribunal acknowledged that "'no source document evidence was introduced to indicate . . . that [Parhat] had actually joined ETIM, or that he himself had personally committed any hostile acts against the United States or its coalition partners.'" *Id.* (quoting CSRT Decision, encl. 2, at 3).

The enemy-combatant finding was pretextual, designed to deflect judicial scrutiny then anticipated after the Supreme Court's recent ruling in *Rasul v. Bush*, 542 U.S. 466 (2004).   The Tribunal stated that Parhat "'does present an attractive candidate for release'" and "'urge[d] favorable consideration for release . . . and also urge[d] that he not be forcibly returned to the People's Republic of China' because he 'will almost certainly be treated harshly if he is returned to Chinese custody.'"   2008 WL 2576977, at *4 (quoting CSRT Decision, encl. 2, at 2, 4).

**B.      Conditions Of Parhat's Confinement**

Although military authorities in 2003 and 2004 had concluded that Parhat should be released, the conditions of his confinement became, over time, harsher, until in 2006, he was sent to the "tomb above the ground," as the notorious Camp 6 prison is referred to by the prisoners. Until earlier this month,[5] Parhat had endured an isolation regimen harsher than that of almost any

---

[5] On July 2, 2008, shortly after the *Kiyemba* petitioners moved for injunctive relief, counsel for Parhat and other Uighurs received confirmation from the government that Parhat, as well as Abdul Sabour (275), Abdul Semet (295), Jalal Jalaldin (285), and Sabir Osman (282), all of whom have *habeas* petitions pending before this Court, were transferred from the isolation regimen of Camp 6 to Camp 4.   Between 2003 and 2006, most of the Uighurs had been detained in Camp 4, where they lived communally in a bunk house, ate communally at picnic tables, had 24-hour access to a small outside area (and thus to sunlight and fresh air), and most significantly, had 24-hour access to each other. *See* January 20, 2007 Declaration of Sabin Willett, *Parhat v.*

(Footnote Continued on Next Page.)

-5-

federal prison. *See Locked Up Alone – Detention Conditions and Mental Health at Guantánamo,* Human Rights Watch, June 2008, at 20 ("HRW Report"), *available at* http://www.hrw.org/reports/2008/us0608/us0608web.pdf.

In Camp 6, Parhat was isolated in a small, solid-walled cell. Each day he passed 22 hours alone, without natural sunlight or air, without companions, conversation, or activities of any kind. For two hours out of 24, he could be shackled and led to the "rec area," a 3 x 4 meter space surrounded by two-story concrete walls and topped with wire mesh. These two hours afforded his only chance of a glimpse of sunlight. The odds were poor – rec time regularly happened at night, often after midnight. Rec time is also a Camp 6 inmate's only opportunity to speak to another human being. Counsel have observed profound deterioration in the psychological health of the Uighurs since their transfers to Camp 6. They demonstrate anger, listlessness, hopelessness. Some reported hearing voices. *See* January 20, 2007 Declaration of Sabin Willett, *Parhat v. Gates,* No. 06-1397 (D.C. Cir. Jan. 22, 2007), ¶¶ 8-10. *See also* HRW Report at 11.

The Camp 6 isolation regimen appears to cause the same psychological injuries – paranoia, depression, and an inability to distinguish fact from fancy – that American servicemen suffered when isolation was imposed upon them by North Korean captors during the Korean War. After these abuses came to light in 1953 (and were roundly and rightly denounced by the United States), the Department of Defense commissioned studies of the psychological effects of isolation. *See* Lawrence E. Hinkle, Jr. & Harold G. Wolff, COMMUNIST INTERROGATION AND THE INDOCTRINATION OF "ENEMIES OF THE STATES" (1956), *cited in* Stuart Grassian, *Psychiatric Effects if Solitary Confinement,* 22 WASH. U. J. L. & POL'Y. 325 (2006) ("Grassian"). Like Camp 6, Soviet KGB facilities contained cells approximately six by ten feet in size, where the prisoner was isolated for at least 22 hours a day. Grassian at 380-81. The DoD's studies noted the effect of isolation:

---

(Footnote Continued from Previous Page.)

*Gates,* No. 06-1397 (D.C. Cir. Jan. 22, 2007), ¶¶ 27-29. *At least six of the Uighur petitioners in these consolidated cases remain in Camp 6.*

A/72598848.1

> The period of anxiety, hyperactivity, and apparent adjustment to the isolation routine usually continues from one to three weeks. As it continues, the prisoner becomes increasingly dejected and dependent. He gradually gives up all spontaneous activity within his cell and ceases to care about personal appearance and actions. Finally, he sits and stares with a vacant expression, perhaps endlessly twisting a button his coat. He allows himself to become dirty and disheveled. . . . Ultimately he seems to lose many of the restraints of ordinary behavior. He may soil himself. He weeps; he mutters . . . . It usually takes four to six weeks to produce this phenomenon in a newly imprisoned man.

Grassian at 381. The report continued, "[The prisoner's] sleep is disturbed by nightmares . . . . In this state the prisoner may have illusory experiences." *Id.* A psychiatrist who has personally observed more than two hundreds persons held in solitary confinement, Dr. Grassian concludes, "for many of the inmates so housed, incarceration in solitary caused . . . the appearance of an acute mental illness in individuals who had previously been free of any such illness." *Id.* at 333.

Modern studies have concluded that prolonged detention in solitary conditions can cause significant psychiatric harm. The HRW Report noted:

> The absence of social and environmental stimulation has been found to lead to a range of mental health problems, ranging from insomnia and confusion to hallucinations and psychosis . . . even inmates with no prior history of mental illness can become 'significantly ill' when subjected to prolonged periods of isolation.

> Predictably, the isolation common in supermax facilities has been found to produce a higher rate of psychiatric and psychological health problems than imprisonment in units where inmates are allowed group recreation, communal meals, and other regular interaction with each other.

