IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, AS NEXT FRIEND OF ABDUSABUR DOE, et al.,<br><br>Petitioners,<br>v.<br>GEORGE W. BUSH, et al.,<br>Respondents. | Civil Action No. 05-1509 (RMU) |

### HUZAIFA PARHAT'S MOTION FOR IMMEDIATE RELEASE ON PAROLE INTO THE CONTINENTAL UNITED STATES PENDING FINAL JUDGMENT ON HIS *HABEAS* PETITION

Huzaifa Parhat, a civilian determined not to be an enemy combatant, yet wrongfully imprisoned at Guantánamo Bay, moves for immediate release on parole into the continental United States pending final judgment in this *habeas corpus* action. As grounds therefor, Parhat relies on the Declarations of Alim Seytoff and Rebia Kadeer and his memorandum of points and authorities in support hereof, submitted herewith, as well as the memorandum of points and authorities in support of his motion for judgment ordering release, and the accompanying July 21, 2008 Declaration of Sabin Willett, and says:

1. Parhat is a civilian who has been determined not to be an enemy combatant by the Court of Appeals for the District of Columbia Circuit. He has moved for judgment ordering his immediate release.

2. Parhat continues to be unlawfully detained at Guantánamo, where he is now suffering in his seventh year.

A/72602672.1

3. Parhat expects the government to vigorously oppose his motion for judgment, and expects that this Court's review of that motion and the potential appeals from this Court's final judgment to be time-consuming.

4. An immediate vehicle for release is available. A community of Uighur (also spelled "Uyghur") Americans is resident in the District of Columbia and its environs, and is deeply sympathetic to Mr. Parhat's plight. *See generally* Declarations of Alim Seytoff and Rebiya Kadeer, submitted herewith. This expatriate community has deep loyalty to the United States. Its leader, Ms. Kadeer, has met with and been honored by President Bush for her tireless efforts in behalf of human rights. The community also has broad experience helping Uighur refugees – some of them victims of long imprisonment – to negotiate the linguistic and practical challenges of resettlement in the United States. Ms. Kadeer herself, current president of the Uyghur American Association and the World Uyghur Congress, arrived in this country in 2005 after a long and harsh imprisonment in the People's Republic of China. Kadeer Decl. ¶¶ 5, 8.

5. The Uyghur American community can provide valuable assistance in assuring that Parhat can understand and comply with whatever conditions of release may be imposed by the Court, which may include maintaining close contact with immigration authorities and the U.S. Marshals' Service, as well as the Court. All such arrangements can be addressed at Parhat's parole hearing.

**WHEREFORE**, Parhat requests that:

A. The Court convene an immediate hearing, at which the government should be ordered to produce Parhat, to consider terms and conditions of parole. The court should permit testimony and/or other proffer of information from the parties as to the logistical support necessary to effectuate parole.

B. At hearing, the Court should immediately order Parhat released on parole pending final judgment. The Court should enter such conditions for reporting and monitoring as are reasonable in the circumstances.

C. The Court should enter such other and further relief as may be just and proper.

A/72602672.1

                                                Respectfully submitted,

DATED: July 23, 2008

                                                */s/ Susan Baker Manning*
Susan Baker Manning
susan.manning@bingham.com
Catherine R. Murphy
catherine.murphy@bingham.com
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006
Telephone:   (202) 373-6000
Facsimile:   (202) 373-6001

Sabin Willett
sabin.willett@bingham.com
Neil McGaraghan
neil.mcgaraghan@bingham.com
Rheba Rutkowski
rheba.rutkowski@bingham.com
Jason S. Pinney
jason.pinney@bingham.com
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
Telephone:   (617) 951-8000
Facsimile:   (617) 951-8736

*Counsel for Huzaifa Parhat*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, AS NEXT FRIEND OF ABDUSABUR DOE, et al.,<br><br>    Petitioners,<br>    v.<br><br>GEORGE W. BUSH, et al.,<br>    Respondents. | Civil Action No. 05-1509 (RMU) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
HUZAIFA PARHAT'S MOTION FOR IMMEDIATE RELEASE ON PAROLE
INTO THE CONTINENTAL UNITED STATES PENDING FINAL JUDGMENT
ON HIS *HABEAS* PETITION**

Huzaifa Parhat, a civilian unlawfully imprisoned at Guantánamo Bay, has moved for judgment on his *habeas corpus* petition ordering release into the continental United States. Parhat also has moved for immediate release on parole into the continental United States pending entry of final judgment ("Parole Motion"). He submits this memorandum of points and authorities in support of his Parole Motion.

