Pre-approved for Public Filing by the CSO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: <br><br> GUANTANAMO BAY <br> DETAINEE LITIGATION | ) <br> ) <br> ) <br> ) Misc. No. 08-442 (TFH) <br> ) <br> ) Civil Action No. 1:04 CV 1194 (HHK) <br> ) <br> ) <br> ) |

**PETITIONER MUSA'AB OMAR AL MADHWANI'S TRAVERSE IN RESPONSE TO RESPONDENTS' FACTUAL RETURN**

Respondents have detained Musa'ab Omar Al Madhwani ("Musa'ab" or "Petitioner") unlawfully at the Guantánamo Bay Naval Base for almost six years, since late fall 2002. On July 15, 2004, Musa'ab filed his Petition for Writ of Habeas Corpus with this Court. On October 6, 2004, the Respondents filed their Factual Return to Petition for Writ of Habeas Corpus by Petitioner Musa'ab Omar Al Madhwani ("Factual Return") (Dkt. 33). Musa'ab respectfully submits this Traverse in Response to Respondents' Factual Return. Because Respondents' allegations are factually and legally insufficient to justify Musa'ab's indefinite detention, this Court should release Musa'ab from Respondents' custody or order an evidentiary hearing in which Respondents are required to establish an adequate basis for his detention.

I.      **Musa'ab Denies Each And Every One Of Respondents' Allegations.**

Musa'ab is a citizen of Yemen and has been held by the United States for almost six years. He is neither an enemy of the United States nor a combatant. Respondents rest their conclusion of "enemy combatant" status on two vague and unsubstantiated allegations (Factual Return at 24, Ex. R-1):

      *3.a.*    *The detainee is an Al Qaeda fighter.*

      *3.b.*    *The detainee participated in military operations against the coalition.*

The allegations presented in Respondents' Factual Return are insufficient to justify Musa'ab's continued detention. Musa'ab denied these allegations during his Combatant Status Review Tribunal ("CSRT") hearing and again denies them here, as attested in his Declaration dated July 1, 2008, attached hereto as Exhibit A. Musa'ab was not an al Qaida fighter; he was never a member or associate of al Qaida. (Ex. A, at ¶ 3.) Further, he never participated in, let alone witnessed, any fighting against the coalition or anyone else. (*Id.*)

Musa'ab was invited to visit Afghanistan in the summer of 2001 by two men he met in a neighborhood coffee shop. Those men told Musa'ab he could teach children or do anything he wanted; they never mentioned anything about training or fighting. Musa'ab had no intention of training or fighting. If Musa'ab had known or been told he was going to a training camp, he would not have gone to Afghanistan. (*Id.* at ¶ 1.)

When Musa'ab arrived in Afghanistan, his passport and personal papers were confiscated and he was told he had to attend a training camp for two months. (*Id.* at ¶ 2.) The events of September 11, 2001 occurred less than a month later. Musa'ab did not want to participate in any fighting, so he left the camp and traveled to Pakistan in the hope of returning to Yemen. (*Id.*) Musa'ab was never involved in any combat; he never fought on the side of Al Qaida or the Taliban; and he never fought against the United States or coalition forces. (*Id.* at ¶ 3.) Musa'ab was arrested by Pakistani forces in Pakistan in September 2002. (*Id.* at ¶ 4.)

Because Musa'ab has denied Respondents' allegations and Respondents have presented no credible evidence to the contrary, their allegations are factually insufficient to support an "enemy combatant" determination. To the extent Musa'ab's Declaration does not address

certain aspects of Respondents' allegations, this is the inevitable result of Respondents' designation of those allegations as classified and counsel's inability to discuss with Petitioner the classified allegations against him.

II. **Respondents' Allegations Do Not Satisfy Any Reasonable Definition of "Enemy Combatant."**

Even if Respondents' allegations were true – and they are not, as demonstrated in the attached Declaration – they are insufficient to justify Musa'ab's continued detention because they do not satisfy any reasonable definition of "enemy combatant." Nor do they satisfy any of the shifting definitions of "enemy combatant" that Respondents have adopted in the past six and one-half years, including the definition provided by Congress in the Authorization for Use of Military Force ("AUMF"); Respondents' definition as accepted in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); or the Department of Defense's definition in the CSRT Procedures.

