1              **IN THE UNITED STATES DISTRICT COURT**

2                **FOR THE DISTRICT OF COLUMBIA**

3   IN RE:                        .
     GUANTANAMO BAY DETAINEE       .
4   .                             .  Docket No. MS 08-442
                                   .
5                                  .  Washington, D.C.
                                   .  July 8, 2008
6                                  .
    . . . . . . . . . . . . . . .  .
7

8              TRANSCRIPT OF SCHEDULING CONFERENCE

9       BEFORE THE HONORABLE SENIOR JUDGE THOMAS F. HOGAN

10               UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Government:   GREGORY G. KATSAS, Esquire
                          JOHN C. O'QUINN, Esquire
13                        U.S. Department of Justice
                          9th & Pennsylvania Avenue, N.W.
14                        Room 3601
                          Washington, D.C. 20530
15
                          JUDRY L. SUBAR, Esquire
16                        U.S. Department of Justice
                          Civil Division, Federal Programs Branch
17                        20 Massachusetts Avenue, N.W.
                          Washington, D.C. 20530
18

19  For the Defendants:   SHAYANA KADIDAL, Esquire
                          GITANJALI GUTIERREZ, Esquire
20                        Center for Constitutional Rights
                          666 Broadway, Seventh Floor
21                        New York, New York 10012

22

23

24

25

Dockets.Justia.com

1    Court Reporter:    Cathryn J. Jones, RPR
                        Official Court Reporter
2                       Room 6521, U.S. District Court
                        333 Constitution Avenue, N.W.
3                       Washington, D.C. 20001

4

5

6

7    Proceedings recorded by machine shorthand, transcript
     produced by computer-aided transcription.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2          THE DEPUTY CLERK:  Miscellaneous Number 08-442, In

3    Re: Guantanamo Bay Detainee Litigation.  This hearing is now

4    in session.

5          THE COURT:  All right.  Good afternoon, Counsel,

6    thank you for coming in.  And we have also counsel by phone

7    who are attending whose names have already been taken,

8    representing their clients as well.

9          This was a scheduling conference in accordance

10   with the resolution of the court at our executive session

11   that the parties have been given copies of previously.  This

12   series of cases today that I wanted to discuss with counsel

13   consist of approximately 125 cases, I believe.  One of the

14   things we need to discuss is the number of cases, but of

15   detainees who are in Guantanamo Bay.

16         The decision was decided on June 12th, on

17   June 18th, six days later, the chief judge of the District

18   Court, Judge Lamberth, called a meeting of counsel in his

19   chambers-type conference in our conference room, that I

20   attended to get the sense of the parties as to organization

21   of these cases and proceedings subsequent to Boumediene,

22   even though they had just been decided six days earlier.

23         We held a subsequent meeting on the 25th of June,

24   one week later, to attempt to resolve some of the issues

25   between the parties or among the parties, as to proceedings

in these matters.  Subsequently, the Court met in an

executive session a week later approximately, and returned

with the resolution by a majority of the judges appointing

me as a coordinating judge, transferring cases to me at

least for now to help organize them to move forward in as

expeditious a way as possible, by Judge Leon having opted

out, Judge Sullivan wanting to hold his own conference, but

has informed me he will follow generally the procedures we

adopt.

The Court has had an opportunity to review the

correspondence the parties sent in to assist the Court in

attempting to organize these cases.  There are fundamental

differences between the approach of the petitioners and the

government that we hope to resolve today.  I have gone

through a list of issues as raised by the parties as well as

by my judges, whom I canvassed.  And as to these current

cases before me, I've also put out a second order and other

miscellaneous cases to those cases where the individuals are

no longer detained.  I'm awaiting status reports on those

cases.

I propose today, I had asked the counsel to, if

possible, to have two appointed speakers on each side

because of the numerosity of counsel on the case.  Those who

do not get to address the Court, I will ask to file written

statements with the Court, so all may have a chance to be

considered, if I have not considered your issues to date. I

did try to take into account everything that's been sent to

the Court to this time, and also the notes from the

discussions that we've had.

Some of the issues, and I'll hear from counsel as

to other issues they want to raise, are ones that we've

discussed previously. To put this in context for those who

are not privy to the earlier conversations that the Court

has had and meetings with counsel from each side, we, at our

meetings, the government has -- and I believe one of their

letters was released that had been provided to counsel, some

counsel I think, and had been released, but provided a

system of updating returns and filing returns. They have

not, for the detained individuals, on a time frame. And had

included suggestions for certain overreaching or overall

issues common to all the cases for the coordinating judge to

decide.

Counsel petitioners have been concerned on any

further delays, some of the petitioners having been

incarcerated for six-plus years, going into six and a half

at least, and others who have particular problems of illness

and difficulties at this time and were concerned about any

further delays, and felt I think essentially that each judge

could handle the cases according to their own schedule and

their own priorities individually, without the need for any

overall coordination that could result in further delay and
not expedition.  Particularly, they were concerned with
delays not only in returns, the filing amended returns, but
in any type of issues that would be considered overreaching
issues that would be decided by one judge, rather than going
forward with the individual cases on an individual basis to
each judge, attempting to avoid any interim delays such as
appeals from the rulings the coordinating court would make,
et cetera.

It doesn't solve the problem if the government
wishes to take appeals or the petitioners wish to take
appeals if they lose a particular issue.  But I have looked
at those issues and think there is some things that the
coordinating judge can do, and others that it would not be
appropriate for the coordinating judge to do.

Let me just set down a couple of basic concepts I
have, and then listen to counsel about it.  One, the
ultimate decisions as to each individual case, the ultimate
claim of release I think goes to each judge on the
individual cases.  I'm not involved in that process at all
and will not be, unless I have my own particular cases
assigned to me.

The issue as to certain procedural areas I may be
able to handle in some ways.  It seems to me that there are
some very straightforward matters we can handle generally,

and they will be issues of stays, lifting the stay of the

docket cleanup, protective order issues. A discussion of

the priority of cases, and I'll hear from counsel a little

bit I assume again on that; there are certain categories of

cases it seems to me that we can look at. The production of

facts returns and updated returns, if they're committed,

under what circumstances, when they'll be done, seems to be

an overreaching issue I can handle. A 30-day notice of

transfer, again, seems to be an issue that can be handled by

a coordinating judge.

The issues of counsel retention and clearances,

communications since all can be part of the protective order

and part of what I can do. The handling of sensitive

information, I can do some generally, but some of that may

be individual, depending on the type of case. Issues as to

discovery, I'm not as sanguine that I can make much headway

in that, but I will hear from counsel about it. It seems to

me some of that may be, if not a lot of it, somewhat

individualized cases. But the government must produce as to

evidence and the scope of it, whether it's everything that

they have or produced earlier or not, whether exculpatory

information is produced, and how access to other detainees'

information, et cetera, are issues we need to discuss.

The law that will apply to the hearings,

procedural, evidentiary rules, what rights they have,

1    it's -- again, I'm not satisfied that I can provide answers

2    to all of those across the board.  I think perhaps core

3    legal issues and procedure that really goes to the

4    substantive rights such as evidentiary issues may have to

5    wait for the individual judges.  But those are some of the

6    issues we need to consider and discuss.

7              First, I would like to talk with counsel and hear

8    what they have to say, but some of the things that I want to

9    talk about is preliminary issues.  We need to identify which

10   petitioners are still at Guantanamo Bay, if that hasn't been

11   done yet.  We need to clarify all duplicate petitions and

12   get that accomplished, and make sure we know whom we have

13   here.  Identify the 54 or more now the government has said

14   are cleared for release, to determine whether or not the

15   cases that have been dismissed prior to Boumediene can be

16   reinstated by a simple application to reinstate.  It would

17   seem somewhat logical to visit the protective order matters

18   about communications with client, access and filing

19   mechanisms to make it simpler to file the security

20   procedures, et cetera.  And the clean up of certain motions

21   that are still outstanding, we need to resolve and move

22   these matters along.

23             One of the matters that came to my attention this

24   morning was a motion to consolidate 17 Uighur petitioners in

25   one case before a District Court judge.  And I have

1    discussed with the affected judges, except for one.  And we

2    can look at that as well.

3         The bottom line is I think from what the chief

4    judge has indicated, and I think all my judges in all the

5    discussions that we have had together, and you can be

6    assured I've had multiple phone calls and visits from all of

7    my judges about this, is a commitment for this Court to move

8    this matter expeditiously forward.  There are things to be

9    done to aid in that, not only what we can do, but if we

10   can -- the petitioners who have cases in the Court of

11   Appeals that are pending, perhaps assist in getting some of

12   those decisions issued so that we would have guidance on

13   some of the issues we're going to have to deal with here.

14        This Court will move forward on these cases in a

15   timely fashion, keep the feet to the fire on both sides of

16   this case to get these matters done and accomplished as soon

17   as reasonably possible, in accordance with Boumediene.

18        I think the clearing up the docket and getting

19   through some of these more administrative matters will help;

20   at the same time, we want to move along with the substance.

21   I don't look at any of these issues as needing to delay any

22   other issues.  We should be working on many fronts at the

23   same time to move all these forward.

24        So with that short introduction, I would like to

25   have counsel who have been nominated to address the Court,

and I have some questions and some issues to discuss with

them.  And then we'll I think be able to issue a scheduling

order in certain areas by tomorrow, so this matter can

continue to move forward.

So with that, is the government then the

counsel -- who are going to address the Court for the

counsel for the petitioners' constitutional rights?

MR. KADIDAL:  Your Honor, thank you.  My name is

Shayana Kadidal, you know me from the closed sessions.  I'm

the Guantanamo litigation project at the Center for

Constitutional Rights.

THE COURT:  I appreciate it.

MR. KADIDAL:  I'm one of the two appointed

spokespersons, and the other is my colleague, Gitanjali

Guiterrez from the Center, who is also --

THE COURT:  I appreciate that you actually have an

agreement that someone can speak for you all.

MR. KADIDAL:  I'm sorry?

THE COURT:  I said I appreciate you have an

agreement that someone can actually speak for you all.

We'll have less than 20 or 30.  I'm sure that's difficult,

but I appreciate that.

MR. KADIDAL:  Thank you.  Just by way of

background, Gitanjali was the first civilian habeas counsel

to visit the base, and is a veteran of the proceedings

1  before Judge Green in 2004 and 2005.  Should we begin?

2          THE COURT:  Yes, sir, please.

3          MR. KADIDAL:  Your Honor, you directed us to

4  designate two speakers, myself and Gitanjali, we've been

5  designated, but I want to reemphasize at the outset that

6  there is no collective habeas position in these cases

7  because there is no collective habeas case.  As we

8  emphasized during the two closed sessions, there are an

9  extraordinary diversity of cases here, you know, some cases

10  that will go forward primarily based on challenges to the

11  legal standard that the government intends to use to justify

12  detention; other cases where petitioners will intend to

13  challenge the factual basis that the government puts

14  forward.  We remain convinced that the only thing that will

15  come of trying to coordinate resolution of procedural and

16  merit standards through a single judge is delay, and so I'm

17  pleased to hear that you are not sanguine about the

18  prospects for expediting these cases by coordinating those

19  issues.

20          And again, I also want to reiterate at the outset

21  that speed and fairness are the primary values that this

22  process should serve, and rigid conformity on the legal

23  standards applied in the course of resolving each case is

24  not one of those primary values.

25          We have essentially kind of a three-part proposal

for you today on scheduling.  The first item deals with

factual returns, then after that, a proposal for status

reports following production of factual or part of a factual

returns, and then a proposal for some motion forward on the

30-day notice orders issue.  And with that, I think maybe an

appropriate way to go forward would be for me to present

those three proposals, and then hear from the government on

its position and my colleague, Ms. Gutierrez, will address

sort of any responses to the government's position.

THE COURT:  Let me ask you a preliminary question:

Are you aware of any -- and others can answer this, as I

said, you're all welcome to file a written report with the

Court as to this conference we're having today that I can

consider, although we do want to move forward very rapidly

so it will have to come in quickly.

Are you all familiar at all with any cases that

are in a position to move the Court to the ultimate hearing

or not?  In other words, are the returns filed, the versus

filed, no updates coming, you're ready to move; you don't

need discovery in any other motions, but you're ready to

move forward with the hearing?  Because, I mean, people are

talking about having immediate hearings, when they look at

their cases, they say well, no, we want discovery, I want to

know every time my clients are mentioned in any document in

the United State's possession, that's going to take a while

1   to work out.  But if there's some of them that's ready to

2   go, we can see if we can't move ahead with some of these

3   cases.

4           MR. KADIDAL:  Sure, Your Honor.  Well, I think we

5   reported in one of the closed sessions that originally a

6   status conference was scheduled for today in a case

7   involving some Yemeni detainees, I think Sutherland &

8   Asbill, that law firm, is a petitioner's counsel in that

9   case.  Two ot their clients were cleared for release, and i

10  think they attended to move forward, you know, relatively

11  expeditiously, without asking --

12          I didn't make my question clear enough.  Setting

13  aside those that have been cleared for release, I think

14  that's a category that I'm going to try to take care of when

15  I talk with the government about it, but detained people who

16  are being detained, being held or not cleared for release.

