# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **IN RE:** | **Misc. No. 08-442 (TFH)** |
| **GUANTANAMO BAY** | **Civil Action No. 05-1509 (RMU)** |
| **DETAINEE LITIGATION** |  |

**RESPONDENT'S COMBINED OPPOSITION TO PARHAT'S MOTION FOR IMMEDIATE RELEASE INTO THE UNITED STATES AND TO PARHAT'S MOTION FOR JUDGMENT ON HIS HABEAS PETITION**

### INTRODUCTION AND SUMMARY

Respondent, the Secretary of Defense, respectfully opposes petitioner Huzaifa Parhat's requests for judgment on the merits and to be released or paroled immediately into the United States.

In a decision issued June 20, 2008, the D.C. Circuit vacated the determination of a Combatant Status Review Tribunal ("CSRT") regarding petitioner Huzaifa Parhat's status as an enemy combatant. *Parhat v. Gates*, __ F.3d __, 2008 WL 2576977 (D.C. Cir. 2008), *rhg. pet. pending* (filed August 4, 2008). In exercising its jurisdiction under the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, 119 Stat. 2680 (2005), the Court concluded that the CSRT had failed to make appropriate findings regarding the reliability of the documents it relied upon and that the Court could not determine whether the documents were, on their face, sufficiently reliable to support the CSRT's enemy combatant determination. *Parhat*, 2008 WL 2576977 at *11-*14. "Having concluded that the evidence before the CSRT was insufficient to sustain its determination that Parhat is an enemy combatant," the Court remanded the matter for further proceedings. *Id.* at

1

*14. Now, based on that decision, Parhat seeks immediate judgment in his habeas case and release (and instant parole) *into the United States*, where he intends to settle in the Washington, D.C. area, and suggests that he should also be entitled to a work authorization. Petitioner thus demands the most extraordinary remedy imaginable—the privileges of immigration into the United States—when he is not in the United States and has no right to enter the United States. This Court simply has no authority to order his admission or parole into the United States in contravention of the immigration laws.

It is undisputed that petitioner traveled to Afghanistan to receive military training from a camp affiliated with enemies of this country. The D.C. Circuit's conclusions about the Government's evidence related solely to the question of whether the Government had established sufficient affiliation with the enemies of the United States, and not whether petitioner was an armed militant. Indeed, in *Parhat*, the D.C. Circuit did not purport to resolve petitioner's status conclusively or to require his release into the United States, and Parhat errs in arguing to the contrary. Although the D.C. Circuit expressly permitted the Government to convene a new CSRT to re-adjudicate Parhat's status, the Government, having previously concluded that Parhat should be cleared for release, believes that it would serve no useful purpose to engage in further litigation over his status. Accordingly, DoD plans to house Parhat as if he were no longer an enemy combatant. Petitioner would, after transfer to such special housing, remain there until he is placed in another country, absent behavior posing a security threat. The Government thus will concentrate its scarce litigation resources on the hundreds of other pending habeas cases.

Parhat's assertion that he should be released or paroled into the United States, and assertion that the D.C. Circuit endorsed such authority in its ruling, is without basis. The court of appeals did

not assume it had any authority to order release under the DTA. To the contrary, the court specifically declined to address the availability of release as a remedy under the DTA, stating that "*we need not resolve today*" that issue. *Parhat*, 2008 WL 2576977 at *14. (emphasis added). Even more significantly, the court of appeals did not suggest that *any* court could order a detainee held at Guantanamo Bay, Cuba to be released into the United States. That question was squarely addressed in *Qassim v. Bush*, 407 F.Supp.2d 198 (D.D.C. 2005), *appeal dismissed as moot*, 466 F.3d 1073 (D.C. Cir. 2006), in which Judge Robertson held that a court cannot order such relief in the exercise of its habeas jurisdiction. *Id.* at 202-03. The court of appeals in *Parhat* did not discuss the issue presented in *Qassim* or purport to overrule its analysis.

As we detail below, Judge Robertson was correct in *Qassim*, in concluding that a habeas court does not have authority to order a detainee at Guantanamo brought to the United States. An order requiring the Government to bring a non-resident alien petitioner to the United States not only would conflict with the specific provisions of the Immigration and Nationality Act, but also would be contrary to over a century of Supreme Court jurisprudence recognizing that the admission of aliens is a quintessential sovereign function reserved exclusively to the political branches of Government. Notably, although the Supreme Court held in *Boumediene* that release is generally the appropriate habeas relief, the Court also made clear that release is "not the appropriate one in every case in which the writ is granted." *Boumediene v. Bush*, 128 S.Ct. 2229, 2266 (2008). And in *Munaf v. Geren*, 128 S.Ct. 2207 (2008), decided the same day as *Boumediene*, the Court unanimously held (in a case involving an American citizen detained abroad) that "a habeas court is 'not bound in every case' to issue the writ," *id.* at 2220, and that, in the exercise of its equitable discretion, even a habeas court must be "'reluctant to intrude upon the authority of the Executive in military and national

3

security affairs.'" *Id*. at 2218. Here, an order of release can entitle petitioner only to the right to go to a country willing to accept him; it cannot force his admission into any unwilling country, including the United States.

