## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, *et al*.,<br><br>     Petitioners,<br><br>       v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>     Respondents. | Civil Action No. 05-1509 (RMU) |

## REPLY OF HUZAIFA PARHAT
## TO GOVERNMENT'S OPPOSITION TO MOTIONS
## FOR PAROLE AND JUDGMENT ORDERING RELEASE

Susan Baker Manning
Catherine Murphy
BINGHAM McCUTCHEN LLP
2020 K Street, N.W.
Washington, D.C.  20006
Telephone:   (202) 373-6000
Facsimile:    (202) 373-6001
susan.manning@bingham.com
catherine.murphy@bingham.com

Sabin Willett
Neil McGaraghan
Rheba Rutkowski
Jason S. Pinney
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
Telephone:   (617) 951-8000
Facsimile:    (617) 951-8736
sabin.willett@bingham.com
neil.mcgaraghan@bingham.com
rheba.rutkowski@bingham.com
jason.pinney@bingham.com

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    ARGUMENT ....................................................................................................... 1

    A.     The Court Has The Power To Order The Relief Sought By Parhat...................... 1

    B.     Under The D.C. Circuit's Order, The Government, Having Waived Its Re-
          CSRT Right, *Must* Release Parhat Into The Continental United States ................ 2

    C.     The Government's Misstatements Of The Record Cannot Justify
          Withholding The Release Remedy ........................................................................ 7

    D.     The Law Of Immigration Affords No Defense.................................................... 10

    E.     The Government's Immigration Argument Fails Under the Suspension
          Clause................................................................................................................... 20

    F.     *Munaf* Does Not Bar Parhat's Requested Relief................................................. 22

    G.     Geneva Conventions ............................................................................................ 23

    H.     The Path Forward................................................................................................. 23

III.    CONCLUSION.................................................................................................... 25

A/72618805.2

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Baker v. Sard*, 420 F.2d 1342 (D.C. Cir. 1969) ....................................................................11

*Bell v. Hood*, 327 U.S. 678 (1946)......................................................................................19

*Bolante v. Keisler*, 506 F.3d 618 (7th Cir. 2007)................................................................13

*Ex Parte Bollman*, 4 U.S. (Cranch) 75 (1807) ....................................................................7

*Boumediene v. Bush*, 553 U.S. ___, 128 S. Ct. 2229 (2008) .................................... *passim*

*Chessman v. Teets*, 354 U.S. 156 (1957) ..............................................................................7

*Chin Yow v. United States*, 208 U.S. 8 (1908) ............................................................12, 13

*Clark v. Martinez*, 543 U.S. 371 (2005) ..............................................................12, 15, 16

*Fiallo v. Bell*, 430 U.S. 787 (1977)..................................................................................

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ..........................................................................19

*INS v. St. Cyr*, 533 U.S. 289 (2001)..................................................................................21

*In Re Guantanamo Bay Detainee Litigation*, 2008 WL 3155155 (D.D.C. Aug. 7, 2008) ..................................................................................................................................3

*Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005) ...............................21

*Johnston v. Marsh*, 227 F.2d 528 (3rd Cir. 1955)...............................................................11

*Kaplan v. Tod*, 267 U.S. 228 (1925) ..................................................................................12

*Leng May Ma v. Barber*, 357 U.S. 185 (1958) ............................................................12, 13

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) ..........................................................11, 12, 14

*Munaf v. Geren*, 128 S. Ct. 2207 (2008)......................................................................22, 23

*Parhat v. Gates*, 2008 WL 2576977 (D.C. Cir. June 20, 2008) ............................... *passim*

*Principe v. Ault*, 62 F. Supp. 279 (N.D. Ohio 1945) ....................................................11, 12

*Qassim v. Bush*, 407 F. Supp. 2d 198 (D.D.C. 2005) ......................................................3, 4

*Rasul v. Bush*, 542 U.S. 466 (2004)..................................................................................20

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) ...................................17

*Smith v. United States Department of Justice*, 218 F. Supp. 2d 357 (W.D.N.Y. 2002) ..................................................................................................................................12

*Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005) ...................................................13

*Tam v. INS*, 14 F. Supp. 2d 1184 (E.D. Cal. 1998)...........................................12

*United States v. Nixon*, 418 U.S. 683 (1974) ...................................................19

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) ...................18

*Whitfield v. Hanges*, 222 F. 745 (8th Cir. 1915).............................................12

*Wright v. Henkel*, 190 U.S. 40 (1903).............................................................11

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................15, 21

## DOCKETED CASES

*Kabir v. Bush*, No. 05-1704 (D.D.C. July 11, 2008) ...........................................3

*Zakirjan v. Bush*, No. 05-2053 (D.D.C. Nov. 3, 2005).........................................5

## CONSTITUTION, FEDERAL STATUTES AND REGULATIONS

8 U.S.C. § 1101(a)(13)(B) ...............................................................................13

8 U.S.C. § 1182(d)(5)(A) .................................................................................13

28 U.S.C. § 2241..............................................................................................24

28 U.S.C. § 2243 (cl. 5) ....................................................................................24

FED. R. APP. P. 35(c) ...........................................................................................6

FED. R. APP. P. 40(a)(1), (3)................................................................................6

INA § 212(a)(3)(B)(vi)(II), 69 F.R. 23555 (Apr. 29, 2004) ...............................14

U.S. CONST. art. I, § 8, cl. 4 .............................................................................20

U.S. CONST., art. I, § 9, cl. 2 ............................................................................20

## TREATIES AND COMMENTARY

Geneva Convention relative to the Protection of Civilian Persons in Time of War,
Aug. 12, 1949, 75 U.N.T.S. 973 .................................................................23

## MISCELLANEOUS

Charles D. Wessleberg, *The Exclusion and Detention of Aliens: Lessons from the Lives of Ellen Knauff and Ignatz Mezei,* 143 U. PA. L. REV. 933 (1995) .............17, 18

Human Rights Watch Report, *Devastating Blows, Religious Suppression of*

iii

*Uighurs in Xinjiang: II*.................................................................................................15

The Roberts Report on Central Asia and Kazakhstan: Lambs to the Slaughter
(Aug. 5, 2008) ..................................................................................................... 9

Transcript of Deputy Secretary of State Richard Armitage Press Conference—
Conclusion of China Visit (Aug. 26, 2002) ...................................................15

2 TRIAL OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL TRIBUNAL
110-11 (1947)..................................................................................................... 17

U.S. Dep't of State 2001 Report on Foreign Terrorists .....................................14

A/72618805.2

Huzaifa Parhat replies to the Respondent's Combined Opposition to Parhat's Motion for Immediate Release Into the United States and to Parhat's Motion for Judgment on his Habeas Petition ("Opposition") as follows.

## ARGUMENT

**A.    The Court Has The Power To Order The Relief Sought By Parhat.**

The government's broad proposition is that it may concede that Parhat is not an enemy combatant and hold him at its pleasure anyway.  This Court, the government contends, can offer no relief.

If the government is right, then six years of litigation and two trips through the entire apparatus of the federal judiciary were pointless.  *Boumediene v. Bush*, 553 U.S. ___, 128 S. Ct. 2229 (2008), was a tempest in a teapot.  The Secretary of Defense can concede that Parhat is a noncombatant, as he has done here.  Opp. at 4-5.  The government can spend four fruitless years—as it claims to have done here—exhausting every other corner of the earth where Parhat might safely be sent.  The Court of Appeals can order release.  None of that matters.

If the government is right, this Court is a debating society.  At the end of our debate, this Court is permitted an essay about who prevailed, but that is all.  The lawyers will go home (or perhaps proceed to another debating society, for another round).  The most ancient proposition of judicial review, that a court can force the King or the President to release an innocent from a prison, is charming history.  Because the government's view is that nothing *real* may come of it. Parhat will return to an imprisonment that already exceeds the sentence of the convicted war criminal Salim Hamdan—if the government is right.

But the government is not right, either as to both the broad proposition or as to the narrow points we address below.  We encourage this Court, as it considers these narrow points, to reflect on what it would actually mean to judicial review *if the government were right*.

