**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ) | |
| ) | **Misc. No. 08-442 (TFH)** |
| **IN RE:** ) | |
| **GUANTANAMO BAY** ) | **Civil Action Nos.** |
| **DETAINEE LITIGATION** ) | **06-CV-1690, 08-1085, 08-1207, 08-1360** |
| ) | |
| ) | |
| ) | |

**RESPONDENTS' MOTION TO RECONSIDER
APPLICATION OF STANDARD HABEAS PROTECTIVE ORDER
TO THESE CASES AND REQUEST FOR ENTRY OF
PROPOSED PROTECTIVE ORDER PERTAINING TO
TOP SECRET / SENSITIVE COMPARTMENTED INFORMATION;
RESPONSE TO MOTION FOR ORDER DIRECTING FILING OF
SUPPLEMENTAL STATUS REPORT IN *Khan v. Bush*, No. 06-CV-1690**

Respondents hereby move for reconsideration of one aspect of the orders entered by the

Court on July 29, 2008, and August 15, 2008, in the above-captioned cases. Those orders

applied in these cases, "pending further order of the Court," the protective order and counsel

access regime applicable in most other Guantanamo Bay habeas cases.[1]  While petitioners are

currently held in Department of Defense ("DoD") custody at Guantanamo Bay, by virtue of

petitioners' prior detention in the custody of the Central Intelligence Agency as part of a still

highly classified program, any protective order and counsel access regime in these cases must

appropriately address the management and handling of information of a special classification

level and sensitivity, *i.e.*, TOP SECRET/ SENSITIVE COMPARTMENTED INFORMATION

---

[1] *See In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. Nov. 8, 2004)
("Amended Protective Order"); Order Supplementing and Amending Filing Procedures
Contained in November 8, 2004 Amended Protective Order in *In re Guantanamo Detainee
Cases*, No. 02-CV-0299, *et al.* (D.D.C. Dec. 13, 2004); Order Addressing Designation
Procedures for "Protected Information" in *In re Guantanamo Detainee Cases*, No. 02-CV-0299,
*et al.* (D.D.C. Nov. 10, 2004).

("TS/SCI"). As explained below, the *habeas* protective order regime typically applicable in other Guantanamo cases is not appropriate with respect to the management and handling of such information. While the Court previously required the parties to confer regarding "a separate proposed protective order for use in cases involving 'high-value detainees,'" *see* Order of July 11, 2008, ¶ 2.A (Misc. No. 08-0442), and respondents suggested briefing on the issue of such a separate order, *see* Joint Report in Response to Court's July 11, 2008 Scheduling Order, ¶ A.1 (Misc. No. 08-0442), the Court has not had the opportunity to receive full briefing on and consider issues related to the necessity for such an order. Reconsideration of the entry of the standard *habeas* protective order in these cases, therefore, is warranted, and the Court should enter the TS/SCI Protective Order regime proposed by respondents herein, which incorporates much of the current protective order regime, but appropriately addresses needed TS/SCI information management.[2]

---

[2] This filing also incorporates respondents' response to petitioner Khan's Motion for Order Directing Court Security Office to File Supplemental Status Report in *Khan v. Bush*, No. 06-CV-1690 (filed Aug. 4, 2008). *See infra* note 22.

Counsel for respondents have attempted to confer counsel for petitioners in the above-captioned cases. Counsel in *Khan*, No. 06-CV-1690, have indicated that they oppose respondents' requested relief for reasons including those stated by petitioners in the Joint Report in Response to Court's July 11, 2008 Scheduling Order, ¶ A.2.b (Misc. No. 08-0442). Other counsel have not responded and presumably oppose respondents' requested relief.

## BACKGROUND

Petitioners in these cases (Majid Khan, Abd Al-Rahim Hussain Mohammed Al-Nashiri,[3] and Muhammad Husayn (a.k.a. Abu Zubaydah)) are among fourteen individuals who in September 2006 were transferred to Guantanamo to the custody of the Department of Defense ("DoD") from the custody of the Central Intelligence Agency ("CIA").[4]  The CIA had previously held petitioners as part of a special, limited program operated by that agency to capture; detain (in secret, off-shore facilities); and interrogate key terrorist leaders and operatives in order to help prevent terrorist attacks.  *See* President George W. Bush, Speech: President Discusses Creation of Military Commissions to Try Suspected Terrorists (September 6, 2006) (copy attached as Exhibit 2) (acknowledging CIA program; discussing certain petitioners' involvement in program);[5] *see also* Declaration of Marilyn A. Dorn (Oct. 26, 2006) ¶¶ 7, 10, 16 ("Dorn Decl.") (attached as Exhibit 1) (discussing CIA program).[6]  The importance of the program to national security interests cannot be overstated.  Information obtained through the program has provided the United States with one of the most useful tools in combating terrorist threats to the national

---

[3] Petitioner Al-Nashiri has had two *habeas* cases brought on his behalf by different counsel, *Al Nashir v. Gates*, No. 08-CV-1085, and *Al-Nashiri v. Bush*, No. 08-CV-1207.  All three petitioners in the above-captioned cases also have cases in the Court of Appeals seeking that Court's review under the Detainee Treatment Act of their designation as enemy combatants.

[4] After their transfer to DoD custody, petitioners were found to be enemy combatants by Combatant Status Review Tribunals.  *See* U.S. Department of Defense, Combatant Status Review Tribunals / Administrative Review Boards, http://www.defenselink.mil/news/Combatant_Tribunals.html (last visited Aug. 16, 2008).

[5] The text of the President's speech is available at <<http://www.whitehouse.gov/ news/releases/2006/09/20060906-3.html>> .

[6] The Dorn Declaration was originally filed in *Khan v. Bush*, No. 06-CV-1690 (RBW) (D.D.C.).

security.  Dorn Decl. ¶ 11.  It has shed light on probable targets and likely methods for attacks on

the United States, has led to the disruption of terrorist plots against the United States and its

allies, and has gathered information that has played a role in the capture and questioning of

senior Al Qaeda operatives.  *Id*.  Many aspects of the terrorist detainee program remain classified

as TS/SCI.  *Id*.  For example, information such as where detainees have been held, the details of

their confinement, interrogation methods, and other operational details constitute or involve

TS/SCI information.  *Id*.

Under Executive Order 12958, as amended,[7] the anticipated severity of the damage to

national security resulting from disclosure determines which of three classification levels is

applied to information.  Thus, if an unauthorized disclosure of information reasonably could be

expected to cause damage to the national security, that information may be classified as

CONFIDENTIAL; serious damage may be classified as SECRET; and exceptionally grave

damage may be classified as TOP SECRET.  *Id.* § 1.2.  Section 4.3 of Executive Order 12958

further provides that specified officials may create special access programs upon a finding that

the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for

determining eligibility for access applicable to information classified at the same level are not

deemed sufficient to protect the information from unauthorized disclosure.  These special access

programs relating to intelligence are called Sensitive Compartmented Information, or SCI,

programs.  *See* Dorn Decl. ¶ 9.  As noted above, many aspects of the terrorist detainee program

are classified at the TS//SCI level.

---

[7] *See* Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).

In light of the prevalence of TS/SCI information in petitioners' cases, respondents previously suggested the need for a special protective order and counsel access regime in these cases tailored for the handling of such information.  The Court then required the parties to confer regarding such "a separate proposed protective order for use in cases involving 'high-value detainees.'"  *See* Order of July 11, 2008, ¶ 2.A (Misc. No. 08-0442).  In the parties' July 21, 2008 Joint Report in Response to Court's July 11, 2008 Scheduling Order, ¶ A, respondents noted that the parties had been unable to agree to a separate protective order, that petitioners had suggested briefing on the matter, and that respondents were amenable to such briefing.  *Id.*  Petitioners in the Joint Order urged entry of the standard *habeas* protective order.  *Id.*

Subsequently, without briefing on the matter, the Court made the standard *habeas* protective order, which had never before been made applicable to cases involving high-value detainees and the prevalence of TS/SCI information, applicable in all the cases being coordinated by the Court, "pending further order of the Court."  *See* Order (Jul. 29, 2008) in Misc. No. 08-442.  The Court thereafter also made the standard *habeas* protective order applicable in the subsequently filed case on behalf of petitioner Husayn, No. 08-CV-1360.  *See* Minute Order (Aug. 15, 2008) in Misc. No. 08-442 and No. 08-CV-1360.

## ARGUMENT

A court should reconsider an interlocutory order where "justice requires" it, in the sense that reconsideration may be appropriate when the court has "'patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court.'"  *See Singh v. George*

*Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (Lamberth, J.) (citing *Cobell v.*

*Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)). "Errors of apprehension may include a Court's

failure to consider 'controlling decisions or data that might reasonably be expected to alter the

conclusion reached by the court.'" *Id.* (citing *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d

Cir. 1995)). "These considerations leave a great deal of room for the court's discretion and,

accordingly, the 'as justice requires' standard amounts to determining 'whether reconsideration is

necessary under the relevant circumstances.'" *Williams v. Savage*, No. 07-CV-0583 (RMU), __

F. Supp. 2d __, 2008 WL 2977585 at *7 (D.D.C. Aug. 5, 2008) (quoting *Cobell*, 224 F.R.D. at

272).

  In this case, reconsideration of the Court's decision to enter the standard *habeas*

protective order in these cases involving high-value or TS/SCI detainees[8] is appropriate given

that the Court appears to have taken such action without the benefit of a full explanation of the

ramifications of such action and of the absolute need for a special protective order and counsel

access regime tailored to the management and handling of TS/SCI information. Indeed, as

explained below, the Court may have based its action on a misapprehension of the effect of

application of the standard protective order in these cases, thus warranting reconsideration of the

matter. The Court entered the standard *habeas* protective order, which had never before been

made applicable to cases involving high-value detainees and the prevalence of TS/SCI

information, "pending further order of the Court." *See* Order (Jul. 29, 2008) in Misc. No. 08-

442. Respondents respectfully note the possibility that the Court's reference to a "further order"

---

[8] Judge Sullivan, in a status conference in *Al-Shibh v. Bush*, No. 06-CV-1725 (EGS),
directed respondents to use the term, "TS/SCI detainees," instead of "high-value detainees."

was intended to signify that a further order on this issue would be forthcoming.  In any event, a

"further order of the Court" is appropriate now for the reasons explained below, and the Court

should enter forthwith the TS/SCI Protective Order regime proposed by respondents herein,

which incorporates much of the current protective order regime, but appropriately addresses

needed TS/SCI information management.

> **I.    A REVISED PROTECTIVE ORDER APPROPRIATE FOR THE
> MANAGEMENT AND HANDLING OF TS/SCI INFORMATION IS
> NECESSARY IN THESE CASES.**

Because petitioners in these cases are in possession of information classified as TS/SCI

by virtue of their prior detention in the CIA program, a protective order regime appropriate for

the management and handling of TS/SCI information is necessary in these cases.  Petitioners'

counsel suggestion that the protective order and counsel access regime normally applicable in

Guantanamo *habeas* cases not involving detainees with TS/SCI information is not appropriate.

The standard *habeas* protective order and counsel access regime is improper and unsuitable given

the unique circumstances of petitioners and their prior CIA custody.  As explained below, the

protective order regime applicable in many other Guantanamo cases contemplates issues

associated with the handling of information classified no higher than SECRET, while counsel

access in these cases require appropriate provisions and protections to govern information

potentially classified at the TS/SCI level, by virtue of petitioners' prior detention and

involvement in the CIA's still highly classified terrorist detainee program.

As explained *supra*, because of petitioners' involvement in the CIA program, it is likely

they possess, and will be able to transmit to counsel, information that is classified at the TOP

SECRET/SCI level, such as detention locations and other operational details, or information that

would warrant equivalent treatment or other special handling while petitioners remain in United States' custody. *See* Dorn Decl. ¶¶ 8, 10, 16. For example, as explained in the Dorn Declaration, improper disclosure of operational details about the program, such as the locations of CIA detention facilities, would put United States' allies at risk of terrorist retaliation and betray relationships that are built on trust and are vital to efforts against terrorism. *See id.* ¶ 12; *see also* Declaration of Wendy M. Hilton (Mar. 28, 2006) ¶¶ 12-20 (attached as Exhibit 3) ("Hilton Decl.").[9] Improper disclosure of other operational details, such as interrogation methods, could also enable terrorist organizations and operatives to adapt their training to counter such methods, thereby obstructing the CIA's ability to obtain vital intelligence that could disrupt future planned terrorist attacks. Dorn Decl. ¶ 13; Hilton Decl. ¶¶ 19-21. The appropriate and adequate protection of information that petitioners may possess and may transmit to counsel, therefore, is imperative.

The protective order and counsel access regime entered in many other Guantanamo cases not involving detainees who had previously been held in the CIA program, however, is patently inadequate to protect the unique national security-related interests in this case. For example, the standard counsel access regime applicable in various other cases contemplates that counsel representing a detainee hold or obtain only a SECRET-level clearance. *See* Amended Protective Order, Exhibit A, Revised Procedures for Counsel Access to Detainees ("Standard Access

---

[9] The Hilton Declaration was originally filed in petitioner Khan's Detainee Treatment Act case, *Khan v. Gates*, No. 07-1324 (D.C. Cir.), in opposition to a motion to unseal TS/SCI filings in that Court.

Procedures") § III.A.1.[10]  Such a clearance would not permit counsel access to information

classified or treated as TS/SCI, and an appropriate counsel access regime should require the

appropriate clearance level.  The counsel access regime further contemplates mailing of

communications to counsel from a detainee or of notes of a counsel's meeting with a detainee

from Guantanamo to the secure workspace facility for *habeas* counsel called for under the

protective order.[11]  *See* Standard Access Procedures §§ IV.B.3; VI.B; Amended Protective Order

¶ 20.  While information classified at the SECRET-level can be sent through the mail, via

certified mail, materials classified or treated as TS/SCI, cannot.  *See* Dorn Decl. ¶ 15; 32 C.F.R.

§ 2001.45(c), (d) (DoD regulation regarding handling of classified information).  The standard

*habeas* protective order regime also provides a presumed "need to know" between counsel in

related Guantanamo detainee cases pending before the Court, *see* Amended Protective Order

¶ 29, which, as discussed in more detail *infra*, is not appropriate in the unique context of this

case, which involves TS/SCI information.

   As the Supreme Court stated in *Boumediene*, "the Government [in the Guantanamo

*habeas* cases] has a legitimate interest in protecting sources and methods of intelligence

gathering; and we expect that the District Court will use its discretion to accommodate this

interest to the greatest extent possible."  *Boumediene v. Bush*, 128 S. Ct. 2229, 2276 (2008).[12]

---

   [10] A copy of the Amended Protective Order is attached hereto as Exhibit 4, for the Court's convenience.

   [11] *See* Standard Access Procedures §§ IV.A.6 (counsel required to treat information learned from a detainee, "including any oral and written communications with a detainee," as classified pending classification review by a DoD Privilege Team).

   [12] The *Boumediene* opinion is not the first instance in which the Supreme Court has recognized the responsibility of the Executive to safeguard and protect classified and other

Here, "[a] protective order that allows individuals without the necessary security clearances access to TS/SCI information, or permits the use of procedures not appropriate for TS/SCI information, cannot possibly begin to adequately protect such information from unauthorized disclosure." Dorn Decl. ¶ 15. Accordingly, the Court should not continue in these cases the standard *habeas* protective order regime, which fails to address classification-level concerns such as those raised above. Reconsideration is warranted, and a revised protective order regime, tailored for TS/SCI information issues, is required.

Indeed, in recognition of the special classification-level issues presented in these cases, special procedures to deal with the management and handling of TS/SCI information have been used in cases involving TS/SCI detainees, including several petitioners, in litigation under the Detainee Treatment Act ("DTA") in the Court of Appeals. *See* Stipulation to Immediate Entry of *Khan* Protective Order (filed in *Al-Nashiri v. Gates*, No. 08-1007 (D.C. Cir.)) & Ex. A, B (copy attached as Exhibit 5). The procedures, *inter alia*, require an appropriate (TS/SCI) security clearance and include requirements for proper handling and transmission of TS/SCI information. *Id.* Ex. A ("DTA HVD Protective Order"). The procedures also include, consistent with the standard protective order regime in DTA cases in the Court of Appeals, monitoring and possible

---

national security information adequately and the responsibility of courts to defer to protective measures the Executive deems appropriate. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 527-30 (1988) (authority to control access to classified information is constitutionally vested in the President as head of the Executive Branch and Commander in Chief and should not be intruded upon by the courts "[f]or reasons . . . too obvious to call for enlarged discussion"); *see also Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation.").

redaction by a DoD Privilege Team of legal mail going from petitioner's counsel to petitioner in the case.  DTA HVD Protective Order ¶ 4.B.

Certain petitioners in these cases previously argued that the standard *habeas* protective order is sufficient for use in these cases because other counsel were permitted to submit TS/SCI information to the Court in another Guantanamo *habeas* case, *Zalita v. Bush*, No. 05-CV-1220 (RMU) (D.D.C.), in which only the standard *habeas* protective order had been entered.  *See* Joint Report in Response to Court's July 11, 2008 Scheduling Order at 4-5 (filed Jul. 21, 2008 in Misc. No. 08-0442).  That situation does not support entry of the standard *habeas* protective order in these cases, however.  In *Zalita* respondents authorized TS/SCI-cleared petitioner's counsel to share information with the District Court that counsel had previously learned through access to a TS/SCI detainee in the context of a DTA case in the Court of Appeals – access that had been permitted pursuant to and governed by the special, TS/SCI access procedures applicable in the DTA litigation context.[13]  Thus, *Zalita* did not involve initial access by *habeas* counsel to a TS/SCI detainee or TS/SCI information under the standard *habeas* protective order regime or the transmission of TS/SCI information from Guantanamo to D.C. under the standard *habeas* protective order regime.  The *Zalita* situation simply does not support application in this case of a *habeas* protective order regime that, as explained above, is demonstrably inappropriate for the management and handling (including transmission) of TS/SCI information.  A revised protective order regime, tailored for TS/SCI information issues, is required in these cases.

---

[13] The DTA protective order did not permit counsel in the DTA case to disclose TS/SCI information learned in that case to any other court or in any other case, *see* DTA HVD Protective Order ¶ 5.H; thus, *habeas* counsel sought the government's consent to a disclosure to the District Court in the *Zalita* case.  The government consented to the disclosure to the District Court.

II.     **THE COURT SHOULD ADOPT THE TS/SCI PROTECTIVE ORDER REGIME PROPOSED HEREIN.**

Respondents submit herewith a protective order and counsel access regime that addresses the special needs and interests presented by the handling and management of TS/SCI information, and the Court should enter it in these cases in place of the standard *habeas* protective order.[14]  *See* Proposed TS/SCI Protective Order and Counsel Access Regime, Ex. A ("Guantanamo Procedure Guide For Counsel Access in Detainee Habeas Cases Involving TS/SCI Material") (attached).  As reflected in the proposed order, this regime incorporates the standard *habeas* protective order regime, with two exceptions.[15]  First, the Counsel Access Procedures appended as Exhibit A to the standard protective order are replaced with revised counsel access procedures tailored to account for the handling, transmission, and management of TS/SCI information ("TS/SCI Access Procedures").  *See* Proposed TS/SCI Protective Order ¶ 2 & Ex. A.  Second, the TS/SCI Protective Order revises the "need to know" provisions of the standard protective order.  Each of these changes are discussed in greater detail below.

The primary difference between the proposed TS/SCI Protective Order and the standard Amended Protective Order is that the standard counsel access procedures appended as Exhibit A to the Amended Protective Order ("Standard Access Procedures") are replaced with revised counsel access procedures, *i.e.*, the "Guantanamo Procedure Guide For Counsel Access in

---

[14] Respondents have also proposed entry of the same Proposed TS/SCI Protective Order in a high-value or TS/SCI detainee case pending before Judge Sullivan.  *See* Resps' Mem. in Support of Proposed Protective Order Pertaining to Top Secret / Sensitive Compartmented Information (filed Aug. 5, 2008 in *Al-Shibh v. Bush*, No. 06-CV-1725 (EGS)) (dkt. no. 36).

[15] Pursuant to the request of the Court Security Officer responsible for the Guantanamo *habeas* cases, the proposed order also revises the list of CSOs assigned to these cases.  *See* Proposed TS/SCI Protective Order ¶ 3.

Detainee Habeas Cases Involving TS/SCI Material," tailored for counsel's receipt from petitioner and handling of information potentially classified as TS/SCI, *see* Proposed TS/SCI Protective Order, Ex. A ("TS/SCI Access Procedures").  Like the Standard Access Procedures, the TS/SCI Access Procedures require, for access to a detainee, an appropriate clearance level (TS/SCI) and verification of counsel's representation of the detainee.[16]  *Compare* Standard Access Procedures § III.A, C *with* TS/SCI Access Procedures ¶ 1.1.  Further, under both the standard and TS/SCI Access Procedures, petitioner's counsel are required to comply with the procedures unless they are revised by the Court.  *Compare* Standard Access Procedures § III.B *with* TS/SCI Access Procedures ¶ 1.2.   Each set of procedures addresses counsel-detainee visit logistics.  *Compare* Standard Access Procedures § III.D *with* TS/SCI Access Procedures ¶ 2.

