**EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MAJID KHAN, et al., )
 )
    Petitioners )
 )
v. ) Civil Action No. 06-CV-1690 (RBW)
 )
GEORGE W. BUSH, )
    President of the United States, )
    et al., )
 )
    Respondents. )
_____ )

## DECLARATION OF MARILYN A. DORN, INFORMATION REVIEW OFFICER, CENTRAL INTELLIGENCE AGENCY

I, MARILYN A. DORN, hereby declare and say:

1. I am the Information Review Officer (IRO) for the National Clandestine Service (NCS) of the Central Intelligence Agency (CIA). After serving one and a half years as Associate NCS/IRO, I was appointed to my current position on 1 August 2003.

2. The NCS is the organization within the CIA responsible for conducting the CIA's foreign intelligence and counterintelligence activities; conducting covert action; conducting liaison with foreign intelligence and security services; serving as the repository for foreign counterintelligence information; supporting clandestine technical collection; and coordinating CIA support to the Department of Defense. Specifically, the NCS is responsible for the conduct of foreign intelligence collection through the clandestine use of human sources.

3. The IRO is responsible for the review of records maintained by offices in the NCS that may be responsive to requests from the Department of Justice in criminal and civil litigation. As part of my official duties, I ensure that determinations such as the release or withholding of information related to the CIA are proper and do not jeopardize CIA interests, personnel, or facilities, and, on behalf of the Director of the CIA, do not jeopardize CIA intelligence activities, sources, or methods.

4. As a senior CIA official and under a written delegation of authority pursuant to section 1.3(c) of Executive Order 12958, as amended,[1] I hold original classification authority at the TOP SECRET level. Therefore, I am authorized to conduct classification reviews and to make original classification and declassification decisions.

5. Through the exercise of my official duties, I am generally familiar with this case. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

## Purpose of this Declaration

6. I understand that a Petition for Writ of Habeas Corpus has been filed on behalf of Majid Kahn and that petitioner's counsel has requested that the Court enter a standard protective order used in a number of previous cases involving detainees at the United States Naval Base in Guantanamo Bay, Cuba. Such protective orders are entered to establish the procedures that must be followed by petitioner's counsel and various other individuals who receive access to potentially classified national security information in connection with these cases. The purpose of this declaration is to inform the Court that

---

[1] (U) Executive Order 12958 was amended by Executive Order 13292. See Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. See Exec. Order No. 12,958, 3 C.F.R. 333 (1995), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

the classified national security information likely to arise in this case is different and more sensitive than any of the previous cases involving detainees at Guantanamo Bay. Therefore, the standard protective order used in previous cases is insufficient to protect that information.

### The Classified National Security Information at Issue

7. On September 6, 2006, President George W. Bush delivered a speech in which he disclosed the existence of a secret CIA program to capture, detain, and interrogate key terrorist leaders and operatives in order to help prevent terrorist attacks. President Bush also disclosed that fourteen individuals formerly in CIA custody as part of the secret CIA program had been transferred to Department of Defense (DOD) custody at Guantanamo Bay. Petitioner was one of the fourteen individuals formerly in the secret CIA program, now detained by DOD at Guantanamo Bay.

8. While the President publicly disclosed that the fourteen individuals were detained and questioned outside the United States in a program operated by the CIA, he also explicitly stated that many specifics of the program, including where the detainees had been held, the details of their confinement, the employment of alternative interrogation methods, and other operational details could not be divulged and would remain classified. In fact, such details constitute and involve TOP SECRET, Sensitive Compartmented Information (SCI).

9. Under Executive Order 12958, as amended, the anticipated severity of the damage to national security resulting from disclosure determines which of three classification levels is applied to the information. Thus, if an unauthorized disclosure of information reasonably could be expected to cause *damage* to the national security, that

information may be classified as CONFIDENTIAL; *serious damage* may be classified as SECRET; and *exceptionally grave damage* may be classified as TOP SECRET. Executive Order 12958, section 4.3, provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure. This section further provides that the Director of the CIA is responsible for establishing and maintaining special access programs relating to intelligence activities, sources, and methods. These special access programs relating to intelligence are called Sensitive Compartmented Information (SCI) programs.

