**EXHIBIT 3**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MAJID KHAN,                    )
                               )
        Petitioner,            )
                               )
    v.                         )  No. 07-1324
                               )
                               )
ROBERT M. GATES,               )
                               )
        Respondent.            )
_____)

**DECLARATION OF WENDY M. HILTON**
**ASSOCIATE INFORMATION REVIEW OFFICER**
**NATIONAL CLANDESTINE SERVICE**
<u>**CENTRAL INTELLIGENCE AGENCY**</u>

I, WENDY M. HILTON, hereby declare and say:

1. I am an Associate Information Review Officer (AIRO) for the National Clandestine Service (NCS) of the Central Intelligence Agency (CIA). I was appointed to this position in March 2007. I have held a variety of positions in the CIA since I became a staff officer in 1983.

2. The NCS is the organization within the CIA responsible for conducting the CIA's foreign intelligence and counterintelligence activities; conducting special activities, including covert action; conducting liaison with foreign intelligence and security services; serving as the repository for foreign counterintelligence information; supporting

clandestine technical collection; and coordinating CIA support to the Department of Defense. Specifically, the NCS is responsible for the conduct of foreign intelligence collection activities through the clandestine use of human sources.

3. As AIRO, I am authorized to assess the current, proper classification of CIA information based on the classification criteria of Executive Order 12958, as amended,[1] and applicable CIA regulations. As part of my official duties, I ensure that determinations such as the release or withholding of information related to the CIA are proper and do not jeopardize CIA interests, personnel, or facilities, and, on behalf of the Director of the CIA, do not jeopardize CIA intelligence activities, sources, or methods. I am able to describe, based on my experience, the damage to the national security that reasonably could be expected to result from the unauthorized disclosure of classified information.

4. Section 6.1 of Executive Order 12958 defines "national security" as "the national defense or foreign relations of the United States;" and defines "information" as "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by

---

[1] Executive Order 12958 was amended by Executive Order 13292. See Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. See Exec. Order No. 12958, 3 C.F.R. 333 (1995), reprinted as amended in 50 U.S.C.A. § 435 note at 187 (West Supp. 2007).

2

or for, or is under the control of the United States Government."

5. Section 1.1(a) of the Executive Order provides that information may be originally classified under the terms of this order only if the following conditions are met:

   (1) an original classification authority is classifying the information;

   (2) the information is owned by, produced by or for, or is under the control of the United States Government;

   (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

   (4) The original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order 12958, § 1.1(a).

6. Section 1.3(a) of the Executive Order provides that the authority to classify information originally may be exercised only by the President and, in the performance of executive duties, the Vice President; agency heads and officials designated by the President in the Federal Register; and United States Government officials delegated this authority pursuant to section 1.3(c) of the Order. Section 1.3(c)(2) provides that TOP SECRET original classification authority may be delegated only by the President; in the performance of executive duties,

the Vice President; or an agency head or official designated pursuant to section 1.3(a)(2) of the Executive Order.

7. In accordance with section 1.3(a)(2), the President designated the Director of the CIA as an official who may classify information originally as TOP SECRET.[2] Under the authority of section 1.3(c)(2), the Director of the CIA has delegated original TOP SECRET classification authority to me. Section 1.3(b) of the Executive Order provides that original TOP SECRET classification authority includes the authority to classify information originally as SECRET and CONFIDENTIAL. I am authorized, therefore, to conduct classification reviews and to make original classification and declassification decisions regarding national security information.

8. Section 102(A)(i) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1(i), requires the Director of National Intelligence (DNI) to protect intelligence sources and methods from unauthorized disclosure. As explained below, petitioner Majid Khan has been exposed to intelligence sources and methods that the DNI is required to protect from unauthorized disclosure. For this reason, the DNI authorized me to take all necessary and appropriate measures in this case to ensure that intelligence sources and methods are protected from

---

[2] Order of President, Designation under Executive Order 12958, 70 Fed. Reg. 21,609 (Apr. 21, 2005), reprinted in U.S.C.A. § 435 note at 199 (West Supp. 2007).

4

public disclosure. Under this authorization of the DNI and in accordance with section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g, and sections 1.3(a)(5) and 1.5(h) of Executive Order 12333, the DCIA is responsible for protecting CIA sources and methods from unauthorized disclosure.

9. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

10. Through the exercise of my official duties, I am generally familiar with this case. I understand that Petitioner has filed a Petition under the Detainee Treatment Act (DTA) challenging the determination by the Department of Defense (DOD) that Petitioner should continue to be detained as an enemy combatant at Guantanamo Bay, Cuba. I also understand that a protective order was entered by the Court on 12 October 2007. I have reviewed in their entirety Petitioner's Motion for Preservation of Torture Evidence and Motion to Declare Interrogation Methods Applied Against Petitioner Torture and all accompanying exhibits to these motions. I understand that The New York Times Company, the Associated Press, and USA Today have filed a motion to unseal certain classified filings made in this case. The purpose of this declaration is to describe for the Court the damage to the national security that reasonably could

5

be expected to result if the classified information in these filings is unsealed.

11. Petitioner and the fifteen other high-value detainees at Guantanamo Bay formerly held in CIA custody (HVDs)[3] have been exposed to intelligence sources and methods. In addition to being protected from disclosure under the National Security Act of 1947 and the Central Intelligence Agency Act of 1949, these sources and methods also are classified information the disclosure of which reasonably could be expected to result in exceptionally grave damage to the national security. Specifically, the locations of CIA intelligence activities overseas, the assistance provided by certain foreign governments in furtherance of those activities, and the conditions of confinement and interrogation methods used by the CIA are all properly classified intelligence sources and methods. Part I of this declaration describes the intelligence activities implicated in this case and the exceptionally grave damage to national security that reasonably could be expected to result if Petitioner's classified statements about these intelligence sources and methods are publicly disclosed. Part II of this declaration describes the extraordinary measures the U.S. Government has taken to ensure that the classified information

---

[3] On September 6, 2006, the President announced that fourteen detainees who had been held in CIA custody had been transferred to Department of Defense custody at Guantanamo Bay, Cuba. Two additional detainees were later transferred to Guantanamo Bay from CIA custody.

6

to which the HVDs have been exposed is protected against unauthorized disclosure.

## I. Damage to National Security Resulting from Public Disclosure of Petitioner's Statements about CIA Intelligence Activities

12. Public disclosure of the classified information to which Petitioner has been exposed reasonably could be expected to cause exceptionally grave damage to the national security. Specifically, disclosure of such information is reasonably likely to damage the CIA's relationships with foreign intelligence and security services and thereby degrade the CIA's ability to effectively question terrorist detainees and elicit information necessary to protect the American people.

### A. Damage to Foreign Relations

13. Among the most critical sources and methods in the collection of foreign intelligence are the relationships that the United States maintains with the intelligence and security services of foreign countries. Through these intelligence liaison relationships, the CIA can collect intelligence and provide to U.S. national security and foreign policy officials information that is critical to informed decision making; information that the CIA cannot obtain through other sources and methods.

14. In this case, foreign governments have provided critical assistance to CIA counterterrorism operations,

7

including but not limited to hosting of foreign detention facilities, under the condition that their assistance be kept secret. Statements from Petitioner and other HVDs acknowledged to have been in the CIA's detention program about the specific foreign detention locations and other critical assistance that foreign countries have provided to the CIA's counterterrorism operations would damage the CIA's relations with these foreign governments and could cause them to cease cooperating with the CIA on such matters. If the United States demonstrates that it is unwilling or unable to stand by its commitments to foreign governments, they will be less willing to cooperate with the United States on counterterrorism activities.

15. The damage to national security that could result if Petitioner and other HVDs were permitted to discuss their knowledge about foreign cooperation is not merely conjectural. Just prior to the President's 6 September 2006 speech announcing the transfer of HVDs to DOD custody, the CIA provided certain foreign partners specific assurances that the CIA would protect their cooperation. These liaison partners expressed their deep appreciation and highlighted that their continued cooperation was conditioned on the CIA's commitment and ability to keep their assistance strictly confidential.

16. Specifically, one particular liaison partner reduced its cooperation with the CIA when its role in the terrorist

8

detention program leaked to a third country whose national had been detained within the program. The liaison partner lost the trust and cooperation of that third country in matters of their own national security. Repair of the CIA's relationship with this liaison partner came only through the senior-level intervention of the CIA Director personally apologizing for the leak. Despite this significant effort, to this day the damage this one incident has caused to the CIA's relationship with the liaison partner is incalculable, as the CIA can never be sure to what extent the liaison partner is withholding vital intelligence necessary to the national security of the United States. Accordingly, Petitioner's and other HVDs' disclosures concerning foreign cooperation would have a lasting negative impact by frustrating CIA efforts to obtain vital national security information required to protect the American people.

