**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------- **X**

                       **:**

**MAHMOAD ABDAH,** *et al.*,         **:**

                       **:**

         **Petitioners,**         **:**

     **v.**                     **:**

                       **:**         **Civ. No. 04-1254 (HHK)**

**GEORGE W. BUSH, President of the**   **:**

   **United States,** *et al.*,         **:**

                       **:**

         **Respondents.**         **:**

                       **:**

---------------------------------------------------------------- **X**

## EMERGENCY MOTION TO COMPEL ACCESS TO
## MEDICAL RECORDS OF PETITIONER ADNAN FARHAN ABDUL LATIF
## AND FOR OTHER MISCELLANEOUS RELIEF

By this motion, undersigned counsel seeks immediate access to the medical records for

petitioner Adnan Farhan Abdul Latif.  Counsel visited with Mr. Latif yesterday at the Guantán-

amo Bay military prison and fears that Mr. Latif – whose body weight has dropped in the last six

weeks from 145 to approximately 107 pounds – is near death.  Mr. Latif is *not* on a hunger strike,

and the cause of his alarming weight drop appears to be unknown.  Mr. Latif is also manifesting

signs of schizophrenia, for which he is apparently not being treated.

In addition to access to the medical records, counsel also seeks an order requiring prison

officials to provide Mr. Latif with a blanket and a mattress in his cell.

Counsel for Respondents oppose this motion.

### INTRODUCTION

1.       Mr. Latif is a citizen of Yemen.  He was taken into custody by Pakistani security

forces at the border of Pakistan and Afghanistan in late 2001.  Mr. Latif was subsequently

handed over to the United Stated military and detained in Afghanistan before being transferred to Guantánamo. He has been held at Guantánamo since January 2002, and is at present living in solitary confinement in Camp 6 of the prison.

2.     Mr. Latif filed a petition for writ of habeas corpus in July 2004, alleging that his detention is in violation of the Constitution, laws and treaties of the United States. His case has traveled the same, well-known path as the other habeas matters that were coordinated before Senior Judge Joyce Hens Green in August 2004. Now that the Supreme Court has annulled Congress's attempts at jurisdiction stripping, *see Hamdan v. Bush*, 548 U.S. 557, 584 (2006) (holding that the Detainee Treatment Act of 2005 has no retrospective effect on petitioners' cases); *Boumediene v. Bush*, 128 S. Ct. 2229, 2242 (2008) (holding that the Military Commissions Act of 2007 effects an unconstitutional suspension of the writ), counsel for Mr. Latif anticipates that a habeas hearing will be scheduled before this Court in the near future.

3.     Counsel believes, however, that Mr. Latif may not survive until his hearing and that, if he does, Mr. Latif will not be competent to assist in the prosecution of his habeas case. *See generally* Ex. A (Declaration of Marc D. Falkoff).

### FACTUAL BACKGROUND

4.     Mr. Latif has suffered from serious physical problems since at least 1994, when he was in an automobile accident in Yemen. He sustained grave injuries in the accident, including a broken skull and perforated eardrum, along with damage to his hearing and vision. He spent the next half-dozen years seeking medical treatment in hospitals and clinics in Yemen, Jordan, Pakistan and Afghanistan. Some of his medical records, along with translations, are appended as Exhibit B. Mr. Latif still experiences incessant headaches and balance problems stemming from the injuries he received in the accident. Falkoff Decl. at ¶¶ 4–7.

5.      In addition, Respondents have been aware for years that Mr. Latif suffers from serious psychological problems, apparently including schizophrenia.  Mr. Latif has told counsel that he was once punished for smearing feces all over his cell.  Because Respondents have consistently refused requests for counsel to review Mr. Latif's medical records – even though counsel is in possession of a written consent to view the records, *see* Ex. C – counsel does not know whether Mr. Latif has been offered anti-psychotic, anti-depressant or other psychoactive drugs.  Mr. Latif has indicated to counsel that he has never taken any psychoactive medication at Guantánamo.  Falkoff Decl. at ¶¶ 13–16.

6.      Both in conversations and letters, Mr. Latif has indicated to counsel that he has attempted suicide on multiple occasions while imprisoned at Guantánamo, and that he may do so again in the future.  Mr. Latif has repeatedly stated that he feels that death would be more merciful than his current situation.  In a letter recently received by counsel, Mr. Latif wrote that he had recently attempted to hang himself.  According to the letter, he regained consciousness in a hospital bed, where he was told by doctors that he was lucky to be alive.  Counsel has never received any confirmation from Respondents that Mr. Latif has attempted suicide.  Falkoff Decl. at ¶ 17.

