UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

IN RE:
GUANTANAMO BAY
DETAINEE LITIGATION

Misc. No. 08-442 (TFH)

---
---

RAHIM ALI-NASHIR, et. al.

Declaration Pursuant to
28 U.S.C. §1746

                      Petitioners,

08 cv 1085 (TFH)

v.
ROBERT M. GATES,

                      Respondent.

---

## PETITIONER'S RESPONSE TO RESPONDENT'S MOTION FOR A PROTECTIVE ORDER

Respondent has filed a motion to reconsider application of the standard *habeas* protective order to Petitioner Rahim ali-Nashir's ("Petitioner") matter and requests the entry of a proposed protective order pertaining to top secret/sensitive compartmented information ("TS/SCI"). *See* 08 misc. 442 (TFH). By order of this Court, dated August 19, 2008, this Court granted the government's motion in part and sought response from counsel to the various Guantánamo Bay detainees formerly detained by the Central Intelligence Agency, including Petitioner herein, with regard to Respondent's proposed TS/SCI protective order. Petitioner herein files this response to Respondent's request that this Court enter the proposed TS/SCI protective order.

### Preliminary Statement

Respondent argues that because of the risk to national security stemming from Petitioner's knowledge of the "operational details" and the "detention locations" resulting from his prior detention in the custody of a CIA program, the standard *habeas* protective order

procedures are rendered inadequate.[1]  Specifically, Respondent argues that the standard protective order in effect for *habeas* matters is inadequate in two areas, that is, the counsel access procedures and the "need to know" provisions.  Petitioner's response herein is limited to the inadequacy of the proposed protective order's counsel access procedures.

The TS/SCI counsel access procedures of the proposed protective order require that counsel secure an appropriate security clearance and submit verification of counsel's representation of the detainee to the United States Department of Justice (the "Justice Department") in order to gain access to the detainees.  *See* TS/SCI access procedures, ¶1.1. Because both of these provisions have been the subject of past government abuse, as experienced by the undersigned in his representation of Petitioner and another detainee, Ahmed Khalfan Ghailani, Petitioner submits that the proposed protective order must be modified to provide for judicial oversight.  Specifically, the government's manipulation of the existing protective orders, including the TS/SCI protective order in effect in the United States Court of Appeals for the District of Columbia Circuit ("DC Circuit"), has resulted in the violation of the detainees' Fifth and Sixth Amendment rights to due process of law and counsel of choice, including Petitioner's herein.  Accordingly, to prevent the continuation of such abuses, Respondent's proposed TS/SCI protective order must be modified to include judicial oversight over the implementation of the counsel access procedures.

### Statement of Material Facts

Long before the events of the instant matter, the undersigned initiated a separate and unrelated lawsuit in the United States District Court for the Southern District of New York (the "Southern District Action").  *See* 05 cv 7468 (RMB).  The Southern District Action sought to

---

[1] *See* Respondent's memorandum, footnote 4.

have attorneys automatically assigned to detainees who were then unaware that the President had initiated the process of charging them for war crimes before the military commissions, crimes for which they could receive the death penalty. In the course of the Southern District Action, the Justice Department asserted to the court that Petitioner and other detainees similarly situated were able to secure their own attorneys and that they were able to communicate with those attorneys at will. In support of that claim, by letter dated May 31, 2007, the Justice Department, on behalf of the United States Secretary of Defense and others, provided the court the mailing address for detainees at Guantánamo Bay through which prospective attorneys and detainees could communicate. *See* August 29, 2008 Declaration of Scott L. Fenstermaker ("Fenstermaker Declaration"), Exhibit A, Page 4. The Justice Department further claimed in that letter that Petitioner and other detainees similarly situated had "access to mail and are able to contact friends, relatives or attorneys." *See id.*, Page 3. The Justice Department repeated this claim during oral argument in the Southern District Action. *See* Fenstermaker Declaration, Exhibit B, lines 2 through 5 of Page 25 of the transcript of the Southern District oral argument. At no time did the Justice Department inform the court or the undersigned that attorney-client mail sent to that address would be returned to the sender, as undeliverable to the detainee, unless the attorney-client privilege was waived.

