*CLEARED FOR PUBLIC FILING BY COURT SECURITY OFFICER*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ) | |
| IN RE:                                ) | **Misc. No. 08-0442 (TFH)** |
| **GUANTANAMO BAY**          ) | |
| **DETAINEE LITIGATION**    ) | **Civil Action No. 04-1254 (HHK)** |
| ) | |

## REPLY TO OPPOSITION TO EMERGENCY MOTION TO COMPEL ACCESS TO MEDICAL RECORDS OF PETITIONER ADNAN FARHAN ABDUL LATIF AND FOR OTHER MISCELLANEOUS RELIEF

On August 14, 2008, counsel met with Petitioner Adnan Farhan Abdul Latif. Mr. Latif appeared to weigh about 100 pounds and looked close to death. Blood had been appearing in his stool and vomit for reasons the military doctors were unable to explain. Although he was not on hunger strike and was not being force-fed, for weeks he had been unable keep his meals down. Mr. Latif had recently attempted to hang himself, and during the meeting with counsel he manifested signs of serious mental illness. In the meantime, his blanket and mattress had been confiscated from his cell as punishment for an undisclosed disciplinary infraction.

After the military denied counsel's request to see Mr. Latif's medical records, counsel filed the instant Emergency Motion with this Court. In their answer to the motion, Respondents provided information about Mr. Latif's medical history that largely confirms the factual statements made above. Respondents nonetheless oppose providing counsel with the requested medical records, contending that this Court is without jurisdiction to take any steps to preserve Mr. Latif's life and health. Respondents also claim, contrary to all appearances and common sense, that Mr. Latif is "currently in good health with no significant mental health problems." Opp. 19.

Dockets.Justia.com

Respondents' assertion that Mr. Latif is physically and psychologically well is not credible. By Respondents' own admission, Mr. Latif dropped nearly a quarter of his weight in only a few weeks in August, a precipitous weight loss that even hunger striking may not account for. *See* Decl. of Dr. David M. Nathan ¶ 4, attached as Exh. A. But Mr. Latif denies that he is on a hunger strike, and as of August 14 (the date of counsel's visit), Respondents themselves did not believe that he was on a hunger strike. They began to treat Mr. Latif as a hunger striker and to force-feed him only *after* the instant Motion was filed. Further, by Respondents' own admission, Mr. Latif attempted to hang himself in his cell in late June, an act that they accept "could have resulted in self harm." Opp. 6. Respondents, however, would have this Court believe that Mr. Latif's suicide attempt was not a sign of mental disturbance, but merely a "gesture." *Id.* at 20.

Respondents contend that, even in such extreme circumstances, the Court lacks jurisdiction to intervene. On Respondents' logic, the military could starve or torture Mr. Latif, and the Court would be powerless to act. Mr. Latif, however, is properly before this Court as a habeas litigant, *Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008), and this Court has the authority and obligation to assure that his ability to prosecute his case is not undermined by Respondents' acts or failures to act, *Johnson v. Avery*, 393 U.S. 483, 485 (1969).

The instant motion does not ask the Court to order Respondents to do anything more than make Mr. Latif's own medical records available to counsel, so that counsel, in consultation with their own physicians, may decide whether to ask the Court for further assistance.

## MR. LATIF'S MENTAL AND PHYSICAL HEALTH

Respondents strive to portray Mr. Latif as an ordinary prisoner who suffers only from minor ailments. One look at Mr. Latif's emaciated body, however, gives the lie to this portrayal of his physical condition, and it takes no more than ten minutes of conversation with Mr. Latif to

conclude that he is suffering from severe mental disturbance and is suicidal. Undersigned counsel was not exaggerating in stating that Mr. Latif seems near to death. *See* Decl. of Marc D. Falkoff ¶¶ 3, 31, Mot. Exh. A.

The selective information about Mr. Latif's health that Respondents have provided does little to allay counsel's fears. Respondents are unwilling to acknowledge Mr. Latif's psychological problems, they elected to treat Mr. Latif as a hunger striker only after counsel complained of his weight loss and emaciated condition, and they refuse to acknowledge the role of Mr. Latif's mental condition as a factor in the collapse of his physical health. Whether Respondents are sincere is irrelevant. All in all, Respondents maintain that Mr. Latif's condition is no cause for concern, when all indications point the other way.

**(A)      Weight Loss And Other Physical Problems**

Respondents do not dispute counsel's assertion that on August 14, 2008, Mr. Latif was emaciated and looked close to death. They do not deny that he has lost a shocking amount of weight in a very short time. On the contrary, they report that Mr. Latif's weight dropped from 135 pounds to 110 pounds between July 31 and August 24, a loss of 25 pounds – 19 percent of Mr. Latif's weight – in just 24 days.

Respondents' admissions, moreover, do not tell the whole frightening story. They neither confirm nor deny that Mr. Latif was weighed on August 11, three days before counsel's visit, and that he was told he weighed *107* pounds. If accurate, Mr. Latif lost 28 pounds, or 21 percent of his body weight, in the 11 days between July 31 and August 11. Even more disturbing, if counsel is correct that Mr. Latif weighed closer to *100* pounds on August 24, then Mr. Latif

dropped from 135 pounds on July 31 to about 100 pounds on August 14, a 35 pound loss in 14 days, or 26 percent of his weight. These numbers are compiled in the chart below.[1]

| Start Date | Start Weight | End Date | End Weight | Time Period | Weight Loss | % Body Weight |
|------------|--------------|----------|------------|-------------|-------------|---------------|
| June 29 | 139 | August 11 | 107* | 43 days | 32 lbs | 23% |
| June 29 | 139 | August 14 | 100** | 46 days | 39 lbs | 28% |
| June 29 | 139 | August 24 | 110 | 56 days | 29 lbs | 21% |
| July 31 | 135 | August 11 | 107* | 11 days | 28 lbs | 21% |
| July 31 | 135 | August 14 | 100** | 14 days | 35 lbs | 26% |
| July 31 | 135 | August 24 | 110 | 24 days | 25 lbs | 19% |

\*   Mr. Latif's reported weight from a hospital visit several days before his interview with counsel on August 14.

