IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
|---|
| IN RE: |
| |
| GUANTANAMO BAY DETAINEE |
| LITIGATION |

Misc. No.  08-MC-442 (TFH)

Civil Action No. 04-1254 (HHK)

## RESPONDENTS' OPPOSITION TO PETITIONER'S EMERGENCY MOTION TO COMPEL ACCESS TO MEDICAL RECORDS OF PETITIONER ADNAN FARHAN ABDUL LATIF AND FOR OTHER MISCELLANEOUS RELIEF

Respondents hereby oppose Petitioner Adnan Farhan Abdul Latif's motion for a preliminary injunction seeking extraordinary judicial intervention and governance over Petitioner's medical care and conditions of confinement at the United States Naval Base at Guantanamo Bay, Cuba ("Guantanamo Bay").  The Court should deny Petitioner's preliminary injunction motion for lack of jurisdiction.  Petitioner seeks to challenge an aspect of his detention and the conditions of his confinement.  The Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, § 7(a), 120 Stat. 2600 (codified at 28 U.S.C. § 2241(e)) ("Section 7"), specifically withdrew such challenges from the judiciary's purview.  This part of the MCA remains good law even in light of the Supreme Court's decision in *Boumediene v. Bush*, ___ U.S. ___, 128 S. Ct. 2229 (2008).

Should the Court hold that it has jurisdiction to hear Petitioner's preliminary injunction motion, the Court should deny the motion because Petitioner has failed to meet the standard for obtaining such an extraordinary and drastic remedy.  Legally, Petitioner's conditions-of-confinement claim is non-cognizable in a habeas proceeding.  And even if such a challenge were cognizable in a habeas proceeding, Petitioner has failed to meet the legal standard for showing

that his medical care has been unconstitutionally inadequate.  Factually, Petitioner has utterly

failed to show irreparable harm.  Over the last three months, Petitioner's health has been

regularly monitored, he has had regular interaction with Guantanamo Bay's mental health staff,

and he has been seen as an outpatient at the medical clinic on numerous occasions.  During that

time he has not been diagnosed with any serious mental illness or any serious gastrointestinal

problems.  Practically, Petitioner's motion is an invitation to have the Court micro-manage a

detainee's medical care, livelihood, and health at Guantanamo Bay and would impose significant

burdens upon the government and other detainees, and would harm the public interest.

## STATEMENT OF FACTS

On August 16, 2008, Petitioner filed an emergency motion to compel the production of

his medical records to his counsel and to compel the return of his mattress and blanket with

assurances that they would not be confiscated in the future.  Petitioner alleges that he has been

suffering from schizophrenia or other serious mental illnesses for some time (*see* Petr's Mot.,

Falkoff Decl. ¶ 13) and that, over the last six weeks, has been suffering from a severe stomach

ailment (*id.* ¶¶ 22-22, 26.)  He contends that these undiagnosed and untreated illnesses have only

been exacerbated by chronic, severe headaches and the loss of his mattress and blankets.  (*Id.* ¶¶

25-26.)  As the facts show, Petitioner has had the benefit of comprehensive medical care.  (Ex. 1,

Meneley Decl. ¶¶ 4-11.)  This medical care has included frequent outpatient visits with medical

staff and regular meetings with mental health experts.  (*See generally id.* ¶ 12-14, 21-28.)

Furthermore, the temporary loss of his mattress and blanket was done to discipline Petitioner for

assaulting a guard.  (Ex. 2, Vargo Decl. ¶¶ 7-9.)

# I.     MEDICAL CARE AVAILABLE TO DETAINEES

Upon arrival at Guantanamo Bay, all detainees are given complete physical examinations.  (Ex. 1, Meneley Decl. ¶ 5.)  Medical issues identified during the examination or identified during subsequent examinations are followed by the medical staff.[1]  (*Id.*)  Detainees may request medical care at any time by making a request to the guard staff or the medical staff, who make daily rounds on the cellblocks.  (*Id.*)  In addition to responding to detainee requests, the medical staff will investigate any medical issue observed by guards or staff.  (*Id.*)

For most medical care requiring in-patient services, detainees are admitted to the Detention Hospital, a 20-bed medical facility.  (*Id.* ¶ 7.)  The Detention Hospital is staffed by approximately 100 military personnel, including an anesthesiologist, a general surgeon, an orthopedic surgeon, family physicians, internal medicine physicians, a psychiatrist, a psychologist, a physician's assistant, a licensed dietician, dentists, and a physical therapist.  (*Id.* ¶ 4).  The staff also includes licensed medical/surgical nurses, corpsmen (formally trained Navy medical personnel akin to a "medic" in the Army), various technicians (lab, radiology, pharmacy, operating room, respiratory, physical therapy, information technology and biomedical repair), and administrative staff.  (*Id.*)  When an area of medical specialty is required beyond what is available at the Detention Hospital, the military brings in specialists to treat the

---

[1]For many of the detainees it was the United States' military medical staff that initially diagnosed conditions that had previously been unknown to the detainees.  (Ex. 1, Meneley Decl. ¶ 6.)  Many of the detainees were suffering from significant, undiagnosed, or untreated pre-existing medical conditions.  (*Id.*)  Indeed, the medical staff has treated detainees for a wide variety of illness, including hepatitis, heart ailments, hypertension, combat wounds, diabetes, latent tuberculosis, appendicitis, inguinal hernia, leishmaniasis, malaria, and malnutrition.  (*Id.* ¶ 8.)  Because of this consistent, high-quality medical care, the detainees' health has markedly improved since their arrival at Guantanamo Bay.  (*Id.* ¶ 6.)

detainees. (*Id.*) Finally, for detainees on hunger strike, other specialists, including internal medicine and behavioral health professionals, assist in monitoring and providing specialized care. (*Id.* ¶ 4.) The medical care provided by the military and the Detention Hospital staff is comparable to what is given to our active-duty service members. (*Id.* ¶ 9)

A 16-member Behavioral Health Science ("BHS") staff supports the Detention Hospital. (*Id.* ¶ 10.) The BHS staff is composed of a board-certified psychiatrist, a psychologist with a doctorate degree, psychiatric nurses, and psychiatric technicians. (*Id.*) The BHS staff conducts mental health assessments, provides crisis intervention, develops individualized treatment plans, and formulates behavior modification plans for management of acute and high risk behaviors that pose a threat to self or others. (*Id.*) Long-term supportive care and psychotropic medication therapy is provided as needed to treat symptoms of major psychiatric disorders. (*Id.*) Additionally, the BHS staff regularly follows detainees who are on hunger strike and visits with those detainees weekly after they have ended their hunger strike. (*See id.* ¶ 18.)

