**EXHIBIT 1**

Declaration of Dr. Bruce Meneley

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE<br>LITIGATION | Misc. No. 08-MC-442 (TFH)<br><br>Civil Action No. 04-1254 (HHK) |

DECLARATION OF CAPTAIN BRUCE C. MENELEY, M.D.

Pursuant to 28 U.S.C. § 1746, I, Bruce C. Meneley, M.D., hereby declare:

1. I am a Captain in the United States Navy with over 32 years of active and reserve service. I currently serve as the Commander, Joint Medical Group, Guantanamo Bay and Joint Task Force Surgeon, Joint Task Force-Guantanamo (JTF-GTMO), at Guantanamo Bay, Cuba. I am responsible for the medical care provided to personnel stationed at Guantanamo Bay and oversee the operation of the Joint Medical Group that provides medical care to the detainees currently held at Guantanamo Bay. There are currently approximately 260 detainees being held at the detainee camp at Guantanamo Bay, Cuba. I have served in this position since 6 July 2007.

2. I received my medical degree from the University of Nevada, School of Medicine. I completed an Internship at Naval Hospital Bremerton and a Residency in Emergency Medicine at Naval Medical Center San Diego.

3. I have personal knowledge of the procedures that are in place for the operation of the JTF-GTMO Detention Hospital and I am responsible for ensuring that they are followed. Due to my responsibilities, I have personal knowledge of, or have received information concerning the allegations made by ISN 156 (Adnan Farhan Abdul Latif), one of the petitioners in the above-

1

captioned case. This declaration is based on information made available to me through my official duties and from the medical records of ISN 156.

## MEDICAL CARE AT GUANTANAMO BAY

4. The Joint Medical Group staff consists of licensed, board-certified physicians of different specialties. Specifically as of August 2008, the hospital staff consisted of 116 professionally trained individuals. This staff includes an anesthesiologist, a general surgeon, an orthopedic surgeon, family physicians, internal medicine physicians, a psychiatrist, a psychologist, a physician's assistant, a licensed dietician, dentists, and a physical therapist. In addition, the staff included licensed medical/surgical nurses, corpsmen (formally trained Navy medical personnel akin to a "medic" in the Army), various technicians (lab, radiology, pharmacy, operating room, respiratory, physical therapy, information technology and biomedical repair), and administrative staff. We have routinely brought down specialists in Dermatology, Cardiology, ENT, Gastroenterology, Neurosurgery, Urology, and Audiology to name a few. Any specialty required is available. Other specialists specifically involved in the care of the detainees on hunger strike include nutritionists, internal medicine and behavioral health professionals, all of whom assist in monitoring and providing specialized care, as needed.

5. Upon arrival at Guantanamo Bay, all detainees are given complete physical examinations. Medical issues identified during the examination or identified during subsequent examinations are followed by the medical staff. Detainees may request medical care at any time by making a request to guard personnel or the medical staff who make daily rounds on the cellblocks. In addition to responding to detainee requests, the medical staff will investigate any medical issue observed by JTF-GTMO guards or staff. The availability of this care has resulted

in thousands of outpatient contacts between detainees and medical staff, followed by in-patient care as needed.

6. For many of the detainees it was the United States' military medical staff that initially diagnosed conditions that had previously been unknown to the detainees. Many of the detainees were suffering from significant, undiagnosed, or untreated pre-existing medical conditions. JTF-GTMO has consistently provided high-quality medical care to the detainees. As a result, the health of the detainee population has markedly improved since their arrival at Guantanamo Bay.

7. For most medical care requiring in-patient services detainees are admitted to the JTF-GTMO Detention Hospital. This is a 20-bed medical facility, which is staffed to provide medical care to the detainees at Guantanamo Bay. The medical staff, consisting of approximately 100 military personnel, includes five medical doctors and one physician's assistant. In addition, the medical staff includes medical/surgical nurses, corpsmen, technicians (lab, radiology, pharmacy, operating room, respiratory, physical therapy), and administrative staff. For medical procedures beyond the capability of the Detention Hospital, the detainees are transferred to Naval Hospital, Guantanamo Bay. JTF-GTMO can, and has, requested specialists to be flown to Guantanamo Bay to provide care to detainees whose medical needs exceed the capabilities of the Detention Hospital and the Naval Hospital, Guantanamo Bay.

