**REDACTED VERSION**

FILED WITH THE
COURT SECURITY OFFICER
CSO: _Maciso_
DATE: _10/9/08_

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| IN RE: | : | Misc. No.: | 08-0442 (TFH) |
| | : | | |
| GUANTANAMO BAY | : | Civil Action Nos: | 05-1509 (RMU) |
| DETAINEE LITIGATION. | : | | 05-1602 (RMU) |
| | : | | 05-1704 (RMU) |
| | : | | 05-2370 (RMU) |
| | : | | 05-2398 (RMU) |
| | : | | 08-1310 (RMU) |
| | : | | |
| | : | Document Nos.: | 133, 134, 172 |

**MEMORANDUM OPINION**

**GRANTING THE PETITIONERS' MOTIONS FOR JUDGMENT ON THEIR PENDING HABEAS
PETITIONS AND DENYING AS MOOT THE PETITIONERS' MOTIONS FOR
IMMEDIATE RELEASE ON PAROLE INTO THE UNITED STATES**

## I. INTRODUCTION

There comes a time when delayed action prompted by judicial deference to the executive

branch's function yields inaction not consistent with the constitutional imperative. Such a time

has come in the case of the 17 Uighurs in Guantanamo Bay, Cuba ("Guantanamo") whom the

government has detained for 7 years without an opportunity for judicial redress until recently. In

reviewing the evidence leading to the designation of one Uighur petitioner as an enemy

combatant, the D.C. Circuit described the evidence supporting that determination as "lack[ing]

sufficient indicia of . . . reliability." *Parhat v. Gates*, 532 F.3d 834, 836 (D.C. Cir. 2008).

Prompted by the *Parhat* decision, the government decided that it would no longer consider the

17 Uighur detainees enemy combatants. In light of developments and the Supreme Court's

recent ruling in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), restoring the court's jurisdiction

over detainee habeas petitions, the detainees filed motions alleging that their continued detention

is unlawful and requesting that the court order the government to release them into the United

REDACTED VERSION

States.  Because the Constitution prohibits indefinite detention without just cause, this court rules

that the government's continued detention of the petitioners is unlawful.  Furthermore, because

separation-of-powers concerns do not trump the very principle upon which this nation was

founded – the unalienable right to liberty – the court orders the government to release the

petitioners into the United States.


## II.  BACKGROUND

### A.  Factual Background

The 17 petitioners are Uighurs (a Turkic Muslim minority group) who arrived in

Afghanistan after fleeing far-western China where they faced oppression.  *See Parhat*, 532 F.3d

at 837.  Once in Afghanistan, the petitioners lived together in "Uighur camps."  *Id.*  The nature of

these camps is hotly contested.  The government contends that the camps were run by the East

Turkistan Islamic Movement ("ETIM") and supported by the Taliban.  Govt's Opp'n at 10.  But

the government has only produced evidence that one of the Uighurs was "part of or supporting

forces" in Afghanistan.  *Parhat*, 532 F.3d at 843 (stating that Parhat's own statements indicate

that "he received training on a Kalashnikov rifle and a pistol, which 'consisted of weapon

disassembly and cleaning'").  The *Parhat* court did not decide whether the camp was run by

ETIM because the government's other evidence was independently insufficient to support the

Combatant Status Review Tribunal's ("CSRT") determination that Parhat is an enemy

combatant.  *Id.* at 844 (explaining that the government's evidence that ETIM was "associated"

with al Qaida or the Taliban and that ETIM engaged in hostilities against the United States or its

allies "does not disclose from whence it came [and] is therefore insufficient").  The government

concedes that there are no material factual differences among the petitioners and that the holding

REDACTED VERSION

in *Parhat* applies to them all equally. Accordingly, this court recognizes that the petitioners acquired weaponry skills at "training camps" in Afghanistan after fleeing China, but will not draw adverse inferences based on other unsubstantiated allegations.

Although it remains unclear how long they remained in these "training camps," once the U.S. military began bombing the area, the petitioners relocated to Pakistan. *Id.* at 837. Local villagers there handed the petitioners over to Pakistani officials in late 2001. *Id.*; *but see* Joint Status Report (Aug. 18, 2008), Ex. 1 (noting that one petitioner was captured in May 2002). These officials then turned the petitioners over to the U.S. military for $5,000 a head. *Parhat*, 532 F.3d at 837; Uighur Petrs' Notice of Supp. Auth. (Sept. 25, 2008), Ex. E ("Decl. of J. Wells Dixon") at 3. In June 2002, the military transferred the petitioners to Guantanamo Bay. *Parhat*, 532 F.3d at 837.

