IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | ) |
| IN RE: | ) Misc. No. 08-0442 (TFH) |
| | ) |
| GUANTANAMO BAY | ) |
| DETAINEE LITIGATION | ) |
| _____ | ) |
| | ) |
| MOHAMMED AL-ADAHI, *et al.*, | ) Civil Action No. 05-cv-0280 (GK) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| GEORGE W. BUSH, | ) |
| President of the United States, | ) |
| *et al.*, | ) |
| Respondents. | ) |
| _____ | ) |

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO
PETITIONERS' MOTION TO TRANSFER AND FOR AN ORDER
REGARDING RELEASE OF PETITIONERS TO YEMEN**

Respondents hereby oppose Petitioners' Motion to Transfer and for an Order Regarding

Release of Petitioners to Yemen from the United States Naval Base in Guantanamo Bay, Cuba

("Guantanamo").  As fully explained below, this Court should deny Petitioners' request for

transfer of their cases back to Judge Kessler.  The July 1, 2008 Resolution of the Executive

Session plainly applies to all Guantanamo cases coordinated and managed before this Court and

does not carve out exceptions for petitioners whom the Department of Defense ("DoD") has

approved for transfer or release from Guantanamo.  Contrary to Petitioners' arguments,

coordination before this Court is not merely for the ministerial purpose of setting deadlines, but

for the greater purpose of seeking uniform rulings on issues so that the Court can efficiently and

quickly dispose of Guantanamo cases in their entirety, rather than delaying that goal with the

prospect of contradictory rulings and piecemeal appeals.  Pursuant to its coordination and

management duties, this Court's September 19, 2008 Order merely suspended the deadline for filing factual returns and motions to amend factual returns for detainees who have been approved by the DoD for transfer or release from Guantanamo – it did not necessarily or indefinitely eliminate the obligation for filing such returns. Accordingly, Petitioners' cases are appropriate for continued coordination and management by this Court, and their request for transfer back to Judge Kessler should be denied.

Moreover, this Court should deny the request for an order directing Respondents to immediately release these designated enemy combatants to Yemen. Petitioners' request for relief is premature, as the Court has not yet adjudicated their habeas claims and determined whether they are entitled to relief, if any. Regardless, this Court lacks jurisdiction to provide such relief, as Congress itself specifically withdrew from judicial scrutiny issues concerning a Guantanamo detainee's "*transfer*, treatment, or conditions of confinement." *See* 28 U.S.C. § 2241(e) (emphasis added). Petitioners' claims here, which solely challenge the terms and conditions of their transfer from Guantanamo, seek to intrude on that statutory proscription, a proscription that the Supreme Court's *Boumediene* decision left untouched. Finally, as the Supreme Court also recently held, matters concerning how and when the Executive Branch chooses to release an enemy combatant still lie within the province of that Branch, and do not lend themselves to judicial second-guessing. *See Munaf v. Geren*, 128 S.Ct. 2207 (June 12, 2008). Petitioners' arguments invite this Court to invade that core Executive function. Accordingly, this Court should reject these arguments and deny Petitioners' request for an order regarding their immediate release to Yemen.

# BACKGROUND

A. **Coordination and Management of Guantanamo Cases**

In accordance with the July 1, 2008 Resolution of the Executive Session, all Guantanamo cases are to be transferred to this Court for coordination and management, while the transferring Judges will retain the cases for all other purposes. Resolution of the Executive Session of the United States District Court for the District of Columbia (July 1, 2008). The purpose of transferring these cases to this Court for coordination and management is to provide the most expeditious and efficient handling of these proceedings. *Id.* To that end, this Court has been tasked with identifying and delineating procedural and substantive issues that are common to all or some of the cases and, to the extent possible, ruling on these issues.[1] *Id.* This Court's duties go well beyond simply setting deadlines for filing factual returns. Likewise, this Court's rulings are not limited to cases only involving detainees who, unlike Petitioners, have not been approved for transfer or release from Guantanamo. In the process of carrying out its coordination and management duties, this Court entered an order on September 19, 2008 setting forth deadlines for Respondents to file factual returns in these proceedings. *See* September 19, 2009 Order, No. 08-mc-442-TFH Dkt#464 (emphasis added). The Order provided that "*pending further order of the Court*, the government need not file factual returns . . . *at this time* for petitioners approved for transfer or release from the United States Naval Base at Guantanamo Bay, Cuba." *Id.* (emphasis added).

Petitioners now seek to have their cases transferred back to Judge Gladys Kessler based on their incorrect interpretations of the scope of this Court's coordination and management duties, as well as the effect of the September 19, 2008 Order.

---

[1] This Court or one of the transferring Judges may rule on substantive issues common to all or some of the cases, though a transferring Judge is not bound by that substantive decision if he or she does not agree with it. Resolution of the Executive Session of the United States District Court for the District of Columbia (July 1, 2008).

**B.**     <u>Policies and Process for Transferring Detainees from Guantanamo</u>

Petitioners are currently detained as enemy combatants at Guantanamo.  Earlier this year, Petitioners were approved by the DoD for transfer or release from Guantanamo to the custody of a foreign government.  At this time, the DoD is still in the process of identifying a foreign government willing to take custody of Petitioners consistent with the settled and carefully considered U.S. policies designed to minimize the risk that a detainee transferred from Guantanamo will pose a threat of future danger to the United States and its allies.  Despite this fact, Petitioners seek to compel their immediate release to Yemen, their country of citizenship.  In doing so, they request that this Court intervene in and supersede the United States Government's policies and process for securing and facilitating detainee transfers from Guantanamo, preemptively substituting its judgment for that of the Executive Branch.

