IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MUIEEN ADEEN JAMAL ADEEN ABD ) | |
| AL FUSAL ABD AL SATTAR, ) | |
| Detainee, United States Naval Station at ) | Misc Case No.  08-0442 |
| Guantánamo Bay, Cuba, Petitioner, ) | |
| ) | |
| v. ) | Case No.: 08-CV-1236 |
| ) | |
| GEORGE W.  BUSH, ) | |
| President of the United States, ) | |
| ) | |
| ROBERT M.  GATES, ) | |
| Secretary of Defense, ) | |
| ) | |
| READ ADMIRAL DAVID M.  THOMAS, JR. ) | |
| Commander, Joint Task Force - GTMO ) | |
| ) | |
| ARMY COL.  BRUCE VARGO, ) | |
| Commander, Joint Detention Operations ) | |
| Group, Joint Task Force - GTMO, ) | |
| Respondents. ) | |

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

1.      Petitioner, Muieen Adeen Jamal Adeen Abd Al Fusal Abd Al Sattar, seeks the Great Writ.

He has been subjected to unlawful detention for about seven years and is entitled to an order

requiring his immediate release from imprisonment at the United States Naval Station at

Guantánamo Bay, Cuba ("Guantánamo").   He is entitled to relief under the historical common

law, under the Constitution and laws of the United States, and under the Supreme Court's

holding in *Boumediene v. Bush*, 128 S.Ct.  2229 (2008).

2.      Mr. Abd Al Sattar is from the United Arab Emirates.

3.      Mr. Abd Al Sattar is a civilian and a victim of wrongful imprisonment.   Although the

specifics of his capture are not clear, it appears he was captured on the Afghanistan/Pakistan

border sometime in 2001, shortly after the group he was with was bombed, rendering him

Dockets.Justia.com

unconscious. He has been detained at Guantánamo without charge or trial ever since. Mr. Abd Al Sattar has been wrongly classified as an "enemy combatant" by the President of the United States, and is being held virtually *incommunicado* in military custody at the Guantánamo.

4. Mr. Abd Al Sattar has been imprisoned for about seven years in a small cell, thousands of miles from his family and friends, on the basis of incredible and unreliable evidence that he has never been permitted to see, much less challenge.

5. Mr. Abd Al Sattar is not now, and has never been, a terrorist or terrorist sympathizer. Mr. Abd Al Sattar is not a combatant under United States and international law. To the best of counsel's knowledge and belief, he is not a member of any nation's military; has never fought alongside any nation's armed forces; has not borne arms against the United States or its allies anywhere in the world.

6. Mr. Abd Al Sattar has not violated international humanitarian or human rights law, and is not an "unlawful" combatant. Nor has he been found by any tribunal, competent or otherwise, to be an "unlawful enemy combatant," a category of combatant heretofore unrecognized under United States and international law. *See* Brief of *Amici Curiae* Specialists in the Law of War at 3, 13, *Al Marri v. Wright*, 487 F.3d 160 (4th Cir. 2006) (No. 06-7427) (noting that the government has used "various constructions of enemy combatant since 2001," which are of "unprecedentedly broad and vague scope," and asserting that this practice conflicts with the laws of war). Mr. Abd Al Sattar is thus not subject to trial by miliary commission.

7. Mr. Abd Al Sattar is detained without lawful basis, without charge, and without any fair process by which he might challenge his detention. He is a civilian under United States and international law. However, Respondents continue to imprison him without charge or trial in

military custody; have not allowed undersigned counsel meaningful access to him in Guantánamo; and have yet to provide any factual or legal basis for his indefinite detention.

8.     Instead, after holding Mr. Abd Al Sattar virtually *incommunicado* for more than two years after his arrival at Guantánamo, Respondents subjected him to a Combatant Status Review Tribunal ("CSRT"), which, pursuant to a July 2004 Department of Defense ("DOD") order, was supposed to determine whether he should be detained indefinitely in military custody as an "enemy combatant."[1]

9.     The order establishing the CSRTs defines "enemy combatant" as "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners," including "any person who has committed a belligerent act or has directly support hostilities in aid of enemy armed forces." *See supra* note 1. That definition is inconsistent with, and impermissibly exceeds, the definition of an "enemy combatant" under *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004) (involving alleged "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who were engaged in an armed conflict against the United States there"). It is also inconsistent with, and impermissibly exceeds, the President's authority as Commander-in-Chief, under the laws and usages of war, and under Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001) ("AUMF").

10.    The CSRT panel wrongly classified Mr. Abd Al Sattar as an "enemy combatant." This classification was not based on an individualized assessment of evidence presented against Mr.

---

[1] The July 2004 order and other CSRT regulations, as amended July 14, 2006, are available at http://www.defenselink.mil/news/Aug2006/d20060809CSRTProcedures.pdf.

Abd Al Sattar at his CSRT, and is not supported by a preponderance of the evidence against him. In particular, while the CSRT purported to conclude by a preponderance of the evidence that Mr. Abd Al Sattar was an enemy combatant, the panel reached this conclusion despite: (i) Mr. Abd Al Sattar's consistent denials that he is or ever was associated with al Qaeda or the Taliban; and (ii) the complete absence of credible evidence in the record that Mr. Abd Al Sattar is or ever was associated with al Qaeda, the Taliban, or any group engaged in hostilities against the United States.

11.    Mr. Abd Al Sattar has been denied access to counsel until recently when the Court appointed counsel for him after a "next friend" habeas petition was filed on his behalf, July 17, 2008. Mr. Abd Al Sattar has been denied access to evidence that could lead to his exoneration. He has been imprisoned for about seven years, thousands of miles from his family, on the basis of incredible and unreliable evidence that he was never permitted to see, much less challenge. During this time, it can be presumed that he has been subjected to interrogations, torture, and other cruel, inhuman and degrading treatment by United States officials.

12.    Mr. Abd Al Sattar now seeks the Great Writ of Habeas Corpus. He is entitled to habeas corpus under the historical common law, the Constitution and laws of the United States, and the United States Supreme Court's decision in *Boumediene v. Bush*, 128 S.Ct. 2229 (2008), because he is imprisoned by Respondents and other Executive officials without charge or trial in violation of United States and international law, including the Geneva Conventions.

13.    Mr. Abd Al Sattar also seeks additional relief, *see infra* Part IV, including immediate entry of the standard protective order applicable to most Guantánamo detainee habeas cases, and immediate production of a factual return to this Petition, including production to his security-

cleared counsel[2] of all reasonably available information in the possession, custody or control of the United States government that bears on the issue of whether he should have been or continues to be designated as an enemy combatant, whether or not such information heretofore has been compiled.

14.     Mr. Abd Al Sattar is detained without lawful basis, without charge, and without any fair process by which he might challenge his detention. He is being held under color and authority of the Executive, and in violation of the Constitution, laws and treaties of the United States as well as in violation of customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release him or to establish in this Court a lawful basis for his detention. This Court should also order injunctive and declaratory relief as is necessary to protect Mr. Abd Al Sattar's access to this Court, his access to and opportunity to consult with counsel, his right to be free from torture and the transfer to torture, and his physical and mental health to the extent necessary to enable him to participate in and pursue the litigation of this case.

