IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GUANTANAMO BAY | ) | Misc. No. 08-442 (TFH) |
| DETAINEE LITIGATION | ) | |
| _____ | ) | |
| HANI SALEH RASHID ABDULLAH, | ) | |
| *et al.,* | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| *v.* | ) | Civil No. 05-0023 (RWR) |
| | ) | |
| GEORGE W. BUSH, *et al.,* | ) | |
| | ) | |
| *Respondents*. | ) | |
| _____ | ) | |

**OPPOSITION TO MOTION FOR RECONSIDERATION**

Petitioner Hani Abdullah was arrested by Pakistani authorities and

turned over to United States officials in September 2002 and was tortured while in

the custody of the Central Intelligence Agency ("CIA"). He made inculpatory

statements under coercion. After several weeks, the CIA turned Abdullah over to

his current jailers. He was interrogated further by employees (or contractors) of

the Defense Department ("DOD"), and was told that if he did not cooperate, he

would be sent back to the CIA's "prison of darkness." None of the statements

Abdullah made either to the CIA while being coerced, or to DOD under threat of

coercion, is admissible in a court of law. The government, for its part, by applying

an indefensible construction of its obligations under this court's Case Management

Order and the law, seeks to withhold from Abdullah the evidence in its possession

which would prove the inadmissibility of Abdullah's statements.

That coerced confessions cannot be admitted is not open to question.

*Rochin v. California*, 342 U.S. 165, 172-73 (1952) ("It has long since ceased to be

true that due process of law is heedless of the means by which otherwise relevant

and credible evidence is obtained. This was not true even before the series of

recent cases enforced the constitutional principle that the States may not base

convictions upon confessions, however much verified, obtained by coercion. These

decisions are not arbitrary exceptions to the comprehensive right of States to

fashion their own rules of evidence for criminal trials. They are not sports in our

constitutional law but applications of a general principle."). "Conduct that shocks

the conscience," or is "so brutal and offensive" that it does "not comport with

traditional ideas of fair play and decency," *Breithaupt v. Abrams*, 352 U.S. 432,

435 (1975), renders resultant statements inadmissible. As Justice Black succinctly

explained in *Chambers v. Florida*,

> Tyrannical governments had immemorially utilized
> dictatorial criminal procedure and punishment to make
> scape goats of the weak, or of helpless political,
> religious, or racial minorities and those who differed,
> who would not conform and who resisted tyranny. The
> instruments of such governments were in the main, two.
> Conduct, innocent when engaged in, was subsequently
> made by fiat criminally punishable without legislation.

And a liberty loving people won the principle that
criminal punishments could not be inflicted save for that
which proper legislative action had already by 'the law of
the land' forbidden when done. But even more was
needed. From the popular hatred and abhorrence of
illegal confinement, torture and extortion of confessions
of violations of the 'law of the land' evolved the
fundamental idea that no man's life, liberty or property be
forfeited as criminal punishment for violation of that law
until there had been a charge fairly made and fairly tried
in a public tribunal free of prejudice, passion, excitement
and tyrannical power. Thus, as assurance against ancient
evils, our country, in order to preserve 'the blessings of
liberty', wrote into its basic law the requirement, among
others, that the forfeiture of the lives, liberties or property
of people accused of crime can only follow if procedural
safeguards of due process have been obeyed..

309 U.S. 227, 236-37 (1940). Chief Justice Hughes defined minimal due process

in *Brown v. Mississippi*: "But the freedom of the State in establishing its policy is

the freedom of constitutional government and is limited by the requirement of due

process of law. Because a State may dispense with a jury trial, it does not follow

that it may substitute trial by ordeal. The rack and torture chamber may not be

substituted for the witness stand. . . . And the trial equally is a mere pretense where

the state authorities have contrived a conviction resting solely upon confessions

obtained by violence." 297 U.S. 278, 285-86 (1936).[1] Although these cases were

decided on Fourteenth Amendment grounds, the values underlying them are older

---

[1] This is neither the time nor place to describe in detail the government's treatment of Abdullah. Suffice it to say that the resemblance to the conduct in *Chambers* or *Brown* is closer than one would hope, in our more civilized time.

and broader than that.  The Law Lords discussed several centuries of Anglo-

American jurisprudence on this point in *A(FC) v. Secretary of State for the Home

Department*, [2005] U.K.H.L. 71, at length.[2]  Nor is the prohibition on evidence

---

[2] For example, in paragraph 11 of his opinion, Lord Bingham of Cornhill noted:

