# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------

RAHIM ALI-NASHIR, *et. al.*

                            Petitioners,              08 cv 1085 (PLF)

         v.                                        08 cv 1207 (RWR)

ROBERT M. GATES, *et. al.*

                            Respondents.

-----------------------------------------------------------

## PETITIONER'S CONSOLIDATED REPLY TO THE FEDERAL DEFENDER'S AND RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR A HEARING AND FOR AFFIRMATIVE RELIEF

      On October 28, 2008, the Federal Defender for the District of Nevada (the "Federal Defender") responded to Petitioner's October 17, 2008 request for an evidentiary hearing and miscellaneous relief. On October 31, 2008, Respondents similarly filed their response opposing the Petitioner's request for an evidentiary hearing and miscellaneous relief. On November 21, 2008, Petitioner received the Federal Defender's October 31, 2008 response to the Court's October 27, 2008 Order to Show Cause. By this reply, Petitioner addresses the arguments of the Federal Defender and Respondents in their October 28th and the two October 31st submissions. Should the Court deny Petitioner's request for an evidentiary hearing, Petitioner requests that this Court grant an unconditional writ of *habeas corpus* and order his release.

### Statement of Material Facts

#### General Background

      In August of 2005, Retained Counsel filed suit in the United States District Court for the Southern District of New York individually and on behalf of eight unnamed detainees held at Guantánamo Bay (the "SDNY Litigation"). *See* October 16, 2008 Declaration of Scott L. Fenstermaker, Esq. ("October 16th Fenstermaker Declaration"), ¶ 3. The SDNY Litigation was

1

Dockets.Justia.com

amended on or about September 26, 2006 to include causes of action on behalf of Petitioner, Ahmed Khalfan Ghailani and 12 other Guantánamo Bay detainees. *See id.* Retained Counsel learned, in Thursday, December 27, 2007 e-mail from G. Brent Mickum, Esq., an attorney involved in representing detainees at Guantánamo Bay, that various attorneys were asserting claims that they represented five of the named petitioners in the SDNY Litigation, including Petitioner herein. *See* November 25, 2008 Declaration of Scott L. Fenstermaker ("November 25[th] Fenstermaker Declaration"), ¶ 3. The attorney claiming to represent Petitioner herein was the Federal Defender. Based upon the representations of these five attorneys, including the Federal Defender, Retained Counsel sought to remove these five detainees as parties in the SDNY Litigation which was then pending in the United States Court of Appeals for the Second Circuit (07-2980-cv). *See id.*, ¶ 4. On January 30, 2008, prior to successfully removing Petitioner from the SDNY Litigation, Retained Counsel received Petitioner's August 22, 2007 letter naming Retained Counsel as Petitioner's designated legal representative. *See id.* The other four detainees were successfully removed as their apparent attorneys requested. *See id.*

### Respondents' Refusal to Acknowledge Retained Counsel as Petitioner's Attorney

By letters dated February 2, 2008 and July 1, 2008, Retained Counsel notified Respondent Gates and his subordinates in the Office of Military Commissions of his attorney-client relationship with Petitioner. *See id*, ¶ 5. In a letter dated July 21, 2008, Michael C. Chapman, an advisor to Susan J. Crawford, the Convening Authority for the Military Commissions informed Retained Counsel that on the advice of Colonel Steven David, then the Chief Defense Counsel for the Office of Military Commissions, Ms. Crawford was refusing to recognize Retained Counsel as Petitioner's attorney. *See id.*, ¶ 6. Mr. Chapman declined to provide an explanation for Ms. Crawford's refusal or the basis for Colonel David's conclusion.

*Ghailani v. Gates*, 08-1190 (RJL)

Through letters dated October 20, 2007, April 10, 2008, April 16, 2008, May 12, 2008, and May 26, 2008, Ahmed Khalfan Ghailani designated Retained Counsel as his attorney. Despite Mr. Ghailani's direction to Retained Counsel, the government never permitted Retained Counsel to meet with Mr. Ghailani at Guantánamo Bay. In addition, since announcing its July 1, 2008 policy of rejecting all of Retained Counsel's mail to Guantánamo Bay, the government has rejected 38 pieces of mail from Retained Counsel to Mr. Ghailani, including one letter Retained Counsel left unprivileged. *See* October 16th and November 25th Fenstermaker Declarations.

Retained Counsel notified officials in the Office of Military Commissions of his attorney-client relationship with Mr. Ghailani by letters dated December 14, 2007 and March 31, 2008. Shortly after Retained Counsel's March 31st letter, and without consulting Retained Counsel, Colonel David appointed a military attorney, Lt. Col. Michael Acuff, to represent Mr. Ghailani before the military commissions. A description of the troubled relationship between Lt. Col. Acuff and Retained Counsel can be found in Document 10 of *Ghailani v. Gates*, 08-1190 (RJL) (the "*Ghailani* Matter"), ¶¶ 10-12, 14-25, and 27-32; *see also* November 25th Fenstermaker Declaration, ¶¶ 13 and 14. This troubled history led Colonel David and Lt. Col. Acuff to retain David Remes, Esq., a civilian attorney, to secure Retained Counsel's removal from the *Ghailani* Matter.

On July 25, 2008, Mr. Remes, who had never met or communicated with Mr. Ghailani and acting solely under the authorization of Lt. Col. Acuff, filed a motion to remove Retained Counsel as the attorney of record for Mr. Ghailani in the *Ghailani* Matter. The motion relied in its entirety on an e-mail notification and the affidavits of Colonel David and Lt. Col. Acuff. Based solely on the e-mail and affidavits, and before Retained Counsel replied to

Respondents' opposition to an evidentiary hearing therein, the *Ghailani* Court summarily denied

Retained Counsel's request for an evidentiary hearing and granted Mr. Remes' motion striking

Retained Counsel's notice of appearance and permanently barring him from filing further papers

on Mr. Ghailani's behalf in that Court. (*See* 08-1190, document 14).

