UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: )<br>GUANTANAMO BAY )<br>DETAINEE LITIGATION )<br>_____ )<br> )<br>MAHBUB RAHMAN, )<br>    *Petitioner* )<br> )<br>vs. )<br> )<br>Bush, et al. )<br>    *Respondents* ) | Misc. No. 08-442 (TFH)<br><br><br><br><br><br>Case Number 08-1223 (JR) |

**PETITIONER'S RESPONSE TO ORDER TO SHOW CAUSE
DATED SEPTEMBER 5, 2008**

On September 2, 2008, the Respondents filed a "Notice of Transfer of Petitioner," asserting that "the United States has relinquished custody of Petitioner, Mahbub Rahman (ISN 1052) and transferred him to the control of the government of Afghanistan." On September 5, 2008, this Court directed Petitioner Rahman's counsel to show cause why Petitioner Rahman's Petition should not be dismissed. On September 19, 2008, Petitioner filed a Motion to Extend Time for response to the Court's Order.

On October 24, 2008, Court granted Petitioner Rahman's Motion to Extend Time and allowed Petitioner until December 19, 2008 to file this response.

The Petition should not be dismissed for two reasons. First, Rahman has not been released from custody. Rather on information and belief, he has been transferred from Guantanamo Naval Base to the newly constructed "National Defense" detention wing at the infamous Policharky Prison in Kabul, Afghanistan. Significant issues remain about whether this

1

transfer amounts to a relinquishment of "custody" of the Petitioner, or whether the Respondents have simply transferred him to another facility where the Respondents continue to maintain significant control over his continued custody and prospects for release. This Court cannot find on the present record, based on a bare and unsubstantiated claim that "control" of the Petitioner has been transferred, that Petitioner Rahman no longer remains "in custody under or by color of the authority of the United States." 28 U.S.C. § 2241(c)(1).

Second, even if the Respondents have transferred "custody" of the Petitioner, such that they no longer maintain any modicum of control over his continued custody or prospects for release – which, once again, the Court cannot find from the present record – it is still improper to dismiss this habeas action because Petitioner Rahman continues to suffer collateral consequences from being designated an "enemy combatant." Notably, the Respondents' Notice of Transfer does not clear him of that designation. So long as the Respondents brand him with that label, despite never having provided even the bare minimum of acceptable procedures by which he could dispute that designation, he continues to suffer consequences such that this habeas corpus action must continue.

## FACTUAL BACKGROUND

**1. Petitioner's Purported Transfer and Continued Incarceration.**

Rahman was incarcerated by the United States Department of Defense at Guantánamo Bay Naval Base, Cuba, without cause, without charge, and without meaningful process, from on or about June 1, 2003 until on or about September 2, 2008. The Notice of Transfer Of Petitioner, while claiming that the United States has "relinquished custody" of petitioner and "transferred [him] to the control of the government of Afghanistan," does not acknowledge what counsel believes to be true – that, far from being released, Rahman has been transferred to the new

"national defense" detention wing of Policharky prison in Kabul, Afghanistan.[1]

Counsel represents, based on information and belief, that Rahman is at Policharky and has had no process before an Afghan court or other Afghan authority concerning his continued incarceration.[2] Rahman continues to be held without charges – other than having been labelled an "enemy combatant" by the United States – and without access to counsel. To undersigned counsels' knowledge, there is no process available to Rahman in Afghanistan through which he would be able to challenge his designation as an "enemy combatant" or his continued incarceration. Declaration of Ahadullah Azimi (July 31, 2007) ("Azimi Declar") at ¶¶ 17-22 (submitted in *Ruzatullah v. Gates*, 06-CV-01707 (GK) (D.D.C.). In short, following his "transfer," the only thing that has changed for petitioner is the address of his prison. His incarceration continues to result directly from his designation as an "enemy combatant" by the United States, and there continues to be no means for him to contest that designation, except through the United States courts.

In similar cases, detainee "transfers" have been subject to restrictive terms and conditions imposed by the United States. As Matthew C. Waxman, then-Deputy Assistant Secretary of Defense for Detainee Affairs, averred in *Abdah v. Bush*, Civ. Action No. 04-1254 (HHK) (D.D.C.), "the United States also transfers GTMO detainees, under appropriate conditions, to the control of other governments *for continued detention, investigation, and/or prosecution*." Declaration of Matthew C. Waxman (June 2, 2005) ("Waxman Decl.") at ¶ 3 (emphasis added).

