IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: ) GUANTANAMO BAY DETAINEE ) LITIGATION ) | Misc. No. 08-442 (TFH) |
| AL HAMANDY, Petitioner, v. GEORGE W. BUSH, *et al.*, Respondents. | Civil Action No. 05-CV-2385 (RMU) |
| HAMOUD ABDULLAH HAMOUD HASSAN AL WADY, Petitioner, v. GEORGE W. BUSH, et al., Respondents. | Civil Action No. 08-CV-1237 (RMC) |

**MOTION FOR DIRECT CONTACT WITH CLIENT**

I.

<u>INTRODUCTION</u>

For more than six years, Mr. Al Wady has languished in executive detention. His sole

human contact, aside from other similarly situated detainees, has consisted of being shackled by

prison guards and berated by interrogators. Due to the lengthy detention and deplorable

conditions, many detainees suffer from, at best, near complete despair and loss of hope and, at worst, extreme psychological trauma.  It is therefore no wonder that detainees such as Mr. Al Wady have difficulty trusting anyone who tries to meet with them.

It is equally unsurprising that the government, which has strenuously resisted allowing these detainees any judicial access at all, is, to put it charitably, now unhelpful in assuring that detainees fully understand and carefully consider their recently recognized right to judicial access.  Mr. Al Wady is one detainee among a number recently who, according to guard personnel at Guantanamo Bay, has refused to meet with counsel.  But guard personnel have refused to allow counsel to hear this directly from Mr. Al Wady, thereby preventing counsel from trying to clarify their role, make sure Mr. Al Wady understands what they can do, and change Mr. Al Wady's mind if in fact he is truly refusing.  Counsel for the government, rather than attempting to intervene and convince the custodial authorities that allowing counsel to hear Mr. Al Wady's "refusal" directly would be appropriate, have simply acceded to the position of the custodial authorities.  *See* Exhibit C.

Counsel therefore bring this motion, asking the court to order two forms of relief before their next trip to Guantánamo Bay, which is scheduled on January 19.[1]  First, the Court should order that counsel's Arabic speaking interpreter be allowed to go back to speak to Mr. Al Wady directly and explain to him why it is in his interest to meet with counsel.  Second, the Court should order that, if this does not work, defense counsel be allowed to meet privately with Mr. Al Wady in the camp in which he is actually detained, so that defense counsel may personally explain their role and their purpose.  These are the only ways to ensure that Mr. Al Wady's

---

[1]  The forms of relief requested herein are among the forms of relief which the government rejected when counsel conferred with the government counsel.  *See* Exhibit C.

decision not to meet with counsel is intelligent and voluntary and made with a full understanding of who it is who are trying to meet with him, why counsel are trying to meet with him, and what counsel think they can do for him.

II.

STATEMENT OF FACTS[2]

On December 13, 2005, a petition was filed under the name of Houmad Warzly, but no counsel was appointed to represent the petitioner. A different petition was filed on July 17, 2008 under the name of Hamoud Abdullah Hamoud Hassan Al Wady, and counsel was appointed on petition on August 8, 2008. *See* Exhibit A.[3] This appointment came almost six years after Mr. Al Wady had been taken into custody, and, as far as counsel is aware, he has not seen an attorney once during that time.

Subsequently, after receiving security clearances required by the government and by the Guantanamo Bay Litigation protective order issued by United States District Judge Hogan, counsel scheduled an appointment with Mr. Al Wady and traveled to Guantanamo Bay to meet with him, during the week of December 1, 2008. *See* Exhibit B. On the day of their appointment with Mr. Al Wady, counsel were escorted to the camp at which attorney meetings with clients are

---

[2] This statement of facts is supported by the declaration of counsel which is attached to this motion.

[3] Based on representations made by both the government and the Center for Constitutional Rights, which filed the initial petition and has been coordinating litigation in these cases, counsel subsequently substituted in as counsel on the first petition two months after being appointed on the second petition. Counsel believe they should meet with Mr. Al Wady to confirm that the two names both refer to him before either petition is dismissed on grounds of duplication, and as discussed in this motion, they have not yet been able to have that meeting.

generally held, in a room set aside for that – and possibly other – purposes. Counsel told the guard personnel at the camp that they were there to meet with Mr. Al Wady.

