IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: ) <br> ) <br> GUANTANAMO BAY ) <br> DETAINEE LITIGATION ) <br> ) <br> ) <br> AHMED ISLAM SAID KUMAN ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> GEORGE W. BUSH, et al., ) <br> ) <br> Respondents. ) <br> ) <br> ) | Misc. No. 08-442 (TFH) <br><br><br><br><br> Civil Action No. 08-CV-1235 (JDB) |

**MOTION FOR DIRECT CONTACT WITH CLIENT**

I.

<u>INTRODUCTION</u>

For more than six years, Mr. Kuman has languished in executive detention. His sole human contact, aside from other similarly situated detainees, has consisted of being shackled by prison guards and berated by interrogators. Due to the lengthy detention and deplorable conditions, many detainees suffer from, at best, near complete despair and loss of hope and, at worst, extreme psychological trauma. It is therefore no wonder that detainees such as Mr. Kuman have difficulty trusting anyone who tries to meet with them.

It is equally unsurprising that the government, which has strenuously resisted allowing these detainees any judicial access at all, is, to put it charitably, now unhelpful in assuring that detainees fully understand and carefully consider their recently recognized right to judicial

access.  Mr. Kuman is one detainee among a number recently who, according to guard personnel at Guantanamo Bay, has refused to meet with counsel.  But guard personnel have refused to allow counsel to hear this directly from Mr. Kuman, thereby preventing counsel from trying to clarify their role, make sure Mr. Kuman understands what they can do, and change Mr. Kuman's mind if in fact he is truly refusing.  Counsel for the government, rather than attempting to intervene and convince the custodial authorities that allowing counsel to hear Mr. Kuman's "refusal" directly would be appropriate, have simply acceded to the position of the custodial authorities.  *See* Exhibit C.

Counsel therefore bring this motion, asking the court to order two forms of relief before their next trip to Guantánamo Bay, which is scheduled on January 19.[1]  First, the Court should order that, if there is again a purported "refusal" by Mr. Kuman, counsel's Arabic speaking interpreter be allowed to go back to speak to Mr. Kuman directly and explain to him why it is in his interest to meet with counsel.  Second, the Court should order that, if this does not work, defense counsel be allowed to meet privately with Mr. Kuman in the camp in which he is actually detained, so that defense counsel may personally explain their role and their purpose.  These are the only ways to ensure that Mr. Kuman's decision not to meet with counsel is intelligent and voluntary and made with a full understanding of who it is who are trying to meet with him, why counsel are trying to meet with him, and what counsel think they can do for him.

---

[1] The forms of relief requested herein are among the forms of relief which the government rejected when counsel conferred with the government counsel.  *See* Exhibit C.

II.

## STATEMENT OF FACTS[2]

On July 17, 2008, a petition was filed on behalf of Mr. Kuman. Counsel was appointed on August 8, 2008. *See* Exhibit A. This appointment came more than six years after Mr. Kuman had been taken into custody, and, as far as counsel is aware, he has not seen an attorney once during that time.

Subsequently, after receiving security clearances required by the government and by the Guantanamo Bay Litigation protective order issued by United States District Judge Hogan, counsel scheduled an appointment with Mr. Kuman and traveled to Guantanamo Bay to meet with him, during the week of December 1, 2008. *See* Exhibit B. On the afternoon of the day they arrived, when their appointment with Mr. Kuman was scheduled, counsel were escorted to the camp at which attorney meetings with clients are generally held, in a room set aside for that – and possibly other – purposes. Counsel told the guard personnel at the camp that they were there to meet with Mr. Kuman.

Counsel were then told that Mr. Kuman refused to meet with them. They were not told this by Mr. Kuman himself but were told by guard personnel at the camp. They were also not told *why* Mr. Kuman was purportedly refusing to see them.

Counsel were next told – in accord with what they were told was standard procedure in this circumstance – that they could write a note to Mr. Kuman and have the guards take the note to him. Counsel wrote such a note and gave it to guard personnel who took it with them. The

---

[2] This statement of facts is supported by the declaration of counsel which is attached to this motion.

guard personnel returned a short time later and claimed that Mr. Kuman had refused to read the note and so an interpreter accompanying the guards had read it to him.

In order to (1) be sure that Mr. Kuman correctly understood who counsel were and why they were there to see him and (2) possibly change his mind about meeting with counsel, counsel then asked to be taken back to Mr. Kuman – whom counsel understood was in one of the attorney-client interview rooms – so they could speak to him directly and make sure he understood. This request was refused, however.

