UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTÁNAMO BAY<br>DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| AL HALMANDY, *et al.*,<br><br>Petitioners,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents. | No. 05-cv-2385 (RMU)<br><br>**AMENDED<br>PETITION FOR<br>WRIT OF<br>HABEAS CORPUS** |

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS ON BEHALF OF
MOHAMMED JAWAD (ALSO KNOWN AS SAKI BACHA)**

Petitioner Mohammed Jawad is an Afghan citizen who was taken into U.S.

custody as a teenager in December 2002, on the basis of a false "confession" that Afghan

officials obtained from him through torture. He was illegally removed from his

homeland to the U.S. Naval Base at Guantánamo Bay, Cuba, to face an illegal military

tribunal for a non-existent "war crime." He has been detained at Guantánamo on the

flimsiest of evidence for more than six years, while being systematically abused. That

evidence has now been thoroughly discredited and disavowed by the government, yet

Mohammed has never had a meaningful opportunity to challenge the basis for his

detention. The U.S. government has not alleged that Mohammed is a member of al

Qaeda or the Taliban, nor has it alleged that he engaged in any terrorism-related crime;

there is no legal or factual basis for Mohammed's detention. Mohammed's ongoing detention is by color and authority of the Executive Branch, and in violation of the Constitution, laws and treaties of the United States, including the Geneva Conventions, as well as customary international law and fundamental human rights. Accordingly, this Court should issue a Writ of *Habeas Corpus*, and order injunctive, declaratory, or other relief as necessitated by the facts and law applicable to Mohammed's detention.[1]

## JURISDICTION

1.      Petitioner invokes this Court's jurisdiction under 28 U.S.C. §§ 2241, 2242, 1331, 1350, 1361, 5 U.S.C. § 702, and the All Writs Act, 28 U.S.C. § 1651. This action arises under the Constitution, laws and treaties of the United States, including Articles I, II, III, and VI of the Constitution, and the Fourth, Fifth and Sixth Amendments thereto. *See also Rasul v. Bush*, 542 U.S. 466 (2004), *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), *Boumediene v. Bush*, 128 S. Ct. 2229 (June 12, 2008). Petitioner files on his own behalf. *See* Exhibit A, Authorization of Mohammed Jawad for filing of petition for *habeas corpus*, dated June 20, 2008.

2.      This Court has personal jurisdiction over the parties. Respondents have substantial contacts in this District.

3.      Petitioner is included in the above-captioned and previously-filed Petition for Writ of *Habeas Corpus* under the name Saki Bacha. This Amended Petition is being submitted pursuant to 28 U.S.C. §§ 2241 and 2242 and Rule 15 of the Federal Rules of Civil Procedure. It is filed as of right because no responsive pleading has been filed.

---

[1] Petitioner is exercising his right, under Rule 15 of the Federal Rules of Civil Procedure, to file an amended petition based on information that was not available at the time of initial filing and detailing the facts and circumstances of his initial and on-going detention, as well as the bases for *habeas corpus* relief to which he is entitled.

## VENUE

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b), (e) since a substantial part of the events, acts, and omissions giving rise to the claim occurred in this District.

## PARTIES

5.      Petitioner Mohammed Jawad is an Afghan citizen who has been in United States custody since he was a minor and has been held in Respondents' unlawful custody and control at the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo"), since February 2003.

6.      Respondent George W. Bush is the President of the United States and the Commander in Chief of the armed forces of the United States.  Petitioner is being detained pursuant to an unlawful exercise of President Bush's authority as Commander in Chief and under the laws and usages of war or, alternatively, unlawfully pursuant to the Executive Order of November 13, 2001, entitled "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism," 66 Fed. Reg. 57,833 (Nov. 13, 2001).  President Bush is authorized to establish military commissions under the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (codified at 10 U.S.C. §§ 948, 948a to 950w) ("MCA"), under which Petitioner continues to be detained for trial and which Petitioner challenges as unlawful.

7.      Respondent Robert M. Gates is the Secretary of Defense of the United States, and commands the armed forces of the United States, including the Combatant Status Review Tribunals and the Office of the Military Commissions established to implement the MCA.  Respondent Gates has custodial authority over Petitioner and is

ultimately in charge of the prosecution of Petitioner by military commission. Respondent Gates is substituted for former Respondent and former Secretary of Defense Donald Rumsfeld by operation of law.

8.     Respondent Rear Admiral David M. Thomas, Jr. is the Commander of Joint Task Force-GTMO, which has control of the detention operation at Guantánamo. He has supervisory and custodial responsibility for Petitioner. Respondent Thomas is substituted for former Respondent and the former Commander of Joint Task Force-GTMO, Army Brig. Gen. Jay Hood, by operation of law.

9.     Respondent Colonel Bruce E. Vargo is the Commander of the Guantánamo Joint Detention Operations Group and the JTF-GTMO detention camps, and in that capacity, is responsible for the U.S. facility where Petitioner is presently detained. He exercises immediate custody over Petitioner pursuant to orders issued by Respondents Bush, Gates and Thomas. Respondent Vargo is substituted for former Respondent and the former Commander of the Guantánamo Joint Detention Operations Group, Army Col. Gen. Mike Bumgarner, by operation of law.

## STATEMENT OF FACTS[2]

### A.     Background

10.     After the September 11, 2001 attacks, Congress passed a "Use of Force" Resolution on September 14, 2001, that authorized President Bush to "use all necessary and appropriate force against those nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or harbored

---

[2] The facts alleged in this Amended Petition are based on publicly available sources, including filings cleared for release by the U.S. government and open-source media, or the declaration of Lt. Colonel Darrell Vandeveld, the former lead prosecutor in the Guantánamo Military Commissions case against Petitioner, attached hereto as Exhibit B (in which he certifies that the declaration does not contain any classified information).

such organizations or persons." Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF").

11.     Pursuant to the AUMF, the United States, at the direction of President Bush, commenced military operations against the Taliban and al Qaeda targets in Afghanistan on or about October 7, 2001. United States forces began ground operations on October 19, 2001. Through December 2001, U.S. military operations involved a small number of Special Forces personnel operating on the ground in Afghanistan, and working in cooperation with the forces of the Northern Alliance, a coalition of armed and organized Afghan groups that opposed the Taliban. Over the course of the conflict, Special Force teams from other countries joined U.S. forces and the Northern Alliance against the Taliban and al Qaeda. Afghanistan's capital, Kabul, was captured by Northern Alliance forces on or about November 13, 2001, and the Taliban government was essentially ousted by the end of that month.