HRW Report at 20-21 (citing several recent studies on the effects of solitary confinement on inmates and noting that "[t]his research has been cited by several federal court opinions warning of the negative psychological impact of isolation in prison"). *See also id.* at 49-50 (discussing psychological effects of restricted confinement).

C.    **The Impact On Parhat Of Further Imprisonment**

Parhat is now in his seventh year of imprisonment. In 2007, he appeared to counsel to abandon hope of ever leaving Guantánamo. He requested that a message be passed to his wife that she should consider him dead and remarry. *See* July 21, 2008 Declaration of Sabin Willett ¶ 1. In 2008, his most urgent concern has been to speak to his mother. He understands from the Red Cross that her health is deteriorating. Requests for a telephone call have been

-7-

denied. *Id.* ¶¶ 2-3.

**ARGUMENT**

**A.    The Court Has A Duty To Give An Effective Remedy.**

Remedy is the defining attribute of the judicial branch. It is central to the "judicial power of the United States" vested in the federal courts by Article III of the Constitution. *Muskrat v. United States*, 219 U.S. 346, 356 (1911) ("judicial power . . . is the power of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision"). Judicial decrees grant meaningful relief designed to right the wrong in a given case or controversy. *Murray v. Carrier*, 477 U.S. 478, 505 (1986) (correcting a "fundamentally unjust incarceration" is a judicial "imperative"); *Kendall v. United States*, 12 U.S. (Pet.) 524, 624 (1838) (It is "a monstrous absurdity in a well organized government that there should be no remedy, although a clear and undeniable right should be shown to exist."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (Our government "has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."); *see also* 3 W. Blackstone, COMMENTARIES 23 (1783) ("[W]here there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded.").

Remedy is particularly necessary in cases that present overreaching by one of the coordinate branches of government. *Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60, 66 (1992) (judicial remedies "historically . . . thought necessary to provide an important safeguard against abuses of legislative and executive power, as well as to ensure an independent judiciary"); *National Treasury Employees Union v. Nixon*, 492 F.2d 587, 604-05 (D.C. Cir. 1974) ("[T]he judicial branch of the Federal government has the constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch."); *National Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 695 (D.C. Cir. 1971) (same).

Nowhere is the imperative for a judicial remedy more urgent than in *habeas*, which presents executive over-reaching at its starkest. "There is no higher duty of a court under our

-8-

constitutional system than the careful processing and adjudication of petitions for writs of *habeas corpus.*" *Harris v. Nelson*, 394 U.S. 286, 292 (1969); *see Swain v. Pressley*, 430 U.S. 372, 380 n.13 (1977); *Wingo v. Wedding*, 418 U.S. 461, 468 (1974) ("[T]he great constitutional privilege of *habeas corpus* historically provided a prompt and efficacious remedy for whatever society deems to be intolerable restraints. . . . [I]f the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release."); *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968) (declaring that the right to *habeas corpus* is "shaped to guarantee the most fundamental of all rights"); *Bowen v. Johnston*, 306 U.S. 19, 26 (1939) ("It must never be forgotten that the writ of *habeas corpus* is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired."). This is especially so in a case of "actual innocence." *Schlup v. Delo*, 513 U.S. 298 (1995). The Court exists as a bulwark against indefinite executive imprisonment. Absent remedy, there is no bulwark.

Absent release, there is no *habeas* remedy.[6] Release is the only "meaningful" check on the Executive's unlawful imprisonment.

**B.     Parhat Is Entitled To Release Into The Continental United States.**

**1.     *Boumediene v. Bush***

On June 12, 2008, the Supreme Court held in *Boumediene* that Parhat has "the constitutional privilege of *habeas corpus.*" 128 S. Ct. at 2240. Emphasizing that "the costs of delay can no longer be borne by those who are held in custody," the Court instructed that Parhat and the other Guantánamo prisoners "are entitled to a prompt *habeas corpus* hearing." *Id.* at 2275; *see also id.* at 2263 (recognizing that these are "exceptional circumstances," in part, because of "the fact that these detainees have been denied meaningful access to a judicial forum

---

[6] The government appears to concede as much. At oral argument before the Supreme Court in *Boumediene*, the Government said, "if what the Constitution requires to make the DTA to be an adequate substitute is the power to order release, there is no obstacle in the text of the DTA to that. And the All Writs Act is available to allow them [the court] to order release to protect their jurisdiction under the DTA." Transcript of Oral Argument at 37:20-25, *Boumediene v. Bush*, No. 06-1195 (U.S. argued Dec. 5, 2007).

A/72598848.1

for a period of years").

Judicial power to order release is an essential attribute of *habeas*; the absence of a specific release remedy in the DTA was one reason it was an inadequate substitute for *habeas corpus*. 128 S. Ct. at 2271 ("[W]hen the judicial power to issue *habeas corpus* properly is invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release."); *id.* at 2266 ("the *habeas* court must have the power to order the conditional release of an individual unlawfully detained").

### 2.    *Parhat v. Gates*

On June 20, 2008, the D.C. Circuit granted Parhat's motion for judgment as a matter of law. *Parhat v. Gates*, 2008 WL 2576977 at \*14-\*15.[7] Acknowledging that the extent of the remedy provided by the DTA was in question, the Court explained that "*Boumediene* made it quite clear" that Parhat is entitled to seek *habeas corpus* relief "immediately, without waiting to learn whether the government will convene another CSRT," and that, in such *habeas* proceeding, "he will be able to make use of the determinations we have made today regarding the decision of his CSRT, and he will be able to raise issues that we did not reach." 2008 WL 2576977 at \*15 (citing *Boumediene* slip op. at 49, 66). "Most important," the Court emphasized, "in that proceeding there is no question but that the court will have the power to order him released." *Id.* (citing *Boumediene* slip op. at 50, 58). A central tenet of the Supreme Court's decision in *Boumediene* is that the delay in considering the Guantánamo detainees' *habeas* petitions challenging their detention has already been far too long, and that "[t]he detainees in these cases are entitled to a prompt *habeas corpus* hearing." 128 S. Ct. at 2275.