**PROCEDURAL HISTORY**

The factual and procedural history of Parhat's case are set out in his motion for judgment and memorandum of points and authorities in support thereof. On June 20, 2008, the Court of Appeals for the D.C. Circuit held that the government's record did not justify Parhat's detention as an enemy combatant. *Parhat v. Gates*, No. 06-1397, 2008 WL 2576977, *1 (D.C. Cir. June 20, 2008). The Court ordered the government to release or transfer Parhat, or to expeditiously hold a new Combatant Status Review Tribunal ("CSRT") consistent with its opinion. *Id.* at *14.

A/72602574.1

The Court of Appeals noted that this Court, as a *habeas* court, has the power to order release, and that Parhat could seek that remedy immediately, *regardless of whether the government sought another CSRT. Id.* at *18.

Parhat has moved for final judgment ordering his release into the continental United States. He expects that the government will vigorously resist that motion. Because Parhat continues to be held in Guantánamo under no legal authority whatsoever, he has also moved for interim relief: namely, parole into the continental United States pending a ruling on the merits of his motion for judgment.

## ARGUMENT

A.   **This Court Has The Power To Order Parhat's Release On Parole.**

This Court has inherent power as a *habeas* court to order "parole—that is, release on conditions—pending its final decision on the merits of Parhat's motion for judgment. *Baker v. Sard*, 420 F.2d 1342 (D.C. Cir. 1969). In *Baker*, the D.C. Circuit stated that "[w]hen an action pending in a United States court seek release from what is claimed to be illegal detention, the court's jurisdiction to order release as a final disposition of the action includes an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits." 420 F.3d at 1343. The power is an incident to—a lesser-included subset of—*habeas* jurisdiction itself, not simply an analog to a bail statute. *See Johnston v. Marsh*, 227 F. 2d 528 (3d Cir. 1955) (court has power to order bail in *habeas* even in absence of bail statute).

This power is fully available to the Court in cases involving aliens. *See Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Truong Thanh Tam v. INS*, 14 F. Supp. 2d 1184, 1190-92 (E.D. Cal. 1998) (ordering release of an unremovable alien pending resolution of the merits of a *habeas* petition challenging indefinite detention where the detainee had a high probability of success on the merits and could not be deported to home country). In *Mapp*, for example, the Second Circuit held that there was *inherent* power to admit an alien to bail—power derivative not from any bail statute but from the power to grant final relief in a *habeas* case. 241 F.3d at 226. That power may be used where it may implicate a requirement that the government move

the prisoner. *United States v. Mauro*, 436 U.S. 340, 357 (1978) (power to issue writs of *habeas corpus* includes authority to issue such a writ when it is necessary to bring a prisoner into court to testify or for trial or to remove a prisoner in order to prosecute him in the jurisdiction where the offense was committed); *Chick Yow v. United States*, 208 U.S. 8, 13 (1908) (ordering writ of *habeas corpus* for a petitioner denied entry in a case in which citizenship was disputed; prisoner ordered brought before judge for trial); *Whitfield v. Hanges*, 222 F. 745, 756 (8th Cir. 1915) (concluding that "the [*habeas*] court has ample power to admit the alien to bail or to take his own recognizance").

      Parole does not constitute an admission into the United States for immigration purposes, *see Kaplan v. Tod*, 267 U.S. 228, 230 (1925), and Parhat does not, by this motion, seek an order changing his immigration status. Rather, interim release on conditions accords with recent Supreme Court guidance in an analogous circumstance—where deportable aliens have no legal right to admission into the United States, but are stranded because no foreign government has agreed to accept them. In *Clark v. Martinez*, 543 U.S. 371 (2005), the Supreme Court approved release into the population of aliens who were physically present but had never been admitted (for immigration purposes) to the United States. The case involved Cubans who arrived in the United States as part of the Mariel boatlift. Under the law then effective, such refugees were not lawful aliens, and they were not "admitted," but rather were "paroled" (in the immigration sense of the word) into the United States.[1] (Refugees could later adjust their status to that of lawful permanent resident unless they fell within statutory exclusions.) The *Martinez* petitioners committed (and served sentences for) serious crimes in the United States, and were therefore excluded from admission. The men were ordered deported, but because Cuba would not accept them, they were detained pursuant to statute. They brought *habeas corpus* petitions. The Supreme Court ordered that they must be released, even though, as the government argues is true