Respondents' definitions of an "enemy combatant" have expanded exponentially since Musa'ab arrived at Guantánamo in late 2002. Under the AUMF passed on September 18, 2001, Congress authorized the President "to use all necessary and appropriate force against":

> those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

(AUMF, Pub. L. 107-40 § 2(a), 115 Stat. 224, 224 (2001)). In *Hamdi*, decided in June 2004, Respondents defined "enemy combatant" as "an individual who . . . was 'part of or supporting forces hostile to the United States or coalition partners' in Afghanistan and who 'engaged in an armed conflict against the United States' there." 542 U.S. at 517. In the CSRT Procedures promulgated in July 2004 and 2006, the Department of Defense defined an "enemy combatant" as (Encl. 1):

3

>an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

Under any of these definitions, however, Musa'ab would not qualify as an "enemy combatant." Under *Parhat v. Gates*, the government must justify detaining an alleged "enemy combatant" in one of two ways. No. 06-1397, slip op. at 16-17 (publicly released version) (D.C. Cir. June 20, 2008). First, the government may prove that Musa'ab is an "enemy combatant" by proving that he is a member of al Qaida or the Taliban (*id.*) – a burden that Respondents unsuccessfully attempt to meet with their broad and unsupported allegations. Second, absent proof of al Qaida or Taliban membership, "the government must prove by a preponderance of the evidence" each of the following three elements: "(1) the petitioner was part of or supporting 'forces'; (2) those forces were associated with al Qaida or the Taliban; and (3) those forces are engaged in hostilities against the United States or its coalition partners." *Id.* Respondents have not met – and cannot meet – the elements of either of these tests.

Respondents have failed to show – by any standard – that Musa'ab is a member of al Qaida or the Taliban. Respondents allege that Musa'ab was an al Qaida fighter, but they provide no evidence that he ever fought or engaged in any hostilities against anyone on behalf of al Qaida or any other organization. Nor could they provide such evidence, because it does not exist. Musa'ab was never on a battlefield and did not even witness any fighting (Ex. A, at ¶ 3), and Respondents do not allege otherwise. Furthermore, Respondents have not alleged that the two men who allegedly recruited Musa'ab or the camp he allegedly attended before September 11, 2001 were even associated with al Qaida. In fact, in a failed attempt to show that Musa'ab was an al Qaida fighter, Respondents allege that the training camp was affiliated with

4

the Taliban – not al Qaida. Not only are these allegations contradictory, but even if the camp was affiliated with the Taliban, the D.C. Circuit recognized in *Parhat* that "the Taliban was the 'Afghani Government' in 2001, and not all entities provided with housing by that government … were 'associated' with the Taliban in a sense that would make them enemy combatants." Slip op. at 20. Respondents' allegations are therefore wholly insufficient to show that Musa'ab was an al Qaida or Taliban member or that he was a combatant of any sort. These allegations fail to support an "enemy combatant" determination.

In the absence of proof that Musa'ab was an al Qaida or Taliban member, Respondents must prove the three elements laid out in *Parhat*. Respondents have not proved and cannot prove any of these elements.

First, Respondents have not alleged, much less proved, that Musa'ab was "part of or supporting 'forces.'" Respondents allege, without more, that Musa'ab was an al Qaida fighter, but Musa'ab has denied this allegation and the Government has failed to put forth any evidence to support its contention. Furthermore, the Government has failed to allege when or how Musa'ab provided support to any armed "forces." Musa'ab was not captured on the battlefield in Afghanistan or anywhere else. He was not armed or carrying any indicia of military activity when he was arrested. Indeed, Respondents have not even alleged that Musa'ab was ever on a battlefield. He was arrested in an apartment in Pakistan, where he was staying while he attempted to return home to Yemen.

Second, Respondents have failed to allege that Musa'ab was "associated" with the Taliban or al Qaida. The CSRT Procedures do not define "associated," but "under the government's own definition, the evidence must establish a connection … that is considerably closer than the relationship suggested by the usual meaning of the word 'associated.'" *Parhat*,

5

slip op. at 19. In the face of Musa'ab's denial of Respondents' allegations, the Government must prove that Musa'ab was indeed "associated" with al Qaida. This it cannot do. Furthermore, allegations of weapons training alone do not justify an "enemy combatant" classification. *See id.* at 22 n.8.