17  You think there's anyone immediately available that wants to

18  go for a hearing where everything is updated?  I haven't

19  asked the government they need to update any particular

20  person you may nominate, but --

21          MR. KADIDAL:  Sir, I think almost certainly

22  they'll be cases like that.  I don't know that I can give

23  you an example off the top of my head.

24          THE COURT:   Well, that's just a question I had.

25  I can get a report on that.

1           All right.  I interrupted you, go ahead, sir.

2           MR. KADIDAL:  Sorry.  Okay.  Well, let's begin

3   with the returns.  It's our position that the

4   government's --

5           THE COURT REPORTER:  Sir, I'm going to need you to

6   please slow down.

7           MR. KADIDAL:  I'm sorry, there was no one taking

8   stenography during the closed sessions, so I'll try.

9           It's our position that the government's proposal

10  for producing factual returns or amended factual returns, as

11  the case might be in these cases, is -- would just involve

12  absurd delay.  The proposal that we heard involved a 60-day

13  delay for the production of the first amended returns,

14  followed by a production I suppose of a 25 returns every two

15  weeks, which would put the final return or amended return in

16  any of these cases being produced at the first week of

17  December.  That's sort of a six-month delay in producing

18  records for men who are held for six years, I think is a

19  absurd regime, and that that idea I think needs to be killed

20  here today.

21          THE COURT:  Let me ask you this:  What -- go

22  ahead, finish up first.

23          MR. KADIDAL:  Sure.  And our proposal essentially

24  for having moved forward on the returns is that the

25  government is in a position to produce the classified CSRT

and ARB records immediately, you know, presumably filing

these things in a secure facility. And even though that

they've failed to produce classified CSRT records, even in

some cases where a protective order is already in place, we

feel that they are -- should be able to do that by the end

of next week, July 18th. That gives them about ten days.

Now, you know, in all previous Guantanamo habeas

cases, the government has said that the return, the complete

return, was a CSRT hearing record, so just to give you an

example, in an August 31st, 2004 letter, the government

urged the Court, then Judge Green, to wait for CSRT returns,

quote, as a complete statement of the factual basis for a

detainees' detention as an enemy combatant. And they argued

that the small delay was necessary to prevent the need to

supplement the returns later.

They said at the time that they -- at the end of

August 2004, that they expected to have the majority of

these returns done by the end of September, and anticipated

filing the last of those returns by October 18th, 2004, so

in a relatively short time frame starting from scratch.

According to a transcript of proceedings before Judge Green

in mid October 2004, they had, in fact, failed to produce

returns even on that schedule in 38 of 66 cases.

So, you know, that's our starting point. But the

government's position throughout this litigation has been

that the CSRT record ought to be the complete record. And,
you know, very clearly I think that there shouldn't be any
impediment to them filing those records in every case within
ten days.

Now, in the DTA process, the government, as we
pointed out to you during the close sessions, the government
argued again and again that the record on review was a CSRT
hearing record and even procured a stay on the entire DTA
regime so that it could go to the Supreme Court to establish
that the record in the DTA process ought to be the CSRT
hearing record.

Now, in the one month since -- almost since
Boumediene was decided, the government has never said that
it doesn't have right now, today, in ever Guantanamo case,
that CSRT record in hand. It would be astonishing if it
weren't so. The government boasts repeatedly that it's put
these people through CSRT's and that the CSRT's represent
some kind of real process, and that materials were submitted
to each CSRT panel and so forth. There's no reason that
that hearing record shouldn't be filed in every habeas case
by next Friday. And so, we think the starting point ought
to be there. We should begin there and that should be the
provisional return.

Now, you know, we don't insist that it ends there
in every case, but it begins there, and that should begin

1    immediately.  If the government says that it wants to amend

2    that factual return, that provisional factual return, then

3    they should, as we initially proposed before Your Honor and

4    Judge Lamberth, we've in short ordered for leave to amend

5    with the amendment itself attached before the individual

6    District Court judges.

7              Now, I think it's very clear that the government

8    has no outright right to amend.  If you look to the

9    statutory procedure outlined for section 2241 cases, 28 USC

10   Section 2243, in paragraph seven says that, the return,

11   quote, may be amended by leave of court.  And we think

12   that's the standard that ought to apply here.  Each judge

13   ought to determine on the facts that are put before them

14   those motions for leave, you know, whether or not the

15   amendment ought to be accepted.  And that's something that I

16   think each judge has discretion to consider.

17             So we begin with the CSRT hearing record, let a

18   judge and counsel look at it, and let the government make a

19   specific case why it has to be amended from the government's

20   point of view.  The trial judge obviously, ought to require

21   that the government represent that they have something

22   substantial to amend the return with, not that they will --

23   not that the government will begin an investigation at that

24   point in hopes of finding something.  Again, we think that

25   the amendment ought to be attached to those motions for

leave.  And as we propose in our final letter to Your Honor,

I think something like a 30-day period of time for those

motions for leave to amend to be filed in every case would

be a useful matter for this Court to impose in order to

expedite the process of producing these returns.

Now, the government has implied that they want to,

just for background I suppose, there are about 200 cases

here, and we've heard from the government that in about a

hundred of them some form of factual return has been filed.

Meaning in about a hundred were waiting for the first

factual return, whether it's provisional or not.  Now, the

government has implied that out of the hundred that it's

already filed, that it intends to amend every single one of

them to put its best case forward.  And I think, you know,

the individual judges that hear these cases ought to examine

the judges motions for leave -- I'm sorry, the government's

motion for leave, in order to determine whether or not

there's anything of substance to add.  This is the sort of

scrutiny that the ordinary requirement of seeking leave

enforces.

And from there, it would be useful from our

perspective to have some kind of meet and confer process

with the government on these cases.  And I think, you know,

that might require the government identifying one lawyer on

their side of the fence that each petitioner's counsel can

confer with.  It would also be useful to us I think, if the

government certified that all the exculpatory information in

its records is contained in whatever amendment they propose

to make at that point.

Now, you know, Your Honor asked about cases that

might be -- you know, where people might be willing to move

forward to a hearing.  Certainly I think there may be cases

were there are individuals who are willing to stipulate to

factual assertions that the government has made and attempt

to move forward without even seeing the purported evidence

that supports the stipulated facts.  So, you know, those

might form an entire category of cases that, you know, might

be amendable for ready settlements or for quick hearings.

Now, in order to facilitate this whole process, we

propose that both sides submit status reports a week after

the CSRT record is put into place.  We think it's probably

easier if they are individual status reports, meaning not

joint, just given the logistics of producing joint reports,

that requires a little bit more conferring upfront.

Now, what we propose to include in those status

reports on the government end, I think that they ought to

include, you know, indication of intent to amend the return

and in some sense of the substance of the amendment.  Also,

they ought to indicate whether or not the DTA record was

assembled in that individual petitioner's case.  We had I

think, about 170 DTA petitions filed.  And again, the
government had repeatedly said in that process that they
were, you know, working night and day to produce the
records.

I'll give you some examples from their briefs.
The government said in an August 22nd brief and in the
Bismullah case, "to be sure, the government is not sitting
on its hands in the interim; many governmental entities are
currently expending significant resources, actively
gathering and reviewing material that might be treated as
part of the record in this case."  On August 31st, last
year, they filed another brief saying that, "numerous
governmental entities are engaged in a large scale
production record -- sorry, large scale production effort,
and that the relevant government entities are proceeding
expeditiously with this process."And then finally, in June
of this year, the government said in seeking to hold the DTA
cases in advance that, "significant military intelligence
resources have been devoted in preparing records and
reviewing classified filings to facilitate the DTA review in
this court."

So, you know, presumably there's something pretty
significant there.  And I think the status reports that the
government would submit in a week from the 18th, that would
be July 25th, and that they ought to indicate whether or not

the DTA record was, in fact, assembled in the individual

petitioner's case, whether or not it was ever filed with the

Court.

From our side, I think there are a number of sort

of basic administrative issues that could be dealt with in

these status reports, or at least some notice to Your Honor.

So any clearance issues, any protective order issues, those

sort of things, some rough indication of intent to seek

discovery might be something that a large number of

petitioners would be able to put into their status reports

at that point.  Perhaps reports on conditions of confinement

to give Your Honor a sense of whether or not there might be

challenges on that front, although again, we think that

conditions of confinement claims really properly belong

before the individual judges that these cases were assigned

to, in part because they implicate the ability of the

detainee to participate in their own habeas case.

And then finally, in our status reports, some

sense of a direction that we anticipate the case will take.

You know, whether it will be, you know, one of those cases

where the challenges are primarily legal, primarily factual,

some combination, you know, and so forth.  So, that's our

second proposal for status reports on July 25th, following,

you know, a week after the government's submission of the

kind provisional record, the CSRT and ARB records.

1          Now, I'd like to end with a proposal about the

2     30-day notice orders.  As Your Honor knows, there are

3     pending appeals before the Circuit in -- I believe there are

4     39 open appeals consolidated in the circuit in the Odah

5     case, the first case number there is 05-5224; there may be

6     some other cases with some of the same issues raised.  It

7     appears that the Court of Appeals will decide this issue in

8     the first instance.  And given that, we have a number of

9     30-day notice orders already in effect in cases in the

10    District.  We feel that there isn't really any sort of

11    substantial harm to the government for Your Honor to enter

12    30-day notice orders in all cases where counsel, in cases

13    before, you make a request for them in their status reports.

14         So, you know, we feel basically both that in the

15    interest of consistency and sort of the notion of balance of

16    harms, that they both favor a quick entry of notice orders

17    in cases where petitioners want them.  If the government

18    wants to litigate out those issues further before the

19    individual District Court judges perhaps they can do that,

20    but, you know, in the interest of our clients are not being

21    sent back to countries where they might face torture, are

22    substantial and we feel that they outweigh any interest that

23    the government has in not wanting to have an expedited

24    process for entry of 30-day notice orders.

25         So, in short, our proposal is that in any case

1    where there isn't a 30-day notice order and counsel requests

2    that a 30-day notice order be put in place in the status

3    report or earlier, that Your Honor enter them and, you know,

4    we would hope that any counsel who wanted that would at the

5    latest put in those requests by the date of the status

6    report, which again is July 25th.

7              THE COURT:  Do you know if the petitioners in the

8    cases that are on appeal, have they asked for an expedited

9    ruling by the Court of Appeals in that area?  One is a

10   Kembuck case, is one of them.  I think there are --

11             MR. KADIDAL:  Right.  I'm not certain what the

12   status is of those appeals in terms of expedition.

13             THE COURT:  It might help the Court if they could

14   get a ruling.  All right.

15             MR. KADIDAL:  We've got the motion to govern

16   further proceedings in front of us, which I think was filed

17   today or -- the government's motion.

18             Well, I think since that sort of closes up our

19   preliminary sort of three proposals, perhaps we can hear

20   from the government at this point and maybe report back to

21   you after they've spoken about the status of the appeals.

22             THE COURT:  Did you have any notes or associates

23   going to address at all, there's been some motions to vacate

24   dismissals, some discussions where they can be automatically

25   reinstated or have to be motions and argument on that, did

1    you have any position on that?  These are cases that have

2    been dismissed under Boumediene.

3              MR. KADIDAL:  Right, right.  So where the

4    dismissals are on the basis of jurisdiction, I think that

5    ought to be something that -- you know, I think ideally that

6    would be something maybe that -- where the cases would be

7    reinstated or the request for reinstatement might come

8    through the status report.  But since we're looking at

9    something a couple of weeks off in the future, I think maybe

10   we can put in some sort of coordinated requests for a number

11   of cases to be reinstated.  Does that sound --

12             THE COURT:  I receive some of those motions,

13   received motions to lift the stay as well, which I'll

14   discuss with the government in a minute.  And motions to

15   give notice to transfer the 30-days notice, you've already

16   talked about, I've received a motion for that.  There's a

17   motion to enjoin trial by the military commission, the Hamdi

18   case, which is before Judge Robertson.  It's been exempted

19   from our group here.  A motion to enter a new protective

20   order for newly filed cases; we'll talk about that in a

21   minute.  And the motion to consolidate the Uighur cases.

22             MR. KADIDAL:  Your Honor, hopefully I think we can

23   probably stipulate actually, given that I think the

24   government doesn't object to reopening most of those cases.

25   And we can probably confer and iron out most of them within

1  a week or two.

2        I do want to mention one point, that a number of

3  counsel whose clients are facing charges before military

4  commission are -- were concerned that the courts press

5  release was may be a little bit ambiguous about the question

6  of whether or not the issue of whether habeas petitioners

7  could -- or whether such -- I suppose in the Hamdi case, the

8  petitioner there is seeking to enjoin for the progress of

9  his military commission through habeas, and we would like

10 some clarity as to whether or not that issue is being

11 decided by Judge Robertson as a coordinating judge for all

12 the military commission cases or just for Hamdi?