## ARGUMENT

I.    **THIS COURT NEED NOT ADDRESS THE CLAIMS REGARDING PARHAT'S ENEMY COMBATANT STATUS BECAUSE THE GOVERNMENT IS PROVIDING PARHAT WITH ALL THE RELIEF THAT COULD PROPERLY BE ORDERED BY THIS COURT.**

The D.C. Circuit, exercising jurisdiction under the DTA, concluded that the CSRT had failed to make appropriate findings regarding the reliability of the documents in Parhat's case. *See Parhat*, 2008 WL 2576977 at *11-*14. The Court further found that it could not determine whether the documents were, on their face, sufficiently reliable to support the CSRT's enemy combatant determination. *Ibid.* "Having concluded that the evidence before the CSRT was insufficient to sustain its determination that Parhat is an enemy combatant," the Court remanded the matter for further proceedings. *Id.* at *14. That order did not, however, purport to resolve Parhat's status conclusively and did not address his current claim that he is entitled to release into the United States.

Under the *Parhat* ruling, the Government could seek to hold a new CSRT for Parhat, while simultaneously responding to Parhat's habeas petition in this Court. At the same time, pursuant to Judge Hogan's order in the consolidated cases, the Government is being required to produce at least 50 factual returns per month in other detainee cases, *see* Scheduling Order, *In re Guantanamo Bay Litig.*, Misc. No. 08-442 (D.D.C. July 11, 2008), and must also this month produce an additional 14 factual returns in cases pending before Judge Leon and Judge Sullivan. In light of these circumstances, and DoD's prior, independent assessment that Parhat should be cleared for release,

4

it would serve no purpose to engage in further litigation over Parhat's status. The Government will, instead, focus its limited resources on the cases of the other detainees.

The Government will thus treat Parhat as if he were no longer an enemy combatant, a determination with several important consequences. To date, 38 Guantanamo detainees have been determined by CSRTs to no longer be enemy combatants. *All* of those detainees were thereafter released to other countries. Parhat cannot be returned to his home country and objects to his repatriation there. However, the Government will use its best efforts to release Parhat to another country, as it has in the cases of past detainees no longer held as enemy combatants.

In the interim, DoD plans to house Parhat as one who is no longer an enemy combatant. In the past, the Department of Defense has housed individuals determined to no longer be enemy combatants at a special, separate camp facility. In general, such individuals are provided the greatest possible degree of freedom consistent with the security needs of an operating United States military base. For example, such individuals have had a communal living arrangement, with access to all areas of the camp, including a recreation yard, their own bunk house, and an activity room. They have had access to a television set equipped with a VCR and DVD, a stereo system, and recreational items such as soccer, volleyball, and table tennis. And they have had air conditioning in all living areas (which they control), special food items, and expanded access to shower facilities and library materials. Once transferred to such special housing, petitioner would remain there until he can be transferred to another country willing to accept him, absent any misconduct or other behavior jeopardizing operational security.

As explained more fully below, this course of action will provide Parhat with all the relief that could properly be ordered by this Court in the exercise of its habeas jurisdiction, absent the

Government finding a country that will accept him. Typically, upon release, detainees should be returned to their native countries. But petitioner vigorously opposes being sent to his native country, and the United States, consistent with its policy against returning an individual when it is more likely than not he will be tortured, will not return him involuntarily to that country. Thus, he is held by the military, pending the outcome of extensive diplomatic efforts to transfer him to an appropriate country. In the meantime, however, it is not unlawful to continue to detain petitioner until he can be properly resettled. As detailed below, it is common practice to continue to detain individuals captured in wartime when they object to repatriation to their native country, as is the case here, pending relocation to an appropriate country. The diplomatic efforts to place Parhat are on-going, but Parhat nonetheless claims an immediate entitlement to enter, live, and work in the United States. Petitioner, however, sought and was given weapons training at a military training camp supplied by the Taliban, and obviously has no immigration status or other right permitting him to enter the United States. Thus, as set forth below, petitioner's demand for a court order permitting him to enter the United States is improper.

## II.     THIS COURT LACKS AUTHORITY TO ORDER PETITIONER'S RELEASE INTO THE UNITED STATES.

### A.     The D.C. Circuit's Opinion Does Not Cast Doubt On What *Qassim* Correctly Held: Habeas Courts May Not Order Detainees In Guantanamo Bay, Cuba Released Into the United States.