1

**B.    Under The D.C. Circuit's Order, The Government, Having Waived Its Re-CSRT Right, *Must* Release Parhat Into The Continental United States.**

The government's Opposition has changed this case profoundly.  On August 5, 2008, the government advised this Court (i) of no present plan to transfer Parhat (it contemplates holding him), and (ii) that it has waived the option to convene a new CSRT.  Opp. at 2.

On June 20, the D.C. Circuit left the government with three choices.  The Court "direct[ed] the government to release or to transfer the petitioner, or to expeditiously hold a new CSRT consistent with this opinion."  *Parhat v. Gates*, 2008 WL 2576977, at *18 (D.C. Cir. June 20, 2008).  The Court did not suggest or advise.  It directed.  And it did not direct that Parhat be released or transferred when it was convenient for the government to do so.  It did not qualify the order.  The Secretary might convene a new CSRT *expeditiously*.  Otherwise Parhat was to be released, or transferred.  Period.  Nearly two months have passed.  Because the government has not transferred Parhat and has waived the right to hold another CSRT, only one choice remains.  The immediate right of release is no longer a matter for evidence, or briefing, or even judicial determination by this Court.  The government must release Parhat because it has been ordered to do so.  This point is dispositive and renders all the other points academic.  We address below the government's arguments concerning the Court of Appeals' order.

1.    The alternative the government proposes—to improve Parhat's conditions of imprisonment[1]—is not, in any way, shape or form, release.  Parhat will still be imprisoned at the Guantánamo prison, perhaps forever: "Petitioner would remain there until he can be transferred to another country willing to accept him."  Opp. at 5.  At the government's whim, he might be sent back to the cruel isolation of Camp 6:  "[Parhat would] remain [in improved conditions] . . . absent any misconduct or other behavior jeopardizing operational security."  *Id.*  What is misconduct?  What jeopardizes operational security?  Whatever the government decrees.  The government has only just advised the Court that it exercises absolute power to say who goes where, and when, and under what conditions, at Guantánamo Bay.  Respondents' Opp. to

---

[1] *See* Opp. at 5.  It does not say when it will do so.  "DoD *plans* to house Parhat as one who is no longer an enemy combatant."  *Id.* (emphasis added).

Petitioners' Motion for Temporary Restraining Order and Preliminary Injunction, filed in *Kabir v. Bush*, No. 05-1704 (July 11, 2008, Dkt. No. 87).  On August 7, denying the motion for injunctive relief filed in consolidated cases, this Court agreed.  *In Re Guantánamo Bay Detainee Litig.*, 2008 WL 3155155, at *5 (D.D.C. Aug. 7, 2008).  So the government proposes to imprison Parhat as long as it likes.

      2.      The government argues, *see* Opp. at 10-13, that it has a right to effect repatriation on its own timetable.  In *Qassim v. Bush*, 407 F. Supp. 2d 198 (D.D.C. 2005), a case addressing efforts to repatriate the Uighurs three years ago, the court held that there is no such power.  *Id.* at 201.  And even if such power had existed before, the Court of Appeals' order to release or transfer Parhat forecloses it here.

      Even if the government had a "wind-up" power, it was used up long ago.[2]  The government seriously misrepresents what has happened here by suggesting—without evidence of any kind—that we are now at the *beginning* of a repatriation process.  Opp. at 12-13.  That is simply false.  We are at the *end* of a five-year failed effort by the government to repatriate Parhat and the other Uighurs.  The government long ago determined that it cannot effect a transfer.  Its own record in its own CSRT established that as of October 29, 2004, "Spokesman Richard Boucher said the Bush administration is trying to relocate the Uighurs.  The State Department has contacted a number of countries about the resettlement of the Uighurs."  CTA App. 106.[3]  It claimed vigorous efforts were underway a year later.  Opening Br. at 14.  The litigation has been a stalling tactic, undertaken in Uighur cases since 2005, to buy time for this repatriation.  *See*

---

[2] The government cites no legal authority for its claimed "wind up" power, and makes no historical case either, citing inapposite history involving North Korean and Chinese soldiers taken on the battlefields of Korea, and the Geneva-compliant, six-months-and-done post-war operations of the First Gulf War.  (The Uighurs never marched out from China as soldiers; indeed, they were never soldiers at all.)  The government never addresses the actual post-war conditions of World War II prisoners of war.  It never explains what, if anything, limits this "wind-up" power.  Indeed, it is clear that nothing would limit it.  The proposition is that the Executive may seize anyone, anywhere on the Globe — *by mistake* — hood him, shackle him, and take him to an island forever, as long as it assures us that it is pursuing an "orderly" windup.  Among other things, this proposition cannot withstand *Boumediene*.

[3] Citations to "CTA App." are to pages of the unclassified version of the record on review in the Court of Appeals.  Cited pages are attached hereto as <u>Exhibit A</u>.

*Qassim*, 407 F. Supp. 2d at 200.  Through every day of that time Parhat's confinement has continued.  Today the government has offered this Court *no* evidence of what, if anything, it is doing to effect release or transfer, or why there is any reason to hope in 2008 for success.  The government's proposal is simply for more delay, and amounts to another multi-year sentence for a civilian never even charged with wrongdoing.  Opp. at 13.

For the few months that separated their work-release from transportation home, the Italians POWs had vastly more liberty than Parhat.  *See* Opening Brief at 6.  But to put the experience of the Italian POWs in perspective, our government has been trying to resettle Parhat, who was never an enemy combatant, for longer than the entire period during which the Italians, who *were* enemy combatants, fought, were captured, held as POWs, and then repatriated.

3.     The government argues that the Court of Appeals "did not resolve the question of whether it may order release pursuant to the DTA."  Opp. at 7.  This is plainly incorrect.  It will help to set out the key language in the decision, complete with the footnote reference:

> We therefore direct the government to release or to transfer* the petitioner, or to expeditiously hold a new CSRT consistent with this opinion.  This disposition is without prejudice to Parhat's right to seek release immediately through a writ of *habeas corpus* in the district court, pursuant to the Supreme Court's decision in *Boumediene*, slip op. at 65-66.

*Parhat*, 2008 WL 2576977, at *18.  A footnote appended to the word, "transfer," directs the reader to footnote 19, which in turn refers to *this* Court's 2005 order requiring the government to give notice of any intent to remove Parhat from Guantánamo to a third nation.  "This disposition," the Court wrote (*i.e.*, disposition of release, transfer or new CSRT as a remedy in *the DTA action*) is "without prejudice to Parhat's right to seek release immediately through a writ of *habeas corpus*."  *Id.*  This careful language tells us two things.  First, release (or transfer, or re-CSRT) *was part of the DTA remedy* ordered by the Court of Appeals.[4]  Second, the difference between DTA release, as ordered by the Court of Appeals, and *habeas* release, which

---

[4] This point is made repeatedly and emphatically at *14 and *18.  Elsewhere in the opinion, denying the suggestion "that we will countenance the 'endless do-overs' that Parhat fears," the Court "note[d] that DTA review is not Parhat's only, or his best, path to release."  *Id.* at *15.  That is a plain statement that DTA review *is* a path to release—simply not the best one.

Parhat is also entitled to pursue here, was that last June the Court of Appeals thought *habeas* provided *faster* release (and, in the event of a contest, more procedural rights). DTA release was conditional on the government's non-exercise of its other options, but Parhat was entitled to seek a faster release even if a re-CSRT was pending.