Also, like the standard access regime, the TS/SCI regime provides for a system of privileged legal mail between counsel and represented detainee.  Under both regimes, legal mail sent to a detainee is subject to contraband inspection by a DoD Privilege Team, which cannot disclose the contents of such communications except as governed by the access procedures. *Compare* Standard Access Procedures §§ IV.A, VII.A *with* TS/SCI Access Procedures ¶¶ 3.1, 6.6, 6.7.  Likewise, both regimes similarly restrict the content of legal mail sent to a detainee, prohibiting, unless "directly related" to the litigation, information relating to military, intelligence, security, or law enforcement operations; concerning current political events in any country; and information relating to security procedures at Guantánamo (including names of United States government personnel and the layout of camp facilities) and the status of other

---

[16] At least one counsel for each of the three petitioners in these cases meets these requirements.

detainees.  *Compare* Standard Access Procedures §§ II.E, IV.A.7, V.B *with* TS/SCI Access

Procedures ¶ 3.1.[17]  Both  access regimes also reasonably require that non-legal mail and

messages to or from a detainee not be sent through privileged legal mail channels, but rather

through normal mail channels at Guantanamo.  *Compare* Standard Access Procedures §§ IV.A.5,

IV.B.5, VI.C *with* TS/SCI Access Procedures ¶¶ 3.2, 3.6.  Also, both regimes permit counsel to

bring legal mail materials and, if approved by Guantanamo, non-legal mail materials into

meetings with detainees.  *Compare* Standard Access Procedures § V.A *with* TS/SCI Access

Procedures ¶ 4.

Both regimes also make provision for methods and modes of transmission of

presumptively classified counsel notes and materials from counsel-detainee meetings to the

*habeas* counsel secure facility in the Washington, D.C., area.  While, as discussed *supra*, the

standard Access Procedures permit mailing of such materials (consistent with the handling of

information classified at the SECRET level), the TS/SCI Access Procedures utilize privileged

non-mail means of transmission appropriate to TS/SCI material.  *Compare* Standard Access

Procedures § VI *with* TS/SCI Access Procedures ¶¶ 1.4, 5.

---

[17] The TS/SCI Access Procedures additionally prohibit from legal mail channels media and advocacy publications not directly related to the litigation, which, like the other banned information, have the potential to unnecessarily incite unrest and disturbance among the detainee population.  *See* TS/SCI Access Procedures ¶ 3.1.  This prohibition is contained in the protective order entered in petitioners' DTA litigation in the Court of Appeals.  *See* DTA HVD Protective Order ¶ 3.I(iii)(d).  The DTA protective order in the Court of Appeals also permits the DoD Privilege Team to redact the content of legal mail sent to a detainee in order to prevent the injection of inappropriate information into the detainee population.  *Id.* ¶ 4; *see Bismullah v. Gates*, 501 F.3d 178, 188-89 (D.C. Cir. 2007), judgment vacated in light of *Boumediene*, 128 S. Ct. 2960 (2008).  In light of petitioner's counsel's objections to such redaction provisions, and in order to facilitate the entry of a TS/SCI Protective Order in this Court, the redaction provision has been omitted from the TS/SCI Access Procedures proposed by respondents to the Court.

Both regimes likewise provide for classification review of presumptively classified materials (involving information provided by a detainee to counsel) by the DoD Privilege Team, at counsel's request.  *Compare* Standard Access Procedures §§ VII *with* TS/SCI Access Procedures ¶ 6.[18]  And both regimes similarly impose a nondisclosure obligation upon the DoD Privilege Team,[19] with an exception for information threatening national security or reflecting imminent violence – information that petitioner's counsel is likewise obligated to report. *Compare* Standard Access Procedures § VII.D, E, F; § IX.C *with* TS/SCI Access Procedures ¶¶ 6.6-6.8.

Accordingly, the TS/SCI Access Procedures, tailored to account for the handling, transmission, and management of TS/SCI information, are a necessary and appropriate replacement for the Counsel Access Procedures appended as Exhibit A to the standard Amended Protective Order.

_____

[18] The TS/SCI Access Procedures permit the DoD Privilege Team, with petitioner's counsel's consent, to consult with individuals in appropriate federal agencies for the purpose of identifying classified information and appropriately marking materials submitted by counsel for classification review.  *See* TS/SCI Access Procedures ¶ 6.2.1.  This reflects the reality of limited expertise within the government as to classification issues related to the CIA detention program. Similarly, the Privilege Team can disclose disputes with counsel regarding legal mail if court intervention is sought by counsel to permit injection of inappropriate legal mail into the detainee population.  *Id.* ¶ 6.6.  A similar provision is contained in the protective order entered in petitioner's DTA litigation in the Court of Appeals.  *See* Petr's Resp. Ex. C, ¶ 4.E.

[19] The DoD Privilege Team is permitted to disclose information to a Special Litigation Team that represents the Privilege Team as necessary in court.  *See* TS/SCI Access Procedures ¶ 6.6.  Of course, the Special Litigation Team operates under nondisclosure obligations similar to those of the Privilege Team.  *Id.*  Under the standard *habeas* protective order regime, disclosures to the Special Litigation Team are similarly permitted under orders entered by Magistrate Judge Kay creating the Special Litigation Team.  *See*, *e.g.*, Order (Feb. 2, 2006), *Salahi v Bush*, 05-CV-569 (JR) (dkt. no. 49).  *See also* DTA HVD Protective Order ¶ 4.F-J (DTA Protective Order similarly permitting disclosures to Special Litigation Team representing Privilege Team).

The TS/SCI Protective Order proposed by respondents also appropriately revises the "need to know" provisions of the standard Amended Protective Order. *See* Proposed TS/SCI Protective Order ¶ 2. The standard Amended Protective Order regime provides for a presumed "need to know" between counsel in related Guantanamo detainee cases pending before the Court, *see* Amended Protective Order ¶ 29, but this is not appropriate in the unique context of these cases, which involve TS/SCI information. Such a presumed "need to know" is not only inappropriate generally, *see, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 527-30 (1988) (authority to control access to classified information is constitutionally vested in the President as head of the Executive Branch and Commander in Chief and should not be intruded upon by the courts "[f]or reasons . . . too obvious to call for enlarged discussion"), it is especially inappropriate in these cases, given the potential that information involved in the cases could require classification or treatment at a TS/SCI level – based upon the possibility of "exceptionally grave damage" to national security and, beyond that, the determination that the information is so exceptionally sensitive that normal criteria for access and handling of even TOP SECRET information are not sufficient. *See* Dorn Decl. ¶¶ 8-10. Such a presumption, and placement of the burden upon the government to overcome the presumption in any particular situation (of which the government will not have advance, if any, notice), is improper in this unique context.

Indeed, for Sensitive Compartmented Information, for which the normal criteria for access and handling of even TOP SECRET information are not sufficient, the need-to-know requirement is strictly enforced. A compartment is created only upon a determination that the normal criteria for classification are insufficient to protect the information. *See* Executive Order 12958, as amended, § 4.3(a). Even for government employees, holders of security clearances are

not provided with access to compartmented information unless absolutely necessary.  And even a person cleared into a compartment may not be given access to all the information in that compartment; they are given access to information only as they have a legitimate need to know it. Thus, a presumed need-to-know all TS/SCI information that may be learned by cleared counsel in various TS/SCI cases, such that such information may be shared between those counsel, is inappropriate.  A presumed need-to-know hinders, indeed prevents, the protection of especially sensitive information, as there is no way to know what information has been shared; thus, any hope of addressing protection of that information would only come after an inappropriate disclosure has been made and somehow discovered.  Such a system thus risks exactly what a sensitive compartment seeks to avoid – the unauthorized disclosure of particularly sensitive information to individuals with no need to know that information.

While there certainly may be information that could be shared between cleared counsel, that determination should be made on a case-by-case basis.[20]  The elimination of the presumed need-to-know in the TS/SCI Protective Order does not prevent counsel seeking, even in a privileged fashion, requests for authorization from appropriate officials to disclose TS/SCI information to appropriately cleared counsel in other TS/SCI cases or to receive such information from them.[21]  In the unique and especially sensitive circumstances of this case, involving TS/SCI

_____

[20] Indeed, several requests to share information between cleared petitioners' counsel in the DTA context have been considered and consented to by the government.

[21] Petitioners' argument that a presumed need-to-know is necessary so as to permit assessment of the credibility or circumstances of statements made by detainees that the government may use in its habeas cases, *see* Joint Report in Response to Court's July 11, 2008 Scheduling Order at 6 (filed Jul. 21, 2008 in Misc. No. 08-0442), is premature since the government has yet to file final factual returns in the cases.  A presumed need-to-know, in the special circumstances of this case involving TS/SCI information, should not be imposed

information, for which the normal criteria for access and handling of even TOP SECRET

information are not sufficient, such a regime, whereby need-to-know is not presumed, but rather

permission to share is sought on a case-by-case basis, is necessary and appropriate. *See*

*Boumediene*, 128 S. Ct. at 2276 ("[T]he Government [in the Guantanamo *habeas* cases] has a

legitimate interest in protecting sources and methods of intelligence gathering; and we expect

that the District Court will use its discretion to accommodate this interest to the greatest extent

possible."); *see also supra* note 12.

## CONCLUSION

For the foregoing reasons, the Court should enter the TS/SCI Protective Order submitted

by respondents herewith.[22]  The proposed order is attached.

---

prematurely or based on speculation, if ever.

[22] Entry of the TS/SCI Protective Order submitted by respondents would render moot petitioner Khan's Motion for Order Directing Court Security Office to File Supplemental Status Report in *Khan v. Bush*, No. 06-CV-1690 (filed Aug. 4, 2008).  In that motion, petitioner Khan seeks an order directing the filing of a supplemental status report petitioner previously lodged with the Court Security Officer in the *Khan* case, claiming that the government has previously objected to this Court having access to the supplemental status report.  The government, however, has never objected to this Court having access through appropriate means to presumptively TS/SCI information from a petitioner.  (For example, the government permitted such information to be provided to the Court in the *Zalita* case discussed *supra*.  And even here, the question is not Court access, but rather whether the information that was lodged with the Court Security Officer and is available to the Court should be formally filed.)  The government, rather, has noted that information obtained by petitioner's counsel under the auspices of the DTA HVD Protective Order is constrained by the terms of that protective order and could only be handled, as of right, consistent with the terms of that order, which does not authorize the filing of classified materials obtained in that case in other courts or in other cases.  *See* Joint Status Report ¶ 6 (filed Jun. 27, 2008 in *Khan v. Bush*, No. 06-CV-1690) (dkt. no. 42).  The government has consistently maintained that entry of a protective order regime specifically tailored for the handling of TS/SCI is needed in petitioner Khan's case, as is appropriate.

Dated: August 18, 2008

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General

___/s/ *Terry M. Henry*_____
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar No. 347518)
TERRY M. HENRY
ANDREW I. WARDEN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Tel:  (202) 514-4107

Attorneys for Respondents

EXHIBIT  1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MAJID KHAN, *et al.*,                    )
                                         )
    Petitioners                  )
                                         )
    v.                           )    Civil Action No. 06-CV-1690 (RBW)
                                         )
GEORGE W. BUSH,                          )
    President of the United States,  )
    *et al.*,                    )
                                         )
    Respondents.                 )
_____)

## DECLARATION OF MARILYN A. DORN, INFORMATION REVIEW OFFICER, CENTRAL INTELLIGENCE AGENCY

I, MARILYN A. DORN, hereby declare and say:

1. I am the Information Review Officer (IRO) for the National Clandestine Service (NCS) of the Central Intelligence Agency (CIA). After serving one and a half years as Associate NCS/IRO, I was appointed to my current position on 1 August 2003.

2. The NCS is the organization within the CIA responsible for conducting the CIA's foreign intelligence and counterintelligence activities; conducting covert action; conducting liaison with foreign intelligence and security services; serving as the repository for foreign counterintelligence information; supporting clandestine technical collection; and coordinating CIA support to the Department of Defense. Specifically, the NCS is responsible for the conduct of foreign intelligence collection through the clandestine use of human sources.

3. The IRO is responsible for the review of records maintained by offices in the NCS that may be responsive to requests from the Department of Justice in criminal and civil litigation. As part of my official duties, I ensure that determinations such as the release or withholding of information related to the CIA are proper and do not jeopardize CIA interests, personnel, or facilities, and, on behalf of the Director of the CIA, do not jeopardize CIA intelligence activities, sources, or methods.

4. As a senior CIA official and under a written delegation of authority pursuant to section 1.3(c) of Executive Order 12958, as amended,[1] I hold original classification authority at the TOP SECRET level. Therefore, I am authorized to conduct classification reviews and to make original classification and declassification decisions.

5. Through the exercise of my official duties, I am generally familiar with this case. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

### Purpose of this Declaration

6. I understand that a Petition for Writ of Habeas Corpus has been filed on behalf of Majid Kahn and that petitioner's counsel has requested that the Court enter a standard protective order used in a number of previous cases involving detainees at the United States Naval Base in Guantanamo Bay, Cuba. Such protective orders are entered to establish the procedures that must be followed by petitioner's counsel and various other individuals who receive access to potentially classified national security information in connection with these cases. The purpose of this declaration is to inform the Court that

---

[1] (U) Executive Order 12958 was amended by Executive Order 13292. See Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. See Exec. Order No. 12,958, 3 C.F.R. 333 (1995), *reprinted as amended in 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

the classified national security information likely to arise in this case is different and more sensitive than any of the previous cases involving detainees at Guantanamo Bay. Therefore, the standard protective order used in previous cases is insufficient to protect that information.

### The Classified National Security Information at Issue

7. On September 6, 2006, President George W. Bush delivered a speech in which he disclosed the existence of a secret CIA program to capture, detain, and interrogate key terrorist leaders and operatives in order to help prevent terrorist attacks. President Bush also disclosed that fourteen individuals formerly in CIA custody as part of the secret CIA program had been transferred to Department of Defense (DOD) custody at Guantanamo Bay. Petitioner was one of the fourteen individuals formerly in the secret CIA program, now detained by DOD at Guantanamo Bay.

8. While the President publicly disclosed that the fourteen individuals were detained and questioned outside the United States in a program operated by the CIA, he also explicitly stated that many specifics of the program, including where the detainees had been held, the details of their confinement, the employment of alternative interrogation methods, and other operational details could not be divulged and would remain classified. In fact, such details constitute and involve TOP SECRET, Sensitive Compartmented Information (SCI).

9. Under Executive Order 12958, as amended, the anticipated severity of the damage to national security resulting from disclosure determines which of three classification levels is applied to the information. Thus, if an unauthorized disclosure of information reasonably could be expected to cause *damage* to the national security, that

information may be classified as CONFIDENTIAL; *serious damage* may be classified as SECRET; and *exceptionally grave damage* may be classified as TOP SECRET. Executive Order 12958, section 4.3, provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure. This section further provides that the Director of the CIA is responsible for establishing and maintaining special access programs relating to intelligence activities, sources, and methods. These special access programs relating to intelligence are called Sensitive Compartmented Information (SCI) programs.

10. Information relating to the CIA terrorist detention program has been placed in a TOP SECRET//SCI program to enhance protection from unauthorized disclosure. Because Majid Kahn was detained by CIA in this program, he may have come into possession of information, including locations of detention, conditions of detention, and alternative interrogation techniques, that is classified at the TOP SECRET//SCI level.

### The Damage to the National Security

11. The President made clear in his speech that operation of the secret CIA detention program will continue. In order to fully appreciate the risk to the national security that disclosure of the operational details of the program would pose, the Court must first understand the importance of the program to the national security. Information obtained from the program has provided the U.S. Government with one of the most useful tools in combating terrorist threats to the national security. It has shed light on probable targets and likely methods for attacks on the United States, and has led to the

disruption of terrorist plots against the United States and its allies. Information obtained from the program has also played a role in the capture and questioning of additional senior al Qaeda operatives.

12. One of the most critical tools in the war against al Qaeda and its affiliates is the close intelligence relationships that the United States maintains with allies around the world. Many countries take great risks in order to assist the United States, and they do so with the explicit agreement that the nature of their assistance will remain secret. Should operational details about the program be improperly disclosed, such as the locations of CIA detention facilities, it would put our allies at risk of terrorist retaliation and betray relationships that are built on trust and are vital to our efforts against terrorism.

13. Improper disclosure of details regarding the conditions of detention and specific alternative interrogation procedures could also cause exceptionally grave consequences. Many terrorist operatives are specifically trained in counter-interrogation techniques. If specific alternative techniques were disclosed, it would permit terrorist organizations to adapt their training to counter the tactics that CIA can employ in interrogations. If detainees in the CIA program are more fully prepared to resist interrogation, it could prevent the CIA from obtaining vital intelligence that could disrupt future planned attacks.

The Inadequacy of the Standard Protective Order Used in Previous Cases

14. The very purpose of a protective order is to establish the procedures that are to be followed by petitioner's counsel, translators for the parties, and various other individuals who will receive access to potentially classified national security information. The protective order that petitioner requests the Court to adopt contemplates that the

national security information at issue would be classified at the SECRET level, rather than at the TOP SECRET//SCI level as it is here. As such, the standard protective order used in previous detainee habeas cases fails, on its face, to adequately protect the national security information that may arise in this case.

15. By way of specific example, the protective order proposed by petitioner requires petitioners' counsel to hold a valid United States security clearance at only the SECRET level. Similarly, it does not require other individuals who may have access to potentially classified information provided by a detainee, such as translators, to possess clearances above the SECRET level. To adequately protect TOP SECRET//SCI information potentially provided by a detainee, access to such information would have to be restricted to individuals with TOP SECRET// SCI security clearances who have received briefings regarding the security procedures, signed a non-disclosure agreement, and been determined to have a need-to-know[2] the information at issue. In addition, the protective order proposed by petitioner permits procedures for handling and controlling potentially classified information that may be permissible for SECRET information, but is expressly prohibited for TOP SECRET//SCI. For example, information classified at the SECRET level may be transmitted via certified mail, a procedure that is prohibited for our nation's most guarded secrets at the TOP SECRET//SCI level. Similarly, documents at the SECRET level may be stored in a facility with fewer security devices than information at the TOP SECRET//SCI level. A protective order that allows individuals without the necessary security clearances access to TOP SECRET//SCI information, or permits the use of procedures not appropriate for TOP SECRET//SCI

---

[2] Executive Order 12958, as amended, defines "need-to-know" as a "determination by an authorized holder of classified information that a prospective recipient requires access to classified information in order to perform or assist in a lawful and authorized governmental function."

information, cannot possibly begin to adequately protect such information from unauthorized disclosure. Moreover, such procedures would explicitly violate the safeguarding requirements prescribed to protect classified information in Executive Order 12958, Part 4, as amended.

## Conclusion

16. I have determined that Majid Kahn may have come into possession of national security information that is classified at the TOP SECRET// SCI level. I have also determined that handling of such information under the standard protective order used in previous cases poses an unacceptable risk of disclosure, which reasonably could be expected to cause extremely grave damage to the national security.

\* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of October, 2006.

Marilyn A. Dorn
Information Review Officer
National Clandestine Service
Central Intelligence Agency

**EXHIBIT 2**

Case 1:08-mc-00442-TFH    Document 264-3    Filed 08/18/2008    Page 2 of 8





For Immediate Release
Office of the Press Secretary
September 6, 2006

## President Discusses Creation of Military Commissions to Try Suspected Terrorists
The East Room

   Fact Sheet: The Administration's Legislation to Create Military
Commissions
    Myth/Fact: The Administration's Legislation to Create Military
Commissions
    Fact Sheet: Bringing Terrorists to Justice

 In Focus: National Security
   en Español

President's Remarks
 view

1:45 P.M. EDT

THE PRESIDENT: Thank you. Thanks for the warm welcome. Welcome to the White House. Mr. Vice President, Secretary Rice, Attorney General Gonzales, Ambassador Negroponte, General Hayden, members of the United States Congress, families who lost loved ones in the terrorist attacks on our nation, and my fellow citizens: Thanks for coming.



On the morning of September the 11th, 2001, our nation awoke to a nightmare attack. Nineteen men, armed with box cutters, took control of airplanes and turned them into missiles. They used them to kill nearly 3,000 innocent people. We watched the Twin Towers collapse before our eyes -- and it became instantly clear that we'd entered a new world, and a dangerous new war.

The attacks of September the 11th horrified our nation. And amid the grief came new fears and urgent questions: Who had attacked us? What did they want? And what else were they planning? Americans saw the destruction the terrorists had caused in New York, and Washington, and Pennsylvania, and they wondered if there were other terrorist cells in our midst poised to strike; they wondered if there was a second wave of attacks still to come.

With the Twin Towers and the Pentagon still smoldering, our country on edge, and a stream of intelligence coming in about potential new attacks, my administration faced immediate challenges: We had to respond to the attack on our country. We had to wage an unprecedented war against an enemy unlike any we had fought before. We had to find the terrorists hiding in America and across the world, before they were able to strike our country again. So in the early days and weeks after 9/11, I directed our government's senior national security officials to do everything in their power, within our laws, to prevent another attack.

Nearly five years have passed since these -- those initial days of shock and sadness -- and we are thankful that the terrorists have not succeeded in launching another attack on our soil. This is not for the lack of desire or determination on the part of the enemy. As the recently foiled plot in London shows, the terrorists are still active, and they're still trying to strike America, and they're still trying to kill our people. One reason the terrorists have not succeeded is because of the hard work of thousands of dedicated men and women in our government, who have toiled day and night, along with our allies, to stop the enemy from carrying out their plans. And we are grateful for these hardworking citizens of ours.

Another reason the terrorists have not succeeded is because our government has changed its policies -- and given our military, intelligence, and law enforcement personnel the tools they need to fight this enemy and

protect our people and preserve our freedoms.



The terrorists who declared war on America represent no nation, they defend no territory, and they wear no uniform. They do not mass armies on borders, or flotillas of warships on the high seas. They operate in the shadows of society; they send small teams of operatives to infiltrate free nations; they live quietly among their victims; they conspire in secret, and then they strike without warning. In this new war, the most important source of information on where the terrorists are hiding and what they are planning is the terrorists, themselves. Captured terrorists have unique knowledge about how terrorist networks operate. They have knowledge of where their operatives are deployed, and knowledge about what plots are underway. This intelligence -- this is intelligence that cannot be found any other place. And our security depends on getting this kind of information. To win the war on terror, we must be able to detain, question, and, when appropriate, prosecute terrorists captured here in America, and on the battlefields around the world.

After the 9/11 attacks, our coalition launched operations across the world to remove terrorist safe havens, and capture or kill terrorist operatives and leaders. Working with our allies, we've captured and detained thousands of terrorists and enemy fighters in Afghanistan, in Iraq, and other fronts of this war on terror. These enemy -- these are enemy combatants, who were waging war on our nation. We have a right under the laws of war, and we have an obligation to the American people, to detain these enemies and stop them from rejoining the battle.