10. Information relating to the CIA terrorist detention program has been placed in a TOP SECRET//SCI program to enhance protection from unauthorized disclosure. Because Majid Kahn was detained by CIA in this program, he may have come into possession of information, including locations of detention, conditions of detention, and alternative interrogation techniques, that is classified at the TOP SECRET//SCI level.

The Damage to the National Security

11. The President made clear in his speech that operation of the secret CIA detention program will continue. In order to fully appreciate the risk to the national security that disclosure of the operational details of the program would pose, the Court must first understand the importance of the program to the national security. Information obtained from the program has provided the U.S. Government with one of the most useful tools in combating terrorist threats to the national security. It has shed light on probable targets and likely methods for attacks on the United States, and has led to the

disruption of terrorist plots against the United States and its allies. Information obtained from the program has also played a role in the capture and questioning of additional senior al Qaeda operatives.

12. One of the most critical tools in the war against al Qaeda and its affiliates is the close intelligence relationships that the United States maintains with allies around the world. Many countries take great risks in order to assist the United States, and they do so with the explicit agreement that the nature of their assistance will remain secret. Should operational details about the program be improperly disclosed, such as the locations of CIA detention facilities, it would put our allies at risk of terrorist retaliation and betray relationships that are built on trust and are vital to our efforts against terrorism.

13. Improper disclosure of details regarding the conditions of detention and specific alternative interrogation procedures could also cause exceptionally grave consequences. Many terrorist operatives are specifically trained in counter-interrogation techniques. If specific alternative techniques were disclosed, it would permit terrorist organizations to adapt their training to counter the tactics that CIA can employ in interrogations. If detainees in the CIA program are more fully prepared to resist interrogation, it could prevent the CIA from obtaining vital intelligence that could disrupt future planned attacks.

<u>The Inadequacy of the Standard Protective Order Used in Previous Cases</u>

14. The very purpose of a protective order is to establish the procedures that are to be followed by petitioner's counsel, translators for the parties, and various other individuals who will receive access to potentially classified national security information. The protective order that petitioner requests the Court to adopt contemplates that the

national security information at issue would be classified at the SECRET level, rather than at the TOP SECRET//SCI level as it is here. As such, the standard protective order used in previous detainee habeas cases fails, on its face, to adequately protect the national security information that may arise in this case.

15. By way of specific example, the protective order proposed by petitioner requires petitioners' counsel to hold a valid United States security clearance at only the SECRET level. Similarly, it does not require other individuals who may have access to potentially classified information provided by a detainee, such as translators, to possess clearances above the SECRET level. To adequately protect TOP SECRET//SCI information potentially provided by a detainee, access to such information would have to be restricted to individuals with TOP SECRET// SCI security clearances who have received briefings regarding the security procedures, signed a non-disclosure agreement, and been determined to have a need-to-know[2] the information at issue. In addition, the protective order proposed by petitioner permits procedures for handling and controlling potentially classified information that may be permissible for SECRET information, but is expressly prohibited for TOP SECRET//SCI. For example, information classified at the SECRET level may be transmitted via certified mail, a procedure that is prohibited for our nation's most guarded secrets at the TOP SECRET//SCI level. Similarly, documents at the SECRET level may be stored in a facility with fewer security devices than information at the TOP SECRET//SCI level. A protective order that allows individuals without the necessary security clearances access to TOP SECRET//SCI information, or permits the use of procedures not appropriate for TOP SECRET//SCI

---

[2] Executive Order 12958, as amended, defines "need-to-know" as a "determination by an authorized holder of classified information that a prospective recipient requires access to classified information in order to perform or assist in a lawful and authorized governmental function."

information, cannot possibly begin to adequately protect such information from unauthorized disclosure. Moreover, such procedures would explicitly violate the safeguarding requirements prescribed to protect classified information in Executive Order 12958, Part 4, as amended.

## Conclusion

16. I have determined that Majid Kahn may have come into possession of national security information that is classified at the TOP SECRET// SCI level. I have also determined that handling of such information under the standard protective order used in previous cases poses an unacceptable risk of disclosure, which reasonably could be expected to cause extremely grave damage to the national security.

\* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26TH day of October, 2006.

Marilyn A. Dorn
Information Review Officer
National Clandestine Service
Central Intelligence Agency