B. Damage to CIA Intelligence Activities

17. Petitioner and other HVDs have been exposed to classified intelligence methods, including the CIA's methods of questioning, conditions of confinement while in CIA custody, and certain intelligence disclosed during the course of questioning. Public disclosure of such information reasonably could be expected to cause exceptionally grave damage to national security by making it more difficult for the CIA to obtain the information it needs to help protect the American people.

9

18. As the President has acknowledged in his speech of September 6, 2006 announcing the transfer of the HVDs to Guantanamo Bay, the CIA is authorized to use alternative procedures in the questioning of certain terrorist detainees. He also stated, however, that the details of their confinement and the methods of their interrogation could not be divulged and that he intended that the CIA program continue. Unauthorized disclosures regarding the specifics of the detention and interrogation program, including the techniques the CIA uses to elicit information, are likely to degrade the program's effectiveness and therefore result in exceptionally grave damage to the national security.

19. The CIA's detention program has provided the U.S. Government with one of the most useful tools in combating terrorist threats to the national security. It has shed light on probable targets and likely methods for attacks on the United States, and has led to the disruption of terrorist plots against the United States and its allies. For example, information obtained through the program thwarted a plot to fly a plane into the tallest building in Los Angeles. Additional plots that were disrupted included hijacking passenger planes to fly into Heathrow Airport and the Canary Wharf in London and attacking the U.S. consulate in Karachi, Pakistan, using car bombs and motorcycle bombs.

20. Additionally, information obtained through the program also has played a vital role in the capture and questioning of additional senior al Qaeda operatives. For example, interrogations of detainees produced information that provided initial leads to the locations of al Qaeda operatives that led to their capture. In addition, the United States gained valuable information that explained previously unknown details of al Qaeda, such as its organization, financing, communications, and logistics.

21. The U.S. Government is aware that al Qaeda and other terrorists train in counter-interrogation methods. Public disclosure of the methods used by the CIA would allow al Qaeda and other terrorists to more effectively train to resist such techniques, which would result in degradation in the effectiveness of the techniques in the future.

C. <u>Allegations Regarding the CIA Detention Program by Persons other than High-Value Detainees</u>

22. I am aware of media speculation about the supposed locations of CIA detention facilities and the techniques that the CIA is allegedly authorized to use during the interrogation of terrorist detainees. I also am aware that persons other than Petitioner and the HVDs at Guantanamo Bay, Cuba, have made allegations about detention and mistreatment by the CIA and foreign governments assisting the CIA. In none of those cases,

11

however, has the U.S. Government acknowledged whether the information in the media is correct or whether such persons were ever held in the CIA detention program.[4]

23.  In contrast, the U.S. Government has acknowledged publicly that Petitioner and the other HVDs were held in the CIA's detention program and that at least some were subjected to alternative interrogation techniques.  The U.S. Government has acknowledged, therefore, that the Petitioner and other HVDs may have come into possession of the very information about the CIA program that the U.S. Government seeks to protect, including the locations of detention facilities, the identities of cooperating foreign governments, and the conditions of confinement and interrogations techniques.  If the U.S. Government allows anything Petitioner says about the program to be publicly disclosed, then Petitioner and other HVDs will be in a position to make truthful unauthorized disclosures about such activities.  Terrorists could then rely on such disclosures by Petitioner and other HVDs and would exploit such disclosures to improve their counter-interrogation training.  Additionally, allowing such

---

[4] Media speculation about details of detainee interrogations does not thereby render the information unclassified.  In terms of the potential impact upon the intelligence activities and foreign relations of the United States, there is a critical distinction between unsubstantiated information circulating in the press and official government release or acknowledgement of such information.  The U.S. Government must be able to maintain the distinction between media reports--which may or may not be accurate--by individuals not authorized to speak on behalf of the United States, and official disclosures. Unauthorized public statements do not affect the status of properly classified information.

disclosures by Petitioner would violate our secrecy agreement with foreign countries, making them less willing to assist the CIA with this program and other counterterrorism operations.

D. <u>False Allegations by High-Value Detainees</u>

24. I recognize that many of the allegations that Petitioner has made about the CIA's detention program are untrue. Notwithstanding this, Petitioner and each of the HVDs is in a position to provide accurate and detailed information about the CIA's detention program. As already stated, the disclosure of such details reasonably could be expected to result in exceptionally grave damage to national security.