7.      In the past, Mr. Latif has engaged in lengthy hunger strikes and has been subjected to painful force-feeding, at least according to his own accounts.  Because Respondents have refused to furnish any medical records, counsel cannot verify Mr. Latif's accounts of his hunger striking.  Mr. Latif has told counsel, however, that he abandoned all hunger striking in February 2008.  At the conclusion of his strike, he says he weighed approximately 137 pounds.  Over the next several months, he says he gained some weight and, as of six weeks ago, weighed approximately 145 pounds.  Falkoff Decl. at ¶¶ 18, 22.

8.      Beginning approximately six weeks ago, Mr. Latif started having difficulty keeping his food down.  He quickly lost a substantial amount of weight.  According to Mr. Latif, he began suffering from frequent vomiting, and often observed blood in his urine and vomit.  He was seen by a doctor several weeks ago, and apparently was given a thorough examination.  All that Mr. Latif was told after the examination was that he had a "serious germ" – an uninformative diagnosis that is surely a result of poor translation by a military interpreter.  Mr. Latif says that the only treatment that he was offered was a sedative, which he refused.  Falkoff Decl. at ¶¶ 23, 24, 26.

9.      Mr. Latif told counsel that his weight, as of the last measurement days ago, was 107 pounds.  From counsel's observations, Mr. Latif likely weighs even less than that, perhaps less than 100 pounds.  Mr. Latif looks emaciated and skeletal, like a victim of famine.  Falkoff Decl. at ¶ 23.

10.     Mr. Latif reports that notwithstanding his dire physical condition, he has been "punished" by having all of the comfort items removed from his cell, including his mattress and blankets, leaving him only with a thin "isomat" to cover the steel of his bunk.  Falkoff Decl. at ¶ 25.

11.     Mr. Latif believes that he is dying.  He does not believe that he will live to participate in his habeas hearing.  He is also terrified that the military will began painfully force-feeding him again – as they did when he was on hunger strike – because they might erroneously believe that he is on hunger strike again.  Falkoff Decl. at ¶ 29.

12.     As set forth in the accompanying declaration, counsel believes that Mr. Latif's life is in grave danger.  Despite counsel's requests for specific information relating to Mr. Latif's

medical condition, Respondents have responded with a blanket refusal to provide any such information.  Falkoff Decl. at ¶¶ 28, 31.

13.    In light of the urgent nature of the issues presented by this application, counsel for Mr. Latif requests that the Court order immediate access by counsel to records detailing Mr. Latif's medical treatment, meal schedules, punishment, and hospitalization.  Counsel also asks the Court to order Respondents to assure that Mr. Latif is provided with a mattress and blankets and that those items will not again be confiscated from him.

14.    In addition, because Respondents have, in other Guantánamo habeas cases, filed replies to identical legal arguments in the past, *see, e.g.*, *Al Joudi v. Bush*, 406 F. Supp. 2d 13 (D.D.C. 2005) (granting preliminary injunction ordering access to medical records based on same legal arguments presented below), counsel for Mr. Latif respectfully asks this Court to order a prompt reply to the instant motion and to schedule a conference to discuss the motion by next week at the earliest.

## ARGUMENT

15.    This Court may issue preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure to ensure that Petitioners have access to the Court.  This Court also has inherent power, under the All Writs Act, 28 U.S.C. § 1651(a), to issue "all writs necessary or appropriate to aid of [its] jurisdiction[] and agreeable to the usages and principles of law."  The Act "empowers a district court to issue injunctions to protect its jurisdiction," *SEC* v. *Vision Communications*, *Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Env'tl. Def. Fund*. v. *EPA*, 485 F.2d 780, 784 n. 2 (D.C. Cir. 1973), and "to achieve the ends of justice entrusted to it."  *Adams* v. *United States*, 317 U.S. 269, 273 (1942).  Where "alternative remedies are unavailable," *Clinton* v. *Goldsmith*, 526 U.S. 529, 537 (1999), a court may use the Act to order appropriate relief.

16.    In considering a request for preliminary injunctive relief, the Court must consider four factors:  (1) whether Petitioner would suffer irreparable injury if an injunction were not granted; (2) whether Petitioner has a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest.  *See Cobel v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).   "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs, Inc.* v. *Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  *City Fed Fin. Corp.* v. *Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).

17.    When the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'"  *Washington Metro. Area Transit Comm'n* v. *Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co.* v. *Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)).

18.    Here, counsel for Mr. Latif seeks nothing more than to ensure that Mr. Latif's most fundamental right – to bodily integrity, health and safety – is protected.  Without his physical and mental health, Mr. Latif will likewise lose his right of access to the courts to prosecute his habeas petition.  *See Bounds* v. *Smith*, 430 U.S. 817, 824 (1977).  Counsel cannot ensure such protections.  Respondents, however, have refused to provide counsel with *any* particularized information related to the status of Mr. Latif.  Without the disclosure of information related to Mr. Latif's status and health, counsel's hands are tied.  As a result, Mr. Latif requests a simple and

narrowly-tailored remedy – access to Mr. Latif's medical records and an order that he be provided with a blanket and mattress.