Shortly thereafter, the undersigned began corresponding with some of the detainees using the address provided by the Justice Department. After receiving the undersigned's letter, eight detainees, including Petitioner and Ahmed Khalfan Ghailani, corresponded in writing with the undersigned, the only means by which they could communicate with him. Petitioner retained the undersigned by letter dated August 22, 2007. *See* Fenstermaker Declaration, ¶ 3. The undersigned received Petitioner's August 22, 2007 letter on January 30, 2008. *See* Fenstermaker

Declaration, footnote 2. Similarly, by letter dated October 20, 2007, Ahmed Khalfan Ghailani retained the undersigned as his legal representative. The undersigned subsequently notified personnel affiliated with the Office of Military Commissions regarding his attorney-client relationship with Petitioner. *See* Fenstermaker Declaration, Exhibit C.

### **Representation of Petitioner**

Prior to the undersigned's January 30, 2008 receipt of Petitioner's August 22, 2007 letter, the undersigned was unaware of Petitioner's intent to retain him as his legal representative.[2] During the period before January 30, 2008, the undersigned learned that the Federal Defender for the District of Nevada (the "Federal Defender") was claiming to represent Petitioner. Unaware at the time that Petitioner had retained him, the undersigned contacted the Federal Defender and agreed to seek the removal of Petitioner as a party from the appeal of the Southern District Action. Shortly after the undersigned's agreement, on January 9, 2008, the Federal Defender filed a petition pursuant to the Detainee Treatment Act of 2005 ("DTA") on Petitioner's behalf in the DC Circuit. A short time later, the Federal Defender moved jointly with the government for a protective order which provided for many of the provisions in Respondent's proposed protective order. Although the Federal Defender had apparently never communicated with Petitioner in any manner, in writing or in person, the court temporarily authorized the Federal Defender to serve as Petitioner's counsel until such time as the Federal Defender received the necessary security clearance to visit with Petitioner and to obtain his personal authorization to proceed with the DTA petition which was then still unauthorized. In

---

[2] Although the undersigned received another letter from Petitioner dated after his August 22, 2007 letter, that second letter sought legal advice but did not restate Petitioner's interest in retaining the undersigned with sufficient clarity. A review of the October 1, 2007 letter without the August 22, 2007 letter in hand led the undersigned to believe that Petitioner was merely seeking general advice without retaining the undersigned specifically as his legal representative.

essence, the court permitted the Federal Defender to serve as legal counsel in an as yet unauthorized DTA action until the Federal Defender was able to convert Petitioner from a "prospective client" to a firm one, after a visit with Petitioner at Guantánamo Bay. Two weeks later, agents of the United States government released Petitioner's August 22, 2007 retention letter for delivery to the undersigned.[3]

With the receipt of Petitioner's August 22, 2008 letter, the undersigned notified the Federal Defender of his retention by Petitioner on or about February 1, 2008.[4] The Federal Defender directed the undersigned to not contact Petitioner. Despite the Federal Defender's hostility toward the undersigned upon receiving this information, he sought to enlist the Federal Defender to act as co-counsel in Petitioner's defense. During this time, the undersigned continued to correspond with Petitioner and, in fact, introduced Mr. Turner in his letters speaking cordially of him despite the Federal Defender's hostility. When it became apparent that the Federal Defender was not amenable to serving as co-counsel, the undersigned was left with no choice but to file a motion to substitute counsel in Petitioner's pending DTA action in the DC Circuit.[5] See 08-1007. In the course of motion practice, the undersigned learned that Mr. Turner had received his top secret security clearance and had visited Petitioner in May of 2008, shortly before the undersigned filed his motion to substitute.[6] Thereafter, the Federal Defender claimed, in her response to the undersigned's motion to substitute counsel, that although she had been aware of the undersigned's assertion that Petitioner had retained the undersigned as his legal

---

[3] The envelope containing this letter was postmarked January 28, 2008.
[4] The undersigned notified the government that he represented in letters dated February 2, 2008 and July 1, 2008. See Fenstermaker Declaration, Exhibit C.
[5] The undersigned waited to file a notice of appearance in the matter until he received his admission to practice before the bar of that court. The motion to substitute is still pending before the DC Circuit.
[6] In papers filed in the DC Circuit in Petitioner's DTA Petition, Mr. Turner claims to have visited Petitioner in May of 2008.

representative, the court should nonetheless recognize the Federal Defender as Petitioner's counsel because the Federal Defender had visited Petitioner and were the first to secure Petitioner's personal authorization to proceed with the DTA action and therefore should remain counsel of record. The government has never granted the undersigned the necessary security clearance and he was thereby prevented from meeting with the client that had retained him.[7]

### Representation of Ahmed Khalfan Ghailani

By letter dated October 20, 2007, Ahmed Khalfan Ghailani retained the undersigned to serve as his counsel. By letters dated December 14, 2007 and then again, on March 31, 2008, the undersigned notified the government and members of the Office of Military Commissions, including Colonel Steven H. David, the head of the Office of the Chief Defense Counsel ("CDC") for the Office of Military Commissions, that the undersigned represented Mr. Ghailani. The undersigned initiated the process of obtaining the necessary security clearance to visit Mr. Ghailani in March of 2008.