\*\* Estimate from counsel's observations of Mr. Latif at their meeting on August 14. Respondents have not provided counsel or the Court with Mr. Latif's weight from the date of counsel's visit on August 14 until August 24, which was after they had begun force-feeding Mr. Latif.

Respondents concede (for the first time in this litigation) that Mr. Latif was on hunger strike from February 2007 through February 2008. They also suggest that he is on a hunger strike at present, and they imply that his weight loss is a result of his hunger striking. *See* Decl. of Dr. Bruce Meneley ¶ 21, Opp. Exh. 1. Without access to Mr. Latif's medical records, how-

---

[1] Respondents note that Mr. Latif's weight when he arrived at Guantánamo in the middle of January 2002 was 114 pounds, *see* Opp. 6 n.3, implying that a present weight of 110 pounds does not represent a large discrepancy. Respondents fail to note, however, that Mr. Latif was taken into custody by Pakistani security forces in early November 2001 and then turned over to United States forces sometime during that month. When the U.S. took custody of Mr. Latif, he weighed 120 pounds. Between November 2001 and January 2002, while in U.S. custody, he lost 6 pounds. It can hardly be contended that Mr. Latif was at a healthy weight during this period.

ever, Respondents' sudden conclusion that Mr. Latif is currently on hunger strike must be viewed skeptically. More important, whether Mr. Latif is on a hunger strike at present does not alone explain his precipitous weight drop or obviate the need for counsel to see his medical records.

First, Mr. Latif denied to counsel in emphatic terms in a meeting in June, as well as in counsel's meeting of August 14, that he had reinstituted his hunger strike. (Mr. Latif told counsel at both meetings that he had ended his hunger strike in February 2008 because visiting Yemeni officials had assured him that he and other Yemenis would be released to Yemen within a month.) Moreover, during counsel's visit in August, Mr. Latif tried, with some success, to drink fruit juice provided by counsel. Mr. Latif urged strenuously that he wanted to eat and tried to eat, but was unable to keep his food down. He also conveyed to counsel his fear that the military would believe that he was hunger striking and would attempt to force feed him via a naso-gastric tube – which he described as "having a dagger shoved down your throat" – rather than treat him for whatever was causing his weight loss and inability to eat. In fact, no one at Guantánamo believed that Mr. Latif was engaged in a hunger strike until two days after the instant Motion seeking access to his medical records was filed on August 16. *See* Meneley Decl. ¶ 19 (stating that Mr. Latif was declared a hunger striker on August 18).

Second, even if Mr. Latif is on a hunger strike, it is impossible to know from the facts before the court whether the hunger striking alone could account for his extreme weight loss. Even accepting the numbers most favorable to Respondents, Mr. Latif lost 25 pounds in the 24 days between July 31 and August 24. (The Court should note that the August 24 measurement was made by personnel at Guantánamo well *after* they began force-feeding Mr. Latif and, indeed, two days *after* Respondents' Opposition was originally due on August 22. Respondents' reli-

ance on these belated measurements obscures the true weight loss suffered by Mr. Latif in this short time period.) According to Dr. David M. Nathan, a Harvard Medical School physician contacted by Mr. Latif's counsel, there is no way to know, without consulting Mr. Latif's medical records, whether a hunger strike alone could account for the loss of so much weight in so short a time. *See* Nathan Decl. ¶ 4.

Respondents, in fact, offer no explanation for Mr. Latif's rapid weight loss. They do, however, reveal to the Court and counsel (for the first time) that Mr. Latif has tested positive for latent tuberculosis, and they concede that the last time a chest X-ray was performed on him was in September 2006. As Dr. Nathan explains, the extreme stress that Mr. Latif's body has experienced as a result of a year-long hunger strike may have activated his tuberculosis and could explain many of his present symptoms. *Id.* ¶ 5. It is impossible, however, to tell whether Mr. Latif has active tuberculosis without a recent chest X-ray. *Id.*

Respondents, moreover, have offered contradictory information in response to Mr. Latif's assertion that another of the symptoms of his ill health is blood in his vomit, stool and urine. In his declaration on behalf of Respondents, Dr. Meneley states that

> over the last three months, ISN 156 [Mr. Latif] has not complained about … having blood in his vomit or urine. Except as discussed below, there is no record of ISN 156 seeking medical care for such problems or mentioning these problems during his medical visits, including no record of him raising the issue during the daily rounds made by medical staff. Similarly, the medical staff has not observed ISN 156 experiencing involuntary regurgitation after meals or of having blood in his vomit or urine. No vomit or complaint of blood in his vomit was documented in his medical record during the past 6 months prior to 13 August.

Meneley Decl. ¶ 22; *see also id.* ¶ 24. Nowhere in his declaration does Dr. Meneley acknowledge either that Mr. Latif has complained about blood in his stool and vomit at any time, or that doctors were in fact notified of his complaints. In contrast, Colonel Bruce Vargo states in his declaration for Respondents that "[o]n 12 August 2008, ISN 156 complained to a guard that he

had blood in both his stool and his vomit.  Medical was notified that day.  On 19 August 2008, ISN 156 was observed vomiting in his cell and it appeared to the guard that there was blood in his vomit.  Medical was notified that day."  Vargo Decl. ¶ 5, Opp. Exh. B.  Respondents implicitly acknowledge that Mr. Latif suffered from nausea and vomiting.  *See* Opp. 5 (stating that a "physician concluded that Petitioner's vital signs were normal and that his nausea and vomiting had been resolved").