## II.  PETITIONER'S MEDICAL CARE

Petitioner has taken full advantage of the comprehensive medical care provided to detainees. Over the past three months, he has been seen as an outpatient in the medical clinic on 13 different occasions for such issues as skin rashes and latent tuberculosis. (*Id.* ¶¶ 22-27.) During this time period, has complained of stomach issues only once. On August 12, 2008, Petitioner complained to a guard of blood in his stool and vomit. (Ex. 2, Vargo Decl. ¶ 5.) The guard then alerted a medical corpsman, who evaluated Petitioner. (*Id.*) The next day, Petitioner was further evaluated by a staff physician. (Ex. 1, Meneley Decl. ¶ 16.) After a thorough examination, the staff physician concluded that a viral syndrome or irregular eating habits may

have triggered Petitioner's stomach ailment. (*Id.*) Petitioner was offered an anti-nausea medication, but he declined. (*Id.*)

On August 18, 2008, after having missed nine consecutive meals, Petitioner was declared a hunger striker. (*Id.* ¶ 19.) Pursuant to Department of Defense protocol,[2] he was placed under daily medical observation. (*Id.* ¶ 24.) Though Petitioner has not complained of stomach problems since August 12, he was observed vomiting on August 19. (Ex. 2, Vargo Decl. ¶ 5.) The guard, upon seeing what appeared to be blood in Petitioner's vomit, alerted medical and his chain of command. (*Id.* ¶ 5.) Petitioner was then brought to the medical clinic for an examination by a staff physician. (Ex. 1, Meneley Decl. ¶ 24.) After an examination, the physician concluded that Petitioner's vital signs were normal and that his nausea and vomiting had been resolved. Petitioner returned to his cell alert and fully oriented. (*Id.* ¶ 24.)

Because many detainees do not declare themselves to be hunger strikers, but rather participate in a hunger strike surreptitiously by only eating small parts of their meals, they are weighed monthly. (*Id.* ¶ 21.) Through the end of July, Petitioner did not exhibit any significant

---

[2]It is the policy of the Department of Defense to support the preservation of life by appropriate clinical means, in a humane manner, and in accordance with all applicable standards. (Ex. 1, Meneley Decl. ¶ 18.) To this end, Guantanamo Bay follows the Federal Bureau of Prisons' model for managing hunger strikers. (*Id.* 19.) Prior to any enteral feeding guard staff offer detainee a meal to eat. (*Id.* ¶ 20.) Medical professionals administer enteral feeding for hunger striking detainees in a humane and compassionate manner, and do so only when it becomes medically necessary to preserve a detainee's health. (*Id.* ¶ 18.) A detainee is only kept in a restraint chair for the time required to administer a feeding and for a short, informal observation period of 10-15 minutes after the feeding is completed to prevent the detainee from purging. (*Id.* ¶ 19.) During this time medical staff periodically check the detainee's circulation in their arms and legs to ensure they have not been restrained too tightly. (*Id.* ¶ 20.) Furthermore, while a detainee is hunger striking, the medical staff carefully assesses his health by means of physical and psychological examinations, weight monitoring, personal observation and laboratory tests. (*Id.* ¶ 18.)

weight fluctuation.[3]  (Ex. 1, Meneley Decl. ¶ 21.)  Recently, however, his weight began to drop.

(*Id.*)  By August 18, 2008, Petitioner had refused a sufficient number of meals to be categorized

as a hunger striker.  (Ex. 2, Vargo Decl. ¶ 4.)  Two days later, the Joint Task Force Commander

approved Petitioner for enteral feeding in a manner consistent with Department of Defense

protocols.  (*Id.*; *see also* Ex. 1, Meneley Decl. ¶¶ 18-20.)  Since the end of July, Petitioner has

lost approximately 25 pounds, and, as of August 24, 2008, weighs 110 pounds.  (*Id.* ¶ 14.)

## III.    PETITIONER'S MENTAL HEALTH

Petitioner has also had regular contact with Guantanamo Bay's mental health staff.

During his previous hunger strike, which lasted from February 2007 to February 2008, Petitioner

was regularly monitored by BHS staff.  (*Id.* ¶¶ 15, 18.)  After his previous, year-long hunger

strike ended, Petitioner had weekly meetings with a BHS psychiatric technician.  (*Id.* ¶ 18.)

Furthermore, in June, he met with BHS staff, including the staff psychologist, several times after

he was observed making a suicidal gesture.[4]  (*Id.* ¶¶ 11-12.)  Although this gesture could have

resulted in self harm, Petitioner consistently denied being suicidal.  (*Id.* ¶ 12.)  Still, based on

this incident, Petitioner's history, and pattern of behavior, the BHS staff has diagnosed him as

---

[3]When Petitioner arrived at Guantanamo Bay in January 2002, he weighed 114 pounds. Since his previous, year-old hunger strike, which ended in February 2008, Petitioner has gotten his weight up to his ideal body weight of 135 pounds.  (Ex. 1, Meneley Decl. ¶ 21.)

[4]On 18 June 2008, a guard observed Petitioner lying in the corner of his cell with his head underneath his desk.  (Ex. 2, Vargo Decl. ¶ 10.)  His prayer rug was draped over his desk in such a manner as to shield his head and neck from view.  (*Id.*)  Petitioner was rolling back and forth on the ground in a manner that caused a makeshift rope to tighten around his neck.  (*Id.*)  A response team then entered Petitioner's cell and took him to a medical room for examination by BHS staff.  (*Id.*; Ex. 1, Meneley Decl. ¶ 11.)  When he was evaluated by the staff psychologist the following day, Petitioner stated that he had been upset about his continued detention but denied that he had intended to end his life through these actions.  (*Id.* ¶ 12.)

having a personality disorder.  (*Id.* ¶ 12.)  These issues have not changed the fact that, since his

arrival to Guantanamo Bay, Petitioner has never been diagnosed with a severe mental health

problem, has never been diagnosed with or exhibited manifestations consistent with

schizophrenia, and has never been prescribed drugs or other treatment for a severe mental illness.

(*Id.*)

## IV.    PETITIONER'S DISCIPLINARY STATUS

On 13 August 2008, while being unshackled in the recreation yard, Petitioner spit in the

face of a guard.  (Ex. 2, Vargo Decl. ¶ 7.)  After the incident was reviewed by the appropriate

officer in the chain of command, a determination was made that Petitioner had violated camp

rules by committing a "major assault" on a guard, and he was placed under certain disciplinary

measures until September 2, 2008.  (*Id.* ¶ 8.)  These disciplinary measures included the loss of

his mattress and blanket for the pendency of his disciplinary period.  (*Id.* ¶ 9.)  He is, however,

allowed the full-time use of a thinner ISO-mat and his blanket is returned to him during the

sleeping hours of 9:00 pm to 5:00 am.  (*Id.*)

## ARGUMENT

As an initial matter, Petitioner's motion should be dismissed for lack of jurisdiction.