8. The medical staff at the Detention Hospital and the Naval Base Hospital have treated detainees for a variety of medical conditions, including hepatitis, heart ailments, hypertension, combat wounds, diabetes, latent tuberculosis, appendicitis, inguinal hernia, leishmaniasis, malaria, and malnutrition. In addition to providing medical treatment and prescription drugs to detainees, JTF-GTMO's medical staff has provided detainees with prescription eyeglasses and prosthetic limbs.

9. The Joint Medical Group is committed to providing unconditional appropriate comprehensive medical care to all detainees regardless of their disciplinary status, cooperation, or participation in a hunger strike. The healthcare provided to detainees being held at Guantanamo Bay rivals that provided in any community in the United States. Detainees receive timely, compassionate, quality healthcare and have regular access to primary and specialist physicians. The care provided to detainees is comparable to that afforded our active duty service members. All medical procedures performed are justified and meet accepted standards of care. A detainee is provided medical care and treatment based solely on his need for such care and the level and type of treatment is dependent on the accepted medical standard of care for the condition being treated. Diagnosis of such conditions and medical care and treatment for them are not affected in any way by a detainee's cooperation, or lack thereof, during an interrogation session. Similarly, medical care is not provided or withheld based on a detainee's compliance or noncompliance with detention camp rules or on his refusal to end a hunger strike. Medical decisions and treatment are not withheld as a form of punishment. Additionally, the medical staff has no involvement in discipline decisions made by detention personnel nor are they involved in interrogating detainees.

10. A 16-member Behavioral Health Science (BHS) staff supports the Detention Hospital. The BHS staff includes a Board Certified Psychiatrist and a psychologist with a doctorate degree. The remainder of the staff includes psychiatric nurses and psychiatric technicians. The BHS staff conducts mental health assessments, provides crisis intervention, develops individualized treatment plans, and formulates short-term behavioral modification therapy for acute management of self-injurious ideation or behavior. Additionally, long-term supportive care and psychotropic medication therapy is provided, as needed, to treat symptoms

of major mood or thought disorders, such as Major Depression, Bipolar Disorder and Schizophrenia. The medical and BHS staff provide appropriate medical and mental health services for all detainees through a thorough, coordinated team approach, based on individualized treatment plans that account for each patient's condition and circumstances.

11. It is the standard practice of medical providers in the Joint Medical Group to discuss with detainees their diagnosis and provide recommendations for further evaluation and treatment. Counseling is provided on the potential risks and benefits of treatment, as well as the consequences involved with decisions, including the risks associated with rejection of care. The communication is facilitated with the assistance of a translator and opportunities for the detainee to ask questions are available at every encounter with medical providers. Obtaining direct or implied informed consent is a routine part of any testing, treatment and medical procedure, which includes a review of the risks and benefits, as well as any available alternatives.

## ISN 156's MENTAL HEALTH

12. Since his arrival on Guantanamo Bay, detainee ISN 156 has never been diagnosed with a severe mental illness or severe mental health problems, nor has he ever been diagnosed with or exhibited manifestations consistent with schizophrenia. Although he has not endorsed symptoms warranting the diagnosis of a mental illness, his history and pattern of behavior has manifested qualities consistent with a personality disorder, leading us to diagnose him as having a "personality disorder, not otherwise specified," with borderline and antisocial features. As ISN 156 does not suffer from a severe mental illness, he is not currently prescribed any psychotropic medications.

13. Following a suicidal gesture in his cell on June 18, 2008, ISN 156 was evaluated by the JTF-GTMO psychologist the following day. ISN 156 did not require any medical treatment

for that incident but, consistent with our standard protocol, he was evaluated by a mental health professional. During that evaluation, ISN 156 stated that he had been upset about his continued detention but denied that he had intended to end his life through his actions in the cell. Although some of his behavior conceivably could have resulted in self harm, detainee ISN 156 has consistently denied suicidal ideations. Detainees engage in self-harming behaviors for a multitude of reasons, not all of which include the presence of mental illness. Although detainees who engage in such behaviors warrant increased scrutiny, 156's behavior did not change our opinion regarding his lack of a clinical mental illness.

14. On 18 June 2008, ISN 156 was placed on Acute Self Harm Precautions (ASHP)[1], in accordance with standard operating procedures (SOP). After a detainee is placed on ASHP, a psychiatric technician does an initial evaluation as soon as the detainee is medically cleared. A mental health provider then re-evaluates the detainee within 24 hours. Before ASHP can be discontinued, the SOP mandates that a mental health provider must evaluate the detainee and make a determination that he is no longer an imminent danger to himself. ISN 156 was removed from ASHP the day following the incident, when it was determined that he was not an imminent self-harm risk.