## B. Procedural History

The 17 Uighur detainees began filing habeas petitions with this court in July 2005. Approximately two years before filing their first petition, the government had already cleared 10 of the petitioners for release. Joint Status Report (Aug. 18, 2008), Ex. 1. The government cleared an additional 5 for release or transfer in 2005, 1 for transfer in 2006 and 1 for transfer in May of this year. *Id.* To date, all 17 petitioners remain at Guantanamo.

On July 10, 2008, Judge Thomas F. Hogan ordered that all the Uighur petitions be "consolidated for consideration before Judge Urbina." Order (July 10, 2008). Over the next few months, the government determined that it would treat all Uighur petitioners "as if they are no longer enemy combatants." Govt's Opp'n at 2; Joint Status Report (Aug. 18, 2008) at 14; Notice of Status (Sept. 30, 2008) at 2. As "no longer enemy combatants," the government provides

**REDACTED VERSION**

these detainees "special housing" "while efforts continue to resettle them in a foreign country."

Notice of Status (Sept. 30, 2008) at 2.

Because the government no longer treats the detainees as enemy combatants, it will not

be filing factual returns in any of their cases. Accordingly, the only issues to be resolved are

whether the government has authority to "wind up" the petitioners' detention and whether the

court has the authority to order the petitioners released into the United States. Parhat filed

motions on July 23 and 25, 2008, requesting that the court release him into the United States

pending final judgment of his habeas petition and also as the ultimate relief sought from his

petition. The government opposed both motions. At a status hearing on August 21, 2008, the

court granted a motion by 4 other petitioners to join the Parhat's pending motions, and on

October 1, 2008, the remaining petitioners filed a motion incorporating by reference the

arguments articulated in Parhat's motions.

## III. ANALYSIS

### A. Legality of Detention

### 1. Enemy Combatant Status

Congress passed the Authorization for Use of Military Force ("AUMF"), authorizing the

President

> to use all necessary and appropriate force against those nations, organizations, or
> persons he determines planned, authorized, committed or aided the terrorist
> attacks that occurred on September 11, 2001, or harbored such organizations or
> persons, in order to prevent any future acts of international terrorism against the
> United States by such nations, organizations, or persons.

50 U.S.C. § 1541 note Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001). Inclusive in this grant is

the authority to detain individuals "who fought against the United States in Afghanistan for the

**REDACTED VERSION**

duration of the particular conflict." *Boumediene*, 128 S. Ct. at 2240-41 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 518, 588-89 (2004)). The Deputy Secretary of Defense issued an Order on July 7, 2004 setting forth an "enemy combatant" standard to assist military tribunals in deciding whether to detain someone caught in the theater of war. *Parhat*, 532 F.3d at 837-38 (reciting the military's definition of enemy combatant as "an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners"). Thus far, this standard is the only one recognized by the Supreme Court for legally detaining individuals under the AUMF. *Hamdi*, 542 U.S. at 517.

In this case, because the government has already absolved the petitioners of this status, Govt's Opp'n at 5; Joint Status Report (Aug. 18, 2008); Govt's Notice (Sept. 30, 2008), its theory for continued detention is based on an inherent Executive authority to "wind up" detentions in an orderly fashion, Govt's Opp'n at 10. Initially, the petitioners protest that this "wind-up" authority, should it exist, would not apply to them because they were never lawfully detained. Petrs' Reply at 3. But the Supreme Court has made clear that habeas is not available "the moment a prisoner is taken into custody," *Boumediene*, 128 S. Ct. at 2275, and in any event, the record is too undeveloped as to the circumstances regarding their transfer from Pakistan to United States custody to determine whether they were, at the time of their capture, lawfully detained, *see Qassim v. Bush*, 407 F. Supp. 2d 198, 200 (D.D.C. 2005) (expressing displeasure that "[t]he government's use of the Kafkaesque term 'no longer enemy combatants' deliberately begs the question of whether these petitioners ever were enemy combatants"). Accordingly, the court assumes, for the sake of this discussion, that the petitioners were lawfully detained and that the Executive does have some inherent authority to "wind up" wartime detentions.