As explained more fully below, however, the Executive Branch is the appropriate locus for decisions regarding transfer of Guantanamo detainees.  A general overview of the policies and process of transferring detainees to the control of foreign governments are described in the attached declarations attested to by Ambassador Clint Williamson and Deputy Assistant Secretary of Defense for Detainee Affairs Sandra Hodgkinson.  *See* Exhibits 1 and 2 (herein after referred to as Hodgkinson Decl. and Williamson Decl., respectively).  The United States Government's paramount goal is to ensure that transferring a detainee from Guantanamo will not increase the risk of further attacks on the United States or its allies.  Williamson Decl. at ¶ 2.  When the DoD determines that detention is no longer necessary, a detainee may be transferred to the control of another government for release or otherwise.  Hodgkinson Decl. at ¶ 3.  Such governments can include the detainee's home country or another country, including a country that may have law enforcement, prosecution or other interests in the detainee.  *Id.*

Except in the case of transfers for release, the United States transfers detainees to the control of foreign governments when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the United States or its allies. *Id.* In this circumstance, a detainee is transferred only after the DoD conducts a dialogue with the foreign government to ascertain or establish what measures the foreign government will take under its own laws to effectuate those assurances. *Id.* at ¶ 5. These assurances are critical because, once transferred the detainee is no longer in the custody and control of the United States and is entirely within the custody and control of the other government, *Id.* The foreign government, thus, may release the detainee or subject the detainee to detention, investigation and/or prosecution, if appropriate, under that country's laws. *Id.* at ¶ 3. Of the detainees transferred from Guantanamo to the control of their home countries, most have subsequently been released. *Id.* at ¶ 5.

Once the transfer of a detainee is proposed, the views of interested federal agencies are considered, including the Department of State. *Id.* at ¶ 6. In transfer cases in which continued detention or other security measures by the foreign government concerned are foreseen, the Department of State is primarily concerned with obtaining and evaluating assurances of humane treatment in accordance with the international obligations of the foreign government accepting transfer. Williamson Decl. at ¶ 4. Additionally, the Department of State generally communicates on transfer-related matters between the United States and the foreign government, facilitates transfer discussions and seeks assurances from the foreign government that the United States Government finds necessary and appropriate for the country in question. *Id.* at ¶¶ 5-6.

Ultimately, the decision to transfer a detainee to a particular foreign government is made with the involvement of senior United States officials on a case-by-case basis, Hodgkinson Decl.

at ¶ 7, taking into account the detainee's particular circumstances, an analysis of the current situation on the ground in the prospective foreign country, the input of various Department of State offices with relevant knowledge, personal interactions and negotiations with senior officials of the prospective foreign government, and consideration of assurances provided by the prospective foreign government. The Secretary of Defense or his designee is responsible for approving the transfer. *Id.*

The DoD has no interest in detaining enemy combatants longer than necessary. *Id.* at ¶ 3. However, to ensure that the detainees transferred from Guantanamo do not pose a future threat to the United States and its allies and are treated humanely by the foreign country, the Executive Branch must be able to carry out its policies and process for evaluating the propriety of transfers of Guantanamo detainees, as described above, without judicial intervention.

## ARGUMENT

**I.  PETITIONERS' REQUEST FOR TRANSFER BACK TO JUDGE KESSLER SHOULD BE DENIED, BECAUSE PETITIONERS MISINTERPRET THE SCOPE OF THE COORDINATED PROCEEDING BEFORE THIS COURT AND THE EFFECT OF THIS COURT'S SEPTEMBER 19, 2008 ORDER**

Petitioners misinterpret the scope of the coordinated proceeding before this Court and the effect of the Court's September 19, 2008 Order. This Court's coordination and management duties go beyond simply setting deadlines for filing factual returns and apply to <u>all</u> Guantanamo cases being coordinated by Judge Hogan, not just those in which the petitioners are not approved by the DoD for transfer or release. In its September 19, 2008 Order, this Court merely suspended the deadline for filing factual returns for petitioners who were approved by the DoD for transfer or release from Guantanamo. It did not necessarily or indefinitely eliminate the obligation of filing factual returns for these petitioners. Thus, Petitioners' cases remain subject to the orders issued by this Court for coordination and management of all Guantanamo cases,

including common procedural and substantive issues yet to be decided.  Accordingly, Petitioners' Motion to Transfer should be denied.

Petitioners' Motion to Transfer mischaracterizes the purpose for which this Court is coordinating the Guantanamo cases.  Petitioners argue that the basis of the transfer of their cases to this Court was merely for coordination and management *of the filing of factual returns*. Pet'rs' Mot. at ¶ 4.  However, Petitioners' position significantly understates the role of this Court and the authority given it to coordinate and manage the Guantanamo Bay detainee litigation. Pursuant to the July 1, 2008 Resolution of the Executive Session, all Guantanamo cases are to be transferred to this Court for coordination and management, while the transferring Judge will retain the case for all other purposes.[2]  Resolution of the Executive Session of the United States District Court for the District of Columbia (July 1, 2008).  The Resolution tasked this Court with the duty to "identify and delineate both procedural and substantive issues that are common to all or some of these cases."  *Id.*  To the extent possible, this Court must rule on common procedural issues.  *Id.*  As to substantive issues, the Resolution provides that this Court "will confer with those Judges whose cases raise common substantive issues" and, to the extent possible, either this Court or one of the transferring Judges will address specified substantive issues that are common to the Guantanamo cases.[3]  *Id.*

The coordination and management duties set forth in the Resolution go beyond simply setting deadlines for filing factual returns.  This is clear from the language of the Resolution and