## I. JURISDICTION

15.     Mr. Abd Al Sattar brings this action pursuant to 28 U.S.C. §§ 2241(a), (c)(1) and (c)(3) and 2242, and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; and Articles I, II and III of, and the Fifth and Sixth Amendments to, the United States Constitution, because he is detained under or by color of the authority of the

---

[2] Undersigned counsel have submitted the necessary applications requesting security clearance. Counsel request the Court's assistance in having the process expedited.

United States, or is in custody in violation of the Constitution, laws, or treaties of the United States. Because he seeks declaratory relief, Mr. Abd Al Sattar also relies on Fed.R.Civ.P. 57.

16. This Court is empowered under 28 U.S.C. § 2241 to grant the Writ of Habeas Corpus and to entertain the instant petition under 28 U.S.C. § 2242. This Court is further empowered to entertain this petition pursuant to the United States Supreme Court's rulings in *Rasul v. Bush*, 542 U.S. 466 (2004) and *Boumediene v. Bush*, 128 S.Ct. 2229 (2008).

17. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201; to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction; and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

18. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(4) because Mr. Abd Al Sattar is seeking to redress deprivation of rights guaranteed by the Constitution, laws, and treaties of the United States.

19. This Court also has jurisdiction pursuant to 5 U.S.C. § 702 because Mr. Abd Al Sattar is suffering legally cognizable harm because of agency action, or has been adversely affected or aggrieved by agency action within the meaning of the relevant statutes, and is entitled to judicial review thereof.

20. Jurisdiction and venue reside in this judicial district because the United States exercises exclusive territorial jurisdiction and control over the United States Naval Base at Guantánamo Bay, Cuba, where Mr. Abd Al Sattar is detained; and because the Executive Order of November 13, 2001, *Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism*, 66 Fed. Reg. 57, 833 (November 13, 2001) (Executive Order), was promulgated in

the United States and in this judicial district, Respondents made the decision to incarcerate and detain Mr. Abd Al Sattar in the United States and in this judicial district.

## II. PARTIES

21.     Petitioner Muieen Adeen Jamal Adeen Abd Al Fusal Abd Al Sattar, was born on June 5, 1975, in Dubai, United Arab Emirates.  He is presently incarcerated and held in Respondents' unlawful custody and control at the United States Naval Base at Guantánamo Bay, Cuba.  He has been unlawfully imprisonment since either late 2001 or early 2002.  Mr. Abd Al Sattar was wrongly determined by a Combatant Status Review Tribunal ("CSRT") to be an enemy combatant, and is imprisoned at Guantánamo under Respondent's exclusive care, custody and control.  Respondents refer to Mr. Abd Al Sattar by his Internment Seriel Number ("ISN"), which is 309.

22.     Respondent George W. Bush is the President of the United States and Commander-in-Chief of the United States military.  Mr. Abd Al Sattar is being detained pursuant to President Bush's purported authority as Commander-in-Chief, under the laws and usages of war or, alternatively, pursuant to the Executive Order of November 13, 2001, *Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism*, 66 Fed. Reg. 57,833 (November 13, 2001) (Executive Order).  President Bush is responsible for Mr. Abd Al Sattar's unlawful detention and is sued in his official capacity.

23.     Respondent Robert M. Gates is the Secretary of the United States Department of Defense.  Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war or, alternatively, pursuant to the Executive Order, Respondent Gates has been charged with maintaining the custody and control of Mr. Abd Al Sattar.  He is sued in his official capacity.

24.    Respondent Rear Admiral David M. Thomas, Jr. is the Commander of Joint Task Force -
       GTMO, the task force running the detention operation at Guantánamo. He has supervisory
       responsibility for Mr. Abd Al Sattar and is sued in his official capacity.

25.    Respondent Army Colonel Bruce Vargo is the Commander of the Joint Detention Operations
       Group and the Joint Task Force - GTMO detention camps, including the United States facility
       where Mr. Abd Al Sattar is held presently. Respondent Vargo is the immediate custodian
       responsible for Mr. Abd Al Sattar's detention and is sued in his official capacity.

26.    Respondents are responsible directly for any activities undertaken by or under the
       supervision of any officers, agents or employees acting on their behalf, or of officers, agents or
       employees of private contractors (contractor employees) with whom any agency under
       Respondents' authority or supervision has contracted for the provision of services at
       Guantánamo. All references to Respondents' actions in this Petition include activities performed
       by Respondents' predecessors in office, including Donald H. Rumsfeld, former Secretary of
       Defense, agents or employees, other government agents or contractor employees.

### III. STATEMENT OF FACTS

27.    Petitioner Muieen Adeen Jamal Adeen Abd Al Fusal Abd Al Sattar is a civilian and a victim
       of wrongful imprisonment. To the best of counsel's knowledge and belief, he is not, nor has he
       ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind under any
       definition adopted by the United States Government in any civil or military proceeding. At
       least, Respondents have failed to prove the same by adequate evidence.

28.    Mr. Abd Al Sattar seeks to enforce his right to a judicial determination by an appropriate and
       lawful authority as to whether there is a lawful and factual basis for Respondents' determination
       that he is either an "enemy combatant" as defined by the United States Supreme Court in *Hamdi*

or an "enemy combatant" as that term is defined and used by the Executive in the Combatant Status Review Tribunals ("CSRT").

29.     Mr. Abd Al Sattar is a victim of unlawful imprisonment.  He was seized, apparently, from the Afghanistan/Pakistan border.  According to the unclassified ARB report from August 9, 2005, he was captured after the group he was with was bombed, rendering him unconscious. Undersigned counsel have not had the opportunity to consult with Mr. Abd Al Sattar, but have good reason to suspect he may have been subject to torture and abuse during his incarceration. At the time of the filing of this Amended Habeas Petition, Mr. Abd Al Sattar has been detained for nearly seven years.

30.     Mr. Abd Al Sattar is not properly detained under any authority, including President Bush's Commander-in-Chief authority, the laws and usages of war, and the Authorization for the Use of Military Force ("AUMF").  Mr. Abd Al Sattar is not, nor has he ever been, an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who were engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004).  According to the CSRT and the Administrative Review Board ("ARB") reports, Mr. Abd Al Sattar was not captured on the battlefield or even by United States forces or individuals.  Mr. Abd Al Sattar was not a member of any nation's military; has never fought alongside any nation's armed forces; has not borne arms against the United States or its allies anywhere in the world; and has never engaged in any military activity.  Mr. Abd Al Sattar is not a combatant under United States and international law.  He has not violated international humanitarian or human rights law, and is not an "unlawful" combatant.  It does not appear that, prior to his detention, he committed any violent act against any American person or property.  He had no involvement, direct or indirect, in the

terrorist attacks on the United States on September 11, 2001, the ensuing armed conflict, or any act of international terrorism attributed by the United States to Al Qaeda.