> It is, I think, clear that from its very earliest days the common law of England set its face firmly against the use of torture. Its rejection of this practice was indeed hailed as a distinguishing feature of the common law, the subject of proud claims by English jurists such as Sir John Fortescue (*De Laudibus Legum Angliae,* c. 1460-1470, ed S.B. Chrimes, (1942), Chap 22, pp 47-53), Sir Thomas Smith (*De Republica Anglorum,* ed L Alston, 1906, book 2, chap 24, pp 104-107), Sir Edward Coke (*Institutes of the Laws of England* (1644), Part III, Chap 2, pp 34-36). Sir William Blackstone *(Commentaries on the Laws of England,* (1769) vol IV, chap 25, pp 320-321), and Sir James Stephen (*A History of the Criminal Law of England,* 1883, vol 1, p 222). That reliance was placed on sources of doubtful validity, such as chapter 39 of Magna Carta 1215 and *Felton's Case* as reported by Rushworth (*Rushworth's Collections,* vol (i), p 638) (see D. Jardine, *A Reading on the Use of Torture in the Criminal Law of England Previously to the Commonwealth,* 1837, pp 10-12, 60-62) did not weaken the strength of received opinion. The English rejection of torture was also the subject of admiring comment by foreign authorities such as Beccaria (*An Essay on Crimes and Punishments,* 1764, Chap XVI) and Voltaire (*Commentary on Beccaria's Crimes and Punishments,* 1766, Chap XII). This rejection was contrasted with the practice prevalent in the states of continental Europe who, seeking to discharge the strict standards of proof required by the Roman-canon models they had adopted, came routinely to rely on confessions procured by the infliction of torture: see A L Lowell, *"The Judicial Use of Torture"* (1897) 11 Harvard L Rev 220-233, 290-300; J Langbein, *Torture and the Law of Proof: Europe and England in the Ancien Regime* (1977); D. Hope, "Torture" [2004] 53 ICLQ 807 at pp 810-811. In rejecting the use of torture, whether applied to potential defendants or potential witnesses, the common law was moved by the cruelty of the practice as applied to those not convicted of crime, by the inherent unreliability of confessions or evidence so procured and by the belief that it degraded all those who lent themselves to the practice.

In the same case, Lord Hoffman recounted the specific instance in which England's judiciary stood up to the Crown on the issue of torture:

> 81. On 23 August 1628 George Villiers, Duke of Buckingham and Lord High Admiral of England, was stabbed to death by John Felton, a naval officer, in a house in Portsmouth. The 35-year-old Duke had been the favourite of King James I and was the intimate friend of the new King Charles I, who asked the judges whether Felton could be put to the rack to discover his accomplices. All the judges met in Serjeants' Inn. Many years later Blackstone recorded their historic decision:

(continued...)

-4-

obtained through torture limited to the Anglo-American tradition, or to the common law.  The Convention Against Torture provides that "any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings. . . ."  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, art. 15 (entered into force June 26, 1987).   These principles bind this Court: whatever constitutional status the government might claim applies to Abdullah, no law forces this Court to accept the taint of coerced testimony.

_____

(continued...)

> "The judges, being consulted, declared unanimously, to their own honour and the honour of the English law, that no such proceeding was allowable by the laws of England".

> 82.  That word honour, the deep note which Blackstone strikes twice in one sentence, is what underlies the legal technicalities of this appeal. The use of torture is dishonourable. It corrupts and degrades the state which uses it and the legal system which accepts it. When judicial torture was routine all over Europe, its rejection by the common law was a source of national pride and the admiration of enlightened foreign writers such as Voltaire and Beccaria. In our own century, many people in the United States, heirs to that common law tradition, have felt their country dishonoured by its use of torture outside the jurisdiction and its practice of extra-legal "rendition" of suspects to countries where they would be tortured: see Jeremy Waldron, *Torture and Positive Law: Jurisprudence for the White House* 105 Columbia Law Review 1681-1750 (October, 2005)

> 83.  Just as the writ of habeas corpus is not only a special (and nowadays infrequent) remedy for challenging unlawful detention but also carries a symbolic significance as a touchstone of English liberty which influences the rest of our law, so the rejection of torture by the common law has a special iconic importance as the touchstone of a humane and civilised legal system. Not only that: the abolition of torture, which was used by the state in Elizabethan and Jacobean times to obtain evidence admitted in trials before the court of Star Chamber, was achieved as part of the great constitutional struggle and civil war which made the government subject to the law. Its rejection has a constitutional resonance for the English people which cannot be overestimated.

Certainly nothing in *Hamdi v. Rumsfeld* indicates that the centuries old prohibition on testimony obtained through torture -- or threat of torture -- may be set aside by the Court in this action. Further, the government has cited, and can cite, no authority for the proposition that it may conceal from the Court evidence that testimony it wishes to offer is inadmissible.[3] That evidence relating to coercion is discoverable is also not debatable -- there is thus no basis to certify the case management order for interlocutory appeal in Abdullah's case.