A short time after the *Ghailani* Court granted Mr. Remes' motion, those attorneys

who participated in eliminating Retained Counsel as Mr. Ghailani's attorney were removed. *See*

November 25th Fenstermaker Declaration, ¶¶ 8 and 9. Colonel David was relieved of his

command as the Chief Defense Counsel and has been replaced. *See id*, ¶ 10. Mr. Ghailani

dismissed Lt. Col. Acuff as his attorney and revoked any authorization Lt. Col. Acuff may have

provided to Mr. Remes to act on Mr. Ghailani's behalf.[1] *See id*, ¶¶ 8 and 9. The Office of the

Chief Defense Counsel subsequently assigned Lt. Col. Jeffrey Colwell as Mr. Ghailani's new

military defense counsel. *See id*, ¶ 8. According to Lt. Col. Colwell, in October 2008, at his

arraignment before the military commissions, Mr. Ghailani openly demanded that he be

represented before the military commissions by Retained Counsel. *See id*, ¶ 9.

As for Mr. Ghailani's *habeas* case, those attorneys who initiated Mr. Remes' motion

to strike, that is, Mr. Remes, Colonel David, and Lt. Col. Acuff, have all been removed, leaving

Mr. Ghailani currently unrepresented in that matter. As a result of the *Ghailani* Court's August

19, 2008 Order, Retained Counsel continues to be precluded from representing Mr. Ghailani

before the *Ghailani* Court and notifying that Court of Lt. Col. Acuff's and Mr. Remes'

termination. (08-1190, document 14).

---

[1] Judge Leon's August 19, 2008 Order directed that "within 60 days of the date of this Order, Mr. Remes will file a signed authorization from petitioner to pursue this action, or a declaration by Mr. Remes that states that petitioner directly authorized counsel to pursue the action and explains why counsel was unable to secure a signed authorization." Mr. Remes has filed neither and has failed to notify the Court that Mr. Ghailani has terminated whatever authority he may have had. Mr. Remes' actions have left Mr. Ghailani without counsel in the *Ghailani* Matter.

## Respondents' Suspension of Retained Counsel

On August 29, 2008, without according Retained Counsel an opportunity to be heard, Colonel David notified Retained Counsel that he had suspended Retained Counsel from the pool of attorneys authorized to represent detainees before the military commissions (the "Pool"). *See* November 25 Fenstermaker Declaration, ¶ 7, Exhibit D. Colonel David's action precludes Retained Counsel from representing any detainee before the military commissions, including his clients Petitioner, Mr. Ghailani, Mustafa Bin-Ahmad Al-Hawsawi, and Ammar al-Baluchi.[2]

## ARGUMENT

From December of 2007, until her first visit to see Petitioner in May of 2008, the Federal Defender's only authorization to act as Petitioner's attorney was by self-appointment. As per the *Khan* protective order, Petitioner was merely the Federal Defender's "prospective client" with whom the Federal Defender had never met or otherwise communicated. During her period of self-appointment, the Federal Defender repeatedly misrepresented her authority, falsely claiming that she was appointed by the United States Court of Appeals for the District of Columbia Circuit ("DC Circuit") and implying Petitioner's direct authorization. Had Petitioner been a typical client, not subject to his current unprecedented restrictions, he could have clarified the issue for counsel and the Court. When he finally became aware of the Federal Defender's existence, Petitioner notified and confirmed his rejection of the Federal Defender in both his May 27th and June 8th letters to Retained Counsel and his desire that Retained Counsel act as his

---

[2] On Friday, November 21, 2008, Colonel Thomas J. Krzyminski, a staff officer in the Office of the Chief Defense Counsel notified Retained Counsel, by electronic mail that his office was considering Retained Counsel's suspension. Colonel Krzyminski demanded that Retained Counsel reapply to the Pool and offered him the opportunity to comment on Colonel David's unilateral suspension order. Colonel Krzyminski's notice came less than 24 hours after Retained Counsel first notified this Court of his suspension in a status report in an unrelated matter. *See Al-Hawsawi v. Gates*, 08-1645 (RJL), Doc. 5, ¶ 5.

attorney. These letters, which differ starkly in language and tone from the coached and perhaps coerced July 25th statement submitted by the Federal Defender, demonstrate beyond any reasonable doubt Petitioner's intent to choose Retained Counsel.

Petitioner has apparently notified the Federal Defender of her termination. *See* Petitioner's May 27, 2008 and June 8, 2008 letters to Retained Counsel. Unwilling to respect Petitioner's wishes, the Federal Defender arranged a return visit to Petitioner at a time when the government was simultaneously blocking Retained Counsel's correspondence to Petitioner. Given the forced "relationship" between Petitioner and the Federal Defender, it is not surprising that the Federal Defender rests her entire claim on a July 25, 2008 writing purportedly executed by Petitioner, and the affidavit of Lt. Cmdr. Reyes, the military attorney assigned by Colonel David to represent him. The rest of her claims are devoted to irrelevant denigration of Retained Counsel and his efforts, having no bearing on the issue of which attorney Petitioner selected.

### Petitioner's July 25, 2008 Writing Fails to Support the Federal Defender's Claim to Representation

In support of her claims, the Federal Defender submitted a July 25, 2008 statement by Petitioner. This statement fails to defeat Petitioner's request for a hearing, as it fails to explicitly provide any authorization to the Federal Defender, omits any mention of Retained Counsel's termination, and meekly describes the situation in which Petitioner finds himself as a result of his isolation from his chosen counsel.