---

[1] This facility is known (in English) as the Afghan National Defense Facility (ADNF/Pol-i Charkhi). Declaration of Ahadullah Azimi (July 31, 2007) ("Azimi Decl."), at ¶ 10 (submitted in *Ruzatullah v. Gates*, 06-cv-01707 (GK) (D.D.C.).

Dozens of detainees have been transferred to foreign countries for "further detention, investigation and prosecution." Declaration of Pierre-Richard Prosper (March 8, 2005) ("Prosper Decl.") at ¶ 2 (submitted in *Abdah v. Bush*, CA No. 04-1254 (HHK) (D.D.C.); Waxman Decl. at ¶ 4.[2]

Although the United States has not disclosed the conditions for transfer of specific detainees, *see* Prosper Decl. at ¶ 9, the existence of certain types of conditions have been brought to the attention of petitioner's counsel. The United States acknowledges that continued detention may be a condition of transfer for some detainees. Waxman Decl. at ¶ 3; Prosper Decl. at ¶ 4. Others may experience less onerous, but still restrictive, conditions. For example, a detainee transferred to England was subject to conditions requiring him to register with the police, check in monthly with local police or military, and notify the English government of any plans to travel. Declaration of George Brent Mickum, IV (July 30, 2007), ("Mickum Decl."), at ¶ 10.

Notably, while contending in the Notice of Transfer that Petitioner Rahman has been transferred to the "custody" of the government of Afghanistan, the Respondents have not provided any actual written agreement between the United States and the Government of Afghanistan which governs that transfer. As noted in the Declaration of Ahadullah Azimi, who

---

[2]Former Deputy Assistant Secretary Waxman asserted in his declaration that the continued detention of detainees after transfer is entirely at the discretion of the foreign government and not within the control of the United States. Waxman Decl. at ¶ 5. That statement is, however, in tension with other statements in the Waxman and Prosper declarations. Specifically, both declarants state that the transfer of the detainees is subject to the receiving country's assurance that it will take action that will ensure that a transferred detainee "will not pose a continuing threat to the United States and its allies." Waxman Decl. at ¶ 5; Prosper Decl. at ¶ 3. This strongly suggests that the conditions of transfer are related exclusively to the United States' concerns, and not the law enforcement concerns of the foreign countries. Under these circumstances, it belies reality to suggest that continued detention of a detainee is solely at the receiving country's discretion and based solely on its laws.

actually tried to gain access to detainees at Policharky, and as also noted in publicized accounts about the facility, there is significant evidence of a controlling United States presence at the facility. (Azimi Declar at ¶¶ 17-22). *See, infra* at pp. 6-8.

**2. Policharky Prison**

Policharky prison was initially constructed in the 1970s. Bilal Sarwary, *Kabul's Prison of Death*, BBC News Kabul, Feb. 27, 2006. During the Soviet occupation of Afghanistan, Policharky prison (variously spelled Pul-e-Charkhi, Pul-e-Charky, Pul-i-charki, Policharky) became notorious for torture and ill-treatment. In the early 1980s, close to 17,000 prisoners from Policharky were murdered in night executions that were common during in that period. M. Hassan Kakar, *Afghanistan: The Soviet Invasion and the Afghan Response, 1979-1982* (1995), at ch. 9.[3] According to the United Nations, Policharky prison "was without doubt a kind of Buchenwald." Leo Dobbs, *A Pilot for Prison Reform*, UNAMA Afghan Update (Summer 2006), at 3. For many Afghans the name "Policharky" remains synonymous with horror. Sarwary, *supra*.

Although the principal wings of the Policharky Prison are under Afghan control and are used for ordinary prison functions, the United States has been directly involved in the construction, maintenance, and supervision of areas of the prison that house Afghan detainees "transferred" from Guantánamo and Bagram. Azimi Decl. at ¶ 7. Although these areas are purportedly under the control of the Afghan Ministry of Defense, U.S. military officers continue to control access and security there. These areas operate under different procedures from the rest of Policharky. Azimi Decl. at ¶ 11.

---

[3]Available at http://ark.cdlib.org/ark:/13030/ft7b69p12h/ (last viewed Dec. 27, 2007).