Counsel were then told that Mr. Al Wady refused to meet with them. They were not told this by Mr. Al Wady himself, but were told by guard personnel at the camp. They were also not told *why* Mr. Al Wady was purportedly refusing to see them.

Counsel were next told – in accord with what they were told was standard procedure in this circumstance – that they could write a note to Mr. Al Wady and have the guards take the note to him. Counsel wrote such a note and gave it to guard personnel who took it with them, presumably to the different camp in which Mr. Al Wady was detained.[4] The guard personnel returned a short time later and claimed that Mr. Al Wady had refused to read the note and would not even let the guards read it to him.

In order to (1) be sure that Mr. Al Wady correctly understood who counsel were and why they were there to see him and (2) possibly change his mind about meeting with counsel, counsel then made two further requests of the guard personnel at the camp. First, they asked to be taken back to Mr. Al Wady's cell so they could speak to him directly and make sure he understood, but this request was refused. Second, they asked to send a second note back (1) asking Mr. Al Wady to reconsider overnight – in words suggested by counsel's interpreter as having a religious significance, "do a permission prayer" – and (2) telling him they would return the next day to see if he had changed his mind. The guard personnel also rejected the request to send back this second note, however.

---

[4] As counsel understand it, there are multiple camps at Guantánamo Bay. The rooms in which attorney-client meetings are generally conducted, at least at present and possibly with some occasional exceptions, *see infra* p. 9, are in just one of the camps, and most, if not all, of the detainees are housed in the other camps.

III.

ARGUMENT

It has now been established that detainees at Guantanamo Bay have a right to seek habeas corpus relief in federal court, *see generally Boumediene v. Bush,* 128 S. Ct. 2229 (2008), and – necessarily – a right to be represented by counsel – at least if counsel voluntarily make themselves available,[5] *see Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004) ("[Petitioner] unquestionably has the right to access to counsel in connection with the proceedings on remand."); *cf. Boumediene*, 128 S. Ct. at 2260 (noting lack of counsel as one of deficiencies in CSRT hearing); *id.* at 2269 (same). It follows from the right to representation by counsel that counsel must be able to meet and consult with the detainees. *See Hamdi*, 542 U.S. at 539 (noting that since grant of petition for writ of certiorari, petitioner "has met [with appointed counsel] for consultation purposes on several occasions, and . . . is now being granted unmonitored meetings"). This has been implicitly recognized by the government, through its concession that counsel must be allowed to travel to the naval base at Guantánamo Bay and meet with the clients they represent.

The problem presented in this motion lies in how counsel's availability and usefulness is to be communicated to the client. As noted *supra*, the only communication presently being allowed – about the initial decision of whether to meet – is through the guard personnel at the Guantánamo Bay camps. This is unsatisfactory for multiple reasons.

First, even assuming the utmost good faith on the part of the guard personnel, they will be

---

[5] Private counsel have volunteered to represent a number of detainees pro bono, and several Federal Public Defender offices, such as that of counsel herein, have volunteered to take cases – and subsequently been appointed.

neither as fervent nor as knowledgeable as counsel, or even counsel's interpreter, would be. The guard personnel presumably have no legal education or experience, have little, if any, knowledge of the habeas corpus proceedings and their background, and are, at best, neutral about whether habeas corpus proceedings are a good or bad idea. Counsel, in contrast, have the legal education and experience necessary to explain habeas corpus proceedings to a client, know the history and background of the particular proceedings here, and have an affirmative, strong interest in explaining the benefit of the proceedings to the client.

Second, there is reason to question whether the guards have the utmost good faith assumed in the preceding paragraph – as illustrated by two examples from just the one trip to Guantánamo Bay which counsel in this case have taken to date. As one example, one of Mr. Al Wady's counsel, while waiting to find out if another client would agree to come to a meeting, overheard one guard say, either to himself or another guard, "I hope he [the detainee] cancels." *See* Declaration of Carlton F. Gunn, ¶ 7. As a second example, one client who did meet with counsel in response to a second attempt by counsel told counsel that he had not come out for a meeting the previous afternoon in part because he had been led to believe that the reason the guards wanted to bring him out was for an interrogation. *See id*. Whether or not this was an innocent miscommunication, a deliberate misrepresentation, or something in between, it illustrates the dangers of not allowing someone more interested in having the meeting be the one to communicate its purpose.[6]