III.

ARGUMENT

It has now been established that detainees at Guantanamo Bay have a right to seek habeas corpus relief in federal court, *see generally Boumediene v. Bush,* 128 S. Ct. 2229 (2008), and – necessarily – a right to be represented by counsel – at least if counsel voluntarily make themselves available,[3] *see Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004) ("[Petitioner] unquestionably has the right to access to counsel in connection with the proceedings on remand."); *cf. Boumediene*, 128 S. Ct. at 2260 (noting lack of counsel as one of deficiencies in CSRT hearing); *id.* at 2269 (same). It follows from the right to representation by counsel that counsel must be able to meet with and consult with the detainees. *See Hamdi*, 542 U.S. at 539 (noting that since grant of petition for writ of certiorari, petitioner "has met [with appointed counsel] for consultation purposes on several occasions, and . . . is now being granted

---

[3] Private counsel have volunteered to represent a number of detainees pro bono, and several Federal Public Defender offices, such as that of counsel herein, have volunteered to take cases – and subsequently been appointed.

unmonitored meetings"). This has been implicitly recognized by the government, through its concession that counsel must be allowed to travel to the naval base at Guantánamo Bay and meet with the clients they represent.

The problem presented in this motion lies in how counsel's availability and usefulness is to be communicated to the client. As noted *supra*, the only communication presently being allowed – about the initial decision of whether to meet – is through the guard personnel at the Guantánamo Bay camps. This is unsatisfactory for multiple reasons.

First, even assuming the utmost good faith on the part of the guard personnel, they will be neither as fervent nor as knowledgeable as counsel, or even counsel's interpreter, would be. The guard personnel presumably have no legal education or experience, have little, if any, knowledge of the habeas corpus proceedings and their background, and are, at best, neutral about whether habeas corpus proceedings are a good or bad idea. Counsel, in contrast, have the legal education and experience necessary to explain habeas corpus proceedings to a client, know the history and background of the particular proceedings here, and have an affirmative, strong interest in explaining the benefit of the proceedings to the client.

Second, there is reason to question whether the guards have the utmost good faith assumed in the preceding paragraph – as illustrated by two examples from just the one trip to Guantánamo Bay which counsel in this case have taken to date. As one example, one of Mr. Kuman's counsel, while waiting to find out if another client would agree to come to a meeting, overheard one guard say, either to himself or another guard, "I hope he [the detainee] cancels." *See* Declaration of Carlton F. Gunn, ¶ 7. As a second example, one client who did meet with counsel in response to a second attempt by counsel told counsel that he had not come out for a meeting the previous afternoon in part because he had been led to believe that the reason the

5

guards wanted to bring him out was for an interrogation. *See id.* Whether or not this was an innocent miscommunication, a deliberate misrepresentation, or something in between, it illustrates the dangers of not allowing someone more interested in having the meeting be the one to communicate its purpose.[4]

Third, there could be concern about Mr. Kuman's competency and mental state. While counsel have no specific information regarding Mr. Kuman – since they have not been allowed to see him – the "enhanced interrogation techniques" which have been used with some detainees in the fight against terrorism are well documented. While the government would no doubt disagree with his characterization, a number of reputable national and international organizations have labeled the treatment of the detainees at Guantánamo Bay as abuse, torture, and/or a gross violation of human rights.[5] And whatever the appropriate label, it is certainly possible that the

---

[4] Occasionally, in counsel's experience representing criminal defendants in a Federal Public Defender office, there is comparable miscommunication and/or misinterpretation, even with ordinary criminal defendants in ordinary criminal cases. There are occasions in which counsel have been told that a client has "refused" to come down for a meeting when all the client actually did was something such as tell a guard he would like five minutes to get ready, and occasions on which the client has not come down because he has the impression the visit is not with his attorney, but with some other official, such as a probation officer. *See* Declaration of Carlton F. Gunn, ¶ 8.