12.     On December 22, 2001, Afghan sovereign power was transferred to an Interim Authority chaired by Hamid Karzai. The Interim Authority was established by an agreement among Afghan leaders on December 5, 2001, under the auspices of the United Nations, and endorsed by U.N. Resolution 1383 (2001). Six months later, on June 19, 2002, Hamid Karzai was inaugurated as President of the transitional administration of Afghanistan, after he was elected to the position by a *loya jirga*, a council of Afghan tribal elders. Although hostilities continued in Afghanistan after that date, they were no longer between the governments of the United States and Afghanistan, which became jointly engaged in armed conflict against local and foreign insurgents.

**B.     The Military Order**

13.     On November 13, 2001, President Bush issued an Executive Order authorizing the Secretary of Defense to detain indefinitely anyone President Bush has "reason to believe":

i.      is or was a member of the organization known as al Qaeda;
ii.     has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threatened to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or
iii.    has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

Exec. Order, 66 Fed. Reg. 57,833 (Nov. 13, 2001) (the "Military Order").

14.     Through the Military Order, the President asserts complete discretion to identify the individuals that fall within its scope. Such a sweeping assertion of Executive authority is unconstitutional. The Military Order contains no provision for even the most basic requirements of due process, including notice or a hearing. It purports to authorize indefinite and unreviewable detention based on nothing more than President Bush's delegated written determination that an individual is subject to its terms without review by any independent court.

**C.     The Petitioner**

15.     Mohammed Jawad was born in an Afghan refugee camp in Miran Shah, Pakistan, in about 1987. His father was killed during the war against Soviet forces when Mohammed was a baby.

16.     Mohammed's mother re-married, and he continued to live in the refugee camp with her and with his step-father, two half-brothers and two half-sisters. At the refugee camp, Mohammed was able to go to school, but only for about six years. His

brief education was in his mother tongue, Pashto.  He does not speak any other language (except for a few English words learned since he has been at Guantánamo), and he is functionally illiterate.

17.     Mohammed left school and went to work when he was about 15 years old, in order to help support his family and himself.  He never received any further formal education, or any job training skills.

18.     In or about December 2002, when Mohammed was about 15 or 16, he travelled to Afghanistan based on the promise of a high-paying job removing landmines. Exhibit B, ¶ 4, Declaration of Lt. Col. Darryl Vandeveld, U.S. Army Reserve Judge Advocate General's Corps, dated January 12, 2009 (declaration of former lead prosecutor in the Guantánamo Military Commissions case against Mohammed) ("Vandeveld Decl.").

**D.     Mohammed's Capture by Afghan Forces and Torture in Afghan Custody**

19.     At about 3:30 in the afternoon on December 17, 2002, Mohammed was arrested in Kabul by Afghan police in connection with a hand grenade attack on an American military vehicle that injured two U.S. Special Forces soldiers and their Afghan interpreter.

20.     Upon information and belief, at least two other suspects, both adults, were arrested by the Afghan police in connection with the attack and confessed to a role in the attack.  Amin Tarzi, *Perpetrators of Attacks Against U.S. Troops in Kabul Arrested*, Afghanistan Report (Dec. 20, 2002), *available at* http://www.globalsecurity.org/military/library/news/2002/12/4-201202.htm; *see also* Vandeveld Decl. ¶ 21 ("Media accounts and intelligence reports indicated that at least

three other Afghans had been arrested for the crime and had subsequently confessed, casting considerable doubt on the claim that Mr. Jawad was solely responsible for the attack."). However, only Mohammed was turned over by the Afghan authorities to U.S. custody. Upon information and belief, no formal police investigation of the attack was conducted by the Afghan police, and no civilian eyewitnesses were identified or questioned.

21. Afghan officials present at Mohammed's interrogation observed Mohammed to be under the influence of, or suffering withdrawal from, unidentified drugs while he was in their custody. Nevertheless, Afghan authorities did not wait for the effects of the drugs to wear off before commencing a several-hour-long interrogation of Mohammed.

22. A number of high-ranking Afghan police and security officials were present during Mohammed's interrogation, including the Interior Minister. Several lower-ranking police officers were also present.

23. Upon information and belief, Afghan officials made no attempt to contact Mohammed's parents, or any social service agencies within the Afghan government responsible for the well-being of juveniles. No counsel or any adult responsible for Mohammed's well-being and interests was present during the interrogation. Afghan authorities did not provide Mohammed anything to eat or drink during the approximately 6.5 hours that he was in their custody.

24. Mohammed was subjected to cruel, intimidating and abusive treatment in the custody of the Afghan authorities, including being struck on the bridge of his nose and being subjected to threats. Specifically, Mohammed was told that he would be killed

if he did not confess to the grenade attack. He was also told that his family members would be arrested and killed if he did not confess. Both the police and the other high-level officials conducting the interrogation were armed, and Mohammed had a credible fear that they were capable of carrying out their threats. During the interrogation, Mohammed allegedly made incriminating statements and a document, purporting to be a confession, was prepared for him to "sign" with his thumbprint. Vandeveld Decl. ¶¶ 5, 21. Mohammed did not know what the document was, did not read it, and was told he needed to put his thumb print on it to be released.

25. The written statement allegedly containing Mohammed's confession and thumbprint is in Farsi. Mohammed does not read, write, or speak Farsi. There are several factual assertions in the statement that are false, including Mohammed's name, his father's name, his grandfather's name, his uncle's name, his residence, his current residence, his age, and an assertion that he speaks English. The statement's account of the grenade attack—the responsibility for which the statement ascribes solely to Mohammed—conflicts with the eyewitness accounts of the American victims. Yet, it was this statement that Respondents and their agents primarily relied on as a basis for Mohammed's detention, and for the charges brought against him in the Guantánamo Military Commissions.

**E.      The Torture and Cruel Treatment of Mohammed in U.S. Custody at Forward Operating Base 195**

26. After the grenade attack, U.S. personnel requested that the perpetrators of the attack be turned over to the United States for questioning. Afghan officials were initially reluctant to do so, but finally agreed. Vandeveld Decl. ¶ 6.

27.     Mohammed was transferred to U.S. custody at approximately 10:00 p.m. on December 17, 2002, and taken to Forward Operating Base ("FOB") 195 for further interrogation. He remained there overnight.

28.     From the time he was in Afghan custody (approximately 3:30 in the afternoon on December 17) until well into his interrogation in U.S. custody, Mohammed was not allowed to eat, drink or sleep, although he told interrogators he was hungry and had not eaten in many hours.