### 3.    "Release," in this case, can only mean release into the United States.

The explicit references to release in last month's Supreme Court and D.C. Circuit

---

[7] The opinion was sealed and on June 30, 2008, a redacted version of the opinion was publicly released.

decisions mean, in an appropriate case, release into the United States. This is such a case.

In *Parhat*, the D.C. Circuit ordered the government "to release or to transfer the petitioner, or to expeditiously hold a new CSRT consistent with this opinion." 2008 WL 2576977 at *18. Because "release," in that order, necessarily means something other than "transfer," it means something other than disposition to a foreign government. By process of elimination, "release" can only mean disposition to Parhat's home country or to the United States. But the Court knew and noted that Parhat's home country was unavailable. *Id.* at *15 n.19. The government has always conceded that it is barred from releasing Parhat (or any of the Uighurs) to China, as he would there face an unacceptable risk of torture, or worse, in light of his philosophical antipathy to the communist regime. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment and Punishment, The International Covenant on Civil and Political Rights, Dec. 19, 1966, S. Exec. No. Doc. E, 95-2, 999 U.N.T.S. 171; *see also Parhat*, 2008 WL 2576977 at *4.[8] Thus, in *Parhat*, the only thing left of "release" was "release into the United States." The Circuit knew this. It can have meant nothing else. And it made clear that in *habeas*, this Court had "the power to order [Parhat] released." *Id.* at *15.

## C.    The Government Can Offer No Legal Or Equitable Basis To Resist A Release Order.

Based on the experience in previous a Uighur case, Parhat expects that the government may advance several arguments: (i) that it has some sort of inherent Article II power to continue imprisonment indefinitely, regardless of judicial orders; (ii) that it hopes, after seven years,

---

[8] The Uighur people have been severely oppressed by the Chinese government. The United States has long condemned China's record of human rights abuses generally, and its oppression of the Uighurs in particular. According to the State Department, in China during 2004 "[f]ormer detainees reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and other forms of abuse..... Deaths in custody due to police use of torture to coerce confessions from criminal suspects continued to occur." U.S. Dep't of State, Country Reports on Human Rights Practices – 2004 – China, § 1(c) (2005), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41640.htm. *See also*, *e.g.*, Amnesty International, China Report 2005 (China "continues to brutally suppress any peaceful political, religious, and cultural activities of Uighurs, and enforce a birth control policy that compels minority Uighur women to undergo forced abortions and sterilizations."), *available at* http://web.amnesty.org/report2005/chn-summary-eng.

A/72598848.1

including two years of strenuous advocacy that the appropriate record is the one upon which the case is decided, to pull together a new and improved record; (iii) that it cannot be ordered to "bring" Parhat to the continental United States because that would represent an intrusion on the President's control over immigration matters, as Judge Robertson held in *Qassim v. Bush*, 407 F. Supp. 2d 198 (D.D.C. 2005); and (iv) that release to the United States should not be ordered as a prudential matter. None of these arguments has merit.

### 1.    The Executive has no residual Article II authority to continue Parhat's imprisonment.

The government has elsewhere argued that the Executive has a general Article II power to detain Parhat. This is contrary to the plain text of the Constitution, which confers on the President only the power of the chief general and admiral, carrying out the war that Congress decreed. U.S. Const. art. II, § 2. Nor can the argument withstand the Supreme Court's recent Guantánamo decisions, which flatly reject the President's claim of immunity from congressional or judicial oversight. *See, e.g., Boumediene*, 128 S. Ct. at 2259; *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2773 (2006). Nor can such a claim be squared with *Parhat*, whose "release, transfer or expeditiously re-CSRT" order left no room for an untethered "Article II" power.

As *Boumediene* teaches, separation-of-powers concerns cut precisely the opposite way: "Within the Constitution's separation-of-powers structure, few exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person." 128 S. Ct. at 2277. The Court noted that limitations on *habeas* raised "troubling separation-of-powers concerns," *id.* at 2258, and emphasized that "[b]ecause the Constitution's separation-of-powers structure, like the substantive guarantees of the Fifth and Fourteenth Amendments, protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles," *id.* at 2246 (citations omitted); *see id.* at 2259 ("To hold the political branches have the power to switch the Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.'") (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) at 177). "The test for

A/72598848.1

determining the scope of th[ese] provision[s] must not be subject to manipulation by those whose power [they are] designed to restrain." *Boumediene*, 128 S. Ct. at 2259.

When the Executive has acted illegally – *i.e.*, beyond the scope of its constitutional powers, as has been adjudicated to be the case here – it is the constitutional duty of the judiciary to order the Executive to stop and the duty of the Executive to obey the judicial order. *See United States v. Nixon*, 418 U.S. 683, 703-05 (1974). Here, as in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the force of the government's argument for a generalized Article II power would be to obtain the forbidden "blank check" that "serves only to *condense* power into a single branch of government." 542 U.S. at 536. This Court can reject that claim, as *Hamdi* held it must, only by giving a remedy. *Id.* at 525 (asserting that the writ of *habeas corpus* "has remained a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law"). In *Boumediene*, the Court reaffirmed that *habeas corpus* is an "an indispensable mechanism for monitoring the separation of powers." 128 S. Ct. at 2259. But there are no protections at all without the remedy of release.