---

[1] The Attorney General has discretion to "parole" into the territory of the United States an alien who has never been admitted. 8 C.F.R. § 212.5(a) (2004).

of Parhat, they had no legal entitlement to presence in the continental United States. 543 U.S. at 386; *see also Zadvydas v. Davis*, 533 U.S. 678, 699-700 (2001) (adjudicated criminal aliens entitled to release).

Under *Martinez* and *Zadvydas*, detained deportable aliens "must presumptively be released into American society after six months." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 347-48 (2005) (recognizing the rule). This rule has been followed in numerous cases. *See, e.g., Morales-Fernandez v. INS*, 418 F.3d 1116 (10th Cir. 2005) (ordering release of inadmissible Cuban alien held beyond six-month presumptive detention period); *Baez v. Bureau of Immigration & Customs Enforcement*, 150 Fed. Appx. 311, 2005 WL 2436835 (5th Cir. 2005) (same); *Perez-Aquillar v. Ashcroft*, 130 Fed. Appx. 432, , 2005 WL 1074339 (11th Cir. 2005) (ordering parole and release into the United States of inadmissible Cuban national who had repeatedly violated U.S. laws).

**B.    Parhat Is Highly Likely To Prevail On The Merits.**

    **1.    Parhat has prevailed, and there is no showing the government can overcome its previous loss, in the Court of Appeals.**

The Court of Appeals has concluded that Parhat is not an enemy combatant, and that is the *status quo* today. Further, as the Circuit explained, "*Boumediene* [*v. Bush*, 553 U.S.__, 128 S. Ct. 2229 (2008)] made it quite clear" that Parhat is entitled to seek *habeas corpus* relief "immediately, without waiting to learn whether the government will convene another CSRT," and that, in such *habeas* proceeding, "he will be able to make use of the determinations we have made today regarding the decision of his CSRT, and he will be able to raise issues that we did not reach." 2008 WL 2576977 at *15 (citing *Boumediene* slip op. at 49, 66). "Most important," the Court emphasized, "in that proceeding there is no question but that the court will have the power to order him released." *Id.* (citing *Boumediene* slip op. at 50, 58). A central tenet of the Supreme Court's decision in *Boumediene* is that the delay in considering the Guantánamo detainees' *habeas* petitions challenging their detention has already been far too long, and that "[t]he detainees in these cases are entitled to a prompt *habeas corpus* hearing." 128 S. Ct. at 2275.

That *status quo* is unlikely to change. In *Parhat v. Gates*, the government had complete control of the record. That record included none of the myriad exculpatory materials that Parhat had gathered from public sources. Parhat was not able to make his own case or respond to the government's case, the government's record enjoyed a statutory presumption of accuracy, and still the record was so empty that the government could not prevail. 2008 WL 2576977 at *14-*15.[2] The government has not shown that it can overcome the non-combatant determination. It cannot, for the simple reason that Huzaifa Parhat has never himself been, nor affiliated himself with this Nation's enemies.

2. **Parhat is entitled to the remedy of immediate release.**

Like the detainees in *Martinez*, Parhat is detained for the practical reason that no safe country has been found to take him. As discussed in Parhat's memorandum of points and authorities in support of his motion for judgment, the government has conceded that it cannot return him to China, and it is evident that all efforts to persuade allies to accept him as a refugee have failed. Accordingly, Parhat falls within the rule of *Martinez*, and must be released here.