Third, Respondents have not adequately alleged that Musa'ab engaged in hostilities against the United States or its coalition partners. *See id.* at 17, 22. Despite Respondents' broad allegation, Respondents' supporting allegations merely assert that Musa'ab left a training camp and traveled to Kabul, that Kabul fell three days later, and that Musa'ab then traveled to Pakistan, where he was captured. Even if correct, Musa'ab's itinerary does not furnish a basis for labeling him an enemy combatant. Respondents do not allege that Musa'ab used a weapon or fought in, engaged in, or witnessed any hostilities against the United States or coalition forces. They do not allege that Musa'ab was on or near a battlefield at any time. Respondents' allegations are therefore insufficient to meet the broad definition of "enemy combatant" under the CSRT Procedures, and Respondents' Factual Return is insufficient to support an "enemy combatant" determination.

**III.    On Information And Belief, Respondents' Allegations Are Based On Statements Obtained Through Torture And/Or Coercion And Are Thus Insufficient To Support An "Enemy Combatant" Determination.**

The Supreme Court has consistently held that the Due Process Clause of the Fifth Amendment prohibits the government from depriving a person of liberty based on statements obtained by torture. *See, e.g.*, *Miller v. Fenton*, 474 U.S. 104, 109 (1985); *Rochin v. California*, 342 U.S. 165, 173-74 (1951). Not only is evidence secured through torture inherently unreliable, but allowing detention based on such evidence corrupts the judicial process. As the Supreme Court stated in *Rochin*, coerced confessions "offend the community's sense of fair play and

6

decency. … [T]o sanction [such] brutal conduct … would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society." 342 U.S. at 173-74.

Involuntary confessions violate fundamental human values and are inherently unreliable. *See Jackson v. Denno*, 378 U.S. 368, 386 (1964). Statements "extracted only after countless hours of repetitive questioning over a period of many months, during which time they were subjected to periods of solitary confinement, positional torture, and repeated physical abuse" must be deemed involuntary and thus inadmissible. *U.S. v. Karake*, 443 F. Supp. 2d 8, 50-51 (D.D.C. 2006); *see also Patterson v. Burge*, 328 F. Supp. 2d 878, 896-897 (N.D. Ill. 2004) (holding that a confession made after being beaten, suffocated, and threatened with other torture was involuntary and violated due process).

Furthermore, under the CSRT Procedures, Musa'ab's Tribunal had the obligation to assess the reliability of evidence submitted by the Government. *See Parhat*, Slip op. at 24. The Tribunal must have "had – and [taken] – the opportunity to assess the reliability of the evidence that the government presented to it." *Id*. at 38. The Tribunal is able to assess the reliability of hearsay evidence only if the evidence is presented in proper form or with "sufficient additional information" – including the Government's sources or its underlying reporting. *See id*. at 24, 29. Without the ability to assess reliability, the Government's rebuttable presumption "becomes effectively irrebuttable." *Id*. at 25.

First, on information and belief, the CSRT relied on false statements made by Musa'ab while being subjected to torture, coercive techniques, and/or abusive interrogation tactics. Musa'ab was tortured and/or coerced at both the Prison of Darkness and Guantánamo. When first captured, Musa'ab was taken to the Prison of Darkness. He was interrogated frequently

7

during the 40 days he was held there.  As he stated in his Declaration, Musa'ab falsely admitted the interrogators' accusations "just to stop the torture and abuse." (Ex. A, at ¶¶ 10, 14.)  While held at the Prison of Darkness, Musa'ab was subjected to various forms of torture, including food and sleep deprivation, extreme temperatures, and various forms of physical abuse.  (*Id.* at ¶¶ 8-10.)  For example, Musa'ab was partially suspended by his left hand for his entire detention at the Prison of Darkness, so that he could not sit and was forced to rest all his weight on one leg.  This resulted in permanent nerve damage to one leg.  (*Id.* at ¶ 8.)

Musa'ab was later transferred to Guantánamo, where he was initially held in isolation and interrogated frequently.  Musa'ab told an interrogator that he made false admissions at the Prison of Darkness because he was tortured.  The interrogator became angry and threatened to send Musa'ab back to Bagram or the Prison of Darkness.  "Because [he] feared that the torture would resume," Musa'ab again made false admissions at Guantánamo.  (*Id.* at ¶ 14.)  Musa'ab was tortured, coerced, and subjected to abusive interrogation techniques.  His statements are therefore inherently unreliable in any court of law and do not provide sufficient justification for an "enemy combatant" determination.