13       THE COURT:  No, he's deciding it for his own case,

14 but I suspect that he's recognized this -- authoritative in

15 his area, this case.  But it's not -- he's not been

16 appointed a coordinating judge for all cases involving

17 trials by a military commission.  He's deciding in his own

18 case, but the court has voted to allow him to go ahead with

19 his case, rather than have it come to me.  And so he's going

20 to decide that case and I suspect other judges will look to

21 see what he's done.

22       MR. KADIDAL:  Thank you, Your Honor.

23       THE COURT:  All right.  Thank you for the work in

24 the case, I appreciate it.  I didn't say at the beginning

25 that the Court need to recognize the work of what we call

1   pro bono counsel, unless all counsel in these cases except

2   for one group are not retained counsel.  They're all

3   volunteer counsel that have spent thousands of hours and

4   millions of dollars of their own monies in the attempts to

5   bring their clients before the Court to have a review of

6   their status as detainees.  And have operated in I think the

7   best traditions of the lawyers here in the United States who

8   do -- volunteer this type of work.

9        I know many firms have spent, as I've said,

10  thousands of hours for which they're being uncompensated, to

11  attempt to bring these clients before the Court for a review

12  of their status.  It has been much more work than I think

13  anyone recognized because of the long time this has taken,

14  both because of the appellate process, the Supreme Court

15  process and the legislative process.  And now hopefully

16  we're at a position where we can move these cases forward.

17  All right.  Again, thank you.

18       I'll recognize the government; it's going to be

19  the assistant attorney general in charge of the civil

20  division.

21       MR. KATSAS:  I'm Greg Katsas, I am the assistant

22  attorney general.  I will give you some thoughts from a

23  management perspective of the civil division, and then turn

24  the floor over to my colleague, Judry Subar of our federal

25  programs branch, who has been working on the habeas cases

1   for some years and has intimate familiarity with them.

2           Judge Hogan, we agree with your two basic concepts

3   that the ultimate release decision is for an individual

4   judge, and further that the cases should proceed on as many

5   different fronts as possible.  Our proposal, which

6   distinguishes on the one hand the process of producing

7   factual returns as quickly as possible, which address the

8   necessarily fact-intensive question of the basis for the

9   detention of each individual detainee, have that process

10  proceed on one track while simultaneously attempting to the

11  maximum extent possible to bring as much legal clarity to

12  the circumstances as we can through our proposal for

13  briefing up any issues that any party views to be common and

14  appropriately resolved on the front end.

15          We think that makes eminent good sense because it

16  doesn't make a whole lot of sense to generate factual

17  returns for some 200 or 300 cases, and at least in our

18  opponent's view, begin a trial preparation process in some

19  200 to 300 cases without any particularized sense of what

20  the proceedings will ultimately look like.

21          And we find ourselves after the Boumediene

22  decision with a perhaps unprecedented range of uncertainty.

23  We don't have experience with respect to the conduct of

24  habeas proceedings involving enemy combatants captured and

25  held in wartime.  These are not criminal trials; they are

1  not garden variety 2255s.  The Supreme Court, in Boumediene,

2  made clear that the details of the conduct of the

3  proceedings remain an open question to be worked out by the

4  District Court, and at the most general level, our proposal

5  is designed to push that process as far as we can as early

6  as we can in the process, so that all parties have as much

7  guidance as we can to make the factual inquiry proceed

8  within an appropriate procedural framework and in as

9  streamline a way as possible.

10         Let me begin with the question of returns, and

11  then turn to what we view as the parallel track of legal

12  briefing on common issues.  With respect to factual returns,

13  you have our proposal, it is in the letter that had been

14  confidential; it's now in the public domain.  We have no

15  objection to that.  In essence, we are proposing to submit

16  50 returns a month beginning in 60 days.  We had said in 60

17  days, but we are content to particularize that to

18  approximately the beginning of September.  And we explained

19  to you what an enormous commitment of government resources

20  is entailed by that sort of undertaking.  And you have the

21  details of that before you.

22         THE COURT:  Let me make clear, help me understand

23  this.  Fifty returns -- you have a couple of hundred

24  apparently, people you -- 100 of which I thought you already

25  had returns on.  So am I talking about 100 people you're

1  going to do returns on, so in two months you'll have all the

2  returns?

3        MR. KATSAS:  No, we're talking about 200 returns,

4  because what we have for that hundred was returns produced

5  in 2004 that effectively were combatant status review

6  tribunal records.  And the other side says well, that's

7  fine, the government has argued for limited review on a

8  combatant status review tribunal record; it should be stuck

9  with that decision.  And we have the CSRT records, we can

10  produce them.  So let me respond to that as best I can.

11        First of all, that view of things ignores four

12  years worth of continuing and improving -- improved

13  gathering of intelligence and information about detainees

14  through military operations at Guantanamo Bay, through other

15  operations of American intelligence agencies.  The

16  government should be entitled in 2008 to present its best

17  case for holding each detainee as an enemy combatant in

18  2008.  In many cases, that will involve newly-developed

19  evidence over the last four years.

20        In some cases, the process of updating might work

21  in a detainee's favor, as we find that evidence we thought

22  was reliable in 2004, we might look at with a more jaundiced

23  eye in 2008.  The point of the matter is this is very

24  serious business, and the judgments that this Court will

25  render should be based on the best most current evidence

1    that both sides have to offer.

2            So there's the temporal issue, the passage of

3    time.  There is a further issue with respect to very

4    substantial intervening legal developments between the time

5    that the combatant status review tribunal records were filed

6    in 2004, until the present.  Let me just give you a few

7    examples of that.  In 2004, at the time those records were

8    filed, there was a combatant status review tribunal process.

9    There was no -- there was no Detainee Treatment Act.  The

10   combatant status review tribunals were modeled on Article V

11   Geneva Convention tribunals that the Supreme Court in Hamdi

12   seemed to suggest would be sufficient in this context.  And

13   the defense department and the justice department went about

14   doing their best to assemble those records and then defend

15   the detention based on those records.

16           And we think based on Law circa 2004, both the

17   administrative process was sufficient and a judicial review

18   appellate in nature, whether through what later became the

19   detainee treatment act or through habeas on a World War II

20   model, would be sufficient.  That was the landscape at that

21   time.  We have now learned, among other things from

22   Boumediene, that we have -- we don't have an appellate-like

23   model through the detainee treatment act.  We don't have

24   appellate-like habeas model along the lines of the World War

25   II cases.  We have habeas corpus that necessarily involves a

trial court taking some degree of its own evidence, and we will argue about the details of this, but the proposition favorable to us that the judicial review could start and end on a military record has been overtaken by legal events.

We also have the D.C. Circuit's intervention decision in Parhat, which makes clear that at least in some circumstances it might be insufficient for the government to rely on un-sourced intelligence documents, and we might have to put in some independent indicia of reliability.  We will have to work out just what that entails, but I don't think it can be disputed that that is relevant guidance recently rendered that we need to take into account.  It would be the height of irresponsible lawyering for us simply to file as a factual return in a -- in let's say Parhat's habeas case, the same record -- the same combatant status review tribunal record that we tried to defend in the D.C. Circuit, without at least going through the process of asking ourselves the questions that Parhat seems to require of us.

So both because of intervening factual development and intervening legal development, we feel very strongly that we ought to be entitled to defend these cases on the best record that we can produce today responding to the recent legal guidance that the Supreme Court and the D.C. Circuit have given us.

If you accept at least that proposition, then I

1    think the schedule we proposed is not only reasonable, but

2    is from the government's view, quite aggressive, and

3    frankly, strains our resources almost to the breaking point.

4    The only view of things on which petitioners' time line can

5    possibly make sense is if we are bound by stale tribunal

6    records, which we think is wrong for the reasons I have

7    suggested.

8         THE COURT:  I did have a thought when you're

9    talking about this, before you got to your development on

10   the legal side, just on the factual side.  If you were

11   continuing to originally have whatever facts you had when

12   you took custody of this individual, why should you be now,

13   after the fact, allowed to amend those reasons to justify

14   their original detention?  Because that wasn't in the

15   executives' mind when they originally picked these people

16   up; they had whatever facts they had.  You know, if they

17   weren't sufficient, then they shouldn't have been picked up.

18        MR. KATSAS:  Well, that's right, but we're not

19   doing arbitrary and capricious review under the

20   Administrative Procedure Act where we're sort of limiting a

21   decision maker to his own rational.  Although habeas is

22   prospective in focus, it addresses future detention.  This

23   is serious business in the middle of a war, and we think for

24   all of those reasons the most judicious and appropriate way

25   of the Court looking at the question is whether there is a

1  sufficient factual and lawful basis for detention in 2008

2  going forward, of detainees with -- prospectively in that

3  time frame.

4  THE COURT:  If I understand your presentation then

5  correctly, is that in every case of someone who is still at

6  Guantanamo, that you would you be filing -- you intend to

7  file anyway, depending on what the Court does, a return for

8  those who have not yet had a return.

9  MR. KATSAS:  Right.

10  THE COURT:  And it would be more than the CSRT

11  filing; it would be supplementing that.

12  MR. KATSAS:  What I'm saying is if in every case

13  we preserve the need to ask ourselves difficult and

14  time-consuming questions about whether the 2004 tribunal

15  record reflects the best we can do now in light of further

16  intelligence developed in the future and in light of the

17  intervening guidance from the Courts, we may in particular

18  cases ultimately make a judgment that the tribunal record is

19  pretty good.  In other cases, we might make a judgment that

20  we can and should do better, but that's not a question that

21  we can answer in gross before you today, until we have an

22  expanded team of lawyers intensively working with the

23  defense department and the intelligence agencies to see what

24  we have as of today.

25  THE COURT:  All right.  So the prospect advanced

1    by petitioners of filing the CSRTs as a provisional

2    statement in a week or two is you feel not sufficient, under

3    your obligations representing your client, to get these

4    cases at issue?

5              MR. KATSAS:  I'm not sure how it would advance the

6    ball much.  We certainly take the position that that record

7    shouldn't bind the government's defense if the case is going

8    forward.  And realistically, for the reasons that I have set

9    out, we think it likely that in at least many of the cases,

10   the best most current case we can provide in 2008 responsive

11   to Boumediene and Parhat will look somewhat different from

12   the tribunal records assembled in 2004.  If that proposition

13   is true, then the intermediate step of producing the

14   tribunal records wouldn't seem to advance the ball very

15   much.

16             One final point on returns, Judge Hogan, is, you

17   know, to the extent that you view this as a close or

18   difficult issue, it is exactly the kind of common procedural

19   question that we think is appropriate for you to decide as

20   coordinating judge and, you know, we're happy to have you

21   decide it based on argument today.  If you want to hear

22   more, we're happy to submit further briefing on it.  But the

23   last point I'd like to leave you with on the question of

24   returns is the debate that detainees' counsel and I are

25   having on this point involves quintessentially a common

procedural question; namely, whether the government should

be bound by its best tribunal case as of four years ago.

THE COURT:  All right.  Their request was the

CSRTs, and then a week later file some type of status

report.  And if the returns, under your view, are going to

be coming in seriatim over the next three months or so, or

four --

MR. KATSAS:  As soon as they are ready, consistent

with the general parameters that we've set out.  We're not

proposing, in other words, to hold onto 50 returns until day

60; we're proposing to generate them as quickly as we can.

Post them as quickly as we can.

THE COURT:  Two other matters on that occur to me.

One is there would have to be some decision made on the

priority of these returns.

MR. KATSAS:  Right.

THE COURT:  Which ones you're going to do.

Whether it's the oldest case in this court and start moving

forward; whether there are exceptions.  There's always going

to be some exceptions for people who maybe have special

problems of illness, et cetera, perhaps their -- or whether

you go with the longest-held detainee.  But there are

obviously -- it will have to have some direction of which

returns you're going to focus on first.

MR. KATSAS:  Exactly.  We have given you what

1    seems to us a sensible proposal.  Upon reflection, we think

2    there should be a rational default rule.  We think probably

3    the first return should be key to a order filed in habeas

4    cases, but we don't have a strong stake in the precise rule.

5    We do think that whatever general algorithm the Court asks

6    us to follow, have a degree of flexibility so that we don't

7    end up in a position of if we come upon a particularly

8    difficult return and get hung up for a bit, we're creating a

9    backlog.  We'd like some flexibility to have a rule of

10   reason in terms of how we process the cases.

11          And then we've laid out for you a couple of

12   exceptions to the general rule of we'll give you the first

13   returns based on filing dates.  The one that seems less

14   controversial is that we differ returns of detainees who are

15   no longer at Guantanamo Bay, we think is a legal matter,

16   those cases are moot in any event.  As a factual matter they

17   are clearly less pressing and that judgment seems reflected

18   within the structure of your two procedural orders, so I

19   won't belabor it here.