Parhat argues that the D.C. Circuit's ruling granted this Court the authority to order his release into the United States. The court of appeal's opinion, however, does no such thing.

1. Parhat stresses the court of appeals' statement that "we direct the government to release Parhat, to transfer him, or to expeditiously convene a new CSRT to consider evidence

submitted in a manner consistent with this opinion." *Parhat*, 2008 WL 2576977 at *15. That

Court, however, expressly found it unnecessary to resolve the issue of its own authority to order

release under the DTA. Instead, "[h]aving concluded that the evidence before the CSRT was

insufficient to sustain its determination that Parhat is an enemy combatant," the court remanded

the matter to allow the Government to conduct a new CSRT hearing, consistent with the

Government's contention that a remand, as opposed to a release order, is generally the

appropriate remedy under the DTA. *Id.* at *11-*14. The court of appeals further noted that "the

DTA does not expressly grant the court release authority," but stated that "there is a strong

argument (which the Supreme Court left unresolved in *Boumediene* * * *, *and which we need not

resolve today*) that it is implicit in our authority to determine whether the government has

sustained its burden of proving that a detainee is an enemy combatant." *Id.* at *14 (emphasis

added). Thus, the court of appeals plainly did not resolve the question of whether it may order

release pursuant to the DTA, much less the question whether an order of release, if otherwise

permissible, could extend to release *into the United States* of a detainee held abroad.[1]

  To be sure, the D.C. Circuit made clear that Parhat could seek release in this court under

its habeas jurisdiction. *See Parhat*, 2008 WL 2576977 at *15 ("in that proceeding there is no

question but that the court will have the power to order him released"). Again, however, in so

doing it did not address the different question of whether a habeas court could order Parhat's

release into the United States (or to any other country unwilling to accept him). That issue was,

---

[1] On August 4, 2008, the Government petitioned the panel in *Parhat* to clarify that its opinion does not entitle detainees such as Parhat to be released into the United States. Whether or not that petition is granted, however, the D.C. Circuit's ruling is best read as not resolving this distinct and significant question.

instead, fully addressed by the district court in *Qassim,* where the court correctly held that it had

no authority in the exercise of its habeas jurisdiction to order the release into the United States of

a Guantanamo detainee who had been found to no longer be an enemy combatant. *See Qassim,*

407 F.Supp.2d at 202-03.  That order was appealed to the D.C. Circuit and was the subject of full

briefing.  The appeal was, however, rendered moot when those detainees were released to

another country.  *See Qassim v. Bush*, 466 F.3d 1073 (D.C. Cir. 2006).

Thus, the D.C. Circuit has never spoken to the issue of the scope of relief that can be

afforded to a detainee who cannot return to his home country.  Plainly, the court of appeals did

not, *sub silentio*, reach or resolve that surpassingly important issue in the context of its DTA

ruling.

2.  In *Qassim*, Judge Robertson correctly held that a district court, in the exercise of its

habeas jurisdiction, had no authority to order that an alien held at Guantanamo be brought into

the United States.

As the court in *Qassim* explained, "a strong and consistent current runs through [the

cases] that respects and defers to the special province of the political branches, particularly the

Executive, with regard to the admission or removal of aliens * * *.  These petitioners are Chinese

nationals who received military training in Afghanistan under the Taliban and al Qaida. China is

keenly interested in their return.  An order requiring their release into the United States * * *

would have national security and diplomatic implications beyond the competence or the authority

of this Court."  *Qassim,* 407 F. Supp. 2d at 202-03.   So too here.

The Supreme Court's ruling in *Boumediene* is entirely consistent with that decision.  In

*Boumediene*, the Court held only that the Suspension Clause preserves habeas jurisdiction for the

8

Guantanamo detainees to challenge their detention and that the DTA is not an adequate substitute for habeas. *Boumediene*, 128 S.Ct. at 2239.  In so doing, the Court expressly declined to address the question of what substantive or procedural law would govern habeas practice in this context. *Id*. at 2239-2241.  Moreover, in addressing habeas remedies, the Court made clear that "the habeas court must have the power to order the conditional release of an individual unlawfully detained—*though release need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted.*"  128 S. Ct. at 2266 (emphasis added).  In this case, the Court may not properly order petitioner "released" from U.S. custody, because there is nowhere for him to presently be released.