4.    The government argues that the Circuit "did not address the different question of whether a habeas court could order Parhat's release *into the United States*." Opp. at 7 (emphasis added). This too is wrong. Release into the United States is precisely what the Court of Appeals addressed. We have already noted that the careful use of different terms, "release," and "transfer," must have meant that release was something *other* than transfer—*i.e.*, something other than delivering Parhat to the custody of another, *see* Opening Brief at 11—a point to which the government never responds.[5] The point is further underscored by the placement of the footnote. The Court footnoted *transfer* (not *release*) as an event that would require advance notice to this Court. (By contrast, of course, releasing Parhat into the United States requires no notice because it creates no risk of harm to Parhat.) The Court of Appeals exhaustively analyzed the record about Parhat himself, and repeatedly demonstrated its understanding that China was unavailable to him. *See* 2008 WL 2576977 at *2 (Parhat fled China because of "oppression and torture imposed on Uighur people by the Chinese government") (internal citations omitted); *id.* at *4 (noting panel's urging that he not be forced to return to China where he would "almost

---

[5] In fact, the government has asserted in related proceedings that *any* transportation of a detainee to a foreign country must "consist of, in the first instance, a *transfer* to the control of the government of the destination country." Respondents' Mem. in Opp. to Petitioners' Motions for Temporary Restraining Order And Preliminary Injunction Barring Transfer or Release or Requiring Advance Notice of Transfer or Release, at 8 n.8, filed in *Zakirjan v. Bush*, No. 05-2053 (HHK) (Nov. 3, 2005, Dkt. No. 9) (emphasis added); *id.* ("To be clear, a transfer for release would consist of, in the first instance, a transfer to the control of the government of the destination country. This is necessary because sovereign nations have borders and any transfer must be coordinated with the foreign government concerned. The United States is not in a position to transport individuals to foreign countries and introduce them into civil society there without the involvement of the government concerned.") (citations omitted). It thus necessarily follows that "release" *by* the United States (as opposed to release by a foreign government consequent to that person being "transfer[red by the United States] to the control of the government of the destination country," *id.*) must mean release within the United States.

certainly be treated harshly"). The Court of Appeals knew that "release" to China was not an option when it said, in the most emphatic possible terms, that there is "no question but that *[this Court]* will have the power to order him released." *Id.* at *15 (emphasis added).[6]

The government may not like the decision, but the D.C. Circuit's words were plain. In his DTA action, Parhat received a disposition—then conditional, but now absolute—of release, *and* Parhat is also entitled to seek more immediate release—regardless of further CSRT proceedings—in *habeas*.

5.    The D.C. Circuit's ruling is "best read" as not compelling release, the government says, because it has filed a petition for rehearing. Opp. at 7 n.1. This argument has no merit. The filing does not change the effect of the pending order. The government has not obtained a stay. Petitions for rehearing are so routinely denied that the prevailing party is not even permitted to respond unless the Court requests a response. *See* Fed. R. App. P. 40(a)(1), (3). The filing of such a petition does not in any way excuse this litigant from scrupulous compliance with a clear judicial order of the panel.[7]

6.    The government argues that *Boumediene* "makes clear that release is not the appropriate [remedy] in every case in which the writ is granted." Opp. at 3. Two points bear mention here. First, *Boumediene* is a decision about *habeas corpus*. It does not limit the force or effect of the D.C. Circuit's judgment in Parhat's DTA case, and *the Court's clear judicial order as to his DTA remedy*. Second, the government has omitted context showing that Justice Kennedy's reference was to a situation that the government has now conclusively abandoned.

---

[6] The Court of Appeals cited *Boumediene*, quoting the majority's conclusion that the *habeas* court has "authority to . . . issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release." 128 S. Ct. at 2271. Of course, in the usual Guantánamo case, release would not be necessary, because the prisoner might be transferred to his home country. Release is obviously "necessary" here.

[7] The rehearing petition does not cite authority for reconsideration. Given the panel's careful and lengthy attention to remedy, and its invocation of the carefully-chosen words by which it ordered the parties to act in three separate places in the opinion, *see* 2008 WL 2576977 at *1, *15, *18, it is fanciful to suggest that the Court is now going to edit its opinion, merely because the government finds it disagreeable to comply. The government is out of time to seek *en banc* review. *See* Fed. R. App. P. 35(c). *Parhat v. Gates* will certainly stand unless the Supreme Court orders to the contrary, and no one has sought such relief.

6

The citation comes from section V of the majority opinion, which addresses whether the DTA is an adequate substitute for *habeas*. Subsection B discusses key attributes of *habeas*. Among them is release. The government's quotation comes from this section:

> And the *habeas* court must have the power to order the conditional release of an individual unlawfully detained—though release need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted.

*Id.* at 2266. In support of this proposition Justice Kennedy cites three authorities: two directing that the prisoner must be released,[8] and a third, *Chessman v. Teets*, 354 U.S. 156 (1957), which ordered remand of a *habeas* petitioner's case for retrial, where the petitioner had demonstrated *an error of law in the trial*. *Id.* at 2266-67. Plainly it was to that latter scenario that the phrase, "not the appropriate one in every case" refers. That situation is familiar. A *habeas* petitioner complains of a constitutional failure in his trial. The *habeas* court agrees. But there was substantial evidence of guilt. So the remedy is not release, but rather remand so that the petitioner may fairly be tried. Here there was no trial. And the government does not seek one now. It expressly waived the right to pursue any further litigation of whether it has a legal right to detain. Accordingly the quotation is irrelevant here.

7.      The government never addresses a simple point. Whatever "release" and "transfer" may mean, how does its proposed new prison regimen for Parhat constitute either? The government simply proposes to violate an order of the Court of Appeals.

## C.      The Government's Misstatements Of The Record Cannot Justify Withholding The Release Remedy.

In this section Parhat addresses the government's systematic misstatements of fact, the evident object of which is to frighten the Court. We emphasize how remarkable the Opposition is. The Court of Appeals closely reviewed the government's entire record and held that it could support no disposition other than release or transfer. The government has waived the right to

---

[8] *Ex Parte Bollman*, 4 U.S. (Cranch) 75 (1807) (court "can only direct [the prisoner] to be discharged"); R. Hurd, TREATISE ON THE RIGHT OF PERSONAL LIBERTY, AND ON THE WRIT OF HABEAS CORPUS AND THE PRACTICE CONNECTED WITH IT: WITH A VIEW OF THE LAW OF EXTRADITION OF FUGITIVES 222 (2d ed. 1876) (prisoner has "right to be delivered") (cited in *Boumediene*, 128 S. Ct. at 2266-67).

A/72618805.2

alter that record.  So now the government misstates that record to persuade this Court to deny the very remedy the Court of Appeals demanded.  The government proceeds with few citations to the record on review in the Court of Appeals, no evidentiary submission to this Court, and in many cases with serious errors.  This is a second bite at a bitten apple.  It should be rejected on its face.  In the event it is not, we address the government's errors in turn.

1.    The government says, "it is undisputed that Parhat went to Afghanistan with the purpose of 'receiv[ing] training from a camp affiliated with enemies of this country.'"  Opp. at 2.  This is false as a matter of law.  The Circuit held that there was no reliable evidence that "ETIM" (the entity with which Parhat is charged with being affiliated) was sufficiently "affiliated with enemies of this country"; indeed, it devoted three portions of its opinion, subsections III.B, III.C, and section IV, to demonstrating the proposition false.  *See* 2008 WL 2576977 WL at *9, *10 & *11 n.12.  Parhat denies that he attended any camp affiliated with enemies of this country.  He testified that, "from the time of our great grandparents centuries ago, we have never been against the United States and we do not want to be against the United States," and that "[w]e are willing to be united with the United States."  CTA App. 21.  Parhat further testified:

> Q.    Did the Taliban people ever approach you and ask you to fight with them against their enemies?
>
> A.    No.  In four months we built a house at the camp and we didn't see any other people there.
>
> Q.    Was it only Uighur People you saw everyday when you were there?
>
> A.    Yes.

CTA App. 024.

> Q.    There is a concern that Mr. Hassan Maksum may have relationships with al Qaida people.  Do you know any thing about this?
>
> A.    I don't think so.  The people in Turkistan will not associate with al Qaida.

CTA App. 025.  If the contention—and it is an outrageous one, given the record, and the Circuit's decision—that Parhat has ever contemplated associating with enemies of this country

forms any basis of this Court's consideration, Parhat demands his right under 28 U.S.C. § 2243 (cl. 5), to be present in court for an evidentiary hearing so that he may refute it. Parhat would present his own testimony, and that of five Uighurs who were his companions, and who were determined to be noncombatants by the military and were sent to Albania on May 5, 2006, including Abu Bakker Qassim and Adel Abdul Hakim. Parhat would also offer CSRT records of two additional companions, prisoners Hammad (ISN 328, now held in Camp 6), and Ali (ISN 250, now held in Camp 4), each of whom was determined by a military panel not to be a combatant in 2004, only to have the result ordered reversed by the Pentagon. Parhat would also subpoena and offer evidence of Respondent's representations made to the Albanian government concerning the Executive's assessment of the five released Uighurs sent to Albania in 2006.