Most of the enemy combatants we capture are held in Afghanistan or in Iraq, where they're questioned by our military personnel. Many are released after questioning, or turned over to local authorities -- if we determine that they do not pose a continuing threat and no longer have significant intelligence value. Others remain in American custody near the battlefield, to ensure that they don't return to the fight.

In some cases, we determine that individuals we have captured pose a significant threat, or may have intelligence that we and our allies need to have to prevent new attacks. Many are al Qaeda operatives or Taliban fighters trying to conceal their identities, and they withhold information that could save American lives. In these cases, it has been necessary to move these individuals to an environment where they can be held secretly [sic], questioned by experts, and -- when appropriate -- prosecuted for terrorist acts.



Some of these individuals are taken to the United States Naval Base at Guantanamo Bay, Cuba. It's important for Americans and others across the world to understand the kind of people held at Guantanamo. These aren't common criminals, or bystanders accidentally swept up on the battlefield -- we have in place a rigorous process to ensure those held at Guantanamo Bay belong at Guantanamo. Those held at Guantanamo include suspected bomb makers, terrorist trainers, recruiters and facilitators, and potential suicide bombers. They are in our custody so they cannot murder our people. One detainee held at Guantanamo told a questioner questioning him -- he said this: "I'll never forget your face. I will kill you, your brothers, your mother, and sisters."

In addition to the terrorists held at Guantanamo, a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency. This group includes individuals believed to be the key architects of the September the 11th attacks, and attacks on the USS Cole, an operative involved in the bombings of our embassies in Kenya and Tanzania, and individuals involved in other attacks that have taken the lives of innocent civilians across the world. These are dangerous men with unparalleled knowledge about terrorist networks and their plans for new attacks. The security of our nation and the lives of our citizens depend on our ability to learn what these terrorists know.

Many specifics of this program, including where these detainees have been held and the details of their confinement, cannot be divulged. Doing so would provide our enemies with information they could use to take retribution against our allies and harm our country. I can say that questioning the detainees in this program has given us information that has saved innocent lives by helping us stop new attacks -- here in the United States

and across the world. Today, I'm going to share with you some of the examples provided by our intelligence community of how this program has saved lives; why it remains vital to the security of the United States, and our friends and allies; and why it deserves the support of the United States Congress and the American people.

Within months of September the 11th, 2001, we captured a man known as Abu Zubaydah. We believe that Zubaydah was a senior terrorist leader and a trusted associate of Osama bin Laden. Our intelligence community believes he had run a terrorist camp in Afghanistan where some of the 9/11 hijackers trained, and that he helped smuggle al Qaeda leaders out of Afghanistan after coalition forces arrived to liberate that country. Zubaydah was severely wounded during the firefight that brought him into custody -- and he survived only because of the medical care arranged by the CIA.

After he recovered, Zubaydah was defiant and evasive. He declared his hatred of America. During questioning, he at first disclosed what he thought was nominal information -- and then stopped all cooperation. Well, in fact, the "nominal" information he gave us turned out to be quite important. For example, Zubaydah disclosed Khalid Sheikh Mohammed -- or KSM -- was the mastermind behind the 9/11 attacks, and used the alias "Muktar." This was a vital piece of the puzzle that helped our intelligence community pursue KSM. Abu Zubaydah also provided information that helped stop a terrorist attack being planned for inside the United States -- an attack about which we had no previous information. Zubaydah told us that al Qaeda operatives were planning to launch an attack in the U.S., and provided physical descriptions of the operatives and information on their general location. Based on the information he provided, the operatives were detained -- one while traveling to the United States.

We knew that Zubaydah had more information that could save innocent lives, but he stopped talking. As his questioning proceeded, it became clear that he had received training on how to resist interrogation. And so the CIA used an alternative set of procedures. These procedures were designed to be safe, to comply with our laws, our Constitution, and our treaty obligations. The Department of Justice reviewed the authorized methods extensively and determined them to be lawful. I cannot describe the specific methods used -- I think you understand why -- if I did, it would help the terrorists learn how to resist questioning, and to keep information from us that we need to prevent new attacks on our country. But I can say the procedures were tough, and they were safe, and lawful, and necessary.

Zubaydah was questioned using these procedures, and soon he began to provide information on key al Qaeda operatives, including information that helped us find and capture more of those responsible for the attacks on September the 11th. For example, Zubaydah identified one of KSM's accomplices in the 9/11 attacks -- a terrorist named Ramzi bin al Shibh. The information Zubaydah provided helped lead to the capture of bin al Shibh. And together these two terrorists provided information that helped in the planning and execution of the operation that captured Khalid Sheikh Mohammed.

Once in our custody, KSM was questioned by the CIA using these procedures, and he soon provided information that helped us stop another planned attack on the United States. During questioning, KSM told us about another al Qaeda operative he knew was in CIA custody -- a terrorist named Majid Khan. KSM revealed that Khan had been told to deliver $50,000 to individuals working for a suspected terrorist leader named Hambali, the leader of al Qaeda's Southeast Asian affiliate known as "J-I". CIA officers confronted Khan with this information. Khan confirmed that the money had been delivered to an operative named Zubair, and provided both a physical description and contact number for this operative.

Based on that information, Zubair was captured in June of 2003, and he soon provided information that helped lead to the capture of Hambali. After Hambali's arrest, KSM was questioned again. He identified Hambali's brother as the leader of a "J-I" cell, and Hambali's conduit for communications with al Qaeda. Hambali's brother was soon captured in Pakistan, and, in turn, led us to a cell of 17 Southeast Asian "J-I" operatives. When confronted with the news that his terror cell had been broken up, Hambali admitted that the operatives were being groomed at KSM's request for attacks inside the United States -- probably [sic] using airplanes.

During questioning, KSM also provided many details of other plots to kill innocent Americans. For example, he described the design of planned attacks on buildings inside the United States, and how operatives were directed to carry them out. He told us the operatives had been instructed to ensure that the explosives went off at a point that was high enough to prevent the people trapped above from escaping out the windows.

KSM also provided vital information on al Qaeda's efforts to obtain biological weapons. During questioning, KSM admitted that he had met three individuals involved in al Qaeda's efforts to produce anthrax, a deadly biological

agent -- and he identified one of the individuals as a terrorist named Yazid. KSM apparently believed we already had this information, because Yazid had been captured and taken into foreign custody before KSM's arrest. In fact, we did not know about Yazid's role in al Qaeda's anthrax program. Information from Yazid then helped lead to the capture of his two principal assistants in the anthrax program. Without the information provided by KSM and Yazid, we might not have uncovered this al Qaeda biological weapons program, or stopped this al Qaeda cell from developing anthrax for attacks against the United States.

These are some of the plots that have been stopped because of the information of this vital program. Terrorists held in CIA custody have also provided information that helped stop a planned strike on U.S. Marines at Camp Lemonier in Djibouti -- they were going to use an explosive laden water tanker. They helped stop a planned attack on the U.S. consulate in Karachi using car bombs and motorcycle bombs, and they helped stop a plot to hijack passenger planes and fly them into Heathrow or the Canary Wharf in London.

We're getting vital information necessary to do our jobs, and that's to protect the American people and our allies.

Information from the terrorists in this program has helped us to identify individuals that al Qaeda deemed suitable for Western operations, many of whom we had never heard about before. They include terrorists who were set to case targets inside the United States, including financial buildings in major cities on the East Coast. Information from terrorists in CIA custody has played a role in the capture or questioning of nearly every senior al Qaeda member or associate detained by the U.S. and its allies since this program began. By providing everything from initial leads to photo identifications, to precise locations of where terrorists were hiding, this program has helped us to take potential mass murderers off the streets before they were able to kill.

This program has also played a critical role in helping us understand the enemy we face in this war. Terrorists in this program have painted a picture of al Qaeda's structure and financing, and communications and logistics. They identified al Qaeda's travel routes and safe havens, and explained how al Qaeda's senior leadership communicates with its operatives in places like Iraq. They provided information that allows us -- that has allowed us to make sense of documents and computer records that we have seized in terrorist raids. They've identified voices in recordings of intercepted calls, and helped us understand the meaning of potentially critical terrorist communications.

The information we get from these detainees is corroborated by intelligence, and we've received -- that we've received from other sources -- and together this intelligence has helped us connect the dots and stop attacks before they occur. Information from the terrorists questioned in this program helped unravel plots and terrorist cells in Europe and in other places. It's helped our allies protect their people from deadly enemies. This program has been, and remains, one of the most vital tools in our war against the terrorists. It is invaluable to America and to our allies. Were it not for this program, our intelligence community believes that al Qaeda and its allies would have succeeded in launching another attack against the American homeland. By giving us information about terrorist plans we could not get anywhere else, this program has saved innocent lives.

This program has been subject to multiple legal reviews by the Department of Justice and CIA lawyers; they've determined it complied with our laws. This program has received strict oversight by the CIA's Inspector General. A small number of key leaders from both political parties on Capitol Hill were briefed about this program. All those involved in the questioning of the terrorists are carefully chosen and they're screened from a pool of experienced CIA officers. Those selected to conduct the most sensitive questioning had to complete more than 250 additional hours of specialized training before they are allowed to have contact with a captured terrorist.

I want to be absolutely clear with our people, and the world: The United States does not torture. It's against our laws, and it's against our values. I have not authorized it -- and I will not authorize it. Last year, my administration worked with Senator John McCain, and I signed into law the Detainee Treatment Act, which established the legal standard for treatment of detainees wherever they are held. I support this act. And as we implement this law, our government will continue to use every lawful method to obtain intelligence that can protect innocent people, and stop another attack like the one we experienced on September the 11th, 2001.

The CIA program has detained only a limited number of terrorists at any given time -- and once we've determined that the terrorists held by the CIA have little or no additional intelligence value, many of them have been returned to their home countries for prosecution or detention by their governments. Others have been accused of terrible crimes against the American people, and we have a duty to bring those responsible for these crimes to justice. So we intend to prosecute these men, as appropriate, for their crimes.

Soon after the war on terror began, I authorized a system of military commissions to try foreign terrorists accused of war crimes. Military commissions have been used by Presidents from George Washington to Franklin Roosevelt to prosecute war criminals, because the rules for trying enemy combatants in a time of conflict must be different from those for trying common criminals or members of our own military. One of the first suspected terrorists to be put on trial by military commission was one of Osama bin Laden's bodyguards -- a man named Hamdan. His lawyers challenged the legality of the military commission system. It took more than two years for this case to make its way through the courts. The Court of Appeals for the District of Columbia Circuit upheld the military commissions we had designed, but this past June, the Supreme Court overturned that decision. The Supreme Court determined that military commissions are an appropriate venue for trying terrorists, but ruled that military commissions needed to be explicitly authorized by the United States Congress.

So today, I'm sending Congress legislation to specifically authorize the creation of military commissions to try terrorists for war crimes. My administration has been working with members of both parties in the House and Senate on this legislation. We put forward a bill that ensures these commissions are established in a way that protects our national security, and ensures a full and fair trial for those accused. The procedures in the bill I am sending to Congress today reflect the reality that we are a nation at war, and that it's essential for us to use all reliable evidence to bring these people to justice.

We're now approaching the five-year anniversary of the 9/11 attacks -- and the families of those murdered that day have waited patiently for justice. Some of the families are with us today -- they should have to wait no longer. So I'm announcing today that Khalid Sheikh Mohammed, Abu Zubaydah, Ramzi bin al-Shibh, and 11 other terrorists in CIA custody have been transferred to the United States Naval Base at Guantanamo Bay. (Applause.) They are being held in the custody of the Department of Defense. As soon as Congress acts to authorize the military commissions I have proposed, the men our intelligence officials believe orchestrated the deaths of nearly 3,000 Americans on September the 11th, 2001, can face justice. (Applause.)

We'll also seek to prosecute those believed to be responsible for the attack on the USS Cole, and an operative believed to be involved in the bombings of the American embassies in Kenya and Tanzania. With these prosecutions, we will send a clear message to those who kill Americans: No longer -- how long it takes, we will find you and we will bring you to justice. (Applause.)

These men will be held in a high-security facility at Guantanamo. The International Committee of the Red Cross is being advised of their detention, and will have the opportunity to meet with them. Those charged with crimes will be given access to attorneys who will help them prepare their defense -- and they will be presumed innocent. While at Guantanamo, they will have access to the same food, clothing, medical care, and opportunities for worship as other detainees. They will be questioned subject to the new U.S. Army Field Manual, which the Department of Defense is issuing today. And they will continue to be treated with the humanity that they denied others.

As we move forward with the prosecutions, we will continue to urge nations across the world to take back their nationals at Guantanamo who will not be prosecuted by our military commissions. America has no interest in being the world's jailer. But one of the reasons we have not been able to close Guantanamo is that many countries have refused to take back their nationals held at the facility. Other countries have not provided adequate assurances that their nationals will not be mistreated -- or they will not return to the battlefield, as more than a dozen people released from Guantanamo already have. We will continue working to transfer individuals held at Guantanamo, and ask other countries to work with us in this process. And we will move toward the day when we can eventually close the detention facility at Guantanamo Bay.

I know Americans have heard conflicting information about Guantanamo. Let me give you some facts. Of the thousands of terrorists captured across the world, only about 770 have ever been sent to Guantanamo. Of these, about 315 have been returned to other countries so far -- and about 455 remain in our custody. They are provided the same quality of medical care as the American service members who guard them. The International Committee of the Red Cross has the opportunity to meet privately with all who are held there. The facility has been visited by government officials from more than 30 countries, and delegations from international organizations, as well. After the Organization for Security and Cooperation in Europe came to visit, one of its delegation members called Guantanamo "a model prison" where people are treated better than in prisons in his own country. Our troops can take great pride in the work they do at Guantanamo Bay -- and so can the American people.

As we prosecute suspected terrorist leaders and operatives who have now been transferred to Guantanamo, we'll continue searching for those who have stepped forward to take their places. This nation is going to stay on the offense to protect the American people. We will continue to bring the world's most dangerous terrorists to justice -- and we will continue working to collect the vital intelligence we need to protect our country. The current transfers mean that there are now no terrorists in the CIA program. But as more high-ranking terrorists are captured, the need to obtain intelligence from them will remain critical -- and having a CIA program for questioning terrorists will continue to be crucial to getting life-saving information.

Some may ask: Why are you acknowledging this program now? There are two reasons why I'm making these limited disclosures today. First, we have largely completed our questioning of the men -- and to start the process for bringing them to trial, we must bring them into the open. Second, the Supreme Court's recent decision has impaired our ability to prosecute terrorists through military commissions, and has put in question the future of the CIA program. In its ruling on military commissions, the Court determined that a provision of the Geneva Conventions known as "Common Article Three" applies to our war with al Qaeda. This article includes provisions that prohibit "outrages upon personal dignity" and "humiliating and degrading treatment." The problem is that these and other provisions of Common Article Three are vague and undefined, and each could be interpreted in different ways by American or foreign judges. And some believe our military and intelligence personnel involved in capturing and questioning terrorists could now be at risk of prosecution under the War Crimes Act -- simply for doing their jobs in a thorough and professional way.

This is unacceptable. Our military and intelligence personnel go face to face with the world's most dangerous men every day. They have risked their lives to capture some of the most brutal terrorists on Earth. And they have worked day and night to find out what the terrorists know so we can stop new attacks. America owes our brave men and women some things in return. We owe them our thanks for saving lives and keeping America safe. And we owe them clear rules, so they can continue to do their jobs and protect our people.

So today, I'm asking Congress to pass legislation that will clarify the rules for our personnel fighting the war on terror. First, I'm asking Congress to list the specific, recognizable offenses that would be considered crimes under the War Crimes Act -- so our personnel can know clearly what is prohibited in the handling of terrorist enemies. Second, I'm asking that Congress make explicit that by following the standards of the Detainee Treatment Act our personnel are fulfilling America's obligations under Common Article Three of the Geneva Conventions. Third, I'm asking that Congress make it clear that captured terrorists cannot use the Geneva Conventions as a basis to sue our personnel in courts -- in U.S. courts. The men and women who protect us should not have to fear lawsuits filed by terrorists because they're doing their jobs.

The need for this legislation is urgent. We need to ensure that those questioning terrorists can continue to do everything within the limits of the law to get information that can save American lives. My administration will continue to work with the Congress to get this legislation enacted -- but time is of the essence. Congress is in session just for a few more weeks, and passing this legislation ought to be the top priority. (Applause.)

As we work with Congress to pass a good bill, we will also consult with congressional leaders on how to ensure that the CIA program goes forward in a way that follows the law, that meets the national security needs of our country, and protects the brave men and women we ask to obtain information that will save innocent lives. For the sake of our security, Congress needs to act, and update our laws to meet the threats of this new era. And I know they will.

We're engaged in a global struggle -- and the entire civilized world has a stake in its outcome. America is a nation of law. And as I work with Congress to strengthen and clarify our laws here at home, I will continue to work with members of the international community who have been our partners in this struggle. I've spoken with leaders of foreign governments, and worked with them to address their concerns about Guantanamo and our detention policies. I'll continue to work with the international community to construct a common foundation to defend our nations and protect our freedoms.

Free nations have faced new enemies and adjusted to new threats before -- and we have prevailed. Like the struggles of the last century, today's war on terror is, above all, a struggle for freedom and liberty. The adversaries are different, but the stakes in this war are the same: We're fighting for our way of life, and our ability to live in freedom. We're fighting for the cause of humanity, against those who seek to impose the darkness of tyranny and terror upon the entire world. And we're fighting for a peaceful future for our children and our grandchildren.

May God bless you all. (Applause.)

END 2:22 P.M. EDT

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html



**EXHIBIT  3**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MAJID KHAN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 07-1324 |
| | ) |
| | ) |
| ROBERT M. GATES, | ) |
| | ) |
| Respondent. | ) |
| | ) |

DECLARATION OF WENDY M. HILTON
ASSOCIATE INFORMATION REVIEW OFFICER
NATIONAL CLANDESTINE SERVICE
CENTRAL INTELLIGENCE AGENCY

I, WENDY M. HILTON, hereby declare and say:

1.  I am an Associate Information Review Officer (AIRO) for

the National Clandestine Service (NCS) of the Central

Intelligence Agency (CIA).  I was appointed to this position in

March 2007.  I have held a variety of positions in the CIA since

I became a staff officer in 1983.

2.  The NCS is the organization within the CIA responsible

for conducting the CIA's foreign intelligence and

counterintelligence activities; conducting special activities,

including covert action; conducting liaison with foreign

intelligence and security services; serving as the repository

for foreign counterintelligence information; supporting

clandestine technical collection; and coordinating CIA support
to the Department of Defense.  Specifically, the NCS is
responsible for the conduct of foreign intelligence collection
activities through the clandestine use of human sources.

3.  As AIRO, I am authorized to assess the current, proper
classification of CIA information based on the classification
criteria of Executive Order 12958, as amended,[1] and applicable
CIA regulations.  As part of my official duties, I ensure that
determinations such as the release or withholding of information
related to the CIA are proper and do not jeopardize CIA
interests, personnel, or facilities, and, on behalf of the
Director of the CIA, do not jeopardize CIA intelligence
activities, sources, or methods.  I am able to describe, based
on my experience, the damage to the national security that
reasonably could be expected to result from the unauthorized
disclosure of classified information.

4.  Section 6.1 of Executive Order 12958 defines "national
security" as "the national defense or foreign relations of the
United States;" and defines "information" as "any knowledge that
can be communicated or documentary material, regardless of its
physical form or characteristics, that is owned by, produced by

---

[1] Executive Order 12958 was amended by Executive Order 13292.  See Exec. Order
No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).  All citations to Exec. Order
No. 12958 are to the Order as amended by Exec. Order No. 13292.  See Exec.
Order No. 12958, 3 C.F.R. 333 (1995), reprinted as amended in 50 U.S.C.A. §
435 note at 187 (West Supp. 2007).

or for, or is under the control of the United States
Government."

    5.  Section 1.1(a) of the Executive Order provides that
information may be originally classified under the terms of this
order only if the following conditions are met:

       (1)  an original classification authority is
classifying the information;

       (2)  the information is owned by, produced by or for,
or is under the control of the United States Government;

       (3)  the information falls within one or more of the
categories of information listed in section 1.4 of this
order; and

       (4)  The original classification authority determines
that the unauthorized disclosure of the information
reasonably could be expected to result in damage to the
national security, which includes defense against
transnational terrorism, and the original classification
authority is able to identify or describe the damage.

Exec. Order 12958, § 1.1(a).

    6.  Section 1.3(a) of the Executive Order provides that the
authority to classify information originally may be exercised
only by the President and, in the performance of executive
duties, the Vice President; agency heads and officials
designated by the President in the Federal Register; and United
States Government officials delegated this authority pursuant to
section 1.3(c) of the Order.  Section 1.3(c)(2) provides that
TOP SECRET original classification authority may be delegated
only by the President; in the performance of executive duties,

the Vice President; or an agency head or official designated
pursuant to section 1.3(a)(2) of the Executive Order.

7.   In accordance with section 1.3(a)(2), the President
designated the Director of the CIA as an official who may
classify information originally as TOP SECRET.[2]  Under the
authority of section 1.3(c)(2), the Director of the CIA has
delegated original TOP SECRET classification authority to me.
Section 1.3(b) of the Executive Order provides that original TOP
SECRET classification authority includes the authority to
classify information originally as SECRET and CONFIDENTIAL.   I
am authorized, therefore, to conduct classification reviews and
to make original classification and declassification decisions
regarding national security information.