25. False or exaggerated allegations by the detainees about the classified details of the program, however, also must be treated as classified information because a different rule would have the effect of allowing accurate, highly classified information about the program to be revealed by Petitioner and other HVDs. If a rule to redact only truthful statements were established, a detainee with knowledge of classified facts could easily manipulate the rule to reveal those classified facts. Thus, for example, if the United States redacted only Petitioner's true allegations regarding locations of CIA detention facilities, the true locations of these facilities could be revealed by making multiple allegations as to location, through a simple process of elimination. The same is true with

13

respect to conditions of confinement and interrogation methods. If only true statements about such conditions and techniques are redacted, detainees who have access to classified information regarding actual conditions and techniques could paint a picture of those conditions and techniques used and not used by making repeated allegations about conditions of confinement and interrogation techniques. In sum, the continued success of the interrogation program depends as much on concealing what interrogation methods are not approved as it does on concealing what methods are approved.[5]

26. A rule that allows Petitioner and other HVDs to speak freely about the CIA program will allow them to directly reveal the classified information about the program that the Government must protect. A rule that redacts only true statements that Petitioner makes about the program allows Petitioner and other detainees to manipulate the rule to reveal the true details of the program. Therefore, in order to protect the classified facts at issue here--the details of the CIA terrorist detention and interrogation program--the U.S. Government must treat all allegations by Petitioner and the other HVDs regarding the program as classified.

---

[5] Recently the Director of the CIA publicly acknowledged that the CIA has used waterboarding as an interrogation technique. Section 3.1(b) of Executive Order 12958, as amended, authorizes certain Executive officials to determine whether the need to protect classified information is outweighed by the public interest in disclosure.

14

**II. U.S. Government Measures Taken to Protect this Information**

27.  Recognizing the damage to national security that reasonably could be expected to result if this information were publicly disclosed, the U.S. Government has instituted extraordinary security arrangements for the protection of this information.  Information relating to the CIA terrorist detention and interrogation program has been placed in a tightly compartmented TOP SECRET//SCI Program in order to minimize the number of people who have access to the information and thereby lessen the risk of unauthorized disclosure.[6]

28.  Several additional requirements also have been established since the detainees arrived at Guantanamo Bay, Cuba.  These requirements, although burdensome and expensive for the U.S. Government, are necessary for the protection of national security.  First, all U.S. Government personnel who have substantive contact with the HVDs must possess appropriate

---

[6] Under Executive Order 12958, as amended, the anticipated severity of the damage to the national security resulting from disclosure determines which of three classification levels is applied to the information.  Thus, if an unauthorized disclosure of information reasonably could be expected to cause *damage* to the national security, that information may be classified as CONFIDENTIAL; *serious damage* may be classified as SECRET; and *exceptionally grave damage* may be classified as TOP SECRET.  Section 4.3 of Executive Order 12958, as amended, provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure.  Special access programs relating to intelligence activities or intelligence sources or methods are called Sensitive Compartmented Information (SCI) Programs.

15

security clearances.[7] Second, all work done by U.S. Government personnel that relates to information provided by the HVDs must be conducted on approved secure computer systems. Third, all documents derived from the statements of HVDs must be treated as classified and handled and stored appropriately. Fourth, HVD mail is monitored and redacted for national security purposes before it is released from Guantanamo Bay, Cuba. And finally, individuals interviewing the detainees, including law enforcement personnel, DOD personnel associated with the Combatant Status Review Tribunal Process, and counsel for detainees have been required to obtain a TOP SECRET//SCI security approval before being allowed access to the HVDs.

## III. Conclusion

29. I have determined that Petitioner has been exposed to sensitive national security information that is classified at the TOP SECRET//SCI level. Due to the President's public acknowledgement that Petitioner was previously held by the CIA, his statements regarding the CIA terrorist detention and interrogation program must continue to be protected from public disclosure. For the reasons described above, details regarding the operation of the CIA program remain classified at the TOP SECRET//SCI level.

---

[7] Pursuant to Department of Defense policy, the International Committee of the Red Cross has had access to the HVDs because the ICRC works confidentially with the U.S. Government.

* * * *

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of March, 2008.

_Wendy M. Hilton_
Wendy M. Hilton
Associate Information Review Officer
National Clandestine Service
Central Intelligence Agency