19.     Without a doubt, the situation presented by Mr. Latif is extraordinary.  Counsel cannot present an analogous situation where attorneys would be denied basic information about his client's health if his client were potentially on the precipice of death.  At the very least, this blanket prohibition by Respondents to provide information presents "fair ground[s]" for consideration and investigation by the Court.  *See Washington Metro. Area Transit Comm'n*, 559 F.2d at 844.

**(A)  Mr. Latif faces substantial, irreparable harm if immediate relief is not granted.**

20.     Mr. Latif will suffer irreparable harm if counsel is not permitted to have immediate and meaningful access to his medical records.  Mr. Latif risks death or permanent physical injury due to his precipitous weight loss, which may be due to inadequate treatment of either his (unknown to counsel) physical ailments, psychological ailments, or both.  No subsequent action by the Court or Respondents can repair that damage.

21.     Irreparable harm may be shown where the movant's health is in imminent danger.  *See, e.g.*, *Blackman v. District of Columbia*, 185 F.R.D. 4, 6–7 (D.D.C. 1999); *Wilson v. Group Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992).  As Judge Kessler stated in her decision in *Al-Joudi*, "where the health of a … vulnerable person is at stake, irreparable harm can be established."  406 F. Supp. 2d at 20.  In addressing the request for medical records made on behalf of other detainees at Guantánamo Bay, Judge Kessler further stated that, "[w]hile Petitioners do not lack legal competence as children do, they are indeed vulnerable to further physical deterioration, and possibly death, by virtue of their custodial status at Guantanamo and weakened physical condition." *Id.*

22.    Moreover, any medical intervention that Mr. Latif is subjected to may deny him his basic right to be informed of and consent to medical care.  Loss of these rights cannot later be restored.  The ability of counsel to review Mr. Latif's medical records so as to help him make informed, considered decisions will allow Mr. Latif to enforce those rights, if necessary.  Without the limited relief requested, Mr. Latif will suffer serious harm, including possibly death.

**(B)  Mr. Latif has a substantial likelihood of success on the merits.**

23.    Courts are empowered to "requir[e] additional measures to assure meaningful access" by *habeas* petitioners "to present their own cases."  *Bounds*, 430 U.S. at 824.  Such measures include setting forth affirmative obligations to assure all prisoners meaningful access to the courts.  *Id.*  Pursuant to this power, in a October 20, 2004 Memorandum Opinion setting forth *habeas* petitioners' access to counsel, Judge Kollar-Kotelly made clear that "the Government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship."  Oct. 20, 2004 Memo. Op., *Al-Odah* v. *United States*, No. 02-0828 (CKK).  The Court further held that Respondents may not vitiate petitioners' right to counsel by imposing restrictions on counsel's access that "inappropriately burden" the attorney-client relationship, *id.* at 9, and that  the Court has statutory authority "to craft the procedures necessary" to enforce petitioners' right to counsel so they may "present the facts surrounding their confinement to the Court."  *Id.*  And, as Judge Kessler explained in *Al Joudi*, "[u]nless Petitioners' counsel can have access to their clients, and know their true medical conditions, including whether they are in imminent danger of death, so as to counsel them in order to persuade them to stay alive, it is obvious that their ability to present their claims to the Court will be irreparably compromised." 406 F. Supp. 2d at 21–22 ("counsel … must be made aware if their clients are in such fragile physical condition that their future ability to communicate is in imminent danger").

8

24. Counsel makes this application for emergency relief because the Government has "inappropriately burden[ed]" Mr. Latif's right of reasonable access to the courts by refusing to provide any information related to Mr. Latif despite the exigent circumstances presented by his harrowing recent weight loss.

25. Indeed, particularly in light of this nation's "strong commitment to human rights and … clear history of human rights violations against prisoners," courts have long-held that "judicial protection . . . is particularly appropriate and necessary" where prisoners allege abuses and are limited in their access to the courts. *Kane* v. *Winn,* 19 F. Supp. 2d 162, 175 (D. Mass. 2004); *see also id.* at 182 ("[E]ven if a [*habeas* petitioner] alleges a sort of violation that rarely occurs, any generally applicable statutes or other laws must be interpreted in light of the overall level of violations occurring in our prisons.").

26. Without intervention by the Court, counsel will have no effective means of conferring intelligently with Mr. Latif – and, ultimately, the Court – and therefore no means to address substantial issues related to his medical treatment – leaving Mr. Latif "only the right to a meaningless ritual." *Douglas* v. *State of California*, 373 U.S. 353, 358 (1963). Counsel for Mr. Latif cannot make any informed decisions with respect to his health or competency, as well as responsive actions by the Government, without immediate access to his medical records.