Although Mr. Ghailani had already retained the undersigned, on April 24, 2008, Colonel David assigned Lt. Colonel Michael Acuff ("Appointed Military Counsel") as Mr. Ghailani's detailed military defense counsel. Within two weeks of that assignment, and without consultation with the undersigned, Appointed Military Counsel visited Mr. Ghailani at Guantánamo Bay and spoke with him at length.[8] The undersigned remained, and remains, banned from visiting Mr. Ghailani because of his lack of security clearance. For a time, the undersigned jointly worked with Appointed Military Counsel on Mr. Ghailani's behalf. During

---

[7] In an earlier letter to Petitioner, the undersigned had cordially introduced the Federal Defender to Petitioner and led Petitioner to believe that he was seeking the Federal Defender's assistance as co-counsel. Therefore, when the Federal Defender met with Petitioner, Petitioner believed that the Federal Defender and the undersigned were jointly working on Petitioner's behalf.

[8] Appointed Military Counsel never sought, or received, permission from the undersigned to visit with Mr. Ghailani, who was already represented by counsel.

this period, the undersigned learned that Appointed Military Counsel was also assigned to represent another detainee and discovered the existence of a conflict of interest in Appointed Military Counsel's simultaneous representation. The undersigned protested Appointed Military Counsel's simultaneous representation. As a result of the undersigned's objection and his protests against repeated visits and conversations with Mr. Ghailani despite the conflict, tension arose between Appointed Military Counsel and the undersigned.

On July 1, 2008, as tension between Appointed Military Counsel and the undersigned peaked, the undersigned received an e-mail from Andrew I. Warden, an attorney with the Justice Department.[9] *See* Fenstermaker Declaration, Exhibit E. According to Mr. Warden: "Because you are not authorized to send or receive mail pursuant to any appropriately entered protective orders, the mail you recently sent to [Mr. Ghailani and Petitioner] would ordinarily be processed in accordance with the procedures established for non-privileged mail unless you request that the mail be returned to you. Because that mail is marked privileged, it has not been reviewed or otherwise processed at this point." Fenstermaker Declaration, ¶ 28, Exhibit E. In response, the undersigned wrote, "You are free to process my mail to my clients in whatever fashion you like, *so long as they get it*. I will reserve my arguments regarding the privileged nature of the correspondence for the appropriate forum."[10] Fenstermaker Declaration, ¶ 30, Exhibit F (emphasis added). Shortly thereafter, the undersigned received three packages from the Office of the Staff Judge Advocate at Guantánamo Bay. *See* Fenstermaker Declaration, ¶¶ 32, 33, 34

---

[9] Over the course of the twelve-month period prior to this date, the undersigned had sent mail marked "privileged and confidential/attorney-client privilege" to Guantánamo Bay detainees, including Petitioner and Mr. Ghailani, at the Justice Department-provided address, without incident.

[10] On or about June 16, 2008, and July 7, 2008, the undersigned wrote to Petitioner. These letters, which, among other things, sought clarification from Petitioner regarding the undersigned's status, have been rejected by Respondent and his subordinates and returned to the undersigned.

and 35 . Enclosed were a total of 30 pieces of legal correspondence sent by the undersigned to Petitioner and Mr. Ghailani. *See id.* Included in these packets were copies of legal documents filed on their behalf. Attached to the rejected correspondence was a memo informing the undersigned that the Office of the General Counsel at the Department of Defense had directed the Office of the Staff Judge Advocate at Guantánamo Bay to return the undersigned's privileged correspondence to the undersigned. *See* Fenstermaker Declaration, ¶ 32, Exhibit G.