The conflict between the Meneley and Vargo declarations, coupled with Respondents' refusal to provide the Court and counsel with more than piecemeal information about Mr. Latif's medical history, strongly militate in favor of this Court ordering Respondents to provide counsel for Mr. Latif with his full medical history so that an independent physician may assess his health.

**(B)      Mental Disturbance and Suicide Attempts**

Equally unnerving is the refusal of Respondents to acknowledge that Mr. Latif's physical health must be evaluated in light of his psychological condition.  Indeed, Respondents contend that Mr. Latif is not even suffering from any severe mental illness, suggesting only that he has a "'personality disorder, not otherwise specified,' with borderline and antisocial features."  Meneley Decl. ¶ 12.  Respondents' conclusions are not credible, even to the layman.

First, Respondents admit (for the first time) that Mr. Latif attempted to hang himself in June 2008.  They describe a disturbing scene that includes Mr. Latif draping a prayer rug over his desk to shield his head from view, and then "rolling back and forth on the ground in a manner that caused a makeshift rope to tighten around his neck."  Opp. 6 n.4.  Respondents concede that

the incident "could have resulted in self harm," Meneley Decl. ¶ 13, but they strangely deny that it was a suicide attempt, euphemizing it as a "suicidal gesture," Opp. 20.[2]

Respondents refuse to confirm or deny that Mr. Latif has made other attempts on his life during his time at Guantánamo, though in his Declaration, Mr. Latif's counsel described past discussions with his client about suicide and described seeing scars on his client's wrists. *See* Falkoff Decl. ¶ 5. Rather, Respondents contend that – notwithstanding his attempt to strangle himself – Mr. Latif could not be suicidal because he *denies* that he is suicidal. *See* Opp. 20; Meneley Decl. ¶ 13. Mr. Latif, however, refuses to acknowledge to himself or others that he has attempted to kill himself (maintaining instead that his suicidal acts "happened" to him) because, as a devout Muslim, he believes that he will suffer an eternity in Hell if he takes his own life. He therefore strives to convince both himself and his interlocutors (including counsel) that his suici-

---

[2] This conclusion is particularly odd since, in June 2006, three detainees at Guantánamo succeeded in taking their own lives by "hanging themselves with braided rope made from bed sheets and tee shirts," while using "[b]lankets and sheets … to obstruct the guards' views." Naval Criminal Investigative Service, "Statement on Suicide Investigation," *available at* http://www.dod.mil/pubs/foi/detainees/NCIS-statement_suicide_investigation.pdf (last visited Sept. 1, 2008). Even without this history of successful suicide attempts, skepticism about the military's taxonomy would be warranted. According to Erik R. Saar, an army sergeant who supported intelligence and interrogation operations at Guantánamo, after a spate of suicide attempts drew the attention of the International Committee of the Red Cross, the military began reclassifying them as manipulative "self harm" incidents. "The device of labeling most attempted suicides as 'manipulative self-injurious behavior' kept the numbers low, and Camp Delta's command seemed to be using that designation more often…. The Pentagon said that 350 'self harm' incidents occurred [in 2003], including 120 'hanging gestures.' It doesn't take the smarts of my rocket-scientist pal Timmy to know that it's dangerous to parse when somebody is really trying to kill himself and when he's just trying to get attention. Sometimes it's both at once." Erik R. Saar & Viveca Novak, INSIDE THE WIRE 243 (2005). Indeed, it was "standard operating procedure" at least as of March 2003, for camp guards to avoid referring to "suicide attempts" at all in their logs: "Do not use any of the following phrases in pass-on books or block logs: (a) Suicide attempts (b) Suicide gesture (c) Suicide ideation[.] Use the phrase 'self-injurious behavior' in all documentation." Camp Delta Standard Operative Procedures (SOP) at Ch. 6, § III, 6-15c(2)(j) (Mar. 28, 2003), *available at* http://blog.wired.com/27bstroke6/files/gitmo-sop.pdf (last visited Sept. 1, 2008).

dal acts were something that "happened" to him, rather than something that he consciously willed.

Respondents are dismissive of the notion that Mr. Latif may suffer from schizophrenia or another serious mental illness, like major depression. They state that he has never been offered any kind of pscyhotropic drug, but they do not deny that Mr. Latif was once accused of eating his own feces and smearing it on his cell walls. They do not seem to entertain the possibility that Mr. Latif's suicide attempts are the product of a disturbed mind, or that his hunger striking last year was itself a long-term suicide attempt. The only conclusion they have reached with respect to his mental state is that he has a "personality disorder," a catch-all diagnosis that suggests Respondents are unconcerned with ascertaining the true dimensions of Mr. Latif's psychological problems.

In the last analysis, notwithstanding Mr. Latif's precipitous weight loss, the blood in his vomit and stool, and his suicide attempts, the only way in which Respondents are "treating" Mr. Latif is by force-feeding him twice a day through a naso-gastric tube, even while they continue to punish him by confiscating his mattress and blankets. Mr. Latif's counsel therefore asks this court to take the minimal step of ordering Respondents to provide them access to Mr. Latif's medical records, so that they can have an independent physician review the documents to determine whether or not Mr. Latif's health and life are in danger.