While the Supreme Court's *Boumediene* decision established the core habeas function of

inquiring into the lawfulness of that detention, it did not disturb the remaining parts of Section 7

of the MCA, 28 U.S.C. § 2241(e).  However, even if the Court had jurisdiction, Petitioner's

motion should be denied because he has failed to meet his burden of demonstrating that

extraordinary relief, in the form of a preliminary injunction, is warranted.

I.      **THIS COURT LACKS JURISDICTION TO CONSIDER THE PETITIONER'S CHALLENGES TO ASPECTS OF HIS DETENTION, AND HIS MOTION SHOULD ACCORDINGLY BE DISMISSED OUTRIGHT.**

Through Section 7 of the MCA, Congress expressly withdrew federal-court jurisdiction

over two distinct and enumerated types of actions that could be brought by individuals detained

as enemy combatants.  In 28 U.S.C. § 2241(e)(1) ("§ 2241(e)(1)"), Congress denied federal-

court jurisdiction over claims concerning statutory habeas corpus generally:

> No court, justice, or judge shall have jurisdiction to hear or consider an
> application for a writ of habeas corpus filed by or on behalf of an alien detained
> by the United States who has been determined by the United States to have been
> properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1).  Congress separately withdrew federal-court jurisdiction concerning any

other aspects of the detention outside of the core habeas function, such that:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other
> action against the United States or its agents relating to *any aspect of*
> *the detention, transfer, treatment, trial, or conditions of confinement of an alien* who
> is or was detained by the United States and has been determined by the United
> States to have been properly detained as an enemy combatant . . . .

28 U.S.C. § 2241(e)(2) (emphasis added).  In *Boumediene*, the Supreme Court held that

detainees at Guantanamo Bay have a constitutional right to habeas corpus, protected by the

Suspension Clause, and that "§ 7 of the Military Commissions Act of 2006 (MCA), 28 U.S.C. §

2241(e), operates as an unconstitutional suspension of the writ."  *Boumediene*, 128 S. Ct. at

2240; *see also id.* at 2269 ("The habeas court must have sufficient authority to conduct a

meaningful review of both the cause for detention and the Executive's power to detain.").  In

reaching this conclusion, the Supreme Court only addressed the detainees' constitutional right to

bring core habeas actions—challenges to the lawfulness of detention—as opposed to the broader

class of "any other action . . . relating to any aspect of the detention." *See, e.g.*, *id.* at 2262

("Petitioners, therefore, are entitled to the privilege of habeas corpus to challenge the legality of

their detention.").  Importantly, the Supreme Court did not address the stripping of federal-court

jurisdiction over actions relating to conditions of confinement, *see id.* at 2274, nor was that

question before the Court, *see Belbacha* v. *Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008) .  Because §

2241(e)(2) serves a separate purpose from § 2241(e)(1), it is severable from § 2241(e)(1) and

remains good law.

But even if the Supreme Court entirely invalidated Section 7, thereby reverting to

statutory or common habeas law as it existed prior to the MCA, Petitioner's challenge to

conditions of confinement would not be cognizable in habeas.  As discussed below, the

traditional function of the writ of habeas corpus is to secure a petitioner's release from unlawful

custody.  Remedies short of release, such as challenges to the conditions under which a detainee

is held, therefore, are not available in these proceedings.

### A. Pursuant to 28 U.S.C. § 2241(e)(2), this Court Lacks Jurisdiction to Hear or Consider the Petitioner's Challenge to Aspects of His Confinement.

At base, *Boumediene* held that Guantanamo Bay detainees have a constitutional right to

seek habeas corpus protected by the Suspension Clause, and that, as applied to detainees who are

being held on the basis of an enemy combatant determination by a Combatant Status Review

Tribunal ("CSRT") and whose habeas challenge goes to the legality of their detention, Section 7

operates as an unconstitutional suspension of the writ.  This holding is limited in two important

respects.

First, *Boumediene* held that § 2241(e)(1) is unconstitutional in some circumstances, but

only insofar as it denies habeas review to detainees who have available to them only the CSRT process and who raise a core habeas challenge, that is, one that challenges the legality of their detention. *See Boumediene*, 128 S. Ct. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power *to detain*.") (emphasis added). Put another way, to the extent a petitioner seeks habeas relief concerning collateral or ancillary issues not directly connected to the legality of detention, *Boumediene*'s holding does not invalidate the jurisdiction-limiting provision of § 2241(e)(1). The result in *Boumediene* thus can be read not as a facial invalidation of § 2241(e)(1), but an invalidation of § 2241(e)(1) only as applied to the particular factual situation presented, as it was never established that "no set of circumstances exists under which [Section 7] would be valid." *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Indeed, it is indisputable that the only challenge presented by the *Boumediene* petitioners was related to the legality of their detention; the *Boumediene* petitioners did not challenge ancillary issues related to the conditions of their confinement. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 328-29 (2006) ("[T]he 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'") (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

With regard to how much of § 2241(e) remains operative following *Boumediene*, a reviewing court has an obligation to preserve as much of a statute as is legally permissible. "[A] court should refrain from invalidating more of the statute than is necessary," so that "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of [the] court to so declare, and to maintain the act in so far as it is valid." *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion) (quoting *El Paso & Northeastern R. Co. v. Gutierrez*, 215 U.S. 87, 96 (1909)). In other words, Acts of Congress are valid to the extent they operate constitutionally, which means that a court's holding must be applied with an eye to "limit[ing] the solution to the problem." *Ayotte*, 546 U.S. at 328. Because the problem alleged in *Boumediene* as to § 2241(e)(1) concerned only a core habeas challenge to the legality of detention made by a petitioner with access only to the CSRT process, and not to an ancillary issue related only to conditions of confinement, § 2241(e)(1) remains operative here and removes jurisdiction with regard to the instant challenge.

Second, *Boumediene*'s holding does not invalidate § 2241(e)(1)(2). Indeed, the Court expressly noted that it was not deciding whether Guantanamo detainees have a constitutional right to bring non-core habeas claims, such as conditions-of-confinement claims—one type of claim barred by § 2241(e)(2). *See Boumediene*, 128 S. Ct. at 2274 ("[W]e need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement."); *id.* at 2277 ("It bears repeating that our opinion does not address the content of the law that governs petitioners' detention."). Therefore, even after *Boumediene*, Congress' withdrawal of federal court jurisdiction over "any other action . . . relating to any aspect of the detention, transfer,

treatment, trial, or conditions of confinement" remains operative to deprive this Court of jurisdiction over petitioner's claims, which are ancillary to the core habeas issue.