## HUNGER STIKE PROTOCOLS

15. It is the policy of the Department of Defense to support the preservation of life by appropriate clinical means, in a humane manner, and in accordance with all applicable standards. Medical professionals administer enteral feeding for hunger striking detainees in a humane and compassionate manner, and do so only when it becomes medically necessary to preserve a

---

[1] ASHP entails removal of comfort items and removal of any item which the detainee has used or could use for potential self harm, including (but not limited to): razors; sheets; blankets; towels; long pants; and prayer beads. Detainees on ASHP are also provided with an ASHP smock and blanket.

6

detainee's health. Detainees are designated as hunger strikers after missing nine consecutive meals. The medical staff carefully assesses each hunger-striking detainee's health by means of physical and psychological examinations, weight monitoring, personal observation and laboratory tests. When the preservation of health and life becomes necessary, a recommendation for enteral feeding is made to the Commander of the Joint Task Force, who then orders the necessary enteral feedings. Joint Medical Group personnel provide extensive counseling and detailed warnings to the detainees concerning the risks of failure to eat or drink when they begin a hunger strike, prior to commencing involuntary feeding, and periodically thereafter, if the detainee continues to participate in the hunger strike. Medical personnel (including behavioral health professionals) continually remind detainees who persist in their hunger strike that continuation of the hunger strike could endanger their health or life.

16. JTF-GTMO follows the Federal Bureau of Prisons' model for managing hunger strikers. The Joint Detention Group is responsible for escorting a detainee to the feeding chair and appropriately placing them into the chair. A restraint chair is utilized to ensure the safety of the guard staff, medical staff, and the detainee. A detainee is only kept in the chair for the time required to administer a feeding and for a short, informal observation period of 10-15 minutes after the feeding is completed to prevent the detainee from purging. This process normally lasts less than an hour. Detainees are typically fed twice daily.

17. Prior to any enteral feeding guard staff offer the detainee a meal to eat. Detainees are also offered and encouraged to use the bathroom. A lubricant is always used, typically viscous lidocaine, although we allow them to choose alternative lubricants if they desire. In all cases a topical anesthetic such as lidocaine is available, however, a patient may decline the anesthetic. An enteral feeding tube is introduced by a registered nurse by standard medical protocol to

7

accepted medical standards. Cepacol anesthetic lozenges are available to the detainees on request. After verification of tube placement, an appropriate amount of Jevity nutritional supplement is infused by gravity into the detainee's stomach, at which time the tube is then removed. This process typically takes 30 to 40 minutes. During this time medical staff periodically check the detainee's circulation in their arms and legs to ensure they have not been restrained too tightly.

## ISN 156'S HUNGER STRIKES

18. ISN 156 participated in a hunger strike from approximately February 2007 through February 2008. BHS followed standard protocols during ISN 156's hunger strike by regularly evaluating him: BHS medical personnel performed an initial assessment, routine follow-ups and a final assessment prior to removing detainee from the hunger strike list in February 2008. After he ended his hunger strike in February 2008, ISN 156 was visited weekly in his cell by a BHS psychiatric technician, consistent with our standard protocol. Furthermore, since being taken off of ASHP, the detainee has spoken to BHS staff twice. These BHS visits have been uneventful and reveal no acute problems. He did not have any specific complaints indicative of mental illness. He remains on the service, but has refused since mid-July to engage with BHS staff when he is approached during their visits.

19. ISN 156 has never complained of difficulty eating meals or keeping his food down. On 18 August 2008, after refusing to eat nine consecutive meals, ISN 156 was declared a hunger striker. On 20 August 2008, the JTF-GTMO Commander authorized the enteral feeding of ISN 156. Since 21 August 2008, ISN 156 has been enterally fed twice per day. Guard staff provide him with bottled water, and running water is available in his cell. Detainees are currently fed enterally in a common area in front of their cells in restraint chairs.

20. As is true with all hunger striking detainees, BHS has evaluated ISN 156 since he was declared a hunger striker and will continue to follow up with him on a weekly basis as his hunger strike continues. As is also true of all detainees on hunger strike, ISN 156 has been and will continue to be encouraged to end his hunger strike for the sake of his health. No behaviors warranting further mental health evaluation have been identified by BHS, nor has ISN 156 been diagnosed with a mental illness since his most recent hunger strike was declared.