REDACTED VERSION

### 2. "Wind-up" Authority

The parties strongly disagree over how long the Executive may detain individuals pursuant to its "wind-up" authority. The petitioners contend that the government determined long ago that it cannot effect transfer and after 5 years of failed efforts, any "wind-up" authority has been "used up." Petrs' Reply at 3. The government, on the other hand, recites examples of past wars in which the United States has detained prisoners of war for "several years" after the end of hostilities. Govt's Opp'n at 10-12 (noting the thousands of Iraqis held after the Gulf War, the 100,000 Chinese and Korean prisoners of war detained at the end of the Korean War, and the thousands of prisoners of war held after the end of World War II). The government then concludes that because it determined "only days ago to forego its option of attempting to conduct[] a new CSRT," that continued detention is constitutional. *Id.* at 12-13.

In a case addressing this same issue, the court in *Qassim* evaluated the appropriate length of detention under the Executive's "wind-up" authority by comparing the length of detention allowed under analogous immigration statutes. *Qassim*, 407 F. Supp. 2d at 201. Observing that the presumptive limit to detain an inadmissible or removable alien is 6 months, the court held unlawful the government's 9-month detention of the petitioners after determining that they were no longer enemy combatants. *Id.* (citing *Zadvydas v. Davis*, 533 U.S. 678 (2001) and *Clark v. Martinez*, 543 U.S. 371 (2005)). The *Zadvydas* and *Clark* cases cited in *Qassim*, however, are not strictly analogous to the present inquiry. Both *Zadvydas* and *Clark* interpret an immigration statute as authorizing the government to detain aliens for 6 months – a presumptively reasonable period. *Clark*, 543 U.S. at 384-87. The Court chose not to read the statute to authorize indefinite detention because such a reading "would approach constitutional limits." *Id.* at 384. These constitutional limits, not the immigration statute, are at issue in this case.

**REDACTED VERSION**

The government argues that *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) provides a better read on the constitutional limits to detention than either *Zadvydas* or *Clark*. Govt's Opp'n at 18. The *Mezei* case "concerns an alien immigrant permanently excluded from the United States on security grounds but stranded in his temporary haven on Ellis Island because other countries will not take him back." 345 U.S. at 207. The government would not disclose to the courts the evidence by which it considered the petitioner to be a threat to the public interest. *Id.* at 209. Nevertheless, the Supreme Court, in a 5-4 decision, deemed the petitioner's detention on Ellis Island the equivalent of being stopped at the border. *Id.* at 215. It held that "times being what they are" (i.e., the Cold War), and "[w]hatever our individual estimate of [Congress's policy excluding certain aliens] and the fears on which it rests, [the petitioner's] right to enter the United States depends on congressional will, and the courts cannot substitute their judgment for the legislative mandate." *Id.* at 216.

The court disagrees with the government's assertion that the reasoning in *Mezei* governs the reasoning in this case. Govt's Opp'n at 18. The opening sentence of the *Mezei* decision indicates that the Court was not intending to tackle the constitutionality of indefinite detention. *Id.* at 207 (noting that the petitioner is stranded "in his *temporary* haven" (emphasis added)). To the extent the *Mezei* Court did make a determination as to indefinite detention, it has either been distinguished or ignored by subsequent courts. *Rosales-Garcia v. Holland*, 322 F.3d 386, 414 (6th Cir. 2003) (observing that the Court's conclusion in *Mezei* regarding indefinite detention has been undermined by post-*Mezei* cases that regard indefinite detention as raising constitutional concerns) (collecting cases). For example, the *Clark* Court did not bother distinguishing its holding from the holding in *Mezei*, and the *Zadvydas* Court explained that the cases differed in

**REDACTED VERSION**

that the alien in *Mezei* was stopped at the border, seeking re-entry, whereas the alien in *Zadvydas* was already inside the United States. *Zadvydas*, 533 U.S. at 668-69.