---

[2] In support of the request for transfer, Petitioners note that Judge Kessler ordered a status conference related to the other three petitioners named in this case for whom factual returns and traverses have already been filed.  As explained below, Petitioners are not similarly situated as these petitioners, since no factual returns have been filed against them at this time.  Furthermore, as Respondents set forth in their Status Report (No. 05-cv-280-UNA Dkt#180), even the three other petitions in this case are not ripe for merits proceedings, as procedural framework issues and the Government's motion for leave to file amended factual returns are still pending before this Court.
[3] However, a Judge who does not agree with any substantive decision reached in this manner may resolve the issue in his or her own cases as he or she deems appropriate.  Resolution of the Executive Session of the United States District Court for the District of Columbia (July 1, 2008).

the prior course of this Court's involvement in, and decisions pertaining to, various procedural and substantive issues affecting the Guantanamo Bay detainee litigation.[4]  This Court not only entered an order setting deadlines for filing factual returns, but also issued a protective order regarding classified or protected information and set forth procedures for counsel access to detainees at Guantanamo, among other things.  Moreover, currently before this Court are the parties' case management briefs and proposed orders addressing procedural framework issues for the adjudication of the habeas petitions and Respondents' Motion to Dismiss Improper Respondents, both of which are applicable to and will impact this case.  Thus, the individual Petitioners who filed the present motion still have a stake in the coordinated proceedings before this Court, just as all of the petitioners in the Guantanamo Bay detainee litigation as a group still have an interest in coordination, as do Respondents and the Court.[5]

Petitioners also mischaracterize this Court's September 19, 2008 Order with regard to filing factual returns for petitioners who are approved by the DoD for transfer or release from Guantanamo.  They further mischaracterize Respondents' request for clarification regarding this Court's deadline.  First, contrary to Petitioners' argument, this Court's September 19, 2008 Order did not state "that Respondents had *no obligation* to file factual returns or motions to amend factual returns for those detainees, such as Petitioners, who had been cleared for release from Guantanamo."  Pet'rs' Mot. at ¶ 3 (emphasis added).  Rather, the Order provided that "*pending further order of the Court*, the government *need* not file factual returns . . . *at this time*"

---

[4] The Court itself has interpreted the scope of authority under the transfer order broadly, retaining jurisdiction over issues related to motions to enjoin the transfer of detainees out of Guantanamo.  *See* redacted September 19, 2008 Order at http://www.dcd.uscourts.gov/public-docs/system/files/GITMO.pdf.

[5] Contrary to Petitioners' contention, the coordinated proceedings before this Court are aimed precisely at keeping the Guantanamo cases from foundering in a "procedural morass."  Pet'rs' Mot. at ¶ 4 (citing *Harris v. Nelson*, 394 U.S. 286, 291-92 (1969)).  By having one judge delineate and rule upon common procedural and substantive issues (to the extent possible), these cases can be addressed expeditiously in accordance with the instruction of the Supreme Court in *Boumediene v. Bush*, 128 S.Ct. 2229 (June 12, 2008).  Transferring Petitioners' case back to Judge Kessler before that objective is achieved frustrates its purpose.

for said petitioners. *See* September 19, 2009 Order, No. 08-mc-442-TFH Dkt#464 (emphasis added). Thus, this Court suspended, for good reason, the deadline for filing factual returns for transfer-eligible petitioners for the time being. By its terms, however, it did not relieve necessarily and indefinitely Respondents' obligation to file factual returns for transfer-eligible petitioners for the remainder of this litigation. Further, Respondents did not seek clarification from this Court as to "whether they could elect *not* to file factual returns for those detainees already cleared for release from Guantanamo."[6] Pet'rs' Mot. at ¶¶ 2, 4 (emphasis added). Respondents merely sought clarification as to the deadlines this Court set forth for filing factual returns for petitioners approved for transfer or release from Guantanamo, because they sought the Court's approval of their plan to first file, where possible, factual returns for petitioners who have not been approved by the DoD for transfer or release from Guantanamo.[7] Thus, Petitioners' cases are appropriate for continued coordination and management by the Court, as are cases involving detainees not approved for transfer or release.[8]

Accordingly, Petitioners' Motion to Transfer should be denied. This Court has merely suspended the deadline for filing factual returns for Petitioners for the time being. Further, Respondents have not retreated from the designation of Petitioners as enemy combatants or

---

[6] Petitioners argue that Respondents have decided to treat Petitioners in the same manner as the Uighers, because Respondents have allegedly decided not to file factual returns for Petitioners and that this merits transfer of these cases back to Judge Kessler. Pet'rs' Mot. at ¶ 8. Petitioners fail to acknowledge, however, the difference between the status of the Uighers and Petitioners. With respect to the Uighers, the Government determined that it would not engage in further litigation over enemy combatant status and would treat the Uigher detainees as though they were no longer enemy combatants of the United States while efforts continued to resettle them in a foreign country. *See* Respondents' Notice of Status, No. 05-cv-1509 Dkt#170. No such determination has been made about Petitioners here. While they have been approved for transfer or release from Guantanamo, they continue to be designated as enemy combatants and treated accordingly.

[7] Due to the nature and scope of the Guantanamo Bay detainee litigation, there is a need to prioritize cases to the extent of creating deadlines for filing factual returns in order to ensure the expeditious treatment of these habeas petitions. Thus, it is a more efficient and wise use of resources to first file factual returns, to the extent possible, for those petitioners who have not been approved by the DoD for transfer or release from Guantanamo.

[8] Any transfer of such petitioners from Guantanamo to the custody of a foreign government, however, would render the petitioner's habeas claim moot. *Qassim v. Bush*, 466 F.3d 1073 (D.C. Cir. 2006); *Al Joudi v. Bush*, No. 05-CV-0301, 2008 WL 821884 (D.D.C. March 26, 2008).

indicated that they will not contest their habeas cases. Thus, Petitioners' cases remain subject to the orders issued by this Court for coordination and management. This Court has not concluded its business of identifying, delineating and ruling upon common procedural and substantive issues.