## A. UNITED STATES DETENTION POLICY

### 1. The Authorization for the Use of Military Force

31.     In the wake of the September 11, 2001 attacks on the United States, the United States, at the direction of President Bush, began a massive military campaign against the Taliban Government, then in power in Afghanistan. On September 18, 2001, a Joint Resolution of Congress authorized President Bush to use force against the "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001) ("AUMF").

### 2. The Executive Order

32.     On November 13, 2001, Respondent Bush issued an Executive Order authorizing then Secretary of Defense Donald Rumsfeld, the predecessor of Respondent Gates, to detain indefinitely anyone Respondent Bush has "reason to believe":

(i) is or was a member of the organization known as al Qaeda;

(ii) has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

(iii) has knowingly harbored one or more individuals described ill subparagraphs (i) and (ii).

*See* Executive Order, 66 Fed. Reg. 57,833, §2 (November 13,2001). President Bush must make

this determination in writing. The Executive Order was neither authorized nor directed by Congress, and is beyond the scope of the AUMF.

33.     The Executive Order purports to vest President Bush with the sole discretion to identify individuals who fall within its purview. It establishes no standards governing the exercise of his discretion. Once a person has been detained, the Executive Order contains no provision for that person to be notified of the charges he may face or the basis of his detention. The Executive Order authorizes detainees to be confined indefinitely without charges or the opportunity to challenge the basis for their detention. It contains no provision for a detainee to be notified of his rights under domestic and international law, and provides neither the means to contact and secure counsel, nor rights to notice of consular protection or to consular access at the detainee's request. It provides no right to appear before a neutral tribunal to review the basis for or the legality of a detainee's continued detention and contains no provision for recourse to an Article III Court. Indeed, the United States Supreme Court in *Rasul v. Bush*, 542 U.S. 466 (2004), invalidated the Executive Order's provision barring federal review of the legality of the detainees' imprisonment. The Executive Order purports to authorize indefinite and unreviewable detention, based on nothing more than President Bush's written determination that an individual is subject to its terms.

34.     The Executive Order was promulgated in the United States and in this judicial district, the decision to incarcerate Mr. Abd Al Sattar was made by Respondents in the United States and in this judicial district, the decision to detain Mr. Abd Al Sattar at Guantánamo was made in the United States and in this judicial district, and the decision to continue detaining Mr. Abd Al Sattar was, and is, being made by Respondents in the United States and in this judicial district.

### 3. Guantánamo Bay Naval Station

35. On January 11, 2002, the United States military began transporting detainees captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantánamo Bay, Cuba. In April 2002, detainees were transferred to Camp Delta, a more permanent prison facility at Guantánamo. Currently, detainees are housed in Camp Echo, Camp Delta, and the maximum security detention centers known as Camps V and VI, where detainees are kept in solitary confinement.

36. The United States military has held detainees at Guantánamo virtually incommunicado. The United States government has deprived those imprisoned there of any lawful process. They were not allowed to appear before any lawful civilian or military tribunal. For years, they were deprived of any access to counsel, and their access to counsel has been otherwise restricted. *See, e.g.*, *Razak v. Bush*, 05-1601, dkt. 41 (Dec. 1, 2006) (rejecting government attempt to deprive detainee of counsel access through a challenge to his "next friend" authorization); David Luban, Lawfare and Legal Ethics in Guantánamo, 60 Stan. L. Rev. 1981 (2008); Martha Rayner, *Roadblocks to Effective Representation of Uncharged, Indefinitely Detained Clients at Guantánamo Bay Military Base*, 30 Fordham Int'l L.J. 485 (2007).

37. Detainees at Guantánamo have been held under conditions that violate their constitutional and international rights to dignity and freedom from torture and from cruel, inhuman and degrading treatment or punishment. *See, e.g.*, Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power*, at 83-115 Ch. 12-13, AMR 511063/2005 (13 May 2005); Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces*, Ch. 3 (2005); United Nations Press Release, *United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay*

*Detainees*, Feb. 4, 2005; International Committee of the Red Cross, Press Release, *The ICRC's Work at Guantánamo Bay*, Nov. 30, 2004; International Committee of the Red Cross, *Operational Update, US Detention Related to the Events of September 11, 2001 and Its Aftermath - the Role of the ICRC*, July 26, 2004; Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the "War on Terror"*, at 22 (Oct. 27, 2004) (available at http://web.amnesty.orgilibrary/IndexIENGAMR 511452004); *see also* Barry C. Scheck, *Abuse of Detainees at Guantánamo Bay*, The Nat'l Assoc. of Criminal Defense Lawyers Champion, Nov. 2004, at 4-5.

38.     Many of these violations - including prolonged isolation, twenty-eight hour interrogations, extreme and prolonged stress positions, sleep deprivation, sensory assaults, removal of clothing, hooding, and the use of dogs to create anxiety and terror - were actually interrogation techniques approved for use at Guantánamo by the most senior Department of Defense lawyer. *See* Action Memo from William J. Haynes II, General Counsel, Department of Defense, to Secretary of Defense (Nov. 27,2002); Pentagon Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations, at 62-65 (Apr. 4, 2003).[3]

39.     In a confidential report to the United States Government, the International Committee of the Red Cross ("ICRC") charged the United States military with intentional use during

---

[3] Additional details of the cruel and degrading conditions suffered by detainees at Guantánamo are set out at length in a statement by numerous released British detainees. *See* Shafiq Rasul, Asif Iqbal & Rhuhel Ahmed, *Composite Statement: Detention in Afghanistan and Guantánamo Bay*, 300, at http://www.ccr-ny.org/v2/reports/docs/Gitmo-compositestatement FINAL23 july04.pdf). The Department of Defense also informed the Associated Press that a number of interrogators at Guantánamo have been demoted or reprimanded after investigations into accusations of abuse at the facility. *See* Report Details Guantánamo Abuses, Assoc. Press, Nov. 4, 2004.

interrogations of psychological and physical coercion on detainees at Guantánamo that is "tantamount to torture." *See* Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times, Nov. 30, 2004, at AI. The report includes details how doctors and other medical workers at Guantánamo participated in planning for interrogations. *Id.*; *see also* M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, N. Engl. J. Med., Jan. 6, 2005, at 3-4.