The government argues that it is too burdensome for it to reveal the extent to which it coerced testimony from Abdullah. There is, in Abdullah's view, a readily available solution. The government can withdraw all reliance on statements obtained from Abdullah after September 10, 2002. It must also withdraw reliance on statements by other prisoners sent to the prison of darkness -- *e.g.*, the men arrested at the same time as Abdullah. What the government cannot do, though, is present coerced testimony, in support of what is in effect a life sentence, while denying Abdullah an important means to prove that the testimony was coerced. Whatever burden the government might face here is more than offset by the detriment it seeks to impose on Abdullah.

---

[3] The government assertion that it is not required to produce exculpatory evidence is outrageous. In *Boumediene v. Bush*, the Court explicitly noted that to meet constitutional standards, a habeas court "must have some authority to assess the sufficiency of the Government's evidence against the detainee. It also must have the *authority to admit and consider relevant exculpatory evidence* that was not introduced during the earlier proceeding. 128 S. Ct. 2229, 2270 (2008). The government has exclusive possession of records which would show that Abdullah's testimony was coerced. Allowing it to withhold this evidence amounts to a suspension.

The government also argues that the information sought is secret. Abdullah was present when the government coerced him -- the conduct of the government here is not a secret. Given what is already in the public domain -- including what the government has already declassified of Abdullah's account -- there is no danger of harm to the national security from admitting the truth of how this man was treated. If, however, the government would seek to avoid having to release documents which corroborate Abdullah's account, it can simply withdraw all reliance on the statements he made in custody.

With respect to the schedule, Abdullah is willing -- and indicated as much in response to the government's truncated (and hopelessly inadequate, *see* Exhibit A) meet and confer on this motion -- to work with the government to fashion a reasonable schedule for the prompt resolution of his case, perhaps for joint presentation at the status conference set by the Judge Roberts for December 3, 2008. Obviously, if the government is willing to withdraw all statements made by Abdullah, thus obviating the need for discovery relating to their admissibility, this process can be completed more quickly than if discovery of such evidence is still relevant. In addition, some parts of the government's motion have been overtaken by events: Judge Roberts has ordered the government to comply with the dates in the original case management order, notwithstanding the pendency of the motion for reconsideration. Because of the timetable set in the case management order, by

the time the Court rules on the government's motion, the government will have

either (a) mooted its contentions concerning discovery and exculpatory evidence

by producing the documents requested by Abdullah or (b) abandoned any reliance

on statements made by Abdullah in custody through failure to comply with the

case management order.

To be more precise, one or the other of these would take place if the

government made a good faith effort to comply with the Court's order. The

position it has taken in executing the instruction that it turn over exculpatory

evidence shows that, once again, it will not so comply. The government position

with respect to exculpatory evidence – that it need only consider evidence that it

reviewed while preparing the return, is frivolous on its face, especially as to

Abdullah. There is no good faith argument that evidence that inculpatory

statements were coerced from Abdullah while he was in CIA custody is not

exculpatory, and therefore not covered by the case management order. The

limiting redefinition the government suggests for what 'exculpatory evidence'

means in the case management order, because there is no indication whether those

preparing the returns even considered the question of coercion, cannot be accepted.

Certainly in Abdullah's case, it is no surprise at all that there is exculpatory

evidence of this type, and other types beyond the material in the return: Abdullah

has repeatedly averred he was tortured in the prison of darkness, and that he will

seek evidence concerning the conditions under which he made statements there. Indeed, Abdullah's position on this point could not have been clearer from his discovery request, which the government quotes in its motion for reconsideration. There is also other exculpatory evidence that is the subject of a pending motion.[4]

As to the other aspects of the government's motion -- particularly the handling of hearsay and of classified information -- Abdullah believes that Judge Roberts will be better able to make rulings on particular questions in the exact context and at the time at which they arise. The government's motion should therefore be denied.

---

[4] If the government responds with similar bad faith to Abdullah's discovery – and experience has, regrettably, shown that it probably will -- Abdullah will seek appropriate relief from Judge Roberts. Let there be no mistaking how serious Abdullah considers the government's likely default: the relief he will seek, and can show that he is entitled to, is the striking of all statements of Abdullah relied upon in the factual return.

Shayana Kadidal (DC # 454248)
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

Of Counsel for Petitioner

Respectfully submitted,

_____/s/ Charles H. Carpenter_____
Charles H. Carpenter (DC #432004)
PEPPER HAMILTON LLP
600 Fourteenth Street, N.W.
Suite 500, Hamilton Square
Washington, DC  20005-2004
Tel: (202) 220-1452
Fax: 202 220 1665

Stephen M. Truitt (DC # 13235 )
William J. Bethune (DC # 66696)
PEPPER HAMILTON LLP
600 Fourteenth Street, N.W.
Suite 500, Hamilton Square
Washington, DC  20005-2004
Tel: (202) 220-1507
Fax: (202) 220-1665

Dated:  November 21, 2008

*Counsel for Petitioners*