First, in contrast to Petitioner's letters to Retained Counsel, the July 25, 2008 statement can hardly be deemed a convincing statement of Petitioner's hearty embrace of the Federal Defender as his attorney. Nor does the statement evince voluntariness in his choice. Petitioner executed his July 25th statement during a time of forced isolation from his chosen counsel. Petitioner, who by the Federal Defender's own admission, is in a psychologically

6

weakened position, may incorrectly feel abandoned by Retained Counsel. Had Petitioner intended to specifically terminate Retained Counsel's authority, Petitioner could easily have done so using the same expressive language found in his May 27th and June 8th letters rejecting the Federal Defender. The Federal Defender's failure to secure such an uncoached statement is telling and calls into question the import of the July 25th statement. After all, had Petitioner been so inclined, the Federal Defender, who proclaimed her team's excellent resumes, could easily have persuaded Petitioner to directly reference Retained Counsel's termination.

In addition to its uncertain meaning, the July 25th statement fails to shed light on the circumstances of its creation. As previously discussed, the government's interference with Petitioner's relationship with Retained Counsel has likely left Petitioner with the incorrect conclusion that Retained Counsel has abandoned him. Similarly, Petitioner's years of imprisonment, isolation, and abusive treatment have likely left him in a weakened psychological state. *See* Federal Defender's October 31st submission, pages 11 – 13. Given the circumstances, Petitioner likely sees no alternative but to either proceed *pro se* or accept the attorneys the government forces upon him, which directly implicates the voluntariness of the July 25th writing.

### Lieutenant Commander Reyes' Affidavit Does Not Support the Federal Defender's Claims of Retained Counsel's Termination

In his September 3rd affidavit, Lt. Cmdr. Reyes claims that "[Petitioner] intentionally excluded Mr. Fenstermaker from the list [of attorneys authorized to represent him]."[3] Lt. Cmdr. Reyes' affidavit must be viewed with suspicion. First, Lt. Cmdr. Reyes was appointed by Colonel David, who suspended Retained Counsel from the Pool and helped secure Retained Counsel's dismissal from the *Ghailani* Matter. Lt. Cmdr. Reyes therefore has a vested interest in

---

[3] Lt. Cmdr. Reyes' affidavit mirrors those that Colonel David and Lt. Col. Acuff submitted in the *Ghailani* matter in form, substance, and style.

abiding by his superior officer's decision. Secondly, Lt. Cmdr. Reyes was, by his own admission, not appointed to represent Petitioner until July 7, 2008, after Petitioner was already represented by counsel. Knowing full well that Petitioner was a represented party,[4] Lt. Cmdr. Reyes met repeatedly with Petitioner in what he claims was a successful effort to interfere with Retained Counsel's attorney-client relationship with Petitioner. Lt. Cmdr. Reyes' threat to Retained Counsel warning him against contacting Petitioner or face disciplinary charges reveals the glaring double standard to which he adheres without apparent reservation or embarrassment.

Lt. Cmdr. Reyes' inability to produce a statement directly terminating Retained Counsel's authority, particularly where he has "met with [Petitioner] on numerous occasions," is also rather telling. When Lt. Cmdr. Reyes first contacted Retained Counsel and claimed that Petitioner purportedly did not want Retained Counsel as his attorney, Retained Counsel requested confirmation of that claim in an e-mail to Lt. Cmdr. Reyes, stating as follows:

> If [Petitioner] would like [Retained Counsel] to cease [his] actions on [Petitioner's] behalf, [Petitioner] should feel free to let [Retained Counsel] know. Please have [Petitioner] specifically mention [Retained Counsel's] name, that he understands that [Retained Counsel is] available to help him, and that [Retained Counsel has] been doing so since receiving his August 22nd retention letter (over five months after [Petitioner] wrote it), and that [Petitioner] would like [Retained Counsel] to discontinue [his] efforts in [Petitioner's] DTA petition, *habeas* petition, and the military commissions' matter.

*See* October 16th Fenstermaker Declaration, ¶ 31. Lt. Cmdr. Reyes never responded to this September 7, 2008 e-mail for the simple reason that he could not persuade Petitioner to do so.

### The Federal Defender's Other Claims are Irrelevant and Fail to Support Her Position

The rest of the Federal Defender's claims to representation rest on factors unrelated to the issue of which attorney *Petitioner* selected, the sole issue currently before the Court.

---

[4] Retained Counsel sent letters dated February 2, 2008 and July 1, 2008 to Colonel Steven David informing Colonel David of Retained Counsel's attorney-client relationship with Petitioner.

### The Federal Defender's Efforts and Retained Counsel's Dedication

First, the Federal Defender cites to her resource expenditure on Petitioner's behalf and the excellent attorneys forming her team in support of her claim that she deserves to be declared Petitioner's attorney. These claims, however, shed no light on who *Petitioner* selected.

The Federal Defender points to a litany of actions she has taken on Petitioner's behalf in Petitioner's *habeas* and DTA matters to support her effort to remove Retained Counsel as Petitioner's attorney, while failing to note that a significant portion of her actions were undertaken on or after February 1, 2008, the day Retained Counsel placed the Federal Defender on notice of his receipt of Petitioner's August 22, 2007 letter.[5] The Federal Defender cannot be heard to complain that her efforts on behalf of a represented party might be in vain.[6] Moreover, the Federal Defender's claims can hardly compare to the time and effort Retained Counsel has expended on Petitioner's behalf. As she is aware, Retained Counsel began his efforts on behalf of the detainees in August of 2005 and on Petitioner's behalf in September of 2006.[7]

### The Federal Defender's Legal Team and Retained Counsel's Competence

The Federal Defender questions Retained Counsel's competence and dedication, while describing the qualifications of her team of attorneys. While this information shows why the Federal Defender believes that she ought to be selected, it fails to shed light on which attorney *Petitioner* selected.