The American military has direct involvement in the physical security of Policharky and the detention of prisoners there. A U.S. Army spokesman has acknowledged that the American military "oversee[s] operations at the prison." Kevin Dougherty, *Afghan Who Killed Two American Soldiers Was "Mentally Ill,"* Stars and Stripes, May 8, 2007. "American trainers" have been stationed at Policharky since the opening of a national security wing in April 2007. Associated Press, *Afghan Gunman Kills 2 U.S. Soldiers*, May 7, 2007 .

The United States' authority at the prison appears to extend to control of access to the areas of the prison where "enemy combatants" are held. Ahabullah Azimi, an attorney from the International Legal Foundation, sought access to the prisoners in Policharky pursuant to a letter of permission from the Ministry of Defense. In spite of this permission from the Afghan government, he was turned away by a U.S. military officer. Azimi Decl. at ¶ 15. Specifically, the officer informed Mr. Azimi that no prisoner was permitted to see an attorney until his file had been lodged with Afghanistan's "National Security Court." *Id*. at ¶¶ 14-15.

Following his denial of access, Mr. Azimi sought clarification of this statement from Lieutenant Colonel Nader Khan, an Afghan officer who served as the chief legal advisor for Policharky's national security wing. Mr. Azimi informed Lt. Col. Khan that the National Security Court had been dissolved and again sought access to the Policharky prisoners pursuant to the written permission granted by the Afghan Ministry of Defense. Lt. Col. Khan deferred consideration of Mr. Azimi's renewed request for access on the ground that he needed to "speak with his American advisors." *Id*. at ¶ 19. Lt. Col. Khan later informed Mr. Azimi, presumably at the instruction of the American advisors, that he could not see the national security prisoners without a letter of permission from the Minister of Defense. *Id*. at ¶ 20. Not surprisingly, no

such letter has been forthcoming.

Accordingly, there is strong evidence of the United States' continued involvement in and direction of nominally "transferred" detainees, such as Rahman. Moreover, as a practical matter, it appears that the United States is taking steps to assure that former detainees are held incommunicado.

## ARGUMENT

I. **THE UNITED STATES' PARTICIPATION IN THE PETITIONER'S CONTINUED INCARCERATION PRECLUDES A DETERMINATION OF LACK OF JURISDICTION AT THIS JUNCTURE.**

Rahman's transfer to Policharky does not deprive this Court of jurisdiction. The constitutional right to habeas corpus relief is not determined simply by examining whether the United States exercises *de jure* sovereignty over the place the prisoner is being held. *Boumediene v. Bush*, 128 S. Ct. 2229, 2253 (2008); see also, *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 68 (2004) (jurisdiction over habeas petition requires finding by court that petitioner is in actual or constructive custody of United States);28 U.S.C. §2241(c)(1) (jurisdiction requires that petitioner be "in custody under or by color of the authority of the United States"). There is ample evidence of the United States' continued participation in and supervision of petitioner's incarceration, and therefore of the fact that Rahman remains in the constructive custody of the United States Department of Defense. At the very least, petitioner must be allowed discovery on this issue.

As the Supreme Court noted in *Boumediene*, "the degree of control the military assert[s] over the facility" may be a factor in determining the sovereign reach of the United States and the extension of the writ. 128 S.Ct. at 2257. The high Court articulated three factors relevant to the extraterritorial application of the writ: "(1) the citizenship and *status of the detainee and the*

*adequacy of the process through which that status determination was made;* (2) the nature of the sites where apprehension and *detention took place*; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ." *Id.* at 2259 (emphasis added). Applying these factors to Guantanamo, the Court found that an alien had the right to challenge his detention as an "enemy combatant," even though his apprehension and detention was technically outside the sovereign territory of the United States. *Id.* at 2263.

There is no question that while Petitioner Rahman was held at Guantanamo he had the right to challenge his detention through habeas corpus procedures. Petitioner submits that the *Boumediene* factors continue to weigh in his favor after his rendition to Afghanistan and that that he is not deprived of his right to challenge his status as an enemy combatant, simply because the government has moved him to another location. The first *Boumediene* factor is at the core of his case: he strongly contends that the procedures used to determine his status as an enemy combatant were fatally flawed and have resulted in the lengthy detention of an innocent man.