---

[6] Occasionally, in counsel's experience representing criminal defendants in a Federal Public Defender office, there is comparable miscommunication and/or misinterpretation, even with ordinary criminal defendants in ordinary criminal cases. There are occasions in which counsel have been told that a client has "refused" to come down for a meeting when all the client actually did was something such as tell a guard he would like five minutes to get ready, and occasions on which the client has not come down because he has the impression the visit is not with his attorney, but with some other official, such as a probation officer. *See* Declaration of

Third, there may be other reasons detainees such as Mr. Al Wady refuse to come out to meet with counsel. One detainee attorney has told counsel that one of her clients refused to come out on one occasion because he was fearful of going through a new scanner in the camp in which that detainee was detained. *See* Declaration of Carlton F. Gunn, ¶ 9. Counsel also understand that, more generally, some detainees have expressed hesitance about being moved from the camps in which they are detained to the camp where the attorneys are now required to interview clients because the process of being moved is humiliating and uncomfortable. *See id*. The scanner referred to above, at least in one camp, is a full body scanner that is so invasive that it allows guards to see under the detainee's clothes, and it is apparently standard procedure to hood and shackle the detainees when they are moved to the camp where attorney-client meetings normally take place. *See id*.

Finally, there could be concerns about Mr. Al Wady's competency and mental state. While counsel have no specific information regarding Mr. Al Wady – since they have not been allowed to see him – the "enhanced interrogation techniques" which have been used with some detainees in the fight against terrorism are well documented. While the government would no doubt disagree with his characterization, a number of reputable national and international organizations have labeled the treatment of the detainees at Guantánamo Bay as abuse, torture, and/or a gross violation of human rights.[7] And whatever the appropriate label, it is certainly

---

Carlton F. Gunn, ¶ 8.

[7] *See, e.g.*, Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power*, at 83-115 Ch. 12-13, AMR 511063/2005 (13 May 2005); Amnesty International, *Guantánamo: An Icon of Lawlessness*, Jan. 6, 2005, at 3-5; Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces*, Ch. 3 (2005); United Nations Press Release, *United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay Detainees*, Feb. 4, 2005; International Committee of the Red Cross, Press Release, *The ICRC's Work at Guantánamo Bay*, Nov. 30, 2004;

possible that the treatment described in these sources, combined with what has bordered on incommunicado detention for a period of years, could have had a significant impact on mental health and a detainee's competency. If counsel and/or their interpreter are allowed to see Mr. Al Wady at least briefly, this possibility can be at least preliminarily evaluated.

The Court should also consider that the purported "refusal" of Mr. Al Wady to see counsel is not consistent with his past behavior in connection with the Combatant Status Review Tribunal and Administrative Review Board proceedings. The publicly available summaries of those proceedings reveal that Mr. Al Wady chose to participate in both the Combatant Status Review Tribunal and Administrative Review Board proceedings. *See* Exhibit D (Wikipedia materials). This raises doubt about whether Mr. Al Wady's purported "refusal" to see counsel is real, or, at the very least, whether it is a considered decision that would not change if counsel and/or counsel's interpreter were able to explain the present proceedings to him directly.

Both common sense and prior experience suggest that presentations from other individuals – in particular, counsel and/or their interpreter – could be more effective. First,

---

International Committee of the Red Cross, *Operational Update, US Detention Related to the Events of September 11, 2001 and Its Aftermath - the Role of the ICRC*, July 26, 2004; Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the "War on Terror"*, at 22 (Oct. 27, 2004) (available at http://web.amnesty.orgilibrary/Index IENGAMR 511452004); Barry C. Scheck, *Abuse of Detainees at Guantánamo Bay*, The Nat'l Assoc. of Criminal Defense Lawyers Champion, Nov. 2004, at 4-5. *See also* Carol D. Leonnig, *Guantánamo Detainee Says Beating Injured Spine; Now in Wheelchair, Egyptian-Born Teacher Objects to Plan to Send Him to Native Land*, Wash. Post, Aug. 13, 2005, at A18; Neil A. Lewis, *Fresh Details Emerge on Harsh Methods at Guantánamo*, N.Y. Times, Jan. 1, 2005, at A11; Carol D. Leonnig, *Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos*, Wash. Post, Dec. 26, 2004, at A1; Neil A. Lewis & David Johnston, *New F.B.I Memos Describe Abuses of Iraq Inmates*, N.Y. Times, Dec. 21, 2004, at A1; Dan Eggen & R. Jeffrey Smith, *FBI Agents Allege Abuse of Detainees at Guantánamo Bay*, Wash. Post, Dec. 21, 2004, at A1; Neil A. Lewis, *FBI Memos Criticized Practices at Guantánamo*, N.Y. Times, Dec. 7, 2004, at A19. Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times, Nov. 30, 2004, at AI.