[5] *See, e.g.*, Amnesty International, *Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power*, at 83-115 Ch. 12-13, AMR 511063/2005 (13 May 2005); Amnesty International, *Guantánamo: An Icon of Lawlessness*, Jan. 6, 2005, at 3-5; Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces*, Ch. 3 (2005); United Nations Press Release, *United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay Detainees*, Feb. 4, 2005; International Committee of the Red Cross, Press Release, *The ICRC's Work at Guantánamo Bay*, Nov. 30, 2004; International Committee of the Red Cross, *Operational Update, US Detention Related to the Events of September 11, 2001 and Its Aftermath - the Role of the ICRC*, July 26, 2004; Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the "War on Terror"*, at 22 (Oct. 27, 2004) (available at http://web.amnesty.orgilibrary/Index IENGAMR 511452004); Barry C. Scheck, *Abuse of Detainees at Guantánamo Bay*, The Nat'l Assoc. of Criminal Defense Lawyers Champion, Nov. 2004, at 4-5. *See also* Carol D. Leonnig, *Guantánamo Detainee Says Beating Injured Spine; Now in Wheelchair, Egyptian-Born Teacher*

treatment described in these sources, combined with what has bordered on incommunicado detention for a period of years, could have had a significant impact on mental health and a detainee's competency. If counsel and/or their interpreter are allowed to see Mr. Kuman at least briefly, this possibility can be at least preliminarily evaluated.

The Court should also consider that the purported "refusal" of Mr. Kuman to see counsel appears potentially inconsistent with the fact that he did come over to the camp where attorney-client interviews are conducted. This suggests he might at the very least have been "on the fence" about whether to meet with counsel and raises doubt about whether his purported "refusal" to see counsel is real, or, at the very least, whether it is a considered decision that would not change if counsel and/or counsel's interpreter were able to explain the present proceedings to him directly.

Both common sense and prior experience suggest that presentations from other individuals – in particular, counsel and/or their interpreter – could be more effective. First, common sense suggests that counsel with legal education and experience who are appointed and so ethically obligated to act in a petitioner's best interest – and have an affirmative desire to do so – are likely to present the availability of attorney assistance more positively than guard personnel who have no legal experience and have interests that are adverse to the petitioner. Second, defense counsel can bring to the Court's attention the experience their interpreter, Masud

---

*Objects to Plan to Send Him to Native Land*, Wash. Post, Aug. 13, 2005, at A18; Neil A. Lewis, *Fresh Details Emerge on Harsh Methods at Guantánamo*, N.Y. Times, Jan. 1, 2005, at A11; Carol D. Leonnig, *Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos*, Wash. Post, Dec. 26, 2004, at A1; Neil A. Lewis & David Johnston, *New F.B.I Memos Describe Abuses of Iraq Inmates*, N.Y. Times, Dec. 21, 2004, at A1; Dan Eggen & R. Jeffrey Smith, *FBI Agents Allege Abuse of Detainees at Guantánamo Bay*, Wash. Post, Dec. 21, 2004, at A1; Neil A. Lewis, *FBI Memos Criticized Practices at Guantánamo*, N.Y. Times, Dec. 7, 2004, at A19. Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times, Nov. 30, 2004, at AI.

7

Hasnain, has had. Mr. Hasnain has been traveling to Guantánamo Bay and helping lawyers as an interpreter for several years. Prior to 2007, he was allowed – under the then existing policy at Guantánamo Bay – to go back and personally speak to detainees in their cells when they initially refused to see counsel. And Mr. Hasnain has indicated that he was successful in changing the clients' minds, by his estimate, 50% of the time. *See* Declaration of Carlton F. Gunn, ¶ 9.[6]

Finally, it appears that attorney contact with clients directly in the other camps has occasionally been allowed even more recently. One detainee attorney has informed counsel that as recently as July there was a meeting in the camp known as "Camp 6," and another attorney told counsel that there was a meeting in that camp just the day before he arrived for meetings with clients this month. *See* Declaration of Carlton F. Gunn, ¶ 10. It thus appears that meetings in the other camps are a possibility, at least in special circumstances.

All of the foregoing, taken together, suggests it is appropriate for the Court to order such direct contact here. That is the only way to make sure that Mr. Kuman truly is "refusing" to meet with counsel and make sure that his "refusal" is fully informed and considered.

IV.

CONCLUSION

First, the Court should order that counsel's Arabic speaking interpreter be allowed to go back to speak to Mr. Kuman directly and explain to him why it is in his interest to meet with counsel. Second, the Court should order that, if this does not work, defense counsel be allowed

---

[6] What is sought here – essentially a "cell side visit" – is not something unheard of. Two years ago, it was ordered in a death penalty case in the Central District of California, *see* Exhibit D, and led to the client starting to meet with counsel on a regular basis.

to meet privately with Mr. Kuman in the camp in which he is actually detained, so that defense counsel may personally explain their role and their purpose.