29.     During the interrogation, U.S. interrogators found Mohammed's assertion that he was drugged to be credible and observed him to be suffering from drug withdrawal; they also observed him to be tired, hungry and visibly afraid. Upon information and belief, U.S. interrogators recognized that Mohammed was a juvenile.

30.     Upon information or belief, no U.S. personnel made any attempt to contact Mohammed's parents, another relative or friend, or a social worker, social service agency, or non-governmental organization with expertise in the care of juveniles. Mohammed was not informed at any time that he had the right to remain silent, that he had the right to consult with counsel or have counsel present, or that any statements he made would potentially be used against him in criminal proceedings. Mohammed was not given the opportunity to make a telephone call or contact his parents or a guardian.

31.     Mohammed was subjected to inhuman and degrading treatment by U.S. personnel at FOB 195 upon his arrival there. He was ordered to remove all his clothing, strip-searched, and directed to pose for nude photographs in front of several witnesses. Mohammed was also subjected to coercive interrogation while at FOB 195. U.S. officials blindfolded and hooded Mohammed, and subjected him to interrogation

techniques designed to "shock" him into the extremely fearful state associated with his initial arrest. Other acts of coercion and intimidation include, while he was blindfolded and hooded, being told by interrogators to hold on to a water bottle that he believed was actually a bomb that could explode at any moment. Interrogators also told Mohammed that if he wanted to see his family again, he should cooperate and confess. After initially denying his involvement, Mohammed allegedly then confessed to the attack.

32.     Military interrogators allegedly made a videotape of Mohammed's interrogation and alleged confession; despite a service-wide inquiry, however, that videotape has never been found. Vandeveld Decl. ¶¶ 6, 20.

**F.      The Torture and Cruel Treatment of Mohammed in U.S. Custody at Bagram**

33.     On December 18, 2002, after U.S. forces at FOB 195 completed their interrogation of Mohammed, he was transported to the U.S. prison at Bagram, Afghanistan.

34.     Just days before Mohammed arrived at Bagram, on December 4 and 10, 2002, two detainees held there were beaten to death by U.S. Forces. Tim Golden, *In U.S. Report, Brutal Details of 2 Afghan Inmates' Deaths*, New York Times, May 20, 2005.

35.     While in the custody of U.S. Forces at Bagram for approximately 49 days, Mohammed was also subjected to severe abuse, maltreatment, and torture. U.S. personnel subjected Mohammed to beatings, forced him into so-called "stress positions," forcibly hooded him, placed him in physical and linguistic isolation, pushed him down stairs, chained him to a wall for prolonged periods, and subjected him to threats, including threats to kill him, and other intimidation. Vandeveld Decl. ¶ 25. U.S. forces also subjected Mohammed to sleep deprivation; interrogators' notes indicate that

Mohammed was so disoriented at one point that he did not know whether it was day or night. Mohammed was also intimidated, frightened and deeply disturbed by the sounds of screams from other prisoners and rumors of other prisoners being beaten to death.

36. Mohammed was subjected to at least eleven interrogations at Bagram. An interrogator's notes from the first interrogation at Bagram indicate that Mohammed fell asleep during interviews because he was so tired and appeared to be suffering from drug withdrawal that caused him to fidget and lose focus.

37. Mohammed was subjected to coercive treatment during the interrogations at Bagram. Upon information and belief, interrogators coercively played on fears and longings to which a juvenile would be particularly susceptible. Interrogators used Mohammed's feelings of longing for his mother to gain his cooperation; an interrogator's report states that Mohammed became overwhelmed with excitement when interrogators offered him the opportunity to write to his mother. Interrogators also found Mohammed feared his family's reaction to his arrest, feared being turned over to the Taliban (because, he told interrogators, his cousin was tortured by the Taliban), and used these fears to coerce Mohammed. Mohammed grew so desperate during the interrogations that he eventually told interrogators he was contemplating suicide.

38. Interrogator reports purporting to summarize Mohammed's interrogations at Bagram indicate that he repeatedly denied throwing the hand grenade.

39. Mohammed was held in custody at Bagram until on or about February 6, 2003, when he was transported to Guantánamo. Before he was transported to Guantánamo, Mohammed was intentionally starved for three days, and given only sips of water. Upon information and belief, this treatment was standard operating procedure at

the time to ensure detainees would not soil themselves during the 17-hour flight from Bagram to Guantánamo.

**G.      The Torture and Cruel Treatment of Mohammed at Guantánamo**

40.      Upon arrival at Guantánamo, on February 3, 2003, Mohammed was subjected to 30 days of physical and linguistic isolation.  During this period, his only significant human contact was with interrogators.

41.      Throughout Mohammed's incarceration at Guantánamo, he was treated as an adult and housed with adults, although other juvenile detainees were housed in separate facilities.  At no time during his entire period of incarceration at Guantánamo did Mohammed receive any rehabilitation treatment, special education, or other rights in recognition of his juvenile status.

42.      Military records from throughout 2003 indicate that Mohammed repeatedly cried and asked for his mother during interrogation.  Upon information and belief, before one interrogation, Mohammed fainted, complained of dizziness and stomach pain, but was given an IV and forced to go through interrogation.

43.      One interrogator was sufficiently concerned about Mohammed's mental stability that he requested an assessment from the Behavioral Science Consultation Team ("BSCT") stationed at Guantánamo.  However, the psychological assessment that resulted was not performed for the purpose of treatment, but "instead was conducted to assist the interrogators in extracting information from Mr. Jawad, even exploiting his mental vulnerabilities to do so."  Vandeveld Decl. ¶ 23.

44.      Upon information and belief, at the recommendation of the BSCT psychologist, intelligence officials subjected Mohammed, still a teenager at the time, to

social, physical and linguistic isolation for another 30-day period, in order to create complete dependence on his interrogator. This period of segregation occurred from September 17 to October 16, 2003, and was specifically intended to break Mohammed's will and to devastate him emotionally.

45.     The period of extreme isolation failed in its purpose of persuading Mohammed to admit throwing the hand grenade, and he continued to assert his innocence.

46.     On December 25, 2003, according to official prison logs, Mohammed tried to commit suicide.

47.     Mohammed was subjected to more cruelty in the months after his suicide attempt.  As early as November 2003, Joint Task Force-GTMO ("JTF-GTMO") personnel used sleep deprivation to disorient specific detainees for intelligence purposes. Pursuant to this technique, euphemistically referred to as the "frequent flyer" program, a detainee would be repeatedly moved from one cell to another in quick intervals, throughout the day and night, to disrupt sleep cycles.