**2.    The government cannot justify further delay on the basis of a potential "do-over."**

Although a month has passed since the D.C. Circuit's decision, so far as counsel is aware, the government has not sought expeditiously to conduct a new CSRT. It would be academic even if the government had done so. Not only did the Court specifically direct that *habeas corpus* relief could be granted notwithstanding new CSRT proceedings, *see Parhat*, 2008 WL 2576977 at *14-*15, but in this particular case no re-CSRT could possibly result in "enemy combatant" status. That is because this case is surpassingly pretextual. The military long ago determined that the Uighurs are not the enemy,[9] and the massive litigation effort that has ensued

---

[9] Publicly available information confirms that the U.S. determined long ago that Parhat and the other Uighurs are not a threat. In May 2004, for example, State Department spokesman Richard Boucher reiterated that the U.S. had no interest in continuing to detain the Uighurs. U.S. State Dep't Daily Press Briefing (May 13, 2004), *available at* http://www.state.gov/r/pa/prs/dpb/2004/32455.htm. In early November, 2004, military officials told the New York Times that "at least half of the Uighurs here are eligible for release." Neil A. Lewis, *Freedom for Chinese Hinges on Finding a New Homeland*, N.Y. TIMES, Nov. 8, 2004, at

(Footnote Continued on Next Page.)

since then has been politically motivated cover of the most cynical kind. The Department of

Defense in 2005 observed that the Uighurs "were all considered the same." *See* Petition for

Original Writ of *Habeas Corpus, In re Ali*, No. 06-1194, at 8 (U.S. filed Feb. 13, 2007) (quoting

Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs Matthew Waxman).

Five of Parhat's companions – persons whose situation was precisely identical to his own – were

determined by the military to be noncombatants, *id.* at 7, and as the Circuit noted, the account of

one of those was contained in Parhat's CSRT record, *see* 2008 WL 2576977, *10.

As a preliminary matter, it would be remarkable, and profoundly inequitable, if the

government now sought to build a different record in this case. In 2007 and 2008, it fought three

rounds in the D.C. Circuit to establish that the record that Court ultimately considered *in this

case* was the *only* record that should be considered. The government lost, *see Bismullah v.

Gates*, 501 F.3d 178, 180 (D.C. Cir. 2007); it moved to reconsider and lost, *see Bismullah v.*

---

(Footnote Continued from Previous Page.)

A17. *See also* Tim Golden, *For Guantánamo Review Boards, Limits Abound*, N.Y. TIMES, Dec.
31, 2006, at A20 (quoting a national security official who worked on the Uighur cases, "[W]e
were shocked that they even sent those guys before the C.S.R.T.s. They had already been
identified for release."); Demitri Sevastopulo, *Uighurs face return from Guantánamo*,
FINANCIAL TIMES, Mar. 16, 2005 ("The Pentagon determined last year that half of the two dozen
Uighur Chinese captured in the war on terrorism have no intelligence value and should be
released. The U.S. has so far resisted Beijing's demands for repatriation out of concern that they
may be tortured once back in China."); Navy Secretary Gordon England, U.S. Dep't of Defense
News Transcript – Defense Department Special Briefing on Combatant Status Review Tribunals
at 3 (Mar. 29, 2005) ("I think it has been reported we have Uighurs from China that we have not
returned to China, even though, you know, some of those have been deemed, even before these
[CSRT] hearings, to be non-enemy combatants because of concerns and issues about returning
them to their country."), *available at* http://www.defenselink.mil/transcripts/2005/tr20050329-
2382.html; Editorial, *Detention Dilemma*, WASH. POST, May 3, 2005 ("[T]he military has
determined that about 15 of [the Uighurs at Guantánamo] are not 'enemy combatants.' . . . . The
Pentagon has, consequently, cleared them for release. The trouble is that the State Department
has been unable to find other countries willing to take them."); Carol Rosenberg, *Closing Terror
Prison Tricky for U.S.*, MIAMI HERALD, June 12, 2005, at 1A ("Navy Secretary Gordon England
confirmed in March that Guantánamo captives include Chinese Muslims – reportedly about two
dozen – who are no longer classified as 'enemy combatants,' the Bush administration term for
terrorism suspects."); Demitri Sevastopulo, *Cheney Backs Guantánamo Prison Amid Growing
Unease*, FINANCIAL TIMES, June 13, 2005, at 6 ("The U.S. is holding about 550 detainees at
Guantánamo, including about a dozen Uighur Chinese whom the U.S. has determined are no
longer 'enemy combatants.' The U.S. does not want to repatriate the Uighurs ethnic Muslims
from China's Xinjiang province out of fear that they could be tortured in China. But the Bush
administration is having trouble persuading other countries to take the Uighurs.").

*Gates*, 503 F.3d 137 (D.C. Cir. 2007); it moved for *en banc* consideration and lost, *see Bismullah v. Gates*, 503 F.3d 137 (D.C. Cir. 2007), and it petitioned the Supreme Court for a writ of *certiorari*, *see Gates v. Bismullah*, No. 07-1054.[10] At every step of the way, it asserted that the record the D.C. Circuit considered *was* the record. It cannot be heard now to say, "Let's have a new record after all." Nor can the government now commence a process to *build* a record to justify an imprisonment that already has almost doubled the entire length of the United States' involvement in World War II. *Habeas corpus* demands an immediate accounting of an existing legal basis for detention: it does not confer on the jailer an invitation to begin justifying his actions after the fact. *See* 28 U.S.C. § 2243 (cl. 2) (writ to be returned within twenty days); *Yong v. INS*, 208 F.3d 1116, 1120 (9th Cir. 2000) (*habeas corpus* is intended to be a "swift and imperative remedy in all cases of illegal restraint or confinement"). In every conceivable way, the government has been on notice of Parhat's contentions since 2005. It cannot now ask for more time to develop a theory.

There is a more fundamental reason that the government is unable to change the outcome of the merits determination. Parhat was not detained as an al Qaida or Taliban fighter or supporter. The pretextual theory advanced in, and rejected by the D.C. Circuit was that he was a member of the "East Turkestan Islamic Movement," and that "ETIM" was part of or supporting al Qaida and had engaged in hostilities against the coalition. *Parhat*, 2008 WL 2576977 at *9-*11. After careful review, the D.C. Circuit found that the record did not support either that ETIM was part of or supporting al Qaida or the Taliban, or that ETIM had engaged in hostilities against the coalition. *Id.* The Court did not reach the question whether Parhat himself was part of ETIM, although it noted the CSRT panel's observation that there was no evidence he had ever joined. *Id.* at *11.