Under the *Martinez* rule, courts must order release of an inadmissible alien even where substantial issues are raised concerning the alien's mental stability, risk to the community, or the protection of national security. *See, e.g., Tran v. Mukasey*, 515 F.3d 478, 486 (5th Cir. 2008) ("While this Court is sympathetic to the Government's concern for public safety, we are without power to authorize [petitioner's] continued detention."); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1083-84 (9th Cir. 2006) (granting Sri Lankan national's motion for immediate release from his five-year detention where agency's conclusions that continued detention was in the public interest or that his release posed risk to national security were based on implausible evidence and ignored evidence of detention's deleterious effect on petitioner's health); *Hernandez-Carrera v. Carlson*, 546 F. Supp. 2d 1185, 1190-91 (D. Kan. 2008) (ordering release of Cuban aliens

---

[2] The opinion was sealed and on June 30, 2008, a redacted version of the opinion was publicly released.

detained beyond the six-month presumptive detention period, even though it was alleged that they had a harm-threatening mental illness and were likely to engage in violent behavior if released, such that public safety could not reasonably be guaranteed; explaining that "[i]f further detention of aliens with mental illness or threat of violence is required to protect public safety, rather than the supervised release which is currently authorized, Congress has not yet acted to provide such additional protection").

*A fortiori*, Parhat is entitled to release, because none of those concerns applies here. As demonstrated in Parhat's memorandum of points and authorities in support of his motion for judgment, he has never even been charged with wrongdoing, and has never engaged in nor contemplated hostilities against the United States or its allies. He has been cleared for release for years. He was not deemed by the military in 2003 or 2004 to constitute any threat to U.S. interests, and was transported involuntarily to Guantánamo by bounty hunters and the United States military. His temporary release would constitute no threat.

Parhat's situation recalls that of Italian prisoners of war during World War II. On September 29, 1943, the Badoglio government executed the instrument of Italian surrender with allied forces. *See* Instrument of Surrender of Italy, Sept. 29, 1943, 61 Stat. 2742, 3 Bevans 775. But in September 1943, the Italian peninsula remained in chaos and repatriation of Italians to Italy was impractical. Thus Italian prisoners of war were granted substantial liberty. More than 45,000 Italian prisoners of war joined "Italian Service Units," located throughout the continental United States. *See* Camilla Calamandrei, *Italian POWs Held in America During WW II: Historical Narrative and Scholarly Analysis* (2000), *available at* www.italianpow.com/history.html. These former enemy combatants were given increased freedom of movement among the civilian population: they held jobs and earned money. *Id.* In San Francisco, California, and Ogden, Utah, for example, Italian-American families could take Italian Service Unit members out of POW camps for picnics and outings. *Id.* Fraternization was common: after the war, a significant number of American women traveled to Italy to marry former Italian prisoners of war. *Id.*

After the Italian armistice, prisoners of war formerly held at Camp McKay in South Boston were transported to a housing facility on Peddocks Island in Boston Harbor, which was "not a stockade," according to the commander. *See generally* July 21, 2008 Declaration of Sabin Willett ("July 21, 2008 Willett Decl.") Ex. 1 (*Moved From So. Boston to Harbor Island; Two Sides of the Row*, Boston Globe, July 30, 1944). The Italians were permitted to work for pay. They received liberty to go among the civilian population of the city. *Id.* The War Department stated that "these service units of Italian prisoners of war are being used in *all major ports of embarkation the country*." *Id.* (emphasis supplied). A brigadier general sent a commendatory telegram to local Italian-Americans in the Boston area who had provided social support for the Italian POWs. The army sent out for ice cream and cookies. *Id.* The Boston Globe reported that young women at Carson's Beach [were] "passing notes through the fence." *Id.*; *see also* July 21, 2008 Willett Decl. Ex. 2 (*Former Italian Prisoners Enjoy Boston Hospitality*, Boston Globe June 5, 1944) (documenting how Italian POWs attended Mass in Boston's North End, picnics, and concerts along the Esplanade).

3. **An immediate, practical remedy is available.**

An immediate vehicle for release is available. A community of Uighur Americans is resident in the District of Columbia and its environs, and is deeply sympathetic to Mr. Parhat's plight. *See generally* Declarations of Alim Seytoff and Rebiya Kadeer, submitted herewith. This expatriate community has deep loyalty to the United States. Its leader, Ms. Kadeer, has met with and been honored by President Bush for her tireless efforts in behalf of human rights. The community has broad experience helping Uighur refugees, some of them victims of long Chinese imprisonment, negotiate the linguistic and practical challenges of resettlement in the United States. Ms. Kadeer herself, current president of the Uyghur American Association and the World Uyghur Congress, arrived in this country in 2005 after a long and harsh imprisonment in the People's Republic of China. Kadeer Decl. ¶¶ 5, 8.