Second, on information and belief, the CSRT relied on statements and information obtained from other prisoners – held in Guantánamo and elsewhere – through torture, coercive techniques, and/or abusive interrogation tactics in its determination of whether Musa'ab was an enemy combatant.  On information and belief, the CSRT accepted these statements and information uncritically and accorded them equal weight with any other evidence.  On information and belief, the CSRT was unable to and/or did not assess the reliability of these statements because the Government did not present the Tribunal with additional information about those statements.

8

Because the Government and the Tribunal relied on statements obtained through torture and/or coercion without assessing the reliability of those statements, Respondents' allegations and evidence are insufficient to support a determination that Musa'ab is an "enemy combatant" or to justify Musa'ab's detention.

WHEREFORE, Musa'ab respectfully requests that this Court order his release from Respondents' custody or order an evidentiary hearing where Respondents must establish an adequate basis for Musa'ab's continued detention.

Dated:  July 28, 2008                                  Respectfully submitted,


                                                       __/s/ David W. DeBruin_____
                                                       One of the Attorneys for the Petitioners
                                                       Musa'ab Omar Al Madhwani


David W. DeBruin (DDC Bar No. 337626)        Patricia A. Bronte
JENNER & BLOCK LLP                            Sapna G. Lalmalani
601 Thirteenth Street, N.W., Suite 1200       JENNER & BLOCK LLP
Washington, DC  20005-3823                    330 North Wabash Ave.
Tel: (202) 639-6000                           Chicago, IL  60611
Fax: (202) 639-6066                           Tel: (312) 923-8357
                                              Fax: (312) 840-7757


Shayana Kadidal [D.C. Bar No. 454248]         Darold W. Killmer
CENTER FOR CONSTITUTIONAL RIGHTS              Mari Newman
666 Broadway, 7th Floor                       Sara Rich
New York, New York 10012                      KILLMER, LANE & NEWMAN LLP
T:  (212) 614-6464                            1543 Champa Street, Suite 400
F:  (212) 614-6499                            Denver, Co 80202
                                              T:  (303) 571-1000
                                              F:  (303) 571-1001

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2008, I caused the foregoing Traverse in Response to Respondents' Factual Return to be delivered to the below-listed counsel of record in the above-captioned matters through the CM/ECF system:

>Andrew I. Warden
>United States Department of Justice
>Civil Division, Federal Programs Branch
>20 Massachusetts Avenue NW
>Washington, D.C. 20530
>
>Terry Marcus Henry
>United States Department of Justice
>Civil Division, Federal Programs Branch
>20 Massachusetts Avenue NW
>Washington, D.C. 20530

/s/ David W. DeBruin____

# Exhibit A

UNCLASSIFIED

## DECLARATION OF MUSA'AB OMAR AL MADHWANI

I, Musa'ab Omar Al Madhwani, am a prisoner at Guantánamo Bay Naval Base. I have reviewed the Arabic translation of this Declaration, a copy of which is attached. The information provided in this Declaration is true and correct to the best of my knowledge, information, and belief.

1. I went to Afghanistan in the summer of 2001, before there was any armed conflict between the United States and the Taliban. I met two men in a coffee shop in my neighborhood. The men invited me to travel to Afghanistan, and they told me that I could teach children or do whatever I wanted there for one month. The men paid my airfare and arranged a one-month visa. The men never mentioned anything about training or training camps; if they had, I would not have gone. I had no intention of training or fighting.

2. When I arrived in Afghanistan, I was shocked when my passport and personal papers were confiscated, but I was told they were merely being put in a safe place. I was also told I was required to attend a training camp for two months. I do not know the name of the training camp they sent me to. After I had been at the camp for 25 days, the attacks of September 11, 2001 occurred. I left the training camp because I thought that fighting might occur and I did not want to participate in any fighting. Instead, I went in search of my papers and passport. By the time I recovered them, my visa and return plane ticket had expired. In addition, I had heard that people were selling Arabs for $5,000. I was able to make my way to Pakistan, but my lack of money and visa and fear of capture by bounty hunters prevented me from securing a flight to return home to Yemen.