20          The other principle that we proposed is that

21   defendants charged in military commission prosecutions

22   should have their returns generated last.  With respect to

23   those defendants, there are two independent basis for the

24   detention; one which is at issue in the general core habeas

25   cases is the prior enemy combatant determination.  A second

1    independent and sufficient basis for detention is based on

2    that detainee's status as effectively a pretrial detainee

3    facing a prosecution under Congressionally sanctioned

4    procedures with built-in time lines.  We see no reason in

5    the necessary triage judgements that the Court will have to

6    make not to put those cases at the back on the theory that

7    while the military commission is running its course, there's

8    really nothing for the habeas court to do.

9            We recognize, Judge Hogan, that that is likely a

10   proposal on which there may be disagreement, but again, for

11   purposes of today, the point I'd like to stress most to you

12   is that that, to the extent there's disagreement, that is

13   sort of a common procedural traffic cop sort of question

14   appropriately resolved by you as coordinating judge, so we

15   develop once and for all with as much rationality as

16   possible the rules by which we will generate returns rather

17   than having resource intensive satellite litigation before

18   each individual judge on a wasteful enterprise like that.

19           THE COURT:  All right.

20           MR. KATSAS:  With respect to legal issues that we

21   think you could beneficially resolve during the time that we

22   are generating the factual returns and thereby facilitate

23   the ultimate disposition of the cases, I think they fall

24   into basically three categories which I'll address in turn.

25   The least controversial one seems to be issues with respect

1  to the protective order.  I think parties agree that

2  protective order issues are appropriately decided by you as

3  a coordinating judge.

4          I can tell you that from the government's

5  prospective, at the present time we have no -- we have no

6  desire to seek amendments to the protective order, other

7  than those sought by the CSO in the vast majority of cases

8  that do not involve high-value detainees.  We do intend to

9  seek modification of the protective order with respect to

10  high-value detainees in order to provide an appropriately

11  greater degree of protection to the sensitive

12  compartmentalized information uniquely at issue in those

13  cases.  And we would be happy to produce a briefing schedule

14  for keying up and resolving those issues at the Court's

15  convenience.

16          I'll let the other side speak for themselves, but

17  I think where we are on that is agreement that those are

18  issues for you, perhaps disagreement on what the underlying

19  HBD protective order should say.

20          The second set of issues where we think you can be

21  extremely useful to the parties and to everyone's interest

22  in prompt resolution of the cases is what I will call

23  procedural framework issues; the issues that address how

24  these cases, each one of these cases will, in fact, be

25  tried.  As I said at the outset, we face an unprecedented

1   degree of uncertainty with respect to the details of habeas

2   rules.  We have identified a lot of those issues in our

3   submissions:  What is the nature of the government's initial

4   burden?  Can we rely on summary testimony by a knowledge

5   affiant?  Can we rely on hearsay?  What is the legal

6   consequence of producing the return, does it shift the

7   burden to the detainee to prove more persuasive evidence?

8   What are the circumstances in which the detainee can get

9   discovery?  On and on and on.

10          But we recognize that there is a question about

11  how many of those issues you can usefully resolve at the

12  outset.  And we recognize it may be that you can only

13  usefully push the law so far at the outset, and leave more

14  fine-grained disagreements about procedural questions to be

15  ironed out in the -- within the details of specific cases.

16  But even though there might come a point at which you

17  exhaust how many legal questions you can usefully resolve at

18  the outset, the most important point for you to focus on

19  today is that that enterprise is at least worth trying.

20          We think, for instance, that it would provide very

21  significant guidance to all concerned if we knew at the

22  outset that the framework envisioned by Justice O'Conner in

23  her controlling opinion in the Hamdi case in order to govern

24  an enemy combatant status determination for an American

25  citizen held in this country, would be the governing

1    framework for these 250 to 300 cases.  That would be

2    tremendously useful for us to know.  I have a feeling that

3    our opponents will dispute that proposition because if you

4    look at what they have demanded in their private letters to

5    you and Judge Lamberth, the degree of process that they

6    envision, there's no relationship whatsoever to what Justice

7    O'Conner envisioned in Hamdi.

8         It seems to me there is at least a pretty

9    significant possibility that we can frame some broad legal

10   issues about, for instance, whether the Hamdi framework is

11   controlling, and perhaps on the other side will argue that

12   Boumediene somehow implicitly overrules the Fifth Amendment

13   holding of Hamdi; that's a pretty good legal issue for us to

14   debate.  We can do that now and your resolution of questions

15   like that would immeasurably advance the overall planning,

16   party planning for the cases and coordinating disposition of

17   the cases.

18         You won't know how much you can usefully resolve

19   at the outset until you see very specific concrete proposals

20   from the parties with respect to what I'm calling procedural

21   framework.  Our proposal on this issue is that you order

22   briefing consistent with -- consistent with the general

23   order of the Court and your procedural order that you try to

24   resolve common procedural issues as much as possible.  Let

25   us brief these issues up.  We will give you our general

sense of the procedural framework of these cases, and the other side will have every opportunity to argue not only that our procedures are wrong on the merits, if they care to make those arguments, but just as importantly, they will have every opportunity to make an argument that we should resolve 200 times before 15 judges the question of whether Boumediene implicitly overrules Hamdi rather than do so once at the outset.  They can make arguments like that, and you can decide commonality questions no less than you can decide merits questions.

In our judgement, the only issue before you today is whether the enterprise of trying to establish a procedural framework is one worth at least attempting, and we think the answer to that question is clearly yes.

That brings me to my final category of common issues that we think you can usefully address as the coordinating judge.  For lack of a better word, I will call them collateral issues.  There are essentially two of them, I think we've discussed them.  One is the 30-day notice issue and one is the conditions of confinement issues.  They are collateral in the sense that in our view, they do not address the core habeas question regarding the fact or duration of detention.  They address notices, they address transfer issues, they address condition issues.  We would argue those are much more at the periphery of habeas and;

1   therefore, you're taking those issues does not really

2   intrude into the individual judge's prerogative to decide on

3   the merits, the necessary fact -- question, whether we have

4   a lawful basis for holding a particular detainee as an enemy

5   combatant.  They're collateral in that sense.

6          Just as important, they are also, in our view,

7   common.  The reason they are common is that we have what we

8   think is a pretty good set of legal arguments that this

9   Court respectfully has no jurisdiction to address those

10  sorts of issues in light of portions of the Military

11  Commissions Act that we think survives Boumediene, and in

12  light of what the Supreme Court said about transfer issues

13  in Munaf.  We may or may not be right ultimately in our

14  position, but there's no doubt that those are common issues

15  and it seems to us issues best resolved once and for all at

16  the outset, so that again, my precious limited civil

17  division resources are not consumed litigating conditions

18  issues and transfer issues over and over and over, when it

19  may well turn out that we were right -- that that is not

20  part of constitutional habeas.

21         I should note, you asked about the D.C. Circuit.

22  The D.C. Circuit has involvement in both of these issues.

23  With respect to 30-day notice, that issue is teed up in a

24  D.C. Circuit case called Kiyemba.  You have the docket

25  number in our letter.  We, within the last day or two, filed

1    a motion to govern future proceedings in Kiyemba, in which

2    we suggested to the D.C. Circuit that they allow limited

3    accelerated supplemental briefing in Kiyemba to take account

4    of Boumediene and other legal developments since the cases

5    were originally briefed, and if necessary, set the case for

6    an expedited -- I believe it would be a second oral

7    argument.

8              With respect to conditions issues, those are teed

9    up in Belbacha, and we have a motion to govern future

10   proceedings in the pipeline.  We expect to file it in a

11   matter of a few days, and we expect to take a very similar

12   task in which we would ask the D.C. Circuit to give the

13   parties a limited chance to address arguably intervening

14   legal developments, and then to decide that appeal as

15   expeditiously as possible.

16             And I think the fact that those pending actions in

17   the D.C. Circuit would so profoundly affect the overall

18   conduct of this litigation just underscores the point that

19   it is something sensibly coordinated, certainly horizontally

20   among the judges of this court, if you think appropriate

21   vertically between you and your colleagues in the D.C.

22   Circuit.

23             THE COURT:  Judge Lamberth has, as you know,

24   written to the circuit chief judge asking to see if they can

25   expedite these cases.  I was not aware you had filed

1  materials, at least in the one case, asking for additional

2  briefing but on an expedited basis.

3           MR. KATSAS:  We have motions to govern due in all

4  of the many D.C. Circuit habeas and DTA cases that have been

5  held for Boumediene, and so we are very much in the process

6  of asking that court to ramp up and itself address what we

7  regard as common questions that will be very helpful to

8  everyone involved as these cases go forward.

9           Let me just check my notes to see if there's

10 anything else; that is our affirmative proposal in a

11 nutshell.  Nothing else is leaping out at me, so I would

12 just invite Judry to come up and elaborate and hopefully not

13 correct, but if necessary, correct anything that I have

14 said.

15          THE COURT:  Thank you.  I've got some specific

16 questions on cases and numbers, maybe he has that

17 information.

18          MR. SUBAR:  I might, Your Honor.  We'll do our

19 best.

20          Just to fill in a few of the details with regard

21 to some of the details that Mr. Katsas was talking about, to

22 start out on the question of the filing of factual returns,

23 Mr. Katsas explained why the proposal put forward by

24 petitions isn't required by law and wouldn't be useful.  I'd

25 like to just point out briefly that petitioner's proposal

1  would also not be realistic and it wouldn't be well suited

2  to achieve the goal that we share with them, which is the

3  expeditious and fair resolution of these cases.

4          And that's simply because, as Mr. Katsas

5  indicated, he has limited resources that he gets to our

6  office, which has been assigned to the task of handling

7  these cases.  And without the resources to act more

8  aggressively that the already aggressive proposal that we've

9  put on the table, we just won't be able to make these cases

10  move forward in the way that the Court and petitioner's

11  counsel and the government as well all want to happen.

12          As we've indicted to the Court, as of the decision

13  date with regard to the Supreme Court's Boumediene decision,

14  there were just four people in our office assigned on a

15  full-time basis to -- or essentially a full-time basis to

16  work on these cases.  There were others who helped out as

17  their schedules and the needs of the litigation warranted.

18  But were ramping as quickly as we can to have hopefully

19  before too very long some 50 lawyers at the Justice

20  Department working on this.  But in order to get from here

21  to there or I should say from there to there, from where we

22  were a couple of weeks ago to the full complement of 50,

23  because we're already fortunately headed in that direction,

24  we have to find lawyers, we have to clear lawyers, we have

25  to train lawyers, we have to get them up to speed.  We have

to house lawyers, we have to find a way to put them in

offices, put them at desks, plug in their computers, get

them telephones, explain to them what's needed, and put them

in positions where they'll be able to deal with this

litigation.  And if we don't have that, then a couple of

hundred lawyers on petitioner's side clamoring for immediate

filings of combatant status review tribunal records, even if

they were available and even if it was otherwise warranted

that we produce them, just wouldn't happen.

So even aside from the considerations that

Mr. Katsas outlined with regard to the reasons that the

government should be given some period of time to put the

factual returns into a more appropriate form to allow the

Court to resolve these cases, given those considerations and

the ones that I've just mentioned, it's more appropriate

that a proposal along the lines of the one that we've made,

which is, as Mr. Katsas mentioned, as I just pointed out

quite aggressive itself, is quite appropriate.

Moving on to the next set of points that

Mr. Katsas addressed having to do with the resolution of

some of the procedural framework issues governing these

cases.  First of all, with regard to the protective order

issues, I think those can be addressed in the following

fashion:  We're prepared to speak with petitioner's counsel

in very short order with regard to both the issues

1    implicated by the interest of the Court's security officers

2    which I think the Court is aware of, and with regard to the

3    issues raised -- in the cases that Mr. Katsas referred to as

4    the high-value detainee cases.

5              With regard to the CSO issues having to do with

6    filing requirements and so forth, we can sit down with

7    petitioner's counsel and the CSOs fairly quickly, hopefully

8    iron those out without the need for court involvement, other

9    than final sign off on new parts of those, the order that

10   pertained to filing.  But if court involvement it turns out

11   is necessary, we can come to you and seek that.

12             With regard to the high-value detainee issues, I

13   don't know that we'll come to resolution with regard to

14   those issues with counsel, but I'm reasonably confident that

15   we can at least narrow the issues and then present them

16   fairly quickly.  And what I'd like to propose is that with

17   regard to both of those issues, that we confer over the next

18   week and if by Wednesday of next week we either have not

19   come to resolution or whatever the status might be, we can

20   give the Court an update and at that point suggest a

21   briefing schedule, if one is needed, with regard to those

22   points.