The error of Parhat's argument is made plain by *Munaf v. Green,* 128 S. Ct. 2207 (2008), decided by a unanimous Court the same day as *Boumediene*.  In *Munaf*, two habeas petitioners sought to be "released" from U.S. custody within Iraq, in a way that would prevent Iraqi authorities from detecting and re-detaining them.  *Id.* at 2220.  Thus, "the last thing petitioners want[ed] [wa]s simple release."  *Id*.  at 2221.  The same is true here.  A "simple release" of petitioner would be either to return him to his native country or to release him to the local Cuban government.  Neither option is available.  Instead, as in *Munaf*, petitioner seeks not just release, but "a court order requiring the United States to shelter" him.  *Id.*  As Judge Robertson concluded in *Qassim*, habeas does not empower a Court to order an inadmissible alien, captured in an active war zone and detained abroad, to be admitted or paroled into the United States simply because he is no longer treated as an enemy combatant, and because there is no country willing to take him.

### B.  Parhat's Detention Pending Repatriation Is Lawful.

The circumstance of petitioner's capture and detention warrant review.  Parhat traveled to

Afghanistan to receive weapons training, over the course of several months, near Tora Bora, at a military camp supported by the Taliban and run by the East Turkistan Islamic Movement (ETIM). *Parhat*, 2008 WL 2576977 at *9-*10, *12. It is also undisputed that ETIM is engaged in violent resistance to Chinese rule over portions of western China, and that Parhat traveled to its camp to join that resistance. When Northern Alliance Forces approached the camp, Parhat and others fled to the nearby Tora Bora caves, where they were subsequently captured. *See, e.g., Parhat*, 2008 WL 2576977 at *9. Under the circumstances, it is hardly surprising that Parhat and his confederates were initially captured as suspected enemy combatants against United States and allied forces. And as *Boumediene* itself makes clear, "it likely would be both an impractical and unprecedented extension of judicial power to assume that habeas corpus would be available at the moment the prisoner is taken into custody." 128 S.Ct. at 2275. Nor is the legitimacy of Parhat's initial capture undermined by the D.C. Circuit's conclusion, rendered with the benefit of hindsight, that the extent of ETIM's affiliation with al Qaida, and the extent to which ETIM was in fact fighting alongside al Qaida, may be unclear. *See Parhat*, 2008 WL 2576977 at *3.

Now that the exigency supporting Parhat's wartime detention has abated, the question is whether the Department of Defense has the authority to wind up Parhat's detention in an orderly fashion. It clearly does, for reasons rooted in history and logic.

The United States armed forces have detained prisoners of war following the end of major conflicts when the prisoner objects to repatriation in his native country.[2] For example, at

---

[2] Even in the absence of such objections by the prisoner, there can often be substantial delays in effecting repatriation following the cessation of hostilities. *See, e.g.,* Howard S. Levie (ed,), DOCUMENTS ON PRISONERS OF WAR, 796 note (Naval War College Press, 1979) (noting that it took nearly two years after hostilities ceased between Pakistan and India in 1971, to repatriate prisoners of war).

the end of the Korean War, approximately 100,000 Chinese and North Korean prisoners of war refused to return to their native countries, citing fears of execution, imprisonment, or mistreatment in their countries if returned. *See* Charmatz and Wit, *Repatriation of Prisoners of War and the 1949 Geneva Convention*, 62 Yale L.J. 391, 392 (Feb 1953); Delessert, RELEASE AND REPATRIATION OF PRISONERS OF WAR AT THE END OF ACTIVE HOSTILITIES: A STUDY OF ARTICLE 118, PARAGRAPH 1, OF THE THIRD GENEVA CONVENTION RELATIVE TO THE TREATMENT OF PRISONERS OF WAR, 157-165 (Schulthess 1977). The United Nations Command continued to hold those 100,000 prisoners for more than one and one-half years while it considered whether and how best to resettle them. *See* Delessert, RELEASE AND REPATRIATION at 163-164.

After World War II, Allied Forces spent several years at the end of hostilities dealing with such issues with respect to prisoners of war they detained during the war, including issues regarding thousands of prisoners who did not wish to return to their native countries. *See id.* at 145-156 & n.53 (citing, *inter alia*, the fact that as late as 1948 England held 24,000 German prisoners who did not wish to repatriate); Charmatz and Wit, *Repatriation or Prisoners of War*, 62 Yale L.J. at 401 nn.46 & 48, 404 n.70; Delessert, REPATRIATION OF PRISONERS OF WAR TO THE SOVIET UNION DURING WORLD WAR II: A QUESTION OF HUMAN RIGHTS, IN WORLD IN TRANSITION: CHALLENGES TO HUMAN RIGHTS, DEVELOPMENT AND WORLD ORDER, 80 (Henry H. Han ed., 1979). Similarly, thousands of Iraqis were held in continued detention by the United States and its allies after the end of combat in the prior Gulf War because they refused to be repatriated in their native country. *See* FINAL REPORT TO CONGRESS ON THE CONDUCT OF THE PERSIAN GULF WAR, APPENDIX O, at 708 (April 1992) (http://www.ndu.edu/library/epubs/

cpgw.pdf) (discussing the more than 13,000 Iraqi POWs who refused repatriation and remained in custody despite the end of hostilities).