2.    The government says that Parhat went to "a military camp supported by the Taliban." Opp. At 10. The Circuit made no such finding. Parhat denies that statement, and the Circuit itself noted there was no evidence on the point. 2008 WL 2576977, at *10. The Taliban simply happened to be the prevailing government in Afghanistan, at a time when Uighur refugees found it easier to congregate in Afghanistan than in neighboring Chinese satellites. *Id.* At an evidentiary hearing, Parhat would present evidence of this point noted by the Circuit.

3.    The government says that the camp was "run by the East Turkistan Islamic Movement."[9] Opp. at 10. Parhat denies knowledge that this is true. Evidently this is a reference to Hassan Maksum, whom Parhat saw at the camp. The government *alleged* that Maksum was a leader of ETIM, and was planning hostilities against China, but the government has never offered (in any court) admissible evidence that either proposition is true. The government offers none now. Parhat denies it and demands an evidentiary hearing on this point if the Court regards it as material. At such a hearing, Parhat would call as witnesses himself and Mr. Omer Kanat, a

---

[9] The existence of ETIM has been called into question by serious scholars. *See*, *e.g*., The Roberts Report on Central Asia and Kazakhstan: Lambs to the Slaughter (Aug. 5, 2008), *available at* http://roberts-report.blogspot.com/2008/08/lambs-to-slaughter-what-is-east.html. There is considerable evidence that many reports concerning ETIM have been generated by China for propaganda purposes. *See id*.

correspondent for Radio Free Asia who has interviewed Mr. Maksum (Maksum is now believed dead), and other witnesses.

4.     The government then makes this astonishing (and unsourced) statement: "It is also undisputed that ETIM is engaged in violent resistance to Chinese rule over portions of western China, and that Parhat traveled to its camp to join that resistance." Opp. at 10. *Every aspect* of that statement is disputed by Parhat. No admissible evidence supports it. Parhat denies it and demands an evidentiary hearing, if the statement is deemed in any respect material to the Court's judgment. At such a hearing, Parhat would testify himself, and would call scholars of East Turkestan such as Prof. Gardner Bovington of the University of Indiana, Prof. Sean R. Roberts, a professor of International Development at George Washington University, Prof. Yitzhak Shichor of Haifa University, Mr. Alim Seytoff, general secretary of the Uyghur American Association, Ms. Rebiya Kadeer, a Uyghur dissident jailed by the Chinese and admitted as an asylee by this country, and other persons knowledgeable about the relentless propaganda of China in respect of the so-called "ETIM."

5.     The government says it is undisputed that Parhat was captured "in the nearby Tora Bora caves." Opp. at 10. The statement is false. There is no evidence in the record to support it. Parhat was sold for a bounty in Pakistan. CTA App. 29. If this point is deemed material, Parhat demands his right to testify and refute it.

6.     Perhaps most important, Parhat now insists—as he *must* insist, in light of the persistent character assassination in the Opposition—on a meaningful chance to respond to *any* point this Court deems material. After seven years, he has earned that right. He desires to appear before this Court, to look the Court in the eye and be looked in the eye, to give an account of his character and his desire to live peacefully, and point-by-point to refute, firmly, credibly, and plainly the government's campaign of distortion and innuendo.

**D.     The Law of Immigration Affords No Defense.**

The government argues that the law of immigration bars Parhat the remedy ordered by the Circuit. Opp. at 13. The government is wrong.

A/72618805.2

1.    The government persists in asserting that Parhat seeks immigration relief.  *See*, *e.g.*, Opp. at 13.  We think the government understands Parhat's position well enough.  Parhat has not asked for admission into the United States.  He has not asked for asylum.  He has not asked for any immigration status.  He does not ask this Court, in any way, to interfere with whatever his immigration status is today.

Similarly, the "parole" power invoked here is not *immigration* parole, in which the Secretary of Homeland Security has a *statutory* power to exercise discretion to permit an alien without legal right into the country.  We think this was also plain enough from our Opening Brief, but we will try again.  The parole we seek is *habeas* parole—the fundamental equitable power of a *habeas* court to order a petitioner's release on parole or bail pending a determination on the merits of his claim.  *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) ("[T]he federal courts have inherent authority to admit to bail individuals properly within their jurisdiction."); *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) ("When an action pending in a United States court seeks release from what is claimed to be illegal detention, the court's jurisdiction to order release as a final disposition of the action includes an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits."); *Johnston v. Marsh*, 227 F.2d 528, 531 (3rd Cir. 1955) ("One of the inherent powers of the judiciary with regard to proceedings before it has been the admission of a prisoner to bail where, in the exercise of his discretion, the judge deems it advisable.").  This power is not tied to any specific statutory authorization.  *Mapp*, 241 F.3d 226-27; *see also Wright v. Henkel*, 190 U.S. 40, 63 (1903) ("We are unwilling to hold that the circuit courts possess no power in respect of admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition, those courts may not in any case, and whatever the special circumstances, extend that relief.").  And it has nothing to do with immigration.  *See Principe v. Ault*, 62 F. Supp. 279, 283 (N.D. Ohio 1945) ("[T]he power to order bail must be determined entirely by the law applicable to *habeas corpus* . . . .").

Courts have repeatedly recognized that, in exercising this inherent authority, the judiciary is empowered to grant bail to a *habeas* petitioner who is not entitled to admission into the United States under the immigration laws.   *See*, *e.g.*, *Mapp*, 241 F.3d at 231 (federal courts have inherent authority to grant bail to alien *habeas* petitioners detained by the INS); *Whitfield v. Hanges*, 222 F. 745, 756 (8th Cir. 1915) (in a *habeas* proceeding, "the court has ample power to admit the alien to bail or to take his own recognizance"); *Smith v. United States Dep't of Justice*, 218 F. Supp. 2d 357, 363 (W.D.N.Y. 2002) ("Federal courts have inherent authority to permit INS detainees to be released with conditions."); *Tam v. INS*, 14 F. Supp. 2d 1184, 1190 (E.D. Cal. 1998) (approving decision of magistrate judge in a *habeas* proceeding ordering the conditional release of an alien subject to a deportation order); *Ault*, 62 F. Supp. at 280-84 (a district court "has authority to grant bail to an alien ordered deported pending the hearing of his application for writ of *habeas corpus*").   These cases do not turn on the immigration status of the petitioner; they are firmly grounded in the court's *habeas* power.   *Ault*, 62 F. Supp at 281, 284 (concluding finding that the power to admit a *habeas* petitioner to bail is incident to the power to hear and determine the case).   Contrary to the government's contentions, Parhat's immigration status as an inadmissible alien does not prevent the Court from ordering his parole into the United States.   *See also Clark v. Martinez*, 543 U.S. 371, 387 (2005) (ordering the release of an inadmissible alien into the United States in a *habeas* proceeding).

It has long been recognized that parole of non-citizens does not confer any of the statutory rights that would accompany "admission" or "entry" for immigration purposes.   *See Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958) ("For over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States. . . . Our question is whether the granting of temporary parole somehow effects a change in the alien's legal status. . . . Congress specifically provided that parole "shall not be regarded as an admission of the alien[.]"); *Kaplan v. Tod*, 267 U.S. 228, 230-31 (1925) (excludable alien paroled into U.S. held not to have made an "entry" under the immigration statute); *Chin Yow v. United States*, 208

12

U.S. 8, 12-13 (1908) ("petitioner gains no additional right of entrance by being allowed to pass the frontier in custody for the determination of his [*habeas*] case"); *Succar v. Ashcroft*, 394 F.3d 8, 15-16 (1st Cir. 2005) ("A paroled individual is not considered 'admitted' into the United States: he is an 'applicant for admission.'").   In *Barber*, a Chinese woman filed a *habeas* petition alleging that her parole into the United States from 1952 to 1954 effected an entry for immigration purposes.   357 U.S. at 185-86.   The Supreme Court rejected this argument, concluding that "petitioner's parole did not alter her status as an excluded alien or otherwise bring her within the United States" pursuant to the immigration laws.   *Id.* at 186 (internal quotation omitted).   The Court reasoned:

> The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.   It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court. . . . Certainly this policy reflects the humane qualities of an enlightened civilization.