8.   Section 102(A)(i) of the National Security Act of 1947,
as amended, 50 U.S.C. § 403-1(i), requires the Director of
National Intelligence (DNI) to protect intelligence sources and
methods from unauthorized disclosure.  As explained below,
petitioner Majid Khan has been exposed to intelligence sources
and methods that the DNI is required to protect from
unauthorized disclosure.  For this reason, the DNI authorized me
to take all necessary and appropriate measures in this case to
ensure that intelligence sources and methods are protected from

---

[2] Order of President, Designation under Executive Order 12958, 70 Fed. Reg.
21,609 (Apr. 21, 2005), *reprinted in* U.S.C.A. § 435 note at 199 (West Supp.
2007).

public disclosure. Under this authorization of the DNI and in

accordance with section 6 of the Central Intelligence Agency Act

of 1949, as amended, 50 U.S.C.A. § 403g, and sections 1.3(a)(5)

and 1.5(h) of Executive Order 12333, the DCIA is responsible for

protecting CIA sources and methods from unauthorized disclosure.

9.   I make the following statements based upon my personal

knowledge and information made available to me in my official

capacity.

10.   Through the exercise of my official duties, I am

generally familiar with this case. I understand that Petitioner

has filed a Petition under the Detainee Treatment Act (DTA)

challenging the determination by the Department of Defense (DOD)

that Petitioner should continue to be detained as an enemy

combatant at Guantanamo Bay, Cuba. I also understand that a

protective order was entered by the Court on 12 October 2007.  I

have reviewed in their entirety Petitioner's Motion for

Preservation of Torture Evidence and Motion to Declare

Interrogation Methods Applied Against Petitioner Torture and all

accompanying exhibits to these motions. I understand that The

New York Times Company, the Associated Press, and USA Today have

filed a motion to unseal certain classified filings made in this

case.  The purpose of this declaration is to describe for the

Court the damage to the national security that reasonably could

be expected to result if the classified information in these
filings is unsealed.

11.   Petitioner and the fifteen other high-value detainees
at Guantanamo Bay formerly held in CIA custody (HVDs)[3] have been
exposed to intelligence sources and methods.   In addition to
being protected from disclosure under the National Security Act
of 1947 and the Central Intelligence Agency Act of 1949, these
sources and methods also are classified information the
disclosure of which reasonably could be expected to result in
exceptionally grave damage to the national security.
Specifically, the locations of CIA intelligence activities
overseas, the assistance provided by certain foreign governments
in furtherance of those activities, and the conditions of
confinement and interrogation methods used by the CIA are all
properly classified intelligence sources and methods.   Part I of
this declaration describes the intelligence activities
implicated in this case and the exceptionally grave damage to
national security that reasonably could be expected to result if
Petitioner's classified statements about these intelligence
sources and methods are publicly disclosed.   Part II of this
declaration describes the extraordinary measures the U.S.
Government has taken to ensure that the classified information

---

[3] On September 6, 2006, the President announced that fourteen detainees who
had been held in CIA custody had been transferred to Department of Defense
custody at Guantanamo Bay, Cuba.   Two additional detainees were later
transferred to Guantanamo Bay from CIA custody.

6

to which the HVDs have been exposed is protected against
unauthorized disclosure.

## I.   Damage to National Security Resulting from Public Disclosure of Petitioner's Statements about CIA Intelligence Activities

12.   Public disclosure of the classified information to
which Petitioner has been exposed reasonably could be expected
to cause exceptionally grave damage to the national security.
Specifically, disclosure of such information is reasonably
likely to damage the CIA's relationships with foreign
intelligence and security services and thereby degrade the CIA's
ability to effectively question terrorist detainees and elicit
information necessary to protect the American people.

### A.   Damage to Foreign Relations

13.   Among the most critical sources and methods in the
collection of foreign intelligence are the relationships that
the United States maintains with the intelligence and security
services of foreign countries.  Through these intelligence
liaison relationships, the CIA can collect intelligence and
provide to U.S. national security and foreign policy officials
information that is critical to informed decision making;
information that the CIA cannot obtain through other sources and
methods.

14.   In this case, foreign governments have provided
critical assistance to CIA counterterrorism operations,

including but not limited to hosting of foreign detention
facilities, under the condition that their assistance be kept
secret.   Statements from Petitioner and other HVDs acknowledged
to have been in the CIA's detention program about the specific
foreign detention locations and other critical assistance that
foreign countries have provided to the CIA's counterterrorism
operations would damage the CIA's relations with these foreign
governments and could cause them to cease cooperating with the
CIA on such matters.   If the United States demonstrates that it
is unwilling or unable to stand by its commitments to foreign
governments, they will be less willing to cooperate with the
United States on counterterrorism activities.

15.   The damage to national security that could result if
Petitioner and other HVDs were permitted to discuss their
knowledge about foreign cooperation is not merely conjectural.
Just prior to the President's 6 September 2006 speech announcing
the transfer of HVDs to DOD custody, the CIA provided certain
foreign partners specific assurances that the CIA would protect
their cooperation.   These liaison partners expressed their deep
appreciation and highlighted that their continued cooperation
was conditioned on the CIA's commitment and ability to keep
their assistance strictly confidential.

16.   Specifically, one particular liaison partner reduced
its cooperation with the CIA when its role in the terrorist

8

detention program leaked to a third country whose national had been detained within the program. The liaison partner lost the trust and cooperation of that third country in matters of their own national security. Repair of the CIA's relationship with this liaison partner came only through the senior-level intervention of the CIA Director personally apologizing for the leak. Despite this significant effort, to this day the damage this one incident has caused to the CIA's relationship with the liaison partner is incalculable, as the CIA can never be sure to what extent the liaison partner is withholding vital intelligence necessary to the national security of the United States. Accordingly, Petitioner's and other HVDs' disclosures concerning foreign cooperation would have a lasting negative impact by frustrating CIA efforts to obtain vital national security information required to protect the American people.

B.    Damage to CIA Intelligence Activities

17.    Petitioner and other HVDs have been exposed to classified intelligence methods, including the CIA's methods of questioning, conditions of confinement while in CIA custody, and certain intelligence disclosed during the course of questioning. Public disclosure of such information reasonably could be expected to cause exceptionally grave damage to national security by making it more difficult for the CIA to obtain the information it needs to help protect the American people.

9

18.   As the President has acknowledged in his speech of
September 6, 2006 announcing the transfer of the HVDs to
Guantanamo Bay, the CIA is authorized to use alternative
procedures in the questioning of certain terrorist detainees.
He also stated, however, that the details of their confinement
and the methods of their interrogation could not be divulged and
that he intended that the CIA program continue.   Unauthorized
disclosures regarding the specifics of the detention and
interrogation program, including the techniques the CIA uses to
elicit information, are likely to degrade the program's
effectiveness and therefore result in exceptionally grave damage
to the national security.

19.   The CIA's detention program has provided the U.S.
Government with one of the most useful tools in combating
terrorist threats to the national security.   It has shed light
on probable targets and likely methods for attacks on the United
States, and has led to the disruption of terrorist plots against
the United States and its allies.   For example, information
obtained through the program thwarted a plot to fly a plane into
the tallest building in Los Angeles.   Additional plots that were
disrupted included hijacking passenger planes to fly into
Heathrow Airport and the Canary Wharf in London and attacking
the U.S. consulate in Karachi, Pakistan, using car bombs and
motorcycle bombs.

10

20.  Additionally, information obtained through the program also has played a vital role in the capture and questioning of additional senior al Qaeda operatives.  For example, interrogations of detainees produced information that provided initial leads to the locations of al Qaeda operatives that led to their capture.  In addition, the United States gained valuable information that explained previously unknown details of al Qaeda, such as its organization, financing, communications, and logistics.

21.  The U.S. Government is aware that al Qaeda and other terrorists train in counter-interrogation methods.  Public disclosure of the methods used by the CIA would allow al Qaeda and other terrorists to more effectively train to resist such techniques, which would result in degradation in the effectiveness of the techniques in the future.

C.  Allegations Regarding the CIA Detention Program by Persons other than High-Value Detainees

22.  I am aware of media speculation about the supposed locations of CIA detention facilities and the techniques that the CIA is allegedly authorized to use during the interrogation of terrorist detainees.  I also am aware that persons other than Petitioner and the HVDs at Guantanamo Bay, Cuba, have made allegations about detention and mistreatment by the CIA and foreign governments assisting the CIA.  In none of those cases,

11

however, has the U.S. Government acknowledged whether the information in the media is correct or whether such persons were ever held in the CIA detention program.[4]

23.  In contrast, the U.S. Government has acknowledged publicly that Petitioner and the other HVDs were held in the CIA's detention program and that at least some were subjected to alternative interrogation techniques.  The U.S. Government has acknowledged, therefore, that the Petitioner and other HVDs may have come into possession of the very information about the CIA program that the U.S. Government seeks to protect, including the locations of detention facilities, the identities of cooperating foreign governments, and the conditions of confinement and interrogations techniques.  If the U.S. Government allows anything Petitioner says about the program to be publicly disclosed, then Petitioner and other HVDs will be in a position to make truthful unauthorized disclosures about such activities.  Terrorists could then rely on such disclosures by Petitioner and other HVDs and would exploit such disclosures to improve their counter-interrogation training.  Additionally, allowing such

---

[4] Media speculation about details of detainee interrogations does not thereby render the information unclassified.  In terms of the potential impact upon the intelligence activities and foreign relations of the United States, there is a critical distinction between unsubstantiated information circulating in the press and official government release or acknowledgement of such information.  The U.S. Government must be able to maintain the distinction between media reports--which may or may not be accurate--by individuals not authorized to speak on behalf of the United States, and official disclosures.  Unauthorized public statements do not affect the status of properly classified information.

12

disclosures by Petitioner would violate our secrecy agreement with foreign countries, making them less willing to assist the CIA with this program and other counterterrorism operations.

D.   False Allegations by High-Value Detainees

24.   I recognize that many of the allegations that Petitioner has made about the CIA's detention program are untrue.   Notwithstanding this, Petitioner and each of the HVDs is in a position to provide accurate and detailed information about the CIA's detention program.   As already stated, the disclosure of such details reasonably could be expected to result in exceptionally grave damage to national security.

25.   False or exaggerated allegations by the detainees about the classified details of the program, however, also must be treated as classified information because a different rule would have the effect of allowing accurate, highly classified information about the program to be revealed by Petitioner and other HVDs.   If a rule to redact only truthful statements were established, a detainee with knowledge of classified facts could easily manipulate the rule to reveal those classified facts. Thus, for example, if the United States redacted only Petitioner's true allegations regarding locations of CIA detention facilities, the true locations of these facilities could be revealed by making multiple allegations as to location, through a simple process of elimination.   The same is true with

13

respect to conditions of confinement and interrogation methods. If only true statements about such conditions and techniques are redacted, detainees who have access to classified information regarding actual conditions and techniques could paint a picture of those conditions and techniques used and not used by making repeated allegations about conditions of confinement and interrogation techniques.  In sum, the continued success of the interrogation program depends as much on concealing what interrogation methods are not approved as it does on concealing what methods are approved.[5]

26.  A rule that allows Petitioner and other HVDs to speak freely about the CIA program will allow them to directly reveal the classified information about the program that the Government must protect.  A rule that redacts only true statements that Petitioner makes about the program allows Petitioner and other detainees to manipulate the rule to reveal the true details of the program.  Therefore, in order to protect the classified facts at issue here--the details of the CIA terrorist detention and interrogation program--the U.S. Government must treat all allegations by Petitioner and the other HVDs regarding the program as classified.

---

[5] Recently the Director of the CIA publicly acknowledged that the CIA has used waterboarding as an interrogation technique.  Section 3.1(b) of Executive Order 12958, as amended, authorizes certain Executive officials to determine whether the need to protect classified information is outweighed by the public interest in disclosure.

14

## II.  U.S. Government Measures Taken to Protect this Information

27.  Recognizing the damage to national security that reasonably could be expected to result if this information were publicly disclosed, the U.S. Government has instituted extraordinary security arrangements for the protection of this information.  Information relating to the CIA terrorist detention and interrogation program has been placed in a tightly compartmented TOP SECRET//SCI Program in order to minimize the number of people who have access to the information and thereby lessen the risk of unauthorized disclosure.[6]

28.  Several additional requirements also have been established since the detainees arrived at Guantanamo Bay, Cuba. These requirements, although burdensome and expensive for the U.S. Government, are necessary for the protection of national security.  First, all U.S. Government personnel who have substantive contact with the HVDs must possess appropriate

---

[6] Under Executive Order 12958, as amended, the anticipated severity of the damage to the national security resulting from disclosure determines which of three classification levels is applied to the information.  Thus, if an unauthorized disclosure of information reasonably could be expected to cause *damage* to the national security, that information may be classified as CONFIDENTIAL; *serious damage* may be classified as SECRET; and *exceptionally grave damage* may be classified as TOP SECRET.  Section 4.3 of Executive Order 12958, as amended, provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure.  Special access programs relating to intelligence activities or intelligence sources or methods are called Sensitive Compartmented Information (SCI) Programs.

security clearances.[7]   Second, all work done by U.S. Government personnel that relates to information provided by the HVDs must be conducted on approved secure computer systems.   Third, all documents derived from the statements of HVDs must be treated as classified and handled and stored appropriately.   Fourth, HVD mail is monitored and redacted for national security purposes before it is released from Guantanamo Bay, Cuba.   And finally, individuals interviewing the detainees, including law enforcement personnel, DOD personnel associated with the Combatant Status Review Tribunal Process, and counsel for detainees have been required to obtain a TOP SECRET//SCI security approval before being allowed access to the HVDs.

## III.  Conclusion

29.   I have determined that Petitioner has been exposed to sensitive national security information that is classified at the TOP SECRET//SCI level.   Due to the President's public acknowledgement that Petitioner was previously held by the CIA, his statements regarding the CIA terrorist detention and interrogation program must continue to be protected from public disclosure.   For the reasons described above, details regarding the operation of the CIA program remain classified at the TOP SECRET//SCI level.

---

[7] Pursuant to Department of Defense policy, the International Committee of the Red Cross has had access to the HVDs because the ICRC works confidentially with the U.S. Government.

\*    \*    \*    \*

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of March, 2008.

_Wendy M. Hilton_
Wendy M. Hilton
Associate Information Review Officer
National Clandestine Service
Central Intelligence Agency

17

# EXHIBIT 4

**174**          **344 FEDERAL SUPPLEMENT, 2d SERIES**

not be tried by Military Commission for the offenses with which he is charged. It is

**FURTHER ORDERED** that petitioner be released from the pre-Commission detention wing of Camp Delta and returned to the general population of Guantanamo detainees, unless some reason other than the pending charges against him requires different treatment. And it is

**FURTHER ORDERED** that petitioner's remaining claims are **in abeyance**, the Court having abstained from deciding them.



# In re GUANTANAMO DETAINEE CASES

Nos. 02–CV–0299  CKK,  02–CV–0828 CKK,  02–CV–1130  CKK,  04–CV–1135 ESH,  04–CV–1136  JDB,  04–CV–1137 RMC,  04–CV–1142  RJL,  04–CV–1144 RWR,  04–CV–1164  RBW,  04–CV–1166 RJL,  04–CV–1194  HHK,  04–CV–1227 RBW,  04–CV–1254  HHK,  04–CV–1519 JR.

United States District Court, District of Columbia.

Nov. 8, 2004.

**Background:** Actions were brought challenging United States' detention of alleged enemy combatants at United States naval base in Guantanamo Bay. United States moved for protective order.

**Holdings:** The District Court, Joyce Hens Green, J., held that:

(1) entry of protective order was warranted;

(2) petitioners' attorneys were presumed to have "need to know" information; and

(3) attorneys were barred from disclosing classified information not provided by petitioner-detainee to that petitioner-detainee.

Ordered accordingly.

**1. Records** ⚍**32**

Entry of protective order was warranted in actions challenging United States' detention of alleged enemy combatants at United States naval base in Guantanamo Bay, where cases involved classified national security information or documents and other protected information or documents.

**2. Records** ⚍**32**

Counsel for petitioners in cases challenging United States' detention of alleged enemy combatants at United States naval base in Guantanamo Bay were presumed to have "need to know" information both in their own cases and in related cases pending before court, and thus counsel for all petitioners who satisfied all necessary prerequisites and followed all procedures set forth in protective order could share and discuss among themselves classified information to extent necessary for effective representation of their clients.

**3. Records** ⚍**32**

Attorneys for petitioners challenging their detention by United States at United States naval base in Guantanamo Bay were barred from disclosing classified information not provided by petitioner-detainee to that petitioner-detainee.

————

Jon W. Norris, Lenard Barrett Boss, Cozen O'Connor, P.C., Donald Beaton Ver-

rilli, Marc A. Goldman, Jenner & Block, LLC., Barry J. Pollack, Collier Shannon Scott, PLLC, Muneer I. Ahmad, Richard J. Wilson, Stacey Danielle Becker, Clifford Chance US, LLP, George Brent Mickum, IV, Douglas James Behr, Keller & Heckman, LLP, Christopher J. Herrling, Wilmer Cutler & Pickering Hale & Dorr LLP, David H. Remes, Covington & Burling, Neal Katyal, Kelly A. Cameron, Perkins Coie, LLP, Washington, DC, Andrew W. Vail, David E. Walters, Hillary A. Victor Jenner & Block LLP, Chicago, IL, Leon Friedman, Joshua L. Dratel, Joshua L. Dratel, P.C., Eric M. Freedman, Shayana Devendra Kadidal, Douglas Frank Curtis, Wilmer Cutler Pickering Hale & Dorr, LLP, Karen Lee, Andrew Bruce Matheson, Nathan Reilly, Pamela Rogers Chepiga, Allen & Overy LLP, Ralph A. Taylor, Christopher G. Karagheuzoff, Joshua Colangelo–Bryan, Mark S. Sullivan, Stewart D. Aaron, Kevin B. Bedell, Dorsey & Whitney LLP, Marc D. Falkoff, Covington & Burling, New York, NY, Michael D. Mori, Office of the Chief Defense Counsel Office of Military Commissions Department of Defense, Arlington, VA, Baher Azmy, Timothy S. Susanin, Gitanjali Gutierrez, Lawrence S. Lustberg, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, Clive Stafford Smith, Justice In Exile, New Orleans, LA, Erwin Chemerinsky, Durham, NC, Charles Swift, Office of Chief Defense Counsel for Military Commissions, Arlington, VA, Joseph M. McMillan, Perkins Coie LLP, Seattle, WA, for Plaintiffs.

Lisa Ann Olson, Preeya M. Noronha, Terry Marcus Henry, Robert J. Katerberg, Paul Clement, Preeya M. Noronha, U.S. Department of Justice, Robert D. Okun, United States Attorney's Office, Washington, DC, Brian C. Kipnis, U.S. Attorney's Office/WA, Seattle, WA, for Defendants.

**AMENDED PROTECTIVE ORDER AND PROCEDURES FOR COUNSEL ACCESS TO DETAINEES AT THE UNITED STATES NAVAL BASE IN GUANTANAMO BAY, CUBA**

JOYCE HENS GREEN, District Judge.

This matter comes before the Court upon Respondents' Motion for Protective Order to prevent the unauthorized disclosure or dissemination of classified national security information and other protected information that may be reviewed by, made available to, or are otherwise in the possession of, the petitioners and/or petitioners' counsel in these coordinated cases. Pursuant to the general supervisory authority of the Court, in order to protect the national security, and for good cause shown,

IT IS ORDERED:

**[1]** 1. The Court finds that these cases involve classified national security information or documents, the storage, handling and control of which require special security precautions, and access to which requires a security clearance and a "need to know." These cases may also involve other protected information or documents, the storage, handling and control of which may require special precautions in order to protect the security of United States government personnel and facilities, and other significant government interests.

2. The purpose of this Protective Order is to establish the procedures that must be followed by all petitioners' counsel, their respective petitioner(s), all other counsel involved in these cases, translators for the parties, and all other individuals who receive access to classified national security information or documents, or other protected information or documents, in con-

nection with these cases, including the privilege team as defined in Exhibit A.

3. The procedures set forth in this Protective Order will apply to all aspects of these cases, and may be modified by further order of the Court *sua sponte* or upon application by any party. The Court will retain continuing jurisdiction to enforce or modify the terms of this Order.

4. Nothing in this Order is intended to or does preclude the use of classified information by the government as otherwise authorized by law outside of these actions.

5. Petitioners' counsel shall be responsible for advising their employees, the petitioners, and others of the contents of this Protective Order, as appropriate or needed.

6. Petitioners' counsel are bound by the terms and conditions set forth in the "Revised Procedures For Counsel Access To Detainees At the U.S. Naval Base In Guantanamo Bay, Cuba," and the procedures for handling mail and documents brought into and out of counsel meetings, attached hereto as Exhibit A. This Protective Order specifically incorporates by reference all terms and conditions established in the procedures contained in Exhibit A to the extent they place limitations on petitioners' counsel in their access to and interaction with petitioners or handling of information. Any violation of the terms and conditions of those procedures will also be deemed a violation of this Protective Order. This paragraph does not apply with respect to provisions in the procedures contained in Exhibit A that are or have been overridden by the Court.

7. The privilege team shall not disclose to any person any information provided by counsel for a petitioner or by a petitioner, other than information provided in a filing with the Court, unless such information, if it were monitored information, could be disclosed under Section X of Exhibit A. Such disclosure shall be consistent with the provisions of Section X of Exhibit A.

*Definitions*

8. As used herein, the words "documents" or "information" shall include, but are not limited to, all written or printed matter of any kind, formal or informal, including originals, conforming copies and non-conforming copies (whether different from the original by reason of notation made on such copies or otherwise), and further include, but are not limited to:

a. papers, correspondence, memoranda, notes, letters, reports, summaries, photographs, maps, charts, graphs, interoffice and intra-office communications, notations of any sort concerning conversations, meetings, or other communications, bulletins, teletypes, telegrams, telefacsimiles, invoices, worksheets, and drafts, alterations, modifications, changes and amendments of any kind to the foregoing;

b. graphic or oral records or representations of any kind, including, but not limited to, photographs, charts, graphs, microfiche, microfilm, videotapes, sound recordings of any kind, and motion pictures;

c. electronic, mechanical or electric records of any kind, including, but not limited to, tapes, cassettes, disks, recordings, electronic mail, films, typewriter ribbons, word processing or other computer tapes or disks, and all manner of electronic data processing storage; and

d. information acquired orally.