**(C) Issuing immediate injunctive relief satisfies a strong public interest.**

27. The public interest in ensuring that Mr. Latif's counsel has access to his medical records under the dire circumstances presented here is undoubtedly strong. *See United States* v. *Hastings*, 461 U.S. 527 (1983) (noting that there is a "strong public interest in the integrity of the judicial process"). Without immediate access to the medical records, Mr. Latif's safety and well-being will be jeopardized. Furthermore, counsel cannot provide adequate representation without

access to the information related to Mr. Latif's treatment and health. Mr. Latif therefore respectfully requests that the Court grant the limited requested relief, as it furthers the significant public interest in ensuring the principles of access to counsel and the Court, as well as the health and safety of an individual held in United States custody.

**(D)  The relief requested will not injure the Government's interests.**

28.     As a result of Respondents' refusal to provide the requested information, and the exigent circumstances presented by the current crisis, counsel for Mr. Latif comes before the Court to request extremely limited emergency relief. This request does not substantially injure – or even significantly burden – Respondents' interests.

29.     Respondents cannot dispute that they are in possession of Mr. Latif's medical records and that they are easily accessible at the base. Nor can they dispute that they have been required to provide similar records to counsel, either by court order, *see, e.g.*, *Al-Joudi*, 406 F. Supp. 2d at 23, or pursuant to Freedom of Information Act requests and lawsuits.

30.     Respondents surely have no interest in keeping Mr. Latif's own medical documents from Mr. Latif's counsel, particularly where Mr. Latif has authorized counsel to procure them. If for some reason Respondents believe that Mr. Latif's medical documents should be treated as classified, the Court may order that the documents be provided to counsel in the Secure Facility, where all other documents in this litigation are kept.

31.     Any logistical burdens that the government might entail in photocopying Mr. Latif's medical records are far outweighed by the need of Mr. Latif's counsel to ascertain whether his client – who appears to be on the verge of death – is receiving appropriate medical care. The government's secretarial inconveniences weigh little against Mr. Latif's right not just to have access to the courts, but to the very preservation of his life.

**CONCLUSION**

For the above-stated reasons and for any other reason that may become known to the Court, Mr. Latif respectfully requests the Court grant the above requested relief.

Dated: August 15, 2008
        Guantánamo Bay Naval Base

                              Respectfully submitted,

                              _____/s/_____

                              Marc D. Falkoff
                              D.C. Bar No. 491149
                              NORTHERN ILLINOIS UNIVERSITY
                              COLLEGE OF LAW
                              DeKalb, IL 60614
                              347-564-5043 (cell)
                              815-753-9301
                              mdf19@columbia.edu

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------- X
                                             :

MAHMOAD ABDAH, *et al.*,         :
                                             :

                Petitioners,   :
    v.                                 :
                                          :    Civ. No. 04-1254 (HHK)

GEORGE W. BUSH, President of the    :
   United States, *et al.*,        :
                                           :

               Respondents.    :
                                           :
-------------------------------------------------------------------- X

**DECLARATION OF MARC D. FALKOFF IN SUPPORT OF EMERGENCY MOTION
TO COMPEL ACCESS TO MEDICAL RECORDS OF PETITIONER ADNAN FARHAN
ABDUL LATIF AND FOR OTHER MISCELLANEOUS RELIEF**

I, Marc D. Falkoff, declare:

1.  I am an assistant professor of law at Northern Illinois University College of Law in

DeKalb, Illinois. I am an attorney and a member of the bars of New York State and the District

of Columbia, admitted to practice in the federal courts in the District of Columbia. My home

address is 304 West Willow Street, Chicago, Illinois 60614.

2.  Along with Covington & Burling, LLP, I represent sixteen Yemeni nationals being

detained in Guantánamo Bay by the United States military. The firm filed habeas petitions on

behalf of each of these men, including Petitioner Adnan Farhan Abdul Latif (known to the

government as "Allal Ab Aljallil Abd Al Rahman Abd"), in the U.S. District Court for the

District of Columbia in July 2004.

3.  I submit this Declaration in support of Mr. Latif's Emergency Motion to Compel

Access to Medical Records and For Other Miscellaneous Relief because I fear that Mr. Latif may

be close to death and needs the relief requested in the Motion. I have personal knowledge of the following matters and could competently testify thereto.

### Medical History Before Guantánamo

4.   Since November 2004, I have visited with Mr. Latif approximately twelve separate times. In our first discussions, Mr. Latif explained to me that in 1994 he was the victim of a serious automobile accident in Yemen. He sustained grave injuries in the accident, including a broken skull and perforated eardrum, along with damage to his hearing and vision.  He spent the next half-dozen years seeking inexpensive medical treatment in hospitals and clinics in Yemen, Jordan, Pakistan and Afghanistan.   Some of his medical records, along with translations, are appended to Mr. Latif's Motion as Exhibit B.

5.   The medical document from the Islamic Hospital in Amman, Jordan, states in part, "The patient was admitted under my supervision to the Islamic hospital on 07/09/1994 following a head injury. He was suffering from aches and a headache. A clinical test showed blood concentration and hemorrhage above the left eye, and a hole in the left eardrum.  The x-ray test showed a broken skull but no brain injury." Ex. B at 1.