By letter dated June 25, 2008, Respondent and his subordinates notified the undersigned they no longer recognized the undersigned as counsel to Mr. Ghailani.[11] *See* Fenstermaker Declaration, ¶ 25, footnote 10, Exhibit D. Shortly thereafter, Appointed Military Counsel, through another civilian attorney, moved to bar the undersigned from representing Mr. Ghailani in a *habeas* action in this Court (08 CV 1190 (RJL)), claiming that during one of his meetings with Mr. Ghailani at Guantánamo Bay on July 16, 2008 Mr. Ghailani stated that he no longer desired the undersigned to serve as his representative. With no ability to visit Mr. Ghailani and the undersigned's ability to write to Mr. Ghailani regarding privileged information banned by Respondent, the undersigned was left with no means whatsoever of securing information to defeat the motion. The district court shortly thereafter granted the motion barring the undersigned's representation of Mr. Ghailani in his *habeas* action.

### Respondent's Efforts to Obstruct the Undersigned's Communications with Other Detainees

In May of 2008, the undersigned received a letter from Abu Faraj al-Libi, another one of the former CIA prisoners held at Guantánamo Bay. Mr. al-Libi sought the undersigned's assistance in securing independent counsel unaffiliated with the government. According to Mr.

---

[11] By letter dated July 21, General Hartmann's deputy, Michael C. Chapman similarly notified the undersigned that the CDC did not recognize his representation of Petitioner.

al-Libi's letters, he had written the undersigned at least three letters, of which the undersigned had received only two. The undersigned responded to Mr. al-Libi's letter on May 30, 2008 but does not know whether Mr. al-Libi has ever received that letter.

On June 5, 2008, five defendants facing military commissions' charges as a result of their alleged involvement in the September 11th terrorist attacks were arraigned at Guantánamo Bay before a military commission judge. During these proceedings, one of these five defendants, Ammar al-Baluchi (aka, Ali Abdul Aziz Ali), complained to the military commissions' judge that he had been trying to communicate with the undersigned, apparently for the purpose of securing the undersigned's services as his attorney.[12] *See http://us.ft.com/ftgateway/superpage.ft?news_id=fto060920081244373936&page=2*. Mr. al-Baluchi also accused the government of obstructing his communications with the undersigned. The undersigned received four letters from Mr. al-Baluchi. Based on the letters the undersigned has received from Mr. al-Baluchi, the undersigned has reason to believe that Mr. al-Baluchi has written the undersigned at least six, and perhaps more, letters.

## ARGUMENT

According to the proposed protective order, before counsel is permitted access to his detainee-client, counsel must satisfy the TS/SCI counsel access procedures. These procedures require that counsel secure the appropriate security clearance and present the Justice Department with verification of counsel's representation of the detainee. *See* TS/SCI access procedures, ¶1.1. According to the proposed protective order, whether counsel satisfies these prerequisites is determined solely by the government. Granting such unilateral power, without judicial oversight

---

[12] The undersigned requested a copy of the transcript of the June 5, 2008 military commissions' arraignment proceedings and was denied a copy by the Deputy Clerk of Court for the Office of Military Commissions.

9

or any recourse to judicial process, exposes the detainee to violation of the detainee's basic constitutional rights by the government with impunity. As detailed below, Respondent has already engaged in such manipulation to the detriment of Petitioner's and Mr. Ghailani's Fifth and Sixth Amendment rights.

## Respondent's Arguments Imply Petitioner's Unlimited, Indefinite Detention

Initially, Respondent argues that an enhanced protective order is necessary because Petitioner was detained in a highly classified CIA program. Specifically, Respondent argues that attorney-client written or oral communications with Petitioner, which will likely include information regarding Petitioner's detention, will potentially expose "detention locations and other operational details" of the CIA Program, and that such exposure would jeopardize the United States' security interests. Respondent's claim is entirely disingenuous.

First, a natural consequence of Respondent's argument is that Petitioner and other detainees like him can never be released. Assuming that the government disclosed to Petitioner where he was being held by the CIA[13] and the "operational details" of his captivity, Petitioner would forever bear this knowledge. Under the government's assertion, Petitioner's knowledge would preclude his ever being released, even if he were later adjudged no longer an enemy combatant or were acquitted after trial by military commission. Moreover, any claim that circumstances may change which would permit Petitioner's release at some point in the future is similarly unavailing for it is the government that determines when and whether circumstances so permit. In short, under Respondent's argument, Petitioner must be detained regardless of past

---

[13] If Petitioner and his fellow CIA detainees are indeed aware of the locations of these facilities, it is only due to negligence. Any program of this sort would almost certainly entail, among other things, procedures to keep this information from the detainees, including Petitioner.

guilt or future threat simply because he now possesses classified information. This can hardly be correct.