## ARGUMENT

Mr. Latif seeks provision of his medical records to assure that his access to the courts is not compromised. His Motion is necessarily incident to his four-year-old habeas action, and is designed to allow him an opportunity to argue that his continued detention is illegal and that he should be released from the Guantánamo prison. If Mr. Latif is mentally or physically incapaci-

tated – or dead – he will not be able to prosecute his habeas action and this court will necessarily have lost jurisdiction over his action. A modest Order from this Court will help protect both its jurisdiction and Mr. Latif's health, at de minimis cost to Respondents.

Respondents concede that the habeas jurisdiction-stripping provisions of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (codified at 28 U.S.C. § 2241(e)), were ruled unconstitutional by the Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008). After *Boumediene*, there is no doubt that this Court has the authority to hear and decide Mr. Latif's habeas action. This Court accordingly has the obligation to assure that Mr. Latif has adequate access to the courts to prosecute his habeas action, and to determine whether Mr. Latif's habeas action is being compromised by inadequate treatment of his serious physical and psychological ailments.

Respondents try to end-run *Boumediene* by characterizing Mr. Latif's Motion as a "conditions of confinement" complaint, arguing that the MCA provision stripping the courts of jurisdiction over an "'action … relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement,'" survives *Boumediene*. Opp. 8 (quoting 28 U.S.C. § 2241(e)(2)). But Mr. Latif has not initiated a new "action"; the relief sought by this Motion is a necessary incident to his habeas action, which *Boumediene* assured could proceed uncompromised. Habeas is an appropriate vehicle for mounting challenges to government actions that impede access to the courts, *see infra* at 11–16; *Al Odah v. United States*, 346 F. Supp. 2d 1, 11 n.12 (D.D.C. 2004); *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 21 (D.D.C. 2005), and nothing could impede a habeas petitioner's access to the courts more decisively than allowing him to die. Even acts or omissions that merely exacerbate a petitioner's illnesses – physical or mental – undermine his ability to obtain habeas relief.

This Court has the authority to order the requested relief under both the All Writs Act and Fed. R. Civ. P. 65. Respondents' contention that Mr. Latif cannot meet his burden of showing the imminent harm necessary for an injunction – because Mr. Latif is "currently in good health with no significant mental health problems," Opp. 19 – defies reality. Respondents' contention that the burden of photocopying Mr. Latif's medical records outweighs the harms that Mr. Latif faces is absurd. Respondents' contention that the public interest will not be served by an Order allowing counsel to view Mr. Latif's medical records fails to account for the public interest in assuring that the prisoners at Guantánamo remain alive and healthy and able to prosecute the habeas matters that the Supreme Court has said is their constitutional right.

**(A) This Is Not A "Conditions of Confinement" Action**

Respondents' Opposition depends upon the premise that Mr. Latif, by requesting access to his medical records, has initiated a "conditions of confinement" action. *See* Opp. 1. He has not. Mr. Latif has filed a habeas action and only a habeas action, and in that action he seeks release from custody. He requires access to his medical records in order to assure that his ability to prosecute his habeas claims – and ultimately to win his freedom – are not being illegally restricted. Mr. Latif's request to see his medical records is thus a necessary incident to his habeas action.

Other Judges in this District have analyzed this issue and reached the same conclusion in similar circumstances. After the Supreme Court ruled in *Rasul v. Bush*, 542 U.S. 466 (2004), that the Guantánamo prisoners had a statutory right of access to the courts, Judge Kollar-Kotelly noted that such access "must necessarily be meaningful." *Al Odah v. United States*, 346 F. Supp. 2d 1, 11 n.12 (D.D.C. 2004). In their habeas actions, she explained, the petitioners were "entitled to present the facts surrounding their confinement to the Court," and the Court was "author-

ized to craft the procedures necessary to make this possible, in order that the Court might fully consider [their] challenge to their detention." *Id.* at 7. Over the Government's objection, Judge Kollar-Kotelly therefore allowed counsel to visit with their clients at Guantánamo without government monitoring of their attorney-client conversations.

Judge Kessler later adopted the same reasoning in ordering Respondents to provide habeas counsel with medical records for their hunger-striking clients. "In order to give meaning to the Supreme Court's decision in *Rasul*," she wrote, "and to allow Petitioners 'the privilege of litigation in the U.S. courts,' procedures must be fashioned, as necessary and appropriate, to facilitate Petitioners' access to their counsel and the Court … so that Petitioners have the tools to 'present their own cases.'" *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 21 (D.D.C. 2005). Relying on *Bounds v. Smith* and its holding that access to the courts must be "adequate, effective, and meaningful," 430 U.S. 817, 821–22 (1977), Judge Kessler held that "access to the Court means nothing without access to counsel" and that "access to counsel by Petitioners is illusory unless counsel have sufficient access to their clients to be informed about their current physical condition." *Al-Joudi*, 406 F. Supp. 2d at 22.

Judges Kollar-Kotelly and Kessler both recognized that the courts have the authority and responsibility to assure that petitioners encounter no significant obstacles on their path to the courthouse. In *Al Odah*, that meant allowing petitioners to meet with their lawyers at Guantanamo; in *Al-Joudi*, that meant ordering medical updates for the lawyers concerning their clients' medical state; in the instant case, that means providing Mr. Latif's lawyers with access to his medical records.