The Supreme Court's rationale for invalidating § 2241(e)(1), as applied, has no application to § 2241(e)(2).[5] The *Boumediene* majority discusses the detainees' constitutional right to bring only core *habeas* actions—challenging the lawfulness of detention—as opposed to the broader class of "any other action . . . relating to any aspect of the detention." *See, e.g., id.* at 2262 ("Petitioners, therefore, are entitled to the privilege of habeas corpus *to challenge the legality of their detention*.") (emphasis added). Unlike § 2241(e)(1) however, § 2241(e)(2) does not impair the Guantanamo detainees' ability to pursue a writ of habeas corpus. Rather, it expressly limits *other* types of actions that Guantanamo detainees might bring. Recently, another Judge in this Court came to the same conclusion:

> In deciding *Boumediene*, the Court limited its analysis to whether detainees could challenge the legality of their detention through constitutional habeas, *Boumediene*, 128 S. Ct. at 2240, 2262 (noting that "other questions regarding the *legality* of the detention are to be resolved in the first instance by the District Court" and that "[p]etitioners . . . are entitled to the privilege of habeas corpus to challenge the *legality* of their detention") (emphasis added), and explicitly stated that it was not determining "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement," *id.* at 2274. And therefore, this court interprets *Boumediene* to invalidate only 28 U.S.C. § 2241(e)(1).

*In re Guantanamo Bay Detainee Litigation*, ___ F. Supp. 2d ___, 2008 WL 3155155, at *3 (Aug.

_____

[5]Respondent admits that the *Boumediene* Court's opinion refers to Section 7 generally without identifying a particular subsection of § 2241(e). *See, e.g., Boumediene*, 128 S. Ct. at 2274 ("MCA § 7 thus effects an unconstitutional suspension of the writ."). But that is an insufficient basis for construing the Court's opinion to invalidate all of Section 7, particularly since, as discussed above, the Court's rationale for invalidating § 2241(e)(1) has no application to § 2241(e). In fact, at one point in its opinion, the Court seems to acknowledge that its general references to Section 7 are simply short-hand for referring to § 2241(e)(1). *See id.* at 2265 (stating that § 7 is the source of the relevant "jurisdiction-stripping language," but citing specifically to subsection § 2241(e)(1)).

7, 2008).  The Suspension Clause thus provides no basis for invalidating § 2241(e)(2), because that section addresses "other action[s]" and not any constitutional core habeas right the detainees may hold.

While the continuing vitality of § 2242(e)(2) is therefore clear, if any doubt remains this Court must consider its duty to preserve as much of a statute as is constitutional.  *See id.* (" . . . the court recognizes that it must 'refrain from invalidating more of the statue than is necessary [w]henever an act of congress contains unobjectionable provisions separable from those found to be unconstitutional.'") (internal citation omitted); *Tilton v. Richardson*, 403 U.S. 672, 684 (1971) ("'The unconstitutionality of a part of an act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the Legislature would not have enacted those provisions which are within its power . . . the invalid part may be dropped if what is left is fully operative as a law.'") (citation omitted).  Indeed, a plain reading of § 2241(e) shows that the two paragraphs serve separate purposes and are, therefore, severable.[6]  *See Ayotte*, 546 U.S. at 330

---

[6]The text and history of Section 7 demonstrate that Congress surely intended § 2241(e)(2) to survive, even if the elimination of habeas jurisdiction in § 2241(e)(1) could not.  In enacting the MCA, and § 2241(e)(2) in particular, Congress sought to eliminate jurisdiction over conditions-of-confinement claims, precisely to prevent the Executive Branch from having to divert significant resources during the duration of an armed conflict to respond to those claims. *See, e.g.*, 152 Cong. Rec. S10403 (daily ed. Sept. 28, 2006) (Sen. Cornyn) ("[O]nce . . . section 7 is effective, Congress will finally accomplish what it sought to do through the [DTA] last year. It will finally get the lawyers out of Guantanamo Bay.  It will substitute the blizzard of litigation instigated by *Rasul v. Bush* with a narrow DC Circuit-only review of the [CSRT] hearings."); 152 Cong. Rec. at S10367 (Sen. Graham) (citing one petitioner's motion for preliminary injunction regarding conditions of confinement as an examples of a claim that should be barred); *see also* 151 Cong. Rec. at 12656-57 (daily ed. Nov. 10, 2005) (Sen. Graham) (noting that DTA was intended to limit detainees' right to "challenge their status"); 151 Cong. Rec. at S12659-60 (Sen. Kyl) (stating that DTA would grant detainees "substantial rights to contest their status but not the right to clog up Federal courts" with medical malpractice claims and complaints about food).

("After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?").  Thus, § 2241(e)(2) is presumed severable, *News America Publishing, Inc.* v. *F.C.C.*, 844 F.2d 800, 802 (D.C. Cir. 1988), and should remain in force, despite the Supreme Court's holding that § 2241(e)(1) is unconstitutional as applied to Guantanamo Bay detainees who are challenging the legality of their detention.  *Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678, 685 (1987) ("[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted").  Thus, the Court's holding that the Suspension Clause requires invalidation of Section 7 as applied to aliens detained at Guantanamo should be read to apply only to the first part of Section 7, that is, § 2241(e)(1), and only as discussed above.

**B.** **The Right to Seek a Writ of Habeas Corpus Recognized in *Boumediene* Does Not Encompass a Right to Challenge Conditions of Confinement.**

Because § 2241(e)(2) survives the Court's decision in *Boumediene*, that provision removes federal-court jurisdiction over any actions relating to conditions of treatment and confinement, including the placement of a detainee within a certain camp at Guantanamo Bay, except insofar as such actions may be constitutionally protected under *Boumediene*'s interpretation of the Suspension Clause.  In other words, under § 2241(e)(2), detainees at Guantanamo Bay are prohibited from challenging the conditions of their confinement unless their constitutional right to habeas corpus encompasses such claims.

However, the MCA's elimination of jurisdiction over conditions-of-confinement claims raises no Suspension Clause violation because such claims are not even cognizable in a habeas proceeding.  Rather, a habeas action has historically been understood as a vehicle for challenging only the fact of detention or its duration, and not conditions of confinement.  That is, the Great

Writ is only concerned with relief that, if granted, will result in the petitioner's *release* from confinement, not with the conditions of detention or the internal management of the detention facility.