## ISN 156's MEDICAL STATUS

21. Detainees are weighed monthly as a part of their general care and, more specifically, to monitor detainees who, while not technically classified as a hunger striker for refusing to eat nine consecutive meals, may nonetheless be refusing to eat complete meals or missing non-consecutive meals. When he arrived at Guantanamo in January 2002, ISN 156 weighed 114 pounds. His ideal body weight is 135 pound. On 27 May 2008, he weighed 138 pounds. One month later, on 29 June 2008, he weighed 139 pounds and on 31 July 2008, he weighed 135 pounds. ISN 156 lost approximately 25 pounds in the weeks prior to beginning and after formally starting his most recent hunger strike. As of 24 August 2008, ISN 156's weight was 110 pounds.

22. A JTF-GTMO medical provider has seen detainee ISN 156 thirteen times in the past three months as an outpatient in the clinic, including the contacts described in this declaration. During those medical contacts over the last three months, ISN 156 has not complained about being physically unable to eat the food supplied to him or of having blood in his vomit or urine. Except as discussed below, there is no record of ISN 156 seeking medical care for such problems or mentioning these problems during his medical visits, including no record of him raising the issue during the daily rounds made by medical staff. Similarly, the medical staff has not

9

observed ISN 156 experiencing involuntary regurgitation after meals or of having blood in his vomit or urine. No vomit or complaint of blood in his vomit was documented in his medical record during the past 6 months prior to 13 August.

23. On only one occasion over the past three months has ISN 156 complained of stomach problems. Specifically, on 13 August 2008, he was examined by a staff physician after complaining that he had an upset stomach beginning around 9 August 2008 accompanied with vomiting on several occasions during that four day period. After a thorough examination, the staff physician concluded that a viral syndrome or irregular eating habits may have triggered the vomit. The staff physician offered ISN 156 symptomatic therapy consisting of phenergan tablet or suppository, which is a medication to counteract nausea. ISN 156, however, declined this medical treatment.

24. As detailed above, on 19 August 2008, ISN 156 was under daily medical observation as a hunger striker. ISN 156 was seen at Camp 6 medical clinic by a medical doctor after the guard staff brought him in. His vital signs were checked to be normal and his nausea and vomiting had resolved. No medical personnel witnessed any blood in his vomit and he remained alert and fully oriented throughout his medical visit. He was returned to his cell with no medical diagnosis made.

25. Over the past three months, ISN 156 has been seen three times by medical personnel for folliculitis and skin rashes on his legs.

26. He recently underwent a quantiferon test, a type of blood test, which confirmed that he has latent tuberculosis, and was offered treatment for the condition.[2] ISN 156 declined

---

[2] If a person is diagnosed with "latent Tuberculosis," this means that the person's body has been exposed to the tuberculosis mycobacterium, but has no symptoms or findings of active disease. Although many people with latent Tuberculosis never develop active Tuberculosis, we recommend to detainees that they undergo a course of treatment

10

appropriate medical therapy for latent tuberculosis. The last chest X-ray performed on ISN 156 was on 29 September, 2006. The results were normal with no sign of any active tuberculosis. Annually, detainees who have a history of latent tuberculosis but have refused therapy are given an annual survey form. If the survey shows they have symptoms consistent with active infection a chest X-ray is performed. ISN 156 does not have any symptoms of active tuberculosis, including night sweats, cough, or hemoptysis (coughing up blood). Consistent with JTF-GTMO's policy and practice as described above, ISN 156 was informed of this medical condition and his treatment options. Although our medical personnel would not have told him his latent tuberculosis is a "serious germ," it is possible that he understood it in those terms.

27. ISN 156 has never complained of or been seen by medical personnel for headaches.

28. ISN 156 is currently in good health with no significant medical problems. His weight is expected to increase with enteral feedings, with the goal of restoring him to his ideal body weight.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true, accurate, and correct to the best of my knowledge.

Dated: 25 August 2008

_BC Meneley_
BRUCE C. MENELEY
Captain, Medical Corps, U.S. Navy

---

to decrease the likelihood of such a development. Our standard treatment option for detainees diagnosed with latent Tuberculosis is to offer them treatment in the form of a medication called isoniazid (INH), which destroys the Tuberculosis bacteria present in the body. This treatment takes approximately 9 months and consists of taking 900 mg of isoniazid (INH) by mouth twice weekly, along with a 100 mg twice a week supplementation of pyridoxime, or Vitamin B6. This practice meets the standard of care for the treatment of this disease.

11