Moreover, some very important distinctions exist between *Mezei* and this case. First, the *Mezei* Court was unaware of what evidence, if any, existed against the petitioner. *Mezei*, 345 U.S. at 209. And because the Court accepted the government's unsupported allegations as true, the *Mezei* Court's determination regarding continued detention is categorically different from the determination facing this court. Here, pursuant to the Detainee Treatment Act[1] and *Boumediene*, the government presented evidence justifying its detention of the petitioners, but failed to meet its burden. *See generally Parhat*, 532 F.3d 834. Second, the *Mezei* petitioner, unlike the current petitioners, came voluntarily to the United States, seeking admission. *Mezei*, 345 U.S. at 208.

Drawing from the principles espoused in the *Clark* and *Zadvydas* cases and from the Executive's authority as Commander in Chief, the court concludes that the constitutional authority to "wind up" detentions during wartime ceases once (1) detention becomes effectively indefinite; (2) there is a reasonable certainty that the petitioner will not return to the battlefield to fight against the United States; and (3) an alternative legal justification has not been provided for continued detention. Once these elements are met, further detention is unconstitutional. The court addresses each element in turn.

First, in determining whether detention has become effectively indefinite, the court considers what efforts have been made to secure release for the petitioners and then uses that to evaluate the likelihood that these efforts (or any supplemental efforts) will be successful in the future. Looking back, the government cleared 10 of the petitioners for release by the end of 2003. Joint Status Report (Aug. 18, 2008), Ex. 1. The government cleared an additional 5 for release or transfer in 2005, 1 for transfer in 2006 and 1 for transfer in May of this year. *Id.*

---

[1]      This Act grants the Circuit exclusive jurisdiction to review CSRT decisions.

REDACTED VERSION

Throughout this period, the government has been engaged in "extensive diplomatic efforts" to

resettle the petitioners.[2]  Govt's Opp'n at 6.  These efforts over the years have remained largely

unchanged, and the government has not indicated that its strategy or efforts have been or will be

altered now that the petitioners are no longer treated as enemy combatants.  *See generally* Joint

Status Report (Aug. 19, 2008), Ex. 1.  Furthermore, the government cannot provide a date by

which it anticipates releasing or transferring the petitioners.  Joint Status Report (Aug. 19, 2008)

at 4 (stating "there is not [sic] date for resettlement").  Accordingly, their detention has become

effectively indefinite.

The second element has already been resolved by the Circuit's *Parhat* decision.  The

Circuit observed that "[i]t is undisputed that [the petitioner] is not a member of al Qaida or the

Taliban, and that he has never participated in any hostile action against the United States or its

allies," thus dispelling any concerns that the petitioners would return to the field of battle.  *Id.* at

835.  Finally, as to the last element, the government acknowledges that it no longer considers the

petitioners to be enemy combatants.  And it has only presented one alternative theory for

detaining the petitioners: "wind-up" authority.  Govt's Opp'n at 10.  Therefore, this element, too,

has been satisfied, and the court concludes that the government's detention of the petitioners is

unlawful.

## B. An Effective Remedy

The Supreme Court's most recent pronouncement regarding Guantanamo detainees

assured them certain procedural guarantees, but hedged when discussing remedy.  *Boumediene*,

128 S. Ct. at 2266 (qualifying that "release need not be the exclusive remedy and is not the

appropriate remedy in every case in which the writ is granted"); *see also Hamdi*, 542 U.S. at

---

[2]    As indicated in the declaration provided by the Ambassador at Large for War Crimes, the
government has unsuccessfully approached and re-approached almost 100 countries in its efforts
to locate an appropriate resettlement location.  Joint Status Report (Aug. 19, 2008), Ex. 1 ¶¶ 6-10.

REDACTED VERSION

536-37 (concluding that "absent suspension of the writ by Congress, a citizen detained as an enemy combatant is entitled to this *process*" – to "make his way to court with a challenge to the factual basis for his detention by his Government" (emphasis added)). To frame the issue, then, the court must begin with the historical underpinnings of the great writ and then turn to the scope of the political branches' authority over immigration matters.