## II.     PETITIONERS' REQUEST FOR AN ORDER DIRECTING THEIR IMMEDIATE RELEASE FROM GUANTANAMO TO YEMEN SHOULD BE DENIED, BECAUSE THE COURT CANNOT CONSIDER THE ISSUE OF RELIEF, IF ANY, ON PETITIONERS' HABEAS CLAIMS UNTIL THOSE CLAIMS ARE ADJUDICATED ON THE MERITS

It goes without saying that, as a fundamental matter, the Court's authority to consider the matter of relief, if any, to be awarded to a petitioner in a habeas proceeding (or in any civil action) is premised upon the Court's adjudication of the case to its conclusion. Of course, as an antecedent to a remedy imposed by the Court, the petitioner (just as a plaintiff in an ordinary civil action) must meet his or her burden of showing entitlement to that remedy. *Dan Dobbs, Law of Remedies*, § 1:1, p. 1 (2d ed. 1993) (noting that the nature and scope of the relief to be given to a plaintiff can be determined only after "that plaintiff has established a substantive right by appropriate in-court procedures.")

Insofar as Petitioners' claims are concerned, the Supreme Court held that Petitioners are entitled to have "a meaningful review of both the cause for detention and the Executive's power *to detain*." *Boumediene v. Bush*, 128 S.Ct. 2229, 2278 (June 12, 2008) (emphasis added). If Petitioners are able to present evidence demonstrating they are being "held pursuant to 'the erroneous application or interpretation' of relevant law" then the Court may address what, if any, relief should be granted to Petitioners. *Id.* at 2269. As explained above, this Court's September 19, 2008 Order merely suspended the deadline for filing factual returns for the time being. Thus, at this stage, Respondents have not filed factual returns as to Petitioners and, therefore,

Petitioners have not filed traverses. The Court has not performed a meaningful review of the evidence in this case, nor has it determined that Petitioners' detention at Guantanamo is unlawful.

Accordingly, Petitioners' Motion for an Order Regarding Release must be denied. This Court cannot enter any order with respect to relief for Petitioners at this premature stage in the litigation, as the Court has not adjudicated Petitioners' claims on the merits.

III.  **PETITIONERS' REQUEST FOR AN ORDER DIRECTING THEIR IMMEDIATE RELEASE FROM GUANTANAMO TO YEMEN SHOULD BE DENIED, BECAUSE THIS COURT LACKS JURISDICTION TO PROVIDE THE REQUESTED RELIEF**

Moreover, even if this Court could somehow prematurely consider Petitioners' request for relief at this juncture in the proceedings (and it cannot), the Court lacks the jurisdictional authority to provide that relief.

A.  **Notwithstanding *Boumediene*, § 7 of the MCA deprives this Court of jurisdiction to consider any challenge other than to the core habeas inquiry over the lawfulness of detention.**

Notwithstanding the Supreme Court's decision in *Boumediene*, Petitioners are not entitled to challenge the terms and conditions of their transfer from Guantanamo, because the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, § 7(a), 120 Stat. 2600 (codified at 28 U.S.C. § 2241(e)), legitimately withdraws court jurisdiction to provide relief concerning the specifics of a transfer of a detainee from Guantanamo. Thus, this Court should deny Petitioners' Motion for an Order Regarding Release.

Through § 7 of the MCA, Congress expressly withdrew from this Court's jurisdiction two independent and enumerated types of actions that individuals detained by the United States as enemy combatants could bring. Specifically, Congress removed from the jurisdiction of this Court claims concerning statutory habeas corpus generally:

> No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1). Congress separately withdrew federal court jurisdiction concerning any other aspects of the detention outside of the core habeas function, such that:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to *any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien* who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant . . . .

28 U.S.C. § 2241(e)(2) (emphasis added). Under its recent decision in *Boumediene*, the Supreme Court did not invalidate the MCA except to the extent that it precluded courts from exercising core habeas functions, *i.e.*, challenging the legality of the detention itself. Petitioners' claim here falls outside the *Boumediene* holding, because it does not concern that core habeas function. In other words, Petitioners do not challenge the legality of their detention, but rather raise the ancillary issue of the terms and conditions of their transfer out of United States custody (*i.e.*, immediate release to the country of their choice).[9]

**B.     *Boumediene* did not invalidate the MCA except to the extent that it precluded the Court from exercising core habeas functions.**

In *Boumediene*, the Supreme Court held that Guantanamo Bay detainees have a constitutional right to seek *habeas corpus*, and that, as applied to detainees who are being held on the basis of an enemy combatant determination by a Combatant Status Review Tribunal ("CSRT") and whose habeas challenge goes to the legality of their detention, § 7 operates as an unconstitutional suspension of the writ. This holding is, however, limited in two important respects.

---

[9] Petitioners argue erroneously that "the only issue remaining for resolution is the terms and conditions of [their] release." Pet'rs' Mot. at ¶ 8. Therefore, Petitioners' request for relief, according to their own motion, is solely limited to the ancillary issue of their transfer, not the legality of their detention.