40.  Memoranda by the Federal Bureau of Investigation ("FBI") have detailed torture and "highly aggressive interrogation techniques," including 24-plus hour interrogations involving temperature extremes, dogs, prolonged isolation, and loud music. *See*, *e.g.,* Carol D. Leonnig, *Guantánamo Detainee Says Beating Injured Spine; Now in Wheelchair, Egyptian-Born Teacher Objects to Plan to Send Him to Native Land*, Wash. Post, Aug. 13, 2005, at A18; Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power*, at 83-115 Ch. 12-13, AMR 51/063/2005 (13 May 2005); Amnesty International, *Guantánamo: An Icon of Lawlessness*, Jan. 6, 2005, at 3-5; *see also* Neil A. Lewis, *Fresh Details Emerge on Harsh Methods at Guantánamo*, N.Y. Times, Jan. 1, 2005, at A11; Carol D. Leonnig, *Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos*, Wash. Post, Dec. 26, 2004, at A1; Neil A. Lewis & David Johnston, *New F.B.I Memos Describe Abuses of Iraq Inmates*, N.Y. Times, Dec. 21, 2004, at A1; Dan Eggen & R. Jeffrey Smith, *FBI Agents Allege Abuse of Detainees at Guantánamo Bay*, Wash. Post, Dec. 21, 2004, at A1; Neil A. Lewis, *FBI Memos Criticized Practices at Guantánamo*, N.Y. Times, Dec. 7, 2004, at A19.

41.  Female Guantánamo interrogators have used sexual taunting, including smearing fake menstrual blood on a detainee's face, to try to break Muslim detainees. *See Gitmo Soldier Details Sexual Tactics*, Assoc. Press, Jan. 27, 2005; Eric Saar & Viveca Novak, *Inside the Wire: A Military Intelligence Soldier's Eyewitness Account of Life at Guantánamo* 228 (2005).

42.	The unlawful and unconstitutional interrogation techniques used by Respondents at Guantánamo include not only physical and psychological abuse but also other impermissible conduct contrary to due process requirements, including having agents of the Government present themselves as lawyers for the detainees during meetings with the detainees for the purpose of extracting information from the detainees. *See* Sam Hannel, *Lawyers Describe Guantánamo Detainees*, Seattle Post-Intelligencer, Jan. 19, 2005.

43.	Respondents, acting individually or through their agents, have stated that whatever limitations apply on coercive interrogation techniques used by United States military officials under the auspices of the Department of Defense do not apply to interrogations conducted by agents of the CIA or other entities under President Bush. *See* Eric Lichtblau, *Gonzales Says '02 Policy on Detainees Doesn't Bind CIA*, N.Y. Times, Jan. 19, 2005, at A17; Dan Eggen and Charles Babington, *Torture by US Personnel Illegal, Gonzales Tells Senate*, Wash. Post, Jan. 18, 2005, at A4.

44.	In published statements, President Bush and then Defense Secretary Rumsfeld, and predecessors of Respondents Thomas and Vargo, respectively, Lehnert and Carrico, have proclaimed that the United States may hold the detainees under their current conditions indefinitely. *See*, *e.g.*, Roland Watson, The Times (London), Jan. 18, 2002 ("Donald Rumsfeld, the United States Defense Secretary, suggested last night that Al-Qaeda detainees could be held indefinitely at the base. He said that the detention of some would be open-ended as the United States tried to build a case against them."); Lynne Sladky, Assoc. Press, Jan. 22, 2002 ("Marine Brig. Gen. Mike Lehnert, who is in charge of the detention mission, defended the temporary cells where detainees are being held . . . . 'We have to look at Camp X-ray as a work in progress . . .' Lehnert told CNN. Lehnert said plans are to build a more permanent prison 'exactly in

accordance with federal prison standards . . . ."); John Mintz, *Extended Detention in Cuba Mulled*, Wash. Post, Feb. 13, 2002 ("As the Bush Administration nears completion of new rules for conducting military trials of foreign detainees, United States officials say they envision the naval base at Guantánamo Bay, Cuba, as a site for the tribunals and as a terrorist penal colony for many years to come.").

45.     According to the Department of Defense, detainees who are adjudged innocent of all charges by a military commission may nevertheless be kept in detention at Guantánamo indefinitely. *See* Dep't of Defense Press Background Briefing of July 3, 2003, available at http://www. defenselink.mil/transcripts/2003/tr20030703-0323.html.

46.     Counsel for Respondents have also consistently maintained that the United States may hold the detainees under their current conditions indefinitely. *See In re Guantánamo Detainee Cases*, Nos. 02-CV-0299 (CKK) (D.D.C.), Tr. of Dec. 1, 2004 Oral Argument on Motion to Dismiss at 22-24, statements of Principle Deputy Associate Att'y Gen. Brian Boyle; *see also* Dana Priest, *Long-Term Plan Sought for Terror Suspects*, Wash. Post, Jan. 2, 2005, at A1. Moreover, the government has constructed a more permanent facility at Guantánamo. *See* Drake Bennett, The *Road from Guantánamo*, Boston Globe, June 25, 2006; *see also* Christopher Cooper, *In Guantánamo, Prisoners Languish in a Sea of Red Tape*, Wall St. J., Jan. 26, 2005, at A1; *Guantánamo Takes on the Look of Permanency*, Assoc. Press, Jan. 9,2005.

### 4. Rendition and Transfers to Torture

47.     During interrogations at Guantánamo, detainees have been threatened with rendition or transfer to countries that permit indefinite detention without charge or trial and/or routinely practice torture. The United States government has also allowed foreign interrogators from countries that routinely subject those in their custody to torture and/or cruel, inhuman or

16

degrading treatment access to detainees at Guantánamo; foreign interrogators have threatened and abused their nationals while detained in Guantánamo. *See* Oversight and Review Division, Office of the Inspector General, United States Dept. of Justice, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantánamo Bay*, Afghanistan, and Iraq, 183-84, May 2008; Justin Rood, *Gitmo Personnel Aided Brutal Regimes, Group Charges*, ABC News, June 3, 2008.

48.     The United States has secretly transferred detainees to countries which routinely engage in torture and/or cruel, inhuman or degrading treatment without complying with the applicable legal requirements for extradition. This practice, known as "extraordinary rendition," is sometimes used to facilitate interrogation by subjecting detainees to torture. *See* Jane Mayer, *Outsourcing Torture: The Secret History of American's "Extraordinary Rendition" Program*, New Yorker, Feb. 14, 2005, at 106.

49.     The United States Government's practice of extraordinary rendition has been well documented by major American and international news organizations, including, *inter alia*, the Washington Post, the Los Angeles Times, and the British Broadcasting Corporation ("BBC"). According to news accounts:

> Since September 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence source. The suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics - including torture and threats to families - that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogations, the sources said.

Rajiv Chanrasekaran & Peter Finn, *US Behind Secret Transfer of Terror Suspects*, Wash. Post, Mar. 11, 2002, at A1; *see also* Dana Priest, *Long Term Plan Sought for Terror Suspects*, Wash.

Post, Jan. 2, 2005, at Al ("The transfers, called 'renditions: depend on arrangements between the United States and other countries, such as Egypt . . ., that agree to have local security services hold certain suspects in their facilities for interrogation by CIA and foreign liaison officers.").