---

[5] The Federal Defender, in her submissions, would have this Court believe that Petitioner's August 22, 2007 letter merely named Retained Counsel as his "friend." This is not the case and Retained Counsel refers the Court to Exhibit B of the May 19th Abdel-Rahman Declaration, which clearly states that Petitioner named Retained Counsel as his "next friend."

[6] As the Federal Defender is apparently a federally-funded organization whose purpose is to provide representation to those lacking representation, it is unclear why the Federal Defender engaged in any expenditures on or after February 1, 2008 on Petitioner's behalf.

[7] A description of the efforts Retained Counsel has taken on Petitioner's behalf since September of 2006 is also available for this Court's review. Given the irrelevance of the Federal Defender's claims, it will not be included in this reply.

Not surprisingly, the Federal Defender cites to no authority supporting the proposition that the client's decision may be supplanted with the Court's opinion regarding the relative qualifications of competing counsel. Case law reviewing instances of government interference with a defendant's attorney-client relationship shows that the relative competence of replacement counsel is irrelevant in a review of whether the defendant's due process and right to counsel of his choice were violated.[8] *See People v. Moore*, 57 Cal. App.3d 437, 442 (Cal. App. 4th Dist. 1976); *Commonwealth v. Manning*, 373 Mass. 438, 443 (1977); *United States v. Irwin*, 612 F.2d 1182 (9th Cir. 1980); citing to *Moore* and *Manning*; *see also United States v. Amlani*, 111 F.3d 705, 711 (9th Cir. 1997); *Cinelli v. Cutillo*, 896 F.2d 650, 655 (1st Cir. 1990); *United States v. Morrison*, 449 U.S. 361, 367 (1981). The Federal Defender's arguments demonstrate her continuing pattern of disregarding Petitioner's wishes and rights, which began when Retained Counsel announced his January 30, 2008 receipt of Petitioner's August 22, 2007 letter.

### The Federal Defender's Misplaced Reliance on the *Ghailani* Matter

The Federal Defender's reliance on *Ghailani* is also misplaced. With no evidence that Petitioner was even aware of the *Ghailani* case, it can hardly assist this Court in understanding his mindset when he selected his attorney.[9] While not helpful for shedding light on Petitioner's decision, *Ghailani* nevertheless shows that Petitioner's input is essential to a just outcome.

As described in the foregoing statement of facts, as a result of the *Ghailani* Court's August 19th Order barring Retained Counsel from Mr. Ghailani's *habeas* matter, Mr. Ghailani is

---

[8] The Federal Defender complains of Retained Counsel's competence and his dedication to Petitioner's interest. Because of the privileged nature of such a response and the irrelevance of the Federal Defender's claims to the issue of Petitioner's intent, Retained Counsel cannot rebut her claims herein. Should the Court find this information relevant, Retained Counsel requests an opportunity to submit a response to these claims, detailing his years-long efforts.

[9] For reasons described at length in Retained Counsel's briefing in the *Ghailani* Matter, it is far from clear that Mr. Ghailani was aware of the *Ghailani* Matter and Mr. Remes' motion therein.

now without counsel in that matter. (08-1190 (RJL)). Furthermore, as a result of the *Ghailani* Court's broadly worded Order, Retained Counsel is prohibited from notifying that Court of Mr. Ghailani's plight. Mr. Ghailani's matter does, indeed, serve as a "useful model" demonstrating that unless the Court solicits Petitioner's direct input, its decision may well be one that is in contravention of Petitioner's actual wishes.

### Retained Counsel's Purported Conflict of Interest

The Federal Defender, citing a number of government-created "biographies," claims that "with respect to each such person a potential, if not actual, conflict of interest exists." The Federal Defender's general assertions, unsupported by evidentiary foundation, do not support her conflict-of-interest claim.

The Federal Defender's argument noticeably avoids mentioning that the government has refused to recognize that Retained Counsel represents any of them or that any conflict can be waived. *See Holloway v. Arkansas*, 435, U.S. 475, 483 n.5 (1978) (client "may waive his right to the assistance of attorney unhindered by conflict of interests.") "[I]ndeed, in some cases, certain advantages might accrue from joint representation." *Id.* at 482. The Supreme Court has even acknowledged that there is a presumption in favor of conflict waiver. *See Wheat v. United States*, 486 U.S. 153, 164 (1988) ("presumption in favor of petitioner's counsel of choice").

More importantly, Respondents have deliberately chosen to not weigh in on the Federal Defender's conflict claim. It is rare indeed where the government, recognizing a conflict in a matter of this nature, is loath to raise it, particularly in circumstances such as these, where the government clearly favors the Federal Defender to replace Retained Counsel as Petitioner's counsel. Respondents, who are in possession of far more information than the Federal Defender, are in the better position to raise this issue and have made the deliberate choice to avoid doing

so.  Here, the Federal Defender seems bent on supplanting Retained Counsel regardless of the circumstances.  As the Supreme Court once cautioned, "[a party] may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side, . . . ."  The Court should not permit the Federal Defender to circumvent Petitioner's Sixth Amendment right to counsel of his choice by such groundless claims.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) (erroneous deprivation of a defendant's choice of counsel entitles the defendant to a reversal of his conviction).

**"Next Friend" Involvement as Unnecessary**

The Federal Defender is correct that "next friend" involvement is unnecessary herein.  By his May 27th and June 8th letters, Petitioner clearly and explicitly affirmed Retained Counsel's authorization to act as his attorney.[10]  Retained Counsel need not rely solely on his ongoing status as Petitioner's next friend.