The second factor, where the apprehension and detention took place, weighs in his favor, because he was and is detained at a site under control of our government. As described above, in the present case, there is substantial evidence of the United States' participation in, and control of, petitioner's ongoing detention in Policharky:

(1) United States government officials have represented in affidavits in other cases transfer of detainees to the purported custody of foreign governments is generally subject to conditions, which may include continued detention;[4]

(2) The U.S. military oversees operations at Policharky;

---

[4] *E.g., Abdah v. Bush*, No. 04-1254, 2006 U.S. Dist. LEXIS 4942 at *11-*12 (D.D.C. Mar. 29, 2005); *Al-Joudi v. Bush*, No. 05-301, 2005 U.S. Dist. LEXIS 6265 at *6-*7 (D.D.C. Apr. 4, 2005); *Al-Marri v. Bush*, No. 04-2035, 2005 U.S. Dist. LEXIS 6259 at *6-*7 (D.D.C. Apr. 4, 2005).

8

(3) U.S. military personnel control access to the prisoners at Policharky's national security wing, including prisoners transferred from Bagram;

(4) There has been no independent proceeding by the Afghan courts or government considering any evidence against Petitioner Rahman or confirming any basis for his continued incarceration; and

(5) As far as counsel is aware, there is no court in Afghanistan with jurisdiction and authority to consider any petition for release by Petitioner Rahman.

These facts evidence continued U.S. involvement in Rahman's incarceration such that he may be deemed to be in the *de facto* custody of the United States.

The third factor was considered by the *Boumediene* court, the practical obstacles inherent in resolving the prisoner's entitlement to the writ, are no different in this case than they were in *Boumediene*, where the Supreme Court found them to be no obstacle to right to bring a habeas proceeding in this Court. In short, Petitioner submits that the *Boumediene* factors compel the denial of the government's motion to dismiss.

This case is close to *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (2004), in which the petitioner (through his next friend) sought habeas relief from his detention in a Saudi prison. He alleged that his incarceration and interrogation was at the behest and under the supervision of the United States.[5] Respondent argued in *Abu Ali* that this Court lacked jurisdiction because the petitioner was in the physical custody of a foreign sovereign. The Court denied the motion to dismiss and permitted jurisdictional discovery to go forward. As the Court noted,

> Given the accepted breadth of the habeas statute, the imperative to construe the "in custody" requirement expansively in favor of the petitioner and without regard

---

[5] Abu Ali is a U.S. citizen, a fact that the court relied on in its consideration of the applicability of the habeas statute and the Constitution to Ali's incarceration abroad. His citizenship status was not, however, germane to the court's analysis of the "constructive custody" issue. That analysis was premised on evidence of the conduct and agreements of the United States and the foreign government, not the citizenship of the petitioner.

9

> for formalisms, the absence of any language in the text that carves out an exception where the physical custodian is a foreign body, the many circumstances in which habeas jurisdiction has been found where the individual was not in the immediate possession of the Respondent, and the decisions in which habeas jurisdiction was found when the executive or some other government official was working through the intermediary of a State (*Braden*), a private individual (*Jung Ah Lung*) or a private corporation (*Stokes*), the Court cannot find any basis in the habeas statute for denying jurisdiction merely because the executive is allegedly working through the intermediary of a foreign ally.

Id. at 49-50.

In *Abu Ali,* this Court identified a number of factors that are relevant to the question of whether a petitioner is in the constructive custody of the United States, even though he is in the physical custody of another country. These include whether:

(1) The petitioner was detained at the behest of United States officials;

(2) The United States enlisted the foreign state as an agent or intermediary who was generally indifferent to the detention of the prisoner;

(3) The petitioner was transferred to the foreign state to deny him an opportunity to assert his rights in a United States tribunal; and

(4) A request by the United States would secure the petitioners' release.

*Id.* at 68.

These factors are not exhaustive, and all factors need not necessarily be present to find that a petitioner was in constructive U.S. custody. *Id*. at 68 & n.42. ("Where all of these factors are present, however, it blinks reality to conclude that the detainee is anything other than in the custody of the United States for purposes of habeas jurisdiction"). In the present case, it is undisputed that petitioner was originally turned over to the United States military in Afghanistan, transferred to Guantánamo, denominated an "enemy combatant," and held there until approximately September 2, 2008. If, as has been the case with other detainees at Guantánamo,

10

petitioner was released into Afghan custody pursuant to specific terms and conditions that require Afghanistan to continue to detain him (or to take other actions with respect to his imprisonment or restricting his liberty), at least three of the four *Abu Ali* factors would be met.