common sense suggests that counsel with legal education and experience who are appointed and so ethically obligated to act in a petitioner's best interest – and have an affirmative desire to do so – are likely to present the availability of attorney assistance more positively than guard personnel who have no legal experience and have interests that are adverse to the petitioner. Second, defense counsel can bring to the Court's attention the experience their interpreter, Masud Hasnain, has had. Mr. Hasnain has been traveling to Guantánamo Bay and helping lawyers as an interpreter for several years. Prior to 2007, he was allowed – under the then existing policy at Guantánamo Bay – to go back and personally speak to detainees in their cells when they initially refused to see counsel. And Mr. Hasnain has indicated that he was successful in changing the clients' minds, by his estimate, 50% of the time. *See* Declaration of Carlton F. Gunn, ¶ 10.[8]

Finally, it appears that attorney contact with clients directly in the other camps has occasionally been allowed even more recently. One detainee attorney has informed counsel that as recently as July there was a meeting in the camp known as "Camp 6," and another attorney told counsel that there was a meeting in that camp just the day before he arrived for meetings with clients this month. *See* Declaration of Carlton F. Gunn, ¶ 11. It thus appears that meetings in the other camps are a possibility, at least in special circumstances.

All of the foregoing, taken together, suggests it is appropriate for the Court to order such direct contact here. That is the only way to make sure that Mr. Al Wady truly is "refusing" to meet with counsel and make sure that his "refusal" is fully informed and considered.

---

[8] What is sought here – essentially a "cell side visit" – is not something unheard of. Two years ago, it was ordered in a death penalty case in the Central District of California, *see* Exhibit E, and led to the client starting to meet with counsel on a regular basis.

IV.

## CONCLUSION

First, the Court should order that counsel's Arabic speaking interpreter be allowed to go back to speak to Mr. Al Wady directly and explain to him why it is in his interest to meet with counsel. Second, the Court should order that, if this does not work, defense counsel be allowed to meet privately with Mr. Al Wady in the camp in which he is actually detained, so that defense counsel may personally explain their role and their purpose.

DATED: December _22__, 2008

                              Respectfully submitted,

                              ____/S/_____
                              CARLTON F. GUNN (CA Bar No. 112344)
                              CRAIG HARBAUGH (D.C. Bar No. 974117)
                              Deputy Federal Public Defenders
                              Office of the Federal Public Defender
                              321 East 2nd Street
                              Los Angeles, CA 90012
                              (213) 894-1700; Facsimile: (213) 894-0081
                              Attorneys for Petitioner

# DECLARATION OF CARLTON F. GUNN

I, Carlton F. Gunn, hereby declare and state:

1.  I am a Deputy Federal Public Defender in the Central District of California. Our office was appointed to represent the petitioner in this case on August 8, 2008. I and Deputy Federal Public Defender Craig Harbaugh have been assigned to the case.

2.  After our office was appointed and we were assigned to the case, I and Mr. Harbaugh applied for security clearances. The security clearances are required by the protective order which permits counsel to visit clients at Guantánamo Bay. We finally received security clearances in late October.

3.  After receiving the security clearances, I made arrangements for myself, Mr. Harbaugh, and an Arabic interpreter we hired, Masud Hasnain, to travel to Guantánamo Bay to meet with Mr. Al Wady and two other clients we had been appointed to represent. Because of limited flights to Guantanamo Bay and the advance notice required to make appointments to see clients, I was not able to arrange that travel until the week of December 1.