DATED: December _22__, 2008

Respectfully submitted,


____/S/_____
CARLTON F. GUNN (CA Bar No. 112344)
CRAIG HARBAUGH (D.C. Bar No. 974117)
Deputy Federal Public Defenders
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, CA 90012
(213) 894-1700; Facsimile: (213) 894-0081
Attorneys for Petitioner

DECLARATION OF CARLTON F. GUNN

I, Carlton F. Gunn, hereby declare and state:

1. I am a Deputy Federal Public Defender in the Central District of California. Our office was appointed to represent the petitioner in this case on August 8, 2008. I and Deputy Federal Public Defender Craig Harbaugh have been assigned to the case.

2. After our office was appointed and we were assigned to the case, I and Mr. Harbaugh applied for security clearances. The security clearances are required by the protective order which permits counsel to visit clients at Guantánamo Bay. We finally received security clearances in late October.

3. After receiving the security clearances, I made arrangements for myself, Mr. Harbaugh, and an Arabic interpreter we hired, Masud Hasnain, to travel to Guantánamo Bay to meet with Mr. Kuman and two other clients we had been appointed to represent. Because of limited flights to Guantanamo Bay and the advance notice required to make appointments to see clients, I was not able to arrange that travel until the week of December 1.

4. We flew into the base on December 2 and had an appointment to see Mr. Kuman that afternoon. After we arrived, we were escorted to the camp at which attorney meetings with clients are generally held, in rooms set aside for that – and possibly other – purposes. When we

arrived at the camp, we told the guard personnel at the camp that we were there to meet with Mr. Kuman.

5. We were then told by guard personnel that Mr. Kuman refused to meet with us. I do not recall being told why he was refusing to meet with us, but we were told that there was a procedure allowing us to write a note to Mr. Kuman, asking him to reconsider, and then have the guards take the note to him. We then wrote such a note, had our interpreter translate it into Arabic, and gave it to guard personnel who took it with them. It was my understanding that they took it to one of the attorney-client interview rooms, or at least somewhere in that camp, where Mr. Kuman had been moved in anticipation of our coming to see him.

6. The guard personnel returned a short time later and claimed that Mr. Kuman had refused to read the note and so an interpreter with the guards had read it to him. In an effort to (1) be sure that Mr. Kuman correctly understood who we were and why we were there to see him and (2) possibly change Mr. Kuman's mind about meeting with us, we asked if we could be taken back to Mr. Kuman's cell so we could speak to him directly and make sure he understood. The guard personnel refused this request, however.

7. We have concerns that the guard personnel did not sufficiently convey our purpose, the potential help we could give to Mr. Kuman, and our desire to help him as strongly as either we personally or our interpreter could convey these points. Even aside from the natural reason to doubt that a prison guard would be as convincing and effective, there are at least two specific things we overheard and/or were told that raise concerns in our minds about the guard

personnel's effort. First, the next day, while we were waiting to find out if another client would agree to come to a meeting, my co-counsel, Mr. Harbaugh, overheard one guard say, either to himself or another guard, "I hope he cancels." Second, one client who did finally meet with us on a second attempt told us that one of the reasons he had not come out for a meeting the afternoon before was because he had been told that the reason the guards wanted to bring him out was for an interrogation.

8. Such miscommunications and/or misunderstandings are not inconsistent with my occasional experience representing ordinary criminal defendants in a Federal Public Defender office (in which I have practiced for 25 years). There are occasions on which I have been told that a client has "refused" to come down for a meeting when all the client actually did was something such as tell a guard he would like five minutes to get ready. There have been other occasions on which a client has told me (in a later visit) that the reason he did not come down was because he was given the impression the visit was not with his attorney, but with some other person, such as a probation officer.

9. The interpreter who went with us on our trip to Guantánamo Bay, Masud Hasnain, has told us that up until the beginning of 2007, the interpreter was allowed to go back to speak with the client directly when counsel were told that the client was refusing to see them. Mr. Hasnain told us that when he was allowed to do this, he had a 50-50 success rate in changing the client's mind about seeing counsel.

10. I have also been told by other attorneys that there have been occasions on which

attorneys have been allowed to meet with clients in camps other than the one we to which we were taken where the attorney-client meetings normally take place. One attorney told me that as recently as July there was a meeting in the camp known as "Camp 6," and another attorney told me that there was a meeting in that camp just the day before he arrived for meetings with clients this month. It thus appears that meetings in the other camps are a possibility, at least in special circumstances.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: December 22, 2008      By    /S/
                                                            CARLTON F. GUNN
                                                            Deputy Federal Public Defender