48.     Military records show that Mohammed was subjected to the "frequent flyer" program from May 7 to May 20, 2004.  Over that fourteen-day period, Mohammed was forcibly moved from cell to cell 112 times, on an average of about once every three hours, and prevented from sleeping.  Mohammed's medical records indicate that significant health effects he suffered during this time include blood in his urine, bodily pain, and a weight loss of 10% from April 2004 to May 2004.

49.     Mohammed was subjected to the "frequent flyer" program even though the then-Commander of JTF-GTMO, who was responsible for all detainee operations,

had ordered the program to be stopped in March 2004.  That Commander has since stated that he did not authorize and would not have authorized the program to be administered to Mohammed.

50.     At the time Mohammed was subjected to the "frequent flyer" program, the policy of the U.S. Southern Command, to which the Commander of JTF-GTMO reported, required prior approval for sleep deprivation of a detainee and limited the deprivation period to four days.  Upon information and belief, no approval was requested or provided for Mohammed's sleep deprivation for 14 days.

51.     In addition to the "frequent flyer" program used as an interrogation tool, there was also a second, unauthorized, "frequent flyer" program that was used as a disciplinary tool by the Guantánamo Joint Detention Operation Group, the military unit directly responsible for the treatment detainees receive while in detention.  Upon information and belief, Mohammed was subjected to sleep deprivation under this second program.

52.     Other kinds of cruel and inhuman treatment Mohammed suffered during his incarceration at Guantánamo include excessive cold, loud noise, prolonged linguistic isolation (separating him from the only other prisoners who speak his language, Pashto), and prolonged exposure to excessively bright lights.

53.     As recently as on or about June 2, 2008, Mohammed was beaten, kicked, and pepper-sprayed while he was on the ground with his feet and hands in shackles, for allegedly not complying with guards' instructions.  Fifteen days later, there were still visible marks consistent with physical abuse on his body, including his arms, knees, shoulder, forehead, and ribs.

54.     The torture, cruelty, and harsh treatment to which Mohammed has been subjected throughout his six years in U.S. custody have resulted in severe and ongoing psychological harm.

**H.     Mohammed's Combatant Status Review Tribunal and Administrative Review Boards**

55.     After the Supreme Court held in *Rasul v. Bush*, 542 U.S. 466 (2004), that Guantánamo prisoners were entitled to judicial review of the basis for their detention, the U.S. military established Combatant Status Review Tribunals ("CSRT") at Guantánamo to determine whether prisoners were subject to detention as "enemy combatants."  A CSRT is a non-adversarial hearing conducted pursuant to rules and procedures that are unfair in design and biased in practice, and violate the Constitution, laws and treaties of the United States.  *See Boumediene v. Bush*, 128 S. Ct. 2229, 2275 (June 12, 2008) (finding that CSRTs were not an adequate substitute for *habeas* because their procedural flaws created a considerable risk of error).

56.     Among other flaws, in a CSRT, the detainee is denied: access to counsel; the right to see evidence against him; the right to confront, or even know the identity of, his accusers; the right to call witnesses; the right to present evidence; and, the right to know how the military and/or other agencies collected evidence against him.  In addition, the CSRT rules and procedures mandate that the evidence against a detainee (which he may not have seen) be presumed genuine and accurate, permit evidence obtained by torture or coercion, and presume the reliability of hearsay evidence.

57.     Mohammed was determined to be an "enemy combatant" for purposes of detention by a CSRT on November 4, 2004.  This decision was reaffirmed in two annual Administrative Review Boards ("ARB") conducted by the Office of Administrative

Review for Detained Enemy Combatants held on December 8, 2005, and November 8, 2006, respectively.

58.     Mohammed's CSRT was conducted after he met with his personal representative twice for a total of two hours.  No documents were submitted on his behalf and no witnesses were called.  Mohammed's personal representative declined the opportunity to offer comments or objections to the report that unanimously concluded Mohammed was an "enemy combatant."

59.     The evidence upon which the CSRT and the ARBs relied in Mohammed's case, and therefore the basis for Mohammed's initial and on-going detention, has been conclusively undermined by new exculpatory or extenuating evidence.

60.     In reaching their decisions justifying Respondents' continued detention of Mohammed, the CSRT and the ARBs each relied, in significant part, on a document purported to be a written confession by Mohammed, and allegedly signed by him and marked with his thumbprint.   For example, in the Unclassified Summary of Evidence for Administrative Review Board dated November 7, 2005, the government indicated that it was relying on "Detainee Action and Statements" and that "The detainee made a written confession to this attack, signed it and marked it with his fingerprint."  Upon information and belief, similar statements were made in documents prepared for the CSRT and the other ARB.  This purported confession was the document Mohammed was forced to thumbprint, without reading, after being subjected to torture and cruel treatment in Afghan custody.  Vandeveld Decl. ¶¶ 5, 21.

61.     The government has subsequently determined and admitted that the "confession" previously offered to the CSRT and the ARBs to establish Mohammed's

status as an "enemy combatant" was false and not made by him. The government has admitted that it has no other written confessions made by Mohammed. *See* Vandeveld Decl. ¶¶ 5, 21, 30.

62. Apart from the "confession" statement now admitted to be false, the CSRT and the ARBs considered alleged oral confessions by Mohammed to Afghan officials and to U.S. interrogators within 24 hours of his arrest on December 17, 2002. A U.S. military judge found on October 28, 2008, however, that all of the alleged statements made by Mohammed to Afghan authorities and U.S. authorities on December 17 and 18, 2002, were the product of torture (specifically, "physical intimidation" and death threats against Mohammed and threats to kill his family). *See* D-022 Ruling on Defense Motion to Suppress Out of Court Statements of the Accused to Afghan Authorities (Military Comm'n, Guantánamo Bay, Cuba filed Oct. 28, 2008), *available at* http://www.defenselink.mil/news/d20081104JawadD022Suppress.pdf; D-021 Ruling on Defense Motion to Suppress Out of Court Statements Made By the Accused While in U.S. Custody (Military Comm'n, Guantánamo Bay, Cuba filed Nov. 19, 2008), *available at* http://www.defenselink.mil/news/d20081223Jawadexhibitsa-h.pdf. As described below, in paragraph 82, the government has appealed the military judge's November 19 suppression decision.