---

[10] The Supreme Court took no action in *Gates v. Bismullah*, No. 07-1054, until June 23, 2008, when it issued a "GVR" order granting the government's petition for a writ of *certiorari*, vacating the judgment, and remanding the case to the D.C. Circuit for "further consideration in light of *Boumediene v. Bush*, 553 U.S. __ (2008)."

Thus the decision in *Parhat v. Gates* rests on the question of who our enemy was; specifically, whether ETIM was the enemy seven years ago, during the Afghanistan war. It was always farcical for the government to contend that it needs secret evidence to prove who the enemy is. "Who the enemy is" is for Congress, not the President to say, *see* U.S. CONST. art. I, § 8, cl.10 (power to declare war vested in Congress), and Congress says so in the Congressional Record, not in secret evidence. And whether farcical or not, that question has now left any realm of legitimate judicial controversy and entered history. In 2008, the government is not going to discover new evidence as to whom it was at war with in 2001. It is not going to learn that it was at war with ETIM. It can never discover evidence that Congress authorized any such war, because in the Authorization to Use Military Force, 115 Stat. 224 (Sept. 18, 2001), Congress did not authorize war against ETIM. It authorized only a conflict against those involved in the September 11, 2001 attacks, and those nations and organizations that harbored the attackers. The government has never asserted that ETIM did either. In sum, in this Court, the government will never succeed in making a new case on the merits.

Of course, any effort to reconsider the factual merits of Parhat's status is an effort for which, in *habeas*, Parhat has an absolute right to be present, and against which he may testify. 28 U.S.C. § 2243 (cl. 5) *requires* the custodian "to produce at the hearing the body of the person detained." As then-Judge Stevens explained, "Both parties – not just one – should be afforded an opportunity to argue the relevant facts to the district court. Only after that has been done will it be possible to determine whether an evidentiary hearing is necessary." *Kendzierski v. Brantley*, 447 U.S. 806, 808 (7th Cir. 1971); *see Stewart v. Overholser*, 186 F.2d 339, 342 (D.C. Cir. 1950) ("When a factual issue is at the core of a detention challenged by an application for the writ it ordinarily must be resolved by the hearing process.").

### 3.    No immigration power bars release.

In *Qassim v. Bush*, this Court considered the case of two of Parhat's companions. Judge Robertson ruled their imprisonment was unlawful, but dismissed the case because he concluded the court could not order the men released into the continental United States. 407 F. Supp. 2d at

16

202-03. We submitted at the time that the order was error, but the appeal to the Circuit was mooted at the eleventh hour by the transfer of the men to Albania (one business day before oral argument). Thus our disagreement with Judge Robertson's order was not tested.

      **a.**    *Qassim* **has been mooted.**

However, Judge Robertson's ruling has since been mooted, and effectively overruled. As shown above, *Boumediene* holds that Parhat has substantive *habeas* rights, and *Parhat* makes explicit that *habeas* gives the Court power to order release into the United States.

      **b.**    **There was and is no impediment to release into the United States in any event.**

Judge Robertson posited in *Qassim* that the court could not order the Executive to "bring" the petitioners to the United States, because doing so would interfere with immigration powers that are the exclusive province of the Executive. We submit this analysis was incorrect, because (i) for remedy purposes, Parhat is already here, and (ii) as a matter of law, detained deportable aliens must presumptively be released into American society after six months.

      **i.**    **In law, Parhat is already here.**

*Boumediene* vacated section 7 of the MCA, which had stripped from Parhat the right to *habeas corpus* under 28 U.S.C. § 2241, thereby restoring those rights to him. Those rights include, *inter alia*, the requirement that "[u]nless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained." 28 U.S.C. § 2243 (cl. 5). This statutory injunction applies to all persons who may invoke *habeas*, and that includes, of course, non-citizens, and persons outside the territorial boundaries of a judicial district. *Boumediene*, 128 S. Ct. at 2261.[11]

---

[11] In *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484 (1973), the Supreme Court rejected earlier reliance on the physical location of the petitioner, and ruled that a Kentucky federal court had jurisdiction in *habeas* over a petition brought by a prisoner in Alabama, even though the necessary import of the decision was that the petitioner might have to be transported to Kentucky. The Supreme Court has made no distinction between citizen and alien as to this proposition. For while it involved a U.S. citizen, *Braden* felt it necessary to overrule *Ahrens v. Clark*, 335 U.S. 188 (1948), a case involving aliens, and *Rasul*, though itself an alien case, relied on *Braden*. "In England prior to 1789, in the Colonies, and in this Nation during the formative years of our Government the writ of *habeas corpus* was available to nonenemy aliens as well as

(Footnote Continued on Next Page.)

A/72598848.1

The statutory requirement that the body be produced is mandatory, for Parhat's petition does not present "only issues of law." Parhat asserts that, as a matter of *fact*, he is a person whose release into the United States is merited and will create no threat of harm to any person. The Uighurs, he testified, "have never been against the United States and we do not want to be against the United States." *Parhat v. Gates*, 2008 WL 2576977 at *8. (And of course he would respond factually to any further government effort to brand him as an enemy combatant). Thus Parhat has an absolute right – conferred not by the Court but by Congress – to be present in this Court. His physical presence is procured not by an exercise of judicial power, but through Congress's mandate that he be afforded physical presence, in light of the Executive's unilateral action of having transported Parhat, against his will, to a place within the Court's jurisdiction. By enforcing section 2243, the Court will not be "bringing" Parhat anywhere. In law he is already here.[12]

While physical presence for a *habeas corpus* hearing may be the exception, not the rule, that is because the vast majority of *habeas* cases are post-conviction relief cases, which present only questions of law. Here Parhat does assert the right of presence, as Congress authorized him to do. That eliminates any question of the Court intruding on the powers of the coordinate branches. In short, when the Supreme Court concluded that this Court had jurisdiction over the Guantánamo *habeas* cases, and that the petitioners were in a "place that belongs to the United States," its ruling did not mean that Parhat was to be "brought" to the United States. It meant he was already here. Thus there is ample statutory and case authority for the first step: ordering the

---

(Footnote Continued from Previous Page.)

to citizens." *INS v. St. Cyr*, 533 U.S. 289, 301-02 (2001); *see also Ledesma-Valdez v. Sava*, 604 F. Supp. 675 (S.D.N.Y. 1985) (fact that aliens were in aircraft out of New York air space did not deprive court of *habeas* jurisdiction).