In addition, U.S. law itself provides a means of maintenance for persons, like Parhat, in the situation of petitioners like those in *Martinez*; for example, through regulations providing for

the issuance of temporary work authorizations for aliens released under an order of supervision. *See* 8 C.F.R. § 241.13(h)(3); 8 C.F.R. § 241.5(c); 8 C.F.R. § 274a.12(c)(18).

The Court can order such conditions of release as are reasonable. For example, the Court may wish to order regular reporting to the U.S. Marshals' Service, the Department of Homeland Security, or to other governmental officials, while Parhat's *habeas* case is pending. The Court may wish also to enter appropriate restrictions on travel. The Uighur American community can provide valuable assistance in assuring that Parhat can understand and comply with whatever conditions of release may be imposed by the Court. All such arrangements can be addressed at Parhat's parole hearing.

The situation of Italian prisoners of war during World War II is particularly instructive. On September 29, 1943, the Badoglio government executed the instrument of Italian surrender with allied forces. *See* Instrument of Surrender of Italy, Sept. 29, 1943, 61 Stat. 2742, 3 Bevans 775. Northern Italy remained under control of the German army, and the Germans had purported to place Benito Mussolini at the head of newly declared fascist "republic." Accordingly, in September 1943, the Italian peninsula remained in chaos and repatriation of Italians to Italy was impractical. The war against Germany would rage on for twenty months.

Nevertheless, Italian prisoners of war were granted substantial liberty. More than 45,000 Italian prisoners of war joined "Italian Service Units," located throughout the continental United States. *See* Camilla Calamandrei, *Italian POWs Held in America During WW II: Historical Narrative and Scholarly Analysis* (2000), *available at* www.italianpow.com/history.html. These former enemy combatants were given increased freedom of movement among the civilian population: they held jobs and earned money. *Id.* In San Francisco, California, and Ogden, Utah, for example, Italian-American families could take Italian Service Unit members out of POW camps for picnics and outings. *Id.* Fraternization was common: after the war, a significant number of American women traveled to Italy to marry former Italian prisoners of war. *Id.*

After the Italian armistice, prisoners of war formerly held at Camp McKay in South Boston were transported to a housing facility on Peddocks Island in Boston Harbor, which was

"not a stockade," according to the commander. *See generally* July 21, 2008 Declaration of Sabin Willett ("July 21, 2008 Willett Decl.") Ex. 1 (*Moved From So. Boston to Harbor Island; Two Sides of the Row*, Boston Globe, July 30, 1944). The Italians were permitted to work for pay. They received liberty to go among the civilian population of the city. *Id.* They would ride a ferry from Peddocks Island, where they were housed, to work at the Boston Port of Embarkation, where they were paid for work. *Id.* This was not unique to Boston: the War Department stated that "these service units of Italian prisoners of war are being used in *all major ports of embarkation the country*." *Id.* (emphasis supplied).

The commander reported that "they will be given some liberty on their days off in the way of passes out of the camp." July 21, 2008 Willett Decl. Ex. 1. A brigadier general sent a commendatory telegram to local Italian-Americans in the Boston area who had provided social support for the Italian POWs. Even before the transfer to Peddocks, security was lax. The army sent out for ice cream and cookies. *Id.* The Boston Globe reported that young women at Carson's Beach [were] "passing notes through the fence." *Id.*

On June 4, 1944, a group of Italian POWs was taken to St. Leonard's Church in Boston's North End,[3] and thence to the Hatch Shell (an outdoor concert facility along the Esplanade most famous for its Fourth-of-July concerts). *See generally* July 21, 2008 Willett Decl. Ex. 2 (*Former Italian Prisoners Enjoy Boston Hospitality*, Boston Globe June 5, 1944). The Boston Globe reported:

> Following the church services, the men were conveyed by troop carriers down Prince St. in the North End. Crowds cheered them as they passed through Boston's closest facsimile to their beloved homeland. At the Hatch Memorial Shell on the Charles River Esplanade, they halted and sang a native song entitled, "A Bouquet of Flowers."