3. I was never on a battlefield and never witnessed any fighting. I never participated in any fighting, and I never became a member or associate of the Taliban or Al Qaida.



UNCLASSIFIED

UNCLASSIFIED

4. On the morning of September 11, 2002, Pakistani forces raided the apartment building where I was staying. They were looking for a man staying in a different apartment from mine. I immediately surrendered to the Pakistani forces, who shook my hand, thanked me, and photographed me. The Pakistanis told me that, after they took me into custody, there was a firefight between the Pakistani forces and some of the occupants of a different apartment of the building.

5. The Pakistanis held me for about five days. They tied me up, beat and threatened me, and hit me in the head with the butt of a rifle. They told me that if I did not admit to seeing weapons in the apartment, then I would be held responsible for the deaths that occurred in the firefight. The Pakistanis also threatened not to turn me over to Yemen or the United States, but rather to hold me secretly for the rest of my life or to kill me and cut my body into pieces.

6. Five or six hours later, an American with an Arabic interpreter blindfolded me, put a hood over my head, and interrogated me. Americans took several photographs of me that showed the blood from my head wound seeping through the cloth.

7. That night a Pakistani intelligence officer came to my cell. He was very angry that the Americans had seen the blood on my head. The intelligence officer whipped me, and then a Pakistani policeman beat me. The Pakistanis did not clean my head wound until the following day.

8. The Americans then took me to the Dark Prison and held me there for about 40 days. The cell remained in total darkness during that time. Raucous music blared continuously, except that screams of other prisoners could be heard when the tapes were changed. I was beaten, kicked, sprayed with cold water, deprived of food and sleep, and subjected to extreme cold, stress positions, and other forms of torture. I was partially suspended by the left hand for

UNCLASSIFIED
2

**UNCLASSIFIED**

the entire time at the prison, so that I could not sit and was forced to rest all my weight on one leg. This resulted in permanent nerve damage to my leg. Once I tricked the guard into handcuffing my right hand instead of the left. The next day the guard beat me, saying "it must be your left hand." The handcuffs were so tight that my hands were bleeding. The Americans sprayed me with cold water and dumped water on my head until I got seizures and collapsed. The pain was so extreme that I would pass out repeatedly. Then I was freezing and sweating at the same time. An Arabic-speaking interrogator told me that I was in a place the bull flies cannot find. He said no one could find me in that place, not even the International Committee of the Red Cross.

9. Doctors periodically checked on me. After examining me, they told the interrogators that it was okay to continue beating me.

10. I was interrogated frequently in the Dark Prison. During the interrogations a bright light was aimed at my face so that I could only see my interrogator, but I could sense and occasionally hear that other people were in the room. After awhile I admitted to whatever the interrogators accused me of, just to stop the torture and abuse.

11. The interrogators knew that my "admissions" under torture were untrue. Once I was tortured into saying that I had seen a man named Seif Al Adel from far away. Some time later, the interrogator showed me a photograph and asked me if I knew the man pictured there. I did not recognize him. The interrogator flew into a rage, screaming at me and saying that it was Seif Al Adel and I had already admitted knowing him.

12. In the fall of 2002, U.S. forces transferred me to the Bagram prison, where I was held for about five days. The Americans took more photographs of me. I was forced to stand

**UNCLASSIFIED**

# UNCLASSIFIED

the entire time until my feet swelled and I was exhausted. I was dragged by the neck to interrogation, where dogs would bark in my face.

13. U.S. forces transferred me to Guantánamo in late 2002. At first I was held in isolation and interrogated frequently. Each time I was interrogated at Guantánamo, there was a video monitoring device in the room. The interrogators at Guantánamo knew that I had been imprisoned and tortured at Bagram and the Dark Prison. They would ask me, "So, how did you like it at Bagram? How did you like the Dark Prison?"

14. An interrogator at Guantánamo showed me photographs of some of the same people I had been asked to identify at the Dark Prison. I told the interrogator I did not really know these people, and I had only said I did before because I was tortured. The interrogator became very angry, threw the file, grabbed a chair, and began screaming in my face. Because I feared that the torture would resume, and because the interrogator threatened to send me back to Bagram or the Dark Prison, I falsely admitted that I did know the people in the photographs.