23             With regard to the other procedural framework

24   issues that Mr. Katsas outlined that can be litigated while

25   we're in the process of updating the factual returns, we'd

1   like to propose the following:  Those, as Mr. Katsas

2   indicated, are a set of issues that are largely legal in

3   nature that we can be briefing up over the next several

4   weeks.  We'd like to propose, rather than having a system

5   where one party goes first and then we have a ping-ponging

6   back and forth of briefs that could entail three or four

7   rounds, that we have simultaneous briefing beginning two

8   weeks from tomorrow for opening briefs, two weeks after that

9   for responses.  And then the matter would be before Your

10  Honor to resolve the questions with regard to those

11  procedural framework issues.  And that would allow Your

12  Honor hopefully enough time to resolve those issues in

13  advance of the filing of the first set of new factual

14  returns.  So that's it with regard to procedural framework

15  issues.

16          With regard to the collateral common issues, as

17  Mr. Katsas and Your Honor just discussed, some of those

18  issues are before the Court of Appeals and hopefully the

19  Court of Appeals will resolve those in a way that gives this

20  Court and the parties direction.  Meanwhile, those issues

21  are -- some of those issues are being briefed up right now.

22  We would suggest and respectfully request that rather than

23  having those issues resolved by the various different judges

24  in whose cases the issues arise, that Your Honor, as

25  coordinating judge, bring them together, the 30-day notice

1    issues and conditions issues.  And to the extent necessary

2    by virtue of the particulars of any given motion and what

3    the Court of Appeals may or may not do on whatever schedule

4    it might follow, that Your Honor resolve those issues as may

5    be appropriate.

6            Given the history of this litigation, we can

7    anticipate that there very well may be additional motions

8    that get filed relating to conditions of confinement or

9    other collateral points like that.  We'd like to make a

10   couple of proposals that we think would help the Court and

11   the parties as well, so that we avoid getting bogged down in

12   figuring out multiple briefing schedules with paper, I

13   suppose at this point, electronics floating around here and

14   there without sufficient direction.  And those two proposals

15   are as follows:  First of all, as we indicated in the letter

16   that went to Your Honor and Chief Judge Lamberth, we think

17   that it would be appropriate that with the exception of

18   ultimate dispositive motions and perhaps with the exception

19   also of motions for extension of time, that before motions

20   be filed that the Court follow a practice that's followed in

21   some other courts with some regularity; and that is to

22   require the parties to confer briefly with the Court before

23   the filing of such a motion.  We think that that could, in

24   addition to the ordinary meet and confer requirements of the

25   local rules, add to the streamlining of the briefing of

motions and their resolution, and perhaps even hopefully eliminate the need to litigate some points.

The other suggestion is that the Court set up a process whereby representatives of the petitioner's, representatives of the government confer with the Court by telephone. I suppose it could be in person, but by telephone might be more expeditious, on a periodic basis just to see what's happening in the litigation. That's our suggestion on that.

And the final point that I'd like to address has to do with something that both Your Honor and petitioner's counsel mentioned, and that had to do with the docket clean up question; questions of duplicate petitioners and figuring out whether cases are still on the docket, should be dismissed, whether cases that have been dismissed are appropriate for reinstatement. We would propose to confer with petitioner's counsel on that and to get back to the Court by July 21st, which is a week from Monday. We would hope to be in a position to have all the outstanding questions in that regard answered; we're not sure that we'll be able to do that, but we propose to get back to the Court by that date, either with answers or with an indication as to how much more time it looks like the parties would need to resolve those issues, if any, that would still be outstanding at that point.

1          So I think with that, Your Honor, that's our

2     proposal.

3          THE COURT:  Let me ask you first as to some of

4     these potential categories, we were told before, and it may

5     have changed in number now, there were approximately 54

6     people cleared for release that have not been released.

7          MR. SUBAR:  That's correct, Your Honor.

8          THE COURT:  Seventeen of those would be the

9     Uighurs that are part of a motion to consolidate that was

10    filed today; is that your understanding?

11         MR. SUBAR:  That is my understanding.

12         THE COURT:  I don't know if they're all cleared

13    for release, I shouldn't say it that way, but --

14         MR. SUBAR:  I'm sorry, Your Honor?

15         THE COURT:  I'm not sure actually that all the

16    Uighurs are cleared for release.

17         MR. SUBAR:  That could be, I'm not certain of the

18    exact numbers.

19         THE COURT:  But some of them will be part of that

20    54.

21         I received a motion to consolidate all the Uighurs

22    cases today before a District Court judge.  As the

23    government indicated, Mr. Henry was called and said he had

24    no position; is that correct?

25         MR. SUBAR:  That's correct, Your Honor.  Our

1    position at this point is that as a general proposition we

2    don't necessarily oppose that idea.  I'm not sure if

3    Mr. Katsas has anything to add to that.

4         MR. KATSAS:  No, I don't think we -- we don't

5    necessarily oppose it.  A couple of points, though.  I think

6    the motion mistakenly characterizes the D.C. Circuit opinion

7    in Parhat as having definitively resolved against us

8    dispositive legal questions that, if resolved against us,

9    would compel a release of all of the Uighurs.  In fact, the

10   D.C. Circuit expressly reserved the broader legal questions

11   and ruled against us based on an asserted unreliability of

12   particular proof documents.

13        We don't object in principle if in the 17 Uighur

14   cases the proposal is to brief up the potentially

15   dispositive legal issues that the D.C. Circuit expressly

16   reserved.  So in that sense, we are comfortable with the

17   proposal and think it's consistent with our general approach

18   of trying to do things once rather than many times.

19        We would simply ask that if the cases were

20   consolidated, that we sort of think about the consequences,

21   if any, of that for how we go about generating returns.  I

22   just wouldn't want a situation which as a consequence of

23   consolidation, we have 17 Uighur returns due on the front

24   end of things, and that doesn't count towards our pacing of

25   50 per month.

1    THE COURT:  Right.  I think that I understand that

2  issue, but it seems to me that it does fit in with the

3  premises the government has been interested in in trying to

4  resolve these other than individual trials, these

5  preliminary matters.  I can't promise you what the judge

6  would do who would be assigned these cases and how he would

7  approach them obviously.

8        I went through the motion, I have called each of

9  the judges.  One was out and I couldn't reach him, who has

10  one case.  All the judges that have these cases, which are

11  Judge Huvelle, Judge Sullivan, Judge Walton and Judge

12  Urbina -- I didn't reach Judge Robertson who has one case --

13  all the other judges consent to their assignment to one

14  judge for all purposes at this time.  Whether or not that

15  judge would order amended return or returns, I don't know.

16  And what the issues are going to be raised, I'm not sure.

17  The petitioners felt that they're all in the same boat as

18  the Court of Appeals individual was.  I think some have been

19  cleared for release and some others may not, so there may be

20  some differences between the group.  But it does seem

21  they're a group of rather unusual individuals who are tied

22  together by the same nationality and apparently political

23  beliefs that make them somewhat unique in this process.

24  There's a long history of the Uighurs here in this court for

25  Judge Robertson, and then being released for the Court of

1   Appeals to decide on his case.

2          So I'm going to grant that motion for

3   consolidation of the Uighurs cases filed herein today.  Let

4   me get the motion out so I can refer to it.  The motion by

5   all 17 Uighurs currently detained in Guantanamo Bay for

6   consolidation of their petitions for habeas corpus in civil

7   action number 0515-09, 0516-02, 0517-04, 0523-70, 0523-86

8   and 0523-98, is granted.  They asked for expedited

9   consideration, I'm not sure what that means.  That means in

10  my -- granting is granting, the consolidation would be up to

11  the judge that's assigned to consider how he'll proceed in

12  these cases.

13         The judges I've discussed this with have all

14  agreed that Judge Ricardo Urbina will be assigned this case

15  in accordance with local Rule 40.5(c)(2), having the

16  majority of these cases with the earliest case number.  So

17  Judge Urbina will have the 17 Uighur cases I've just

18  designated for his consideration to do with which as he

19  wants.

20         Let me ask a couple of other questions.  We are

21  going to identify, would this be this 21st date or another

22  date, as to the others not -- excluding the Uighurs that are

23  cleared for release, those individual cases or

24  petitioners --

25         MR. SUBAR:  I'm sorry?

1          THE COURT:  Do we have the identity of the

2   petitioners who are cleared for release, the numbers which

3   are approximately 54, some will be those Uighurs, but

4   whatever number there would be after you subtracted the

5   Uighurs, do we have that, who they are precisely?

6          MR. SUBAR:  Yes, we do.

7          THE COURT:  Is it changing somewhat?  I mean, are

8   more being released?

9          MR. SUBAR:  A couple of people who I believe were

10  on that list were released, were released recently.

11         THE COURT:  All right.

12         MR. SUBAR:  But the number is fairly close to --

13         THE COURT:  What I wanted to ask you, and I'll ask

14  the plaintiff's counsel and petitioner's counsel is, does it

15  make sense to consolidate those who have been cleared for

16  release between a particular judge to move those forward?

17         MR. SUBAR:  It probably does, Your Honor.

18         THE COURT:  I mean, we don't need returns on

19  those, I take it.  I mean, I take it the issue is finding a

20  country they need to go to?

21         MR. SUBAR:  That's the issue that the executive

22  branch is struggling with.

23         THE COURT:  All right.  Well, maybe we can assist

24  them to find a place.  All right.

25         As to the issue, and I think I understand the

1  assistant attorney general, I just want to be clear, the

2  government's proffer is not to file returns in cases where

3  they have no returns yet filed, and you believe that's

4  approximately a hundred cases.

5       MR. SUBAR:  Approximately, that's right.

6       THE COURT:  And to file amended returns on all

7  other cases where you've already filed returns, presumedly

8  in most -- in all or most of those cases?

9       MR. SUBAR:  That's right.  We don't know exactly

10  the number yet, but that's correct.

11       THE COURT:  Okay.  And because you're saying that

12  the intervening legal consequences and additional knowledge

13  that's come to light, you believe that it is appropriate to

14  file these amended returns and not rely upon the original

15  reports that you used in these cases?

16       MR. SUBAR:  That's correct, Your Honor.  If I may

17  just underscore two points; one, is to do anything else

18  wouldn't be particularly realistic.  And number two, the

19  position that we've explained to the Court, we think would

20  be more consistent with the Supreme Court's Boumediene

21  decision which said that the DTA process is not an adequate

22  substitute habeas corpus.

23       THE COURT:  Right.

24       MR. SUBAR:  The Supreme Court said forget about

25  the DTA, what the petitioners here are saying essentially is

1    remember the DTA process that we argued to the Supreme Court

2    wasn't adequate, well we hereby embrace it and we ask the

3    court to tell the government to follow it and to use the

4    CSRT record that was used in it.  We say no, no, no, let's

5    pay closer attention to what the Supreme Court had to say,

6    and prepare appropriate factual returns that are up-to-date

7    and, as Mr. Katsas indicated, in some cases might well

8    eliminate issues that would otherwise have to be litigated

9    if we went forward on the basis of the old returns.

10         THE COURT:  There's been an effort by the

11   government to ramp up after Boumediene to the 50 lawyers

12   approximately suggested that are going to be required to

13   handle this on your schedule.  Is there a concomitant

14   commitment by the Department of Defense or the CIA or the

15   State Department, other agencies that have to supply this

16   information to file these returns to wrap up similarly?  I

17   mean, I'm going to get motions that you can't get them

18   because you haven't heard from your clients about these

19   materials, et cetera?

20         MR. SUBAR:  There is a similar effort underway and

21   a similar commitment.  I can't say that the numbers are

22   identical; the needs are different, but yes.  The answer to

23   your question is yes.

24         THE COURT:  I'm afraid that I'll hear that, you

25   know, 25 lawyers have asked the CIA for various information.

1   They're going to come back and tell me, well, one person is

2   assigned to this and we can't get --

3           MR. KATSAS:  Judge, the other affected agencies

4   are all well aware of DOJ's view of what this will take and

5   what the scheduling is.  And they have represented to us

6   that they will make commitments that enable us to litigate

7   these cases on that time frame.

8           THE COURT:  Okay.  All right.  On the motion to

9   give notice, 30 days notice for a transfer, my review of the

10  record indicates that most of the judges have granted these

11  motions at the District Court level that have been asked to

12  do so.

13          MR. SUBAR:  Yes, but not all.  Some have denied

14  it.

15          THE COURT:  Right.  And that the government has

16  appealed that, that it's been sitting up there for some time

17  because of the stays granted.  And I think that it's

18  appropriate that I address that shortly.

19          Now, do you have any issues with my granting

20  motions to lift all stays that have been entered in all

21  these cases?

22          MR. SUBAR:  The motion -- as to the motions to, as

23  simply stay the proceedings pending Boumediene, no, we have

24  no objecting to the lifting of the stays.