Parhat points to the situation of some 45,000 Italian prisoners of war during World War II who were detained in the United States, but agreed to join the American war effort after Italy surrendered. That example does not advance his arguments. To begin with, those detainees had been held by the Executive Branch within the United States, so the question of a judicially compelled transfer to the United States obviously was not presented. Moreover, those Italian detainees were nonetheless still housed in camps; indeed, those prisoners that did not agree to turn against their country and join the war effort were (according to the article Parhat cites) "kept in highly isolated camps in places like Texas, Arizona, Wyoming, and Hawaii." Camilla Calamandrei, *Italian POWs Held in America During WWII*, *available at* www.prisonersinparadise.com/history.html.

More important, no court ever questioned that it was solely for the political branches—not the courts—to decide whether, and to what extent, those Italian POWs were to be given "increased freedom of movement," within the United States. Parhat Mot. for Parole at 6, 8. They were to be repatriated. The power to wind down or how quickly the wartime detention of suspected enemy combatants, like the related power to capture such suspected combatants in the first place, is by "'universal agreement and practice,'" an "'important incident of war'" authorized by the AUMF. *See Hamdi*, 124 S. Ct. at 2640; *see also, id*. at 2647 ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them."). Because the D.C. Circuit held only weeks ago that Parhat's CSRT could not support his continued detention as an

enemy combatant, and because DoD decided only days ago to forego its option of attempting to conducting a new CSRT, this case does not present the question whether a habeas court may ever—at some future time—review the sufficiency of efforts to achieve repatriation of such individuals.

### C.    Parhat Is Equally Mistaken In Urging That The Court Can Order His Parole Or Admission Into The United States.

It is equally clear that the Court cannot properly order Parhat's parole or admission into the United States.  In *Munaf*, the Supreme Court refused to grant the habeas petitioners there the remedy of release, because in that case, "release of *any* kind would interfere with the sovereign authority of Iraq." 128 S. Ct. at 2223 (emphasis in original) (quoting *Wilson v. Girard*, 354 U.S. 524, 529 (1957)).  And it is axiomatic that a fundamental incident of sovereignty is the power to control lawful entry into a country, for "every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Ekiu v. United States*, 142 U.S. 651, 659 (1891); *see also Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893); *Lem Moon Sing v. United States*, 158 U.S. 538, 546-47 (1895). A habeas court is thus powerless to order the release (or parole) of an individual into the United States if doing so would be inconsistent with the exercise of that sovereign power.

1. Releasing or paroling Parhat into the United States would conflict fundamentally with the United States' sovereign power to control lawful entry into this country.  As Parhat does not dispute, he is an inadmissible alien detained abroad with no legal right under the immigration laws to be present in the United States.  And Parhat's motions do not (and properly cannot) seek

a change in his immigration status. Parhat Mot. for Parole at 3. Although, as Parhat notes, (Mot. for Parole at 3 n.1; Mot. for Judgment at 19 n.14) the Secretary of Homeland Security has discretion to parole him into the United States if he deems appropriate, the Secretary has not done so. Hence, both Congress and the Executive have denied Parhat the privilege of being present in this country, and the Court may not order his admission or parole in contravention of the immigration laws. Indeed, having associated himself with ETIM, and having received weapons training in a Taliban sponsored ETIM camp, Parhat is *specifically inadmissible* due to his connections with terrorist organizations. *See generally* 8 U.S.C. § 1182(a)(3)(B); *see id*. at 1182(a)(3)(B)(i)(VIII) (inadmissible aliens include anyone who "has received military-type training (as defined in section 2339D(c)(1) of Title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi))"); *see also* Consolidated List of the U.N. Security Council's Al-Qaida and Taliban Sanctions Committee (updated Jan. 16, 2008), *available at* http://www.un.org/sc/committees/1267/consolist.shtml (concluding "ETIM" is a terrorist organization affiliated with al Qaida).