*Id.* at 190.   This principle has long since been codified.   8 U.S.C. § 1101(a)(13)(B) ("An alien who is paroled . . . shall not be considered to have been admitted."); 8 U.S.C. § 1182(d)(5)(A) (parole of alien by Attorney General "shall not be regarded as an admission of the alien").   It  is thus abundantly clear that parole will not affect Parhat's immigration status but would simply avoid "needless confinement" while this case is pending.   Immigration law poses no bar to Parhat's parole into the United States.

The government's citation to *Bolante v. Keisler*, 506 F.3d 618, 620 (7th Cir. 2007), *see* Opp. at 17, is unavailing.   First, *Bolante* affirms (as Parhat argues) that "[i]nherent judicial authority to grant bail to persons who have asked for relief in an application for *habeas corpus* is a natural incident of *habeas corpus*, the vehicle by which a person questions the government's right to detain him."   *Id.*   The *Bolante* court recognized that "[a] judge ought to be able to decide whether the petitioner should be allowed to go free while his claim to freedom is being adjudicated."   *Id.*   Second, *Bolante* is distinguishable.   In that case, the Seventh Circuit denied the petitioner's bail motion after the Board of Immigration Appeals denied his application for

asylum.  The court based its decision on a statute that limited judicial review of a denial of discretionary relief in a removal proceeding.  Whatever the merits of this decision, it has no application here because Parhat is not presently seeking asylum, nor is he appealing a denial of discretionary relief.  As the court in *Mapp* determined, "[a]bsent a clear direction from Congress, federal judicial power is unaltered, and the authority of the federal courts to admit to bail parties properly within their jurisdiction remains unqualified."  241 F.3d at 227-28.  Thus, *Bolante* is not on point, and does not support the government's position.

      2.      The government asserts that release is barred because Parhat, despite winning his case, is associated with ETIM, which, in turn, is designated as a "terrorist organization" on certain lists.  This distortion is remarkable for two reasons; first, because *the Court of Appeals held that affiliation with designated organizations is utterly irrelevant, see Parhat*, 2008 WL 2576977, at \*9, and second, because *there has been no finding of such affiliation* in any event.  Parhat denies such an affiliation.  If the issue is relevant,[10] he demands the right to be present and to call witnesses as set out above.  Parhat would make several points.  First, he demands the right to demonstrate, at an evidentiary hearing, that he is not affiliated with ETIM, through the CSRT panel's finding that there was no source indication that he ever joined ETIM, *see id.* at \*9, and through his testimony and that of the similarly situated Uighurs.  Second, he could never have been affiliated with ETIM at any time that ETIM was on a list of designated organizations, since it went on the list long after he was imprisoned at Guantánamo.[11]  He would show at a hearing that in the month of his capture the State Department *denied* that ETIM was a "terrorist organization."  *See* U.S. Dep't of State 2001 Report on Foreign Terrorists, *available at* http://www.state.gov/s/ct/rls/rpt/fto/ 2001/5258.htm.  Third, he would show at an evidentiary hearing, at which he would call as a witness former Deputy Secretary of State Richard Armitage,

---

[10] Because he is not seeking to enter as an immigrant, it is immaterial whether Parhat is affiliated with a designated organization in any event.

[11] ETIM was not designated as a Foreign Terrorist Organization for immigration purposes under INA § 212(a)(3)(B)(vi)(II) until April 2004, nearly two years after Parhat was sent to Guantánamo.  *See* 69 F.R. 23555 (Apr. 29, 2004).

14

that the ETIM "terrorist organization" designation was made by the State Department in September, 2002, and was agreed to in an August, 2002, meeting between Mr. Armitage and senior Chinese officials, at which Mr. Armitage promised the Chinese he would make the designation as a *quid pro quo* to induce Chinese support for U.S. war plans in Iraq.  *See* Transcript of Deputy Secretary of State Richard Armitage Press Conference—Conclusion of China Visit (Aug. 26, 2002), *available at* http://lists.state.gov/SCRIPTS/WA-USIAINFO.EXE?A2=ind0208d&L=us-china&H=1&O= D&P=75.  He would further show at an evidentiary hearing that the designation of ETIM as a "terrorist organization" by the U.N. was made at the behest of China.  *See* Human Rights Watch Report, *Devastating Blows, Religious Suppression of Uighurs in Xinjiang: II*, *available at* http://hrw.org/reports/2005/china0405/4.htm.

        3.      The government's mischaracterization of Parhat's position is relentless.  Citing *Clark v. Martinez*, 543 U.S. 371 (2005), and *Zadvydas v. Davis*, 533 U.S. 678 (2001), the government says that Parhat "urges, however, that the immigration laws authorize his immediate release or parole."  Opp. at 15.  Again, it is not a question of rights under the immigration laws.  Those decisions hold that a person cannot indefinitely be detained, even where the Executive is authorized by statute to detain indefinitely.  That the statute in question in these cases was an immigration statute was immaterial—these decisions secure a right of release *wholly outside any immigration rights, because the petitioners in those cases had no immigration rights*.  The rule of each case is that *no* statute can be read to permit indefinite imprisonment—even if it deals with alien criminals and appears on its face to authorize their indefinite imprisonment.  The point is that indefinite detention, whatever its cause, is impermissible.  The government's attempt to distinguish the cases, so far as it is comprehensible at all, appears to be that because they hold only that indefinite detention specifically authorized by a particular statute is impermissible, the government remains free to engage in indefinite detention not permitted by any statute at all.  Opp. at 16.  The distinction is absurd.

A/72618805.2

*Boumediene* has made this point insuperable for the government in cases involving Guantánamo detainees, for there is no longer any question that the Constitution's safeguards against indefinite executive detention run to Guantánamo. The majority wrote: "We do hold that when the judicial power to issue *habeas corpus* properly is invoked the judicial officer must have adequate authority to . . . formulate and issue appropriate orders for relief, including, if necessary, an order directing the petitioner's release." 128 S. Ct. at 2271. The Court then held that the judicial power to order *habeas* relief properly is invoked by a Guantánamo prisoner like Parhat. *Id.* at 2274. In the typical case, release would not be necessary, as a prevailing prisoner could be transferred to his home country. But there is no question that the Supreme Court, with full view of the government's territorial arguments about Guantánamo, ordered that release is available in a case like this. Thus, while the full extent of constitutional protections available to aliens at Guantánamo remains to be tested, it is clear that the Constitution runs there for purposes of release, because the Supreme Court expressly stated that it did. In law, there is no barrier left (as, *arguendo*, there might have been when Judge Robertson decided *Qassim*) to application of the rule of *Clark* and *Zadvydas* here.

4.     The government argues that Parhat "has no right to be released into a country where he [has] no right to be admitted" and that this Court "cannot force his admission into an[] unwilling country, including the United States." Opp. at 19, 4. To the contrary, that is *exactly* what *Clark* and *Zadvydas* instruct. The United States did not "willingly" accept either the physical arrival or the parole of inadmissible, unlawful, criminal aliens in *Clark*, but rather was ordered to do so by a *habeas* court. *Clark*, 543 U.S. at 386-87. Putting aside the fact that Parhat is not a criminal (having never been charged with any crime), the difference between the *Clark* petitioners and Parhat is all to Parhat's benefit. The *Clark* petitioners illegally sought out our territory, while Parhat was brought here illegally. If the men who arrived here without any legal right to do so in *Clark* are afforded a *habeas* right to release in the United States, *a fortiori* a man brought here by the jailer must be. In any event, the Supreme Court in *Boumediene* has since abrogated this distinction—extending to Parhat in Guantánamo the same *habeas* remedy the

16

*Clark* petitioners secured to themselves by their unlawful entry into the United States.  The government's "willingness" to accept Parhat—who requests *lawful habeas* parole—matters little where the Constitution is concerned.