9. The terms "classified national security information and/or documents," "classified information" and "classified documents" refer to:

a. any classified document or information that has been classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)," or any classified information contained in such document;

b. any document or information, regardless of its physical form or characteristics, now or formerly in the possession of a private party that has been derived from United States government information that was classified, regardless of whether such document or information has subsequently been classified by the government pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)";

c. verbal or non-documentary classified information known to the petitioner or petitioners' counsel; or

d. any document and information as to which the petitioner or petitioners' counsel have been notified orally or in writing that such documents or information contains classified information.

10. All classified documents, and information contained therein, shall remain classified unless the documents bear a clear indication that they have been declassified by the agency or department that is the original classification authority of the document or the information contained therein (hereinafter, the "original classification authority").

11. The terms "protected information and/or documents," "protected information" and "protected documents" refer to any document or information deemed by the Court, either upon application by counsel or *sua sponte*, as worthy of special treatment as if the document or information were classified, even if the document or information has not been formally deemed to be classified.

12. For purposes of this Protective Order, "petitioners' counsel" shall be defined to include an attorney who is employed or retained by or on behalf of a petitioner for purposes of representing the petitioner in habeas corpus or other litigation in federal court in the United States, as well as co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.

13. "Access to classified information" or "access to protected information" shall mean having access to, reviewing, reading, learning, or otherwise coming to know in any manner any classified information or protected information.

14. "Secure area" shall mean a physical facility accredited or approved for the storage, handling, and control of classified information.

15. "Unauthorized disclosure of classified information" shall mean any knowing, willful or negligent action that could reasonably be expected to result in a communication or physical transfer of classified information to an unauthorized recipient.

### Designation of Court Security Officer

16. The Court designates Christine E. Gunning as Court Security Officer for these cases, and Joan B. Kendrall, Michael P. Macisso, James P. Londergan, Mary M. Cradlin, Daniel O. Hartenstine, John P. Molinard, Jennifer Campbell, and Barbara

J. Russell as Alternate Court Security Officers, for the purpose of providing security arrangements necessary to protect from unauthorized disclosure of any classified documents or information, or protected documents or information, to be made available in connection with these cases. Petitioners' counsel shall seek guidance from the Court Security Officer with regard to appropriate storage, handling, transmittal, and use of classified documents or information.

*Access to Classified Information and Documents*

17.  Without authorization from the government, no petitioner or petitioners' counsel shall have access to any classified information involved in these cases unless that person shall first have:

a.  made a written submission to the Court Security Officer precisely stating the reasons why counsel has a need to know the classified information requested; and

b.  received the necessary security clearance as determined by the Department of Justice Security Officer; and

c.  signed the Memorandum of Understanding ("MOU"), attached hereto as Exhibit B, agreeing to comply with the terms of this Protective Order.

The written submissions that are made by counsel to the Court Security Officer stating the reasons why counsel has a need to know the classified information requested shall be kept confidential by the Court Security Officer and shall not be disclosed to any other counsel or party to these cases unless the Court specifically orders such disclosure.

18.  Petitioners' counsel to be provided access to classified information shall execute the MOU appended to this Protective Order, and shall file executed originals with the Court and submit copies to the Court Security Officer and counsel for the government. The execution and submission of the MOU is a condition precedent for petitioners' counsel to have access to, or continued access to, classified information for the purposes of this proceeding.

19.  The substitution, departure, or removal of petitioners' counsel from these cases for any reason shall not release that person from the provisions of this Protective Order or the MOU executed in connection with this Order.

20.  The government shall arrange for one appropriately approved secure area for the use of petitioners' counsel. The secure area shall contain a working area that will be supplied with secure office equipment reasonable and necessary to the preparation of the petitioners' case. Expenses for the secure area and its equipment shall be borne by the government.

21.  The Court Security Officer shall establish procedures to ensure that the secure area is accessible to the petitioners' counsel during normal business hours and at other times on reasonable request as approved by the Court Security Officer. The Court Security Officer shall establish procedures to ensure that the secure area may be maintained and operated in the most efficient manner consistent with the protection of classified information. The Court Security Officer or Court Security Officer designee may place reasonable and necessary restrictions on the schedule of use of the secure area in order to accommodate appropriate access to all petitioners' counsel in this and other proceedings.

22.  All classified information provided by the government to counsel for petitioners, and all classified information otherwise possessed or maintained by petitioners' counsel, shall be stored, maintained, and used only in the secure area.

23. No documents containing classified information may be removed from the secure area unless authorized by the Court Security Officer or Court Security Officer designee supervising the area.

24. Consistent with other provisions of this Protective Order, petitioners' counsel shall have access to the classified information made available to them in the secure area, and shall be allowed to take notes and prepare documents with respect to those materials.

25. Petitioners' counsel shall not copy or reproduce any classified information in any form, except with the approval of the Court Security Officer or in accordance with the procedures established by the Court Security Officer for the operation of the secure area.

26. All documents prepared by petitioners or petitioners' counsel that do or may contain classified information (including without limitation, notes taken or memoranda prepared by counsel and pleadings or other documents intended for filing with the Court) shall be transcribed, recorded, typed, duplicated, copied, or otherwise prepared only by persons who have received an appropriate approval for access to classified information. Such activities shall take place in the secure area on approved word processing equipment and in accordance with the procedures approved by the Court Security Officer. All such documents and any associated materials containing classified information (such as notes, memoranda, drafts, copies, typewriter ribbons, magnetic recordings, exhibits) shall be maintained in the secure area unless and until the Court Security Officer advises that those documents or associated materials are unclassified in their entirety. None of these materials shall be disclosed to counsel for the government unless authorized by the Court, by petitioners'

counsel or as otherwise provided in this Protective Order.

27. Petitioners' counsel shall discuss classified information only within the secure area or in another area authorized by the Court Security Officer, shall not discuss classified information over any standard commercial telephone instrument or office intercommunication system, and shall not transmit or discuss classified information in electronic mail communications of any kind.

28. The Court Security Officer or Court Security Officer designee shall not reveal to any person the content of any conversations she or he may hear by or among petitioners' counsel, nor reveal the nature of documents being reviewed by them, or the work generated by them, except as necessary to report violations of this Protective Order to the Court or to carry out their duties pursuant to this Order. In addition, the presence of the Court Security Officer or Court Security Officer designee shall not operate as a waiver of, limit, or otherwise render inapplicable, the attorney-client privilege or work product protections.

**[2]** 29. Petitioners' counsel shall not disclose the contents of any classified documents or information to any person, including counsel in related cases brought by Guantanamo Bay detainees in this or other courts, except those authorized pursuant to this Protective Order, the Court, and counsel for the government with the appropriate clearances and the need to know that information. Except as otherwise specifically provided by Judge Colleen Kollar–Kotelly in her well-reasoned opinion addressing counsel access procedures regarding petitioners Mohammed Ahmed al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi in *Al Odah v. United States*, 02–CV–0828 (CKK), counsel for petitioners in

these cases are presumed to have a "need to know" information both in their own cases and in related cases pending before this Court. Therefore, and except as provided with respect to the three petitioners in *Al Odah* mentioned above, counsel for all petitioners in these cases who have satisfied all necessary prerequisites and follow all procedures set forth herein may share and discuss among themselves classified information to the extent necessary for the effective representation of their clients. Counsel for respondents may challenge the "need to know" presumption on a case-by-case basis for good cause shown.

[3] 30. Petitioners' counsel shall not disclose classified information not provided by petitioner-detainee to that petitioner-detainee. Should petitioners' counsel desire to disclose classified information not provided by petitioner-detainee to that petitioner-detainee, petitioners' counsel will provide in writing to the privilege review team (See Exhibit A) a request for release clearly stating the classified information they seek to release. The privilege review team will forward the petitioner counsel's request to the appropriate government agency authorized to declassify the classified information for a determination. The privilege review team will inform petitioners' counsel of the determination once it is made.

31. No petitioner or counsel for petitioner shall disclose or cause to be disclosed any information known or believed to be classified in connection with any hearing or proceeding in these cases except as otherwise provided herein.

32. Except as otherwise stated in this paragraph and to ensure the security of the United States of America, at no time, including any period subsequent to the conclusion of the proceedings, shall petitioners' counsel make any public or private

statements disclosing any classified information or documents accessed pursuant to this Protective Order, including the fact that any such information or documents are classified. In the event that classified information enters the public domain, however, counsel is not precluded from making private or public statements about the information already in the public domain, but only to the extent that the information is in fact in the public domain. Counsel may not make any public or private statements revealing personal knowledge from non-public sources regarding the classified or protected status of the information or disclosing that counsel had personal access to classified or protected information confirming, contradicting, or otherwise relating to the information already in the public domain. In an abundance of caution and to help ensure clarity on this matter, the Court emphasizes that counsel shall not be the source of any classified or protected information entering the public domain.

As stated in more detail in paragraph 49 below, failure to comply with these rules may result in the revocation of counsel's security clearance as well as civil and/or criminal liability.

33. The foregoing shall not prohibit petitioners' counsel from citing or repeating information in the public domain that petitioners' counsel does not know to be classified information or a classified document, or derived from classified information or a classified document.

34. All documents containing classified information prepared, possessed or maintained by, or provided to, petitioners' counsel (except filings submitted to the Court and served on counsel for the government), shall remain at all times in the control of the Court Security Officer for the duration of these cases. Upon final resolution of these cases, including all ap-

peals, all such documents shall be destroyed by the Court Security Officer.

### Access to Protected Information and Documents

35. Without authorization from the government or the Court, protected information shall not be disclosed or distributed to any person or entity other than the following:

　　a. petitioners' counsel, provided such individuals have signed the Acknowledgment, attached hereto as Exhibit C, attesting to the fact that they have read this Protective Order and agree to be bound by its terms; and

　　b. the Court and its support personnel.

36. The execution of the Acknowledgment is a condition precedent for petitioners' counsel to have access to, or continued access to, protected information for the purposes of this proceeding. A copy of each executed Acknowledgment shall be kept by counsel making the disclosure until thirty (30) days after the termination of this action, including appeals.

37. The substitution, departure, or removal of petitioners' counsel from these cases for any reason shall not release that person from the provisions of this Protective Order or the Acknowledgment executed in connection with this Protective Order.

38. Petitioners' counsel shall not disclose the contents of any protected documents or information to any person, to include counsel in related cases brought by Guantanamo Bay detainees in this or other courts, except those authorized pursuant to this Protective Order, the Court, or counsel for the government. Except as otherwise specifically provided by Judge Colleen Kollar–Kotelly with respect to counsel for petitioners Mohammed Ahmed

al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi in *Al Odah v. United States*, 02–CV–0828 (CKK), counsel for petitioners in these coordinated cases may share protected information with each other but only to the extent that counsel have appropriate security clearances and that all other procedures set forth in this Protective Order are complied with. Petitioners' counsel shall maintain all protected information and documents received through this proceeding in a confidential manner.

39. Petitioners' counsel shall not disclose protected information not provided by petitioner-detainee to that petitioner-detainee without prior concurrence of counsel for the government or express permission of the Court.

40. No petitioner or counsel for petitioner shall disclose or cause to be disclosed any information known or believed to be protected in connection with any hearing or proceeding in these cases except as otherwise provided herein.

41. At no time, including any period subsequent to the conclusion of the proceedings, will petitioners' counsel make any public or private statements disclosing any protected information or documents accessed pursuant to this Protective Order, including the fact that any such information or documents are protected.

42. Protected information shall be used only for purposes directly related to these cases and not for any other litigation or proceeding, except by leave of the Court. Photocopies of documents containing such information shall be made only to the extent necessary to facilitate the permitted use hereunder.

43. Nothing in this Protective Order shall prevent the government from using for any purpose protected information it provides a party. Nothing in this Protec-

tive Order shall entitle another party to protected information.

44. Supplying protected information to another party does not waive privilege with respect to any person or use outside that permitted by this Protective Order.

45. Within sixty (60) days of the resolution of these actions, and the termination of any appeals therefrom, all protected documents or information, and any copies thereof, shall be promptly destroyed, provided that the party to whom protected information is disclosed certifies in writing that all designated documents and materials have been destroyed, and further provided that counsel for the government may retain one complete set of any such materials that were presented in any form to the Court. Any such retained materials shall be placed in an envelope or envelopes marked "Protected Information Subject to Protective Order." In any subsequent or collateral proceeding, a party may seek discovery of such materials from the government, without prejudice to the government's right to oppose such discovery or its ability to dispose of the materials pursuant to its general document retention policies.

*Procedures for Filing Documents*

46. Until further order of this Court, any pleadings or other document filed by a petitioner shall be filed under seal with the Court through the Court Security Officer unless the petitioner has obtained from the Court Security Officer permission, specific to a particular, non-substantive pleading or document (e.g., motions for extensions of time, continuances, scheduling matters, etc.) not containing information that is or may be classified or protected, to file the pleading or document not under seal. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court.

The Court Security Officer shall promptly examine the pleading or document and forward it to the appropriate agencies for their determination whether the pleading or document contains classified information. If it is determined that the pleading or document contains classified information, the Court Security Officer shall ensure that portion of the document, and only that portion, is marked with the appropriate classification marking and that the document remains under seal. If it is determined that the pleading or document contains protected information, the Court Security Officer shall ensure that portion of the document, and only that portion, remains under seal. Any document filed by petitioner that is determined not to contain classified information or protected information, and is not subject to any other restrictions on disclosure, shall immediately be unsealed by the Court Security Officer and placed in the public record. The Court Security Officer shall immediately deliver under seal to the Court and counsel for the government any pleading or document to be filed by petitioners that contains classified information or protected information. The Court shall then direct the clerk to enter on the docket sheet the title of the pleading or document, the date it was filed, and the fact that it has been filed under seal with the Court Security Officer.

47. Any pleading or other document filed by the government containing classified information shall be filed under seal with the Court through the Court Security Officer. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall serve a copy of any classified pleadings by the government upon the Petitioner at the secure facility.

48. Nothing herein shall require the government to disclose classified or protected information. Nor shall anything herein prohibit the government from submitting classified information or protected information to the Court *in camera* or *ex parte* in these proceedings, or entitle petitioners or petitioners' counsel access to such submissions or information. Except for good cause shown in the filing, the government shall provide counsel for the petitioner or petitioners with notice served on such counsel on the date of the filing.

*Penalties for Unauthorized Disclosure*

49. Any unauthorized disclosure of classified information may constitute violations of United States criminal laws. In addition, any violation of the terms of this Protective Order shall be immediately brought to the attention of the Court and may result in a charge of contempt of Court and possible referral for criminal prosecution. *See e.g.,* Executive Order 12958, as amended. Any breach of this Protective Order may also result in the termination of access to classified information and protected information. Persons subject to this Protective Order are advised that direct or indirect unauthorized disclosure, retention, or negligent handling of classified documents or information could cause damage to the national security of the United States or may be used to the advantage of an adversary of the United States or against the interests of the United States. Persons subject to this Protective Order are also advised that direct or indirect unauthorized disclosure, retention, or negligent handling of protected documents or information could risk the security of United States government personnel and facilities, and other significant government interests. This Protective Order is to ensure that those authorized to receive classified information and protected information will not divulge this information to anyone who is not authorized to receive it, without prior written authorization from the original classification authority and in conformity with this Protective Order.

50. The termination of these proceedings shall not relieve any person or party provided classified information or protected information of his, her, or its obligations under this Protective Order.

IT IS SO ORDERED.

### Exhibit A

### REVISED PROCEDURES FOR COUNSEL ACCESS TO DETAINEES AT THE U.S. NAVAL BASE IN GUANTANAMO BAY, CUBA

#### I. Applicability

Except as otherwise stated herein or by other Order issued in the United States District Court for the District of Columbia, the following procedures shall govern counsel access to all detainees in the control of the Department of Defense ("DoD") at the U.S. Naval Base in Guantanamo Bay, Cuba ("GTMO") by counsel for purposes of litigating the cases in which this Order is issued.

These procedures do not apply to counsel who are retained solely to assist in the defense of a detainee in a trial by military commission. Access by that counsel is covered by the Procedures for Monitoring Communications Between Detainees Subject to Trial by Military Commission and their Defense Counsel Pursuant to Military Commission Order No. 3.

#### II. Definitions

A. *Communications:* All forms of communication between counsel and a detainee, including oral, written, electronic, or by any other means.

B. *Counsel:* An attorney who is employed or retained by or on behalf of a detainee for purposes of representing the detainee in the United States District Court for the District of Columbia and who is admitted, either generally or pro hac vice, in this Court. Unless otherwise stated, "counsel" also includes co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.

C. *Detainee:* An individual detained by DoD as an alleged enemy combatant at the U.S. Naval Base in Guantanamo Bay, Cuba.

D. *Privilege Team:* A team comprised of one or more DoD attorneys and one or more intelligence or law enforcement personnel who have not taken part in, and, in the future, will not take part in, any domestic or foreign court, military commission or combatant status tribunal proceedings involving the detainee. If required, the privilege team may include interpreters/translators, provided that such personnel meet these same criteria.

E. *Legal Mail:* Letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged documents and publicly-filed legal documents relating to that representation.

## III. Requirements for Access to and Communication with Detainees

A. *Security Clearance:*

1. Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

2. Counsel who possess a valid security clearance shall provide, in writing, the

date of their background investigation, the date such clearance was granted, the level of the clearance, and the agency who granted the clearance. Access will be granted only after DoD verification of the security clearance.

3. Counsel who does not currently possess a Secret clearance will be required to submit to an application for clearance to the Department of Justice, Litigation Security Division.

B. *Acknowledgment of and Compliance with Access Procedures*

1. Before being granted access to the detainee, counsel will receive a copy of these procedures. To have access to the detainee, counsel must agree to comply fully with these procedures and must sign an affirmation acknowledging his/her agreement to comply with them.

2. This affirmation will not be considered an acknowledgment by counsel that the procedures are legally permissible. Even if counsel elects to challenge these procedures, counsel may not knowingly disobey an obligation imposed by these procedures.

3. The DoD expects that counsel, counsel's staff, and anyone acting on the behalf of the attorney will fully abide by the requirements of this document. Counsel is required to provide the DoD with signed affirmations from interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation, upon utilization of those individuals by counsel in a manner that implicates these procedures.

4. Should counsel fail to comply with the procedures set forth in this docu-

IN RE GUANTANAMO DETAINEE CASES    **185**

Cite as 344 F.Supp.2d 174 (D.D.C. 2004)

Exhibit A—Continued

ment, access to or communication with the detainee will not be permitted.

C. *Verification of Representation*

1. Prior to being permitted access to the detainee, counsel must provide DoD with a *Notification of Representation.* This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as the name of the detainee being represented by the counsel. Additionally, counsel shall provide evidence of his or her authority to represent the detainee.

2. Counsel shall provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of a second visit with the detainee. The Court recognizes that counsel may not be in a position to present such evidence after the initial meeting with a detainee. Counsel for detainees and counsel for respondents shall cooperate to the fullest extent possible to reach a reasonable agreement on the number of counsel visits allowed. Should counsel for a detainee believe that the government is unreasonably limiting the number of visits with a detainee, counsel may petition the Court at the appropriate time for relief.

3. If the counsel withdraws from representation of the detainee or if the representation is otherwise terminated, counsel is required to inform DoD immediately of that change in circumstances.

4. Counsel must provide DoD with a signed representation stating that to the best of counsel's knowledge after reasonable inquiry, the source of funds to pay counsel any fees or reim-

Exhibit A—Continued

bursement of expenses are not funded directly or indirectly by persons or entities the counsel believes are connected to terrorism or the product of terrorist activities, including "Specially Designated Global Terrorists," identified pursuant to Exec. Order No. 13,224, 66 Fed.Reg. 49,079 (Sept. 23, 2001) or Exec. Order No. 12,947, 60 Fed.Reg. 5079 (Jan. 23, 1995), and (b) counsel has complied with ABA Model Rule 1.8(f).

D. *Logistics of Counsel Visits*

1. Counsel shall submit to the Department of Justice (DoJ) any request to meet with a detainee. This request shall specify date(s) of availability for the meeting, the desired duration of the meeting and the language that will be utilized during the meeting with the detainee. Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting. Once the request has been approved, DoJ will contact counsel with the date and duration of the meeting.

2. Legal visits shall take place in a room designated by JTF–Guantanamo. No more than two attorneys (or one attorney and one assistant) plus one interpreter/translator shall visit with a detainee at one time, unless approved in advance by the Commander, JTF–Guantanamo. Such approval shall not be unreasonably withheld.

3. Due to the mission and location of the U.S. Naval Base at Guantanamo Bay, Cuba, certain logistical details will need to be coordinated by counsel prior to arrival. This includes arrangements for travel and lodging. Specific information regarding these issues will be provided by DoJ.

**Exhibit A**—Continued

4. In order to travel to GTMO, all counsel must have a country and theater clearance for that specific visit. In order to begin processing country and theater clearances, counsel must have confirmed flight information for travel to GTMO and a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel). Country and theater clearances require twenty (20) days to process. Accordingly, counsel shall provide DoD, through DoJ, with the required information no later than 20 days prior to the GTMO visit date, or as soon as a visit is scheduled. Requests for visits made inside of 20 days will not normally be granted.

**IV. Procedures for Correspondence Between Counsel and Detainee**

A. *Mail Sent by Counsel to Detainee ("Incoming Mail")*

1. Counsel shall send incoming legal mail for a detainee to the privilege team at the appropriate address provided by government counsel. Each envelope or mailer shall be labeled with the name of the detainee and shall include a return address for counsel sending the materials. The outside of the envelope or mailer for incoming legal mail shall be labeled clearly with the following annotation: "Attorney–Detainee Materials–For Mail Delivery to Detainee."

2. Each page of legal mail shall be labeled "Attorney–Detainee Materials." No staples, paper clips or any non-paper items shall be included with the documents.