6.   The medical document from the Yemen Ministry of Defense's "Military Medical Decision Form," dated July 10, 1995, states in part, "Diagnosis: 1. Loss of sight in the left eye as a result of eye nerve damage. 2. Loss of hearing in the ears." Ex. B at 5.

7.   The medical document from the Al-Thawra General Hospital's Medical Report to the Yemen Ministry of Public Health, dated August 18, 1999, states in part, "The above-named is hard of hearing…. Upon examination, a wide circular hole was detected in his left eardrum. The attached audiography revealed a hearing loss in the left ear. We recommend that he return to the

previous center outside for more tests and therapeutic and surgical procedures at his own expense." Ex. B at 7.

8. Mr. Latif still experiences incessant headaches and balance problems stemming from the injuries he received in the accident.

### Abusive Treatment at Guantánamo

9. From my observations of Mr. Latif over the years, I am certain that he has suffered greatly while in confinement at Guantánamo. Physically, Mr. Latif has always been a thin, frail and sickly man whose body does not stand up well to the physical discipline he has experienced at Guantánamo.

10. For instance, when I entered the interview cell to visit with Mr. Latif on April 15, 2006, he presented a woeful sight. One eye was a sickly blue-black color and the other was swollen shut. He had cuts on his head and contusions all over his body. He could barely keep his head up and had great difficulty talking. His head was constantly in pain and he could not chew or swallow.

11. Mr. Latif explained that several days earlier he had been "IRF'd" – meaning he had been subjected to a forcible extraction from his cell by an "Immediate Reaction Force" team – because he had stepped over a line painted on the floor of his cell while he was being served his lunch. During the extraction, the six members of the IRF team, all dressed in body armor, pepper sprayed him and then entered his cell carrying large shields. While Mr. Latif was lying on the floor of his cell, the members of the IRF team kicked him, hit him with their shields, banged his head against the floor, and choked him. Mr. Latif lost consciousness briefly and then was placed onto a stretcher. A doctor felt his chest and administered smelling salts.

12. Mr. Latif was then taken to another Camp in the prison and began serving what was to be a two-month punishment of solitary confinement. According to Mr. Latif, the entire incident was videotaped by military personnel.

**Psychological Problems**

13. Over the years and after many conversations with Mr. Latif, I have come to believe that he likely suffers from schizophrenia or some other psychological malady. On information and belief, doctors at Guantánamo have long been aware of Mr. Latif's psychological problems and also believe that he suffers from schizophrenia or some similar ailment.

14. I believe that the isolation and physical discipline that Mr. Latif has experienced at Guantánamo have contributed to the decline in his mental health. According to Mr. Latif, after he was extracted from his cell by the IRF team in April 2006 and placed in solitary confinement, he was not fed an adequate quantity of food. He requested more food and, he says, was told by a guard to "eat shit." According to Mr. Latif, this same guard had once threatened to cut his throat and "rape him with his fingers." Mr. Latif proceeded to smear feces on the walls of his cell. According to Mr. Latif, a psychiatrist was summoned and was told by the guard, falsely, that Mr. Latif had ingested his own feces. When the psychiatrist suggested that Mr. Latif take antipsychotic medication, Mr. Latif refused; as he explained to me during our meeting, the psychiatrist "had been in complicit in torture" and he therefore "does not trust him."

15. I do not vouch for the truth of this story. Nonetheless, it is profoundly disturbing, whether the facts as described by Mr. Latif are accurate or not. Either Mr. Latif was subjected to humiliating and degrading treatment following a severe physical beating, or he was manifesting clear signs of mental disturbance.

16. During a later visit to Guantánamo in May 2007, Mr. Latif seemed to engage me in a particularly lucid manner during our meeting. He also seemed less despondent than usual. He stated that he had not been taking any medicine, leading me to suspect that he was somehow being medicated – with anti-psychotics, or anti-depressants, or some other psychotropic drug – without his knowledge.

### Suicidal Thoughts and Attempts

17. During the same interview on April 15, 2006, Mr. Latif spoke with me at length about suicide, ruminating about whether he would suffer an eternity in Hell if he killed himself "without realizing it." Mr. Latif appears to have followed up on these suicidal overtures. My colleagues and I have observed scars on Mr. Latif's wrists that may be indicative of a suicide attempt. In a recent letter to me, he described waking up in a hospital to be told by a doctor that he had attempted to hang himself.

### Hunger Striking

18. Mr. Latif has occasionally engaged in hunger strikes while at Guantánamo. According to Mr. Latif, he began one such strike on February 27, 2007, and continued for almost a full year. I do not know the degree to which he refused food, and suspect that at times his hunger striking was more intense than at others. He has told me, however, that he has been painfully force-fed through a naso-gastric tube, which was inserted while he was lashed – arms, legs and head – to a restraint chair. Respondents have refused my repeated requests for information about Mr. Latif's hunger strikes and about any force-feeding.