Respondent's general assertion claiming threat to national security, without more, is simply insufficient grounds for trumping the constitutional rights of detainees, particularly in these *habeas* actions. As the framers of the Constitution have stated, "the practice of arbitrary imprisonments, have (sic) been, in all ages, the favorite and most formidable instruments of tyranny."[14] Indeed, Alexander Hamilton wrote the following:

> 'but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore A MORE DANGEROUS ENGINE of arbitrary government.' And as a remedy for this fatal evil he is everywhere pecularly emphatical in his encomiums on the habeas-corpus act, which in one place he calls 'the BULWARK of the British Constitution.'

*Id., quoting* Vide Blackstone's 'Commentaries,' vol. iv, p. 438.

The writ of *habeas corpus* exists to guard against this "evil." As described in more detail below, certain provisions of the proposed protective order seek to diminish the protections of the *habeas* proceeding and, in turn, have led to government overreaching.

### Court Oversight Provides a Necessary Buffer to Respondent's Absolute Control Over Access to, and Communication with, the Detainees

Respondent's proposed protective order, while couched in terms of advancing national security interests, provides Respondent with the opportunity to manipulate all former CIA prisoners', including Petitioner's, access to counsel of the detainees' choice. Under the circumstances presented here, where Respondent and his subordinates have demonstrated a willingness to manipulate access to, and communication with, the detainees' counsel of choice,

---

[14] Federalist Papers, No. 84, Alexander Hamilton.

11

the protective order proposed by Respondent must be modified to protect against Respondent's continued abuse of the detainees' Fifth and Sixth Amendment rights.

According to the TS/SCI counsel access procedures, the threshold prerequisite to securing access to the detainees includes counsel providing the Justice Department with verification of counsel's representation and counsel receiving the appropriate security clearance. Satisfaction of these two prerequisites is necessary in order for counsel to gain access to the detainees, both physically, through visits at Guantanamo Bay, and in writing, through written communication sent via the legal mail system. Because the TS/SCI access procedures proposed contain no judicial oversight provisions, final determination as to whether those prerequisites have been satisfied rests solely with the government. The proposed protective order therefore grants the government absolute control over which attorneys will be permitted to represent the detainee by virtue of its discretion to grant security clearances and by its refusal to permit privileged mail sent through the non-legal mail system. Unmodified, the proposed protective order permits the government to continue to violate the detainees' constitutional right to counsel of choice and to do so unchecked. As detailed below, the government has already effected that violation in the undersigned's representation of Mr. Ghailani and Petitioner.

        (a)    <u>Verification of Counsel's Representation of the Detainee</u>

The TS/SCI procedures require that counsel present verification of his authorization to represent the detainee to the government. Securing such verification is hardly simple given the unique circumstances surrounding the detainees' detention, particularly those formerly held in CIA custody, like Petitioner. The former CIA prisoners' conditions of confinement involve unprecedented communications restrictions and present both the detainees and counsel with unique challenges, particularly where Respondent exercises his discretion to

12

refuse privileged mail in an arguably arbitrary and unconstitutional fashion. Further compounding Petitioner's difficulty is his apparent lack of command of the English language and an understanding of the subtleties of legal terms and their effect.

Not surprisingly, the former CIA prisoners, like Petitioner, interested in securing an attorney through written correspondence are faced with a daunting task. Their access to names of attorneys and ability to discover potential counsel's experience, qualifications and dedication are severely restricted. Hence, unlike the typical situation where the attorney-client relationship is established through a retainer agreement, generally executed shortly after a meeting between the attorney and client, simply attempting to secure a civilian attorney through letter-writing is an arduous task that can take months and likely longer, under the circumstances faced by Petitioner and his fellow detainees. These challenges are further compounded by the government's policy of refusing to act on security clearance applications with seeming arbitrariness. Under these circumstances, latitude must be given as to the type of verification that would be deemed sufficient evidence of the attorney's authorization to act on the detainee's behalf and the Court, not Respondent, should be the final arbiter.