It is, in fact, common for restrictions on access to the courts or counsel to be raised and adjudicated on habeas corpus. The leading case extending habeas to the review of restrictions on

prisoners' access to the courts is *Johnson v. Avery*, in which the Supreme Court invalidated *on habeas* a Tennessee prison regulation that forbade inmates from assisting each other with the filing of writs or other legal matters. 393 U.S. 483, 484 (1969). In *Johnson*, the Court observed that "the basic purpose of the writ is to enable those unlawfully incarcerated to obtain their freedom," and that therefore "it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed." *Id.* at 485. Similarly, the Supreme Court has held *on habeas* that a regulation that prohibited state prisoners from filing petitions unless a parole board investigator determined that they were "properly drawn" was invalid, *Ex parte Hull*, 312 U.S. 546, 549 (1941); that a State may not validly make the writ available only to prisoners who could pay a four-dollar filing fee, *Smith v. Bennett*, 365 U.S. 708, 708–09 (1961); and that a State is obligated to furnish prisoners with a transcript or equivalent record of prior habeas corpus hearings for use in further proceedings, *Long v. District Court*, 385 U.S. 192 (1966). *See also* Note, *Developments in the Law – Federal Habeas Corpus*, 83 Harv. L. Rev. 1038, 1082 (1970) ("Prison conditions not specially related to the justification for the sentence can also be attacked … on grounds that the actual custody, through not the conviction or the sentence, is in violation of federal law."); *id.* at 1081–87 (discussing *Johnson*, *Hull*, and the use of habeas to address "conditions" claims generally).

In all of the cases described in the above paragraph, the petitioners were seeking orders to protect their ability to come to court and present their arguments for a release from custody, to allow them meaningful access to the courts, and to keep their habeas cases from becoming an empty shell. The orders from Judges Kollar-Kotelly and Kessler were likewise designed to allow meaningful access to the courts – even if, standing alone, a request for updates on the health status of a prisoner might have the flavor of a "conditions of confinement" claim.

The cases cited by Respondents for the proposition that "conditions of confinement" actions ordinarily should not be brought via habeas, *see* Opp. 15 n.7, are therefore inapposite. None of those cases involved claims by petitioners seeking access to the courts in order to prosecute his habeas action.[3] None of the cases they cite "squarely address[es]," Opp. 15, whether conditions claims may be brought via habeas. That is an unsettled question. *See Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973); *see also Boumediene*, 128 S. Ct. at 229, 2274 (stating that it was unnecessary for the Court to decide whether habeas actions by Guantánamo inmates reached conditions of confinement claims).[4] This Court need not decide that question either, because this is not a "conditions of confinement" action.

The D.C. Circuit cases cited by Respondents, *see* Opp. 16 & n.8, are likewise irrelevant to Mr. Latif's efforts to assure that he remains healthy enough to continue to pursue his habeas action. In *Brown v. Platt*, the D.C. Circuit held only that a prisoner was not *required* to pursue his challenge to placement in administrative segregation on habeas. The D.C. Circuit in fact

---

[3] *See Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 98 (3d Cir. 2008) (seeking relief from sex-offender community-notification requirements); *Glaus v. Anderson*, 408 F.3d 382, 384 (7th Cir. 2005) (seeking transfer to a prison medical facility); *Rael v. Williams*, 223 F.3d 1153, 1154 (10th Cir. 2000) (seeking transfer from private to state-run prison); *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) (seeking transfer to a community treatment center). In *Hutcherson v. Riley*, a death-row prisoner brought a § 1983 action to overturn his conviction on the ground he had not been provided at trial with counsel deemed qualified by the ABA to handle a capital case. Treating the prisoner's complaint as a habeas petition, the court dismissed the petition as a "second or successive petition." 468 F.3d 750, 754–55 (11th Cir. 2006).

[4] In *Bell v. Wolfish*, the Supreme Court said it would "leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself." 441 U.S. 520, 526 n.6 (1979). The Seventh Circuit, in a case cited by Respondents, acknowledged just a few terms ago that, "[a]fter 25 years, that day has yet to arrive." *Glaus v. Anderson*, 408 F.3d 382, 384 (7th Cir. 2005); *see also id.* ("Most recently, in *Nelson v. Campbell*, 541 U.S. 637 (2004), the Court held that some 'civil rights damages actions ... fall at the margins of habeas,' implying that in some circumstances civil rights actions and writs of habeas corpus may be coextensive.").

noted that habeas corpus "might conceivably be available to bring challenges to such prison conditions, as the Court observed in *Preiser*, but *requiring* the use of habeas corpus in such cases would extend *Preiser* far beyond the 'core' of the writ that *Preiser* set out to protect." 131 F.3d 163, 168–69 (D.C. Cir. 1997) (emphasis in original; citation omitted). In *Miller v. Overholser*, the D.C. Circuit *allowed* a petitioner to contest on habeas his conditions of confinement – in particular the place of his confinement – noting that "[i]f appellant's allegations and evidence in respect to the conditions of his confinement be true …, he is illegally confined where he is confined." 206 F.2d 415 (D.C. Cir. 1953) (footnote omitted). And as Respondents acknowledge, Opp. 16 n.3, in *Blair-Bey v. Quick*, the Court of Appeals stated that habeas "might be available to challenge prison conditions in at least some situations." 151 F.3d 1036, 1041 (D.C. Cir. 1998).[5] Indeed, the D.C. Circuit noted that the "issue of whether an action sounds in habeas corpus will often come up early in the case anyway," and that "many cases, such as pure prison-conditions cases, will be easy to identify." *Id.* Respondents cannot plausibly contend that Mr. Latif's action