The Supreme Court thus far has been unwilling to water down the writ from its core purpose into something more akin to what Petitioner seeks. *See Bell* v. *Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself."); *see also Wilkinson v. Dotson*, 125 S. Ct. 1242, 1250 (2005) (Scalia, J., concurring) (noting that conditions-of-confinement claims in habeas would "utterly sever the writ from its common-law roots"); *Brown v. Plaut*, 131 F.3d 163, 168-69 (D.C. Cir. 1997) (indicating that using habeas corpus for conditions claims would extend the writ beyond its core). The Supreme Court's reservation of the question, however, has not prevented courts in other jurisdictions from squarely addressing it. Indeed, such courts have held that conditions of confinement claims that do not seek accelerated release from custody are not within the scope of the writ.[7] The D.C. Circuit has joined these courts in recognizing that a habeas action "is not the

---

[7]*See Glaus* v. *Anderson*, 408 F.3d 382, 387-88 (7th Cir. 2005) (noting the Supreme Court has "never found" a challenge to prison conditions that "qualified" as a habeas claim); *Rael v. Williams*, 223 F.3d 1153, 1154 (10th Cir. 2000) ("[F]ederal claims challenging the conditions of . . . confinement generally do not arise under § 2241."); *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) ("Habeas corpus proceedings are the proper mechanism for a prisoner to challenge the 'legality or duration' of confinement," but not to "challeng[e] 'conditions of . . . confinement.'") (citation omitted); *Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 100 n.3 (3d Cir. 2008) (noting that habeas is limited to "[a]ttacks on the fact or duration of the confinement" and does not include "[c]hallenges to conditions of confinement"); *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006).

correct remedy" for challenging "discipline or treatment." *Miller v. Overholser*, 206 F.2d 415, 419-20 (D.C. Cir. 1953).[8]

Thus, even prior to the MCA, a detainee could not have challenged his conditions of confinement under statutory habeas jurisdiction. And if statutory habeas jurisdiction prior to the MCA did not encompass challenges to conditions of confinement, *a fortiori* the writ as it existed at common law in 1789 would not have permitted such claims. *See Rasul v. Bush*, 542 U.S. 466, 474 (2004) (stating that the "habeas statute clearly has expanded habeas corpus 'beyond the limits that obtained during the 17th and 18th centuries'") (quoting *Swain v. Pressley*, 430 U.S. 372, 380 n.13 (1977)). Although the Supreme Court in *Boumediene* noted that the Court has not "foreclose[d] the possibility that the protections of the Suspension Clause have expanded along with post-1789 developments," *Boumediene*, 128 S. Ct. at 2248, there is nothing in the Court's opinion to suggest that the detainees' constitutional habeas rights extend beyond the common-law writ as it existed in 1789. In fact, the *Boumediene* Court expressly declined to address whether the constitutional writ of habeas corpus encompasses claims regarding unlawful conditions of confinement. *See id.* at 2274. Thus, the Suspension Clause should be read, at most, to protect the common-law writ as it existed in 1789. In any event, even if the writ

_____

[8] In *Miller*, the D.C. Circuit allowed the petitioner to challenge the legality of the *place* of confinement because that challenge was more akin to challenging the fact of confinement than the conditions of confinement. *See* 206 F.2d at 418 ("[T]his habeas corpus proceeding . . . tests only the legality of his present confinement."); *id.* at 419 ("[L]egal validity of confinement in a certain place is a different problem" than "discipline or treatment in a place of legal confinement."); *see also Blair-Bey v. Quick*, 151 F.3d 1036, 1041-42 (D.C. Cir. 1998) (acknowledging possibility that habeas "might be available to challenge prison conditions in at least some situations," but that "pure prison-conditions cases" are "easy to identify" as outside the scope of habeas corpus); *Brown v. Plaut*, 131 F.3d 163, 1689-69 (D.C. Cir. 1997) (noting that use of habeas corpus to challenge conditions of confinement would extend "beyond the 'core' of the writ"). The same consideration is not present here, where Petitioner only challenges the adequacy of his medical care.

protected by the Suspension Clause has expanded along with the habeas statute, the habeas statute has never been interpreted to allow challenges to conditions of confinement. Accordingly, the MCA's elimination of jurisdiction over conditions-of-confinement claims brought by Guantanamo Bay detainees does not implicate the Suspension Clause.

Indeed, the Court's decision in *Munaf v. Geren*, ___ U.S. ___, 128 S. Ct. 2207 (2008)—decided the same day as *Boumediene*—further supports this understanding of the writ's scope. In *Munaf*, the Court emphasized that "[h]abeas is at its core a remedy for unlawful detention. . . . [where t]he typical remedy for such detention is, of course, release." *Id.* at 2221 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion)); *see also Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Based on this understanding of habeas corpus, the Supreme Court refused to extend the relief that a habeas court could grant to the *Munaf* petitioners' collateral challenge to their transfer to Iraqi custody. *Munaf*, 128 S. Ct. at 2228 ("Habeas corpus does not require the United States to shelter such fugitives from the criminal justice system of the sovereign with authority to prosecute them."). As with the collateral claims at issue in *Munaf*, Petitioner's pleas for relief fall well outside the core of a habeas corpus proceeding, and, as such, may not be granted in this habeas.

## II. EVEN IF THIS COURT HAD JURISDICTION TO ENTERTAIN THE PETITIONER'S MOTION, IT SHOULD BE DENIED BECAUSE THE PETITIONER UTTERLY FAILS TO MEET HIS BURDEN OF SHOWING A NEED FOR THE EXTRAORDINARY AND DRASTIC INJUNCTIVE RELIEF HE SEEKS.

Even if the Court has jurisdiction to consider his emergency motion, Petitioner has failed to clearly show that the Court's extraordinary intervention into the daily operation of Guantanamo Bay is merited. To prevail in his request for a preliminary injunction, Petitioner

must "demonstrate:  1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction."  *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995) (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989)).  A request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  In assessing a motion for a preliminary injunction, the district court should "balance the strengths of the requesting part's arguments in each of the four required areas."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *CityFed Financial Corp*, 58 F.3d. at 747).

**A.**     **The Petitioner Has Not Established that He Faces Any Imminent, Irreparable Injury.**

Petitioner's emergency motion should be denied because his argument that he will suffer irreparable harm is premised on the unsupported and faulty premise that Guantanamo Bay medical staff has failed to provide him adequate medical care.  *See CityFed Financial Corp.*, 58 F.3d at 747 (holding that failure to make showing of irreparable injury sufficient to deny preliminary injunction).  To justify the extraordinary relief of a preliminary injunction, Petitioner's irreparable harm "must be both certain and great; it must be actual and not theoretical."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such

*imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citations and internal quotation marks omitted; emphasis in original). Injunctions are not intended "to prevent injuries neither extant nor presently threatened, but only merely feared." *Comm. in Solidarity v. Sessions*, 929 F.2d 742, 745-46 (D.C. Cir. 1991).