## 1. The History of the Great Writ: Grounded in Liberty

As the Court in *Boumediene* recognized, "[t]he Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom." *Boumediene*, 128 S. Ct. at 2244 (recalling that "Magna Carta decreed that no man would be imprisoned contrary to the law of the land"). Historically, the writ has provided a critical check by ensuring that, as the drafters of Magna Carta put it, "the king is and shall be below the law." *Id.* at 2245; *Loving v. United States*, 517 U.S. 748, 756 (1996) (noting that "[e]ven before the birth of this country, separation of powers was known to be a defense against tyranny"). The *Boumediene* Court also recognized that "[l]iberty and security can be reconciled; and in our system they are reconciled with the framework of the law. The Framers decided that habeas corpus, a right of first importance, must be a part of that framework, a part of that law." *Boumediene*, 128 S. Ct. at 2277.

The writ did just that; it "became an integral part of our common-law heritage by the time the Colonies achieved independence and received explicit recognition in the Constitution, which forbids suspension of '[t]he Privilege of the Writ of Habeas Corpus . . . unless when in Cases of Rebellion or Invasion the public Safety may require it.'" *Rasul v. Bush*, 542 U.S. 466, 473-74 (2005) (quoting U.S. CONST. art. I, § 9, cl. 2) (internal citation and quotation omitted). Courts have hailed it as a "great constitutional privilege," *Ex parte Bollman*, 4 Cranch 75, 95 (1807),

and the English jurist Blackstone went even further in pronouncing it the "stable bulwark of our liberties," *Boumediene*, 128 S. Ct. at 2246. "[F]or centuries esteemed the best and only defence of personal freedom," *Ex parte Yerger*, 75 U.S. 85, 95 (1869), the writ is "designed to relieve an individual from oppressive confinement," *Carbo v. United States*, 364 U.S. 611, 618 (1961); *Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 301 (2001) (noting that "[t]he historic purpose of the writ has been to relieve detention . . . ." (quoting *Brown v. Allen*, 344 U.S. 443, 533 (1953))); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) (observing that the traditional function of the writ has been "to secure release from illegal custody"). In that role, the writ has been used to "command the discharge of seamen who had a statutory exemption from impressment into the British Navy, to emancipate slaves, and to obtain the freedom of apprentices and asylum inmates." *St. Cyr*, 533 U.S. at 302.

## 2. The Authority to Admit Aliens: Historically a Political Inquiry

The U.S. Constitution grants Congress the authority "[t]o establish an uniform Rule of Naturalization." U.S. CONST. art. I, § 8, cl. 4. The Supreme Court has "repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotations omitted) (citing *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). This power is "necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security." *Galvan v. Press*, 347 U.S. 522, 530 (1954). And when the Executive acts to exclude an alien, there is no question of improper delegation of authority because this power is "inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). "[T]he power to expel or exclude aliens [i]s a fundamental sovereign attribute exercised

11

REDACTED VERSION

by the Government's political departments largely immune from judicial control." *Fiallo*, 430

U.S. at 792 (citing *Mezei*, 345 U.S. at 210). These powers, however, are not absolute: "the

Government must respect the procedural safeguards of due process," *Galvan*, 347 U.S. at 531,

meaning "no person shall be deprived of his liberty without opportunity, at some time, to be

heard, before such officers, in respect of the matters upon which that liberty depends," *Japanese

Immigrant Case*, 189 U.S. 86, 101 (1903).

### 3. Separation of Powers Secures Personal Liberty

Under its broad constitutional authority, Congress has authorized the Secretary of

Homeland Security to parole and/or admit aliens into the United States. 8 U.S.C. §

1252(a)(2)(B)(ii). It is undisputed that he has not acted on this authority with respect to the

petitioners in this case. Govt's Opp'n at 14. Normally, the discussion would end here, and the

court would have no reason to insinuate itself into a field normally dominated by the political

branches. However, the circumstances now pending before the court are exceptional: the

government captured the petitioners and transported them to a detention facility where they will

remain indefinitely. The government has not charged these petitioners with a crime and has

presented no reliable evidence that they would pose a threat to U.S. interests.[3] Moreover, the

government has stymied its own efforts to resettle the petitioners by insisting (until recently) that

they were enemy combatants, the same designation given to terrorists willing to detonate

themselves amongst crowds of civilians.

The petitioners' request that the court order their release into the United States is not a

simple one. It strikes at the heart of our constitutional structure, raising serious separation-of-

---

[3]    The petitioners have proffered that individuals and organizations are prepared to support the
      Uighurs upon resettlement in the United States by providing housing, employment, money,
      education and other spiritual and social services. Petrs' Written Proffer (Oct. 7, 2008).

powers concerns. The petitioners argue that the Circuit's *Parhat* decision resolved any

separation of powers issues when it ordered the government to release a Uighur petitioner, well

aware of the fact that release could only mean release into the United States. Petrs' Reply at 2.