First, *Boumediene* holds that the first part of § 7 of the MCA, 28 U.S.C. § 2241(e)(1), is unconstitutional in some circumstances, but only insofar as it denies habeas review to detainees who only have the CSRT process available to them and who raise a core habeas challenge, *i.e.*, to challenge the legality of their *detention*.  *See Boumediene*, 128 S.Ct. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power *to detain*.") (emphasis added); *id.* at 2278 (Souter, J., concurring).  Put another way, to the extent a petitioner seeks habeas relief concerning collateral or ancillary issues not directly connected to challenging the legality of detention, *Boumediene*'s holding does not invalidate the jurisdiction limiting provision of § 2241(e)(1).  The result in *Boumediene*, thus, should be read not as a facial invalidation of § 2241(e)(1), but as an invalidation of § 2241(e)(1) only as applied to the particular factual situation presented, as it was never established that "no set of circumstances exists under which [§ 7] would be valid."  *See United States v. Salerno*, 481 U.S. 739, 745 (1987).  Indeed, the right asserted by the *Boumediene* petitioner was not the right to raise a habeas challenge to an ancillary issue, such as Petitioners here seek to do, but rather the ability to challenge the legality of his detention itself.  *Boumediene*, 128 S.Ct. at 2262.

Indeed, after *Boumediene*, a reviewing court still has an obligation to preserve as much of a statute, such as § 2241(e)(1), as is legally permissible.  After all, as the Supreme Court has repeatedly emphasized, "a court should refrain from invalidating more of the statute than is necessary," and "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of [the] court to so declare, and to maintain the act in so far as it is valid."  *Wyoming v. Oklahoma*, 502 U.S. 437, 460 (1992) (quoting *Regan v. Time*, 468 U.S. 641, 652 (1984) (plurality opinion).  Thus, because Acts of Congress are valid

to the extent that they operate constitutionally, the Court's *Boumediene* holding should be applied with an eye to "limit[ing] the solution to the problem." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 328-29 (2006) ("[T]he 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'").  At bottom, the problem alleged in *Boumediene* as to § 2241(e)(1) concerned only a core habeas challenge to the legality of detention made by a petitioner with access only to the CSRT process.  *Boumediene* did not address ancillary issues that did not involve this issue of the legality of detention, such as the terms and conditions of the transfer of a petitioner out of United States custody.  Consequently, § 2241(e)(1) remains operative here and removes jurisdiction with regard to the instant request for relief.

Second, *Boumediene*'s holding does not invalidate the second part of § 7.  Indeed, the Court expressly noted that it was not deciding whether Guantanamo detainees have a constitutional right to bring non-core habeas claims, such as conditions of confinement claims – one type of claim barred by § 2241(e)(2).  *See Boumediene*, 128 S.Ct. at 2274 ("[W]e need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement.").  After *Boumediene*, then, Congress' withdrawal of federal court jurisdiction over "any other action . . . relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement," § 2241(e)(2), remains operative to deprive this Court of jurisdiction over Petitioners' claim to compel immediate transfer to a country of their choosing, a non-core habeas issue.  Recently, Judges in this Court have come to the same conclusion regarding the continuing viability of § 2241(e)(2).  *See Abdah v. Bush*, September 22, 2008 Memorandum Opinion, 04-CV-1254 Dkt#293; *Husayn v. Bush*, September 22, 2008 Memorandum Opinion,

08-cv-1360 Dkt#32; *In re: Guantanamo Bay Detainee Litigation,* 570 F. Supp. 2d. 13 (D.D.C. 2008) (05-cv-1509 Dkt#151, p. 6).

The Supreme Court's rationale for invalidating § 2241(e)(1), as applied, has no application to § 2241(e)(2). The *Boumediene* majority discusses the detainees' constitutional right to bring only core *habeas* actions – challenging the lawfulness of detention – as opposed to the broader class of "any other action . . . relating to any aspect of the detention." *See, e.g.*, *Boumediene*, 128 S.Ct. at 2262 ("Petitioners, therefore, are entitled to the privilege of habeas corpus *to challenge the legality of their detention*.") (emphasis added). Unlike § 2241(e)(1), however, § 2241(e)(2) does not impair the Guantanamo detainees' ability to pursue a writ of *habeas corpus*. Rather, it expressly limits *other* types of actions that Guantanamo detainees might bring. Indeed, the Court explicitly distinguished between habeas actions governed by § 2241(e)(1), and *other*, *non-habeas* actions governed by § 2241(e)(2), even recognizing that "[t]he structure of the two paragraphs [*i.e.* (e)(1) and (e)(2)] implies that habeas actions are a type of action 'relating to an aspect of the detention, transfer, treatment, trial, or conditions of confinement;'" that is, habeas actions are merely one type of action within the broader set of actions "relating to an aspect of . . . detention." *See id.* at 2243. Because § 2241(e)(2) addresses "other action[s]" and not any constitutional habeas right the detainees may hold, the Suspension Clause provides no basis for invalidating it.

That *Boumediene* did not reach § 2241(e)(2) is evidenced by the Court's discussion of what is constitutionally required in habeas proceedings. That discussion does not suggest that Guantanamo detainees have a right to challenge "other action[s]" related to "aspects" of their detention or transfer. Instead, the Court's discussion is phrased in terms limiting a detainee's habeas action narrowly to a challenge of his status or custody. *See, e.g., Boumediene*, 128 S.Ct.

at 2266 ("We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law."); *id.* at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain."); *id.* at 2273 (detainee must have opportunity to present "reasonably available evidence demonstrating there is no basis for his continued detention").