50.     The United States government has forcibly transferred detainees from Guantánamo to the custody of countries that regularly engage in torture and cruel, inhuman and degrading treatment of those in custody despite domestic and international legal prohibitions against these transfers. *See*, *e.g.*, Human Rights Watch, *The "Stamp of Guantánamo": The Story of Seven Men Betrayed by Russia's Diplomatic Assurances to the United States* (Mar. 2007), 16-17 (quoting one detainee recalling that his interrogators at Guantánamo warned him: "'We'll send you to Russia . . . They'll string you up there' and that kind of thing"; and another detainee recalling his interrogators stating: "'If you don't tell us the truth, we'll send you to Afghanistan, and if after Afghanistan anything is left of you, you will be sent to Russia where you will be tortured, you will have no fingers left."); Human Rights Watch, *Ill-Fated Homecomings: A Tunisian Case Study of Guantánamo Repatriations* (Sept. 2007).

**5. Efforts to Obstruct Detainees' Access to Courts to Challenge Their Detention**

51.     Detainees incarcerated at Guantánamo are entitled to test the legality of their detention in the federal courts. *See Rasul v. Bush*, 542 U.S. 466 (2004); *Boumediene v. Bush*, 128 S.Ct. 2229 (2008). Respondents have acted repeatedly to prevent detainees at Guantánamo from accessing lawyers and the courts to challenge their detention.

52.     The government has repeatedly frustrated the detainees' right to have access to lawyers. For more than two years, Respondent Bush and then Secretary Rumsfeld, the predecessor to Respondent Gates, denied the detainees from access to counsel in its entirety. Only after the

Supreme Court first held that Guantánamo detainees had the right to test the legality of their detention in federal courts through petitions for habeas corpus, in June 2004, thirty months after the first detainees were brought to Guantánamo, did lawyers begin to have access to Guantánamo detainees.

53.     Despite the necessity of efforts to secure authorization to represent Guantánamo detainees through "next friends" because of the barriers that the government has erected to securing direct authorizations from detainees, the government has consistently challenged these "next friend" authorizations as either presumptively invalid for the representation of Guantánamo detainees, or impermissible as regards particular detainees.   In the unclassified Status Report filed on August 1, 2008, in Mr. Abd Al Sattar's case, the government challenges the standing of the filing of the initial habeas petition.  (ECF # 6).   However, counsel cannot confer with Mr. Abd Al Sattar to obtain authorization for the filing of a habeas petition until a security clearance is obtained.

54.     In a blatant violation of their obligation under the protective order and the Supreme Court's mandate, military personnel at Guantánamo have attempted to intimidate detainees and persuade them not to work with lawyers at all, or with particular lawyers. Some detainees have been told that their lawyers are unable to provide any benefit to them, or even that the existence of a lawyer will delay a detainee's release from prison.  In multiple instances, military personnel have told detainees that they should not work with particular lawyers because the lawyers were Jewish or homosexual, regardless of the lawyer's religious beliefs or sexual orientation. *See generally* David Luban, Lawfare and Legal Ethics in Guantánamo, 60 Stan. L. Rev. 1981 (2008); Martha Rayner, *Roadblocks to Effective Representation of Uncharged, Indefinitely Detained Clients at Guantánamo Bay Military Base*, 30 Fordham Int'l L.J. 485 (2007).  While counsel are

not aware whether such actions have occurred in Mr. Abd Al Sattar's case, the evidence seems to indicate there is a distinct possibility they have done the same.

55.     Military personnel have placed undue burdens on detainees who express a desire to meet with a lawyer in order to discourage the detainee from accessing this right. When lawyers were first allowed on the base, detainees were forced to sit in isolation in Camp Echo for as long as eleven days prior to a legal visit if they wanted to see a lawyer, and have been held an equal time afterwards. Multiple detainees have been told that they were being taken to an interrogation when in actuality they were being taken to meet with their legal counsel. In some of these instances, a detainee's resistance to being moved for an interrogation is then conveyed to the attorney as a refusal to see his lawyer.

56.     Less than two weeks after the Supreme Court first held that Guantánamo detainees have the right to challenge the legality of their detention through petitions for the writ of habeas corpus in federal court, *Rasul v. Bush*, 542 U.S. 466 (2004), the Executive hastily created the Combatant Status Review Tribunal ("CSRT") process. The Wolfowitz Order, issued July 7, 2004, set forth provisions governing the standards and procedures to be used by the CSRTs in reviewing purported prior determinations that each detainee was an "enemy combatant." On July 29, 2004, Navy Secretary England issued the specific procedures governing the CSRTs.

57.     The CSRT rules and procedures promulgated by Respondents are inconsistent with the Constitution and laws of the United States. A CSRT is a non-adversary hearing conducted pursuant to rules and procedures that are unfair in design and biased in practice. For example, under the CSRT rules and procedures, every detainee is:

    (a) Denied access to counsel;

    (b) Denied the right to see the evidence against him;

(c) Denied the right to confront, or even know the identity of, his accusers;

(d) Denied the right to call witnesses;

(e) Denied the right to present evidence;

(f) Denied the right to know how the military collected evidence; and

(g) Denied an impartial tribunal because the CSRT must presume that evidence against a detainee (which he has not seen) is genuine and accurate.

The CSRT rules and procedures further allow for the consideration of hearsay evidence and/or evidence obtained by torture or coercion. These rules and procedures in practice and effect virtually compel the CSRT conclusion that the detainee is an "enemy combatant."

58.     The CSRTs are incapable of determining who is or is not properly detained by Respondents as an "enemy combatant." Even where a CSRT determines that a detainee is actually innocent of any offense or wrongdoing, that detainee may continue to be held virtually incommunicado, indefinitely, without charge, without access to counsel, and without any meaningful opportunity to challenge the legality of his detention. Respondents have held detainees who have been determined through the CSRT process to be "no longer enemy combatants" or "non-enemy combatants" without affording them the right to an adequate and meaningful judicial process.

59.     The Defense Department subsequently created annual Administrative Review Board ("ARB") hearings purportedly to determine whether detainees designated as enemy combatants should be released from Guantánamo on the grounds that they pose no threat to the United States, nor have any intelligence value. The ARB hearings suffer from the same procedural deficiencies as the CSRT processes. Moreover, their findings are evidently of limited significance. In 2007, about thirty percent of the approximately 115 men transferred out of

Guantánamo had been "cleared" by their ARBs; the rest had been transferred without having officially been cleared.

60.     On December 30, 2005, Respondent Bush signed into law the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45 (2005) ("DTA"). Section 1005(e)(1) of the DTA amended 28 U.S.C. § 2241 to eliminate the jurisdiction of the federal courts to hear or consider petitions for Writs of Habeas Corpus and other actions brought by or on behalf of detainees held in Guantánamo filed after the date of its enactment.