**The Federal Defender's Effort to Avoid an Evidentiary Hearing**

The Federal Defender's effort to avoid an evidentiary hearing reveals the uncertainty she has that Petitioner would confirm her claims.  Were the Federal Defender secure in her conviction that she is Petitioner's chosen counsel, she would welcome an evidentiary hearing at which he could personally confirm it for the Court and Retained Counsel.  She opposes this opportunity because she knows, by her direct contact with Petitioner, that her "relationship" with him, if any, is a tenuous one and that Retained Counsel remains his preferred choice.

Similarly, the Federal Defender's opposition to an evidentiary hearing also evidences her desire to deprive this Court of vital information necessary to a fair and equitable

---

[10] While Retained Counsel did not receive Petitioner's May 27th and June 8th letters until after he filed Petitioner's June 24, 2008 *habeas* petition, the substance of these two letters makes clear that Petitioner authorized such action, to the explicit exclusion of the Federal Defender.

determination herein. There can be little dispute that Petitioner's direct input to the Court would greatly assist this Court. The Federal Defender objects Petitioner's direct input because she fears that such input will confirm Retained Counsel's claims that Petitioner has selected him and reveal her nearly year-long misrepresentations.

### Respondents' National Security Concerns

Initially, Respondents' claim that a hearing at which Petitioner identifies which attorney he selected poses a risk to national security is remarkable. This claim implies that this Court is incapable of controlling the proceeding to determine Petitioner's choice of counsel, a matter entirely unrelated to national security. First, any questioning of the Petitioner at a hearing to identify his attorney will hardly elicit classified information of any nature, let alone information regarding his days as a CIA prisoner. By Respondents' own admission, the information the government seeks to guard relates to activity occurring long before August 22, 2007, the date Petitioner personally activated his right to counsel of choice. Should the issue of coercion become relevant, such questions would merely evoke responses about Respondents' and the Federal Defender's behavior after his September 2006 transfer to Guantánamo Bay. As a result, the Court can take steps to address Respondents' national security concerns at any stage by ruling on Respondents' motion *in limine*.

Moreover, Respondents' claim that Petitioner's knowledge of classified information precludes him from ever speaking in Court can hardly be correct. Not surprisingly, Respondents can offer no legal support that permits them to trump so basic a right on the grounds of some remote national security risk.

Finally, the government's claim that an evidentiary hearing is inappropriate poses troubling implications for Petitioner's *habeas* matter, should he be exonerated of past

13

wrongdoing and be found to not present a risk of future misconduct. A natural consequence of Respondents' argument is that anyone detained in the highly-classified CIA program can never be released, regardless of past guilt or future threat because those detainees will forever bear this knowledge. The government's claim that circumstances may change which would permit Petitioner's release at some future point is also meaningless, for it is the government that determines when and whether such circumstances exist.

What the government really fears is not a breach of national security, but that Petitioner will be able to disclose definitively his selection of Retained Counsel, that it will have to recognize Petitioner's choice of counsel, and that it acted unjustifiably in precluding Petitioner and Retained Counsel's contact with one another by its various acts.

Respondents' efforts to interfere with Retained Counsel's relationship with his clients evidence a consistent, and predictable, pattern. First, at the height of Retained Counsel's conflict with Mr. Ghailani's military attorney, detainee Ammar al-Baluchi told the military commissions' judge during his June 5, 2008 arraignment that the government had obstructed his ability to contact Retained Counsel and to secure his services. In protest over their limited choice of attorneys independent of government influence and Retained Counsel's unavailability, Mr. al-Baluchi and his codefendants announced their decision to proceed *pro se* in their death penalty case rather than accept the attorneys made available by the government. On July 9, 2008, Mr. al-Baluchi made a similar, although more explicit, complaint to the military judge. Apparently, Mr. al-Baluchi notified the military judge during a commissions' appearance that he wanted Retained Counsel to serve as his legal advisor. Respondents, who have refused to release a transcript of these proceedings to Retained Counsel, have noticeably failed to act on Mr. al-Baluchi's complaints.

14

Second, the government's sudden decision to reject Retained Counsel's Guantánamo Bay-bound mail is further evidence of its efforts to frustrate Retained Counsel's involvement.[11] It was only after Retained Counsel's relationship with the Office of the Chief Defense Counsel soured that the government shifted course. In so doing, the government effectively ended all communication between Petitioner, the other detainees, and Retained Counsel, thereby eliminating the detainees' access to counsel of their choice. Indeed, it is unsurprising that detainees are electing to proceed *pro se*, as the circumstances would clearly raise suspicions about the counsel made available by the government.

Retained Counsel's suspension from the Pool raises further questions regarding Respondents' involvement in eliminating his availability. The suspension, the product of a no-notice decision without process of any nature, casts doubt on Colonel David's decision and calls into question both his motivation and the presence of outside influence in the defense function.

### Respondents Mischaracterize Retained Counsel's Involvement

Respondents, in opposing a hearing, would have this Court believe that Retained Counsel is seeking to "contact [Petitioner] for the purpose of offering legal assistance" or to "interfere with the efforts of other attorneys who represent or seek to represent [Petitioner]." *See* Respondents' Response at 8. To the contrary, it is Respondents and the Federal Defender who have interfered with an already established attorney-client relationship. Petitioner here, in his August 22, 2007, October 1, 2007, May 27, 2008 and June 8, 2008 letters has made his intent clear. Any perceived ambiguity exists solely as a result of Respondents' obstructive behavior and the Federal Defender's aggressive interference with the pre-existing and well-established

---

[11] Clearly, the government's implementation of its policy, if indeed there is one, of rejecting privileged mail sent through the *non*-legal general mail system is a pretext designed to disrupt the communication between Retained Counsel and Petitioner and other detainees like him. There seems to be no evidence that any other attorney has been subjected to this treatment.

attorney-client relationship between Petitioner and Retained Counsel. Respondents' claim that Retained Counsel has nothing more than the three letters[12] from Petitioner as evidence of the existence of that relationship is entirely disingenuous and the product of circular reasoning, as the government has eliminated Retained Counsel's ability to secure evidence of this relationship from Petitioner. Ignoring Respondents' heavy-handed behavior would only embolden them.