At the very least, based on the facts herein set forth, the Court should decline to dismiss Petitioner Rahman's habeas corpus petition and should permit litigation and discovery to proceed in due course regarding the United States' continued involvement in his confinement. The notable lack of a factual record about Policharky, coupled with the information submitted herein, demonstrate a need for further inquiry into the *Boumediene* and *Abu Ali* factors. Where extrinsic factual development is necessary to determine jurisdiction, at the very least, the Court should permit a petitioner to undertake discovery with respect to those facts. *E.g.*, *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001).

II. **PETITIONER'S TRANSFER DOES NOT MOOT HIS PETITION BECAUSE HE CONTINUES TO SUFFER COLLATERAL CONSEQUENCES FROM BEING DESIGNATED AN "ENEMY COMBATANT."**

Even if the United States does not maintain constructive custody over Petitioner Rahman at Policharky, this Court continues to have habeas corpus jurisdiction because of the collateral consequences imposed on Petitioner Rahman by his continuing designation as an "enemy combatant." Transfer of a habeas petitioner does not moot his case. *Carafas v. LaVallee*, 391 U.S. 234, 239-40 (1968) (habeas case is not moot if a petitioner, although released from custody, faces sufficient repercussions from his allegedly unlawful punishment). The designation of "enemy combatant" status is potentially more serious than a felony conviction. *Cf. Carafas*, 391

U.S. at 237 (describing the consequences of the petitioner's felony convictions, including disqualification from voting, engaging in certain business, and serving as a juror); *Jones v. Cunningham*, 371 U.S. 236, 241-243 (1963) (collateral consequences include restrictions on liberty such as registration of address, periodic reporting to parole officer, and restrictions on travel). The stigma of being labeled an "enemy combatant" may subject Petitioner Rahmanto life-threatening personal and/or state-sponsored retaliation and other consequences such as restricting his ability to re-enter the United States or travel freely abroad.

There is no line of precedent expounding on all of the collateral consequences of being labeled an enemy combatant because that classification category did not exist until hastily created by the Department of Defense – i.e., by the Respondents themselves – in 2004 after the Supreme Court decided *Rasul*. The enemy combatant designation is neither a creature of statute nor regulation, but rather appeared in a series of Orders and memoranda between the Deputy Secretary of Defense and the Secretary of the Navy on July 7, 2004, and July 29, 2004, several years after Petitioner Rahman was initially detained. *See* Memorandum from Deputy Secretary of Defense Paul Wolfowitz re: Order Establishing Combatant Review Stats Tribunal (July 7, 2004), available at http://www.defenselink.mil/ news/Jul2004/d20040707review.pdf, cited at *Hamdan*, 126 S.Ct. 2749, 2761 n. 1 (2006).

Some of the harms are extremely predictable. Continuing to be designated as an enemy combatant, even after being released, will undoubtedly result in Petitioner Rahman's being unable to apply for admission to the United States. A habeas corpus petition is not rendered moot by the petitioner's transfer out of the country if ineligibility for admission is a collateral consequence. *Leitao v. Reno*, 311 F.3d 453, 456 (1st Cir. 2002) (bar on readmission of a

12

removed alien is a legally cognizable collateral consequence that preserves a live controversy even after deportation of the petitioner); *Chong v. District Director,* INS, 264 F.3d 378, 385-86 (3d Cir.2001) (ten-year bar on readmission of a removed alien into the United States is a sufficient collateral consequence to preserve a live controversy even after deportation of the prisoner); *Max-George v. Reno,* 205 F.3d 194, 196 (5th Cir.2000) (same), *vacated on other grounds,* 533 U.S. 945 (2001); *Smith v. Ashcroft,* 295 F.3d 425, 428 (4th Cir.2002) (same);*Tapia Garcia v. INS,* 237 F.3d 1216, 1218 (10th Cir.2001) (permanent bar to readmission for aggravated felon is collateral consequence); *Steele v. Blackman, INS,* 236 F.3d 130, 134 n. 4 (3d Cir.2001) (same). Indeed, not only is Petitioner Rahman ineligible for legal admission to the country, but a person designated as an enemy combatant would likely have his name on a no-fly list and thus be restricted across the globe as to his ability to board an airplane. *Jones v. Cunningham*, 371 U.S. at 241-243 (restrictions on travel).