4.  We flew into the base on December 2 and had an appointment to see Mr. Al Wady on December 3. On that morning, we were escorted to the camp at which attorney meetings with clients are generally held, in rooms set aside for that – and possibly other – purposes. When we

arrived at the camp, we told the guard personnel at the camp that we were there to meet with Mr. Al Wady.

5. We were then told by guard personnel that Mr. Al Wady refused to meet with us. I do not recall being told why he was refusing to meet with us, but we were told that there was a procedure allowing us to write a note to Mr. Al Wady, asking him to reconsider, and then have the guards take the note to him. We then wrote such a note, had our interpreter translate it into Arabic, and gave it to guard personnel who took it with them. It was my understanding that they took it to a different camp across the street, which was the actual camp in which Mr. Al Wady was detained.

6. The guard personnel returned a short time later and claimed that Mr. Al Wady had refused to read the note and would not even let the guards read it to him. In an effort to (1) be sure that Mr. Al Wady correctly understood who we were and why we were there to see him and (2) possibly change Mr. Al Wady's mind about meeting with us, we then made two further requests of the guard personnel at the camp. First, we asked if either we or our interpreter could be taken back to Mr. Al Wady's cell so we could speak to him directly and make sure he understood. When the guard personnel refused this request, we conferred and asked as an alternative to send a second note back. In this note, we (1) asked Mr. Al Wady to reconsider overnight – or, in words suggested by our interpreter as having a religious significance, "do a permission prayer" – and (2) told Mr. Al Wady that we would return the next day to see if he had changed his mind. The request to send this second note back in writing also was refused, however.

7. We have concerns that the guard personnel did not sufficiently convey our purpose, the potential help we could give to Mr. Al Wady, and our desire to help him as strongly as either we personally or our interpreter could convey those points. Even aside from the natural reason to doubt that a prison guard would be as convincing and effective, there are at least two specific things we overheard and/or were told that raise concerns in our minds about the guard personnel's effort. First, my co-counsel, Mr. Harbaugh, while we were waiting to find out if the other client would agree to come to a meeting, overheard one guard say, either to himself or another guard, "I hope he cancels." Second, one client who did finally meet with us on a second attempt told us that one of the reasons he had not come out for a meeting the afternoon before was because he had been told that the reason the guards wanted to bring him out was for an interrogation.

8. Such miscommunications and/or misunderstandings are not inconsistent with my occasional experience representing ordinary criminal defendants in a Federal Public Defender office (in which I have practiced for 25 years). There are occasions on which I have been told that a client has "refused" to come down for a meeting when all the client actually did was something such as tell a guard he would like five minutes to get ready. There have been other occasions on which a client has told me (in a later visit) that the reason he did not come down was because he was given the impression the visit was not with his attorney, but with some other person, such as a probation officer.

9. Things we have been told by other detainee attorneys have also raised concerns in our minds about whether Mr. Al Wady's "refusal" to see us reflects a fully considered and

informed decision. As an example, one detainee attorney has told us that one of her clients refused to come out on one occasion because he was fearful of going through a new scanner in the camp in which that detainee was detained. We also understand that, more generally, some detainees have expressed hesitance about being moved from the camps in which they are detained to the camp where the attorneys are now required to interview clients because the process of being moved is humiliating and uncomfortable. The detainee attorney who told us about the client who refused to come see her because of the scanner told us that the scanner, at least in one of the camps, is so invasive that it allows the guards to see under the detainee's clothes and that the detainees are hooded and shackled when they are brought for attorney visits.

10. The interpreter who went with us on our trip to Guantánamo Bay, Masud Hasnain, has told us that up until the beginning of 2007, the interpreter was allowed to go back to speak with the client directly when counsel were told that the client was refusing to see them. Mr. Hasnain told us that when he was allowed to do this, he had a 50-50 success rate in changing the client's mind about seeing counsel.

11. I have also been told by other attorneys that there have been occasions on which attorneys have been allowed to meet with clients in camps other than the one we to which we were taken where the attorney-client meetings normally take place. One attorney told me that as recently as July there was a meeting in the camp known as "Camp 6," and another attorney told me that there was a meeting in that camp just the day before he arrived for meetings with clients

//

//

this month. It thus appears that meetings in the other camps are a possibility, at least in special circumstances.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: December  22 , 2008                By _____/S/_____
                                                CARLTON F. GUNN
                                                Deputy Federal Public Defender