63. According to the publicly available CSRT transcript, the government also relied on a purported connection between Mohammed and the group Hezb-I Islami Gulbuddin ("HIG"), a State Department "group of concern"; evidence supporting the connection has also now been shown to be false. The CSRT specifically found that "the detainee is a member of, or affiliated with Hezb-E-Islami." The government relied, in

part, for this assertion on a document purporting to be a pledge of loyalty or membership to HIG and alleged to contain Mohammed's thumbprint.  However, a forensic examination by the U.S. Army Criminal Investigation Laboratory concluded that the thumbprint on the document was not, in fact, Mohammed's.  Vandeveld Decl. ¶¶ 4, 31. This examination, completed in 2006, was never considered by the CSRT or either ARB.

64.     Upon information and belief, neither the CSRT nor the ARBs considered Mohammed's age at the time of his alleged wrongdoing, nor were they made aware that Mohammed had been subjected to any abusive treatment.

65.     Although the two bases for Respondents' decision to detain Mohammed as an "enemy combatant" have now been conclusively undermined, the exculpatory information has not been considered by the U.S. government in evaluating the continued legality of Mohammed's detention because Respondents and their agents brought charges against Mohammed in the Guantánamo military commissions on October 9, 2007. Respondent's procedures provide that the ARB process is suspended for any detainee who is charged before the commissions, and Mohammed was therefore denied his 2007 and 2008 annual ARBs.

66.     After Mohammed's CSRT and his first ARB were held, the U.S. State Department formally acknowledged to the United Nations Committee Against Torture that evidence obtained from torture should not be used in CSRT and ARB proceedings. John Bellinger, Legal Advisor to the State Department, United States Response to the Questions Asked by the Committee Against Torture, Question No. 42 (May 5, 2006), *available at* http://www.state.gov/g/drl/rls/68561.htm.

## I. The Military Commissions Act and Respondents' Charges Against Mohammed

### 1. The Military Commissions Act

67. On October 9, 2007, under authority of Respondent Bush and Respondent Gates pursuant to the Military Commissions Act of 2006, prosecutors swore charges against Mohammed, accusing him of attempted murder in violation of the law of war and of intentionally causing serious bodily harm (the latter charge was dismissed on June 19, 2008). The charges all arose out of the alleged grenade attack. These charges were referred for trial by military commission on January 30, 2008. Mohammed is not charged with any acts of terrorism or material support for terrorism. He is also not alleged to have any affiliation with any terrorist group.

68. The United States has admitted that at the time of the charged offenses, Mohammed was less than 18 years old, and that he is one of only two juveniles facing trial by military commission under the MCA. *See* United States Bureau of Democracy, Human Rights and Labor, United States Written Response to Questions Asked by the Committee on the Rights of the Child (13 May 2008) *available at* http://www.state.gov/g/drl/rls/105435.htm.

69. The United States signed and ratified the Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflict ("Protocol on Child Soldiers") on January 23, 2003. The treaty went into effect and became a binding legal obligation of the United States before U.S. forces transferred Mohammed out of Afghanistan, on or about Feb 6, 2003. According to the Protocol on Child Soldiers, children who were recruited or used in armed conflict should be considered primarily as victims. The Protocol on Child Soldiers requires that the United

States provide any child soldier under its jurisdiction with rehabilitation and social reintegration services. There are no procedures for juvenile rehabilitation and reintegration in the MCA or its implementing regulations, and Mohammed has received no such services at Guantánamo.

70. The military commission system established under the MCA violates the Constitution and the laws and treaties of the United States and customary international law, both in the specifics of its jurisdictional, procedural and evidentiary provisions, and as a whole, for the following reasons, among others:

(a) the MCA permits, and the Commissions have subjected civilian defendants, including Mohammed, to unlawful detention for trial as an "alien unlawful enemy combatant," MCA § 948d, even if no legally constituted tribunal has found the defendant carries such a status and even though the status does not exist under the law of war;

(b) the MCA prohibits defendants from pursuing their right not to be tried in a military system that has no jurisdiction over them until after the trial has occurred and it is too late, by prohibiting interlocutory appeals by defendants, MCA § 950d;

(c) the MCA permits, and the Commissions have subjected defendants, including Mohammed, to unlawful detention for trial for alleged war crimes even though the defendant was a juvenile at the time of his alleged wrongful acts and even though military trial of juveniles, purely for the purpose of punishment and without any provision for rehabilitation and reintegration into society, is a violation of the laws and treaties of the United States;

(d) the MCA permits, and the Commissions have subjected defendants, including Mohammed, to unlawful detention for trial for offenses that were created after the time

they were allegedly committed, in violation of the *Ex Post Facto* Clause of the Constitution;

(e)  the MCA permits, and the Commissions have subjected defendants, including Mohammed, to unlawful detention for trial for offenses that are not violations of the laws of war;

(f)  the MCA permits, and the Commissions may rely on, information and evidence produced through cruel, inhuman, degrading treatment, MCA§ 948r(c)-(d) and, although the MCA purports to prohibit evidence obtained through torture, it does not prohibit evidence derived from torture statements, unlike the Uniform Code of Military Justice ("UCMJ"), which contains a specific prohibition against such derivative evidence;

(g)  the MCA permits, and the Commissions may rely on, hearsay evidence in violation of the Due Process and Confrontation Clauses because the MCA creates the presumption that hearsay is valid and places the burden on the opponent to prove it is unreliable, which has a disproportionately prejudicial effect on Commission defendants, including Mohammed, MCA § 949a(a)(2)(E)(i);

(h)  the MCA permits, and the Commissions may rely on, evidence that the defendant is not permitted to see, in violation of the Due Process and Confrontation Clauses, MCA § 949d(f);

(i)  since their inception, the Commissions have subjected defendants, including Mohammed, to unlawful detention for trial by a tribunal manipulated by unlawful command influence and political considerations;

(j)  the MCA permits, and the Commissions have subjected defendants, including

Mohammed, to an adjudicative process that denies the right to fairly investigate and test the evidence proffered by the government and therefore to present an adequate defense;

(k)  the MCA permits, and the Commissions have subjected defendants, including Mohammed, to unlawful and prolonged pretrial detention without probable cause or other justification;

(l)  the MCA permits, and the Commissions have subjected Mohammed to, unlawful detention for trial even though he was illegally extradited from Afghanistan;

(m)  the MCA prohibits defendants, including Mohammed, from invoking their rights under the Geneva Conventions;

(n)  because of the MCA's and the Commissions' procedural and evidentiary deficiencies and the constraints they impose on a defendant's ability to rebut the factual basis for the government's charges against him, there is a significant risk of error in the Commissions' findings of fact;

(o)  the MCA restricts the scope of military and federal-court review of Commissions findings and decisions so as to deny defendants meaningful appeal rights, including by prohibiting appellate review of questions of fact, MCA § 950 f, g; and

(p)  as a result of the foregoing provisions, among others, which violate the Constitution, laws and treaties of the United States, and depart significantly from the standards applicable in federal criminal trials or courts-martial under the UCMJ, the Commissions impose arbitrary punishment in further violation of the United States Constitution, laws and treaties.