[12] In *Rasul*, the majority concluded that Guantánamo petitioners are within the "territorial jurisdiction" of the United States. 542 U.S. at 480. Justice Kennedy agreed. "From a practical perspective, the indefinite lease of Guantánamo Bay has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it." *Id.* at 487. This proposition was reaffirmed in *Boumediene*: "In every practical sense, Guantánamo is not abroad; it is within the constant jurisdiction of the United States." 128 S. Ct. at 2261 (citations omitted).

18

jailer to produce the body in the court house.

> ii.    **As a matter of law, detained deportable aliens must presumptively be released into American society after six months.**

Once Parhat is physically present, the Court may simply order that he be released.  At that point he would walk out of the courthouse door.[13]  In ordering such relief, the Court would not be granting Parhat asylum, or conferring on him immigration rights.  Release into the United States is a remedy specifically available, even to a person who has not technically made an "entry" into the United States.  In *Lee Fong Fook v. Wixon*, 170 F.2d 245 (9th Cir. 1948), a *habeas* petitioner was denied admission at the Port of San Francisco as an alien.  He claimed to be a citizen.  While the dispute was pending – at a time when he had been deemed an alien by the authority with jurisdiction over the question – the petitioner was released on bail (*i.e.*, into California) "to enable him more effectively to pursue his administrative remedy [by gathering evidence of his birth in the U.S.]" 170 F.2d at 246.  The Ninth Circuit specifically approved the parole into the continental United States of a *habeas* petitioner at a time when he had made no "entry" and had been found by the relevant authority to be an unlawful alien.

In *Clark v. Martinez*, 543 U.S. 371 (2005), the Supreme Court confirmed a similar principle and approved release into the population of aliens who were physically present but had never been admitted to the United States.  The case involved Cubans who arrived in the United States as part of the Mariel boatlift.  Under the law then effective, such refugees were not lawful aliens, and they were not "admitted," but rather "paroled" into the United States.[14]  (Refugees could later adjust their status to that of lawful permanent resident unless they fell within statutory

---

[13] We emphasize that this is an unusual case.  In most cases, where there is no credible fear of abuse at home, release of the prisoner to his home country would be the natural remedy.  Presence in law for purposes of *habeas* would not limit the Court's remedial power to order that remedy, as opposed to release into the United States.  Parhat is entitled to release into the United States because no other remedy is available here.

[14] The Attorney General has discretion to "parole" into the territory of the United States an alien who has never been admitted.  8 C.F.R. § 212.5(a) (2004).

exclusions.) The *Martinez* petitioners committed serious crimes in the United States, and were therefore excluded from admission. They were thus unlawful aliens who had never been admitted to the United States. The men were ordered deported, but because Cuba would not accept them, they were detained pursuant to statute. They brought *habeas corpus* petitions, and the Supreme Court ordered that they must be released, even though they had never been lawful resident aliens. 543 U.S. at 386; *see also Zadvydas v. Davis*, 533 U.S. 678, 699-700 (2001) (adjudicated criminal aliens entitled to release).

Under *Martinez* and *Zadvydas*, detained deportable aliens "must presumptively be released into American society after six months." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 347-48 (2005) (recognizing the rule). This rule has been followed in numerous cases ever since. *See, .e.g., Morales-Fernandez v. INS*, 418 F.3d 1116 (10th Cir. 2005) (applying *Martinez* rule and ordering release of inadmissible Cuban alien held beyond six-month presumptive detention period); *Baez v. Bureau of Immigration & Customs Enforcement*, 150 Fed. Appx. 311, 2005 WL 2436835 (5th Cir. 2005) (same); *Perez-Aquillar v. Ashcroft*, 130 Fed. Appx. 432, 2005 WL 1074339 (11th Cir. 2005) (ordering parole and release into the United States under the rule of *Martinez* of inadmissible Cuban national who had repeatedly violated U.S. laws).

Courts applying *Martinez* have ordered release of inadmissible aliens even where the government raised issues concerning the alien's mental stability, risk to the community, and the protection of national security. *See, e.g., Tran v. Mukasey*, 515 F.3d 478, 486 (5th Cir. 2008) ("While this Court is sympathetic to the Government's concern for public safety, we are without power to authorize [petitioner's] continued detention."); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1083-84 (9th Cir. 2006) (granting Sri Lankan national's motion for immediate release from his five-year detention where agency's conclusions that continued detention was in the public interest or that his release posed risk to national security were based on implausible evidence and ignored evidence of detention's deleterious effect on petitioner's health); *Hernandez-Carrera v. Carlson*, 546 F. Supp. 2d 1185, 1190-91 (D. Kan. 2008) (ordering release of Cuban aliens

detained beyond the six-month presumptive detention period, even though it was alleged that they had a harm-threatening mental illness and were likely to engage in violent behavior if released, such that public safety could not reasonably be guaranteed; explaining that "[i]f further detention of aliens with mental illness or threat of violence is required to protect public safety, rather than the supervised release which is currently authorized, Congress has not yet acted to provide such additional protection").

The foreign nationals in *Martinez* each had been convicted of serious crimes in the United States. They bore responsibility for their stateless plight, because they chose to come to the United States voluntarily. Parhat, by contrast, has never even been charged with wrongdoing, was not deemed by the military in 2003 or 2004 to constitute any threat to U.S. interests, has never been hostile to the United States, and was transported involuntarily to Guantánamo by bounty hunters and the United States military. His release would constitute no threat now.