*Id.* The men posed for pictures; they played bocci; they "feast[ed] on native dishes." *Id.*

---

[3] Then as now, the North End of Boston was home to large numbers of Italian-Americans. It appears that the spirit of welcome among Uighur expatriates in the District of Columbia and its environs would be no less heartfelt.

## CONCLUSION

For the foregoing reasons, Huzaifa Parhat respectfully requests that his Parole Motion be granted.

Respectfully submitted,

DATED: July 23, 2008

/s/ Susan Baker Manning
Susan Baker Manning
susan.manning@bingham.com
Catherine R. Murphy
catherine.murphy@bingham.com
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006
Telephone:   (202) 373-6000
Facsimile:    (202) 373-6001

Sabin Willett
sabin.willett@bingham.com
Neil McGaraghan
neil.mcgaraghan@bingham.com
Rheba Rutkowski
rheba.rutkowski@bingham.com
Jason S. Pinney
jason.pinney@bingham.com
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
Telephone:   (617) 951-8000
Facsimile:    (617) 951-8736

*Counsel for Huzaifa Parhat*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, AS NEXT FRIEND OF ABDUSABUR DOE, et al.,<br><br>Petitioners,<br>v.<br>GEORGE W. BUSH, et al.,<br>Respondents. | Civil Action No. 05-1509 (RMU) |

## DECLARATION OF REBIYA KADEER

I, Rebiya Kadeer, declare under penalty of perjury that the following is true:

1. My name is Rebiya Kadeer. I reside in Fairfax, Virginia.

2. I was granted political asylum by the United States in 2005.

3. I have personal knowledge and experience both of the persecution that has driven many Uyghur people to flee China, and the ability of the Uyghur-American community to provide logistical and cultural support to refugees who arrive here.

4. I am of Uyghur heritage. I was born in East Turkestan, a region of Asia under the control of the People's Republic of China and referred to by the government as the Xinjiang Uighur Autonomous Region. In the 1980s and 1990s, in the city of Urumchi, I developed and ran a multimillion-dollar trading company and a department store.

A/72600772.1

5.  In the late 1990s, I became increasingly vocal in my criticisms of the Chinese government's abuses of Uyghur people. In 1999, while on my way to meet a U.S. Congressional delegation to discuss human rights-related issues, I was arrested. I was sentenced to eight years' imprisonment in March 2000, following a secret trial. During my imprisonment in Bajiahu Prison in Urumchi, I witnessed the beating and torture of other Uyghur prisoners. I myself spent two years in solitary confinement.

6.  I later learned that, while in prison, I received human rights awards from Human Rights Watch and Norway's Rafto Foundation.

7.  On March 17, 2005, three days before a state visit to Beijing by U.S. Secretary of State Condoleezza Rice, I was released from prison. I was sent to the United States, where I was granted refugee status.

8.  In September 2005, I founded the International Uyghur Human Rights and Democracy Foundation in Washington, D.C, which works to promote human rights for Uyghur women and children in East Turkestan. In May, 2006, I was elected to the presidency of the Uyghur American Association ("UAA"), also based in Washington, which works to support the right of the Uyghur people to use peaceful, democratic means to determine their own political future. In November 2006, I was elected as president of the World Uyghur Congress, which represents the collective interests of the Uyghur Diaspora, both in East Turkestan and in countries throughout the world.

9.  In retaliation for my human rights advocacy, PRC authorities in 2006 detained and beat my sons Ablikim, Alim and Kahar, and placed other family members under house arrest. On April 17, 2007, Ablikim was sentenced to nine years in prison on charges of "instigating and engaging in secessionist activities."

10. I have been privileged to meet with President George W. Bush, and first lady Laura Bush, to discuss the plight of the Uyghurs. In a speech delivered in Prague, Czech Republic, on June 5, 2007, President Bush said, "Another dissident I will meet with here is

Rebiya Kadeer of China, whose sons have been jailed in what we believe is an act of retaliation for her human rights activities. The talent of men and women like Rebiya is the greatest resource of their nations -- far more valuable than the weapons of their army or oil under the ground. So America calls on every nation that stifles dissent to end its repression, trust its people, and grant its citizens the freedom they deserve."