15. In or about early 2004, a military guard asked me if I wanted to go outside. I asked for a translator. The guard became upset that I could not speak English and said, "You don't want to go outside." That night, I heard the Immediate Reaction Force ("IRF") approaching. They shot pepper spray at my face and forced me to lie face down on the metal floor of the cell. Several guards got on top of me and beat my back. While this was happening, a guard was videotaping the actions of the IRF.

16. At various times, interrogators have coerced me into saying that I have seen Khalid Sheikh Mohammed before. I do not know Khalid Sheikh Mohammed, and if he saw me or my photograph he would not know who I am or anything about me, except perhaps what other interrogators have told him about me.



# UNCLASSIFIED

4

**UNCLASSIFIED**

17. Although I have been treated harshly by some Americans, I do not harbor any *of innocent people and violent operations by any group whatsoever* hatred in my heart for the American people. I have never fought and never would fight the United States, and I am ~~adamantly~~ *strongly* opposed to ~~terrorists like Al Qaida who pervert the true meaning of Islam~~ *killing*. If I were allowed to return home, I would rejoin my family. I would get married as soon as possible and start a family of my own. My mother and sister are already saving money and preparing for my wedding. I would also like to attend college to study accounting.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 1/7/, 2008

_____
Musa'ab Omar Al Madhwani
ISN 839

**UNCLASSIFIED**

UNCLASSIFIED

## إقرار مصعب عمر المدواني

أنا، مصعب عمر المدواني، سجين بالقاعدة البحرية بخليج جوانتانامو. لقد اطّلعت على الترجمة العربية من هذا الإقرار، ومرفق نسخة منه، والمعلومات الواردة في هذا الإقرار حقيقية وصحيحة على حد علمي ومعلوماتي ويقيني.

1. لقد ذهبت إلى أفغانستان في صيف 2001 قبل وجود أي نزاع مسلح بين الولايات المتحدة وطالبان. لقد قابلت رجلين بمقهى بمنطقة جيرتي ودعياني إلى السفر إلى أفغانستان. وأخبراني أنني يمكنني التدريس للأطفال أو أن أفعل ما يحلو لي هناك لمدة شهر واحد. وقد سددا أجرة السفر بالطيران ورتبا لي تأشيرة لمدة شهر واحد. ولم يذكرا أي شيء عن تدريب أو عن معسكرات التدريب؛ ولو كانوا قد قاما بذلك لما ذهبت. ولم تكن لدي أي نية للتدريب أو القتال.

2. وعندما وصلت لأفغانستان صعقت عند مصادرة جواز سفري وأوراقي الشخصية، ولكني أخبرت أنها ستوضع فحسب في مكان آمن. وقد أخبرت أيضًا أنني مطالب بحضور معسكر تدريب لمدة شهرين، ولكني لا أعلم اسم معسكر التدريب الذي أرسلوني إليه. وبعد مكوثي في المعسكر لمدة 25 يومًا وقعت هجمات الحادي عشر من سبتمبر 2001، فتركت معسكر التدريب لأنني ظننت باحتمالية نشوب قتال وأنا لا أريد أن أشارك في أي قتال. وعوضًا عن ذلك، أخذت في البحث عن أوراقي وجواز سفري. وحينما استرددتهم كانت تأشيرتي وتذكرة الرجوع بالطائرة قد انقضيا. وعلاوةً على ذلك، سمعت بأن الناس يبيعون العرب نظير 5000 دولار أمريكي. وقد كنت قادراً على شق طريقي إلى باكستان ولكن منعني نقص الأموال وعدم وجود تأشيرة وخوفي من الأسر من قِبَل صائدي الجوائز[2] من تدبير رحلة بالطيران والعودة إلى وطني اليمن.

3. لم أتواجد قط في ساحة القتال ولم أشهد بتاتًا أو أشارك أبدًا في أي قتال، كما لم أصبح فردًا أو انتسبت لطالبان أو القاعدة.

4. صباح 11 سبتمبر 2002 أغارت القوات الباكستانية على المبنى الكائنة به الشقة التي أقيم بها. وقد كانوا يبحثون عن رجل يقيم في شقة غير شقتي، وقد استسلمت على الفور للقوات الباكستانية التي صافحتني وشكرتني والتقطت لي صورة. وقد أخبرني الباكستانيين بعدما اعتقلوني أن معركة بالأسلحة النارية نشبت بين القوات الباكستانية وبعض المقيمين بشقة أخرى بالمبنى.