25          THE COURT:  All right.  I'm going to enter an

order granting the motion.  There's one motion, but I'm

going to make it applicable to all cases that it's

applicable to, and that is the cases that were stayed here

in this court.  And the Circuit still has a couple of cases

they haven't sent mandates back on; I'm not sure I can

operate in those cases.  Now, there was a motion that came

in today to hold an immediate hearing and produce matters in

seven days.  There's still no mandate back in that case.

So the motion to lift stay, I'm going to grant and

make it applicable to all cases that have been stayed

pending Boumediene in this case, so the parties can move

ahead as we enter appropriate scheduling orders.

The motion to vacate dismissals, have you all

taken a position or are you going to take a position on

July 21st on that?  Is that what your proposal was?

MR. SUBAR:  It probably makes sense for us to

confer on that issue to a certain degree.  As a general

proposition, we won't oppose that.  The question, the main

question in my mind is whether there are some cases in that

category as to which the detainees have been transferred out

of Guantanamo Bay and; therefore, in our view, the cases

should remain dismissed.  If the petitioners in those cases

agree with that, then that's fine.  There might be some

cases where there's disagreement.  But as a general

proposition, we wouldn't have a problem with that.  It might

1    be premature for the Court to enter an order in that regard.

2            THE COURT:  I agree.  I think I would have to have

3    a list of those cases.  And I think for the record I should

4    have probably a motion to vacate the dismissal on the

5    record, then I can grant the motion.  I'm not sure I can do

6    a blanket reinstating of all cases without something in the

7    file, particularly if any get contested because the

8    government feels they should not be reinstated, no longer in

9    the possession of -- the individuals no longer in the

10   custody of the United States.

11           I am concerned on the timing and a couple -- on

12   the sequencing of the cases.  I think it's important if this

13   Court, as the coordinating judge sets a schedule, we keep to

14   it, that other judges are judge, individually, may set some

15   other schedules because of the Uighur case or Judge Leon.

16   But that as a overall coordinating judge, I hope we can

17   coordinate those as well among ourselves.

18           But I'm concerned about time and extensions.  And

19   whatever I decide, I would anticipate the parties will

20   follow and that motion for extension will be rarely granted.

21   And that any type of extension would have to be approved by

22   the court.  It makes no sense to set a schedule and to make

23   continuances.

24           It does seem to the Court, and I haven't heard

25   from the plaintiffs, I'm going to let them hear my thinking

now so they can answer that at the same time they're going

to answer the government's issues, that there should be some

type of priority or sequencing of these cases.  Without

that, we leave it to counsel to rush to each judge and

insist their case is the most worthy of being heard first,

whether they've been here a year or six years, or held for

six years or held for six months.  There are some exceptions

perhaps that are necessary that can be taken on a case by

case basis, but I don't understand the position of the

petitioners that it's a free for all and whoever gets to the

Court first wins.  I think that is an invitation to chaos

and an improper way to hand the cases by the Court.

So I'm going to consider setting a priority of

cases as to how the returns will be done and as to how they

will be keyed up for decision with some exceptions that may

be necessary.

The protective order, I do think the parties can

consult on both protective orders, on the regular protective

order to a high-value order, and bring to me their

suggestions as soon as possible.  I do know the CSOs are

pressed beyond belief; that is, court security officers.

They're a small organization and justice that was only meant

to handle CEPA cases, only a few in the country, and

suddenly they've been pressed into service, handling

hundreds of cases, hundreds of clearances all at once.  They

1    need help, they need more money, they need more budget.  The

2    chief judge has been working on that to the top of the

3    Justice Department, to help to move these matters forward.

4    There are security issues in getting clearances for various

5    types of individuals; whether there are more lawyers,

6    whether there are law clerks, whether they're translators.

7    We had discussed that in meetings and we've been familiar

8    with those issues.  We're going to do the best we possibly

9    can to move them along.

10            One thing that will help us, changing the filing

11    procedure and it should be in the amended order to reflect

12    that, the parties can work on.  Regular filing should not

13    have to be taking over to the CSO and handed to them and

14    they sit on it for weeks and, you know, stamp it in and

15    bring it over here.  I assume that with electronic filing we

16    may be able to circumvent some of that.  Classified one

17    obviously we have to continue with and confidential ones.

18    But I think the parties can work on that with the CSO very

19    well.

20            The cleared for release group, I think the

21    petitioners should seriously consider allowing those to be

22    keyed up before one judge that can evaluate those and

23    perhaps encourage their quick release.  The already released

24    cases do not seem to me to be in the forefront.  And the

25    military commissions cases, we'll see what Judge Robertson

1    will do, but we'll have to think about whether they should

2    be the first ones to get returns and to be keyed up for a

3    hearing when they may be going to trial and military

4    commission.  And whether I decide that or not, we'll have to

5    see.  After whether or not conditions of confinement also

6    would be excluded by the Military Commissions Act.

7            The 30 day notice of transfer I've talked about a

8    little bit.  I'm probably going to order some immediate

9    briefing on that because it's a concern and there's some

10   case law on that; some goes both ways, frankly.

11           Let me hear from plaintiffs for a few minutes on

12   their responses.  The government really has not changed

13   their position substantially from their earlier one.  You

14   can talk about the return progress and their timing and your

15   concerns, and how that goes forward.  And then also

16   obviously on any common issues you think we can present or

17   not, as well as the administrative issues.  I think you

18   agree on administratively there are certain things we can

19   do.

20           MR. KADIDAL:  Thank you, Your Honor.  As I think I

21   said at the outset, we don't have any objection to Your

22   Honor expediting treatment of administrative issues, I mean

23   including all the ones that you mentioned.  I think

24   hopefully we can stipulate with the government on a number

25   of those.

Let me just very briefly respond to some of the things that were said that touched on my initial presentation, and then turn things over to my colleague. First of all, Mr. Katsas asked how the CSRT record could advance the ball here. I think that's quite obvious, it's essentially the basis for our knowing what the allegation is. You know, there are men here who have been held for six years plus, who have really no substantive clue about why they're being detained. And beyond that, this would provide the predicate for a factual investigation, including an investigation potentially on the ground in some of these countries where people are detained, and also would allow petitioners to formulate discovery.

Now, in terms of some of the other things that Mr. Katsas said, I thought I heard him saying in regard to the returns, I thought I heard him concede that -- that the government can't walk in in a habeas case with a multiple hearsay affidavit and depend on that when the returns were being discussed. And then when the question of briefing of common legal issues was being discussed, I thought I heard the opposite; that this Court somehow needs to decide whether or not these hearings can go forward on paper.

Now, of course, the government's whole notion that somehow briefing these common legal issues will expedite matters is tied to their, you know, we think rather dilatory

1   schedule for producing returns.  It's only worth Your Honor

2   trying to resolve those issues in the way that they suggest

3   if there are loads and loads of time available before we see

4   any substantive sort of final factual returns.  In a lot of

5   ways, I think given the posture of these cases, the notion

6   of amending these or the government getting broad leave from

7   this Court to amend every single return that they filed

8   already is much like a situation where a party seeks a last

9   minute very substantial extension on the eve of trial.

10  Typically, judges are very skeptical about that and want to

11  see a very specific basis for why that extension ought to be

12  granted.  I think we're in that sort of setting.

13          In terms of resources, I realize, you know, that

14  generally courts don't see it as their province to tell

15  parties how to staff cases.  But we heard here today that

16  the justice department had four lawyers assigned to these.

17  We at the Center for Constitutional Right, a little -- five

18  lawyers in our office.  So I think, you know, we may be

19  seeking to get this transcript today sealed from the eyes of

20  the foundations that fund us.

21          But one thing that was reported in the media, we

22  have no way of knowing if this is true, but it's consistent

23  with what I've heard, is these cases are being staffed on a

24  volunteer basis; that civil division lawyers are being given

25  the option to opt out for personal, philosophical or moral

1 reasons. You know, when we have a case crisis in our

2 office, and they have happened frequently during the

3 pendency of these Guantanamo case, we just make people do

4 it. And I think that's the attitude that the Court ought to

5 take to Justice Department staffing.

6 Now, I take it, that these four lawyers are

7 responsible or were responsible up to the date of the

8 Boumediene decision for processing the records in 170-odd

9 cases, I think is the number that we had pending. You know,

10 that for me raises another sort of question, which is really

11 how much do the lawyers have to do with the process of

12 producing the returns as opposed to people in DOD or the

13 intelligence agencies. I think, you know, that should play

14 into this Court's thinking about the long delays that the

15 government has asked for in producing records.

16 Let me very quickly address a few other stray

17 points. On the high-value detainee or as we call them CIA

18 detainees, or as Mr. Truitt called in the closed session,

19 the torture detainees, I think we really don't have enough

20 of those cases filed yet to try to do that, coordinated

21 process. There are two right now.

22 THE COURT: We two before us. I think there's

23 seven in the Circuit they're going to be sending back down.

24 MR. KADIDAL: Right. Seven DTA actions. I think

25 we ought let those habeas petitions get filed and let people

1    think about strategic concerns in their own cases before we

2    sit down again to address that, that protective order issue

3    in whatever fashion it needs to be addressed.  Although our

4    position, of course, which was briefed I believe to Judge

5    Walton in Magee Conn's case was that the conventional habeas

6    protective order which mentions in its definition of

7    classified information top secret and SCI information are

8    included in that definition.  We think that's perfectly

9    adequate to deal with these cases.

10           On the Military Commissions cases; that is, the

11   cases of habeas petitioners who have pending military

12   commission charges against them, I think those folks ought

13   to be allowed to be heard by this Court separately, but I

14   will point out one thing, which is that Hamdi counsel I

15   believe has briefed the issue of whether or not the habeas

16   court ought to be the one that make the determination

17   whether someone is an enemy combatant, which itself is a

18   jurisdictional predicate for the military commission having

19   jurisdiction over that person.  So that's an argument that I

20   think is pretty substantial sounding to me and probably

21   needs to be addressed here.

22           There's a lot of mention in Mr. Katsas'

23   presentation of the Hamdi case.  I'll just say very briefly

24   that that case involved a classic sort of battlefield

25   detainee, someone bearing arms engaged in hostile activities

against the U.S.  We know from an analysis of the 512

transcripts of CRT proceedings, that somewhere around four

percent of people at Guantanamo were actually captured on

the battlefield.  We don't think Hamdi is terribly relevant

to the vast majority of the cases out there.

And finally on the transfer issue, if there is

indeed no habeas jurisdiction over questions of transfer, it

is surprising that there are, you know, a number of

extradition habeas cases on the books, all of which were

cited to the Court in Munaf and Omar.  Justice Scalia, it

has been pointed out to me, cited the same section of the

1679 Habeas Corpus Act that I cited to you in the closed

sessions.  And, you know, again, if we are indeed in the

common law or constitutional habeas world as the government

put it in discussing this transfer issue, I think there's

clear precedent there for a 30-day notice order.  And the

Circuit acknowledged the existence of the 30-day notice

orders in the -- I believe the Parhat case.

I'll just mention that our motion to govern is due

on Monday in the 30-day notice order appeals, and we are

asking for expedition.  And finally, Mr. Subar the notion if

premotion conferences.  I'll just point out briefly that

that's not in the rules of this District; there is already a

requirement to confer, and we have no issue with the Court

enforcing that requirement.  Now, while the government may

1    think conferring between counsel is burdensome, they would

2    have to respond by letter to every request for a premotion

3    conference, at least that's been the norm in the case I've

4    worked on with a requirement like this.  So I don't think it

5    really makes the process more efficient to essentially have

6    the Court decide a remotion twice, which is what we would

7    see with that sort of premotion conference requirement.

8              Now, if what we want is fewer ECF filings,

9    especially given that, you know, those have been doubled up

10   because we file a Notice of Filing whenever there's, you

11   know, something that goes to the CSO, and then we have to

12   file the actual document once it's cleared.  Well then, we

13   could institute a process as exists in the Court of Appeals

14   where one of the parties collects all the briefs when the

15   reply is done or the final reply, only then are they filed

16   with the Court.  If that's something that's thought to be

17   necessary, but we don't think the premotion conference idea

18   makes much sense.

19             THE COURT:  I think that's suggestion is

20   worthwhile to explore with the government, and as I

21   understood, we were going to get a report back on July 21st

22   on a couple of these issues, in clearing the docket up, et

23   cetera, and that's one of the things you can consider that

24   may be helpful.

25             All right.  At the same time, we're going to get a

1   report identifying the petitioners in limine or duplicate

2   entries et cetera by then that you all are going to work on.

3          MR. KADIDAL:  Thank you.  Let me turn things over

4   to my colleague, Ms. Guiterrez.

5          MS. GUTIERREZ:  Your Honor, thank you for the

6   opportunity to speak to you today, a day in court in the

7   Guantanamo cases is a treasured moment, and on behalf of

8   both myself and my colleagues we thank you also for the

9   opportunity for those of us who couldn't speak today, to be

10  able to provide you with written submissions.  And I'm sure

11  that our colleagues will do so on a number of these points.