    Congress has also decided that the Secretary of Homeland Security's refusal to parole an alien into this country is a matter solely within his discretion, and is not judicially reviewable. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). The power to exclude such aliens, after all, "is inherent in the executive power to control the foreign affairs of the nation," and "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950). And as Judge Robertson has explained, "'the conditions of entry for every alien * * *

have been recognized as matters wholly outside the power of [courts] to control.'" *Qassim v. Bush*, 407 F. Supp. 2d 198, 203 (D.D.C. 2005) (quoting *Fiallo v. Bell*, 430 U.S. 787, 796 (1977)). No basis for a contrary rule exists here. The Government has concluded that it will treat Parhat as if he were no longer an enemy combatant and will seek his release into a third country. It by no means follows that the Government is powerless to avoid his release into the United States. Indeed, admission to the United States would pose serious concerns. As noted above, Parhat received weapons training at a military camp run by ETIM in Taliban-controlled territory, and in the wake of September 11, 2001, was captured fleeing that camp by the United States military during the war in Afghanistan. It is entirely appropriate for the Government to refuse Parhat admission into this country under those circumstances. *See, e.g.*, 8 U.S.C. § 1182(a)(3)(B). This Court has no power to revisit the Government's refusal to admit or parole Parhat by ordering such relief in this habeas proceeding.

2. Parhat does not suggest that the Court could order his parole if doing so would be contrary to the immigration laws. He urges, however, that the immigration laws authorize his immediate release or parole into the United States, relying in particular on *Clark v. Martinez*, 543 U.S.C. 371 (2005), and *Zadvydas v. Davis*, 533 U.S. 678 (2001). Parhat Mot. for Judgment at 19-21; Parhat Mot. for Parole at 3-5. That reliance is misplaced.

*Clark* and *Zadvydas* construed 8 U.S.C. § 1231(a)(6), which authorizes the Government to detain aliens *who are already within the United States* who have been ordered removed from the United States but detained beyond the 90-day removal period. *Clark* and *Zadvydas*, more specifically, interpreted § 1231(a)(6) to authorize the Government to detain aliens pursuant to that provision only for the period of time reasonably necessary to effect their removal, and

adopted a presumptive six-month limit for such detention, even when the alien in question is inadmissible under the immigration laws, and thus has no legal right to remain in the United States. 533 U.S. at 699-70; 543 U.S. at 378.

Parhat is, of course, an inadmissible alien, but he is not in the United States. Indeed, in the Immigration and Nationality Act, Congress defined the "United States" to include only "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States." 8 U.S.C. §1101(a)(38). And the Detainee Treatment Act makes clear that the geographic scope of the "United States" is that defined in the immigration laws and "in particular, does not include the United States Naval Station, Guantanamo Bay, Cuba." DTA §1005(g). In any event, petitioner is wrong that *Clark* and *Zadvydas* carve out a presumptive six-month detention period for any and all inadmissible aliens, no matter the reason for, or source of authority for, their detention. Rather, *Clark* and *Zadvydas* created that presumption for aliens in the United States who have been ordered removed, and detained beyond the 90-day removal period pursuant to 8 U.S.C. § 1231(a)(6). Parhat does not fit that description. He is not being detained under that statute or any other immigration provision. Nor is he the subject of a removal order. Indeed, subjecting him to such an order would be a legal impossibility, since he is not in the United States.

Even in *Zadvydas*, the Court specifically stated that it was not announcing a rule that would necessarily apply to cases involving "terrorism or other special circumstances where * * * [there would be a need for] heightened deference to the judgments of the political branches with respect to matters of national security." 533 U.S. at 695. In *Clark*, the Court expanded upon that statement, explaining that the Court's interpretation of Section 1231(a)(6) would not affect the

ability of the Government to detain aliens under other authority. 543 U.S. at 379 n.4. The

Government may, for example, convict inadmissible aliens that violate federal criminal statutes

and incarcerate them free of the presumptive six month limit that *Clark* and *Zadvydas* read into §

1231(a)(6). Similarly, as *Clark* itself recognized, Congress has authorized the extra-criminal

detention of aliens in other statutes. 543 U.S. at 386 & n.8; *see also id.* at 387 (O'Connor, J.,

concurring). And in this case, as explained, Parhat was apprehended while fleeing a Taliban-

sponsored training camp during military operations in Tora Bora in late 2001, and is now being

held solely pending repatriation to a country willing to accept him. The fact that repatriation may

take longer than six months does not require petitioner's release or parole into the United States.

*See, e.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 216 (1953). *Clark* and

*Zadvydas* do not address, let alone restrict, the Government's power to detain aliens abroad in

military custody pursuant to that power.

The Seventh Circuit recognized the limited reach of *Clark* and *Zadvydas* in *Bolante v.