5.    The government cites *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), the decision—roundly criticized at the time and ever since, *see generally* Charles D. Wessleberg, *The Exclusion and Detention of Aliens: Lessons from the Lives of Ellen Knauff and Ignatz Mezei*, 143 U. PA. L. REV. 933 (1995)—that stranded Ignatz Mezei at Ellis Island, potentially indefinitely.  It arose during a period not unlike our own, when a single word ("communist") prompted such fear and revulsion that few trifled to inquire whether, in a given case, the word fairly described the person branded with it.  Justice Jackson—who knew something of indefinite detention, having opened for the prosecution at Nuremberg by discussing what indefinite detention did to Germany[12]—filed a dissent eerily predictive of our current national folly.  "Fortunately it still is startling, in this country, to find a person held indefinitely in executive custody without accusation of crime or judicial trial," it began.  345 U.S. at 218.  It continued: "Quite unconsciously, I am sure, the Government's theory of custody for 'safekeeping' without disclosure of charges, evidence, informers or reasons, even in an administrative proceeding, has unmistakable overtones of the 'protective custody' of the Nazis more than of any detaining procedure known to the common law."  *Id.* at 226.  Three others joined him.  Several points bear noting here.

First, *Mezei* does not control this case.  Unlike Parhat and the others imprisoned at Guantánamo, Mezei left the U.S. voluntarily and returned, voluntarily, without a visa.  Mezei also sought, at least initially, an immigration-type remedy: admission.  His *habeas* claim came later.  The government apparently believed of Mezei that he was a "communist."  Here the Court of Appeals has determined that the government's evidence provides no basis for its

---

[12] 2 TRIAL OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL TRIBUNAL 110-11 (1947).  The indictment alleged that the defendants used "protective custody" to make the regime "secure from attack and to instill fear in the hearts of the . . . people."  *Id.* at 34-35.

imprisonment of Parhat and the government has waived its right to litigate the issue further. There is a material difference between a petitioner, such as Mezei, who comes to the threshold, knocks on the door, is barred from admission, is detained simply because he got to a place from which he cannot be sent anywhere, and now seeks *habeas* to enter, and a petitioner such as Parhat, who was brought against his will to a place under U.S. control by the government, and who now cannot be released through no fault of its own. The Executive cannot unilaterally and unlawfully bring someone to a prison, and then complain that its own discretionary authority over immigration matters prevents it from freeing the prisoner.[13] Respondent's current problem is of its own making.

Second, *Zadvydas* and *Clark* have made it impossible to extend *Mezei* to this case. Parhat does not deny that the Executive can exclude. What the Executive cannot do, per *Zadvydas* and *Clark*, is detain Parhat indefinitely pending expulsion or exclusion. Whatever the law was before *Zadvydas* and *Clark*, the law thereafter is that in a direct clash between immigration law and *habeas* rights, *habeas* wins. In each of those cases the petitioner (who suffered far less than Parhat has suffered) achieves physical presence, but without legal right, because the only alternative is detention.

Nor can *Mezei* bar relief to Parhat after *Boumediene*. *Boumediene*'s core principle is that the separation of powers embedded in the Constitution's structure and design demands *habeas* and a judicial branch that will effectively block overreaching by the Executive in cases of unwarranted intrusion into liberty. This principle is lost without the *habeas* remedy of release. This principle is the central focus of section III.A of the *Boumediene* decision and of the authorities cited therein. 128 S. Ct. at 2244-46. "[T]he writ of *habeas corpus* is itself an

---

[13] Mezei and the petitioner in *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), also cited by the government, both were eventually released into the United States. Charles D. Wessleberg, *The Exclusion and Detention of Aliens: Lessons from the Lives of Ellen Knauff and Ignatz Mezei*, 143 U. PA. L. REV. 933, 954, 963-64 (1995). "Once the government was required to justify its exclusion decision with substantial and reliable evidence, in an open proceeding, Knauff gained admission into the United States." *Id.* at 964. Once he got a hearing, Mezei was paroled into the United States by the Attorney General, although he was never admitted as a citizen or permanent resident. *Id.* at 984.

indispensable mechanism for monitoring the separation of powers.  The test for determining the scope of this provision must not be subject to manipulation by those whose power it is designed to restrain."  *Id.* at 2259.  The Respondent's assertion of an entitlement to unilateral decision-making "serves only to *condense* power into a single branch of government," *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004), in contravention of *Boumediene*'s most pressing concern— the need to have a judicial remedy against executive overreaching during one of those "pendular cycles" when the Executive has gone too far.  Thus, separation of powers principle demands a remedy here.

Granting the relief sought by Parhat would not conflict with statutory law or usurp the immigration authority of the political branches.  To hold otherwise would lead to the conclusion that *habeas* itself is an unconstitutional violation of separation of powers.  Every time the writ is granted, a court orders the Executive to release someone that it, in the exercise of its prerogatives, had chosen to imprison.  That has always been the essence of separation of powers—checks and balances operating precisely as they should.  If the Executive is found to have detained someone illegally it is subject to an enforceable judicial order that the individual be released if the illegality cannot be promptly remedied.  *Cf. United States v. Nixon*, 418 U.S. 683, 703-05 (1974).

Moreover, *Boumediene* makes plain that Parhat has the same constitutional *habeas* right as any alien in the lower forty-eight.  128 S. Ct. at 2262.  *Mezei* never wrestled with this point, and *Boumediene*, at least as applied to stateless Guantánamo prisoners, effectively overrules *Mezei*.  *See also Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[W]here federally protected rights [are threatened], it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.").

**E.      The Government's Immigration Argument Fails Under the Suspension Clause.**

The government's argument that certain immigration statutes (as well as *Mezei* and other immigration-related cases[14]) bar this Court from ordering Parhat released to the United States, *see* Opp. at 13-14, must fail under Art. I, § 9, cl. 2 of the Constitution, which prohibits Congress from suspending *habeas* except in cases of invasion or rebellion.  The government's argument would eliminate release, thereby creating the same structural defect that *Boumediene* held infected the DTA.

This Court has jurisdiction over Parhat's *habeas* case, *see Rasul v. Bush*, 542 U.S. 466 (2004), and the writ runs to Guantánamo, where Parhat has the constitutional right to invoke it, *see Boumediene*, 128 S. Ct. at 2262; *Parhat*, 2008 WL 257697 at *15.  Judicial power to order release clearly is a *sine qua non* of *habeas*, for the absence of an express release provision in the DTA was an aspect of the Supreme Court's finding of its inadequacy as a substitute. *Boumediene*, 128 S. Ct. at 2271-72.  The release power is the first attribute of *habeas* considered in *Boumediene*'s adequate-substitution analysis.  *Boumediene* holds that this Court may order release of a Guantánamo detainee where necessary to relieve unlawful detention. *Id.* at 2271; *see Parhat*, 2008 WL 2576977 WL at *15 (there is "no question" of this Court's release power).

The Executive has no constitutional power over immigration matters, but only those powers delegated to it by the Congress.  Article II of the Constitution says nothing of immigration.  The Constitution confers immigration power on Congress alone.  U.S. CONST. art. I, § 8, cl. 4; *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (Congress has power over admission of aliens).  Thus the government's proposition is that Congress, by delegating immigration authority to the Executive, has barred Parhat's release under *habeas* altogether.  That proposition frames the question as a pure violation of the Suspension Clause analysis—for it necessarily implies that through immigration law, Congress may deprive petitioner of the benefit of the writ.

---

[14] The other immigration cases cited by the government, *see* Opp. at 13, are inapposite.  All involved petitioners detained pursuant to an immigration statute providing for the exclusion of certain classes of people.  In each case, petitioners challenged the validity of the immigration statute preventing their admission, and the Court's inquiry was limited to the statute's validity.  Parhat is not detained pursuant to an immigration statute, and does not challenge the legality of a statute preventing his admission.