3. Upon receiving legal mail from counsel for delivery to the detainee, the

**Exhibit A**—Continued

privilege team shall open the envelope or mailer to search the contents for prohibited physical contraband. Within two (2) business days of receipt of legal mail, and assuming no physical contraband is present, the privilege team shall forward the mail to military personnel at GTMO in a sealed envelope marked "Legal Mail Approved by Privilege Team" and clearly indicating the identity of the detainee to which the legal mail is to be delivered. The privilege team shall return to the sender any incoming mail that does not comply with the terms of paragraphs IV.A.1., 2.

4. Within two (2) business days of receipt of legal mail from the privilege team, personnel at GTMO shall deliver the envelope or mailer marked by the privilege team as "Legal Mail Approved by the Privilege Team" to the detainee without opening the envelope or mailer. If counsel desires confirmation that the documents were delivered to the detainee, counsel is responsible for providing a stamped, self-addressed envelope for that purpose. The detainee shall be responsible for mailing any confirmation of delivery to counsel as outgoing legal mail. This method shall be the sole and exclusive means by which confirmation of delivery is provided to counsel.

5. Written correspondence to a detainee not falling within the definition of legal mail shall be sent through the United States Postal Service to the appropriate address provided by government counsel. Non-legal mail includes, but is not limited to, letters from persons other than counsel, including family and friends of the detainee. These non-privileged communications will be reviewed by military

IN RE GUANTANAMO DETAINEE CASES                    **187**
Cite as 344 F.Supp.2d 174 (D.D.C. 2004)

**Exhibit A**—Continued

personnel at GTMO under the standard operating procedures for detainee non-legal mail.

6.  Counsel is required to treat all information learned from a detainee, including any oral and written communications with a detainee, as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise by the privilege team or by this Court or another court. Accordingly, if a counsel's correspondence contains any summary or recitation of or reference to a communication with a detainee that has not been previously determined to be unclassified, the correspondence shall be prepared, marked, transported and handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1–R and AI 26, OSD Information and Security Supplement to DOD Regulation 5200.1R.

7.  Written and oral communications with a detainee, including all incoming legal mail, shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation.

B.  *Mail Sent by Detainee to Counsel ("Outgoing Mail")*

1.  Detainees will be provided with paper to prepare communications to

**Exhibit A**—Continued

counsel. In the presence of military personnel, the detainee will seal the written communication into an envelope and it will be annotated as "Attorney–Detainee Materials–For Mail Delivery To Counsel." Each envelope shall be labeled with the name of the detainee and the counsel. Envelopes annotated with the name of persons other the detainee's counsel (including family/friends or other attorneys) shall be processed according to the standard operating procedures for detainee non-legal mail.

2.  Military personnel will collect the outgoing legal mail within one (1) business day of being notified by the detainee that the communication is prepared for sealing and mailing.

3.  After the outgoing legal mail is collected from the detainee, the envelope will be sealed into a larger envelope by military personnel at Guantanamo which will be marked as "Attorney–Detainee Materials–For Mail Delivery To Counsel" and will be annotated with the name of the detainee and the counsel. The envelope will be sealed and mailed in the manner required for classified materials. Within two (2) business days of receipt from the detainee, the communication will be mailed to the appropriate address as provided by government counsel.

4.  Detainees also are permitted to send non-legal mail, including written communications to persons other than counsel, through the United States Postal Service. These communications shall be reviewed by military personnel at Guantanamo under the standard operating procedures for detainee non-legal mail.

5.  In the event any non-legal correspondence or messages from a detainee to individuals other than his coun-

Exhibit A—Continued

sel (including family/friends or other attorneys) are sent to counsel as, or included with, legal mail, counsel shall return the documents to military personnel at GTMO for processing according to the standard operating procedures for detainee non-legal mail.

**V.  Materials Brought Into A Meeting With Detainee And Counsel**

A.  Counsel shall bring only legal mail, writing utensils and paper into any meeting with a detainee unless counsel has received prior approval from the Commander, JTF–GTMO.  The Commander shall not unreasonably withhold approval for counsel to bring into a meeting with a detainee letters, tapes, or other communications introducing counsel to the detainee, if the government has first reviewed the communication and determined that sharing the communication with the detainee would not threaten the security of the United States.

B.  Written and oral communications with a detainee, including all documents brought into a meeting with a detainee, shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation.

Exhibit A—Continued

**VI.  Materials Brought Out Of A Meeting With Detainee and Counsel**

A.  Upon the completion of each meeting with a detainee or during any break in a meeting session, counsel will give the notes or documents used or produced during the meeting to a designated individual at Guantanamo.  These materials will be sealed in the presence of counsel and will be handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1–R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

B.  Upon the completion of the counsel's visit to Guantanamo, the notes or documents used or produced during the visit shall be sealed in the presence of counsel and placed in an envelope labeled as "Attorney–Detainee Meeting Documents–For Delivery to Counsel."  The envelope shall be sealed into a larger envelope by military personnel at Guantanamo which shall be marked as "Attorney–Detainee Meeting Documents–For Mail Delivery To Counsel" and shall be annotated with the name of the detainee and the counsel.  The envelope shall be sealed and mailed in the manner required for classified materials.  Within two (2) business days following the completion of the counsel's visit to Guantanamo, the package shall be mailed to the appropriate address provided by government counsel.

C.  Correspondence or messages from a detainee to individuals other than his counsel (including family/friends or other attorneys) shall not be handled through this process.  If a detainee provides these communications to his counsel during a visit, counsel shall give those communications to military personnel at Guantanamo so they can

Exhibit A—Continued

be processed under the standard operating procedures for detainee non-legal mail.

### VII. Classification Determination of Detainee Communications

A. Counsel may submit information learned from a detainee to the privilege team for a determination of its appropriate security classification. Counsel shall memorialize the information submitted for classification review into a written memorandum outlining as specifically as possible the information for which counsel requests a classification determination. All documents submitted for classification review shall be prepared, handled and treated in the manner required for classified materials, as provided by as required by Executive Order 12958, DOD Regulation 5200.1–R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R. No information derived from these submissions shall be disclosed outside the privilege team pursuant to these procedures until after the privilege team has reviewed it for security and intelligence purposes. Absent express consent given by the Court, or except as otherwise provided in this document, the submissions shall not be disclosed to any person involved in the interrogation of a detainee, and no such individual may make any use of those communications whatsoever, nor shall the submissions be disclosed to any Government personnel involved in any domestic or foreign court, military commission or combatant status tribunal proceedings involving the detainee.

Exhibit A—Continued

B. Counsel shall send all materials submitted for classification review to the appropriate address to be provided by government counsel. The outside of the envelope or mailer shall be clearly labeled "Attorney–Detainee Meeting Documents–For Classification Review By Privilege Team." Each envelope or mailer shall be annotated with the name of the detainee and the counsel. Each page of the document submitted for classification review shall be marked "Attorney–Detainee Materials" and "Classified." The envelope or mailer will be sealed and mailed in the manner required for classified materials.

C. As soon as possible after conducting the classification review, the privilege team shall advise counsel of the classification levels of the information contained in the materials submitted for review. The privilege team shall forward its classification determination directly to counsel after a review and analysis period not to exceed, from the time of receipt by the privilege team:

1. Seven (7) business days for information that is written in the English language;

2. Fourteen (14) business days for any information that includes writing in any language other than English, to allow for translations by the privilege team;

3. Twenty (20) business days for any information where the privilege team has reason to believe that a code was used, to allow for further analysis.

D. While conducting classification review, the privilege team shall promptly report any information that reasonably could be expected to result in immediate and substantial harm to the national security to the Commander,

Exhibit A—Continued

JTF–Guantanamo. In his discretion, the Commander, JTF–Guantanamo may disseminate the relevant portions of the information to law enforcement, military and intelligence officials as appropriate.

E. If, at any time, the privilege team determines that information in the documents submitted for classification review relate to imminent acts of violence, the privilege team shall report the contents of those documents to Commander, JTF–Guantanamo. In his discretion, the Commander, JTF–Guantanamo may disseminate the relevant portions of the information to law enforcement, military and intelligence officials.

F. The privilege team shall not disclose any information submitted by counsel for classification review outside the privilege team, except as provided by these procedures or as permitted by counsel submitting the information.

**VIII. Telephonic Access to Detainee**

A. Requests for telephonic access to the detainee by counsel or other persons will not normally be approved. Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF–Guantanamo.

B. Any telephonic access by counsel will be subject to appropriate security procedures, but shall not include contemporaneous monitoring or recording.

C. Any telephonic access by persons other than counsel will be subject to appropriate security procedures, including contemporaneous monitoring and recording.

Exhibit A—Continued

**IX. Counsel's Handling And Dissemination Of Information From Detainee**

A. Subject to the terms of any applicable protective order, counsel may disseminate the unclassified contents of the detainee's communications for purposes reasonably related to their representation of that detainee.

B. Counsel is required to treat all information learned from a detainee, including any oral and written communications with a detainee, as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise. All classified material must be handled, transported and stored in a secure manner, as provided by Executive Order 12958, DOD Regulation 5200.1–R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

C. Counsel shall disclose to DoJ or Commander, JTF–Guantanamo any information learned from a detainee involving future events that threaten national security or involve imminent violence.

D. Counsel may not divulge classified information not learned from the detainee to the detainee. Counsel may not otherwise divulge classified information related to a detainee's case to anyone except those with the requisite security clearance and need to know using a secure means of communication. Counsel for detainees in the coordinated cases pending in the United States District Court for the District of Columbia are presumed to have a "need to know" information in related cases pending before this Court. Counsel for respondents in those cases may challenge this pre-

Exhibit A—Continued

sumption on a case-by-case basis for good cause shown.

## X. JTF–Guantanamo Security Procedures

A.  Counsel and translators/interpreters shall comply with the following security procedures and force protection safeguards applicable to the U.S. Naval Base in Guantanamo Bay, Cuba, JTF–Guantanamo and the personnel assigned to or visiting these locations, as well as any supplemental procedures implemented by JTF–Guantanamo personnel.

B.  Contraband is not permitted in JTF–Guantanamo and all visitors are subject to search upon arrival and departure.  Examples of contraband include, but are not limited to, weapons, chemicals, drugs, and materials that may be used in an escape attempt. Contraband also includes money, stamps, cigarettes, writing instruments, etc.  No items of any kind may be provided to the detainee without the advance approval of the Commander, JTF–Guantanamo.

C.  Photography or recording of any type is prohibited without the prior approval of the Commander, JTF–Guantanamo.  No electronic communication devices are permitted.  All recording devices, cameras, pagers, cellular phones, PDAs, laptops, portable electronic devices and related equipment are prohibited in or near JTF–Guantanamo.  Should any of these devices be inadvertently taken into a prohibited area, the device must be surrendered to JTF–Guantanamo staff and purged of all information.

D.  Upon arrival at JTF–Guantanamo, security personnel will perform a contraband inspection of counsel and

Exhibit A—Continued

translators/interpreters using metal detectors as well as a physical inspection of counsel's bags and briefcases and, if determined necessary, a physical inspection of his/her person.

E.  Counsel shall not be permitted to interview or question members of the Joint Task Force about their duties or interactions with detainees without first obtaining permission from the Commander, Joint Task Force Guantanamo.  Should permission be unreasonably denied, counsel may seek an Order from this Court granting permission for good cause shown.

F.  Counsel will meet with a detainee in conference facilities provided by GTMO. These facilities are subject to visual monitoring by closed circuit TV for safety and security reasons.  (The only other method of visual observation available is for the door to remain open with military police sitting outside the door.).  No oral communications between counsel and detainee will be heard.

G.  At the conclusion of a meeting with a detainee, counsel and translators/interpreters will again be inspected using a metal detector and, if deemed necessary, by physical inspection of their persons.

### Exhibit B

### *MEMORANDUM OF UNDERSTANDING REGARDING ACCESS TO CLASSIFIED NATIONAL SECURITY INFORMATION*

Having familiarized myself with the applicable statutes, regulations, and orders related to, but not limited to, unauthorized disclosure of classified information, espionage and related offenses; The Intelligence Identities Protection Act, 50 U.S.C. § 421;  18 U.S.C. § 641;  50 U.S.C. § 783; 28 C.F.R. § 17 *et seq.;* and Executive Or-

**192**        344 FEDERAL SUPPLEMENT, 2d SERIES

### Exhibit B—Continued

der 12958; I understand that I may be the recipient of information and documents that belong to the United States and concern the present and future security of the United States, and that such documents and information together with the methods and sources of collecting it are classified by the United States government.  In consideration for the disclosure of classified information and documents:

(1) I agree that I shall never divulge, publish, or reveal either by word, conduct or any other means, such classified documents and information unless specifically authorized in writing to do so by an authorized representative of the United States government, or as expressly authorized by the Protective Order entered in the United States District Court for the District of Columbia in the case captioned _____ *v. George W. Bush*, No. _____.

(2) I agree that this Memorandum of Understanding and any other non-disclosure agreement signed by me will remain forever binding on me.

(3) I have received, read, and understand the Protective Order entered by the United States District Court for the District of Columbia in the case captioned _____ *v. George W. Bush*, No. _____, and I agree to comply with the provisions thereof.

### Exhibit C

#### *ACKNOWLEDGMENT*

The undersigned hereby acknowledges that he/she has read the Protective Order entered in the United States District Court for the District of Columbia in the case captioned _____ *v. George W. Bush*, No. _____, understands its terms, and agrees to be bound by each of those terms.  Specifically, and without limitation, the undersigned agrees not to use or dis-

### Exhibit C—Continued

close any protected information or documents made available to him/her other than as provided by the Protective Order. The undersigned acknowledges that his/her duties under the Protective Order shall survive the termination of this case and are permanently binding, and that failure to comply with the terms of the Protective Order may result in the imposition of sanctions by the Court.



### ROCK CREEK PACK STATION, INC., et. al.  Plaintiffs,

#### v.

### Jack BLACKWELL, Regional Forester, Region 5 of the United States Forest Service; et. al.  Defendants.

#### Nos. CIV.A. 03–330(RCL), CIV.A. 03–353.

United States District Court, District of Columbia.

Nov. 10, 2004.

**Background:**  Pack stations brought action against various government officials and entities alleging that new wilderness management plan for John Muir and Ansel Adams Wilderness Areas violated National Environmental Policy Act (NEPA) and Wilderness Act. Defendants brought motion to dismiss and for summary judgment.

**Holdings:**  The District Court, Lamberth, J., held that:

(1) pack stations did not establish that they suffered economic injury in fact;

(2) pack stations did not establish injury in fact based on environmental damage to wilderness area; and

**EXHIBIT 5**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| ABD AL-RAHIM HUSSAIN | ) | |
| MOHAMMED AL-NASHIRI | ) | |
| Petitioner, | ) | |
| | ) | |
| *v.* | ) | No. 08-1007 |
| | ) | |
| ROBERT M. GATES, | ) | |
| Respondent. | ) | |
| | ) | |

## STIPULATION TO IMMEDIATE ENTRY
## OF *KHAN* PROTECTIVE ORDER

The undersigned counsel for petitioner Abd Al-Rahim Hussain Mohammed Al-Nashiri, and for Respondent Robert M. Gates, hereby move on an emergency basis to entry in this action of the same Protective Order entered in *Majid Khan v. Gates*, No. 07-1324, on October 12, 2007, attached as Exhibit A hereto. Petitioner's counsel seeks to meet with petitioner Abd Al-Rahim Hussain Mohammed Al-Nashiri and therefore requests that the *Khan* Protective Order be entered immediately in this case.

As in *Khan*, petitioner here is one of several detainees who were moved to Guantanamo Bay in 2006, after previously being held in the custody of the Central Intelligence Agency.[1] The *Khan* Protective Order was based on the protective order

---

[1] The Government refers to the detainees transferred from CIA custody as "High Value Detainees," *See* http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html (the President's announcement of the transfer of the high value

this Court entered in *Bismullah v. Gates*, 501 F.3d 178 (D.C. Cir. 2007), as amended

on October 23, 2007,[2] but also included additional provisions the government

believes are necessary because the case involves information classified at a level

higher than that involved in *Bismullah*. The same *Khan* Protective Order is deemed

necessary by the government for the same reason in this case.[3] Notably, the *Khan*

order has been entered by this Court in all other cases where a protective order was

sought by a detainee who was previously in CIA custody. *See Al Shibh v. Gates*, No.

07-1399 (D.C. Cir. order dated Jan. 2, 2008); *Husayn v. Gates*, No. 07-1520 (D.C.

Cir. order dated Jan. 2, 2008) (orders attached hereto as Exhibit B).

The stipulated protective order is designed to enable petitioner's counsel to

communicate with petitioner Abd Al-Rahim Hussain Mohammed Al-Nashiri in order

to facilitate counsel's handling of this litigation. Both parties retain all rights to seek

modification (by joint stipulation or otherwise) to this order or to challenge it before

---

detainees); http://www.defenselink.mil/pdf/detaineebiographies1.pdf (listing the
detainees); http://www.defenselink.mil/pdf/thehighvaluedetaineeprogram2.pdf (a
description of the high value detainee program).

[2] The government has challenged the *Bismullah* decision, including the
protective order entered on July 30, 2007, and reserves the right to challenge any
protective order entered in this case based on that decision. Petitioners also reserve
the right to challenge any protective order entered in this case based on that decision.

[3] The parties recognize that section 5.L of the *Khan* protective order is
addressed primarily to court filings and that material submitted for review other than
court filing will not be reviewed on an expedited basis.

this Court or the Supreme Court.

## CONCLUSION

For the foregoing reasons, the parties stipulate to this Court's immediate entry

of the *Khan* protective order (in the form of Exhibit A, hereto).

Respectfully submitted,

*Paul H. Turner*

FRANNY A. FORSMAN
Federal Public Defender
Office of Federal Public Defender
District of Nevada
PAUL G. TURNER
Nevada Bar No. 07941
Assistant Federal Public Defender
GERALD BIERBAUM
Texas Bar No. 24025252
Assistant Federal Public Defender
MUKUND H. SHARMA
California Bar No. 249125
Assistant Federal Public Defender
411 East Bonneville Avenue, Ste. 250
Las Vegas, NV 89101
(702) 388-6577
Attorneys for Petitioner

MATTHEW COLLETTE
ROBERT LOEB
(202) 514-4332
Attorney, Appellate Staff
Civil Division, Room 7268
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
For Respondent

-3-

Exhibit A

OCT-12-2007 15:53    US COURT OF APPEALS              202 219 8530    P.002/002

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 07-1324                              September Term, 2007

Majid Khan and Rabia Khan, as Next of Friend,
Petitioners

v.

Robert M. Gates, U.S. Secretary of Defense,
Respondent



Filed On:

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED

OCT 1 2 2007

CLERK

BEFORE:   Sentelle, Randolph, and Brown, Circuit Judges

## O R D E R

Upon consideration of the "emergency stipulation to immediate entry of interim Guantanamo SCI protective order," it is

**ORDERED** that the protective order attached as Exhibit A to the above-referenced stipulation be entered in accordance with the terms of the stipulation, pending further order of the court.

**Per Curiam**

TOTAL P.002

## 1. General Provisions

A.    The court finds that this case involves classified national security information or documents, the storage, handling and control of which require special security precautions, and access to which require a security clearance and a "need to know." This case may also involve other protected information or documents, the storage, handling and control of which may require special precautions in order to protect the security of United States personnel and facilities, and other significant interests.

B.    The purpose of this Protective Order is to establish the procedures that must be followed by a Petitioner, Petitioner's Counsel, and all other individuals who receive access to classified information or documents, or other protected information or documents, in connection with this case, including the Department of Defense (DoD) Privilege Team.

C.    The procedures set forth in this Protective Order will apply to all aspects of this case, and may be modified by further order of the court *sua sponte* or upon application by any party. The court will retain continuing jurisdiction to enforce or modify the terms of this Order.

D.    Nothing in this Order is intended to or does preclude the use of classified information by the Government as otherwise authorized by law outside of this action under the Detainee Treatment Act.

E.    Petitioner's counsel of record is responsible for advising his or her partners, associates, and employees, the petitioner, and others of the contents of this Protective Order, as appropriate or needed.

F.    All documents marked as classified, and information contained therein, remain classified unless the documents bear a clear indication that they have been declassified or determined to be unclassified by the agency or department that is the original classification authority of the document or of the information contained therein.

G.    Any violation of this Protective Order may result in a sanction for contempt.

## 2. Designation of Court Security Officer

The Court designates Christine E. Gunning as Court Security Officer for these cases, and Jennifer H. Campbell, Erin E. Hogarty, Joan B. Kennedy, Charline A. DaSilva, Nathaniel A. Johnson, Daniel O. Hartenstine, Michael P. Macisso, James P. Londergan, Barbara J. Russell and Miguel A. Ferrer as Alternate Court Security Officers, for the purpose of providing security arrangements necessary to protect from unauthorized disclosure of any classified documents or information, or protected documents or information, to be made available in connection with these cases. Petitioners' counsel shall seek guidance from the Court Security Officer with regard to appropriate storage, handling, transmittal, and use of classified documents or information.

### 3. Definitions

A.    "Detainee" means an alien detained by the DoD as an alleged enemy combatant at the U.S. Naval Base at Guantánamo Bay, Cuba.

B.    "Petitioner" means a Detainee or a "next friend" acting on his behalf.

C.    "Petitioner's Counsel" includes a lawyer who is employed or retained by or on behalf of a Detainee for purposes of representing the Detainee in this litigation, as well as co-counsel, interpreters, translators, paralegals, investigators, and all other personnel or support staff employed or engaged to assist in this litigation.