### Visit of August 14, 2008

19. I have long been concerned about the physical and mental health of Mr. Latif and over the years have frequently asked Department of Justice lawyers to allow me access to his

medical records. I have been denied the records at every turn. I nonetheless hoped that the military doctors and psychiatrists truly had his best interests at heart, notwithstanding Mr. Latif's obvious distrust of them and news reports about physician complicity in interrogations.

20. When I walked into the interview cell in Camp Iguana to visit with Adnan yesterday, my naïve hopes for the adequacy of the medical care at Guantánamo vanished. Mr. Latif was lying on the floor, with his stomach and chest partly exposed. He was stick thin. His ribs were jutting out and his face was sunken. He looked like a famine victim or a survivor of a concentration camp. I was shaken.

21. My translator and I helped Mr. Latif into his chair. Initially he could only speak in a weak and raspy voice. Tremors ran through his entire body during our morning interview. He would frequently turn to retch and occasional spit out bile onto the floor.

22. I assumed that his condition was the result of continued hunger striking and asked him about it. Mr. Latif told me in no uncertain terms that he was not hunger striking and that he wanted to eat and drink, but that for the past six weeks he had not been able to keep any food down. He said that he had ceased his hunger strike more than six months ago, in February, and that at the time he stopped hunger striking he weighed about 137 pounds. He also stated that over the next few months he gained weight, and was up to about 145 pounds in June.

23. Mr. Latif explained that in the past six weeks, however, he had been unable to keep any food down, and that at his last weighing he was told that he weighed 107 pounds. Both my translator and I believed that the man sitting in front of us weighed less than 100 pounds.

24. Mr. Latif stated that he had been given a full examination by a doctor about two weeks earlier, and that the diagnosis was that he had a "serious germ." My translator and I believe that the military translator who must have been interpreting for the doctor was unable to

express the diagnosis to Mr. Latif in a competent fashion. Mr. Latif says that the only treatment he was offered was a sedative to help him sleep.

25. If accurate, this course of "treatment" is particularly ironic, since Mr. Latif also reports that, notwithstanding his pitiable condition, he is at present being punished for violating some camp disciplinary rule, and that all of his comfort items – including his mattress and blankets – have been taken from his cell. All he has left, he says, is an isomat. Of course, I do not know firsthand whether what he is saying is true, and I find it almost impossible to believe that one of our soldiers would treat someone in his condition in such an inhumane manner.

26. Mr. Latif also told me that he has occasionally seen blood in his urine and vomit, and that his body is wracked with pain. These problems are in addition to the chronic headaches and vision problems that he has experienced since his automobile accident in 1994.

27. During a break in our meeting, I asked to be taken to the Staff Judge Advocate's office. There I spoke with an attorney and described Mr. Latif's condition. I recounted much of what I have discussed in this Declaration, and told him that I felt it imperative to see Mr. Latif's medical records to determine what exactly was wrong with him. I explained that I thought that Mr. Latif might have some kind of cancer, or perhaps a virus, or perhaps he was still, in fact, on a hunger strike. I wanted to know what kinds of psychotropic drugs, if any, he was taking. I wanted to know whether he had in fact attempted suicide recently, as he claimed. Whatever explanation might be forthcoming, it was obvious to me that my client was nearing death and that I needed to know what was going on.

28. The lawyer from the office of the Staff Judge Advocate told me that he would get back to me. After the habeas lawyers finished with their lunch, I asked our escort to contact the office of the Staff Judge Advocate so that I could learn the status of my request. The message

that was communicated to me was that JTF-GTMO was "aware" of Mr. Latif's health status and that the doctors on base provided excellent medical care to all of the detainees. My request for access to Mr. Latif's medical information was denied.

29. When we returned for the afternoon to visit with Mr. Latif, there was evidence that he had vomited in our absence. He was again lying on the floor, and we again helped him to a chair. At his request I had returned with several juice drinks, which he tried to drink – with some limited success – during the hours of our visit. Mr. Latif was pleased that he was able to keep the liquid down, telling me that he was terrified that the guards would try to force-feed him if he could not manage to eat on his own.

30. I will not, of course, disclose the content of our discussions, but I will note that Mr. Latif dwelled on his mortality throughout our conversation and seemed to be utterly despairing. Although he would occasionally perk up as we spoke – such as when we discussed the fact that his photograph was on the cover of the Amnesty International Magazine last year, with his story detailed inside it – for the most part he was the very picture of depression. Mr. Latif made it clear to me before our visit ended that he never expected to see me again because he was certain that he would be dead before I could return.

### Conclusion

31. I believe that Mr. Latif is nearing death. Respondents will not tell me what is wrong with him or why he now weighs only about 100 pounds. I need to know this information in order to figure out if there is something I can do to help him.