(b) <u>Counsel's Security Clearance and Communication with the Detainees through the Legal and Non-legal Channels.</u>

Absent judicial oversight, the government's unfettered ability to control the existing dual-track mail system accords it absolute power over a detainee's selection of counsel. The undersigned's experience in representing Mr. Ghailani and Petitioner before the military commissions firmly illustrates the potential for abuse. As described below, not only was the undersigned prohibited from using the legal mail system, but his ability to utilize the non-legal mail system for privileged communications was also eliminated by government fiat. In the end, the government's transparent abuse of access to the mail systems enabled it to eliminate Mr.

Ghailani's chosen counsel and may enable it to do the same to Petitioner. This set of circumstances is the direct result of provisions in the TS/SCI protective orders like that proposed by Respondent.

As a preliminary matter, there is no ostensible purpose behind limiting access to the legal mail system to attorneys approved by Respondent. The privilege teams currently in place to monitor the flow of legal mail to Guantánamo Bay detainees could, if so tasked, easily accommodate mail sent by attorneys not currently on the Justice Department's list of attorneys authorized to send legal mail, irrespective of their security clearances status. Should an attorney seeking to communicate through the legal mail system not have the requisite security clearance, procedures could easily be enacted to limit the nature of material contained in correspondence to the detainees and from the detainees to counsel. Indeed, the current non-legal mail system has such security measures in place, as letters from detainees to the undersigned are routinely redacted. The only apparent advantage to maintaining the current dual-track system for communication from attorneys is to enable Respondent to continue his limitation of the detainees' ability to secure representation from counsel of choice. As discussed in greater detail below, Respondent has taken aggressive advantage of this apparent loophole in the current protective orders, to the detriment of many detainees, including Petitioner and Mr. Ghailani.[15]

Despite the government's initial recognition of the undersigned as Mr. Ghailani's legal representative, the undersigned's communication with Mr. Ghailani was relegated to letter-writing, to include copies of legal documents filed in pending proceedings, sent to Mr. Ghailani

---

[15] As Ammar al-Baluchi so chillingly stated in his May 26, 2008 letter to the undersigned "Mr. Fenstermaker, unfortunately there is no legal representation or legal assistance for brothers detained here." See Fenstermaker Declaration, ¶ 38.

through the non-legal mail system.[16] As the undersigned's relationship with Appointed Military Counsel deteriorated as a result of disputes over strategy and the reality of Appointed Military Counsel's conflict of interest, the government instituted a policy of rejecting all of the undersigned's privileged legal mail sent to all detainees, including Mr. Ghailani and Petitioner. In so doing, the government effectively selected Appointed Military Counsel as Mr. Ghailani's attorney, notwithstanding his clear preference for the undersigned. The government successfully achieved its goal when this Court, by the Honorable Richard J. Leon, granted Appointed Military Counsel's retained attorney's motion to strike the undersigned's notice of appearance and bar the undersigned from filing further documents on Mr. Ghailani's behalf in Mr. Ghailani's *habeas* matter before this Court. *See* 08 CV 1190 (RJL). The government accomplished this constitutionally suspect result by, in effect, holding Mr. Ghailani incommunicado from the undersigned through the use of existing protective orders. *See* Fenstermaker Declaration, Exhibit E. The dangers of the current protective order regime could not be clearer. Under these circumstances, the government is able to act with impunity in disrupting attorney-client relationships, as it successfully accomplished in Mr. Ghailani's matter.

Similarly, in Petitioner's case, the government was able to ensure that the Federal Defender was in place before releasing Petitioner's August 22, 2007 retention letter for delivery to the undersigned.[17] That manipulation, when coupled with the Federal Defender's opportunistic behavior, eliminated Petitioner's ability to secure counsel of his choice, the undersigned.

---

[16] The non-legal mail system is ponderously slow, as it typically takes two months for a letter to reach its intended recipient.

[17] Under the circumstances, the five month and one week delay in delivery of Petitioner's August 22, 2007 letter is otherwise inexplicable.