---

[5] *See also Creek v. Stone*, 379 F.2d 106, 109 (D.C. Cir. 1967) ("We begin by noting that in general habeas corpus is available not only to an applicant who claims he is entitled to be freed of all restraints, but also to an applicant who protests his confinement in a certain place, or under certain conditions, that he claims vitiate the justification for confinement."); *Lake v. Cameron*, 364 F.2d 657, 659 (D.C. Cir. 1966) (en banc) ("Habeas corpus challenges not only the fact of confinement but also the place of confinement.") (footnote omitted); *Benton v. Reid*, 231 F.2d 780, 783 (D.C. Cir. 1956) (habeas corpus available to challenge the place of detention of a person suffering from tuberculosis); *Coffin v. Reichard*, 143 F.2d 443, 445 (6th Cir. 1944) (per curiam) ("A prisoner is entitled to the writ of habeas corpus when, though lawfully in custody, he is deprived of some right to which he is lawfully entitled even in his confinement, the deprivation of which serves to make his imprisonment more burdensome than the law allows or curtails his liberty to a greater extent than the law permits.") (citing *Logan v. United States*, 144 U.S. 263 (1892)); *In re Bonner*, 151 U.S. 242, 260 (1894) ("The proposition put forward by counsel that if the court has authority to inflict the punishment prescribed, its action is not void, though it pursues any form or mode which may commend itself to its discretion, is certainly not to be tolerated. Imprisonment might be accompanied with inconceivable misery and mental suffering, by its solitary character or other attending circumstances. Death might be inflicted by torture, or by starvation, or by drawing and quartering. All these modes, or any of them, would be permissible, if the doctrine asserted by him can be maintained.").

seeking release from allegedly illegal custody is anything but a habeas action or that it even remotely resembles a "pure prison-conditions case."

Finally, Respondents are mistaken in suggesting that *Munaf v. Geren*, 128 S. Ct. 2207 (2008), refused to extend habeas jurisdiction to a "conditions" claim where the petitioner sought to enjoin a transfer to Iraqi custody. *See* Opp. 17. In *Munaf*, the Supreme Court concluded that U.S. courts had habeas jurisdiction to address claims relating to the petitioners' proposed transfer to Iraq, but the Court held that "[u]nder circumstances such as those presented here, however, habeas corpus provides petitioners with no relief." *Id.* If anything, *Munaf* confirms that this Court has jurisdiction to address claims ancillary to the particular relief from illegal confinement that a petitioner seeks in habeas. That the petitioner in *Munaf* lost this claim on the merits obviously does not undermine the Court's jurisdictional holding.

**(B)**     **Nothing In The MCA Affects This Court's Authority To Decide Mr. Latif's Motion**

In *Boumediene*, the Supreme Court held that § 7 of the Military Commissions Act was an unconstitutional suspension of habeas, and that the District Courts have jurisdiction to entertain the habeas actions initiated by Mr. Latif and the other petitioners in the case and to grant habeas relief as appropriate. 128 S. Ct. at 2274. Respondents argue that, notwithstanding *Boumediene*, § 7 of the MCA precludes the exercise of jurisdiction by this Court to hear and decide Mr. Latif's motion for access to his medical records to allow him to continue to pursue his habeas action. *See* Opp. 8–9. They argue that *Boumediene* struck down only § 2241(e)(1), and that therefore this Court is barred from requiring Respondents to provide counsel with health information about Mr. Latif – an aspect of his case that they argue is covered by § 2241(e)(2). *See id.* 11–17.

But this argument misses the point of *Boumediene*. Section 2241(e)(1) purported to strip the courts of "'jurisdiction to hear or consider an application for a writ of habeas corpus filed by

or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.'" *Boumediene*, 128 S. Ct. at 2242. Congress intended more than merely to strip the courts' jurisdiction to *consider* a Guantánamo prisoner's habeas petition challenging the legality of his detention. Section 2241(e)(1) also attempted to strip the courts of any habeas *remedy* for an unlawful detention. In striking down § 2241(e)(1), the Supreme Court held that a habeas court "must have" jurisdiction and the power to remedy such claims. *See Boumediene*, 128 S. Ct. at 2266–67.

Respondents would like to read Section 2241(e) as distinguishing "core" habeas (treated in § 2241(e)(1)) and "ancillary" habeas (treated in § 2241(e)(2)). But whether Mr. Latif's request for medical records is at the "core" of a habeas remedy or ancillary to "core" habeas, *see* Opp. 12–13, is irrelevant.[6] Sections 2241(e)(1) and (e)(2) do not divide the world by habeas "issues" or habeas "aspects." At most, they distinguish between two types of *actions*. Section 2241(e)(1) treats habeas actions; section 2241(e)(2) treats "other action[s] against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant."[7] Thus, whether

---

[6] Respondents' position that this Court should read into *Boumediene* a critical distinction between "core" and "non-core" habeas claims is perplexing. The term "core" appears in that decision only *once*, and only then when citing *Schlup v. Delo*, 513 U.S. 298, 319 (1995), for the proposition that habeas "is, at its core, an equitable remedy." There is not a single statement in *Boumediene* to support the Government's apparent position that a claim relating to a habeas petitioner's access to the courts is not a "core" habeas claim or, for that matter, why it would make any difference as a matter of law if it were not.