Petitioner argues that his counsel should have access to his medical records because of his dire medical and mental health, which includes chronic headaches, a severe stomach ailment, and a serious, undiagnosed mental illness. Yet, as the facts show, the guard staff and medical staff have been quite attentive to Petitioner's medical health. During the last three months, Petitioner has complained of stomach problems only once, and on that occasion he was examined by medical staff immediately. (Ex. 2, Vargo Decl. ¶ 5; Ex. 1, Meneley Decl. ¶ 23.) Unfortunately, after being diagnosed with vomiting triggered by a viral syndrome or irregular eating habits, Petitioner declined the anti-nausea drugs that the staff physician offered him. *Id.* Less than a week later, Petitioner was immediately treated by the medical staff after a guard reported seeing him vomiting and with what appeared to be blood in the vomit. (*Id.* ¶ 22; Ex. 2, Vargo Decl. ¶ 5.) And since returning to his hunger strike, Petitioner has been under regular care of the medical staff and the BHS staff. (*See* Ex. 1, Meneley Decl. ¶¶ 13-14, 18.) Indeed, despite being on a hunger strike, the medical staff has ensured that Petitioner is currently in good health with no significant mental health problems. (*Id.* ¶ 28.) And until just recently, Petitioner's weight had remained steady around his ideal body weight. (*See id.* ¶ 21.)

Petitioner also complains that he has not been treated for chronic, severe headaches that he suffered as a result of a previous automobile accident. In fact, Petitioner has never complained of severe headaches to the medical staff or to the guards. (*See id.* ¶ 27.) This is not

surprising considering the records he provided.  In 1994, Petitioner understandably suffered from head aches as a result of a broken skull.  (Petr's Mot., Ex. 2 at *1, 3.)  But in both 1995 and 1999, none of Petitioner's records report problems of chronic, severe headaches.  (*Id.* at *5-8.)  At most these records show that, after his automobile accident but not necessarily because of it, Petitioner suffered from hearing loss and visual impairment.

Also, Petitioner alleges that "the doctors at Guantanamo have long been aware of Mr. Latif's psychological problems and also believe that he suffers from schizophrenia or some similar ailment."  (Petr's Mot., Falkoff Decl. ¶ 13.)  Petitioner also alleges that the medical staff is aware of his numerous attempts at killing himself.  (*Id.* ¶ 17.)  These allegations are false.  Petitioner has long been monitored by a psychiatric technician, and has recently had frequent interaction with BHS staff.  (Ex. 1, Meneley Decl. ¶¶ 13-15, 18.)  Contrary to Petitioner's assertions, he has never been diagnosed with or exhibited manifestations consistent with schizophrenia or any other serious mental illness.  (*Id*. ¶ 12.)  And while he was recently observed making what appeared to be a suicidal gesture, this does not necessarily indicate mental illness and Petitioner has consistently denied being suicidal.  (*Id.* ¶ 13.)  Admittedly, Petitioner does suffer from a personality disorder, but, contrary to Petitioner's assertions, he does not suffer from a serious mental illness for which drugs or other treatment are required.  (*Id.* ¶ 12.)

Finally, Petitioner argues that these alleged illnesses have been exacerbated by recent disciplinary measures taken against him.  (Petr's Mot. ¶ 10.)  As discussed above, Petitioner committed a major assault against a guard.  (Ex. 2, Vargo Decl. ¶ 7.)  Discipline was meted out according to a standardized disciplinary system that is designed to provide for the fair and

consistent delivery of consequences for negative behavior by detainees and rewards for positive behavior. (*Id.* ¶ 6.) An officer in the chain of command reviewed Petitioner's actions and determined that discipline was appropriate. (*Id.* ¶¶ 6, 8.) The disciplinary measures taken against him included the loss of the use of a mattress and the full-time use of a blanket, though he is allowed the 24-hour use of an ISO-mat and the nightly use of a blanket. (*Id.* ¶¶ 8-9.) The disciplinary period for committing a major assault on a guard is due to end on September 2, 2008. (*Id.* ¶ 8.) This discipline was imposed as part of a Guantanamo Bay's disciplinary system and Petitioner's punishment hardly merits counsel's implied accusation that the guards in Guantanamo Bay are treating Petitioner inhumanely. (Petr's Mot. ¶ 25.)

At bottom, Petitioner's motion for preliminary injunction is based on the faulty premise that Guantanamo Bay medical personnel have failed to provide adequate medical care to Petitioner. (*Id.* ¶ 20.) As illustrated above, however, the story Petitioner has conveyed to his counsel is refuted by the detailed declarations provided by those responsible for his care and detention at Guantanamo Bay. Far from neglecting Petitioner's health, Guantanamo Bay medical staff has provided Petitioner with comprehensive and attentive medical care.[9] Consequently, Petitioner has not carried his burden of establishing an imminent threat of irreparable harm related to Guantanamo Bay's provision of medical care to him, and his motion

---

[9]Petitioner cites to *Al-Joudi v. Bush*, 406 F. Supp. 2d 13 (D.D.C. 2005), as support for a couple of the preliminary injunction factors, including irreparable injury. In *Al-Joudi*, counsel for detainees participating in a hunger strike asked for updates on detainees' health status and access to their hospitalization records. *Id.* at 15. Recognizing that "courts often find a showing of irreparable harm where the movant's health is in imminent danger," and that "[p]etitioners have provided sufficient facts . . . to establish that the threat of death or serious physical deterioration is real and imminent," the Judge Kessler granted relief. *Id.* at 20. Here, in contrast, Captain Meneley's declaration directly refutes Petitioner's contention that his health is in imminent danger or that he faces a threat of real and imminent physical deterioration.

should be denied.

**B.    The Petitioner Has Little Chance of Success on the Merits because His Constitutional Right to Seek a Writ of Habeas Corpus Does Not Encompass a Right to Challenge His Conditions of Confinement.**

Petitioner asks this Court to significantly intrude upon and micro-manage the operations of the Guantanamo Bay detention facility by ordering the production of medical records so that his counsel may judge the adequacy of his medical care and by ordering the premature end of Petitioner's present disciplinary status.  This Court should deny Petitioner's motion for a preliminary injunction because he has not demonstrated a substantial likelihood of success on the merits.  Indeed, Petitioner's pleas to this Court to alter some aspect of his confinement are virtually certain to fail on the merits.  As discussed in Part I above, the core habeas right recognized in *Boumediene* does not include the right to challenge the conditions under which a detainee is confined.  But even assuming that *Boumediene* invalidated § 2241(e)(2); that conditions-of-confinement claims are cognizable in habeas; and that Petitioner is entitled to other constitutional protections under the Fifth Amendment, he still fails to demonstrate that his conditions-of-confinement claims are likely to succeed.