The government counters that the Circuit explicitly reserved judgment as to whether it even had

the authority to release the petitioner under the DTA and notes that it filed a motion with the

Circuit requesting clarification of its order. Govt's Opp'n at 7. The petitioners retort that the

Circuit's denial of the government's request for clarification "resolved the question of whether it

may order release pursuant to the [DTA]." Petrs' Notice of Supp. Auth. (Sept. 25, 2008) at 2.

As stated at the outset of its opinion in *Parhat*, the Circuit's focus was on assessing the

validity of the final decision of a CSRT. *Parhat*, 532 F.3d at 835. The Circuit held that the

evidence was insufficient to support the CSRT's determination and explicitly reserved judgment

as to whether the DTA grants the Circuit authority to release detainees. *Id.* at 850 (noting that

"we need not resolve today" whether the DTA grants release authority). And the Circuit noted in

a recent order, expanding the *Parhat* decision to 4 other Uighur detainees, that "no issue

regarding the places to which these petitioners may be released is before this panel." Petrs'

Notice of Supp. Auth. (Sept. 25, 2008), Ex. A at 3. But, in the *Parhat* decision the Circuit also

explicitly directs the government "to release or to transfer the petitioner, or to expeditiously hold

a new CSRT consistent with this opinion," *Parhat*, 532 F.3d at 854, and declares that "there is no

question but that the [district] court will have the power to order [Parhat] released," *id.* at 851.

The precise extent of this court's authority to implement *Parhat's* mandate remains opaque. It is

not for this court, however, to clarify the Circuit's intent or to read into the language reasoning

and explanation that are simply not there. *See United States ex rel. Dep't of Labor v. Ins. Co. of*

*N. Am.*, 131 F.3d 1037, 1041 (D.C. Cir. 1997) (explaining that with respect to the mandate rule,

REDACTED VERSION

"the mere fact that an issue could have been decided is not sufficient to foreclose the issue on

remand" (internal alterations omitted) (quoting *Maggard v. O'Connell*, 703 F.3d 1284, 1289

(D.C. Cir. 1982))). Thus, the court does not consider the Circuit's *Parhat* decision to have

conclusively resolved this court's authority to order the petitioners' release into the United

States.

The government proposes that this court follow the holding reached by a fellow district

judge in *Qassim*, 407 F. Supp. 2d 198. In assessing the weight to be accorded *Qassim*, the court

notes that the legal landscape has changed since the decision was issued in 2005.[4] In June of this

year, the Supreme Court handed down its *Boumediene* decision unequivocally extending to

Guantanamo detainees the constitutional right to habeas corpus. *Boumediene*, 128 S. Ct. at 2229.

And in the process, the Court re-emphasized the importance of the writ in preserving liberty. *Id.*

at 2277. As the Court succinctly put it, "the writ must be effective." *Id.* at 2269. Additionally,

this Circuit's decision in *Parhat* observed that "[i]t is undisputed that [a Uighur detainee] is not a

member of al Qaida or the Taliban, and that he has never participated in any hostile action

against the United States or its allies." *Parhat*, 532 F.3d at 835-36.

In addition to not having the benefit of these recent cases, the case law cited in *Qassim* is

not entirely supportive of the absolute deference that the government suggests this court should

afford the political branches. The *Qassim* court initially proffers a sound proposition: "a strong

---

[4]    The government quibbles with this characterization, asserting that rather than changing the legal
landscape, *Boumediene* affirms the holding in *Qassim* by making clear that "release need not be
the exclusive remedy and is not the appropriate one in every case in which the writ is granted."
Govt's Opp'n at 8-9 (quoting *Boumediene*, 128 S. Ct. at 2266). In support of the proposition that
release is not appropriate in every case, the Supreme Court cites a case in which a retrial is
ordered. *Boumediene*, 128 S. Ct. at 2267. The equivalent in this context would be an order to
reconvene a CSRT; this in no way authorizes indefinite detention without just cause.
Furthermore, to the extent *Boumediene* refers to prudential concerns cited in *Munaf v. Geren*, 128
S. Ct. 2207 (2008), issued the same day, those concerns are more appropriately addressed in this
case under the separation-of-powers doctrine. The court discusses this doctrine in more detail
below.