None of the analysis in *Boumediene* suggests that a petitioner's *constitutional* habeas rights now suddenly include a right to challenge any other aspect related to his detention beyond its legality. Thus, the Court's holding that the Suspension Clause requires invalidation of § 7 of the MCA, as applied to aliens detained abroad at Guantanamo, should be read to apply only to the first part of § 7, *i.e.*, § 2241(e)(1), and only as discussed above.[10]

A contrary conclusion would require this Court to conclude that while the Supreme Court *expressly* held that § 2241(e)(1) is unconstitutional as applied to Guantanamo detainees who have only had the benefit of CSRT procedures, it determined *sub silentio* the constitutionality of 28 U.S.C. § 2241(e)(2). But if the Court had intended to pass on § 2241(e)(2)'s constitutionality, the only rationale that might have supported that conclusion would have been if the Court had determined that conditions of confinement claims, for example, are encompassed in the detainees' constitutional right to habeas, so that elimination of jurisdiction over those claims

---

[10] Although the Court's opinion refers generally to § 7, without identifying a particular subsection of 28 U.S.C. § 2241(e), *see, e.g.*, *Boumediene*, 128 S.Ct. at 2274 ("MCA § 7 thus effects an unconstitutional suspension of the writ."); *id.* at 2274 ("The only law we identify as unconstitutional is MCA §7, 28 U.S.C.A. § 2241(e) (Supp. 2007)"), that is an insufficient basis for construing the Court's opinion to invalidate *all* of § 7. This is particularly so because the Court's rationale for invalidating § 2241(e)(1) has no application to § 2241(e)(2). In fact, at one point in its opinion, the Court seems to acknowledge that its reference generally to § 7 is simply short-hand for referring to § 2241(e)(1). *See id.* at 2265 (stating that § 7 is the source of the relevant "jurisdiction-stripping language," but citing specifically to subsection § 2241(e)(1)).

jeopardized their constitutional habeas right. But, as noted above, the Court expressly stated that it was *not* deciding that issue.[11] *See Boumediene*, 128 S.Ct. at 2274.

The continuing vitality of § 2242(e)(2) is, therefore, clear. If any doubt remains, as noted above, the Court must consider its duty to preserve as much of a statute as is constitutional. *See In re Guantanamo Bay Detainee Litigation*, 570 F. Supp. 2d at 13 ("[T]he court recognizes that it must 'refrain from invalidating more of the statute than is necessary [w]henever an act of congress contains unobjectionable provisions separable from those found to be unconstitutional.'") (citation omitted); *Tilton* v. *Richardson*, 403 U.S. 672, 684 (1971) ("'the invalid part [of an act] may be dropped if what is left is fully operative as a law.'"). Indeed, because § 2241(e)(2) is severable, there is no obstacle to continuing to apply that provision, despite the *Boumediene* Court's holding. *Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678, 685 (1987) ("[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted").[12] Thus, section 2241(e)(2) remains in force.

---

[11] Moreover, the fact that the constitutionality of § 2241(e)(2) was never challenged in *Boumediene* further supports the argument that the Court's holding does not invalidate that provision. *See Belbacha* v. *Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008) ("In [the court of appeals' decision in] *Boumediene* we held that § 7(a)(1) [28 U.S.C. § 2241(e)(1)] of the MCA does not violate the Suspension Clause of the Constitution"). It would be odd to interpret the Court's decision in *Boumediene* as not only having reached the constitutionality of § 2241(e)(2), *sua sponte* and for the first time on appeal, but also to have determined that the provision is unconstitutional without any explanation as to why.

[12] The text and history of § 7 of the MCA demonstrate that Congress surely intended § 2241(e)(2) to survive, even if the elimination of habeas jurisdiction in § 2241(e)(1) could not. In enacting the MCA, Congress sought to eliminate jurisdiction over ancillary issues, precisely to prevent the Executive Branch from having to divert significant resources during the duration of an armed conflict to respond to those claims. *See, e.g.*, 152 Cong Rec. S10403 (daily ed. Sept. 28, 2006) (Sen. Cornyn) ("[O]nce . . . section 7 is effective, Congress will finally accomplish what it sought to do through the [Detainee Treatment Act ("DTA")] last year. It will finally get the lawyers out of Guantanamo Bay. It will substitute the blizzard of litigation instigated by *Rasul v. Bush* with a narrow DC Circuit-only review of the [CSRT] hearings."); 152 *id.* at S10367 (Sen. Graham) (citing one petitioner's motion for preliminary injunction regarding conditions of confinement as an examples of a claim that should be barred); *see also* 151 *id.* at 12656–57 (daily ed. Nov. 10, 2005) (Sen. Graham) (noting that DTA was intended to limit detainees' right to "challenge their status"); 151 *id.* at S12659-60 (Sen. Kyl) (stating that DTA would grant detainees "substantial rights to contest their status but not the right to clog up Federal courts" with medical malpractice claims and complaints about food).

**C.    The right to seek a writ of *habeas corpus* recognized in *Boumediene* does not encompass a right to ancillary relief concerning transfer.**

Section 2241(e)(1) still validly removes jurisdiction of issues ancillary to and beyond the core habeas function of challenging legality of detention and § 2241(e)(2) remains fully operative.  Consequently, there is no federal court jurisdiction over "any other action" concerning "any aspect" of Petitioners' detention, transfer, treatment or confinement, except insofar as such claims may be constitutionally protected under *Boumediene*'s interpretation of the Suspension Clause.  Therefore, under § 2241(e)(1), as applied to Petitioners' claim for relief, and under § 2241(e)(2), Petitioners cannot state a cognizable habeas claim unless their constitutional right to *habeas corpus* encompasses that claim.

The elimination of jurisdiction over Petitioners' claim regarding the terms and conditions of transfer, however, could not constitute a Suspension Clause violation, because it does not go to the core of habeas – legality of detention – addressed by the Supreme Court in *Boumediene*.  A habeas action has historically been understood as a vehicle for challenging one thing – the fact of detention.  *See Boumediene*, 128 S.Ct. at 2242-47.  Petitioner's claim here goes beyond the core habeas claim[13] and requests that this Court determine an ancillary issue – the terms and conditions of Petitioners' transfer from United States custody.  Jurisdiction is, therefore, lacking to consider Petitioners' request.