61.     Section 1005(e)(2)(A) of the DTA granted the United States Court of Appeals for the District of Columbia Circuit "exclusive jurisdiction" to determine the validity of any final decision of a Combatant Status Review Tribunal ("CSRT") that an alien is properly detained as an "enemy combatant." Section 1005(e)(2)(C) also provided that the applicable "scope of review" by the Court of Appeals is limited to determining whether a final CSRT decision "was consistent with the standards and procedures specified by the Secretary of Defense," and "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." Section 1005(e) of the DTA fails to provide the full measure of process, rights and remedies required by the Suspension Clause of the United States Constitution, Art. I, § 9, cl. 2. *See Boumediene*, 128 S.Ct. at 2274 (holding "the Government has not established that the detainees' access to the statutory review mechanisms at issue is an adequate substitute for the writ of habeas corpus" and that "MCA § 7 thus effects an unconstitutional suspension of the writ").

62.     On June 29, 2006, the Supreme Court for a second time recognized that detainees at Guantánamo had a right to petition the federal courts for Writs of Habeas Corpus, *Hamdan v.*

*Rumsfeld*, 548 U.S. 557, 576 (2006), and that the DTA failed to remove from the courts jurisdiction to consider pending habeas petitions.

63.     On October 17, 2006, less than four months after the Supreme Court's ruling in *Hamdan*, Respondent Bush signed into law the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006). Section 7 of the MCA further amended 28 U.S.C. 2241 to remove the jurisdiction of any "court, justice, or judge . . . to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." The MCA provision applied both prospectively and retrospectively. The MCA aimed to situate the narrow review mechanism established by the DTA as the exclusive mechanism for non-citizens in United States custody classified as enemy combatants.

64.     On June 12, 2008, the Supreme Court ruled for the third time that the Executive had overstepped its constitutional bounds in denying judicial review to detainees at Guantánamo. In *Boumediene*, the Court held detainees maintain a constitutional privilege of habeas corpus and suggested that proceedings in which detainees do not have access to counsel and evidence where it is not reasonably available to them may raise due process concerns. The Court held Section 7 of the MCA is unconstitutional on its face because it violates the Habeas Corpus Suspension Clause of the United States Constitution, Art. I, § 9, cl. 2, and therefore does not deprive this Court of jurisdiction to hear or consider this Petition, and grant the relief that Mr. Abd Al Sattar seeks herein. *Boumediene*, 128 S.Ct. at 2266-67 ("We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law. .

23

. . And the habeas court must have the power to order the conditional release of an individual unlawfully detained. . . .These are the easily identified attributes of any constitutionally adequate habeas corpus proceeding. But, depending on the circumstances, more may be required." (internal citations omitted)).

## B. PETITIONER MUIEEN ADEEN JAMAL ADEEN ABD AL FUSAL ABD AL SATTAR

65.     Undersigned counsel know very little about Mr. Abd Al Sattar.  The only information counsel have been able to obtain has been from the unclassified CSRT and ARB reports found at http://www.dod.mil/pubs/foi/detainees/csrt_arb/index.html.  *See* Appendix 1 (CSRT dated October 12, 2004), Appendix 2 (ARB dated August 9, 2005), Appendix 3 (ARB dated May 5, 2006).   Counsel also learned from an open source that Mr. Abd Al Sattar's birthdate is June 5, 1975 and that he was born in Dubai, United Arab Emirates.  *See* Appendix 4 (http://en. wikipedia.org/wiki/Muieen_A_Deen_Jamal_A_Deen_Abd_Al_Fusal_Abd_Al_Sattar).

### 1. Lack of Process or Evidence Justifying Petitioner's Imprisonment

66.     Mr. Abd Al Sattar has not been afforded any procedures that would satisfy his rights under the most fundamental common law notions of due process, the Constitution, laws and treaties of the United States, or customary international law.

67.     Mr. Abd Al Sattar not been charged with an offense and has not been notified of any pending or contemplated charges. He has not appeared before a lawful civilian or military tribunal, or adequately informed by Respondents of his rights under the United States Constitution, the regulations of the United States military, the Geneva Conventions, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, the 1954 Convention Relating to the Status of Refugees or customary international law.

68. As Mr. Abd Al Sattar did not participate in the armed conflict at any point in time, he is not properly detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war, or the AUMF. On information and belief, President Bush has never certified or determined in any manner, in writing or otherwise, that Mr. Abd Al Sattar is subject to the Executive Order. Mr. Abd Al Sattar is not properly subject to the Executive Order, and, in any event, the Executive Order is unjust, ultra vires, and violates the laws, treaties, and Constitution of the United States. Mr. Abd Al Sattar has been, and is being, detained unlawfully purportedly pursuant President Bush's authority as Commander-in-Chief and/or under the laws and usages of war.

69. The only "process" Mr. Abd Al Sattar has had was through the hastily created and severely inadequate CSRT and annual ARB processes.

a. Petitioner Abd Al Sattar's CSRT Proceedings

70. The unclassified excerpts of Mr. Abd Al Sattar's CSRT proceedings, while far from accurate or complete, reveal the following allegations against him:

71. According to the CSRT, Mr. Abd Al Sattar is alleged to have traveled to Pakistan and then to Kandahar and Kabul, Afghanistan sometime in 2001. It was also alleged that he was a trainer at the al Farouq training camp; that he was trying to become a Kuwadir, a more specialized trainer; that he was fighter in Tora Bora, and that he carried various forms of currency. *See* Appendix 1. In 2001, Mr. Abd Al Sattar would have been 26 years of age.

72. There were no other allegations made against Mr. Abd Al Sattar during his initial CSRT proceedings. The allegations that were made are not supported by reliable evidence, classified or unclassified, and, even if they were, are insufficient to support an enemy combatant designation by a preponderance of the evidence.

25

### b. Petitioner Abd Al Sattar's ARB Proceedings

73.  According to the first ARB, dated August 9, 2005, Mr. Abd Al Sattar was then allegedly identified as a "senior Al Qaida member" and as an "old mujahidin with at least 10 years of experience." He was claimed to be a fighter in the Tora Bora. He was reportedly educated in Saudi Arabia by Sheikh Muhammed Al Shingeti at the Islamic University in Medina. He was alleged to have participated in the Dawa in Afghanistan. He was claimed to be captured on the Afghanistan/Pakistan border. Apparently, the group he was with were bombed, rendering him unconscious. He was allegedly captured with 2,000 Afghanistan dinars, $1,000 United States dollars, and 1000 Saudi Ryals. He was allegedly identified as a trainer at the al Farouq training camp in Afghanistan, where he was trying to become a Kuwadir, a more specialized trainer. *See* Appendix 2.

74.  Also in the August 9, 2005 ARB, Mr. Abd Al Sattar was also identified as "Omar Al Farouq." *See* Appendix 2. However, undersigned counsel learned "Omar Al Farouq," who was detained by Indonesian authorities on June 5, 2002 on immigration violations, escaped from a United States detention facility in Bagram, Afghanistan, on July 11, 2005, and was killed by hostile fire from British forces on September 25, 2006. *See* Appendix 5, (http://www.global security.org/ security/profiles/omar_al-farouq.htm).