### The Court Can Only Learn of Petitioner's Present Intent and Choice of Counsel By Way of an Evidentiary Hearing

Here, two groups of opposing attorneys both present written evidence of authority to represent Petitioner. Retained Counsel has four letters from Petitioner which reflect Petitioner's candid and explicit preference for Retained Counsel and his rejection of the Federal Defender. The Federal Defender, on the other hand, while failing to disclose to the Court Petitioner's May and June 2008 written rejection of her, presents a writing obtained from Petitioner dated long after the government began blocking Retained Counsel's mail to Petitioner and after he was represented by Retained Counsel.[13]

At least one of the attorneys present at these meetings with Petitioner is almost certainly Lt. Cmdr. Reyes, an attorney under Respondents' supervision and who was appointed for the purpose of insinuating himself into Petitioner's situation at least a month after Petitioner's May 27, 2008 letter to Retained Counsel and almost a month after Petitioner wrote his June 8, 2008 letter to Retained Counsel. Under the circumstances, absent a hearing, the Court simply does not have sufficient information to make an informed decision on counsels' dispute.

---

[12] Respondents made their claim prior to Retained Counsel receiving the June 8, 2008 letter from Petitioner.

[13] The July 25th date on Petitioner's writing further calls into question the credibility of Michael Chapman's July 21st letter to Retained Counsel informing him that Colonel David was rejecting his claims to represent Petitioner. It is unclear how Colonel David would have known, as of July 21st, of Petitioner's choice of counsel, as the July 25th "authorization" was not yet accorded.

### Retained Counsel Should be Afforded Attorney-Client Visits with
### Petitioner at Guantánamo Bay and Access to the Legal Mail System

Retained Counsel should be afforded attorney-client conferences with Petitioner and access to the existing legal mail system. The government argues that because Retained Counsel lacks the necessary security clearance, he must be precluded from communicating or meeting with his client. *See* Respondents' Response at 9 and 10. Respondents' arguments are circular and are designed to further the government's continuing efforts to isolate Petitioner from his chosen counsel.

In opposing Retained Counsel's requests to visit with Petitioner at Guantánamo Bay, Respondents merely argue that an "attorney who has no relationship with a detainee is not entitled to contact the detainee for the purpose of offering legal assistance to the detainee." *See* Respondents' Response at 8. Not only is this claim disingenuous, it is directly contradicted by Respondents' behavior toward the Federal Defender.

Generally, issuance of a *Khan* protective order evidences the parties' and the court's acknowledgement that the establishment of an attorney-client relationship is complicated by the realities of the detainees' confinement. As a solution, the *Khan* protective order was developed for the purpose of easing access to the detainees by attorneys interested in offering legal assistance and who would not otherwise be permitted to visit the detainees because they lack the necessary relationship. In the instant case, the government permitted the entry of a *Khan* protective order in January of 2008 and filed that order with the DC Circuit on February 1, 2008, leading to the Federal Defender's first visit with Petitioner in May 2008. The *Khan* protective order was necessary because when the Federal Defender visited Petitioner in May of 2008, she had no relationship with Petitioner, other than by self-appointment.

Moreover, that Respondents permitted such a visit again in July of 2008 after Petitioner rejected the Federal Defender in his May 27th and June 8th letters further reveals the weakness of their argument seeking to exclude Retained Counsel. There can be no doubt that when she paid each of these visits to Petitioner, it was the Federal Defender who was the "attorney who ha[d] no relationship with [Petitioner and who was, by the government's argument] not entitled to contact [him] for the purpose of offering legal assistance." Respondents are fully aware that visits by Retained Counsel are entirely appropriate.

Respondents similarly argue that access to the legal mail system requires the imposition of a protective order with procedures requiring Retained Counsel to secure the appropriate security clearance. Respondents' Response at 9 and 10. As demonstrated below, Respondents' claims here do not explain the need for security clearance in order to access the legal mail system.

Initially, the government's two-track mail system, the "legal" mail channel and the "non-legal" mail channel, seems designed to further security issues, not the privilege issue cited in the July 1st Warden e-mail. Indeed, there seems to be no legitimate government interest for routing all privileged mail into the legal mail system which demands users to obtain security clearance. Such a policy calls into question the prohibition against the sending of privileged mail through the non-legal mail system. After all, all mail sent to and from the detainees is subject to review and redaction by the government, regardless of which system is used. Hence, any classified information contained in an outgoing letter sent over either system by a detainee is routinely subject to review and possible redaction as the circumstances require. Similarly, mail sent by Retained Counsel over the legal mail system may be subject to review and redaction for inappropriate content, as it once was treated over the non-legal mail system before the

government's reversal of policy.  There exists no legitimate basis for prohibiting the sending of privileged mail over the non-legal mail system or the need to obtain a security clearance to access the legal mail channel.