In *Qassim v. Bush*, 466 F.3d 1073, 1076 (D.C. Cir. 2006), the Court noted that the collateral consequences doctrine could enable a released habeas petitioner to continue his litigation. In *Qassim* there was no such consequence because the Uigher prisoners, before release, had specifically been designated as "no longer enemy combatants." *Qassim v. Bush*, 382 F. Supp.2d 126, 127 (D.D.C. 2005). By contrast, Petitioner Rahman's designation as an enemy combatant continues after his transfer despite his continuous protestations of innocence dating back to his earliest statements in the records of this Court.

The fact that the enemy combatant designation remains, and that Petitioner Rahman's transfer from Guantánamo was only a transfer from one government to another, shows that he remains subject to disability because of the designation. As described above, although the terms

13

of his transfer to Afghanistan have not been disclosed, other transfers have been subject to inter-government agreements that place restrictions on detainees, including requiring the foreign governments involved to conduct investigations and impose other restraints on their liberty. *Cf.* Waxman Decl. at ¶ 3 ("the United States also transfers GTMO detainees, under appropriate conditions, to the control of other governments *for continued detention, investigation, and/or prosecution*") (emphasis added); Prosper Decl. at ¶ 2 (Dozens of detainees have been transferred to foreign countries for "further detention, investigation and prosecution"); Mickum Decl. at ¶ 10 (detainee transferred to England was subject to conditions requiring him to register with the police, check in monthly with local police or military, and notify the English government of any plans to travel). Consequently, this Court should permit discovery as to the precise terms of any agreements between the Governments of the United States and Afghanistan regarding restrictions placed on returned detainees, and should not dismiss the petition absent such discovery.

Petitioner Rahman's habeas corpus petition not only seeks his release from unlawful detention, but also steadfastly proclaims his innocence and challenges the wrongfulness of Respondents' designating him an "enemy combatant. Even if the Respondents have relinquished custody of Petitioner Rahman to the Government of Afghanistan, the fact remains that he is "suffering, and will continue to suffer, serious disabilities because of the law's complexities and not because of his fault, if his claim that he has been illegally [detained and wrongfully designated as an enemy combatant] is meritorious." *Carafas v. Lavalee*, 391 U.S. 234, 239 (1968).

## CONCLUSION

This action should not be dismissed on the present record because serious questions

remain about whether the United States continues to maintain constructive custody over Petitioner Rahman's detention in the national security wing at Policharky. At a bare minimum, this Court should order the government to file factual returns at the Secure Facility showing what its basis was for holding Rahman in custody and designating him as an enemy combatant. Following that, counsel should be permitted to engage in investigation and conduct discovery about the extent of United States' control and influence over the continued detention of detainees at Policharky.

Even if, after investigation and factual development, it should be determined that Petitioner Rahman is not in the constructive custody of the United States, this case should still not be dismissed because of the collateral consequences imposed by being branded an enemy combatant. Respondents created that category of human being out of whole cloth, smeared Petitioner Rahman with that label, and imprisoned him for five years despite his protestations of innocence while affording him no meaningful process. Due process requires that Petitioner Rahmanbe offered a fair opportunity before an independent tribunal to free himself from the status of "enemy combatant."

This the 19th day December, 2008.

/s/ Robert M. Elliot
Robert M. Elliot (D.C. Cir. Bar # 51320)
J. Griffin Morgan (D.C. Cir. Bar No. 51744)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, North Carolina 27101
Tel: (336)724-2828
Fax: (336)714-4499

Stewart W. Fisher (D.C. Cir. Bar # 51544)
Glenn, Mills, Fisher & Mahoney, P.A.

400 West Main Street, Suite 709
Durham, North Carolina 27701
Tel: (919)683-2135
Fax: (919)688-9339

C. Frank Goldsmith, Jr. (D.C. Cir. Bar # 51666)
Goldsmith Goldsmith & Dews, P.A.
P.O. Box 1107
Marion, North Carolina 28752-1107
Tel: (828)652-3000
Fax: (828)652-9196

ATTORNEYS FOR PETITIONER

Of Counsel:
Pardiss Kebriaei (Pursuant to LCvR 83.2 (g))
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212)614-6452
Fax: (212)614-6499