71.    Trial by the Guantánamo Military Commissions does not present defendants with a meaningful opportunity to challenge the basis for their detention with

the possibility of securing release. Even a determination by a Guantánamo Military Commission that it does not have personal jurisdiction over a defendant, or, after trial, that the defendant should be acquitted, does not have binding effect. During a recent press briefing, Pentagon Press Secretary Geoff Morrell stated with respect to another Commission defendant, "even if he were acquitted of the charges that are before him, he would still be considered an enemy combatant and therefore would continue to be subjected to—subject to continued detention." Geoff Morrell, Press Secretary, Pentagon, Department of Defense News Briefing (Aug. 5, 2008), *available at* http://www.defenselink.mil/transcripts/transcript.aspx?transcriptid=4270.

## 2. The Military Commissions Case against Mohammed

72.     In September 2008, the lead prosecutor in the Guantánamo Military Commissions case against Mohammed, Lt. Col. Darryl Vandeveld, left the Commissions because he did not believe he could ethically continue to prosecute the case. Vandeveld Decl. ¶¶ 2, 32.

73.     Until his resignation from the Jawad prosecution, Lt. Col. Vandeveld "lived with that case, day in and day out for over a year," and knows it better than any other person in the U.S. government. *Id.* ¶ 30.

74.     Lt. Col. Vandeveld initially believed that Mohammed's case was no more complex than a street crime case, in large part because Mohammed had no significant intelligence value. *Id.* ¶¶ 3, 12. Lt. Col. Vandeveld would find, however, that neither the facts nor the law supported the charges against Mohammed or the basis for his detention. *Id.* ¶¶ 2, 21, 26, 27, 28, 30.

75.     As he investigated the case, Lt. Col. Vandeveld discovered that contrary to his original belief that Mohammed was not abused or was exaggerating his abuse, *id*. ¶¶11, 12, the military's own records and witnesses proved that Mohammed had been subjected to torture and cruelty in Bagram and Guantánamo.  *Id*. ¶¶ 18, 19, 23, 24, 25. He also discovered that the government's evidence against Mohammed was obtained through torture or coercion, *id*. ¶¶ 2, 18, 23, 24, 25, or otherwise not credible.  *id*. ¶ 21 (material differences in statements made to interrogators caused Vandeveld and other prosecutors"to wonder whether either could be used to establish the truth").

76.     Lt. Col. Vandeveld found, moreover, that the Commissions system for gathering, maintaining and producing evidence was in chaos.  *Id.* ¶¶ 7, 8, 20, 29. Physical evidence that had been collected had disappeared.  *Id.* ¶¶ 8, 20.  "The state of disarray was so extensive that I later learned . . . that crucial physical evidence and other documents relevant to both the prosecution and the defense had been tossed into a locker located at Guantánamo and promptly forgotten."  *Id.* ¶ 8.  It was only by "sheer happenstance" that Lt. Col. Vandeveld in fact found exculpatory evidence gathered by the military itself: a statement contemporaneously corroborating Mohammed's account of abuse at Bagram.  *Id.* ¶ 25.

77.     According to Lt. Col. Vandeveld,  "The chaotic state of the evidence, overly broad and unnecessary restrictions imposed under the guise of national security, and the absence of any systematic, reliable method of preserving and cataloguing evidence, all of which have plagued the Tribunals and Commissions since their inception in 2002 and 2006, make it impossible for anyone involved (the prosecutors) or caught up

(the detainees) in the Commissions to harbor even the remotest hope that justice is an achievable goal." *Id.* ¶ 29.

78.     The government's case against Mohammed suffered another blow when the Military Commissions judge rejected the novel legal theory underlying the government's case: that Mohammed's alleged status as an "unlawful combatant" rendered conduct he allegedly engaged in a violation of the law of war. *Id.* ¶¶ 10, 30. Instead, the judge held, alleged status was not enough: the government also had to show the alleged crime was itself a violation of the law of war. *Id.* ¶ 30. This, the government told the judge, it could not do. *Id.* ¶ 30.

79.     Once Lt. Col. Vandeveld concluded that Mohammed could and should not be prosecuted, he wanted to convince his superiors to seek withdrawal of the charges, but knew such efforts would be futile. *Id.* ¶ 27. Knowing also that a dismissal of the case would not, in any event, have led to Mohammed's release because of Respondents' position that the government can indefinitely hold Mohammed as an "enemy combatant," *id.*, Lt. Col. Vandeveld sought approval from his superiors to negotiate a plea bargain that would eventually lead to Mohammed's release, *id.* His efforts were rejected. *Id.*

80.     Deciding that he could no longer ethically prosecute Mohammed, Lt. Col. Vandeveld petitioned the Army's Judge Advocate General to let him serve out the remainder of his assignment in Afghanistan or Iraq. *Id.* ¶ 32. Instead, he was released from active duty. *Id.*

81.     Since Lt. Col. Vandeveld's departure, the government has appealed to the Court of Military Commission Review (an appellate body established under the MCA) the military judge's decision suppressing alleged confessions made by Mohammed in

U.S. custody because he found they were the product of torture.  The Military

Commission proceedings against Mohammed are stayed pending the outcome of the

appeal.

82.     Based on his personal knowledge of the case and of Mohammed, Lt. Col.

Vandeveld does not believe Mohammed presents a threat:

> [H]ad I been returned to Afghanistan or Iraq, and had I encountered Mohammed
> Jawad in either of those hostile lands, where two of my friends have been killed in
> action and another one of my very best friends in the world had been terribly
> wounded, I have no doubt at all—none—that Mr. Jawad would pose no threat
> whatsoever to me, his former prosecutor and now-repentant persecutor.  Six years is
> long enough for a boy of sixteen to serve in virtual solitary confinement, in a distant
> land, for reasons he may never fully understand.

*Id*.