To the extent of any tension between the urgency of judicial remedy, and the Executive's immigration authority, judicial remedy must prevail. Whatever imposition might exist on immigration discretion is one the Executive placed on itself when it transported Parhat to Guantánamo. But without remedy in this *habeas* case, there will be no check on executive lawlessness, and the entire force of *Boumediene* would be lost.

*Habeas corpus*, in the words of Justice Holmes, "cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell." *Frank v. Mangum*, 237 U.S. 309, 346 (1915) (dissenting opinion) (cited in *Boumediene*, 128 S. Ct. at 2270). That form-cutting power compels a remedy, and the only remedy available here is release.

4.    **Geneva IV obligates the United States to tolerate Parhat's presence in the continental United States.**

Because Parhat is not an enemy combatant, his prior capture by the United States military makes him, as a civilian, a protected person under Geneva IV, Articles 4 and 13, whose custody

is subject to 28 U.S.C. § 2241(c)(3) ("custody in violation of the Constitution or laws or treaties of the United States"). By adopting the treaty, the United States has already acknowledged that those in Parhat's position are entitled to release into the continental United States.

The convention contemplates that such persons may be released from confinement while pursuing (and presumably while the government pursues) a final asylum solution, whether that be here or abroad, and that such a the release has no impact on the parties' respective rights in that regard. Geneva IV recognizes:

> [T]he internee's right to choose between return to his residence or repatriation. It also implies that the Detaining Power [*i.e.*, the United States] has the right to refuse the internee permission to reside in its territory. At that point, what will happen if the internee thus refused permission himself opposes his repatriation? It would be contrary to the spirit of the Convention if he could be forcibly repatriated when he feared persecution in his country of origin for his political opinions or his religious beliefs. In such a case he would become a refugee, obliged to seek a new domicile in a country different from the one in which he is living. *While awaiting the result of his efforts to find such a new domicile, the Detaining Power [i.e., the United States] is bound by its humanitarian duty to tolerate his presence in the country on a temporary basis.*

Geneva Convention relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 973, art. 135 cmt. (emphasis supplied). Parhat thus has the right to be released into the continental United States so that he can seek refugee status either in the United States or in another country.

## 5.    Prudential concerns cannot defeat Parhat's release right.

The government can make no case that some equitable or prudential reason can impose further delay on Parhat's legal right to be immediately free of further confinement. Parhat has been imprisoned for more than six years. He has never been charged with, or suspected of criminal wrongdoing. He has never been a martial enemy of this Nation. The "training" he received in the assembly and disassembly of firearms is no different from the training millions of Americans receive every day. Had he physically possessed a firearm in Afghanistan, he would have done no more than every homeowner in the District of Columbia has a constitutional right to do. *See District of Columbia v. Heller*, 554 U.S. ___, 128 S. Ct. 2783 (2008). At his *habeas* hearing, Parhat will meet any suggestion or innuendo that his release would threaten any person.

Nor can the President justify further prudential delay so as to effect a consensual transfer. That process had been underway for a long period before, in 2005, the State Department averred that it had made prodigious efforts. *See* National Public Radio, Morning Edition, "Chinese detainees at Guantanamo get hearing" (Aug. 25, 2005) (interview with Pierre-Richard Prosper, U.S. ambassador-at-large for war crimes, in which Prosper stated that between 2003 and August 2005, the United States asked at least 25 countries to take the Uighurs). The government has long since exhausted any right to seek additional time. *See generally Martinez*, 543 U.S. at 386 (six months the presumptive limit on detention pending deportation). The Executive itself has created the very circumstances of which it complains. Resettlement abroad has become all but hopeless, as the Executive long ago persuaded the rest of the world that Guantánamo prisoners are terrorists.[15]

Parhat concedes that the practical considerations presented by the remedy phase of his case are poignant. Penniless, far from family and friends, and understanding little English, he has suffered an almost unimaginable imprisonment. He cannot suddenly pick up a Berlitz English book and join the work force. It will be important that Parhat receive community support. Immigration authorities will have a legitimate interest in knowing of the conditions of his release. All such arrangements can be addressed at Parhat's *habeas* hearing, as a loyal expatriate community of Uighurs is present in the District of Columbia to provide the necessary support. Representatives of this group (who bear deep allegiance to the United States) will be present in Court and able to assure the Court as to the details of release.

---

[15] Justice Jackson wrote of Ignatz Mezei, the alien stranded at Ellis Island, "Since we proclaimed him a Samson who might pull down the pillars of our temple [Mezei was a suspected communist], we should not be surprised if peoples less prosperous, less strongly established and less stable feared to take him off our timorous hands." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 220 (1953) (Jackson, J., dissenting).

A/72598848.1

## CONCLUSION

For the foregoing reasons, Huzaifa Parhat respectfully requests that his Motion be granted.

Respectfully submitted,

DATED: July 22, 2008

Susan Baker Manning
susan.manning@bingham.com
Catherine R. Murphy
catherine.murphy@bingham.com
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006
Telephone:    (202) 373-6000
Facsimile:    (202) 373-6001

Sabin Willett
sabin.willett@bingham.com
Neil McGaraghan
neil.mcgaraghan@bingham.com
Rheba Rutkowski
rheba.rutkowski@bingham.com
Jason S. Pinney
jason.pinney@bingham.com
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
Telephone:    (617) 951-8000
Facsimile:    (617) 951-8736

*Counsel for Huzaifa Parhat*

A/72598848.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, AS NEXT FRIEND OF<br>ABDUSABUR DOE, et al.,<br><br>     Petitioners,<br><br>        v.<br><br>GEORGE W. BUSH, et al., .<br>     Respondents. | Civil Action No. 05-1509 (RMU) |

### JULY 21, 2008 DECLARATION OF SABIN WILLETT

Pursuant to 28 U.S.C. § 1746, I, Sabin Willett, declare under penalty of perjury that the following is true:

1.    I met with Huzaifa Parhat in Camp 6, Guantánamo Bay, in mid-October, 2007. In our meeting, he requested that a message be passed to his wife. He stated that she should consider him dead and remarry.