11. Public accounts concerning the Uyghur prisoners at Guantanamo Bay are closely followed and frequently discussed among Uyghurs resident in America and around the world. Developments in the cases are regularly reported on the UAA website and in the reports of Radio Free Asia that are prepared and broadcast from studios in Washington, D.C.

12. Among the cases that I and many other Uyghurs have followed in the public press is that of Huzaifa Parhat.

13. There is widespread sympathy in the Uyghur American community for Mr. Parhat and the other Uyghur men detained at Guantanamo Bay.

14. Upon reaching the United States in 2005, immediately after my release from a long imprisonment, I was welcomed and supported by members of the Uyghur American community. Since my arrival, I and members of that community have frequently provided support to Uyghur refugees who have been granted asylum here. I know from personal experience that that community is ready, willing and able to provide such support to Uyghur prisoners released from Guantanamo, should the Court order their release.

15. I and other members of the Uyghur American community would be pleased to appear in Court and address any questions of the government or the Court with regard to the provision of logistical support to Mr. Parhat, or other Uyghurs released from Guantanamo Bay.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true.

Dated: July __, 2008

_____
Rebiya Kadeer

A/72600772.1                                4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, AS NEXT FRIEND OF ABDUSABUR DOE, et al.,<br><br>    Petitioners,<br>    v.<br>GEORGE W. BUSH, et al.,<br>    Respondents. | Civil Action No. 05-1509 (RMU) |

## DECLARATION OF ALIM SEYTOFF

I, Alim Seytoff, hereby declare under penalty of perjury that the following is true:

1. My name is Alim Seytoff. I am the general secretary of the Uyghur American Association ("UAA").

2. I reside at 4600 Duke street, No. 1101, Alexandria, VA 22304. I am a permanent resident alien in the United States.

3. Uyghurs as a group have suffered persecution from the government of the People's Republic of China. many Uyghurs have been granted asylum in the United States as political refugees. The UAA is an association of expatriate Uyghurs resident in the United States that promotes the cultural and political interests of the Uyghur people.

A/72600738.1

4.  In my capacity as general secretary of UAA, I am regularly in contact with representatives of Congress, the State Department, and various human rights organizations and think tanks in connection with Uyghur affairs.

5.  To the best of my knowledge, more than 250 Uyghur people live in and around the District of Columbia.

6.  The cases of the Uyghur men held prisoner at Guantanamo are well known to me and among Uyghurs resident in America. Public developments in those cases are regularly reported on the UAA website and in the reports of Radio Free Asia that are prepared and broadcast from studios in Washington, D.C. I have frequently engaged in discussions with UAA leaders, members, and other Uyghurs concerning these cases.

7.  Among the cases that I and many other Uyghurs have followed in the public press is that of Huzaifa Parhat.

8.  There is widespread sympathy in the Uyghur American community for Mr. Parhat and the other Uyghur men detained at Guantanamo Bay. There is broad support in the UAA and among Uyghurs resident in the United States for the release of Mr. Parhat, and the other Uyghurs at Guantanamo, into the United States.

9.  The Uyghur American community is ready, willing, and able to provide support to any Uyghurs who are released from Guantanamo to America. Uyghurs stand ready to provide residential accommodation to Mr. Parhat, and other released Uyghurs, as well as logistical support with regard to language, cultural, and religious matters. The community is ready, willing and able to assist Mr. Parhat as regards any conditions of temporary release that might be imposed by the Court, including with regards to transportation, language, and the like, that may be necessary to meet reporting obligations to government officials and to interact with courts, government officials, and the world at large.

10.  The Uyghur American community has considerable experience in addressing matters of this kind. Many Uyghurs who have made there way to America have suffered persecution, and arrive here with significant logistical needs. Also, we are aware that after long imprisonment, Mr. Parhat and other Uyghurs will need considerable support to acclimate themselves to normal life. The Uyghur American community has on many occasions in the past provided this kind of logistical and personal support.

11.  I and other members of the Uyghur American community would be pleased to appear in Court and address any questions of the government or the Court with regard to the provision of logistical support to Mr. Parhat, or other Uyghurs released from Guantanamo Bay.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true.

Dated: July 21, 2008

_____
Alim Seytoff