UNCLASSIFIED

---
[2] تعليق المترجم: هم أفراد يلاحقون المطلوبين للعدالة لقاء مكافأة مالية.

UNCLASSIFIED

5. وقد احتجزني الباكستانيون لخمسة أيام تقريبًا، وقاموا بتقييدي وضربي وتهديدي، وقد ضربوني بعقب بندقية في رأسي وأخبروني أنني إذا لم أعترف برؤية أسلحة في الشقة سأكون مسئولاً آنئذ عن حالات الوفاة التي حدثت في المعركة النارية. وقد هددوني أيضًا بعدم تسليمي إلى اليمن أو الولايات المتحدة، ولكنهم بدلاً من ذلك سيحتجزونني سرًا لبقية حياتي أو أن يقوموا بقتلي وتمزيق جسدي إربًا.

6. بعد ذلك بخمسة أو ستة ساعات قام أمريكي برفقته مترجم فوري للغة العربية بعصب عينيّ ووضع غطاء على رأسي واستجوابي. وقد أخذ الأمريكي بضعة صور لي أظهرت الدم النازف من رأسي ويغرق ثيابي.

7. في تلك الليلة قدم إلى زنزانتي ضابط مخابرات باكستاني، وقد كان في شدة الغضب لمرأى الأمريكيين الدم على رأسي. وقام ضابط المخابرات بجلدي ثم ضربني ضابط بوليس باكستاني، ولم ينظف الباكستانيون جرح رأسي إلى اليوم التالي.

8. من ثم أخذني الأمريكيون إلى سجن مظلم واحتجزوني هناك لنحو 40 يومًا. وقد ظلت الزنزانة في ظلام حالك طوال ذلك الوقت. وكانت موسيقى صاخبة تدوي على نحو مستمر، باستثناء ذلك كانت تسمع صرخات المساجين الآخرين عند تغيير الشرائط. وقد تم ضربي وركلي ورشي بماء بارد وحرماني من الطعام والنوم، وعرّضت إلى برد قارص وأوضاع إجهاد وألوان أخرى من العذاب. وقد كنت معلق بشكل جزئي من يديّ اليمنى طوال الوقت بالسجن بحيث لا أتمكن من الجلوس وأن أجبر أن أرتكز بكل وزني على قدم واحدة، ونتج عن هذا تلف دائم بعصب ساقي. يومًا ما احتلتُ على الحارس ليصفّد يدي اليمنى بدلاً من اليسرى فضربني اليوم التالي قائلاً "يجب أن تكون اليد اليسرى هي المُصفَّدة." وقد كانت الأصفاد غاية في الإحكام حتى أدمت يداي. وقام الأمريكان برشي بالماء البارد وإغراق رأسي بالماء حتى انتابتني نوبات مرضية وانهرت. وقد بلغ بي الألم مبلغه إلى أن تكرر فقداني للوعي. حينها كنتُ أتجمد بردًا وأغرق في العرق في الوقت ذاته وأخبرني محقق ناطق بالعربية أني في مكان لا يمكن حتى لحشرات روث البهائم أن تجده. وقال لا يمكن لأحد أن يجدني في هذا المكان حتى اللجنة الدولية للصليب الأحمر.

9. كان الأطباء يقومون بفحصي بشكلٍ دوري. وأخبروا المحققين بعد فحصي أنه لا بأس من الاستمرار في ضربي.

10. كثيرًا ما كان يتم استجوابي في السجن المظلم. وكان يسلط ضوء ساطع في وجهي أثناء الاستجوابات بحيث لا يمكنني أن أرى سوى محققي، ولكني كنت أسمع وأحسّ من آن لآخر أن هناك أناس آخرون في الغرفة. وبعد فترة قصيرة اعترفت بأيّما اتهمني به المحققين فقط كي يتوقف التعذيب والإساءات.

UNCLASSIFIED

CLASSIFIED

11. وقد علم المحققين أن "اعترافاتي" تحت التعذيب كانت غير صحيحة. وذات مرة أجبرت تحت وطأة التعذيب إلى أن أقول أني رأيت رجلاً يدعى سيف العدل منذ زمن، وبعدها بحين أراني المحقق صورة وسألني إذا ما كنت أعرف الرجل بها فلم أتعرفه عليه، حينها استشاط غضبًا وصرخ في قائلا أنه هو سيف العدل وأني قد اعترفت أنني أعرفه.