12         These have always been habeas cases, they've never

13  been administrative reviews.  They were habeas cases in 2000

14  when they were filed; they were habeas cases in 2004 and

15  2005, when the factual returns were initially filed, and

16  they are habeas cases today in 2008.  And as the Supreme

17  Court has said, as the government has said, as we have and

18  as Your Honor has said, expedition is really a priority in

19  these cases.

20         I just want to go through six points briefly, both

21  points the Court addressed and also points raised by the

22  government.  Your Honor, there are cases that are ready to

23  do go now.  As you've identified, these may fall into two

24  different categories; both the set of petitioners who have

25  been cleared for release, although these individuals may

need judicially supervised negotiations in order to
administer a release to a safer country.  Some of these
cases may also need factual returns filed because
individuals are being held in detention based upon the
United States finding of their enemy combatant status.  And
so there's questions of whether collateral consequences may
exist in the habeas cases.  There are also cases of
individuals where the petitioners counsel are prepared to
move forward on summary judgment motions, and there should
not be any delay in those cases.

With respect to generating factual returns, both
returns in cases where no government information has been
filed as well as the amended returns, I'll just briefly
speak to those cases where no information has been filed.
The government today has not denied that it could provide a
CSRT or annual review board, or some cases, the, quote,
government information that was compiled for a Detainee
Treatment Act case.  This information or these files, no
matter what you call them, are files purporting to justify
the security concerns or the basis for the detention of our
clients.  And this information is in the hands of the
government now, these files, and there's no reason at all
why this information cannot be provided to petitioner's
counsel by the end of next week.

And they could simply call that information

whatever they want in the past; however, it was categorized

in 2004, but today it should be provided by the end of next

week.  The CSRTs in 2004 were prepared in the context of

habeas litigation.  These cases were not Administrative

Procedures Act cases; they were not administrative review

cases.  But in the habeas litigation, the coordinated habeas

litigation before Judge Green, these were certainly provided

as initial factual returns.

          With respect to the government's desire to amend

factual returns based on intervening legal and factual

developments, we just want to briefly make a few points

about that.  First, with respect to the idea that there has

been factual developments that justify a detention that

occurred in 2002 as ongoing, we would ask and point out that

the government needs to move to amend and they need to show

cause in order to do that under the governing habeas

jurisprudence.  The government, if it's identifying new

factual information; one, it should be new substantive

information.  If it deals with things like affiliations with

an organization that in 2008 has been designated as a

terrorist organization, it is difficult to see how that

could be relevant to justifying a detention that occurred in

2002.

          So with respect to that kind of factual

information, we'd ask that the government be held to the

task to move to amend those petitions, and to actually

assert to the Court that there is substantive information

that's been discovered that relates to their detention in

2002, not 2008.

The legal developments that have been pointed to,

the Parhat decision, the decision in Boumediene, again,

these have always been habeas cases.  And to the extent that

Parhat rejected the government's reliance on unsourced

intelligence or summaries of intelligence information,

petitioners in some case would like the opportunity to meet

and confer, and as my colleague Mr. Kadidal mentioned, it

may be possible in some cases to stipulate to the source of

the information, and to narrow the issues for litigation so

that a complete amended factual return is not necessary.

And those cases should not be delayed at all due to the need

for amended returns in other cases.

The government also has acknowledged today that in

some cases they may find an amended return is unnecessary.

And it would be manifest injustice to tell any one of our

clients two months from now that the information that is

sitting in a file in government offices now is not provided

in July because the government wanted to take two months to

think about it.  And so now they're telling us in August or

September or October, here's the information we've been

sitting on for two months.  The government should be held to

1    task and required to notify petitioner's counsel preferably

2    by the end of next week, whether they intend to amend or

3    move to amend the factual return of any particular case.

4           To the extent that the government is concerned or

5    that the Court is concerned about the priority of sequencing

6    or in trying to figure out where the government should put

7    its resources, we would submit that the individualized

8    circumstances of the cases, either addressed by this Court

9    or the individual judge will organically and naturally help

10   delineate the cases.  Amended factual returns will not be

11   required in every case.  Some cases are ready to move now.

12   In other cases, many of these cases we anticipate may settle

13   and negotiations now supervised by each individual judge

14   will remove those cases from the priority sequencing.  So

15   allowing the individual judges to move forward in the cases

16   will both help sequence the cases that need an amended

17   factual return as well as save the judicial resources and

18   the resources of the parties in engaging in full-fledged

19   habeas hearings.

20          We've discussed quite a bit about the pending

21   motions, both in addition to lifting the stays, there are

22   cases to reinstate -- or motions to reinstate the dismissed

23   cases.  The government, to our knowledge so far, has

24   consented to motions to reinstate cases where the detainees

25   are still detained and perhaps in the back and forth today

1    or with Your Honor, we can have the government consent to

2    motions to reinstate for those individuals still detained.

3    As I mentioned earlier, there are still concerns about

4    collateral consequences for some individuals who have been

5    transferred as a result of their status, their designation

6    by the United States as enemy combatants.  And we may need

7    to deal with those on a case by case basis.

8           Other pending motions which Your Honor has

9    identified are really individualized motions or address

10   catagoreis of cases; the Uighurs, those who have been

11   charged to military commissions.  And again, the parties are

12   identifying the legal issues in those motions that are

13   appropriate for consolidation, rather than looking at all

14   200 cases as a group, but identifying discreet legal issues

15   for particular cases.

16           THE COURT:  Right.

17           MS. GUTIERREZ:  And I would say that there are a

18   number of counsel here if there are other particular motions

19   that you have questions about today.

20           THE COURT:  Okay.

21           MS. GUTIERREZ:  The government also has asserted

22   that some of the questions, the legal questions about how

23   the proceedings will look, are appropriate for a

24   coordinating judge.  And based on the decision both in Hamdi

25   and the Supreme Court's mandate in Boumediene, that would be

1    with respect inappropriate.  We agree that how the

2    proceedings will look will be determine by the District

3    Court judges, but this should not be -- in a coordinating

4    proceeding, it should be by each individual judge based on

5    the individual facts of the case.

6           The District Court judges have a plethora of

7    experience with habeas cases, both dealing with executive

8    detention as well as postconviction.  Habeas proceedings are

9    not an unknown beast the way the questions were coming up

10   around potential DTA petitions; this is a tried and true

11   familiar process for all the parties involved.  The national

12   security concerns that the government is raising, the Court

13   is perfectly competent to deal with and has in the past.

14          The individualized questions about the nature of

15   the process due each individual, the type of questions

16   around discovery, should be determined by the individual

17   facts of each case.  As in Hamdi and its reliance on

18   Matthews v. Eldridge not all detainees were picked up on a

19   battlefield.  There is a difference perhaps in the amount of

20   process due to individuals picked up on a battlefield and

21   individuals picked in a country far away from Afghanistan.

22          The number of years of detention have an impact.

23   The nature of the evidence against an individual, how it was

24   obtained, where it came from, whether it came from a foreign

25   country or the United States, whether the information is

secret, even to the petitioner's counsel or whether it has been disclosed, all of these kinds of fact-intensive questions will go to the amount of process that's now due to an individual in habeas proceeding.  Broad brush procedures at this point are entirely inappropriate for a diversely-situated man, both in terms of the legal questions raised by the case as well as the factual questions.

We, I think, have clearly identified issues that would be appropriate for coordination, that will expedite consideration of these cases, including dealing with the stays and dismissals, the docket clean up, questions around the protective order clearances and access.  And all parties seem to be willing to work on that.  And we have done so in the past with Judge Green and it was facilitated quite well.

In closing, the discussion we've had today has been yet again in most respects an abstract discussion of what will happened to the individual men in Guantanamo.  In 2008, now is the time to drill down into the facts of the individual cases and to move beyond these abstract discussions of law.  The question is not what is an enemy combatant; the question is whether, for example, Mr. Parhat is an enemy combatant, whether my individual client is an enemy combatant.  The question is not abstractly whether hearsay can be considered by a habeas judge or a judge in a habeas proceeding, but whether evidence extracted from an

individual by the CIA using coercion can be used in this
particular case before a particular judge to justify
executive decision.

The conditions motions that have been talked about
in the abstract relate to things like a client's
deteriorating psychological state that is preventing him
from being able to engage in attorney-client meetings and
actively participate in the challenge to his detention, his
conditions of confinement, his mental health treatment.  For
example, in one case before Judge Sullivan, is being dealt
with hopefully right now on an expedited basis.  These kinds
of questions must be answered in individual habeas
proceedings.

And I will echo my colleague Mr. Kadidal's empathy
with the government, that as a nonprofit NGO, we do
appreciate the government's difficulties with hiring and
office space, but with respect to my colleagues across the
table, we are dealing with imprisonment.  I recognize the
logistical difficulties for the government, but our clients
are sitting in cells in Guantanamo and have been for eight
years, and have a right now for their cases to be heard.

Boumediene stated in unequivocal terms that there
will be a burden of delay as a result of these and it must
not be borne by the detainee; it must be borne by the
government.  As a practical matter, these delays are

impacting and deteriorating our attorney-client

relationships, and preventing our ability to meet with

clients to review information and factual returns, and to

present challenges to the court.  It's impacting our

clients' psychological state which has been seen in the

suicide and suicide attempts that have occurred to

Guantanamo.

          The right to an individualized habeas review of

imprisonment must be meaningful, and the delays in these

cases are running the risk that after three Supreme Court

decisions, six years of imprisonment, factual returns and

government information and annual review boards, that after

all of this, the writ of habeas corpus is on the verge of

being rendered meaningless.  We would ask this Court to set

a very expedited schedule for the production of any

additional information that the government feels it needs to

provide, so that the individual judges can move forward in

an expedited manner.  Thank you.

          THE COURT:  All right.  Thank you very much.  The

discussion is helpful to the Court, and I'm going to make

some observations at this time.  I'm going to consolidate

these in the order, but since I've given leave for anyone

who was here and couldn't speak for the detainees and those

on the telephone, I'm going to not issue it today, but I

will wait until you have an opportunity, you can file

1  something electronically with the Court if you wish to make

2  a position or support the positions that have already been

3  evidenced here today for your clients, hopefully by

4  tomorrow.  So I will not issue an order until you have time

5  to do that, and probably then until Thursday.

6            There's several categories of issues that we've

7  looked at, and starting with the administrative ones, would

8  seem to have some agreement; that is, we have to address the

9  security clearance issues, we've talked a little bit about

10 that in the protective order.  As I understand, the parties

11 are going to consult on amending the protective order if you

12 need to or not, or if it needs to be amended, so that this

13 filing can go forward with the CSOs on a more expeditious

14 and easy basis for the parties.  And I'm going to let you

15 all do that and get back to me, and I'm going to set some

16 dates in a minute.

17           The factual returns to be updated and new ones to

18 be filed that haven't been filed, I have a concern about the

19 government having carte blanche to file an amended return

20 without some showing it's necessary after all these years.

21 I do have some empathy perhaps for the government's position

22 that legal developments have changed what they thought was

23 necessary, and they want to supplement what they had.  At

24 the same time, it does fall on the face of logic as I

25 indicated, to me that these returns were supposedly adequate

1    when they were made, and that's what they were being held

2    on, and then to supplement seems to be asking for

3    retroactive information that later require information that

4    makes the detention originally held not proper.  And that's

5    to be debated.

6              But what I'm going to do is set a plan for these

7    returns to be done and for the amended returns to be filed

8    by a motion for leave to file with the attached amendment

9    highlighting the difference between that and the original

10   filing if there's -- so that it's clear what the need is and

11   what -- to the Court whenever they use it.

12             And I'm going to reserve whether I'll decide all

13   of those or whether they will be done by the judges.  But it

14   does concern me as to the amended returns and adding

15   additional information that was later required at the same

16   time the government has a position that they may have

17   someone they have much more information about, making them

18   much more dangerous than they knew before.  And the

19   obligations are to advise the Court of that.

20             On the protective orders and cleaning of the case

21   dockets, et cetera, there was a suggestion that they'll be

22   back on the 21st with the report on those areas, as I

23   understood it.  That was the suggestion, I understand, that

24   you made.

25             MR. SUBAR:  I'm not sure that was precisely the

1    suggestion, but that works for us.

2         THE COURT:  I thought it was -- you said Monday, a

3    week, is that the date I had?

4         MR. SUBAR:  With regards to the duplicate issues

5    and so forth, that's right.  If Your Honor is folding the

6    protective order issues in as well.

7         THE COURT:  Yeah, I think we should so we can move

8    those along.  So I'm going to make those due on the 21st,

9    and then you can get to me on those, so we can move ahead.

10        The dates as to these amended returns and returns

11   being filed, we have very strong differences between the

12   parties whether or not the government is now requesting to

13   file the immediate information they already have in their

14   possession without waiting to amend it or add to it from

15   these reports that they get, the annual reviews of the

16   original detention hearings, is something I'm going to look

17   at.  It would be good to advise the defendants of why their

18   being held and give them advance notice on that information

19   so they can begin to prepare their case.  And when they get

20   their final return in, then they can be fairly ready to

21   proceed.