Keisler*, 506 F.3d 618 (7th Cir. 2007). In that case, an alien who had applied for asylum in the

United States asked the Seventh Circuit to release him on bail pending its review of the order to

remove him from the country. *Id.* at 619. The court, per Judge Posner, rejected that request

because the alien was being detained pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii), a provision that

permits the Government to detain aliens while their applications for asylum are pending. *Id.* at

621. The Executive "can and often does release the alien on parole" while his asylum application

is pending, the court explained, "but his decision to do so is not judicially reviewable." *Id.* "To

allow a court to admit such an alien to bail while he is challenging a removal order would be

inconsistent with these provisions." *Id.*

17

*Bolante* also advanced an "independent basis" for holding that the alien in that case had no right to release or parole into the United States—a basis that applies with equal force to Parhat. "[I]n *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953)," the court explained, "the Supreme Court held that a lawfully admitted alien who had left the country had been detained by the immigration authorities at Ellis Island when he tried to return had no right to be released" into the United States. *Id.* "In *Zadvydas v. Davis*, 533 U.S. at 692-93 * * * the Court distinguished *Mezei* on the ground that since he had been excluded (in the current parlance of immigration law, since he had not been lawfully admitted when he returned to this country from his sojourn abroad), 'his presence on Ellis Island did not count as entry into the United States.'" *Id.* (quoting *Zadvydas*, 533 U.S. at 693). "'Hence he was "treated," for constitutional purposes, "as if stopped at the border."'" *Id.* (quoting *Zadvydas*, 533 U.S. at 693 (in turn quoting *Mezei*, 345 U.S. at 213)). "Our petitioner is in the same position * * * [J]ust like Mezei * * * he was not lawfully admitted to the United States, and so had no right to be released." *Id.* (citation omitted). The court's logic applies with even greater force to Parhat, who is not within the United States, but held on a military base in a foreign country. Parhat is also an inadmissible alien being detained for reasons that were not at issue in, or otherwise affected by, *Zadvydas* or *Clark*. He therefore has no right to be released or paroled into the United States. Since a district court may not review and override a denial of admission, it follows *a fortiori* that a court may not arrogate the political branches' authority by ordering admission in the first instance.[3]

_____

[3] Parhat also relies upon what he describes as the Fourth Geneva Convention of 1949, which he contends "contemplates" that he "may be released from confinement while pursuing (and presumably while the Government pursues) a final asylum solution." Parhat Mot. for Judgment at 22. But in support of that assertion, Parhat quotes not the Fourth Geneva Convention, but rather the

3.  Parhat also contends that he can be released into the United States because "in law" he is already "present" in the United States.  Parhat Mot. for Judgment at 17-19.  In regard to his rights under immigration law, that is plainly incorrect.  Under the plain terms of the Immigration and Nationality Act, Guantanamo is *not* within the definition of the United States.  *See* 8 U.S.C. § 1101(a)(14); DTA, §1005(g).  Being in United States custody and being in the United States are two different things.  To read the habeas statute to permit the court to bring an inadmissible and unparoled detainee housed outside the United States into this country would squarely conflict with the immigration laws and violate the constitutional separation of powers.

In short, Parhat has no right to be released into a country where he was no right to be admitted.  In *Mezei*, the Supreme Court squarely rejected the proposition that an alien's physical presence in the United States conferred on him the right to  enter the United States lawfully.  Mezei was detained at Ellis Island, but the Court ruled that "harborage at Ellis Island is not an entry into the United States."  *Mezei*, 345 U.S. at 213.  "He is an entering alien just the same, and may be excluded if unqualified for admission under existing immigration laws."  *Id.*  Similarly, in *Chin Yow v. United States*, 208 U.S. 8 (1908), the Court rejected the proposition that permitting an alien to participate in his habeas proceedings in the territory of the United States

---

Red Cross Commentary to the Convention, *id.*, which the United States never ratified or adopted as law. Moreover, Parhat's attempt to judicially enforce the Convention (or its commentary) is foreclosed by the Military Commissions Act, which provides that "[n]o person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action... as a source of rights in any court of the United States or its states." MCA § 5(a).  Even assuming Parhat may claim its protections, the actual Fourth Geneva Convention (and indeed the passage from the Red Cross Commentary that Parhat quotes) expressly contemplates that the United States has the right to refuse "permission to reside in its territory to a released internee." *Geneva Convention Relative to the Protection of Civilian Persons in Time of War*, Aug. 12, 1949, art. 135,  6 U.S.T. 3516, 3608.

granted him the legal right to be there.  "[T]he petitioner," the Court explained, "gains no additional right of entrance by being allowed to pass the frontier in custody for the determination of his case."  *Id.* at 12-13.  Even if Parhat were physically brought to the United States, he would still be an inadmissible alien who has no general legal right to be here, and the Court therefore could not order his release into the country.