The principle of constitutional avoidance requires that the immigration laws not be read, as the government would read them, to bar Parhat a release remedy. *See INS v. St. Cyr*, 533 U.S. 289, 300 (2001). Nor may they be read to leave an unreviewable discretion in the Executive to hold Parhat until it deems a transfer convenient. That would reverse the powers of the coordinate branches inherent in and essential to the design and structure of the Constitution: that the judicial branch has power, in a discrete case or controversy, to enter an effective remedy limiting overreaching by the Executive. *Boumediene*, 128 S. Ct. at 2277. An absolute statutory bar, and thus an unconstitutional suspension, is precisely what the government suggests. Without release into the United States under the unusual circumstances of this case, there is no release—or remedy—at all. That is why the government's construction here must be rejected, for inevitably it would force the Court to construe the statutes in question as a violation of the Suspension Clause. This principle is a narrow one; as a practical matter it will apply in few cases. A *habeas* judge has broad discretion in fashioning a remedy. For example, he may conclude, and in most Guantánamo detainee cases would conclude, that a detainee should not be released to the United States because a transfer to the detainee's home country, or some other country is safe and available. And this Court need not reach the question whether a *habeas* judge would have discretion to impose further detention in the United States (or at any rate, substantial limitations on liberty), because of a real and present danger, demonstrated by evidence, that release would threaten the public interest.[15] In this case, all of the evidence was reviewed by the Court of Appeals, and the entire record reviewed there—which remains the only record here—was held to support release. *Parhat*, 2008 WL 2576977 at *14. Thus, in this unusual case, the government's construction of the immigration laws as barring a release to the United States amounts to an

---

[15] *But see* cases cited in the Opening Brief at 20-21 applying the *Martinez/Zadvydas* rule that detained deportable aliens "must presumptively be released into American society after six months," *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 347-48 (2005) (recognizing the rule), even where the government raised issues concerning the alien's mental stability, risk to the community, and the protection of national security. *See also Zadvydas*, 533 U.S. at 691 ("[W]e have upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections.").

unlawful suspension, and must be rejected.

**F.    *Munaf* Does Not Bar Parhat's Requested Relief.**

*Munaf v. Geren*, 128 S. Ct. 2207 (2008), does not support the government's position, and in fact cuts against it. There the Supreme Court considered two consolidated cases (brought by petitioners Munaf and Omar) concerning the availability of *habeas* relief arising from the detention of U.S. citizens by an international coalition force operating in Iraq ("MNF–I"). *Id.* at 2213. Both petitioners voluntarily traveled to Iraq, were detained by MNF-I within the sovereign territory of Iraq as threats to Iraqi security, and were charged with committing serious crimes in Iraq. *Id.* at 2214.[16] Both conceded that, if they were not in MNF–I custody, Iraq would be free to arrest and prosecute them under Iraqi law. *Id.* at 2221. The Supreme Court concluded that *habeas* jurisdiction extends to U.S. citizens held overseas by U.S. forces operating as part of a multinational coalition, *id.* at 2218, and held that (i) the lower courts in *Munaf* had erred in dismissing the case for lack of jurisdiction, and (ii) the lower courts in *Omar* had erred in enjoining Omar's transfer to Iraqi custody for criminal proceedings under Iraqi law, *id.* at 2219.

Rather than reverse and remand, the Court addressed the merits of petitioners' requests for an injunction prohibiting the U.S. from transferring them to Iraqi custody for prosecution under Iraqi law, and "release"—but only to the extent that release would not result in "unlawful" transfer to Iraqi custody. 128 S. Ct. at 2220. The Court held that a U.S. court may not exercise *habeas* jurisdiction to enjoin U.S. forces from transferring individuals detained within a foreign sovereign's territory to that sovereign's government for criminal prosecution because doing so "would interfere with Iraq's sovereign right to 'punish offenses against its laws committed within its borders.'" *Id.* at 2220 (quoting *Wilson v. Girard*, 354 U. S. 524, 529 (1957)).

In so doing, the Court affirmed the bedrock principles that *habeas* is "at its core a remedy for unlawful executive detention," and that "[t]he typical remedy for such detention is, of course,

---

[16] Among other duties, MNF–I forces maintain custody of individuals who pose a threat to Iraq's security, even though Iraq is responsible for the arrest and imprisonment of those who violate its laws, because Iraq's prison facilities have been destroyed. 128 S. Ct. at 2213.

release." *Munaf*, 128 S. Ct. at 2222 (citations omitted).  The petitioners in *Munaf* were held by U.S. forces for the singular purpose of transfer into a foreign sovereign's criminal justice system. Munaf had been convicted in Iraqi criminal proceedings and Omar would have been the subject of ongoing criminal proceedings but for the injunction entered by the district court.  *Id.* at 2214-15.  The Court held that a *habeas* court could not order release from criminal prosecution by a foreign sovereign for crimes committed on its soil.  *Id.* at 2228.

None of that is here.  There is no issue of foreign sovereignty.  Parhat did not voluntarily transport himself to his place of imprisonment.  He has been charged with no crime.  And he seeks no such remedy.  He is held far from any war zone in a place to which, per *Boumediene*, *habeas* runs, and he is held by *this* sovereign, who took him there, and who, per *Boumediene*, is answerable to the decrees of this Court.  *Munaf* is a peculiar case, limited to its facts.  It does not bar relief here.

## G.    Geneva Conventions

The government also takes issue with Parhat's reliance on the Fourth Geneva Convention.  Opp. at 18-19 n.3.  Parhat does not rely on the Geneva Conventions as a source of rights authorizing his release into the United States, but as further support for his argument that the government cannot incarcerate him indefinitely while it searches, year after year, for another country willing to take him.  By means of the treaty, the government has undertaken to release him into the United States during its repatriation efforts and to tolerate his presence here while it works to facilitate his release.  A grant of that relief by this Court cannot be deemed inequitable.

## H.    The Path Forward

This Court, the Court of Appeals, and the Supreme Court of the United States have not been engaged in a six-year charade.  Article III demands a remedy, particularly in a case of *habeas corpus*.  After *Boumediene*, *Parhat*, and the government's abandonment of any attempt to improve its record, the remedy must be release.  We believe we have shown that the effort to rehash the "record" may be rejected on its face.  In the alternative, to the extent the Court deems any factual point material, we have shown that it must afford Parhat his rights of presence,

23

confrontation and traverse under 28 U.S.C. §§ 2241 and 2243, and the right to call witnesses and offer evidence thereunder.

When it ordered that, in the event the record did not materially change, the only appropriate remedy for Parhat was transfer or release, the Court of Appeals had studied intimately the government's entire record about this petitioner. It fully comprehended and understood his stateless dilemma when it wrote, *about this very habeas proceeding*, that "there is no question but that the court will have the power to order him released." 2008 WL 2576977 at *15. The path forward is for this Court and the litigants to implement that release.

We concede that there is a substantial practical reason why this Court may wish to implement the Circuit's ruling in stages. The government is authorized to transfer Parhat to an appropriate and safe third country. And nothing would prevent it from effecting a transfer by exercising its power to deport (again, to a proper country) even after Parhat were physically present. Accordingly, a practical balancing suggests that he should first be paroled here, under such reasonable conditions of release as the Court imposes. The Court may grant to the government a reasonable time to attempt to implement an appropriate transfer before final judgment is ordered in his *habeas* case. His presence here would, as a practical matter enhance chances of a transfer,[17] and the Court might appropriately impose conditions[18] to protect the government's legitimate interest in so doing. This must happen promptly. The urgency of relief is only underscored by this Court's recent determination that it may not intrude judicially into the conditions of confinement in Guantánamo.

## CONCLUSION

Accordingly, Parhat requests:

a.    That the Court immediately schedule a parole hearing, at which Parhat shall be present, to consider and implement terms of his temporary release, with the Court thereafter to

---

[17] Foreign governments would be able to interview him directly—a key component of the asylum process. Now they cannot. And Parhat might at least begin to be free himself from the Guantánamo taint.