D.    As used herein, the words "documents" or "information" include, but are not limited to, all written or printed matter of any kind, formal or informal, including originals, conforming copies and non-conforming copies (whether different from the original by reason of notation made on such copies or otherwise), and further include, but are not limited to:

   i.     papers, correspondence, memoranda, notes, letters, reports, summaries, photographs, maps, charts, graphs, interoffice and intraoffice communications, notations of any sort concerning conversations, meetings, or other communications, bulletins, teletypes, telegrams, telefacsimiles, invoices, worksheets; and drafts, alterations, modifications, changes and amendments of any kind thereto;

   ii.    graphic or oral records or representations of any kind, including, but not limited to, photographs, charts, graphs, microfiche, microfilm, videotapes, sound recordings of any kind, and motion pictures;

   iii.   electronic, mechanical or electric records of any kind, including, but not limited to, tapes, cassettes, disks, recordings, electronic mail,

2

films, typewriter ribbons, word processing or other computer tapes or disks; and all manner of electronic data processing storage; and

iv.    information acquired or conveyed orally.

E.    The terms "classified information" and "classified documents" refer to:

i.    any document or information that has been classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders, as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)," or any classified information contained in such document;

ii.    any document or information, regardless of its physical characteristics, now or formerly in the possession of a private party that has been derived from United States government information that was classified, regardless of whether such document or information has subsequently been classified by the Government pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders, as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)";

iii.    oral or nondocumentary classified information known or reasonably should be known to be classified to the Petitioner or Petitioner's Counsel; or

iv.    any document or information as to which the Petitioner or Petitioner's Counsel has been notified orally or in writing that such document or information contains classified information.

F.    The terms "protected information" and "protected documents" refer to any document or information deemed by the court, either upon application by the Government or *sua sponte*, to require special precautions in storage, handling, and control, in order to protect the security of United States Government personnel or facilities, or other significant government interests.

G.    "Access to classified information" or "access to protected information" means having access to, reviewing, reading, learning, or otherwise coming to know in any manner any classified information or protected information.

H.  "Communication" means all forms of communication between Petitioner's Counsel and a Detainee, including oral, written, electronic, or by any other means.

I.  "Legal Mail" consists only of documents and drafts of documents that are intended for filing in this action and correspondence directly related to those documents that-

   i.  relate directly to the litigation of this action;

4

ii.  address only (a) events leading up to the capture of the Detainee on whose behalf the petition in this action was filed, (b) events occurring between such Detainee's capture and any hearing before a Combatant Status Review Tribunal (CSRT) relating to such Detainee, and (c) the conduct of the CSRT proceeding relating to such Detainee; and

iii.  do not include any of the following information, in any form, unless directly related to the litigation of this action:

a.  information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency;

b.  information relating to current political events in any country;

c.  information relating to security procedures at the Guantánamo Naval Base (including names of United States government personnel and the layout of camp facilities) or the status of other Detainees;

d.  publications, articles, reports, or other such material including newspaper or other media articles, pamphlets, brochures, and publications by nongovernmental or advocacy organizations, or any descriptions of such material.

J.  "Secure area" shall mean a physical facility accredited or approved for the storage, handling, and control of classified information.

## 4. Roles and Functions of the DoD Privilege Team and Special Litigation Team

A.  The "DoD Privilege Team" comprises one or more DoD attorneys and one or more intelligence or law enforcement personnel. If required, the DoD Privilege Team may include interpreters/translators. The DoD Privilege Team is charged with representing and protecting the interests of the United States Government related to security and threat information. The DoD Privilege Team is authorized to review all communications specified in this order, including written communications and other materials sent

5

from Petitioner's Counsel to the Detainee and communications from the Detainee to his counsel. The DoD Privilege Team may not disclose a communication from Petitioner's Counsel to the Detainee or from the Detainee to his counsel other than information provided in a filing with the court and served on government counsel, unless the disclosure of such information is authorized by this or another order of the court or by Petitioner's Counsel.

B.    The DoD Privilege Team may redact or screen out material not meeting the definition of "Legal Mail" in section 2(I) above.

C.    When the DoD Privilege Team proposes to redact or screen out material sent from Petitioner's Counsel to a Detainee, Petitioner's Counsel for that Detainee must be notified.

D.    With the consent of Petitioner's Counsel, the DOD Privilege Team may consult with an individual or individuals in appropriate federal agencies for the purpose of identifying classified information and marking the documents with the appropriate classification. If Petitioner's Counsel does not consent to such consultation, information for which consultation is required will remain classified. Any such consultation will not waive attorney client, attorney work product, or any other applicable privilege. Further, the individual consulted for such purposes will not share the information with other government lawyers and/or officers involved in the litigation of this or other matters involving the petitioner, and the information shall not be used as a result of the consultation in the interrogation or investigation of petitioner. If the individual consulted is involved in the classification review of other documents, that individual may have discussions concerning such documents with government lawyers and/or officers involved in this and other matters involving the petitioner on condition that such discussions be for the sole purpose of classification review of such documents.

E.    In the event a dispute regarding the screening and redaction of material from legal mail sent from Petitioner's Counsel to a Detainee cannot be resolved among the parties and Petitioner's Counsel seeks the intervention of this court, the DoD Privilege Team may disclose the material at issue to the Commander, JTF-Guantánamo Naval Base or his representatives, including counsel for the Government.

F.    A "Special Litigation Team" is authorized to represent the DoD Privilege Team with respect to execution of its duties. The Special Litigation Team will be composed of one or more attorneys from the Department of Justice, who may not take part or be involved in litigating the merits of this

action under the Detainee Treatment Act or any other case brought by or against the Detainee.

G.  The DoD Privilege Team may, through the Special Litigation Team (see § 3(H) below), inform the court of any issues or problems related to the release or processing of information related to this case.

H.  The Special Litigation Team may not disclose information provided by the DoD Privilege Team, or any information submitted by Petitioner's Counsel to the DoD Privilege Team for review, except as provided by this Order or as permitted by Petitioner's Counsel or by the court.

I.  Petitioner's Counsel or the Special Litigation Team may submit filings to the court concerning the DoD Privilege Team or actions taken by it.

J.  Until otherwise notified, potentially privileged information in such filings must be submitted to the court under seal and contain a conspicuous notation as follows: "Submitted Under Seal-Contains Privileged Information." To maintain such information under seal, an appropriate application must be made to the court. Such information must be maintained under seal unless and until the court determines the information should not be sealed. Such filings by Petitioner's Counsel or the Special Litigation Team may not be served on counsel for respondent, except as authorized by Petitioner's Counsel or the court. With respect to a submission made under seal, a redacted version suitable for filing in the public record must be provided. Unresolved disputes concerning such redacted versions may be presented to the court.

K.  Petitioner's Counsel may not convey to a Detainee information redacted or screened by the DoD Privilege Team or designated for such redaction or screening, absent consent from the DoD Privilege Team, the Special Litigation Team, or the Government, or authorization by this court.

## 5. Access to Classified Information and Documents

A.  Without authorization from the Government, neither Petitioner nor Petitioner's Counsel may have access to any classified information involved in this case.

B.  Petitioner's Counsel is presumed to have a "need to know" all the information in the Government's possession concerning the Detainee he represents. This presumption is overcome to the extent the Government seeks to withhold from Petitioner's Counsel highly sensitive information or information concerning a highly sensitive source that the Government

7

presents to the court *ex parte* and *in camera*. Except for good cause shown, the Government must provide notice to Petitioner's Counsel on the same day it files such information with the court *ex parte*.

C.    Petitioners' counsel to be provided access to classified information shall execute the MOU appended to this Protective Order, and shall file executed originals with the Court and submit copies to the Court Security Officer and counsel for the government. *The execution and submission of the MOU is a condition precedent for petitioners' counsel to have access to, or continued access to, classified information for the purposes of this proceeding.*

D.    The substitution, departure, or removal of petitioners' counsel from this case for any reason shall not release that person from the provisions of this Protective Order or the MOU executed in connection with this Order.

E.    Authorization from the Government to access classified information will not be granted to Petitioner's Counsel unless Petitioner's Counsel has first:

    i.    received the necessary security clearance as determined by the Department of Justice; and

    ii.    obtained written evidence of authority to represent the Detainee or *obtained evidence of authority to represent the Detainee through the Detainee's next friend; and*

    iii.    signed the Memorandum of Understanding ("MOU"), attached hereto as Exhibit A, agreeing to comply with the terms of this Protective Order.

F.    Prospective counsel for a Detainee may have up to two visits with a Detainee to obtain his authorization to seek review of the CSRT's determination of his status.

G.    The substitution, departure, or removal of Petitioner's Counsel from this case for any reason will not release that person from the provisions of this Protective Order.

H.    Except as provided herein, Petitioner's Counsel may not disclose any classified or protected information to any person including counsel in related cases brought by Guantanamo Bay detainees in this court or any other court. Petitioner's Counsel may not disclose classified or protected information to a detainee, unless that same information has been previously provided to Petitioner's Counsel by the same detainee.

Counsel may not confirm or deny to the detainee the assertions made by the detainee based on knowledge counsel may have obtained from classified documents.

I.  A disclosure of classified information includes any knowing, willful, or negligent action that could reasonably be expected to result in a communication or physical transfer of classified information.

J.  Neither Petitioner nor Petitioner's Counsel may disclose or cause to be disclosed in connection with this case any information known or believed to be classified except as otherwise provided herein.

K.  At no time, including any time subsequent to the conclusion of this case, may Petitioner's Counsel make any public or private statements disclosing any classified information made available pursuant to this Protective Order, including the fact that any such information is classified.

L.  Petitioner's Counsel is required to treat all information learned from a Detainee, including any oral or written communication with a Detainee, as TS//SCI information, unless and until the information is submitted to the DoD Privilege Team or counsel for the Government and determined to be nonclassified. All classified material must be handled, transported, and stored in a secure manner, as provided by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.  To the extent the handling, transportation, or storage restrictions imposed by this order are more restrictive than the Executive Order and regulations, this Protective Order shall govern.

M.  Petitioner's Counsel or the DoD Privilege Team must disclose to government counsel or Commander, JTF-Guantánamo Naval base any information learned from a Detainee involving any future event that threatens national security or is likely to involve violence. In such cases, the Privilege Team must provide contemporaneous notice to Petitioner's Counsel and retain for Petitioner's Counsel a copy of the material provided to government counsel or Commander, JTF-Guantánamo Naval Base.

N.  Petitioners' counsel shall not disclose the contents of any classified documents or information to any person, except those authorized pursuant to this Protective Order, the Court, and counsel for the government with the appropriate clearances and the need to know that information.

O.  In the event that classified information enters the public domain, counsel is not precluded from making private or public statements about the

9

information already in the public domain, but only where the statements are not subject to the limitation set forth below. Counsel may not make any public or private statements revealing personal knowledge from non-public sources regarding the classified or protected status of the information or disclosing that counsel had personal access to classified or protected information confirming, contradicting, or otherwise relating to the information already in the public domain. In an abundance of caution and to help ensure clarity on this matter, the Court emphasizes that counsel shall not be the source of any classified or protected information entering the public domain.

P.    The foregoing shall not prohibit petitioners' counsel from citing or repeating information in the public domain that petitioners' counsel does not know or have reason to believe to be classified information or a classified document, or derived from classified information or a classified document.

### 6. Secure Storage of Classified Information

A.    The Court Security Officer shall arrange for one appropriately secure area for the use of petitioners' counsel. The secure area shall contain a working area that will be supplied with secure office equipment reasonable and necessary to the preparation of the petitioners' case. Expenses for the secure area and its equipment shall be borne by the government.

B.    The Court Security Officer shall establish procedures to ensure that the secure area is accessible to the petitioners' counsel during normal business hours and at other times on reasonable request as approved by the Court Security Officer. The Court Security Officer shall establish procedures to ensure that the secure area may be maintained and operated in the most efficient manner consistent with the protection of classified information. The Court Security Officer or Court Security Officer designee may place reasonable and necessary restrictions on the schedule of use of the secure area in order to accommodate appropriate access to all petitioners' counsel in this and other proceedings.

C.    All classified information provided by the government to counsel for petitioners, and all classified information otherwise possessed or maintained by petitioners' counsel, shall be stored, maintained, and used only in the secure area.

D.    No documents containing classified information may be removed from the

10

secure area unless authorized by the Court Security Officer or Court Security Officer designee supervising the area.

E.    Consistent with other provisions of this Protective Order, petitioners' counsel shall have access to the classified information made available to them in the secure area, and shall be allowed to take notes and prepare documents with respect to those materials only in the secure area.

F.    Petitioners' counsel shall not copy or reproduce any classified information in any form, except with the approval of the Court Security Officer or in accordance with the procedures established by the Court Security Officer for the operation of the secure area.

G.    All documents prepared by petitioners' counsel that do or may contain classified information (including without limitation, notes taken or memoranda prepared by counsel and pleadings or other documents intended for filing with the Court) shall be transcribed, recorded, typed, duplicated, copied, or otherwise prepared only by persons who have received approval from the Court Security Officer for access to classified information. Such activities shall take place in the secure area on approved word processing equipment and in accordance with the procedures approved by the Court Security Officer. All such documents and any associated materials containing classified information (such as notes, memoranda, drafts, copies, typewriter ribbons, magnetic recordings, exhibits) shall be maintained in the secure area unless and until the Court Security Officer advises that those documents or associated materials are unclassified in their entirety. None of these materials shall be disclosed to counsel for the government unless authorized by the Court, by petitioners' counsel or as otherwise provided in this Protective Order.

H.    Petitioners' counsel shall discuss classified information only within the secure area or in another area authorized by the Court Security Officer, shall not discuss classified information over any standard commercial telephone instrument or office intercommunication system, and shall not transmit or discuss classified information in electronic communications of any kind.

I.    The Court Security Officer or Court Security Officer designee shall not reveal to any person the content of any conversations she or he may hear by or among petitioners' counsel, nor reveal the nature of documents being reviewed by them, or the work generated by them, except as necessary to report violations of this Protective Order to the Court or to carry out their duties pursuant to this Order. In addition, the presence of the Court Security Officer or Court Security Officer designee shall not

11

operate as a waiver of, limit, or otherwise render inapplicable, the attorney-client privilege or work product protections.

J.   All documents containing classified information prepared, possessed or maintained by, or provided to, petitioners' counsel (except filings submitted to the Court and served on counsel for the government), shall remain at all times in the control of the Court Security Officer for the duration of these cases.

K.   As stated in more detail in SECTION 9 below, failure to comply with these rules may result in the revocation of counsel's security clearance as well as civil and/or criminal liability.

## 7.  Access to Protected Information

A.   The Government may apply to the court to deem any information "protected," and if filed in this court to be maintained under seal. Such information must be maintained under seal unless and until the court determines the information should not be designated as "protected."

B.   Without authorization from the Government or the court, protected information may not be disclosed or distributed to any person or entity other than the following:

   i.   Petitioner's Counsel and counsel bound by the terms of this protective order in a case filed on behalf of another Detainee seeking review under the Detainee Treatment Act,

   ii.   the court and its support personnel, and

   iii.   a Detainee if the information was obtained in the first instance from the Detainee.

C.   Neither Petitioner nor Petitioner's Counsel may disclose or cause to be disclosed any information known or believed to be protected in connection with any hearing or proceeding in this case except as otherwise provided herein.

D.   At no time, including any period subsequent to the conclusion of the proceedings, may Petitioner's Counsel make any public or private statements disclosing any protected information made available pursuant to this Protective Order, including the fact that any such information is protected.

12

E.    Protected information may be used only for purposes directly related to this case and not for any other litigation or proceeding, except by leave of the court. Photocopies of documents containing such information may be made only to the extent necessary to facilitate the permitted use hereunder.

F.    Nothing in this Protective Order prevents the Government from using for any purpose protected information it provides to a party. Nothing in this Protective Order entitles a nonparty to this case to protected information.

G.    Within ninety (90) days of the resolution of this action, and the termination of any certiorari review therefrom, all protected documents or information, and any copies thereof, provided to Petitioner's Counsel must be promptly destroyed, and Petitioner's Counsel must certify in writing that all designated documents and materials have been destroyed. Counsel for the government may retain one complete set of any such materials that were presented in any form to the Court. Any such retained materials shall be placed in an envelope or envelopes marked "Protected Information Subject to Protective Order." In any subsequent or collateral proceeding, a party may seek discovery of such materials from the government, without prejudice to the government's right to oppose such discovery or its ability to dispose of the materials pursuant to its general document retention policies.

H.    The Record on Review will be provided to Petitioner's Counsel upon a date established by order of the court.

## Procedures for Filing Documents

A.    Until further order of this Court, any pleadings or other document filed by a petitioner shall be filed under seal with the Court through the Court Security Officer unless the petitioner has obtained from the Court Security Officer permission, specific to a particular, non-substantive pleading or document (e.g., motions for extensions of time, continuances, scheduling matters, etc.) not containing information that is or may be classified or protected, to file the pleading or document not under seal. Petitioner's counsel will provide the original pleading and six copies thereof to the Court Security Officer. Two copies of an additional title page should accompany the filing provided to the CSO. This title page should only include the caption of the case, an unclassified title and should not include any classification markings. The Court shall direct the clerk to enter on

13

the docket sheet the title page, the date it was filed, and the fact that it has been filed under seal with the Court Security Officer. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall promptly examine the pleading or document and forward it to the appropriate agencies for their determination whether the pleading or document contains classified information. The CSO may consult with an individual or individuals in appropriate federal agencies for the purpose of identifying classified information and marking the documents with the appropriate classification markings. If it is determined that the pleading or document contains classified information, the Court Security Officer shall ensure that portion of the document, and only that portion, is marked with the appropriate classification marking and that the document remains under seal. If it is determined that the pleading or document contains protected information, the Court Security Officer shall ensure that portion of the document, and only that portion, remains under seal. Any document filed by petitioner that is determined not to contain classified information or protected information, and is not subject to any other restrictions on disclosure, shall immediately be unsealed by the Court Security Officer and placed in the public record. The Court Security Officer shall immediately deliver under seal to the Court and counsel for the government any pleading or document to be filed by petitioners that contains classified information or protected information.

B.   Any pleading or other document filed by the government containing classified information shall be filed under seal with the Court through the Court Security Officer. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall serve a copy of any classified pleadings by the government upon the Petitioner at the secure facility.

C.   Nothing herein shall require the government to disclose classified or protected information. Nor shall anything herein prohibit the government from submitting classified information or protected information to the Court in camera or ex parte in these proceedings, or entitle petitioners or petitioners' counsel access to such submissions or information. Except for good cause shown in the filing, the government shall provide counsel for the petitioner or petitioners with notice served on such counsel on the date of the filing.

### 9. Penalties for Unauthorized Disclosure

14

A. Any disclosure of classified information in violation of this order may constitute violations of United States criminal laws. In addition, any violation of the terms of this Protective Order shall be immediately brought to the attention of the Court and may result in a charge of contempt of Court and possible referral for criminal prosecution. *See, e.g.,* Executive Order 12958, as amended. Any breach of this Protective Order may also result in the termination of access to classified information and protected information. Persons subject to this Protective Order are advised that direct or indirect unauthorized disclosure, retention, or negligent handling of classified documents or information could cause damage to the national security of the United States or may be used to the advantage of an adversary of the United States or against the interests of the United States. Persons subject to this Protective Order are also advised that direct or indirect unauthorized disclosure, retention, or negligent handling of protected documents or information could jeopardize the security of United States government personnel and facilities, and other significant government interests. This Protective Order is to ensure that those authorized to receive classified information and protected information will not divulge this information to anyone who is not authorized to receive it, without prior written authorization from the original classification authority and in conformity with this Protective Order.

B. The USG reserves the right to unilateral take protective measures to safeguard classified information if it concludes that any provision of the protective order has been violated and the result of such violation reasonably could be expect to lead to the unauthorized disclosure of classified information.

C. The termination of these proceedings shall not relieve any person or party provided classified information or protected information of his, her, or its obligations under this Protective Order.

15

Exhibit A

## MEMORANDUM OF UNDERSTANDING REGARDING ACCESS TO CLASSIFIED NATIONAL SECURITY INFORMATION

Having familiarized myself with the applicable statutes, regulations, and orders related to, but not limited to, unauthorized disclosure of classified information, espionage and related offenses; The Intelligence Identities Protection Act, 50 U.S.C. § 421; 18 U.S.C. § 641; 50 U.S.C. § 783; 28 C.F.R. § 17 et seq.; and Executive Order 12958; I understand that I may be the recipient of information and documents that belong to the United States and concern the present and future security of the United States, and that such documents and information together with the methods and sources of collecting it are classified by the United States government. In consideration for the disclosure of classified information and documents:

(1) I agree that I shall never divulge, publish, or reveal either by word, conduct or any other means, such classified documents and information unless specifically authorized in writing to do so by an authorized representative of the United States government, or as expressly authorized by the Protective Order entered in the case captioned _____.

(2) I agree that this Memorandum of Understanding and any other non-disclosure agreement signed by me will remain forever binding on me.(3) I have received, read, and understand the Protective Order entered by the court in the case captioned _____, and I agree to comply with the provisions thereof.

16

# Exhibit B

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 07-1399**                                    **September Term, 2007**

Ramzi Bin Al-Shibh,
       Petitioner

    v.

Robert M. Gates, U.S. Secretary of Defense,
       Respondent

**Filed On:**



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED     JAN 2 2008

CLERK

**BEFORE:**   Sentelle, Brown, and Griffith, Circuit Judges

## O R D E R

    Upon consideration of the motion for leave to proceed in forma pauperis and the stipulation to immediate entry of <u>Khan</u> Protective Order, it is

    **ORDERED** that the motion for leave to proceed in forma pauperis be granted.  It is

    **FURTHER ORDERED** that the protective order attached as Exhibit A to the above-referenced stipulation be entered in accordance with the terms of the stipulation, pending further order of the court.

**Per Curiam**

                       **FOR THE COURT:**
                       Mark J. Langer, Clerk

           BY:

                       Deputy Clerk/LD

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 07-1520**                                    **September Term, 2007**

**Filed On:**

Zayn Al Abidin Muhammad Husayn,
　　　　Petitioner

　　　v.