I declare under penalty of perjury that the foregoing is true and correct. Executed on Au-gust 15, 2008 in Guantánamo Bay, Cuba.

_____/s/_____
MARC D. FALKOFF

Exhibit B

In the Name of Allah, Most Gracious, Most Merciful

**ISLAMIC HOSPITAL**
Amman, Jordan

[illegible logo]

No.
Date: 08/21/1994
Corresponding to:

Medical Report

Patient's Name: Adnan Abdul Latif Al-Shir'abi

The patient was admitted under my supervision to the Islamic Hospital on 07/09/1994 following a head injury. He was suffering from aches and a headache. A clinical text showed blood concentration and hemorrhage above the left eye, and a hole in the left eardrum.

The x-ray test showed a broken skull but no brain injury.

He underwent careful treatment and his condition improved with medicine and clinical monitoring. He was released from the hospital on 07/14/1994. It is recommended that he return to the Islamic Hospital after six months to complete his tests.

[signature]
Dr. Wa'el Abu Khalaf
Orthopedic Surgeon, FACS England
[illegible stamp]

[stamp:]    Islamic Hospital
            Medical Report
            Date:

[illegible] *on 08/22/94*
[signature]
[illegible seal]

[See original for contact information in Arabic and English.]

1

[See original for photocopied passport in Arabic with corresponding English text.]



**ISLAMIC HOSPITAL**

AMMAN · JORDAN

المـسـتـشـفـى الإسـلامـي

عمان - الأردن

الرقـم :

التاريخ : ١٩٩٤/٨/٢٢

الموافق :

Date :

تقريـر طبـي

اسم المريض : عدنان عبد اللطيف الشرعبي .

ادخل المريض تحت اشراقي الى المستشفى الاسلامي يوم ١٩٩٤/٧/٩ اثر اصابته للراس

حيث    كان يشكو من الام وصداع وزيادة ضغط السريري تبين وجود تجمع دموي ونزيف

فوق العين اليسرى وكذلك وجود نقبة بطبلة الاذن اليسرى .

وبالفحص الشعاعي تبين وجود كسور أسفل الجمجمة والاشعة الطبقية تبين عدم

وجود اية اصابه للدماغ .

تمت مباشرته خطيا وتحسنت حالته بالادويه والمراقبه السريريه    وخرج من المستشفى

يوم ١٩٩٤/٧/١٢ ، ينصح بعودته للمستشفى ثلاثاً - عمان بعد ستة شهور لاستكمال

نحوياته .

الدكتور وائل أبو خلف

اختصاصي جراحة العظام والمفاصل

FRCS. England

الدكتور : وائل أبو خلف

المستشفى الإسلامي

تقرير طبي

التاريخ

تلفون ١٢٧، ٦٨٠ فاكس ٦٦١٧٧٣ صندوق بريد ٩٢٥٦٩٣ تلكس ٢١٩٧٩ اسلامي جو

TEL : 680127  Fax : 661773  P.O.Box : 925693  Telex : 21979 ISLAMI JO

3



4

In the Name of Allah, Most Gracious, Most Merciful

Republic of Yemen
Ministry of Defense                   · [logo:]                    [photograph]
Chief of Staff Headquarters           Republic of Yemen
Military Medical Insurance Department
Military Medical High Committee

Military Medical Decision Form        Session No. 30      Decision No. 412
Patient's Name: *Adnan Farhan Abdul Latif*      Age: *19 years*
Date: *07/10/1995*      Military Rank:      *Enlisted*
Military Number: *Civil*                      Unit: *Department of Personnel General Affairs*

                                      *Department of* [illegible]
                                      [signature]
                                      07/16/1995

---

Diagnosis:      *1. Loss of sight in the left eye as a result of eye nerve* [illegible]
                *2. Loss of hearing in the ears.*

---

Medical Committee's Decision:
*He shall be referred to the medical benefits and has a second degree injury. If his injury were*
*due to military service, the medical disability coverage rate is 100% (one hundred percent).*

| Internal Medicine | Surgeon | Urologist | Ophthalmologist |
|---|---|---|---|
| [signature] | [signature] | [signature] | [signature] |
| Otolaryngologist | Neurologist | Orthopedist | Medical Committee's Head |
|  |  |  | [illegible handwriting] |

The Medical Committee's Decision shall be carried out

[signature]                           [signature]
**Col. Ali Mohamed Naji Nasser**      **Col. Dr. Ahmed Mohsen Al-Akwa'**
Deputy Chief,                         Chief,
Military Medical Insurance Department Military Medical Insurance Department
Director, Military Hospital           [seal:] Republic of Yemen
                                      Military Medical Insurance Department
                                      Chief of Staff Headquarters
                                      [illegible handwriting]

5



الجمهورية اليمنية
وزارة الدفاع
نيابة هيئة الأركان العامة
دائرة التأمين الطبي العسكري
اللجنة الطبية العسكرية العليا