With the fallout stemming from the undersigned's representation of Mr. Ghailani, the government eliminated his ability to communicate with not only Mr. Ghailani and Petitioner, but the other detainees seeking his assistance as well.[18] The government's actions have the effect of eviscerating the detainees' rights to due process of law and counsel of their choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) (holding that a trial court's erroneous deprivation of a criminal defendant's choice of counsel entitles the defendant to a reversal of his conviction, irrespective of prejudice or lack thereof). Thus, the government's ability to capitalize on the heretofore lack of judicial oversight has led to the government's overreaching. Such governmental interference, coupled with the disparity in access between the undersigned and Appointed Military Counsel and the Federal Defender, violated Petitioner and Mr. Ghailani's right to counsel. *See People v. Moore*, 57 Cal. App.3d 437, 442 (Cal. App. 4th Dist. 1976); *Commonwealth v. Manning*, 373 Mass. 438, 443 (1977); *United States v. Irwin*, 612 F.2d 1182 (9th Cir. 1980); citing to *Moore* and *Manning*; *see also United States v. Amlani*, 111 F.3d 705, 711 (9th Cir. 1997); *Cinelli v. Cutillo*, 896 F.2d 650, 655 (1st Cir. 1990); *United States v. Morrison*, 449 U.S. 361, 367 (1981).

Contrary to Respondent's position, this Court is not barred from oversight of the Executive's discretion in the area of national security. In support of his claim that the Court should grant the requested protective order, Respondent relies on *Dep't of Navy v. Egan*, 484 U.S. 518 (1988). In *Egan*, the Court described the proper scope of review of the rejection of a security clearance application by an applicant with a violent criminal record and a self-admitted drinking problem. Subsequent interpretation of *Egan* demonstrates that the government's discretion in the realm of national security is not beyond the review of constitutional claims. *See*

---

[18] *See* Messrs. al-Baluchi and al-Libi.

*Webster v. Doe*, 486 U.S. 592, 603 (1988); *see also Stillman v. CIA*, 517 F.Supp.2d 32, 39 (D.D.C. 2007) (case involving judicial review of a CIA, Department of Energy, Department of Defense, and Defense Intelligence Agency classification determination). Courts have held that "a large measure of discretion gives rise to judicial deference, not immunity from judicial review of constitutional claims." *National Federation of Federal Employees, et. al. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993), *citing Harmon v. Thornburgh*, 878 F.2d 484, 491-92 (D.C. Cir. 1989), *cert. denied*, 493 U.S. 1056 (1990). Indeed, as this Court previously held, "It may well be that *Egan* allows for exceptions where the need for judicial involvement is great and where articulable suspicion is present that the classification of employees with respect to access to top-secret information is designed for such unlawful purposes as the denial of constitutional or other legal rights or the violation of court orders or laws duly enacted by Congress." *American Federation of Government Employees, AFL-CIO, et. al. v. Sullivan*, 744 F.Supp. 294 (D.D.C. 1990). This is just such a situation.

Here, Respondent's continued refusal to act on the undersigned's security clearance application is inexcusable. The undersigned is a Distinguished Graduate and Graduate with Honors from the United States Air Force Academy. *See* Fenstermaker Declaration, ¶ 40. The undersigned, a graduate of the United States Air Force's prisoner of war training, has never been arrested, convicted of a crime, accused of a crime, or, to his knowledge, even suspected of committing a crime. *See id.* The government has never explained its refusal. Under the circumstances, Respondent's failure to honor Petitioner's choice of counsel by refusing to grant his attorney access to him or even to advance his attorney's security clearance application is troubling. Such is the effect of granting the proposed protective order without concomitantly requiring sufficient judicial oversight to ensure the preservation of basic constitutional rights.

If this Court grants Respondent's motion, Respondent may continue to misuse his authority to manipulate the availability of counsel of choice, thereby depriving Petitioner of his Fifth and Sixth Amendment rights. *See United States v. Gonzalez-Lopez, supra*. While Respondent's discretion in the area of national security is broad, it may not be exercised violate Petitioner's (and the other former CIA prisoners') fundamental constitutional rights.

## CONCLUSION

Respondent's request should be denied. In the alternative, this Court should modify the provisions of the TS/SCI counsel access procedures as described herein.

Dated: New York, New York
August 29, 2008

Respectfully submitted,

**The Law Offices of Scott L. Fenstermaker, P.C.**

By: *[signature]*
Scott L. Fenstermaker, Esq.

300 Park Avenue, 17th Floor
New York, New York 10017
212-302-0201

To:  Clerk of the Court
United States District Court
333 Constitution Avenue, N.W.
Washington, DC 20001

Terry M. Henry, Esq.
US Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

Paul G. Turner, Esq.[19]
Assistant Federal Defender
411 East Bonneville Avenue, Suite 250
Las Vegas, NV 89101

---

[19] Mr. Turner is not on the ECF distribution list for this matter. A copy of this brief and the Fenstermaker Declaration will be served on Mr. Turner via e-mail.