[7] Unlike habeas actions addressed by § 2241(e)(1), the "other action[s]" treated by § 2241(e)(2) are not limited to actions "filed by or on behalf of" a Guantánamo prisoner, and those against whom the actions may be brought are not limited to the prisoner's custodian but extend to "the United States or its agents." (continued…)

*Boumediene* invalidated § 2241(e)(2) is a red herring. An order from this Court allowing counsel access to their client's medical records would be nothing more than an incident of the Court's remedial power in a habeas action, which Congress attempted to restrict under § 2241(e)(1) and which was invalidated by *Boumediene*.[8]

**(C)      The All Writs Act Authorizes This Court To Order Injunctive Relief**

Respondents do not respond to Mr. Latif's request, *see* Mot. 5, for an injunction pursuant to the All Writs Act, 28 U.S.C. § 1651. That relief is, however, warranted. It is undisputed that this Court has subject matter jurisdiction over Mr. Latif's habeas petition. *Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008). As the D.C. Circuit recently affirmed in *Belbacha v. Bush*, the All Writs Act provides a federal court with the authority "to issue an 'auxiliary' writ 'in aid' of a 'jurisdiction already existing.'" 520 F.3d 452, 458 (D.C. Cir. 2008) (internal citation omitted). Because subject matter jurisdiction exists here, this Court has authority under the All Writs Act to issue an order – providing counsel with access to Mr. Latif's medical records – that is in aid of its habeas jurisdiction. *See, e.g.*, *Harris v. Nelson*, 394 U.S. 286, 299–300 (1969) (interpreting the All Writs Act to allow discovery in habeas corpus proceedings).

Respondents concede that *Boumediene* holds that the MCA is not a bar to subject matter jurisdiction in Mr. Latif's habeas corpus case. *See* Opp. 8. But this Court will not be able to ad-

---

The "other action[s]" treated by § 2241(e)(2) thus might include non-habeas claims such as *Bivens* actions against government officials for money damages.

[8]  Respondents get no help from the Supreme Court's reservation that "'we need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement.'" Opp. 11 (quoting *Boumediene*, 128 S. Ct. at 2274). As the Court explained, the "structure of the two paragraphs [§§ 2241(e)(1) and (e)(2)] implies that habeas actions [referenced in § 2241(e)(1)] are a type of action [referenced in § 2241(e)(2)] 'relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained . . . as an enemy combatant.'" *Boumediene*, 128 S. Ct. at 2243 (quoting § 2241(e)(2)).

judicate Mr. Latif's petition if the medical and psychological care he receives from Respondents incapacitates him or helps to bring about his death. If Mr. Latif is suicidal but Respondents refuse to acknowledge his mental condition, and if Mr. Latif has cancer or tuberculosis or another disease but Respondents refuse to perform appropriate diagnostic tests, then Mr. Latif's habeas action may soon be mooted because of his death or mental incompetence. This is precisely the type of circumstance in which courts "should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004) (quoting *Ala. Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 218 (1906)).

Once a court has jurisdiction over a matter, it may exercise its discretion in entering orders designed to protect the jurisdiction. As Judge Roberts observed in *El-Banna v. Bush*, "a district court's authority to issue orders pursuant to 28 U.S.C. § 1651 in aid of its fact-finding obligations in habeas corpus proceedings is intended to be flexible and should be exercised as the circumstances require for a proper and just disposition." Civ. Nos. 04-1144, 05-23, 2005 U.S. Dist. LEXIS 16880 at *5 (D.D.C. July 18, 2005) (citing *Harris*, 394 U.S. at 299–300). *See also Bismullah v. Gates*, 501 F.3d 178, 187 (D.C. Cir. 2007) ("[W]e shall enter a protective order resolving the points in contention between the parties in such a way as to ensure the parties do not frustrate the court's ability to review a CSRT determination under the DTA."); *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996) (All Writs Act provides district court with power "to protect its jurisdiction").

An All Writs Act injunction is necessary here in order to ensure that Respondents do not unilaterally divest the district court of its jurisdiction to address Mr. Latif's habeas claims. Once Mr. Latif's medical records are made available to his lawyers for review by an independent phy-

sician, counsel will be in a position to better determine whether to seek further assistance from the Court. Respondents will have ample opportunity if and when such assistance is sought to argue that further relief from the Court is unnecessary or improper.

**(D)    A Rule 65 Injunction Is Warranted**

The existence of this Court's jurisdiction, and its authority to preserve it under the All Writs Act, are dispositive. However, an Order requiring access to Mr. Latif's medical records is also appropriate under the traditional four-factor test under Fed. R. Civ. P. 65. *See* Mot. 6–10.

### (1)    *Mr. Latif Has Established That He Faces Imminent, Irreparable Injury*

Respondents argue that Mr. Latif has failed to establish that he will suffer irreparable harm, in part because his argument "is premised on the unsupported and faulty premise that Guantanamo Bay medical staff has failed to provide him adequate medical care." Opp. 18. Of course, Mr. Latif's argument *is* supported, in the only way available to him – by his own words and by a declaration from counsel describing the deteriorating physical and mental condition of Mr. Latif. More support for his assertions comes from the only other possible source – a military doctor, who in his declaration confirms in large part the statements made by Mr. Latif concerning his precipitous weight drop and hanging attempt. Any further information confirming or undermining Mr. Latif's allegations of dangerously ineffective and deliberately indifferent medical care is to be found in the precise documents to which Mr. Latif seeks access – his medical records.

Mr. Latif's irreparable harm is "certain and great." Undersigned counsel saw his client only days ago, and witnessed him nearing death. Confirmation of his observations is possible only by reference to Mr. Latif's medical documents. Surely Mr. Latif's lawyers need not wait until he is actually dead or in a coma to demonstrate that without injunctive relief he will be ir-

reparably harmed. *Cf. Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) ("Finally, the Government points out that, thus far, 'no one has died.' It goes without saying that this Court need not wait to issue injunctive relief until a detainee has died.") (internal citation omitted).