**1.    Constitutional Standard Appropriate to Petitioner's Challenge to the Conditions of His Confinement.**

At the threshold, it is worth noting that, because no court has ever determined that detainees of the military can even bring conditions-of-confinement claims, especially in a habeas context, *see supra* Part I.B., no court has definitively determined what legal standard should be applied to evaluate such claims brought by detainees in the custody of the military.  *See O.K. v. Bush*, 377 F. Supp. 2d 102, 112 n.10 (D.D.C. 2005) ("No federal court has ever examined the

nature of the substantive due process rights of a prisoner in a military interrogation or prisoner of war context."); *see also In re Guantanamo Bay Detainee Litigation*, 2008 WL 3155155, at *1 ("What is clear is that no court has ever ruled that detainees, designated as enemy combatants, have a right to challenge the conditions of their confinement pursuant to the constitutional writ of habeas corpus.").[10]  Indeed, even in the context of constitutional challenges to conditions of confinement brought by those vested with constitutional rights, courts have applied at least three different standards to determine when an alleged violation justifies court intervention into the management of a detention facility.  For example, when such challenges have been brought by criminals serving a term of imprisonment after conviction, courts have analyzed them under the Eighth Amendment's "deliberate indifference" standard.  This standard requires a prisoner to establish that prison officials "were knowingly and unreasonably disregarding an objectively intolerable risk of harm to the prisoners' health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

In contrast, the constitutional standard of care owed to "pretrial detainees" in the criminal justice context—"those persons who have been charged with a crime but who have not yet been tried on that charge," *Wolfish*, 441 U.S. at 523—is governed by the Due Process Clause of the Fifth Amendment, *id.* at 536.  "[W]here it is alleged that a pretrial detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice,

---

[10]Although *Al-Joudi* granted preliminary injunctive relief, the Court did not articulate a legal standard for conditions-of-confinement claims.  406 F. Supp. 2d at 20-22.  Instead, the Court focused on whether counsel's access to petitioners was imperiled, after already concluding that there were sufficient facts to establish petitioners faced a real and imminent threat of death or serious physical deterioration.  Because petitioner in this case faces no such threat and, as discussed elsewhere in this Opposition, does not adequately explain how access to his counsel is actually threatened, *Al-Joudi* is inapposite.

or policy constitutes punishment[.]"[11]  *Block v. Rutherford*, 468 U.S. 576, 583 (1984) (internal quotations omitted); *see also Brogsdale v. Barry*, 926 F.2d 1184, 1188 n.4 (D.C. Cir. 1991).  For unadmitted or excludable aliens detained by the United States, some courts have applied a separate and higher standard, reviewing the detainee's submission to determine whether it challenges actions amounting to "gross physical abuse."  *See Adras v. Nelson*, 917 F.2d 1552, 1559 (11th Cir. 1990); *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987); *see also Arar v. Ashcroft, et al.*, 532 F.3d 157, 189-90 (2d Cir. 2008) (noting the difference between the "gross physical abuse" and *Wolfish* standards, but not resolving which standard applies because the complainant failed to plead a cause of action under either standard).[12]

Regardless of which standard actually applies to Petitioner, one principle animates all three approaches:  courts accord substantial deference to the judgment of prison administrators and generally refrain from interfering in the day-to-day operations of detention facilities.  *See, e.g.*, *Wolfish*, 441 U.S. at 548, 562 (explaining that the operation of even domestic "correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial," and cautioning lower courts to avoid becoming "enmeshed in the minutiae of prison operations").  This deference is, naturally, at its height when the court is asked to second-

-------------------------------------------------------------

[11]The Supreme Court has stated, in partial explanation of the relationship between these standards, that "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner."  *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  As Judge Bates recently noted, some courts have applied the deliberate indifference standard in both settings.  *See O.K. v. Bush*, 344 F. Supp. 2d 44, 61 n.23 (D.D.C. 2004) (citing *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992)).

[12]Notably, none of the cases establishing the three different standards for evaluating a conditions-of-confinement claim described above arose in the context presented here, of a *habeas corpus* action.  *See supra* Part I.B.

guess decisions made by facility personnel that concern institutional security. *See Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989) ("Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 841 (D.C. Cir. 1988) (noting that "courts are not to be in the business of running prisons" and that "questions of prison administration are to be left to the discretion of prison administrators").

Those same principles which counsel against judicial interference in the penal context should apply with even greater force in this unique context, where detainees are challenging how military forces balance the need for adequate security at a military detention center during a time of war. *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.") (citations omitted); *see also Almurbati v. Bush*, 366 F. Supp. 2d 72, 81 (D.D.C. 2005) ("[I]t is a fundamental principle under our Constitution that deference to the Executive Branch must be afforded in matters concerning the military and national security matters."). Keeping these principles in mind, it is clear that the appropriate standard for this Court to apply is the "gross physical abuse" standard.

This result follows, in part, as a matter of status. Guantanamo Bay detainees are aliens who have not been admitted to the United States. Moreover, they cannot rely on the Eighth Amendment-based standard of deliberate indifference in challenging their conditions of confinement. *See, e.g.*, *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 465-78 (D.D.C.

-25-

2005) (dismissing Eighth Amendment claims), overturned on other grounds, *Boumediene*, 128 S. Ct. at 2229.  But Petitioner also is not a "pretrial detainee," at least not as defined by the Supreme Court, because he has not been charged with a crime and is not being detained as part of the civilian criminal justice system.  *Cf. Hamdi*, 124 S. Ct. at 2640 (plurality opinion) (holding that detention of enemy combatants and unlawful enemy combatants is not punishment or penal in nature).  Moreover, the criminal justice interests served by confining "pretrial detainees" are completely distinct from the military and national security interests served by detaining individuals, such as Petitioner, in conjunction with ongoing hostilities.  *Compare Wolfish*, 441 U.S. at 536-37 (noting that criminal justice interest served by pretrial detention is to ensure detainees' presence at trial), *with Hamdi*, 124 S. Ct. at 2640 (plurality opinion) ("The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants is to prevent captured individuals from returning to the field of battle and taking up arms once again.").