14

**REDACTED VERSION**

and consistent current runs through [immigration/alien exclusion cases] that respects and defers

to the special province of the political branches, particularly the Executive, with regard to the

admission or removal of aliens." *Qassim*, 407 F. Supp. 2d at 203. But then the court extends

this deference to circumstances including indefinite detention without just cause. Such absolute

deference cannot bear the weight of precedent and reasonable constitutional construction. As the

cases cited in *Qassim* recognize, "the power to exclude or expel aliens is vested in the political

branches . . . except so far as the judicial department is authorized by treaty or by statute, or is

required by the Constitution, to intervene." *Fok Young Yo v. United States*, 185 U.S. 296, 302

(1902); *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) (same); *see also Fiallo*, 430

U.S. at 796 (explaining that "choices to exclude or expel aliens . . . are *frequently* of a character

more appropriate to either the Legislature or the Executive than to the Judiciary" and that "the

reasons that preclude review of political questions also dictate a *narrow standard of review* of

decisions made by Congress or the President in the area of immigration and naturalization"

(emphasis added)).

These qualifications are important – indeed essential – to preserving habeas corpus, "an

indispensable mechanism for monitoring the separation of powers." *Boumediene*, 128 S. Ct. at

2259. The judicial authority to issue a writ of habeas corpus is derived from the guiding

principle that "personal liberty [] is secured by adherence to separation of powers."[5] *Id.* at 2277.

And the court's authority to safeguard an individual's liberty from unbridled executive fiat

reaches its zenith when the Executive brings an individual involuntarily within the court's

---

[5]     Although the judicial branch should give deference to the Executive's role in administering
justice and enforcing the law, this deference does not mean that the third branch is frozen in
place. When that deference awaits action contemplated by the Constitution and that action does
not materialize, fidelity to the Constitution may require judicial intervention, especially when an
individual's liberty is at stake.

jurisdiction, detains that individual and then subverts diplomatic efforts to secure alternative channels for release. *See St. Cyr*, 533 U.S. at 301 (stating that the protections afforded by habeas review are at their strongest in reviewing the legality of executive detention). Liberty finds its liberator in the great writ, and the great writ, in turn, finds protection under the Constitution. *Wingo v. Wedding*, 418 U.S. 461, 468 (1974) (recognizing that "the 'great constitutional privilege' of habeas corpus has historically provided a prompt and efficacious remedy for whatever society deems to be intolerable restraints" (internal citation omitted)).

The political branches may not simply dispense with these protections, thereby limiting the scope of habeas review by asserting that they are using their "best efforts" to resettle the petitioners in another country. *Boumediene*, 128 S. Ct. at 2259 (concluding that the scope of habeas "must not be subject to manipulation by those whose power it is designed to restrain"). These efforts have failed for the last 4 years and have no foreseeable date by which they may succeed.[6] To accede to such manipulation would grant the political branches "the power to switch the Constitution on or off at will . . . ." *Id.* This "would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.'" *Id.* Thus, the carte blanche authority the political branches purportedly wield over the Uighurs is not in keeping with our system of governance. *See Hamdi*, 542 U.S. at 536 (holding that "[w]hatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake" (citing *Mistretta v. United States*, 488 U.S. 361, 380 (1989))). Because their detention has already crossed the constitutional threshold into infinitum and because our system of checks and balances is designed to preserve the fundamental right of liberty, the court grants the petitioners'

---

[6]     *See supra* note 1.

**REDACTED VERSION**

motion for release into the United States. *See Wingo*, 418 U.S. at 468 (concluding that "if the

imprisonment cannot be shown to conform with the fundamental requirements of law, the

individual is entitled to his immediate release" (quoting *Fay v. Noia*, 372 U.S. 391, 401-02

(1963))).

## IV. CONCLUSION

For the foregoing reasons the court grants the petitioners' motion for release into the

United States and determines, therefore, that their motion for immediate release on parole

pending resolution of their habeas petitions is moot. An Order consistent with this Memorandum

Opinion is separately and contemporaneously issued this 8th day of October, 2008.

RICARDO M. URBINA
United States District Judge