---

[13] Petitioners summarily note that there is no longer a basis for the United States to detain them in light of the DoD's approval of their transfer or release from Guantanamo and Yemen's willingness to accept them.  Pet'rs' Mot. at ¶ 8.  Petitioners' argument is again in error.  Despite the approval for transfer, Petitioners are still designated as "enemy combatants."  By enacting the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), Congress authorized the detention of individuals who qualify as enemy combatants during active hostilities.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 516-17 (2004) (plurality).  The proper method of challenging the legality of detention on the basis of "enemy combatant" status is through a habeas proceeding, which Petitioners argue is no longer necessary.  Additionally, it is not unlawful to detain Petitioners at Guantanamo pending efforts to find a country to accept them.  *Id.* at 518 (detention of combatants is "by universal agreement and practice" an "important incident of war") (internal quotations omitted); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215-16 (1953) (detention of alien who had not entered United States appropriate pending identification of country to which he could be returned).

Accordingly, Petitioners' Motion for an Order Regarding Release should be denied. Pursuant to § 7 of the MCA, this Court has no jurisdiction to hear or consider Petitioners' challenges to aspects of their detention short of the lawfulness of the detention, including claims related to the terms and conditions of their transfer from Guantanamo (*i.e.*, their immediate release to the country of their choice).

## IV. PETITIONERS' REQUEST FOR AN ORDER DIRECTING THEIR IMMEDIATE RELEASE FROM GUANTANAMO TO YEMEN SHOULD BE DENIED, BECAUSE DECISIONS REGARDING THE TRANSFER OF GUANTANAMO DETAINEES ARE EXCLUSIVELY WITHIN THE PURVIEW OF THE EXECUTIVE BRANCH

Even if the Supreme Court had invalidated § 7 of the MCA in its entirety and all of its applications (which it did not), Petitioners would not be entitled to the requested relief. Petitioners' immediate release from Guantanamo to the custody of Yemen cannot be properly awarded, because such relief would violate the Constitution's separation of powers.

An order compelling Petitioners' transfer to Yemen would undermine the President's constitutional authority as Commander-in-Chief to capture individuals in armed conflict, detain them as enemy combatants, and, upon determining that they are no longer enemy combatants or that it is otherwise appropriate, to release them. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality opinion) ("The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement and practice,' are 'important incident[s] of war.'") (quoting *Ex parte Quirin*, 317 U.S. 1, 28 (1942)); Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) (recognizing that President has "authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States," and authorizing him "to use all necessary and appropriate

force against those nations, organizations, or persons he determines planned, authorized, committed, or aided" the September 11 attacks).

In addition, separation of powers considerations are implicated in the requested relief in light of the United States' policies and process for identifying foreign governments to take custody of detainees and seeking to secure and facilitate their transfer. *See* Hodgkinson Decl. and Williamson Decl.[14] In implementing these policies and processes, the United States routinely engages in sensitive negotiations with other nations when deciding whether to transfer an enemy combatant detainee. Williamson Decl. ¶¶ 9-12. In this context, the requested judicial review causes a separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. *See id.* ¶ 12; *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). The requested relief would not only hamper the Executive's ability to execute its detainee transfer policies and process, but would also undercut its ability to obtain assurances regarding both the measures to be put in place by the foreign government to ensure that the detainee does not pose a threat to our national security and to ensure the humane treatment of the detainee.

The separation of powers concerns raised by Petitioners' requested relief in this case are similar to those raised in cases where petitioners have sought temporary restraining orders or preliminary injunctions to enjoin transfer to a foreign government disfavored by the petitioners or in cases where petitioners sought thirty days notice of transfer from Guantanamo. *Munaf v. Geren*, 128 S.Ct. 2207 (June 12, 2008); *Almurbati v. Bush*, 366 F.Supp. 2d 72 (D.D.C. 2005)

---

[14] Judges of this Court were guided by similar declarations in reaching their conclusions in *Al-Anazi v. Bush*, 370 F.Supp. 2d 188 (D.D.C. 2005)(Bates, J.) and *Almurbati v. Bush*, 366 F.Supp. 2d 72 (D.D.C. 2005)(Walton, J.).

(Walton, J.); *Al-Anazi v. Bush*, 370 F.Supp. 2d 188 (D.D.C. 2005) (Bates, J.).[15]  *Munaf* (decided

the same day as *Boumediene*) involved a habeas petition in this Court brought by a United States

citizen to prevent his transfer from the custody of United States forces that were part of the

Multinational Force-Iraq ("MNF-I") to Iraqi custody.  *Munaf*, 128 S.Ct. at 2218.  After

concluding that habeas jurisdiction existed in the case, the Court nonetheless determined that it

had no authority to prevent petitioner's release from MNF-I custody.  *Id.* at 2228.  *Munaf*

approached the issue "cognizant that 'courts traditionally have been reluctant to intrude upon the

authority of the Executive in military and national security affairs.'"  *Id.* at 2218 (citing

*Department of Navy v. Egan*, 484 U.S. 518, 530 (1988)).  The Court recognized that the terms

and conditions related to the transfer of a detainee to the custody of a foreign government are

fraught with sensitive foreign policy considerations that are better addressed by diplomatic

discussions, rather than legal discussions.  *See id.* at 2225.  "The Judiciary is not suited to

second-guess" transfer determinations made by the Executive Branch.  *Id.* at 2226.  To do so

would "undermine the Government's ability to speak with one voice in this area." *Id.* (citing The

Federalist No. 42, p. 279 (J. Cooke ed. 1961) (J. Madison) ("If we are to be one nation in any

respect, it clearly ought to be in respect to other nations.")); *see Crosby*, 530 U.S. at 381.