75.  In the second ARB, dated May 5, 2006, without any specifics as to times or dates, Mr. Abd Al Sattar was alleged to have been in Towr Khom, Afghanistan for a month and then moved to Tora Bora where he was alleged to be a fighter who encouraged people to fight and be religious. It was also alleged Usama bin Laden visited Towr Khom for one or two days. It was further alleged Mr. Abd Al Sattar had been in the Abdul Qadas al Bahraini Camp in Tora Bora. *See* Appendix 3.

## IV. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## (28 U.S.C. § 2241, 28 U.S.C. § 2242, COMMON LAW - HABEAS CORPUS)

76.     Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

77.     Section 7 of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006), is unconstitutional under the Suspension Clause of the Constitution, pursuant to *Boumediene v. Bush*, 128 S.Ct. 2229 (2008), and Mr. Abd Al Sattar has a right to relief under 28 U.S.C. 28 U.S.C. § 2241, 28 U.S.C. § 2241 and the common law over his habeas claims. *See* U.S. Const. art. 1, § 9, cl. 2.

78.     Accordingly, Mr. Abd Al Sattar is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

## SECOND CLAIM FOR RELIEF

## (COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION - UNLAWFUL DEPRIVATION OF LIBERTY)

79.     Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

80.     By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well as the Due Process Clause of the Fifth Amendment to the Constitution of the United States. President Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals including Mr. Abd Al Sattar, without due process of law, and the remaining Respondents have implemented those orders.

81.     Respondents' actions deny Mr. Abd Al Sattar the process accorded to persons seized and detained by the United states military in times of armed conflict as established by, *inter alia*, the Uniform Code of Military Justice, Army Regulation 190-8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

82.     To the extent that Mr. Abd Al Sattar's detention purports to be authorized by the Executive Order, that Order violates the Fifth Amendment on its face and as applied to Mr. Abd Al Sattar.

83.     Accordingly, Mr. Abd Al Sattar is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

## THIRD CLAIM FOR RELIEF

### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION - UNLAWFUL CONDITIONS OF CONFINEMENT)

84.     Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

85.     By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Mr. Abd Al Sattar to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

86.     Accordingly, Mr. Abd Al Sattar is entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

## FOURTH CLAIM FOR RELIEF

## (GENEVA CONVENTIONS - ARBITRARY DENIAL OF DUE PROCESS)

87.    Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

88.    By the actions described above, Respondents, acting under color of law, have denied and continue to deny Mr. Abd Al Sattar the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

89.    Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law, and constitute an enforceable claim under 28 U.S.C. § 2241(c)(3).

90.    Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

91.    Accordingly, Mr. Abd Al Sattar is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

## FIFTH CLAIM FOR RELIEF

## (INTERNATIONAL HUMANITARIAN AND HUMAN
RIGHTS LAW - ARBITRARY DENIAL OF DUE PROCESS)

92.    Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

93.    By the actions described above, Respondents have denied and continue to deny Mr. Abd Al Sattar the process due to persons seized and detained by the United States military in times of armed conflict as establish by customary international humanitarian and human rights law as

reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

94.     Because Respondents are detaining Mr. Abd Al Sattar "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," Mr. Abd Al Sattar's claim arises under 28 U.S.C.§ 2241, and he is entitled to habeas relief.

95.     Mr. Abd Al Sattar is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

<u>**SIXTH CLAIM FOR RELIEF**</u>

**(ALIEN TORT STATUTE - TORTURE)**

96.     Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

97.     By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about acts that deliberately and intentionally inflicted severe physical and psychological abuse and agony upon Mr. Abd Al Sattar in order to obtain coerced information or confessions from him, punish or intimidate Mr. Abd Al Sattar or for other purposes. Among other abuses, Mr. Abd Al Sattar has been held in and surrounded by conditions of isolation; constant vulnerability to repeated interrogation and severe beatings; the threat or reality of being kept in cages with no privacy; shackled with heavy chains and irons; placed in solitary confinement or the threat of solitary confinement for minor rule infractions for prolonged periods of time; interrogated while shackled and chained in painful positions; exposed to extremes of temperature; subjected to violent behavior or the threat of violence; threatened with rendition to countries that practice torture; sexually humiliated; denied

access to counsel and family; deprived of adequate medical care; and/or subjected to repeated psychological abuse.

98.    The acts described herein constitute torture in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violate customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

99.    Respondents are liable for said conduct because they directed, ordered, confirmed, ratified, and/or conspired together and with others to commit the acts of torture against Mr. Abd Al Sattar.

100.    Mr. Abd Al Sattar was forced to suffer severe physical and psychological abuse and agony and is entitled to habeas, declaratory, and injunctive relief and other relief to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**

**(ALIEN TORT STATUTE - WAR CRIMES)**

101.    Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

102.    By the actions described above, Respondents' acts directing, ordering, confirming, ratifying, and/or conspiring to bring about the torture and other inhumane treatment of Mr. Abd Al Sattar constitute war crimes and/or crimes against humanity in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated, among others, the Fourth Geneva Convention, Common Article III of the Geneva Conventions and Additional Protocols I and II of the Geneva Conventions as well as customary international law prohibiting war

crimes as reflected, expressed, and defined in other multilateral treaties and international instruments, international and domestic judicial decision, and other authorities.

103. As a result of Respondents' unlawful conduct, Mr. Abd Al Sattar has been and is forced to suffer severe physical and psychological abuse and agony, and is therefore entitled to declaratory, and injunctive relief, and such other relief as the court may deem appropriate.

## EIGHTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE -
### CRUEL, INHUMAN OR DEGRADING TREATMENT)

104. Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

105. The acts described herein had the intent and the effect of grossly humiliating and debasing Mr. Abd Al Sattar, forcing him to act against his will and conscience, inciting fear and anguish, and breaking his physical or moral resistance.

106. The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

107. Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to cause the cruel, inhuman or degrading treatment of Mr. Abd Al Sattar.

108. Mr. Abd Al Sattar was forced to suffer severe physical and psychological abuse and agony and is entitled to declaratory and injunctive relief as well as other relief to be determined at trial.

## NINTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE - ARBITRARY ARREST
### AND PROLONGED ARBITRARY DETENTION)

109.     Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

110.     The acts described herein constitute arbitrary arrest and detention of Mr. Abd Al Sattar in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

111.     Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the arbitrary arrest and prolonged arbitrary detention of Mr. Abd Al Sattar in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary arrest and prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

112.     As a result of Respondents' unlawful conduct, Mr. Abd Al Sattar has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse, and is therefore entitled to habeas, declaratory, and injunctive relief, and such other relief as the court may deem appropriate.

## TENTH CLAIM FOR RELIEF

## (ALIEN TORT STATUTE - ENFORCED DISAPPEARANCE)

113.    Mr. Abd Al Sattar  incorporates by reference all preceding paragraphs as if set forth fully

herein.

114.    By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/

or conspired to bring about the enforced disappearance of Mr. Abd Al Sattar in violation of the

law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary

international law prohibiting enforced disappearances as reflected, expressed, and defined in

multilateral treaties and other international instruments, international and domestic judicial

decisions, and other authorities.