Retained Counsel can only conclude from the government's reversal of policy that its decision stemmed from his dispute with military officers at the Office of the Chief Defense Counsel.  In June of 2008, Retained Counsel's relationship with the Office of the Chief Defense Counsel deteriorated as a result of Retained Counsel's raising ethical concerns regarding a military attorney's conflicted and simultaneous representation of his client and another detainee. Shortly thereafter, Colonel David notified the government that he refused to recognize Retained Counsel as representing either Mr. Ghailani or Petitioner.  Respondents' decision to reject all of Retained Counsel's mail, effectively severing Retained Counsel's ties to all his detainee-clients, occurred shortly thereafter.[14]  In so doing, the government effectively eviscerated the detainees' rights to due process of law and counsel of their choice.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) (deprivation of defendant's choice of counsel entitles defendant to a reversal of conviction regardless of prejudice).  By so interfering with the attorney-client relationship between Retained Counsel and Petitioner, the government has improperly injected itself into the attorney-selection process.  *See People v. Moore*, 57 Cal. App.3d 437, 442 (Cal. App. 4th Dist. 1976); *Commonwealth v. Manning*, 373 Mass. 438, 443 (1977); *United States v. Irwin*, 612 F.2d 1182 (9th Cir. 1980); citing to *Moore* and *Manning*; *see also United States v. Amlani*, 111 F.3d 705, 711 (9th Cir. 1997); *Cinelli v. Cutillo*, 896 F.2d 650, 655 (1st Cir. 1990); *United States v. Morrison*, 449 U.S. 361, 367 (1981).

---

[14] Certainly, the government can have no legitimate basis for rejecting mail bearing client copies of court documents and a court Order entered in the addressee's very own case.

The government's act of depriving an attorney of access to both the legal and non-legal mail system on the grounds that he has no existing relationship with any detainee also creates a similar but distinct burden on the detainees' right to counsel. In the case of any detainee facing, or expected to face, war crimes charges before the military commissions at Guantánamo Bay, the government-imposed roadblocks to securing counsel free of government influence raise constitutional concerns. Respondents' purported policy of limiting privileged mail to the legal mail system and requiring users to first obtain security clearance poses a significant practical impediment to a detainee's ability to secure counsel of his choice and is therefore constitutionally problematic, as it constitutes an excessive burden on the detainee's Sixth Amendment rights.[15]

Respondents' argument that Retained Counsel lacks the necessary security clearance is a problem that is of the government's own making and can easily be remedied. Retained Counsel's application for the appropriate security clearance has been pending since March of 2008. His lack of security clearance stems from the government's persistent and inexcusable refusal to advance that application to conclusion. Here, where Retained Counsel is a former prosecutor and graduate of the United States Air Force Academy and its prisoner of war training, there exists no impediment to Retained Counsel's ability to successfully obtain the necessary clearance, if only the government were willing to act on his application. Retained Counsel can only conclude that the government's refusal is part of its wider effort to steer detainees to government-approved attorneys.

---

[15] While the government permits a detainee to write to an attorney, it must permit the delivery of that attorney's privileged response to the detainee in order to avoid the violation seen here. After all, the act of permitting a detainee to write to an attorney is meaningless if the detainee is not permitted to receive that attorney's privileged written response.

Contrary to Respondent's position, this Court is not barred from oversight of the Executive's discretion in the area of national security. Respondents' reliance on *Dep't of Navy v. Egan*, 484 U.S. 518 (1988) is misplaced. Subsequent interpretation of *Egan* demonstrates that constitutional review in the area of national security is entirely appropriate. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) (remanding the matter to the District Court for review of constitutional claims); *see also Stillman v. CIA*, 517 F.Supp.2d 32, 39 (D.D.C. 2007) (judicial review of a CIA, DoE, DoD, and DIA classification determination); *see also National Federation of Federal Employees, et. al. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993) ("a large measure of discretion gives rise to judicial deference, not immunity from judicial review of constitutional claims."), *citing Harmon v. Thornburgh*, 878 F.2d 484, 491-92 (D.C. Cir. 1989) (judicial review of random drug testing program for employees with Top Secret clearances), *cert. denied*, 493 U.S. 1056 (1990). Indeed, as this Court previously held, "It may well be that *Egan* allows for exceptions where the need for judicial involvement is great and where articulable suspicion is present that the classification of employees with respect to access to top-secret information is designed for such unlawful purposes as the denial of constitutional or other legal rights or the violation of court orders or laws duly enacted by Congress." *American Federation of Government Employees, AFL-CIO, et. al. v. Sullivan*, 744 F.Supp. 294, 306 (D.D.C. 1990). This is just such a situation.

Here, Respondents' misuse of their national security discretion, by refusing to consider Retained Counsel's security clearance application, violates Petitioner's rights to due process of law and counsel of his choice. Respondents' claim to "take no position on the question of whether Mr. Fenstermaker is authorized to represent" Petitioner, while aggressively using their security clearance application discretion to frustrate Petitioner's Fifth and Sixth

Amendment rights, is entirely disingenuous.[16]  Similarly, their rejection and return of Retained

Counsel's privileged and non-privileged mail sent to his clients at Guantánamo Bay serves to

further their campaign to isolate petitioner in violation of his Fifth and Sixth Amendment

rights.[17]  Respondents' actions are not taken to protect the nation's security but to isolate

Petitioner in violation of the Constitution and laws of the United States.