## CAUSES OF ACTION

**A.      Claims Based on Illegal Detention as an Alleged Enemy Combatant**

### FIRST CLAIM FOR RELIEF

### UNLAWFUL DETENTION — LACK OF MILITARY JURISDICTION
### TO DETAIN A CIVILIAN CHILD

83.     Jurisdiction vests in military courts and all other relevant military tribunals

under 10 U.S.C. §§ 802 and 821.  Neither these provisions nor any other provision of

military law extend military jurisdiction to a civilian child under 18 years of age, such as

Mohammed.

84.     Mohammed was a child of 16 or 17 at the time of his initial detention and

was interrogated and mistreated numerous times, as set forth above, while he was still a

child under the age of 18.  He is not enlisted in any armed force or group, nor did his

parents or other legal guardian ever grant permission for such enlistment.  Respondents

therefore had no jurisdiction to hold him in military detention and may not continue to exercise military jurisdiction over him.

85.     The exercise of military jurisdiction over Mohammed is *ultra vires* and unlawful in violation of 10 U.S.C. §§ 802 and 821 or any other jurisdictional provision of U.S. military law.

### SECOND CLAIM FOR RELIEF

### UNLAWFUL DETENTION — ARTICLE II
### OF THE UNITED STATES CONSTITUTION

86.     By the actions described above, Respondent Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing the seizure and transfer to military detention of Mohammed, a civilian child who was not engaged in hostilities against the United States, and by authorizing and ordering his continued military detention at Guantánamo.  All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Mohammed.

87.     The military seizure and detention of Mohammed by the Respondents is *ultra vires* and illegal in that it exceeds the Executive Branch's authority under Article II of the United States Constitution.  To the extent the Executive asserts that Mohammed's detention is authorized by the AUMF, the detention of Mohammed exceeds the authority granted to the Executive in the AUMF.  To the extent that the Executive asserts that Mohammed's detention is authorized by the Military Order, that Order exceeds the Executive's authority under Article II.

## THIRD CLAIM FOR RELIEF

## UNLAWFUL DEPRIVATION OF LIBERTY — DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

88.     By the actions described above, Respondents, acting under color of law, have violated and continue to violate the Due Process Clause of the Fifth Amendment to the Constitution of the United States.  President Bush has ordered the prolonged, indefinite, and arbitrary detention of Mohammed, without due process of law, and the other Respondents have implemented those orders.  Respondents' actions deny Mohammed the process accorded to persons detained by the Executive, including meaningful notice of allegations, the right to see and rebut any evidence against him, and a fair and meaningful hearing before an impartial tribunal and including both during and outside of armed conflict as established by and under the UCMJ and Army Regulation 190-8 and as required by the Fifth Amendment.

## FOURTH CLAIM FOR RELIEF

## CRUELTY, MISTREATMENT, AND COERCIVE INTERROGATION —SHOCKING GOVERNMENT CONDUCT IN VIOLATION OF THE FIFTH AMENDMENT

89.     Respondents directed, ordered, confirmed, ratified, committed and/or conspired together and with others in such acts that deliberately and intentionally inflicted severe physical and psychological abuse and agony upon Mohammed in order to obtain coerced information or confessions from him, punish or intimidate Mohammed, or for other purposes.  Mohammed has been beaten, kicked and punched; subjected to extended sleep deprivation; held in conditions of isolation and solitary confinement for prolonged periods; interrogated while shackled and chained in painful positions; exposed to extremes of temperature; subjected to violent behavior or the threat of violence;

shackled with heavy chains and irons; sexually humiliated; denied access to counsel and family; deprived of adequate medical care; and subjected to repeated psychological abuse. Mohammed continues to be subject to physical and psychological abuse. Respondents' conduct and that of their agents "shocks the conscience," thereby violating Mohammed's Fifth Amendment Substantive Due Process rights.

## FIFTH CLAIM FOR RELIEF

### UNLAWFUL ARBITRARY DETENTION — INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW

90.     By the actions described above, Respondents have acted and continue to act in violation of the Third and Fourth Geneva Conventions, the International Convention on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, the Protocol on Child Soldiers, and customary international law as reflected, expressed and defined in the aforementioned international instruments and other international instruments, international and domestic judicial decisions, and other authorities when they directed, ordered, and/or supervised the seizure and military detention of Mohammed, who is a civilian who did not engage in hostilities against the United States and/or coalition forces.

## SIXTH CLAIM FOR RELIEF

### ARBITRARY DENIAL OF DUE PROCESS — INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW

91.     By the actions described above, Respondents, acting under color of law, have denied and continue to deny Mohammed the process accorded to persons seized and detained by the armed forces of the United States both during and outside times of armed conflict as established by, *inter alia*, specific provisions of the Third and Fourth Geneva

Conventions and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

92.     Respondents have also denied and continue to deny to Mohammed the processes and protections established by specific provisions of the Protocol on Child Soldiers and accorded to a child under the age of 18 at the time of the relevant acts giving rise to Mohammed's detention and of the relevant period of his interrogation and other mistreatment.

93.     Respondents are liable for the conduct described above directly and insofar as they set the conditions at Guantánamo Bay Naval Station, and directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions and the Protocol on Child Soldiers.

94.     Violations of the Geneva Conventions and the Protocol on Child Soldiers are direct treaty violations and are also violations of customary international law.

## SEVENTH CLAIM FOR RELIEF

### TORTURE AND CRUEL, INHUMAN AND DEGRADING TREATMENT — INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW

95.     Respondents directed, ordered, confirmed, ratified, committed and/or conspired together and with others in such acts that deliberately and intentionally inflicted severe physical and psychological abuse and agony upon Mohammed in order to obtain coerced information or confessions from him, punish or intimidate Mohammed or for other purposes.  Mohammed has been beaten, kicked and punched; subjected to extended sleep deprivation; held in conditions of isolation and solitary confinement for prolonged periods; interrogated while shackled and chained in painful positions; exposed

to extremes of temperature; subjected to violent behavior or the threat of violence; shackled with heavy chains and irons; sexually humiliated; denied access to counsel and family; deprived of adequate medical care; and subjected to repeated psychological abuse. Mohammed continues to be subject to physical and psychological abuse.