2.    Our most recent communication with Mr. Parhat was by telephone, in July, 2008, following the decision of the Court of Appeals for the District of Columbia Circuit in *Parhat v. Gates*, No. 06-1397, 2008 WL 2576977, *1 (D.C. Cir. June 20, 2008). Parhat advised of an urgent wish to speak to his mother. The Red Cross has informed him that her health is deteriorating, and he was deeply concerned that he might not be able to speak to her again before she dies.

3.    We have requested such a call. To date, the request has not been allowed.

4.    Attached hereto as Exhibit 1 is a photocopy that I obtained from the Boston Public Library of an article published in The Boston Globe on July 30, 1944.

5.    Attached hereto as Exhibit 2 is a photocopy that I obtained from the Boston Public Library of an article published in The Boston Globe on June 5, 1944.

I declare under penalty of perjury that the foregoing is true.

_____
Sabin Willett

## Mobile Service Units

## Moved From So. Boston To Harbor Islands

## Two Sides of the Row

By FRANCES BURNS

Mobile Service Units (prisoners of war) have been housed and fed and hospitalized as American soldiers, according to the agreement of the Geneva Convention for all prisoners of war in this country.

No change in the status of the units is contemplated, Maj. Gen. Sherman Miles, commanding General of the 1st Service Command, announced yesterday. For four months the Islands have been employed as laborers under the authority of the Port of Embarkation, of which Brig. Gen. Calvin DeWitt Jr. is now commanding officer. The arrangements were made by the War Department after the armistice with Italy and the 1st Service Command was charged with the care of the units when they were sent to this area. The men were moved because of the necessity of the camp to Camp Edwards, which has been more crowded than usual this Summer.

Continuation of their present status so long as they remain in Boston means that:

1. They will be housed, fed, clothed and hospitalized as American soldiers according to the agreement of the Geneva Convention for all prisoners of war in this country.

2. As volunteers on work directly connected with the prosecution of the war, they will not be kept in a stockade; one-third of the 80 cents a day which they are paid for nine hours' work will be given them at the end of the month in cash, instead of the canteen checks in which prisoners of war normally receive their pay, they will be given some liberty on their days off in the way of passes out of the camp.

See PRISONERS     Page 14

**Brisol**

Continued from First Page

These parole must be used by troop of not less than 70 or more. Gen. H. Alward recommended by American Army account.

Some veterans organizations in Boston last week demanded that the Italian units be returned to a strict status as prisoners of war. John L. Delay, state commander of the American Legion, told the Globe Friday, the question would be taken up at the state meeting of the Legion in August and "the Army has been asked to treat these men as prisoners of war and not as guests of the country."

"If these men don't want to work here without special privileges they should be returned to the stockade like any other prisoners of war," Delay said. "We can let American soldiers do the work. Negro soldiers are doing a lot of it ... Ask anybody back ... Italy and they'll tell you that ... Italian soldiers were very arrogant in Salerno and Naples to our men. They aren't going to tell the Army what to do, but, we want them to stop 'pampering these prisoners.'"

John B. Powers, adjutant of the ...

### Considered Great Help to U.S.

"These service units of Italian prisoners of war are being used in all major ports of embarkation in the country," a War Department spokesman told the Globe yesterday at the headquarters of the former Italian belligerents.

"Their work performance is uniformly excellent. They are helping to speed the flow of material to our men overseas. Their loss to any port would be critically felt. The demand for them is greater than the supply. Should the units now working in Boston be transferred away from that port it would hurt the Port of Boston and hurt our war effort."

After the armistice with Italy the Allied nations began using labor groups of Italian prisoners of war in Africa with such success that it was suggested an effort be made in this country to ease the burden of the labor shortage. It was an Army spokesman said to the Globe, "put up to the Italians. They were told ...

### "Coddling" Story Refuted

"It is the freedom in the whole life and surroundings of the Italian prisoners of war within the ...

FIRST
of this ...

after clearing tank trap looking over the road to repossession of the Mariana island, former United States territory.



Marine Signal Corps Radio Photo

**FIRST ACTION PHOTO** of battle for Guam shows Marines, after clearing tank trap looking over the road to repossession of this Mariana Island, former United States territory.



# Former Italian Prisoners Enjoy Boston Hospitality

Given their first breath of free... civilian mass in the
...nce the A. of M. GEODE BLIN...

...200 former Italian prisoners ...Since Italy retired from the
...are now... war military authorities in this
...their station... ...have gradually...
...Catholic ...See PRISONERS...    Pace 4

**FORMER ITALIAN WAR PRISONERS** ... A Hatch Shell ... Armando Zanecchia of mili...
...police... music group ... Rev. Daniel St. Elevoile of St. Leonard's Church is seated in...

## Prisoners
Continued from First Page

...take an oath of allegiance to
...United States ...
...subjects under the
...by Army

...'s Church in the
...yesterday morning...
...among the mass of tept-
...Catholic church-goers...
...were clothed in G.I...

...curate, at St. Leonard's, en-
treated these former prisoners of
war to thank God for being
spared from death, and for coming
to this country the greatest demo-
cracy in the world, Fr. ... was
Fr. Pildini was himself a prisoner
of the Germans for 18 months dur-
ing World War L

### Star-Studded Show
Following the church services, the
men were carried to the ...
...East Crowds cheered them as...
...to their beloved...
...at the Hatch Memorial Shell on the
Charles River Esplanade ...
...and sang ...Flowers...
...Sousdine ...Mame...
After posing for ...the...

...noned ...to the subject of their
prayers ...they revealed that they
were offering thanksgiving for the
...ity of recreation and ...
...to a ...conclusion of the war
...that they might return home.

### Party of Home
...played ...among them-
selves ...although the Fathers
...had provided ...baseball equipment
...most of them showed preference for
...their native ...known such as
...an Italian version of bowling on
the green.
While feasting on their native...