12. في خريف 2002 نقلتني القوات الأمريكية إلى سجن "باجرام" حيث احتجزت لخمسة أيام تقريبًا، والتقط الأمريكان المزيد من الصور لي. وقد أُجبرت على الوقوف كل الوقت حتى تورمت قدماي وأُنهكت، وكان يتم جري من رقبتي إلى المحققين حيث تنبح الكلاب في وجهي.

13. نقلتني القوات الأمريكية إلى جوانتانامو في أواخر 2002. في بادئ الأمر كنت محتجزًا في الحبس الانفرادي واستجوبت مرارًا. وكل مرة كان يتم استجوابي في جوانتانامو كان يوجد جهاز مراقبة تليفزيوني بالحجرة. وكان المحققين في جوانتانامو أني سجنت وعُذبت في "باجرام" والسجن المظلم فكانوا يسألونني "إذن، هل أعجبك الأمر في "باجرام"؟ هل أعجبك السجن المظلم؟"

14. أراني محقق في جوانتانامو صور لبعض الناس الذين طُلب مني التعرف عليهم في السجن المظلم. وقد أخبرت المحقق أني لم أعرف أولئك الناس بالفعل وأني قد قلت أني أعرفهم من قَبلُ لأنه تم تعذيبي ليس إلا. فأصبح المحقق في قمة الغضب وألقى بالملف وأمسك كرسيًا وبدأ بالصراخ في وجهي. وبسبب خوفي من استكمال التعذيب ولتهديد المحقق بإعادتي إلى "باجرام" أو السجن المظلم اعترفت كذبًا أني كنت أعرف أولئك الناس بالصور.

15. في مستهل 2004 أو قبل ذلك سألني حارس عسكري إذا ما كنت أرغب بالذهاب إلى الخارج. وعندما طلبت مترجمًا ثار الحارس لأنني لم أستطع التحدث بالانجليزية وقال "أنت لا تريد الذهاب للخارج." وفي تلك الليلة سمعت قوة التدخل الفوري (والمشار إليها بـ "قوة التدخل الفوري") تقترب، وأطلقوا رذاذ الفلفل الحارق في وجهي وأجبروني على الانبطاح للأرض ووجهي على الأرضية المعدنية للزنزانة واعتلاني بعض الحراس وضربوني على ظهري. وأثناء حدوث ذلك كان أحد الحراس يصور أفعال قوة التدخل الفوري على شريط فيديو.

16. وفي مختلف الأوقات كان يكرهني المحققين على قول أني رأيت خالد شيخ محمد من قبل. أنا لا أعرف خالد شيخ محمد وإذا رأني أو رأي صورتي فلن يعرفني ولن يعرف أي شيء بخصوصي عدا ما يكون قد أخبره به المحققين الآخرين عني.

UNCLASSIFIED

17. وعلى الرغم من أنه قد تمت معاملتي بقسوة من بعض الأمريكيين، فأنا لا أضمر أي ضغينة في قلبي تجاه الشعب الأمريكي. كما أني لم أقاتل قد ولا أنوي مقاتلة الولايات المتحدة وأنا معارض بشدة للإرهابيين أمثال القاعدة الذين شوهوا المعنى الحقيقي للإسلام وإن سمح لي بالعودة لموطني، سوف أعيد الاتحاد بعائلتي وسأتزوج بأسرع ما يمكن وأكون عائلة خاصة بي، الآن تدخر أمي وزوجتي النقود وتعدان لزفافي. وأرغب أيضًا بالالتحاق بالكلية لدراسة المحاسبة.

وأقر مدركًا لعقوبة قول الزور بموجب قوانين الولايات المتحدة الأمريكية أن ما سبق حقيقي وصحيح.

التاريخ: ١/٧ ـــــــــ 2008

مصعب عمر المدواني
الرقم المسلسل بالسجن[3] 839

الإجمالي 6 صفحات

{تعليق المترجم: تحمل كافة صفحات هذا المستند خاتمين مفادها: "غير مصنف كمعلومات سرية."}

---

[3] ISN: Internment Serial Number