22        At the same time, I don't want to distract the

23   government from getting this work done, although I expect

24   the government to add whatever resource is necessary to do

25   it.  The constitutional rights organization indicated that

1   they were a few lawyers, I understand that, but they have --

2   reminds of me of the Verizon add, they have about 200

3   lawyers standing behind them.  So they have a little

4   assistance, like Verizon always standing behind you.  So

5   they have a courtroom full of lawyers and some on the phone.

6          The briefing on some of these issues I'm going to

7   look at a little bit more.  It has some appeal to me that

8   whether or not the military commission individuals who are

9   brought before the commission petition should at least go to

10  the end of the line for the returns to be filed, if not

11  stayed.  And the conditions of confinement, I'll have to

12  look at that a little bit, whether I can do that or the

13  judges feel more comfortable with that as to the military

14  commission law taking the jurisdiction away from us on those

15  issues.  Right now, about 20 have been charged or are

16  planning to be charged, they may have some others, I don't

17  know, coming in.

18         One of the things we didn't mention that I recall

19  is there are 34 new cases to be brought as I understand it,

20  coming in from the Federal Public Defender's office shortly.

21  And we'll have to incorporate them in this group.  And I

22  assume they'll all get counsel, so we'll have counsel for

23  every one in these cases.

24         I'd also want to consider the -- I hope by the

25  21st the parties will have met and considered on the

dismissal issue, whether that some cases can be
automatically reinstated by the filing of a motion to
dismiss with opposition by the government, and that can be
granted, or there's some that are going to be contested, but
then can be -- the motions can be filed by the petitioner's
counsel and then I can rule upon them.  That's going to
concern.

The cases where the individuals are no longer at
the Guantanamo Bay, I have a report coming in next Monday, I
believe it is I asked for that.  It seems logical to me if
they're no longer there, that they can await these other
cases to go first for people who are still being confined at
Guantanamo Bay, although I realize there's some subset of
those who may be confined in other countries for whatever
reasons, whether we can reach those or not, that's a whole
other area we'll have to get into.  But I expect now that
I'm going to try to reach and manage those cases
immediately, except for identify them, see what's in those
files and then see where we go on those.

Hopefully the Court of Appeals will address some
of these issues the government is going to file for the
expedited treatment of those, and we can get some guidance
in some of these; otherwise, I will go ahead and rule upon
some of these perhaps, and they can be part of the appeal
either way.  That is the notice to transfer question and

applicably the Military Commissions Act, the conditions of confinement, because I think that needs to move forward.

It seems to me that we should have a priority case the government works on with some exceptions. There have to be particular exceptions for certain individuals, perhaps have been mentioned, people who may have illness problems, mental or physical illness problems; There may be other individuals I'm not aware of. For instance, there are the group that are cleared for release. I think I can give myself and another judge to probably handle those and move those ahead, as soon as we find out who all those are.

It's logical to me that we go on a first-in, first-out basis; that is, those cases that have been pending here the longest. To do otherwise penalizes those people who filed in 2004, I think were the first filings, and gives someone who filed in 2008, who was maybe been there as long, maybe not as long, priority over the 2004, for no reason other than that their lawyers yelled louder than the other lawyers. So I think that we should have some logical way of handling it. And it seems to me that is my first in, first out, and the government would get the returns of those who were here longest, except as indicated, there may be specific exceptions to those that are very complicated or take a longer time for some reason, that can go by a case by basis. The Court can be advised of those problems and I can

1   look at that with the effective parties.

2        The timing the government requests, I'm going to

3   look at that.  I think I'm going to ask I suspect to keep

4   the government's feet to the fire and move these along on a

5   faster basis.  I had a originally indicated -- originally

6   thought, wrongfully as it turns out, that there would not be

7   many returns amended, that we had returns all ready to go,

8   that the updated ones will be done in a couple of months

9   because I didn't think there were that many.  It turns out

10   now that it's going to probably be an updated return in most

11   cases.  But I agree with petitioners that we should find out

12   which ones are going to be updated shortly or not.  And if

13   they aren't going to be updated and they don't need

14   discovery, they may be keyed up, as I said at the beginning

15   of this, for immediate hearing before the effective judge.

16   The ultimate decision will be made by the individual judge I

17   agree these are individualized factual cases; that is, each

18   case is somewhat individual.

19        And I think as we looked at itself by the

20   particular judge as to eventually getting to the merits.  I

21   also, as I said at the beginning, I'm not convinced all the

22   legal issues, the government is looking for a ruling across

23   the board, are amenable to that.  I will take a look at

24   that, but I'm not sure it's amenable to that.  And I may ask

25   for more information on those as we go forward.

1    Briefing some of those actually may not hurt

2    because then they could be all briefed at issue, and if each

3    judge is going to sign them, at least they'll be keyed up

4    for each judge to decide them already without waiting longer

5    and getting different schedules from different judges.  So

6    if we put them all together and brief these, if I don't

7    consider them, at least they can go back to the judges who

8    are going to consider them and they will be all briefed

9    without waiting.

10    I don't think as a practical matter we're going to

11    get to a hearing on the merits immediately unless there are

12    cases the parties can stipulate to and are ready to proceed

13    for a habeas hearing through a summary judgment or motion

14    for judgment on the pleadings that is ready to go.  I do

15    think that the ones that scheduled for -- been found cleared

16    for release can be moved along hopefully, despite I'm sure

17    logistical problems, and I hope that we can put others in

18    line to be heard in the reasonable near future.

19    The Supreme Court was careful to put out about a

20    statement that is all new territory, that the District Court

21    is going to have to improvise.  That there's -- we'll have

22    to recognize the executive -- and burdens in this area.  At

23    the same time, we have to have a prompt resolution of these

24    matters.  There have been people held for six years without

25    a final ruling on their habeas case.  Whether they're

1   released or not, I have no idea what the judge will do

2   obviously, but at least they can get to a hearing and get it

3   done hopefully under guidance.

4          Obviously, I'm going to be available to handle the

5   protective order issues, have the parties keyed up as I said

6   for security problems so I can help on those and getting

7   clearances and how many clearances each firm will get.  I'm

8   not inclined to look favorable to law clerks in private

9   practice, interns, summer associates getting clearances.  We

10  have too much else to do; we're first staring with our law

11  clerks to get them cleared, and that's well on the way.  But

12  if there are other lawyers that need it because they have

13  taken on new cases, et cetera, we can consider that.

14         Also, there are access problems I have understood,

15  and I'm still working on issues with that.  Judge Kay has

16  worked on that for a long time, he can still help me on

17  that.  But I certainly need to have those problems brought

18  to our attention.

19         I had asked in my order, to go back to the order I

20  issued for a minute, on the second page I had suggested that

21  the parties should be prepared to identify a date by which

22  they'll file a status report summarizing the status of each

23  case.  And I think that you'll find all the judges want to

24  know the status of these cases.  And by that I mean

25  obviously exactly what is the situation, whether there's a

return filed or not, whether there's some special problem

with the individual involved, whether there's access

problems to the individual, whatever it may be on the

petitioner's side as well as on the government's side as

what they see the status of the case.

Finally, it has been less than a month since the

Supreme Court ruled. We had jurisdiction in these unique

cases, never before in the history of this country have we

had such type of cases brought to the Court. And it is our

desire to move these along. At the same time, recognizing

that we have challenges on both sides to recognize and the

Court has to deal with these in a proper fashion.

So I'm going to put an order together. The

government is going to have to get the message across to its

people on the other branches of the government affected by

this as well as to their own people, that the time has come

to move these forward, not perhaps in the normal course of

business, but looking upon this as an extraordinary

situation where the United States have held these

individuals for much -- maybe very solids reasons, I don't

know the merits of any of these -- very solid reasons, who

may be very dangerous individuals, most of them anyway, who

now have been -- decided to have constitutional rights of

some type minimally to a habeas petition review of their

status. And we need to plan to get that done for all that

are held.  And I don't know where we'll eventually end up or how many there will be.

But we can't abide by hearing; we don't have enough resources.  We have other commitments.  I think the government has to understand, they're going to set aside every other case that's pending before them in their division, and address these cases first.  Put them on notice that I expect the corresponding agencies to do the same; that they're now in a court process, the Supreme Court has spoken, has asked strongly that these be handled promptly, they be given a promptly resolution, after years of litigation mainly in the higher courts.  And that we recognize these individuals having been held without a court hearing now up to six and half years.  And I intent to see that that's done.

So whatever ruling I put out, I expect the government will engender through their best efforts and necessary resources and their companion agency as well as their own agency, the Justice Department.  I recognize there's a lot of work they do in a lot of areas, but they are committed to have to handle this.  The 50 lawyers may not be enough, they may have to have more as time goes forward.  They may have to have more support staff in the other divisions to move this ahead.  And I think the people who were involved in this on all the levels of government

should understand that.  And the -- that delays I think

would reflect badly and would cause the Court to become

perhaps not only concerned, but suspicious of the necessity

for further delay, which could -- to the detriment of the

government in how we proceed with these cases and take them

to trial.

        So the purpose of the Court is to try to

coordinate this in as expeditious of a fashion as possible,

not to have delay.  The plaintiffs perhaps understandably

are very concerned about further delays for their client,

and are suspicious of the government -- may not be moving as

fast as they could.  I am going to try to make all efforts I

can to have the government move appropriately in accordance

with a good process and fair process to both sides.

        So what I'm going to do is issue an order after I

get a chance.  If anyone wants to, who's a petitioner who is

not heard today, to file something with me to bring up to my

attention something that I've not considered.  If the

government thinks they need to supplement anything they can

do it, but it will have to be by tomorrow close of business.

And then I will attempt to issue an order on Thursday or

Friday of this week, controlling immediate litigation for

the immediate future at least.

        Let me suggest one other thing.  I would like to

be able to set up some status calls using this room, having

1    other lawyers come in.  I query if the lawyers can think

2    about other ways we could do status calls for overall

3    issues, as well as those if there's an individual matter

4    brought to my attention by an individual case.  I am not

5    opposed to doing telephone conference calls on the record,

6    where the counsel can do it from their office, the

7    government can do it from their office, if that's necessary.

8        I would like to orchestrate a rather frequent

9    review of what the issues are with the parties.  That can be

10   either done by a consolidated report from the plaintiff's

11   petitioners and from the government, or by a telephone

12   conference with everyone who wants to get on the telephone

13   and they get a summary report from each side.  But I'm going

14   to ask when you meet to talk over about the protective order

15   and which cases are going to be reinstated, et cetera, that

16   you put on your list future status calls and the context

17   about every two weeks, to see where we are in these cases

18   and what the problems are.  Maybe I can handle somethings by

19   phone and move these matters along without the necessity for

20   filing formal pleadings and taking more time up than it's

21   worth.

22       I find the things that delay cases most are

23   motions practice.  Somebody files a motion, somebody waits

24   and gets an extension of time to file the response, somebody

25   waits and gets an extension of time to file the reply.  And

 1   60 days have gone by and nothing has happened with the case

 2   because everyone has a motion pending.  I'm not talking

 3   about a summary judgment, I'm talking about some type of

 4   interim motion.  That delays a case.

 5          If you get on the phone with the Court and say I

 6   have this problem, and the other side tells you their side,

 7   I may be able to decide that and move this along in certain

 8   areas.  I'm talking about not major rules that affect every

 9   case, but certain discreet problems.  And I'll be available

10   as the coordinating judge to do that when other judges may

11   not be available.

12          There will be about 14 days in August when I won't

13   be available, but it will be a two-week period.  It will not

14   be more than that, so otherwise I'm here.

15          So with that advice to you, I'm going to wait to

16   hear if there's anything else coming in on this, and I'm

17   going to issue an original, a first attempt at a scheduling

18   order.  And then we'll see where that goes and we may amend

19   it in a couple of weeks after we see what else comes in from

20   the parties.  This is all new area for everybody, so I'm

21   open to suggestions on moving forward.  But what I say on

22   deadlines is I want the parties to follow.  And you're going

23   to have to come in with awful good reasons to change the

24   deadline when I set one.

25          All right.  Thank you for coming in today.

1    [Thereupon, the proceedings adjourned at

2    4:34 p.m.]

3                    CERTIFICATE

4    I, Cathryn J. Jones, an Official Court Reporter

5    for the United States District Court of the District of

6    Columbia, do hereby certify that I reported, by machine

7    shorthand, the proceedings had and testimony adduced in the

8    above case.

9    I further certify that the foregoing 93 pages

10   constitute the official transcript of said proceedings as

11   transcribed from my machine shorthand notes.

12   In witness whereof, I have hereto subscribed my

13   name, this the 28th day of July, 2008.

14

15

16

17

18                    _____

                      Cathryn J. Jones, RPR
19                    Official Court Reporter

20

21

22

23

24

25