Parhat's suggestion that "without remedy in this habeas case, there will be no check on executive lawlessness" is entirely meritless.  Pet. Mot'n for Judgment at 21.  Habeas provides a severe check on the Executive's power of detention in this context, because it would require the release of a person no longer held as an enemy combatant to a country willing to receive him.  As Parhat concedes, his is an unusual case where he vociferously opposes being returned to his native country and United States policy prohibits it.  In the meantime, while other efforts are underway to find Parhat a new home, the Executive must house and treat petitioner as if he were no longer an enemy combatant.  That is a substantial change.  But, "[t]o order * * * petitioner[] released, however, would require cutting through more than 'barriers of form and procedural mazes.'  The obstacles are constitutional and involve the separation of powers doctrine." *Qassim*, 407 F. Supp. 2d at 202.  The Court may not order petitioner released into the United States in contravention of the immigration laws and the political branches' prerogatives.  *See, e.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 216 (1953) ("Whatever our individual estimate of [the policy decision not to release Mezei] and the fears on which it rests, respondent's right to enter the United States depends on congressional will, and courts cannot substitute their judgment for the legislative mandate."); *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens, being a power affecting international

relations, is vested in the political departments of the government."). Rather, "[t]he conditions of entry for *every* alien * * * have been recognized as matters * * * wholly outside the power of [the courts] to control." *Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (emphasis added).[4]

4. Finally, Parhat cites various cases for the proposition that this Court has "inherent" authority to grant him "bail" and thus release him into the United States pending the adjudication of his habeas petition. Parhat Mot. for Parole at 2-4. Whatever the merits of this "inherent authority" doctrine generally as it applies to courts of limited jurisdiction,[5] it has no application where, as here, the petitioner seeking "bail" is an inadmissible (and unparoled) alien with no legal right be present in the United States. Parhat relies, for example, on *Baker v. Sard*, 420 F.2d 1342 (D.C. Cir. 1969) (*per curium*), which appeared to involve a citizen, and did not address the question whether the exercise of that "inherent" authority is appropriate where doing so would (as it would here) conflict with the immigration laws. Similarly, *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), involved a lawful permanent resident. As *Zadvydas* made clear, the distinction between lawful permanent residents and inadmissible aliens is crucial, for the latter have no legal right to be present in the United States. 533 U.S. at 693-94. Again, Parhat does not purport to seek (and cannot seek) an order changing his immigration status. That defeats any claim he has to parole.

---

[4]Although the Court must deny petitioner's motions, it may retain jurisdiction over the habeas case and could entertain further applications from petitioner if he can allege that the United States is denying him an opportunity to go to an available country, or otherwise unduly delaying his release.

[5] "Federal courts are courts of limited jurisdiction; they possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).

**CONCLUSION**

Parhat's motion for judgment on his habeas petition seeking release into the United States

and his motion for immediate release or parole pending final judgment, should both be denied.

Dated: August 5, 2008                              Respectfully submitted,

                                                   GREGORY G. KATSAS
                                                   Assistant Attorney General

                                                   JOHN C. O'QUINN
                                                   Deputy Assistant Attorney General

                                                   ___/s/ Scott M. Marconda_____
                                                   JOSEPH H. HUNT (D.C. Bar No. 431134)
                                                   VINCENT M. GARVEY (D.C. Bar No. 127191)
                                                   JUDRY L. SUBAR (D.C. Bar No. 347518)
                                                   TERRY M. HENRY
                                                   AUGUST E. FLENTJE
                                                   ALEXANDER K. HAAS
                                                   PAUL AHERN
                                                   SCOTT M. MARCONDA
                                                   Attorneys
                                                   United States Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   20 Massachusetts Ave., N.W.
                                                   Washington, DC  20530
                                                   Tel:  (202) 514-1278
                                                   Fax:  (202) 514-7964
                                                   Attorneys for Respondents

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ) | |
| IN RE: ) | **Misc. No. 08-442 (TFH)** |
| **GUANTANAMO BAY** ) | **Civil Action No. 05-1509 (RMU)** |
| **DETAINEE LITIGATION** ) | |
| ) | **[PROPOSED] ORDER RE** |
| ) | **PETITIONER'S MOTION FOR JUDGMENT** |

Upon petitioner's Motion for Judgment on His *Habeas* Petition Ordering Release into the

Continental United States, it is hereby ordered as follows:

1. Petitioner's motion is denied.

Date: _____        _____
                                     UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| _____ ) | |
| **IN RE:** ) | **Misc. No. 08-442 (TFH)** |
| **GUANTANAMO BAY** ) | **Civil Action No. 05-1509 (RMU)** |
| **DETAINEE LITIGATION** ) | |
| ) | **[PROPOSED] ORDER RE** |
| _____ ) | **PETITIONER'S MOTION FOR RELEASE** |

Upon petitioner's Motion for Immediate Release on Parole into the Continental United

States Pending Final Judgment on His *Habeas* Petition, it is hereby ordered as follows:

    1.  Petitioner's motion is denied.

Date: _____          _____

                                                     UNITED STATES DISTRICT JUDGE