[18] It would be reasonable for Parhat to report regularly to immigration officials.

schedule such further proceedings as may be appropriate or necessary in connection with the motion for judgment; and that,

      b.     Thereafter the Court schedule such hearings and proceedings as may be appropriate, at which Parhat shall be present, in order that final release may be implemented; and

      c.     In either case, Parhat be afforded a fair opportunity (i) to call upon the Government to prove with evidence any of the points made in the Opposition and deemed by this Court to be material, (ii) to be present for such proof, and (iii) to be afforded a fair opportunity to respond and refute all such efforts with evidence of his own, as set forth above; and

      d.     That he be granted such other and further relief as may be just and proper.

      Respectfully submitted,

DATED:  August 15, 2008

     _/s/ Susan Baker Manning_____
     Susan Baker Manning
     Catherine Murphy
     BINGHAM McCUTCHEN LLP
     2020 K Street, N.W.
     Washington, D.C.  20006
     Telephone:   (202) 373-6000
     Facsimile:    (202) 373-6001
     susan.manning@bingham.com
     catherine.murphy@bingham.com

     Sabin Willett
     Neil McGaraghan
     Rheba Rutkowski
     Jason S. Pinney
     BINGHAM McCUTCHEN LLP
     One Federal Street
     Boston, MA  02110-1726
     Telephone:   (617) 951-8000
     Facsimile:    (617) 951-8736
     sabin.willett@bingham.com
     neil.mcgaraghan@bingham.com
     rheba.rutkowski@bingham.com
     jason.pinney@bingham.com

     *Counsel for Huzaifa Parhat*

# EXHIBIT A

UNCLASSIFIED//FOUO

- 3(b)(2) **The Detainee fled along with others further into the mountains of Tora Bora with the initiation of the United States bombing campaign.**

  Yes, all the Turkistani people fled together (NOTE: The Uighurs often refer to themselves as "Turkistani").

- 3(b)(3) **The Detainee was captured in Pakistan fleeing Afghanistan with other Uighur and Arab personnel in 2001.**

  That is true.

**Tribunal President:** Is there anything else that you would like to add?

**Detainee:** Yes.

**Tribunal President:** Please, go ahead.

**Detainee:** They are saying that we are against the United States. Is that right?

**Tribunal President:** Yes.

**Detainee:** That is not true because from the time of our great grandparents centuries ago, we have never been against the United States and we do not want to be against the United States. We will not stand against the United States because we don't have anything to do with the United States. Also, I can represent for 25 million Uighur people by saying that we will not do anything against the United States. We are willing to be united with the United States. I think that the United States understands the Uighur people much better than other people.

The reason we went into Pakistan was because in China there is torture and too much pressure on the Uighur people. Lately they have laid off the Uighur people from their jobs. Recently, they laid off a lot of Uighur people and filled all the jobs with immigrant Chinese.

The Uighurs have families and need support to eat and if we don't do something, then how are we going to live? If they (fellow Uighurs) wanted to go and farm they would have to pay a lot of taxes. If they can't pay the taxes, they would take away their property.

So many people are without an education because they (apparently the Chinese) are asking too much money for an education. Now, there are a great number of young people on the streets with no education. The Uighur people only have the privilege of having two children. If a female gets pregnant with a third child, the government will forcibly take the kid through abortion.

ISN# 320
Enclosure (3)
Page 3 of 12

UNCLASSIFIED//FOUO

APP 021

UNCLASSIFIED//~~FOUO~~

A:   No, I just stayed there until the bombing started.

Q:   Did the Taliban people ever approach you and ask you to fight with them against their enemies?

A:   No.  In four months we built a house at the camp and we didn't see any other people there.

Q:   Was it only Uighur people you saw everyday when you were there?

A:   Yes.

Q:   Earlier when we were talking about the weapons at the camp, you said that you only trained on two different kinds of weapons.  Which kinds were those?

A:   Kalashnikov and a pistol.

Q:   During your training did your instructors or your camp leaders ever talk to you about fighting Americans?

A:   No.

Q:   There is an important gentleman in the Uighur community by the name of Hassan Maksum; do you know who this man is?

A:   Yes.  I saw that person.

Q:   Who is he, please?

A:   He is a Turkistani person.

Q:   Is he the leader of your Uighur group?

A:   Yes.

Q:   Would he give the Uighurs in the camp guidance and instruction on what to do?

A:   Maybe he would do that and there was another person and he was the leader of the camp guiding all the people.  I saw this person twice at the camp.  I forgot the leader name.

Q:   Would that be Mr. Abdul Haq?

A:   Yes.

Q:   We heard his name from the other Uighur people.

ISN# 320
Enclosure (3)
Page 6 of 12

UNCLASSIFIED//~~FOUO~~

APP 024

UNCLASSIFIED//~~FOUO~~

A:    I told that to the interrogators.

Q:    There is a concern that Mr. Hassan Maksum may have relationships with al Qaida people. Do you know any thing about this?

A:    I don't think so. The people in Turkistan will not associate with al Qaida.

Q:    We noticed that during these Tribunals that some Detainees come to us in different colors. We have orange, beige and white. You are in beige. What is the significance of you being in beige?.

A:    That means level one.

Q:    Is that for good behavior or for some other reason?

A:    Yes, I believe so. If you do not have good behavior they will not put you in level one.

Q:    We know you don't want to be here, but, given that, how have you been treated at the camp since you have been here?

A:    What, do you mean by soldiers?

Q:    Yes.

A:    OK. Good.

Q:    Besides the Chinese people, do the Uighurs have any other people they consider their enemy?

A:    No.

Q:    If you were to be released, where would you want to go and what would you want to do?

A:    Not China. If the US government sends me to another country, I'll go.

Q:    Very good. Thank you very much. I don't have anything else.

**Tribunal Members' Questions to Detainee**

Q:    After the bombing in the mountains when you fled that first night, who was bringing you food for the next couple of days?

A:    There were two guys and they brought us food.

ISN# 320
Enclosure (3)
Page 7 of 12

UNCLASSIFIED//~~FOUO~~

APP 025

UNCLASSIFIED//~~FOUO~~

A:   We crossed into Pakistan and there were tribal people there and they took us to their houses and they killed a sheep and cooked the meat and we ate. At night, they told us that we were going to travel now. We said OK and they took us to one mosque. On our way to the mosque, they provided us tea and bread. We sat down and had tea and three people walked into the mosque, looked around at the people and walked out. They repeated this three or four times. Then they came into to the mosque and said we need to go in groups of ten. They took us to the truck and took us directly to the Pakistani prison.

Q:   Were there Arabs in this group when you were captured?

A:   Yes.

Q:   How did that come to be?

A:   I told you earlier, when we traveled we followed them and we were captured together.

Q:   There were eighteen Uighurs and how many Arabs?

A:   I don't know the exact number maybe, 60 or 70 people.

Q:   Since you've been here at Guantanamo Bay, has the Chinese delegation visited you?

A:   Yes.

Q:   How did they treat you?

A:   They did not treat me good.

Q:   Did they offer you a safe return to China?

A:   (They said) when you go home you have family and we don't think you will be in prison that long. The most is three or four years and then you can live with your family. If they are lying, I will go back to jail for more years.

Q:   Have you ever been in touch with your family since you have been here?

A:   No.

ISN# 320
Enclosure (3)
Page 11 of 12

APP 029



UNCLASSIFIED - FOUO

Washington Post
October 29, 2004
Pg. 14

# Chinese Muslims To Be Freed From Guantanamo

Defense officials have authorized the release of a majority of the 22 Chinese Muslims being held at the military prison at Guantanamo Bay, Cuba, the State Department said yesterday.

Spokesman Richard Boucher said the Bush administration is trying to relocate the Uighurs, who are from northwest China, to a third country because they do not wish to resettle in China. Boucher said it is unclear whether they would be eligible for asylum in the United States.

The State Department has contacted a number of countries about the resettlement of the Uighurs. One country, which an official would not identify, has indicated interest.

Amnesty International has said the Uighurs should not be returned to China because they could face torture and possible execution.

Some Uighurs support independence from China for their province, Xinjiang. China says the independence fighters are tied to al Qaeda.

APP 106

UNCLASSIFIED / FOUO                    Supplement Exhibit 3