Robert M. Gates, U.S. Secretary of Defense,
　　　　Respondent



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   JAN 2 2008

CLERK

**BEFORE:**    Sentelle, Brown, and Griffith, Circuit Judges

## O R D E R

　　Upon consideration of the motion for leave to proceed in forma pauperis and the stipulation to immediate entry of <u>Khan</u> Protective Order, it is

　　**ORDERED** that the motion for leave to proceed in forma pauperis be granted.  It is

　　**FURTHER ORDERED** that the protective order attached as Exhibit A to the above-referenced stipulation be entered in accordance with the terms of the stipulation, pending further order of the court.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: _____

Deputy Clerk/LD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | **Misc. No. 08-442 (TFH)** |
| **IN RE:** | ) | |
| **GUANTANAMO BAY** | ) | **Civil Action Nos.** |
| **DETAINEE LITIGATION** | ) | **06-CV-1690, 08-1085, 08-1207, 08-1360** |
| | ) | |
| | ) | |
| | ) | |

**PROTECTIVE ORDER PERTAINING TO CERTAIN CASES INVOLVING
TOP SECRET / SENSITIVE COMPARTMENTED INFORMATION
("TS/SCI PROTECTIVE ORDER")**

The Court finds that this case involves national security information or documents,

including TOP SECRET/ SENSITIVE COMPARTED INFORMATION ("TS/SCI"), the storage,

handling, and control of which require special security precautions, and access to which requires

an appropriate security clearance and a "need to know."  This case may also involve other

protected information or documents, the storage, handling and control of which may require

special precautions in order to protect the security of United States personnel and facilities, and

other significant interests.

Accordingly, in order to protect national security interests and for good cause shown,

IT IS SO ORDERED:

1.      The following orders previously entered in these and other Guantanamo Bay

detainee habeas corpus cases apply in this case, except as otherwise provided in this TS/SCI

Protective Order: (1) the Amended Protective Order and Procedures for Counsel Access to

Detainees at the United States Naval Base in Guantánamo Bay, Cuba, first issued on November

8, 2004, 344 F. Supp. 2d 174 (D.D.C. 2004) ("Amended Protective Order"); the Order

Addressing Designation Procedures for "Protected Information," first issued on November 10,

2004; and (3) the Order Supplementing and Amending Filing Procedures Contained in

November 8, 2004 Amended Protective Order, first issued on December 13, 2004.

2.    The Guantanamo Procedure Guide for Counsel Access in Detainee Habeas Cases

Involving TS/SCI Material, attached hereto as Exhibit A to this TS/SCI Protective Order, shall

apply in this case in the place of Exhibit A to the Amended Protective Order for governing

counsel access to detainees in the control of the Department of Defense ("DoD") at the U.S.

Naval Base at Guantanamo Bay, Cuba, for purposes of litigating this case.

3.    Paragraph 16 of the Amended Protective Order shall be modified in this case to

read:

The Court designates Christine E. Gunning as Court Security Officer for

these cases, and Jennifer H. Campbell, Miguel A. Ferrer, Daniel O. Hartenstine,

Erin E. Hogarty, Nathaniel A. Johnson, Joan B. Kennedy, James P. Londergan,

Michael P. Macisso and Barbara J. Russell as alternate court security officers for

the purpose of providing security arrangements necessary to prevent the

unauthorized disclosure of any classified documents or information, or protected

documents or information, to be made available in connection with these cases.

Petitioners' counsel shall seek guidance from the Court Security Officer with

regard to appropriate storage, handling, transmittal, and use of classified

documents or information.

4.      Paragraph 29 of the Amended Protective Order shall be modified in this case to delete the second, third, and fourth sentences of that paragraph.

SO ORDERED.


Dated: _____            _____
                                                                Thomas F. Hogan
                                                      United States District Judge

Exhibit A

### GUANTANAMO PROCEDURE GUIDE
### FOR COUNSEL ACCESS IN DETAINEE HABEAS CASES INVOLVING TS/SCI
### MATERIAL

**1. Acknowledgment of and Compliance with Access and Information Handling Procedures**

1.1 Before being granted access to certain designated detainees whose cases may involve material classified as Top Secret/Sensitive Compartmented Information (hereinafter "TS/SCI"), Petitioner's Counsel (hereinafter "counsel"), will receive a copy of this Guantanamo Procedure Guide for Counsel Access in Detainee Habeas Cases Involving TS/SCI Material. To have access to designated detainees, counsel must agree to comply fully with all procedures in this Guide. Counsel must also sign the attached affirmation acknowledging his/her agreement to comply, have the necessary security clearances, and present the Department of Justice adequate evidence of authorization to represent the detainee or the next-friend petitioner.

1.2 This affirmation will not be considered an acknowledgment by counsel that the procedures within this Guide are legally permissible. However, even if counsel elects to challenge these procedures, counsel may not knowingly disobey an obligation imposed by these procedures until such time, if any, that the procedures are modified or revoked by the United States Department of Defense or by a United States District Court or Court of Appeals, or the United States Supreme Court.

1.3 Commander, Joint Task Force-Guantanamo (hereinafter "JTF-GTMO") may suspend the privilege of visiting Guantanamo if he determines a violation of this Guide has occurred or in other appropriate circumstances. Violation of this Guide could also provide grounds for revocation of counsel's security clearance. This Guide is published in an effort to facilitate counsel's access to their clients and is consistent with the current TS/SCI Protective Order established in the Guantanamo detainee habeas cases (hereinafter "TS/SCI Protective Order"). However, it is not intended and does not purport to establish any substantive or procedural rights

for detainees. Moreover, nothing in this Guide shall limit the authority of the Commander of JTF-GTMO to require the imposition of additional security procedures, relating to access to the detainee based on operational requirements, security needs and military resources at JTF-GTMO. Counsel will be advised of any such changes as soon as practicable.

1.4 All documents containing information about or related to material classified as TS/SCI must be handled in accordance with the security procedures established in the TS/SCI Protective Order and this Guide. Materials classified as TS/SCI shall not be handled by counsel outside designated areas while at Guantanamo. All classified material created by an attorney or the detainee that is related to a detainee's case will be transmitted from Guantanamo to Washington, D.C. via secure point–to-point electronic transmission, or via USG designated courier in a sealed container, designed to protect attorney-client confidentiality. (Because these materials must be handled TS/SCI, they cannot be transmitted by mail.) Classified information that is transported at Guantanamo shall be handled in accordance with the security procedures established in  of the TS/SCI Protective Order and this  Guide

**2. Logistics of Counsel Visit**

2.1 Issues related to logistics of counsel visits not addressed by the TS/SCI Protective Order or this Guide are governed by procedures applicable to visits of counsel representing other Guantanamo detainees.

**3. Mail Procedures**

**A. <u>Mail Sent by Counsel for Delivery to Detainee (Incoming Mail)</u>**

***Legal Mail***

3.1 Legal mail consists of correspondence between counsel and a detainee related to counsel's representation of the detainee, as well as privileged documents and publicly filed legal documents relating to that representation.  Legal mail  is to be processed in accordance with the TS/SCI Protective Order and subject to  security review for  contraband by the DoD Privilege Team.  Written and oral communications with a detainee, including all incoming legal mail, shall

not include any of the following information, in any form, unless directly related to the litigation of this action: information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency; information relating to current political events in any country; information relating to security procedures at the Guantánamo Naval Base (including names of United States government personnel and the layout of camp facilities); the status of other detainees; publications, articles, reports, or other such material including newspaper or other media articles, pamphlets, brochures, and publications by nongovernmental or advocacy organizations, or any descriptions of such material.

Counsel shall send incoming legal mail for a detainee to the DoD Privilege Team (referenced in the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba, first issued on November 8, 2004, 344 F. Supp. 2d 174 (D.D.C. 2004)) at an address supplied by the government.  Each envelope or mailer shall be labeled with the name and Internment Serial Number (ISN) of the detainee and shall include a return address for counsel sending the materials. The outside of the envelope or mailer for incoming legal mail shall be labeled clearly with the following annotation: "Attorney-Detainee Materials-For Mail Delivery to Detainee." Each page of legal mail shall be labeled "Attorney-Detainee Materials." No staples, paper clips or any non-paper items shall be included with the documents.

Upon receiving legal mail, the DoD Privilege Team shall open the envelope or mailer to search the contents for prohibited  contraband.

Following its review, the DoD Privilege Team shall send legal mail approved for delivery to the detainee to personnel at Guantanamo Bay. The DoD Privilege Team is not required to send legal mail to personnel at Guantanamo Bay in the event of a dispute with counsel regarding the presence of contraband. Each page of legal mail that is approved for delivery to the detainee by DoD Privilege Team shall be marked/stamped "Legal Mail Approved by Privilege Team" and

placed in a sealed envelope bearing the same marking on the exterior. Within three (3) business days of receipt of legal mail from the DoD Privilege Team, personnel at Guantanamo shall deliver the envelope bearing the approved DoD Privilege Team marking to the detainee without opening the envelope. In the event an envelope approved by the DoD Privilege Team arrives at Guantanamo bearing evidence of tampering or physical contraband, JTF-GTMO personnel retain the authority to return the envelope, without opening it, to the DoD Privilege Team for appropriate action.

The detainee shall be responsible for mailing any confirmation of delivery to counsel as outgoing legal mail. This method shall be the sole and exclusive means by which confirmation of delivery is provided to counsel.

### *Non-Legal Mail*

3.2 Written correspondence to a detainee not falling within the legal mail definition of the TS/SCI Protective Order (also referred to as "non-legal mail") shall be sent through the United States Postal Service to the following address: Detainee's Name and ISN, U.S. Naval Base, Guantanamo Bay, Cuba, Washington, D.C. 20355. These non-privileged communications will be reviewed by military personnel at Guantanamo under the standard operating procedures for detainee non-legal mail.

### B. Mail Sent by Detainee to Counsel (Outgoing Legal Mail)

### *Legal Mail (All such Legal Mail is Presumptively TS/SCI)*

3.3 Guantanamo will provide each detainee with paper to prepare legal mail communications to counsel. Access to such items may be limited or restricted because of the detainee's disciplinary and/or medical status, although a detainee's disciplinary and/or medical status shall not be a basis for denying all access to such items. Any outgoing legal mail will be handled as if it is classified at the TS/SCI level, as defined by the TS/SCI Protective Order, pending an appropriate classification review of the legal mail by a DoD Privilege Team member.

3.4 When legal mail is ready to be sent, the detainee will notify the guard staff, who will contact the SJA legal mail clerk. In the presence of the SJA legal mail clerk, the detainee will double-wrap all legal mail. Each envelope will be annotated with the words "Attorney-Detainee Materials-For Delivery To Counsel." Each envelope shall be labeled with the name of the detainee, the detainee's ISN, and the name of the detainee's counsel.

3.5 The SJA mail clerk will place the outgoing mail into a courier bag, which will then be locked, and hand delivered to a DoD Privilege Team member at Guantanamo. The DoD Privilege Team member will send all approved legal mail to the secure facility in Washington, D.C., through a secure electronic point-to-point transfer system in a manner designed to protect the classified material as well as attorney-client confidentiality. All originals of legal mail sent by a detainee will be stored in a safe located in the secure area in Guantanamo in a manner designed to protect classified material as well as attorney-client confidentiality. The DoD Privilege Team will notify counsel via email when legal mail has been received at the secure facility in Washington D.C.

**Non-Legal Mail**

3.6 Non-legal mail communications and combined non-legal/legal mail communications from detainees, including written communications to persons other than counsel, shall be sent through the United States Postal Service and are subject to ordinary review by military personnel at Guantanamo under the standard operating procedures for detainee non-legal mail. Any envelope or communication submitted by a detainee to Guantanamo personnel for mailing will be processed as non-legal mail unless the envelope or communication meets the criteria for legal mail listed above.

In the event any non-legal correspondence or messages from a detainee to individuals other than his counsel (including but not limited to family/friends or other attorneys) or communications not generated by the detainee (*e.g.*, notes from other detainees) are sent to counsel as legal mail, the DoD Privilege Team shall notify counsel that the material will not be

processed and the DoD Privilege Team shall return the communication to Guantanamo for processing according to the standard operating procedures for detainee non-legal mail. In the event non-legal communications are included with legal mail communications such that the non-legal mail communication cannot be segregated and returned to Guantanamo for processing in accordance with standard operating procedures for non-legal mail, the DoD Privilege Team shall redact or screen out any material not meeting the definition of "Legal Mail."

Classified information may not be sent through non-legal mail channels.

**4. Materials Brought Into a Meeting between Counsel and Detainee**

4.1 Counsel shall bring only writing utensils, and blank paper into any meeting with a detainee, unless counsel has received prior approval from Commander, JTF- GTMO. Blank paper may not be left with the detainee.

**A. <u>Categories of Materials</u>**

***Legal Mail***

4.2 All legal mail counsel seeks to bring to a meeting with a detainee must be processed pursuant to the general procedures set out in § 3.A of this document. Each page of legal mail that counsel seek to bring into a meeting with a detainee following screening by the DoD Privilege Team must be marked/stamped by the DoD Privilege Team with the following annotation: "Legal Mail Approved by Privilege Team." Commander, JTF-GTMO, after confirming that the materials are stamped as indicated above, will permit counsel to bring stamped materials into a meeting with a detainee-client subject to the contraband screening policies discussed above. Counsel are responsible for submitting to the DoD Privilege Team any legal mail that they seek to hand-carry into the meeting that they seek to have reviewed by the DoD Privilege Team twenty-one (21) days in advance of counsel's scheduled visit in order to allow the DoD Privilege Team to review the documents and return them to counsel.

*Non-Legal Mail*

4.3 With the exception of writing utensils, blank paper, and legal mail screened as discussed above, any communications or physical items that counsel seek to bring into a meeting must be approved in advance by the Commander, JTF-GTMO. All such non-legal items submitted for advanced review in connection with a counsel visit must be received by Guantanamo through the United States Postal Service twenty-one (21) days in advance of counsel's requested visit. Counsel may send non-legal materials to the following address: Detainee's Name and ISN, U.S. Naval Base, Guantanamo Bay, Cuba, Washington, D.C. 20355. Review of this material will be conducted as resources allow and include both a physical contraband inspection as well as a substantive review of any written content. There is no guarantee that this non-legal material will be processed and approved in advance of a visit. Nonetheless, providing material in advance will speed up processing and increase the likelihood that material requested will be allowed to be carried into a meeting with the detainee.

*Food Items*

4.4 Counsel may bring food items into a meeting, but all authorized food items must be consumed during the visit or removed by counsel. JTF-GTMO personnel will inspect all food items. Any food item may not be allowed into a meeting location if it is determined by guard personnel that the proposed items constitute a hazard or other security issue. Counsel must ensure that all food items not consumed and packaging and debris are collected from the meeting area prior to each departure. Counsel agree to notify the guards if the detainee keeps and/or refuses to return any item brought in by counsel that the detainee is not authorized to keep. Failure to notify the guards can result in a loss of the privilege to bring food items to future meetings. Flowers, balloons and other similar items are expressly prohibited.

**5. Materials Brought Out of a Meeting between Counsel and Detainee**

5.1 Upon completion of each meeting with a detainee or during any break in a meeting session, the notes or documents carried into, used or produced during the meeting, except those

left in the possession of the detainee, shall be transported to the secure area, and placed in a safe in a manner designed to protect classified material and attorney-client confidentiality. These materials will be sealed in the presence of counsel and handled as TS/SCI material.

5.2 If further counsel-detainee meetings are scheduled where these materials may be used, counsel will advise on which materials the counsel wants to take into the next meeting. These materials will be placed in a separate envelope and made available to the counsel for use at the next meeting.

5.3 All materials coming out of the counsel-detainee meeting are presumptively TS/SCI, even if the document was unclassified going into the meeting (to account for, among other things, the possible addition of notations to the materials during the meeting). Upon completion of the counsel's visit to JTF-GTMO, the DoD Privilege Team member in Guantanamo will conduct a review to determine that any originally unclassified documents have not been modified in any way. Unclassified materials will be mailed to an address designated by counsel, or, if no such address has been designated, to the secure facility in Washington, DC. Other materials shall be sent by the Privilege Team or by courier to the Washington, D.C., secure facility in accordance with governing security regulations.

5.4 For other material coming out of the counsel-detainee meeting, the DoD Privilege Team will send English language documents containing any potentially classified information to the secure facility in Washington, D.C. through a secure electronic point-to-point transfer system, or via USG designated courier in a sealed container, in a manner designed to protect classified material and attorney-client confidentiality. All foreign language materials will be sent to the secure facility in Washington, D.C. through this same electronic mechanism. The original notes, documents, and other materials shall be stored in a safe located within the secure area at JTF-Guantanamo, in a manner designed to protect classified material and attorney-client confidentiality. The DoD Privilege Team will notify counsel via email when the electronically transmitted materials have been received at the secure facility in Washington, D.C.

5.5 Non-legal mail communications provided to the DoD Privilege Team by counsel following a visit shall be processed as non-legal mail .

5.6 During a meeting with a detainee, counsel may provide the detainee with any written documents that were approved to be brought into the meeting. The detainee will be permitted to bring all such privileged documents back to his cell at the conclusion of the meeting, subject to an appropriate contraband review by JTF-GTMO. The detainee may also bring back to his cell any documents, notes, or communications created by the detainee and/or counsel during the course of the meeting, subject to an appropriate contraband review by JTF-GTMO.

**6. Classification Determination of Communications between Counsel and Detainee**

6.1 Subject to the review described above, all information provided and materials sent by a detainee to counsel or brought out of a meeting by counsel will be handled and treated as classified at the TS/SCI level, pending an appropriate classification review.

**A. <u>Classification Request of Detainee Communications</u>**

6.2 Counsel may submit information learned from a detainee to the DoD Privilege Team located at the secure facility in the Washington, DC area. for a classification and security review which may result in a determination of its appropriate security classification and whether it contains protected material. Counsel shall memorialize the information submitted for classification and security review into a written memorandum outlining as specifically as possible the information for which counsel requests a classification determination. All documents submitted for classification and security review shall be prepared, handled and treated in the manner required for classified materials, as required by Executive Order 12958 (as amended), DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

6.2.1  With the consent of counsel, the DOD Privilege Team may consult with an individual or individuals in appropriate federal agencies for the purpose of identifying classified

information and marking the documents with the appropriate classification. If counsel does not consent to such consultation, information for which consultation is required will remain classified. Any such consultation will not waive attorney client, attorney work product, or any other applicable privilege. Further, the individual consulted for such purposes will not share the information with other government lawyers and/or officers involved in the litigation of this or other matters involving the petitioner, and the information shall not be used as a result of the consultation in the interrogation or investigation of petitioner. If the individual consulted is involved in the classification review of other documents, that individual may have discussions concerning such documents with government lawyers and/or officers involved in this and other matters involving the petitioner on condition that such discussions be for the sole purpose of classification review of such documents.

6.3 Materials provided by counsel to the DoD Privilege Team must be in legible handwriting or transcribed by typewriter or computer. Materials that the DoD Privilege Team determines are not legible will be returned to the secure facility and counsel will be required to transcribe those materials into type-written form. Materials that are not in English must be accompanied by an English translation. Each page of the document submitted for classification review shall be marked "Attorney-Detainee Materials" and "Classified." Materials that do not comply with any of these requirements will not be processed, and will be returned to counsel at the secure facility within five (5) business days.

6.4 As soon as possible after conducting the classification and security review, the DoD Privilege Team shall advise counsel of the classification levels of the information contained in the materials submitted for review. The DoD Privilege Team will also designate material as "protected." Pursuant to  the TS/SCI Protective Order, counsel shall not publicly disclose information designated as "protected." If counsel seeks to use the information in a public court filing, the document should be filed through the Court Security Officer and the Government then

have the opportunity to have the material maintained under seal as protected (pursuant to the TS/SCI Protective Order).

6.5 The DoD Privilege Team shall not be required to perform classification review of any communications that fall outside the scope of legal mail, as defined by the TS/SCI Protective Order. Communications not reviewed by the DoD Privilege Team shall remain presumptively classified.

6.6 The DoD Privilege Team may not disclose a communication from counsel to the detainee or from the detainee to his counsel other than information provided in a filing with the Court and served on government counsel, unless the disclosure of such information is authorized by this or another order of the Court or by petitioner's counsel or is to the Special Litigation Team representing the DoD Privilege Team. The Special Litigation Team likewise may not disclose information provided by the DoD Privilege Team, or any information submitted by counsel to the DoD Privilege Team for review, except as provided by this Order or as permitted by counsel or by the Court. The DoD Privilege Team may, through the Special Litigation Team inform the Court of any issues or problems related to the release or processing of information related to this case. In the event a dispute regarding aspects of legal mail sent from counsel to a detainee cannot be resolved with counsel and counsel seeks the intervention of this Court, the DoD Privilege Team may disclose the material at issue to the Commander, JTF-Guantánamo Naval Base or his representatives, including counsel for the Government.

6.7 If, at any time, the DoD Privilege Team determines that information in the documents submitted by counsel involve any future event that threatens national security or is likely to involve violence, the DoD Privilege Team will disclose this information to Commander, JTF-GTMO.

6.8 Petitioner's counsel shall disclose to government counsel or Commander, JTF-GTMO any information learned from a detainee involving future events that threaten national security or involve imminent violence.

## **ACKNOWLEDGMENT**

The undersigned hereby acknowledges that he/she has read the Guantanamo Procedure Guide for

Counsel Access in Detainee Habeas Cases Involving TS/SCI Material , understands its terms, and

agrees to be bound by each of those terms. The undersigned acknowledges that his/her duties

under the  Guantanamo Procedure Guide for Counsel Access in Detainee Habeas Cases Involving

TS/SCI Material shall survive the termination of this case, are permanently binding, and that

failure to comply with the terms of the Guantanamo Procedure Guide for Counsel Access in

Detainee Habeas Cases Involving TS/SCI Material could provide grounds for revocation of

counsel's security clearance and/or suspension or termination of counsel's access to Guantanamo.

DATED: _____ BY: _____
                                                (type or print name)

SIGNED:_____