استمارة القرار الطبي للعسكريين  رقم الجلسة (٠٦-)  رقم القرار (٤٦٢)

اسم المريض: مروان فرحان نبيل الدعيقي  العمر: ١٩ عاماً

التاريخ: ١٠ / ٧ / ١٩٩٥م  الرتبة العسكرية: متطوع

الرقم العسكري: مدني  الوحدة: دائرة شؤون الطيران الخاصة بصنعاء

التشخيص: ① انعدام الرؤية من العين اليسرى ناتج عن جرح بالعصب البصري
② انعدام سمع بالأذنين

قرار اللجنة الطبية:
يحال إلى اخصائي البصري وتشوه درجة ... إذا ثبت يعامل به
السبب الواجب العسكري بنسبة للبصري ٨٠٪ مئة بالمئة

اخصائي الباطنية    اخصائي الجراحة    اخصائي المسالك    اخصائي العيون

اخصائي الأذن والأنف والحنجرة    اخصائي الأعصاب    اخصائي العظام    رئيس الأشعة الطبية

يعتمد قرار اللجنة الطبية

عقيد ركن / علي محمد ناجي نصر          عقيد ركن / دكتور / محسن الاكوع
نائب دائرة التأمين الطبي العسكري          مدير المستشفى العسكري

6

[stamp:]
Issued by Al-Thawra General Hospital under
No. *1239/8*
Date: *08/18/1999*
Attachments: [illegible]

[photograph]
[illegible seal]

In the Name of Allah, Most Gracious, Most Merciful

Republic of Yemen                                      Date: *08/18/199-*
Ministry of Public Health                              No.
Office of Health Affairs
Al-Thawra General Hospital
At Taz

Medical Report for Adnan Rahman Abdul Latif Al-Shir'abi

The above-named is hard of hearing. Upon examination, a wide circular hole was detected in his left eardrum. The attached audiography revealed a hearing loss in the left ear. [illegible] We recommend that he return to the previous center outside for more tests and therapeutic and surgical procedures at his own expense… This is to whom it may concern…

| Treatment Doctor | Division Chief | Technical Director | Hospital's General Director |
|---|---|---|---|
| [signature] | [signature] | [signature] | [signature] |
| [illegible date] | [illegible date] | [illegible date] | [illegible date] |

[seal:] Republic of Yemen
Al-Thawra General Hospital

Copies [illegible], Medical Affairs Office

[illegible] *hospital*
*as long as it is at his own expense*
[signature]
[illegible name & seal]

[illegible stamp:] Yemeni Foreign Ministry

[illegible seal]

[fiscal stamps]

7



# Exhibit C

AUG-07-2003  01:11

P.11

Yes, I Adnan Farhan Abd-El-Latif authorize the attorneys, David Remes, Marc Falkoff and others from Covington & Burling firm to withdraw papers and medical reports that relates to me from hospitals, specifically from Jordan and Yemen which proves the reality of my medical situation and what I suffer from and what documented medical situation I am in.

Patient name: Adnan Farhan Abd-El-Latif
Signature: Illegible
Date: December, 22nd, 2004

*ARABIC Version*
*# 1 also for*
*easy identification*

**UNCLASSIFIED**

143-4-1

نعم أنا عدنان فرحان عبد اللطيف قد أكدت وأناً على توكيلي المحامين ديفيد ريمس
ومارك فالكوف من شركة  كو  فينغتن  و بر  لينغ ما خونني من هذه الشركه
على سحب الأوراق والتقرير الطبي الخاص بي من المستشفيات
و خاصاً الأردن واليمن التي  تبين حقيقة الأمراض التي
أعاني منها والحالات التي  تثبت ما أنا عليه من الحالات الصحيه

أسم المريض = عدنان فرحان عبداللطيف
التوقيع = 
التأريخ = ٢٢/٢/٢٠٠٤

UNCLASSIFIED

143-4-2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------------------------------------------- X
                                                                  :
**MAHMOAD ABDAH,** *et al.***,**                                  :
                                                                  :
                                   **Petitioners,**               :
            **v.**                                                :
                                                                  :         **Civ. No. 04-1254 (HHK)**
**GEORGE W. BUSH, President of the**                              :
     **United States,** *et al.***,**                             :
                                                                  :
                                   **Respondents.**               :
                                                                  :
----------------------------------------------------------------- X

**[PROPOSED] ORDER**

Having considered Petitioner Adnan Farhan Abdul Latif's Emergency Motion to Compel

Access to Medical Records and For Other Miscellaneous Relief, IT IS HEREBY ORDERED

that Respondents shall provide Mr. Latif's medical records to his counsel within five business

days.  IT IS FURTHER ORDERED that Respondents shall ensure that Mr. Latif is provided with

a mattress and blankets in his cell.

_____
Honorable Henry H. Kennedy
United States District Court