Boilerplate recitations about the quality of the medical care at Guantanamo and selective discussion of Mr. Latif's medical history cannot be a substitute for access to his medical records. This is particularly so where the military doctors have proven themselves – by dismissing in their declarations Mr. Latif's suicide attempt as nothing but a "gesture" – to be deliberately indifferent to Mr. Latif's fate. The fact that Mr. Latif has been seen by doctors at the prison speaks nothing to the quality of care that he has received. *See* Nathan Decl. ¶ 5 (noting that doctors at Guantánamo have failed to screen Mr. Latif for active tuberculosis, which may have been triggered by his weakened state during his earlier, year-long hunger strike). Even the fact that Respondents would take Mr. Latif at his word that he is not suicidal – after one acknowledged hanging attempt and many others discussed with counsel and undoubtedly detailed in his medical history – suggests a deliberate attempt by Respondents to close their eyes to Mr. Latif's psychological state. It should not be difficult for Respondents to understand that a religious Muslim would believe that committing suicide would lead to an eternity in Hell, and that Mr. Latif has therefore tried to convince himself that his suicide attempts are non-volitional.

Finally, Respondents do not contest Mr. Latif's assertion that his physical and psychological problems have been exacerbated by the confiscation of his mattress and blankets. They respond only by stating that he is being punished just like everyone else at Guantánamo, "according to a standardized disciplinary system." Opp. 20. Of course, Mr. Latif is not just like everyone else. He is physically ill, suicidal, likely schizophrenic or in a major depression, and in des-

perate straits. Confiscating a blanket and mattress from Mr. Latif is the very definition of inhumane treatment.

### (2) *Mr. Latif Has An Excellent Prospect Of Success On The Merits*

Respondents spend many pages arguing to this Court that Mr. Latif has little chance of winning his "conditions-of-confinement claims." Opp. 22, 22–29. As discussed at length above, Mr. Latif has not raised any "conditions" claims. He has raised an "access to the courts" claim as part of his habeas action. The only question is whether Mr. Latif's has made a prima facie showing that his mental and physical health have deteriorated to such a degree that he may soon be unable to assist in the prosecution of his habeas action, and that inadequate and indifferent medical care may be a contributing factor in the deterioration of his health. He has surely done so, and should be allowed the opportunity to peruse his own medical records to determine whether there is any further relief that he should ask the Court to provide.

### (3) *Respondents' Burden Is De Minimis, But Mr. Latif's May Be Life-Threatening*

Respondents do not deny that Mr. Latif's medical records are already gathered and easily accessible at Guantánamo. Their asserted burden is that Mr. Latif "seeks to interfere with the competent medical judgment and expertise of the Guantánamo Bay medical staff as to what medical care is appropriate with respect to [Mr. Latif]." Opp. at 29. To date, Mr. Latif has not sought the assistance of the Court to prescribe his medical treatment. All that he wants is to see his own medical records to determine whether the medical he has received *is* appropriate. If, in the considered opinion of his own physician, the medical care he has received is *not* appropriate, then Mr. Latif *may* choose to ask the Court for more assistance. Mr. Latif thus does not here seek an "extraordinary intervention into the daily operation of Guantanamo Bay," nor does he ask the Court to "intrude upon and micro-manage the operations of the Guantanamo Bay deten-

tion facility." Opp. 17, 22. As in *Al-Joudi*, while Respondents certainly will be forced to communicate with habeas counsel, such a "logistical burden is simply not substantial when weighed against the irreparable injury Petitioners face." 406 F. Supp. 2d 13, 22 (D.D.C. 2005).

No significant burden on Respondents could possibly occur unless the Court were in future to order *further* relief for Mr. Latif. The only burden Respondents face with respect to the instant modest request for access to medical documents is that of devoting some period of time to photocopying Mr. Latif's medical records. To be sure, if the Court grants the requested relief, other habeas petitioners may ask for access to their medical records. That is hardly a basis for denying relief. In such cases, the Court will determine, on the facts before it, whether such relief is warranted. If relief is warranted, it should be granted.

**(4)** *The Public Interest Will Be Served By Allowing Access To The Records*

There can be no public interest in allowing a fifth Guantánamo prisoner to die in custody, either by his own hand or by an undiagnosed disease, particularly where the death could be prevented by simply allowing his lawyers access to his medical records. Moreover, as Judge Kessler has explained, the public has a strong interest in "ensuring that habeas petitioners … can meaningfully challenge their detention, and the courts can adjudicate their claims." *Al-Joudi*, 406 F. Supp. 2d at 22–23. As in *Al-Joudi*, the relief that Mr. Latif seeks is "narrowly drawn so as not to unduly interfere in the day-to-day operations at Guantanamo, and will cause only minimal clerical burdens to the Government." *Id.* at 23.

## CONCLUSION

For the above-stated reasons, the reasons set forth in Mr. Latif's original Motion, and for any other reason that may become known to the Court, Mr. Latif respectfully requests the Court grant the above requested relief.

Dated: Washington, DC
September 3, 2008

Respectfully submitted,

_____

Marc D. Falkoff
D.C. Bar No. 491149
NORTHERN ILLINOIS UNIVERSITY
COLLEGE OF LAW
DeKalb, IL 60614
(347) 564-5043 (phone)
(815) 753-9301 (fax)
mdf19@columbia.edu

S. William Livingston
D.C. Bar. No. 59005
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, DC 20004-2401
(202) 662-6000 (phone)
(202) 778-6000 (fax)
wlivingston@cov.com
apemberton@cov.com

Alan A. Pemberton
D.C. Bar. No. 367108
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, DC 20004-2401
(202) 662-6000 (phone)
(202) 778-6000 (fax)
wlivingston@cov.com
apemberton@cov.com

David H. Remes
D.C. Bar. No. 370372
APPEAL FOR JUSTICE
1106 Noyes Drive
Silver Spring, MD 20910
(202) 669-6508 (phone)
remesdh@gmail.com