Rather, these alien detainees are held outside the continental United States in military, administrative, detention, at a time of war and under circumstances in which this Court owes the highest degree of deference to executive decisions affecting the mechanics of detention.  In this way, Petitioner is most akin to the unadmitted aliens at issue in *Adras v. Nelson*, 917 F.2d 1552 (11th Cir. 1990) and *Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987).  The inquiry this Court should thus make, if it reaches the merits, is whether Petitioner has alleged such "gross physical abuse" that the Court's direct intervention in the management of the Guantanamo Bay facility is

warranted.[13]

## 2. Petitioner Has Failed to Prove that the Conditions of His Confinement Violate the Constitution.

Petitioner's conclusory allegations do not demonstrate any such indifference and, indeed, the record shows that military officials at Guantanamo Bay are well aware of and comply with their obligations to maintain safe and humane conditions while ensuring institutional security. In substance, Petitioner apparently alleges, in conclusory fashion and without any basis, that he is suffering from serious, untreated physical and mental decline as a result of the inadequacy of his medical care. (Petr's Mot. ¶ 20.) Indeed, what the record demonstrates is that Petitioner has available and has taken advantage of comprehensive and extensive medical care. (*See* Ex. 1, Meneley Decl. ¶¶ 20-24.) As part of his regular care, his weight is measured and his food intake is monitored. (*Id.* ¶ 19; Ex. 2, Vargo Decl. ¶ 3.) He has had regular visits with mental health experts. (Ex. 1, Meneley Decl. ¶¶ 16, 18.) And every time he has complained of or been observed having symptoms approximating what he has alleged, Petitioner was immediately

---

[13]Petitioner suggests that he need not satisfy the demanding "gross physical abuse" or "deliberate indifference" standards by apparently arguing that courts have inherent authority under the habeas statute, the All Writs Act or otherwise to take whatever action necessary to protect the lives and health of all habeas petitioners. This argument falters on the facts of these cases; as noted below, Petitioner's conclusory allegations fail to state any reason for this Court to believe that his life or health is at risk. Moreover, such a theory would involve standardless and unbounded court oversight of detention conditions all in the name of preserving habeas petitioners' access to the courts, which is not and cannot be the appropriate legal standard. Any court oversight of conditions of confinement (even if cognizable in habeas, which respondents dispute) must be tethered to an appropriate legal standard, and the case law, even in the context of domestic incarceration of those possessed of full constitutional rights, requires that prison conditions or care sink to the level of deliberate indifference to an inmate's health or well-being before a court may intervene in the management of a detention facility. *See Neitzke v. Williams*, 490 U.S. 319, 321 (1989). The standard for unadmitted aliens detained in administrative custody is even more demanding.

examined and offered treatment, which he ultimately declined. (*Id.* ¶¶ 21-22.) At this juncture, any health problems that Petitioner suffers from are the result of his own decision to go on a hunger strike. (*See id* ¶¶ 21, 23-24). With respect to Petitioner's present disciplinary status, it is based on an important and regularized system of discipline. (Ex. 2, Vargo Decl. ¶ 6.) Contrary to Petitioner's assertions, those disciplinary measures taken against him are not so severe as to exacerbate his present physical and mental condition. (*See id.* ¶¶ 8-9.)

This same result would be obtained even if the Court were to find that a different standard, such as that of deliberate indifference, applies to these detainees. *See, e.g.*, *O.K.*, 344 F. Supp. 2d at 60-63 & n.23 ("Without concluding that the 'deliberate indifference' doctrine is the correct standard for any constitutional claims the petitioners may raise . . . the Court will draw on this well-developed body of law to guide its analysis[.]"). Under that standard, only upon a showing that prison conditions or care sink to the level of deliberate indifference to an inmate's health or well-being is a court justified in intervening in the treatment of inmates in the traditional penal prison setting. *See Neitzke*, 490 U.S. at 321; *Chandler v. District of Columbia Dept. of Corrections*, 145 F.3d 1355, 1360 (D.C. Cir. 1998) ("To prevail in a case alleging unconstitutional conditions of confinement, a prisoner must show that the government official 'knew of and disregarded an excessive risk to inmate health or safety.'") (quoting *Farmer*, 511 U.S. at 837).

At its base, Petitioner's request for relief invites this Court to micro-manage the manner in which he is detained. His motion asks for the type of judicial intervention and oversight of the operations that is highly discouraged under the law and particularly unwarranted in the unique context presented in this case. Indeed, as discussed below, his motion is an invitation to inject

security risks into the facility against the considered judgment of those charged with maintaining the health, welfare and safety of these and other detainees. But this Court is "not equipped or authorized to assume the broader roles of a congressional oversight committee or a superintendent of the operations of a military base." *O.K.*, 377 F. Supp. 2d at 114. Accordingly, even if habeas courts have the authority to consider challenges to a detainee's confinement conditions, Petitioner is not likely to succeed on the merits of his challenge because he cannot demonstrate that the Guantanamo Bay staff has been deliberately indifferent to his health or well-being. *See, e.g.*, *El-Banna v. Bush*, 394 F. Supp. 2d 76, 78-79 (D.D.C. 2005); *O.K.*, 344 F. Supp. 2d at 60-63.

### C. The Relief Petitioner Requests Would Impose Substantial and Undue Burdens on the Government and Injure its Interests, as Well as Those of Other Detainees.

Courts are understandably reluctant to intervene in the management of detention facilities and to second-guess the security judgments made by trained personnel. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Wolfish*, 441 U.S. at 548, 562. Deference to the considered judgment of Guantanamo Bay staff is particularly appropriate under the unique circumstances here, involving enemy combatants detained by the military in a time of war. Petitioner's requests for relief also would impose substantial burdens on the Guantanamo Bay medical staff and interfere with the appropriate operation of Guantanamo Bay's provision of medical care. Petitioner's requested relief seeks to interfere with the competent medical judgment and expertise of the Guantanamo Bay medical staff as to what medical care is appropriate with respect to Petitioner. In addition, Petitioner's request that his mattress and blanket be returned with assurances that they will never again be confiscated would surely undermine the ability of the military to keep discipline among the detainees.

Petitioner's requests for relief cannot be viewed in isolation or confined to just the Petitioner at issue in the present motion, because any order granting the forms of relief Petitioner seeks would likely prompt counsel for many detainees in other cases to demand the same types of remedies. Accordingly, providing Petitioner with the relief requested would be a significant burden for the military authorities and medical staff at Guantanamo Bay. Regardless of whether Petitioner has any right to seek the relief he requests, its costs should not be borne by other interested parties—Guantanamo Bay staff and, not incidentally, other detainees. This Court should thus deny a preliminary injunction.

**D.     The Public Interest Would Not be Served by a Preliminary Injunction.**

Finally, the public has a strong interest in assuring that the military and security operations provided at Guantanamo Bay are not interrupted, overly burdened, and second-guessed by the unnecessary demands pertaining to the particulars of his confinement conditions. As demonstrated above, the Guantanamo Bay staff has taken and will continue to take appropriate and careful measures to preserve the life and health of Petitioner, as well as that of military personnel and other detainees. Accordingly, to avoid the unnecessary burdens imposed by Petitioner's motion, the public interest would best be served if the Court denied the motion.

# CONCLUSION

For the reasons stated above, respondents respectfully request that Petitioner's motion for preliminary injunction be denied in all respects.

Dated: August 22, 2008           Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General


   /s/ Scott Levin
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR
TERRY M. HENRY
ANDREW I. WARDEN
PAUL E. AHERN
SCOTT D. LEVIN
SEAN W. O'DONNELL
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Tel: (202) 514-3755
Fax: (202) 616-8470

Attorneys for Respondents