Likewise, Judges of this Court have relied on the same separation of powers principles in

the context of denying preliminary injunctions seeking thirty days notice of a petitioner's transfer

---

[15] These cases are fully consistent with the District of Columbia Circuit's longstanding prohibition against judicial interference with the Executive's foreign policy decisions.  *See, e.g., Joo v. Japan*, 413 F.3d 45, 52-53 (D.C. Cir. 2005) (adjudication that "'would undo'" Executive's judgment in foreign policy "would be imprudent to a degree beyond our power"); *Schneider v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005) ("pass[ing] judgment on the policy-based decision of the executive" in foreign policy "is not the stuff of adjudication"); *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.") (citing *Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103 (1948)); *see also Holmes v. Laird*, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959)).

from Guantanamo.  *Almurbati*, 366 F.Supp. 2d 72; *Al-Anazi v. Bush*, 370 F.Supp. 2d 188.  In *Al-Anazi*, Judge Bates compared the Government's decision-making powers regarding transferring detainees to its decision-making powers in the realms of extradition and the judicial review of the treatment of individuals in a foreign state.  *Al-Anazi*, 370 F.Supp. 2d at 194-95.  The Court noted that "[f]oreign policy decisions by the Executive 'are political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."  *Id.* at 195 (quoting in citation *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999)).  *Almurbati* reached the same conclusion on the scope of the Court's authority to grant the petitioners' preliminary injunction.  *Almurbati*, 366 F.Supp. 2d at 81.  In *Almurbati*, Judge Walton held that granting the petitioners' preliminary injunction "would amount to an unconstitutional infringement on the Executive Branch's authority to assess the propriety of when designated enemy combatants in the United States' ongoing battle against terrorism should be released."  *Id.* at 82.[16]

In this case, granting Petitioners' requested relief would mean this Court would necessarily have to insinuate itself into the realms of military and national security affairs, as well as foreign policy – realms traditionally governed by the Executive Branch.  Petitioners request that this Court second-guess the Executive's policies and process regarding identifying foreign governments to take custody of detainees and seeking to secure and facilitate their transfer, which a unanimous Supreme Court held in *Munaf* was inappropriate.  "We have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments."  *Munaf*, 128 S.Ct. at

---

[16] Not all of the Judges of this Court have agreed with Judges Bates and Walton; however, the issue regarding the requirement of thirty days notice of transfer from Guantanamo is pending in the D.C. Circuit.

2225.  Thus, even in the face of the asserted willingness of Yemen to receive Yemeni detainees transferred from Guantanamo, the ultimate decision regarding transfer is a "concern . . . to be addressed by the political branches, not the judiciary."  *Id*.  There is simply no role for the courts to supersede the decision-making powers of the Executive to identify foreign governments and to secure and facilitate transfer of Guantanamo detainees to the custody of those foreign governments and, thus, no authority to compel Petitioners' immediate release to Yemen.

Further, the public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants during hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.  As Judge Bates held in *Al-Anazi*:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.

*Al-Anazi*, 370 F. Supp. 2d at 199.

As set forth in the declarations attached hereto, the DoD has set forth policies and a process for identifying foreign governments to take custody of detainees and seeking to secure and facilitate their transfer.  The ultimate determination of the terms and conditions of transfer is made on a case-by-case basis after the DoD receives proper assurances from the foreign government that the detainee will not pose a threat to the United States or its allies and that the detainee will be treated humanely by the foreign government.  Hodgkinson Decl. at ¶¶ 2-3, 5-7; Williamson Decl. at ¶¶ 4-6.  The assurances are obtained through diplomatic discussions with prospective foreign governments and are evaluated and assessed through an inter-agency system. *Id.*  The United States Government, through its political branches, is best suited to carry out these

responsibilities, not the judiciary.  Petitioners attach exhibits to establish Yemen's willingness to accept Petitioners into Yemen, as well as the remaining Yemeni detainees at Guantanamo. Petitioners' proffer regarding Yemen's willingness, however, is an insufficient ground for this Court to override the Government's foreign policy and intervene in this matter.  It is for the United States Government, not the Court or private parties, to determine whether Yemen has satisfactorily assured that it will both take adequate steps to prevent a transferred detainee from posing a threat to our security and treat him humanely.  For the Court to hold otherwise would set a dangerous course for the future of this litigation, effectively allowing private parties, such as Petitioners' counsel, to attempt to broker deals with foreign governments without authority and without obtaining the types of assurances discussed above.  Thus, the public interest disfavors an order compelling transfer of Guantanamo detainees to a foreign country in the absence of a determination by the United States Government in accordance with its policies and process.

Accordingly, Petitioners' Motion for an Order Regarding Release should be denied.  This Court cannot grant the requested relief without transgressing constitutional separation of powers, laying the groundwork to engage in an inquiry that the Supreme Court has clearly held belongs to the political branches and not the judiciary.  Judicial intervention will additionally harm the public interest and undermine the Government's ability to speak for the Nation with one voice.

## CONCLUSION

For the reasons set forth above, Respondents respectfully request that this Court deny Petitioners' Motion to Transfer and for an Order Regarding Release of Petitioners to Yemen and enter the attached proposed Order.

Dated: October 28, 2008                    Respectfully submitted,

                                           GREGORY G. KATSAS
                                           Assistant Attorney General

                                           JOHN C. O'QUINN
                                           Deputy Assistant Attorney General

                                           */s/ Kathryn C. Mason*
                                           JOSEPH H. HUNT (D.C. Bar No. 431134)
                                           VINCENT M. GARVEY (D.C. Bar No. 127191)
                                           TERRY M. HENRY
                                           ANDREW I. WARDEN
                                           PAUL E. AHERN
                                           KATHRYN C. MASON
                                           Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.
                                           Washington, DC 20530
                                           Tel: (202)616-8298
                                           Fax: (202)616-8470
                                           Attorneys for Respondents