115.    As a result of Respondents' unlawful conduct, Mr. Abd Al Sattar has been and is deprived

of his freedom, separated from his family, and forced to suffer severe physical and mental abuse,

and is therefore entitled to habeas, declaratory and injunctive relief and such other relief as the

court may deem appropriate.

## ELEVENTH CLAIM FOR RELIEF

## (ARTICLE II OF THE UNITED STATES
CONSTITUTION - UNLAWFUL DETENTION)

116.    Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully

herein.

117.    Mr. Abd Al Sattar is not, nor has he ever been, an enemy alien, lawful or unlawful

belligerent, or combatant of any kind. The Executive lacks the authority to order or direct

military officials to detain civilians who are seized far from the theater of war or occupied

territory or who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.l (2004).

118.    By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that military officials seize Mr. Abd Al Sattar and transfer him to military detention, and by authorizing and ordering his continued military detention at Guantánamo. All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Mr. Abd Al Sattar.

119.    The military seizure and detention of Mr. Abd Al Sattar by the Respondents is ultra vires and illegal because it is in violation of Article II of the United States Constitution. To the extent that the Executive asserts that Mr. Abd Al Sattar's detention is authorized by the Executive Order, that Order exceeds the Executive's authority under Article II and is ultra vires and void on its face and as applied to Mr. Abd Al Sattar.

120.    To the extent that Respondents assert that their authority to detain Mr. Abd Al Sattar derives from a source other than the Executive Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the United States Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

121.    Accordingly, Mr. Abd Al Sattar is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## TWELFTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA - ARBITRARY
### AND CAPRICIOUS UNLAWFUL DETENTION)

122.    Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

123.    Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States. *See e.g.*, Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

124.    By arbitrarily and capriciously detaining Mr. Abd Al Sattar in military custody for over four years in the manner described above, Respondents have acted and continue to act ultra vires and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

125.    Accordingly, Mr. Abd Al Sattar is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## THIRTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA - ARBITRARY
### AND CAPRICIOUS DENIAL OF DUE PROCESS)

126.    Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

127.    By the actions described above, Respondents, acting under color of law, have arbitrarily and capriciously denied and continue to deny Mr. Abd Al Sattar the process accorded to persons

seized and detained by the United States military in times of armed conflict as established by Army Regulation 190-8 in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

128.    Accordingly, Mr. Abd Al Sattar is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## FOURTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA - TORTURE AND CRUEL, INHUMAN OR DEGRADING TREATMENT)

129.    Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

130.    By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject Mr. Abd Al Sattar to torture and/or cruel, inhuman or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedures Act, 5 U.S.C. § 706(2).

131.    Accordingly, Mr. Abd Al Sattar is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## FIFTEENTH CLAIM FOR RELIEF

### (FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION VIOLATION OF THE RIGHT TO COUNSEL AND TO ACCESS TO THE COURTS)

132.    Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

133.    Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Mr. Abd Al Sattar's right to consult with counsel by conditioning counsel's access to Mr. Abd Al Sattar on unreasonable terms, including classification/

declassification procedures, all in violation of Mr. Abd Al Sattar's attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. United States Constitution.

134.     Accordingly, Mr. Abd Al Sattar is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## SIXTEENTH CLAIM FOR RELIEF

### (28 U.S.C. § 1651, CONVENTION AGAINST TORTURE, INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS, THIRD AND FOURTH GENEVA CONVENTIONS, DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT RENDITION)

135.     Mr. Abd Al Sattar incorporates by reference all preceding paragraphs as if set forth fully herein.

136.     Mr. Abd Al Sattar is at risk of being rendered, expelled or returned without lawful procedures to a country where he would be at risk of torture or persecution. This Court has inherent power and jurisdiction under 28 U.S.C. § 1651, in aid of its own jurisdiction, to address the potential rendition or transfer of Mr. Abd Al Sattar. Additionally, the transfer of the Mr. Abd Al Sattar to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Mr. Abd Al Sattar's rights under the Convention Against Torture, International Covenant on Civil and Political Rights, Third and Fourth Geneva Conventions, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

137.     Accordingly, Mr. Abd Al Sattar is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## VI. PRAYER FOR RELIEF

WHEREFORE, Mr. Abd Al Sattar prays for relief as follows:

1. Grant the Writ of Habeas Corpus and order Respondents to release Mr. Abd Al Sattar from his current unlawful detention;

2. Order that Mr. Abd Al Sattar be brought before the Court or before a Magistrate Judge assigned by the Court at a convenient facility to conduct proceedings under the supervision of the Court to vindicate his rights;

3. Order that Mr. Abd Al Sattar cannot be transferred to any other country without the specific, written agreement of Mr. Abd Al Sattar and/or Mr. Abd Al Sattar's counsel while this action is pending;

4. Order that Mr. Abd Al Sattar cannot be delivered, returned, or rendered to a country where there is a foreseeable and imminent risk that Mr. Abd Al Sattar will be subject to torture;

5. Order Respondents to allow counsel immediately to meet and confer with Mr. Abd Al Sattar, in private and unmonitored attorney-client conversations;

6. Order Respondents to cease all interrogations of Mr. Abd Al Sattar, direct or indirect, while this litigation is pending;

7. Order Respondents to cease all acts of torture; cruel, inhuman and degrading treatment; and outrages upon the personal dignity of Mr. Abd Al Sattar;

8. Order and declare the Executive Order of November 13, 2001 is ultra vires and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the United States Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. § 702, federal common law, the treaties of the United States and customary international law;

39

9. Order and declare that the prolonged, indefinite, and restrictive detention of Mr. Abd Al Sattar without due process is arbitrary and unlawful and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, the regulations of the United States military, the treaties of the United States, and customary international human rights and humanitarian law; and

10. Grant such other relief as the Court may deem necessary and appropriate to protect Mr. Abd Al Sattar's rights under the common law, the United States Constitution, federal statutory law and international law.

November 7, 2008                                     Respectfully submitted,

                                     /s/ Vicki Werneke
                                     VICKI WERNEKE (LCvR 83.2(e))
                                     Assistant Federal Public Defender
                                     Office of the Federal Public Defender,
                                           Northern District of Ohio
                                     1660 West Second Street, Suite 750
                                     Cleveland, Ohio 44113
                                     Phone: (216) 522-4856; Fax: (216) 522-4321
                                     Email: vicki_werneke@fd.org

                                     /s/ Amy B. Cleary
                                     AMY B. CLEARY (LCvR 83.2(e))
                                     Attorney at Law
                                     Office of the Federal Public Defender,
                                           Northern District of Ohio
                                     1660 West Second Street, Suite 750
                                     Cleveland, Ohio 44113
                                     Phone: (216) 522-4856; Fax: (216) 522-4321
                                     Email: amy_cleary@fd.org

                                     Counsel for Petitioner Muieen Adeen Jamal
                                           Adeen Abd Al F. Abd Al Sattar