### Respondents' Repeated Involvement in Obstructing the Attorney-Client Relationship with Petitioner is an Unprecedented Violation of Separation of Powers and Calls into Question the President's Power to Involve the Military in Civilian Affairs

Respondents' interference with Petitioner's selection of counsel is entirely

unauthorized and improper and implicates basic and fundamental constitutional rights.  Here,

commissioned officers in the United States military and multiple Justice Department officials

have repeatedly interfered with Retained Counsel's relationship with Petitioner and his ability to

communicate with his client.  Respondents' and the Justice Department's actions described

above and in Petitioner's October 17th submission violate the separation of powers doctrine.  *See*

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)

("[T]he Constitution diffuses power the better to secure liberty.");  *Loving v. United States*, 517

U.S. 748, 756 (1996) ("Even before the birth of this country, separation of powers was known to

be a defense against tyranny");  *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy,

J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress

---

[16] Respondents apparently make much of the fact that Retained Counsel's security clearance application was filed with the Department of Defense pursuant to his representation of Petitioner before the military commissions. *See* Respondents' Response at 10.  Respondents' mention of this fact is puzzling, as Respondents and their attorneys are all familiar with Retained Counsel's security clearance application and its status, as Retained Counsel and his involvement are the subject of ongoing litigation in this Court, the DC Circuit, and the military commissions.  In short, the fact that Retained Counsel's security clearance application is still pending is simply further evidence of Respondents' obstructive interference with Petitioner's constitutional rights.

[17] There is no evidence that any other attorney has ever had mail rejected by the non-legal mail system staff at Guantánamo Bay.

the separation of powers"). The Supreme Court recently reaffirmed these basic principles in a matter directly confirming the availability of Petitioner's access to the writ of *habeas corpus*. *See Boumediene v. Bush*, 128 S.Ct. 2229, 2246 (2008) (separation of powers "serves not only to make Government accountable but also to secure individual liberty."). The Court should not countenance Respondents' and the Justice Department's unlawful attempt to bypass Petitioner's right to counsel of his choice by supplanting Retained Counsel with the Federal Defender.

Respondents have, on three separate occasions, delayed Petitioner's letters to Retained Counsel.[18] On each occasion, these delays directly assisted the Federal Defender as she sought to supplant Retained Counsel as Petitioner's attorney. The delay in delivery of Petitioner's August 22, 2007 letter directly enabled the Federal Defender to file his DTA action on January 9, 2008. Delay in delivery of Petitioner's May 27, 2008 and June 8, 2008 letters enabled the Federal Defender to return to Guantánamo Bay and secure Petitioner's July 25th writing. These efforts are shocking and should not go unpunished. *See Hamdan*, 548 U.S. at 638 ("Concentration of power puts personal liberty in peril of arbitrary action by officials, an incursion the Constitution's three-part system is designed to avoid) (Breyer, J., concurring).

Here, where the matter before this Court is a petition for a writ of *habeas corpus* seeking to challenge the legality of Respondents' military detention of Petitioner, the government's actions are particularly problematic. Permitting Respondents, their military subordinates, and the Justice Department to play a direct role in selecting counsel for military detainees raises many constitutional and practical problems, particularly where, as here, Petitioner has expressed an explicit preference for Retained Counsel and a clear rejection of the Federal Defender. By exercising complete control over Retained Counsel's access to, and

---

[18] Petitioner's August 22, 2007, May 27, 2008, and June 8, 2008 letters were delivered on January 30, 2008, October 1, 2008, and November 14, 2008 respectively.

communications with, Petitioner, Respondents overstep their constitutionally-sanctioned authority. Should this Court countenance the government's interference with Retained Counsel's efforts as Petitioner's counsel of choice, the Court would effectively cede oversight of selection of counsel to the government at Petitioner's expense. Such a ruling would, in effect, grant the government unprecedented authority in our civilian court system and would present a chilling circumstance in our system of ordered liberty. The potential for abuse is abundantly clear and the evidence suggests that such abuse has repeatedly occurred in Petitioner's matter.

### Petitioner's Application for an Unconditional Writ of *Habeas Corpus* Should be Granted and His Immediate Release Ordered

Respondents have repeatedly violated Petitioner's Fifth and Sixth Amendment rights to due process of law and counsel of his choice and have admitted to those acts that form the basis for those violations. Petitioner retained Retained Counsel by letter dated August 22, 2007. Yet in the fifteen ensuing months, Respondents have (1) eliminated his attorney's ability to communicate with him, (2) refused to permit his attorney to meet with him, (3) suspended his attorney from practicing before the military commissions, thereby precluding his attorney's presence before the military commissions on his behalf, and (4) acted in a manner consistent with furthering the efforts of another attorney, the Federal Defender, to interfere with Petitioner's relationship with Retained Counsel. Michael Chapman's announcement on July 21, 2008, four days *before* the Federal Defender was able to secure Petitioner's July 25th statement, further supports Petitioner's claim of government misconduct.[19]

---

[19] Mr. Chapman's letter is dated four days *before* Petitioner's July 25th writing, at a time when Petitioner's authorization to Retained Counsel clearly remained in effect. Colonel David's claim to the government that Retained Counsel does not represent Petitioner, as announced in the July 21, 2008 Chapman letter, is directly contradicted by Petitioner's June 8, 2008 letter confirming Retained Counsel's authorization to act as his attorney.

Respondents' current attempt to mute Petitioner further by claiming that he may not speak at a neutral setting because his statements identifying which attorney he selected somehow pose a risk to national security is designed to conceal their misconduct from review by this Court. Given the egregiousness of the government's misconduct in violating Petitioner's most basic rights, an Order directing Petitioner's immediate release from custody is entirely appropriate. It is only through this drastic measure that the Court can ensure that Petitioner's fundamental rights are protected and that the government is deterred from future abuse of such power.

## CONCLUSION

Petitioner's request for an evidentiary hearing and an Order directing that Retained Counsel be permitted access to Petitioner by way of in-person conferences at Guantánamo Bay and to the legal mail system in place at Guantánamo Bay should be granted. In the alternative, Petitioner should be immediately released.

Dated: New York, New York
      November 25, 2008

Respectfully submitted,

**The Law Offices of Scott L. Fenstermaker, P.C.**

By: _Scott L. Fenstermaker_
Scott L. Fenstermaker, Esq.

300 Park Avenue, 17th Floor
New York, New York 10017
212-302-0201