96. The acts described herein constitute torture and cruel, inhuman and degrading treatment in violation of the Geneva Conventions, the U.N. Convention Against Torture and customary international law prohibiting torture and cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

**B. Claims Based on Illegal Detention For Trial by Military Commissions**

**<u>EIGHTH CLAIM FOR RELIEF</u>**

**DETENTION FOR TRIAL AND TRIAL BY COMMISSIONS CONSTITUTED UNDER THE MILITARY COMMISSIONS ACT VIOLATE THE CONSTITUTION, LAWS AND TREATIES OF THE UNITED STATES**

97. Respondents have wrongfully subjected Mohammed to detention for prosecution by the U.S. Military Commissions at Guantánamo Bay, Cuba, which do not have personal or subject matter jurisdiction over him because he is not an "alien unlawful enemy combatant" and because the jurisdictional, procedural and evidentiary provisions of the MCA specifically, and as a whole, on their face, and as applied to Mohammed, violate the Supremacy and Suspension Clauses of the United States Constitution and the Fourth, Fifth, and Sixth Amendments thereto, the principle of Separation of Powers, and also violate the UCMJ, the U.N. Convention Against Torture, the Geneva Conventions, the Additional Protocols thereto, and customary international law as reflected, expressed,

and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

98.	By the MCA's own terms, and in violation of the Suspension Clause of the United States Constitution, Mohammed cannot vindicate his right not to be tried by a military commission acting without jurisdiction because the MCA does not provide Guantánamo Military Commission defendants the right to an interlocutory appeal, even if the challenge is to the Commissions' jurisdiction, and it also prohibits any collateral challenge to the Commissions.  MCA §§ 950d and 950j(b).

99.	In violation of the Suspension Clause, Respondents have determined that even if the Guantánamo Military Commission were to conclude that it did not have personal or subject matter jurisdiction over a defendant, or if it determined that he is innocent of the charges against him, it does not have the power to order his release because the Respondents have asserted they have the authority to detain Commission defendants regardless of the outcome of the case.

100.	Mohammed will suffer irreparable injury if he is tried by the Guantánamo Military Commissions both because the Commissions are unconstitutional and because the evidence against him is based on torture in further violation of his rights under the Constitution, laws and treaties of the United States.

**NINTH CLAIM FOR RELIEF**

**THE MILITARY COMMISSIONS ACT VIOLATES
CONGRESS' ARTICLE I POWERS**

101.	The Military Commissions established by the MCA are not traditional military commissions, which are convened as "incident to the conduct of war," and whose extraordinary procedures are required only to comport with the law of war in

recognition of the exigencies of armed conflict and military necessity. *Hamdan v. Rumsfeld*, 548 U.S. 557, 126 S.Ct. 2749, 2775-76 (2006) (plurality opinion). Instead, the Guantánamo Military Commissions are Article I military courts that must comply with the requirements of the Constitution, including the limits imposed by Article III and the Bill of Rights.

102. For the reasons described above, the Military Commissions established under the MCA violate the Constitution of the United States and the MCA is an invalid exercise of Congress' power to convene Article I courts.

## TENTH CLAIM FOR RELIEF

### OUTRAGEOUS GOVERNMENT CONDUCT MERITING DISMISSAL OF CHARGES — FIFTH AMENDMENT

103. The charges brought against Mohammed in the Military Commissions proceeding against him are based on unlawfully obtained statements obtained from Mohammed. These statements were procured through coercive and abusive interrogation, including the use of death threats against Mohammed and his family as well as beatings and other abuse, all of which "shock the conscience," thereby violating Mohammed's Fifth Amendment Due Process rights. The means used to procure the statements also violate Mohammed's rights under the Geneva Conventions and the Additional Protocols thereto, the Convention against Torture, the UCMJ, the Alien Tort Claims Act, Army Regulation 190-8 and customary international law.

104. Because the abuse, mistreatment and related interrogations of Mohammed constitute shocking and offensive government conduct, because Mohammed has been denied his rights to due process, and because the Military Commissions under which he has been charged permit the use of evidence obtained through cruel, inhuman and

degrading treatment such as that suffered by Mohammed (among other jurisdictional, procedural and evidentiary violations of the Constitution and the United States' international legal obligations), the only remedy capable of vindicating Mohammed's rights is the grant of a Writ of *Habeas Corpus*, dismissal of the Commission charges against him, and an order requiring his release.

## PRAYER FOR RELIEF

1. Grant the Writ of *Habeas Corpus* and order Respondents to release Petitioner from his current unlawful detention;

2. Order that Petitioner be brought before the Court to vindicate his rights;

3. Order that while this action is pending Petitioner cannot be transferred to any other country without the knowing consent and written agreement of Petitioner (obtained voluntarily and without duress) and Petitioner's counsel;

4. Order that Petitioner cannot be delivered, returned or rendered to a country where there is a foreseeable and imminent risk that he will be subjected to torture;

5. Order Respondents to allow counsel to meet and confer with Petitioner in private and to engage in unmonitored attorney-client conversations;

6. Order Respondents to cease all interrogations of Petitioner, direct or indirect, while this litigation is pending;

7. Order Respondents to cease all acts of torture and cruel, inhuman and degrading treatment of Petitioner;

8.    Order and declare the Military Order of November 13, 2001, *ultra vires* and unlawful as applied to Petitioner;

9.    Suspend the Military Commissions prosecution of Petitioner;

10.   Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner without due process is arbitrary and unlawful and a deprivation of liberty without due process of law;

11.   Order Respondents to respond to this Petition and to provide counsel with factual returns, discovery and all other evidence allegedly justifying Petitioner's continued detention;

12.   Order Respondents to preserve all evidence relating to Petitioner's initial and on-going detention and treatment in U.S. custody;

13.   Grant an evidentiary hearing or other such process that would allow Petitioner opportunity to provide further evidence and proof of his claims and justify the relief sought; and

14.   Grant such other and further relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the common law, the Constitution of the United States, federal statutory law, international law, the treaties to which the United States is a party and military law.

Dated:  January 13, 2009

Respectfully submitted,

 /s/ Hina Shamsi

Hina Shamsi (admitted *pro hac vice*)
Jonathan L. Hafetz (admitted *pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor

New York, NY 10004
Phone: (212) 519-7886
Fax: (212) 549-2583
hshamsi@aclu.org

Major David J.R. Frakt (admitted *pro hac vice*)
Office of Military Commissions
Office of the Chief Defense Counsel
Franklin Court Building, Suite 2000D
1099 14th Street, N.W., Suite 119
Washington, D.C. 20005
Phone: (202) 761-0133, ext. 106
Fax: (202) 761-0510
fraktd@dodgc.osd.mil

 /s/ Arthur B. Spitzer            

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
Phone: (202) 457-0800
Fax: (202) 452-1868
artspitzer@aol.com


*Counsel for Petitioner*

**VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.


                                         _/s/ Hina Shamsi                      
                                                 Hina Shamsi


Executed on this 13th day of January, 2009