## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAMOUD ABDULLAH HAMOUD )<br>HASSAN AL WADY, )<br> )<br>Petitioner, )<br> )<br>v. )<br> )<br>BARACK H. OBAMA, et al., )<br> )<br>Respondents. )<br>_____) | Civil Action No. 08-CV-1237 (RMU) |

## RENEWED MOTION FOR DIRECT CONTACT WITH CLIENT

### I.

### INTRODUCTION

For going on seven years now, Mr. Al Wady has languished in executive detention.
Virtually his only human contact,[1] aside from contact with other similarly situated detainees, has
consisted of being shackled by prison guards and berated by interrogators.  Due to the lengthy
detention and deplorable conditions, many detainees suffer from, at best, near complete despair
and loss of hope and, at worst, extreme psychological trauma.  Hunger strikes are becoming an
increasingly common form of protest.  It is therefore no wonder that detainees such as Mr. Al
Wady have difficulty trusting anyone who tries to meet with them.

---

[1] Counsel understand from contact with Mr. Al Wady's family that he has had two
telephone calls with his family since being detained.  He has also been able to *send* his family
three letters, but the family has not been able to write back, so he has not *received* any letters.

It is equally unsurprising that the government, which has strenuously resisted allowing these detainees any judicial access at all, is taking, at best, a passive role in assuring that detainees fully understand and carefully consider their recently recognized rights to counsel and judicial access. Mr. Al Wady is one detainee among a number recently who, according to guard personnel at Guantanamo Bay, have refused to meet with counsel. The government has refused to allow counsel to hear this directly from Mr. Al Wady, however, thereby preventing counsel from trying to clarify their role, make sure Mr. Al Wady understands what they can do, and change Mr. Al Wady's mind if in fact he is truly refusing. The most the government has agreed to do, as a result of a prior mediation, is allow counsel to attempt to meet with Mr. Al Wady in the particular camp in which he is detained and/or allow an interpreter to go back to persuade Mr. Al Wady, if – *and only if* – Mr. Al Wady agrees initially to leave his cell and go to an interview room. This has now been tried and failed. Counsel therefore bring this motion, which is a renewal of a prior motion withdrawn without prejudice when the government made the limited concessions just described, *see* Motion for Direct Contact with Client, Docket #47, Case No. 08-cv-1237 (RMU); Joint Notice of Agreement Regarding Petitioners' Motion for Direct Contact, Docket #1457, Case No. 08-mc-442 (TFH).

Through this motion, counsel ask the Court to order three forms of relief before their next trip to Guantanamo Bay, which is tentatively scheduled in mid-April. First, the Court should order that counsel's Arabic speaking interpreter be allowed to go back to speak to Mr. Al Wady directly – at his actual cell if he will not go to the interview room – and explain to him why it is in his interest to meet with counsel. Second, the Court should order that, if this does not work, defense counsel be allowed a private, cellside meeting with Mr. Al Wady. Third, if neither of these proposed alternatives works, or if the Court decides they are not feasible, the Court should

order that Mr. Al Wady be told that the Court needs to know the reasons he has not seen counsel

and that Mr. Al Wady be taken to one of the courtrooms or hearing rooms in which military

tribunal and/or Combatant Status Review Board proceedings have been conducted so that

counsel may meet him in that setting.[2]  These are the only ways to ensure that Mr. Al Wady's

decision not to meet with counsel is intelligent and voluntary and made with a full understanding

of who it is who is trying to meet with him, why counsel are trying to meet with him, and what

counsel think they can do for him.[3]


## II.

## STATEMENT OF FACTS[4]


On December 13, 2005, a petition was filed under the name of Houmad Warzly, but no

counsel was appointed to represent the petitioner.  A different petition was filed on July 17, 2008

under the name of Hamoud Abdullah Hamoud Hassan Al Wady, and counsel was appointed on

that petition on August 8, 2008.[5]  This appointment came more than six years after Mr. Al Wady

---

[2]  Counsel have conferred with counsel for the government and they will not agree to these forms of relief.

[3]  This motion will obviously become moot if Mr. Al Wady agrees to meet with counsel on their next trip.  Given the time which passes between scheduling trips to Guantanamo Bay, it is important that the procedures requested be in place if there is another purported "refusal."

[4]  This statement of facts is supported by the declaration of counsel which is attached to this motion.

[5]  Based on representations made by both the government and the Center for Constitutional Rights, which filed the initial petition and has been coordinating litigation in these cases, that the two petitioners were the same person, counsel subsequently substituted in as counsel on the first petition two months after being appointed on the second petition.  That earlier petition has since been dismissed without prejudice.

had been taken into custody, and, as far as counsel is aware, he had not seen an attorney once during that time.

Subsequently, after receiving security clearances required by the government and by the Guantanamo Bay Litigation protective order issued by United States District Judge Hogan, counsel scheduled an appointment with Mr. Al Wady and traveled to Guantanamo Bay to meet with him, during the week of December 1, 2008. On the day of their appointment with Mr. Al Wady, counsel were escorted to the camp at which attorney meetings with clients are generally held, in a room set aside for that – and possibly other – purposes. Counsel told the guard personnel at the camp that they were there to meet with Mr. Al Wady.

Counsel were then told that Mr. Al Wady refused to meet with them. They were not told this by Mr. Al Wady himself, but were told by guard personnel at the camp. They were also not told *why* Mr. Al Wady was purportedly refusing to see them.

Counsel were next told – in accord with what they were told was standard procedure in this circumstance – that they could write a note to Mr. Al Wady and have the guards take the note to him. Counsel wrote such a note and gave it to guard personnel who took it with them, presumably to the different camp in which Mr. Al Wady was detained. The guard personnel returned a short time later and claimed that Mr. Al Wady had refused to read the note and would not even let the guards read it to him.

In order to (1) be sure that Mr. Al Wady correctly understood who counsel were and why they were there to see him and (2) possibly change his mind about meeting with counsel, counsel then made two further requests of the guard personnel at the camp. First, they asked to be taken back to Mr. Al Wady's cell so they could speak to him directly and make sure he understood, but this request was refused. Second, they asked to send a second note back (1) asking Mr. Al Wady

to reconsider overnight – in words suggested by counsel's interpreter as having a religious significance, "do a permission prayer" – and (2) telling him they would return the next day to see if he had changed his mind. The guard personnel also rejected the request to send back this second note, however.

After returning from Guantanamo Bay and conferring with counsel for the government, counsel for petitioner filed a Motion for Direct Contact with Client, seeking relief comparable to that sought in this renewed motion. Judge Hogan referred that motion to mediation by United States Magistrate Judge Kay, and a telephonic mediation conference took place on January 2, 2009. The government was unwilling to agree to all the alternatives proposed in the motion, but did agree to (1) allow counsel to attempt to meet with Mr. Al Wady in the particular camp in which he is detained and (2) if Mr. Al Wady declined to meet with counsel, allow an interpreter to go back to try to change Mr. Al Wady's mind, but only if Mr. Al Wady initially agreed to leave his cell and go to an interview room. The government would not agree to allow a cellside visit by either the interpreter or counsel.

Believing that it was worth at least trying these alternatives, counsel agreed to withdraw the Motion for Direct Contact with Client, without prejudice to renewing it if these half measures did not work. Counsel then traveled to Guantanamo Bay the week of January 19 to attempt to meet with Mr. Al Wady.[6] The meeting was scheduled to take place in the camp in which Mr. Al Wady was housed, as the parties had agreed after the mediation. But, again, counsel were told that Mr. Al Wady had declined to meet with them. And, again, counsel were not able to hear this from Mr. Al Wady directly and were not told the reason for the purported refusal.

---

[6] Counsel also had meetings scheduled with two other clients.

III.

ARGUMENT

It has now been established that detainees at Guantanamo Bay have a right to seek habeas

corpus relief in federal court, *see generally Boumediene v. Bush,* 128 S. Ct. 2229 (2008), and –

necessarily – a right to be represented by counsel – at least if counsel voluntarily make

themselves available,[7] *see Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004) ("[Petitioner]

unquestionably has the right to access to counsel in connection with the proceedings on

remand."); *cf. Boumediene*, 128 S. Ct. at 2260 (noting lack of counsel as one of deficiencies in

Combatant Status Review Tribunal hearing); *id.* at 2269 (same). It follows from the right to

representation by counsel that counsel must be able to meet and consult with the detainees. *See*

*Hamdi*, 542 U.S. at 539 (noting that since grant of petition for writ of certiorari, petitioner "has

met [with appointed counsel] for consultation purposes on several occasions, and . . . is now

being granted unmonitored meetings"). This has been implicitly recognized by the government,

through its concession that counsel must be allowed to travel to the naval base at Guantanamo

Bay and meet with the clients they represent.

The problem presented in this motion lies in how counsel's availability and usefulness is

to be communicated to the client. As noted above, the only communication presently being

allowed – about the initial decision of whether to meet – is through the guard personnel at the

Guantanamo Bay camps. This is unsatisfactory for multiple reasons.

First, even assuming the utmost good faith on the part of the guard personnel, they will be

_____

[7] Private counsel have volunteered to represent a number of detainees pro bono, and
several Federal Public Defender offices, such as that of counsel herein, have volunteered to take
cases – and subsequently been appointed.

neither as fervent nor as knowledgeable as counsel, or even counsel's interpreter, would be.  The guard personnel presumably have no legal education or experience, have little, if any, knowledge of the habeas corpus proceedings and their background, and are, at best, neutral about whether habeas corpus proceedings are a good or bad idea.  Counsel, in contrast, have the legal education and experience necessary to explain habeas corpus proceedings to a client, know the history and background of the particular proceedings here, and have an affirmative, strong interest in explaining the benefit of the proceedings to the client.

Second, there is reason to question whether the guards have the utmost good faith assumed in the preceding paragraph – as illustrated by two examples from counsel's first trip to Guantanamo Bay.  As one example, one of Mr. Al Wady's counsel, while waiting to find out if another client would agree to come to a meeting, overheard one guard say, either to himself or another guard, "I hope he [the detainee] cancels."  *See* Declaration of Carlton F. Gunn, ¶ 11.  As a second example, one client who did meet with counsel in response to a second attempt by counsel told counsel that he had not come out for a meeting the previous afternoon in part because he had been led to believe that the reason the guards wanted to bring him out was for an interrogation.  *See id*.  Whether or not this was an innocent miscommunication, a deliberate misrepresentation, or something in between, it illustrates the dangers of not allowing someone more interested in having the meeting be the one to communicate its purpose.[8]

---

[8]  Occasionally, in counsel's experience representing criminal defendants in a Federal Public Defender office, there is comparable miscommunication and/or misinterpretation, even with ordinary criminal defendants in ordinary criminal cases.  There are occasions on which counsel have been told that a client has "refused" to come down for a meeting when all the client actually did was something such as tell a guard he would like five minutes to get ready, and occasions on which a client has not come down because he has the impression the visit is not with his attorney, but with some other official, such as a probation officer.  *See* Declaration of Carlton F. Gunn, ¶ 12.

Third, what the authorities at Guantanamo Bay characterize as a "refusal" may not be a true "refusal," or at least may represent something far different from a rejection of legal assistance. This is illustrated by a declaration filed in another case which is attached to this motion as Exhibit A. That declaration reveals at least one instance in which the authorities asserted there was a "refusal" when what really happened was that the detainee asserted that he was not able to walk to the meeting with the attorney and the prison staff disagreed. *See* Exhibit A, Exhibit 2, at 3-5. This demonstrates that what the authorities label a "refusal" may be more a disagreement about conditions such as medical needs.

Fourth, and perhaps related to the foregoing example, there appears to be a movement among many detainees at Guantanamo Bay toward protests such as hunger strikes, in part because of frustration with conditions there and in part because of frustration with the time which it has taken for court proceedings to get under way. The inhumane conditions, the detainees' reaction to them, and the increasing number of hunger strikes in which detainees are engaging are outlined in detail in the letter from the Center for Constitutional Rights to the Department of Defense which is attached as Exhibit B. It may be that Mr. Al Wady's decision not to see counsel is related to this. Further, some counsel who have been involved in these cases for a much longer period of time have suggested to counsel for Mr. Al Wady that there may be more authoritative detainees in the camps that are directing less assertive detainees to engage in such protest or "strike"-type activities. This raises a concern that Mr. Al Wady's "refusal," if that is what it is, is not his decision but someone else's.

Fifth, there may be other reasons detainees such as Mr. Al Wady refuse to come out to meet with counsel. One detainee attorney has told counsel that one of her clients refused to come out on one occasion because he was fearful of going through a new scanner in the camp in which

that detainee was detained.  *See* Declaration of Carlton F. Gunn, ¶ 13.  The scanner, at least in

one camp, is a full body scanner which is so invasive that it allows guards to see under the

detainee's clothes.  *See id.*  Whether or not the scanner is an issue in Mr. Al Wady's case, the

Center for Constitutional Rights letter to the Department of Defense suggests other similar

reasons why detainees are sometimes reticent to leave their cells.  *See, e.g.*, Exhibit B, at 8-9

(quoting one detainee's apologetic explanation to his counsel for not leaving cell for meeting).

Finally, there could be concerns about Mr. Al Wady's competency and mental state.

While counsel have no specific information regarding Mr. Al Wady – since they have not been

allowed to see him – the "enhanced interrogation techniques" which have been used with some

detainees in the fight against terrorism are well documented.  While the government would no

doubt disagree with this characterization, a number of reputable national and international

organizations have labeled the treatment of the detainees at Guantanamo Bay as abuse, torture,

and/or a gross violation of human rights.[9]  Whatever the appropriate label, it is certainly possible

---

[9] *See, e.g.*, Amnesty International, *Guantanamo and Beyond: The Continuing Pursuit of Unchecked Executive Power*, at 83-115 Ch. 12-13, AMR 511063/2005 (13 May 2005); Amnesty International, *Guantanamo: An Icon of Lawlessness*, Jan. 6, 2005, at 3-5; Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces*, Ch. 3 (2005); United Nations Press Release, *United Nations Human Rights Experts Express Continued Concern About Situation of Guantanamo Bay Detainees*, Feb. 4, 2005; International Committee of the Red Cross, Press Release, *The ICRC's Work at Guantanamo Bay*, Nov. 30, 2004; International Committee of the Red Cross, *Operational Update, US Detention Related to the Events of September 11, 2001 and Its Aftermath - the Role of the ICRC*, July 26, 2004; Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the "War on Terror"*, at 22 (Oct. 27, 2004) (available at http://web.amnesty.orgilibrary/Index IENGAMR 511452004); Barry C. Scheck, *Abuse of Detainees at Guantanamo Bay*, The Nat'l Assoc. of Criminal Defense Lawyers Champion, Nov. 2004, at 4-5.  *See also* Carol D. Leonnig, *Guantanamo Detainee Says Beating Injured Spine; Now in Wheelchair, Egyptian-Born Teacher Objects to Plan to Send Him to Native Land*, Wash. Post, Aug. 13, 2005, at A18; Neil A. Lewis, *Fresh Details Emerge on Harsh Methods at Guantanamo*, N.Y. Times, Jan. 1, 2005, at A11; Carol D. Leonnig, *Further Detainee Abuse Alleged; Guantanamo Prison Cited in FBI Memos*, Wash. Post, Dec. 26, 2004, at A1; Neil A. Lewis & David Johnston, *New F.B.I Memos Describe Abuses of Iraq Inmates*, N.Y. Times, Dec. 21, 2004, at A1; Dan Eggen & R. Jeffrey Smith, *FBI*

that the treatment described in these sources, combined with what has bordered on incommunicado detention for a period of years and the conditions described in the Center for Constitutional Rights letter, could have had a significant impact on mental health and a detainee's competency. *See, e.g.*, Exhibit B, at 6-8 (describing effect on one detainee). If counsel and/or their interpreter are allowed to see Mr. Al Wady at least briefly, this possibility can be evaluated, at least preliminarily.

The Court should also consider that the purported "refusal" of Mr. Al Wady to see counsel is not consistent with his past behavior in connection with Combatant Status Review Tribunal and Administrative Review Board proceedings. The publicly available summaries of those proceedings reveal that Mr. Al Wady chose to participate in both the Combatant Status Review Tribunal and Administrative Review Board proceedings. *See* Exhibit C (Wikipedia materials). This raises doubt about whether Mr. Al Wady's purported "refusal" to see counsel is real, or, at the very least, whether it is a considered decision that would not change if counsel and/or counsel's interpreter were able to explain the present proceedings to him directly.

Both common sense and prior experience suggest that presentations from individuals other than guard personnel – in particular, counsel and/or their interpreter – could be more effective. First, common sense suggests that counsel with legal education and experience who are appointed and so ethically obligated to act in a petitioner's best interest – and have an affirmative desire to do so – are likely to present the availability of attorney assistance more positively than guard personnel who have no legal experience and have interests that are adverse

---

*Agents Allege Abuse of Detainees at Guantanamo Bay*, Wash. Post, Dec. 21, 2004, at A1; Neil A. Lewis, *FBI Memos Criticized Practices at Guantanamo*, N.Y. Times, Dec. 7, 2004, at A19. Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantanamo*, N.Y. Times, Nov. 30, 2004, at AI.

to the petitioner.  Second, defense counsel can bring to the Court's attention the experience their interpreter, Masud Hasnain, has had.  Mr. Hasnain has been traveling to Guantanamo Bay and helping lawyers as an interpreter for several years.  Prior to 2007, he was allowed – under the then existing policy at Guantanamo Bay – to go back and personally speak to detainees when they refused to see counsel after being brought to the interview rooms.  And Mr. Hasnain has indicated that he was successful in changing the clients' minds, by his estimate, 50% of the time.  *See* Declaration of Carlton F. Gunn, ¶ 15.[10]  There is no reason to think that the cellside visits requested in this motion would be less successful.

As to the last form of relief requested – meetings in one of the tribunal or hearing rooms – it draws a fine line between compelling Mr. Al Wady to go to an interview with counsel[11] and simply requiring Mr. Al Wady to move elsewhere within a detention facility as prisoners often are required to do.  Requiring Mr. Al Wady to go a hearing room is similar to requiring a criminal defendant to go to a trial or court hearing.  Requiring this to make sure a detainee's legal decisions are intelligent and voluntary certainly is far less coercive than the force feeding which authorities are willing to conduct to make sure the detainee does not harm himself medically, *see* Exhibit B, at 9-11.  And it does not have to be blamed on counsel; rather, it can be fairly characterized as a court order based on the Court's need to know whether Mr. Al Wady's decision not to meet with client is a true "refusal" or something else.

All of the foregoing, taken together, suggests it is appropriate for the Court to order the

---

[10]  What is sought here – essentially a "cellside visit" – is not something unheard of.  Two years ago, it was ordered in a death penalty case in the Central District of California, *see* Exhibit D, and led to the client starting to meet with counsel on a regular basis.

[11]  This could be, but would not automatically be, counterproductive if blamed on counsel.

opportunities for direct contact requested here.  That is the only way to make sure that Mr. Al

Wady truly is "refusing" to meet with counsel and make sure that his "refusal" is fully informed

and considered.


IV.

<u>CONCLUSION</u>


The Court should order three things if during counsel's presently planned April visit,

guard personnel again assert that Mr. Al Wady has refused to meet with counsel.  First, the Court

should order that counsel's Arabic speaking interpreter be allowed to go back to speak to Mr. Al

Wady directly at his cell and explain to him why it is in his interest to meet with counsel.

Second, the Court should order that, if this does not work, defense counsel be allowed to meet

Mr. Al Wady at his cell, so that defense counsel may personally explain their role and their

purpose.  Third, the Court should order that Mr. Wady be brought to one of the courtrooms or

///

///

///

///

///

///

///

///

///

12

hearing rooms in which military tribunal and/or Combatant Status Review Board proceedings have been conducted so that counsel may meet Mr. Al Wady in that setting.

DATED:  February 27, 2009

Respectfully submitted,

____/S/_____
CARLTON F. GUNN (CA Bar No. 112344)
CRAIG HARBAUGH (D.C. Bar No. 974117)
Deputy Federal Public Defenders
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, CA 90012
(213) 894-1700; Facsimile: (213) 894-0081
Attorneys for Petitioner

# DECLARATION OF CARLTON F. GUNN

I, Carlton F. Gunn, hereby declare and state:

1.      I am a Deputy Federal Public Defender in the Central District of California.  Our office was appointed to represent the petitioner in this case on August 8, 2008.  I and Deputy Federal Public Defender Craig Harbaugh have been assigned to the case.

2.      After our office was appointed and we were assigned to the case, I and Mr. Harbaugh applied for security clearances.  The security clearances are required by the protective order which permits counsel to visit clients at Guantanamo Bay.  We finally received security clearances in late October.

3.      After receiving the security clearances, I made arrangements for myself, Mr. Harbaugh, and an Arabic interpreter we hired, Masud Hasnain, to travel to Guantanamo Bay to meet with Mr. Al Wady and two other clients we had been appointed to represent.  Because of limited flights to Guantanamo Bay and the advance notice required to make appointments to see clients, I was not able to arrange that travel until the week of December 1.

4.      We flew into the base on December 2 and had an appointment to see Mr. Al Wady on December 3.  On that morning, we were escorted to the camp at which attorney meetings with clients are generally held, in rooms set aside for that – and possibly other – purposes.  When we

arrived at the camp, we told the guard personnel at the camp that we were there to meet with Mr. Al Wady.

5.     We were then told by guard personnel that Mr. Al Wady refused to meet with us. I do not recall being told why he was refusing to meet with us, but we were told that there was a procedure allowing us to write a note to Mr. Al Wady, asking him to reconsider, and then have the guards take the note to him.  We then wrote such a note, had our interpreter translate it into Arabic, and gave it to guard personnel who took it with them.  It was my understanding that they took it to a different camp across the street, which was the actual camp in which Mr. Al Wady was detained.

6.     The guard personnel returned a short time later and claimed that Mr. Al Wady had refused to read the note and would not even let the guards read it to him.  In an effort to (1) be sure that Mr. Al Wady correctly understood who we were and why we were there to see him and (2) possibly change Mr. Al Wady's mind about meeting with us, we then made two further requests of the guard personnel at the camp.  First, we asked if either we or our interpreter could be taken back to Mr. Al Wady's cell so we could speak to him directly and make sure he understood.  When the guard personnel refused this request, we conferred and asked as an alternative to send a second note back.  In this note, we (1) asked Mr. Al Wady to reconsider overnight – or, in words suggested by our interpreter as having a religious significance, "do a permission prayer" – and (2) told Mr. Al Wady that we would return the next day to see if he had changed his mind.  The request to send this second note back in writing also was refused, however.

7.      After we returned from this trip to Guantanamo Bay, we conferred with counsel for the government about having more direct contact with the client in some form. We were not able to reach a satisfactory agreement with the government, and so we filed a Motion for Direct Contact with Client in which we requested the relief that the government was not willing to provide.

8.      The parties were thereafter directed to a mediation conference by Judge Hogan, which was held with Magistrate Judge Kay on January 2, 2009. After that mediation, the government agreed to allow a small part of what we had requested in our motion. Specifically, it agreed to allow us to attempt to meet with Mr. Al Wady in the camp in which he is actually detained. It also agreed to allow our interpreter to go back and try to persuade Mr. Al Wady to change his mind if he still refused, but it agreed to allow this only if Mr. Al Wady agreed to leave his cell and go to the interview room first. It would not agree to allow the interpreter or us to speak to Mr. Al Wady at his cell if he would not even go to the interview room.

9.      We were not certain these accommodations would be sufficient but said that we would be willing to try again. We and the government therefore filed a Joint Notice of Agreement Regarding Petitioners' Motion for Direct Contact, and we withdrew our Motion for Direct Contact with Client, but without prejudice to refiling it if we were told on our next visit that Mr. Al Wady still refused to meet with us under the new conditions.

10.     We then took our next trip to Guantanamo Bay the week of January 19 and scheduled a meeting with Mr. Al Wady – and two other clients – that week. When we arrived on

the day our meeting with Mr. Al Wady was scheduled, we were told that he had again refused to see us. We were also told that he had refused to even go to the interview room, which meant our interpreter would not be allowed to go back to try to change his mind.

11. We have concerns that the guard personnel did not sufficiently convey our purpose, the potential help we could give to Mr. Al Wady, and our desire to help him as strongly as either we personally or our interpreter could convey those points. Even aside from the natural reason to doubt that a prison guard would be as convincing and effective, there are at least two specific things we overheard and/or were told on our first trip that raise concerns in our minds about the guard personnel's effort. First, my co-counsel, Mr. Harbaugh, while we were waiting to find out if the other client would agree to come to a meeting, overheard one guard say, either to himself or another guard, "I hope he cancels." Second, one client who did finally meet with us on a second attempt, told us that one of the reasons he had not come out for a meeting the afternoon before was because he had been told that the reason the guards wanted to bring him out was for an interrogation. Additional concerns of this sort are raised by the declarations from another case that are attached to this motion as Exhibit A, which reflect that what the authorities at Guantanamo Bay label a "refusal" is sometimes just a disagreement about the conditions of a detainee's meeting with counsel.

12. Such miscommunications and/or misunderstandings are not inconsistent with my occasional experience representing ordinary criminal defendants in a Federal Public Defender office (in which I have practiced for over 25 years). There are occasions on which I have been told that a client has "refused" to come down for a meeting when all the client actually did was

something such as tell a guard he would like five minutes to get ready.  There have been other

occasions on which a client has told me (in a later visit) that the reason he did not come down

was because he was given the impression the visit was not with his attorney, but with some other

person, such as a probation officer.

13.	Things we have been told by other detainee attorneys have also raised concerns in

our minds about whether Mr. Al Wady's "refusals" to see us reflect a fully considered and

informed decision.  As an example, one detainee attorney has told us that one of her clients

refused to come out on one occasion because he was fearful of going through a new scanner in

the camp in which that detainee was detained.  We also understand that, more generally, some

detainees have expressed hesitance about being moved from the camps in which they are

detained to the camp where the attorneys are now required to interview clients because the

process of being moved is humiliating and uncomfortable.  The detainee attorney who told us

about the client who refused to come see her because of the scanner told us that the scanner, at

least in one of the camps, is so invasive that it allows the guards to see under the detainee's

clothes and that the detainees are hooded and shackled when they are brought for attorney visits.

Finally, we recently received a copy of the Center for Constitutional Rights letter which is

attached to this motion as Exhibit B, and it details other reasons why some detainees have

declined to meet with counsel.  We are concerned that these could be reasons for Mr. Al Wady as

well.

14.	There is also an additional reason we have concerns about the nature and basis of

what we are being told is Mr. Al Wady's refusal to see us.  In my conversation with another

detainee attorney who has been involved in these cases for several years, he suggested that there are "mullahs," or more authoritative detainees, who sometimes tell less authoritative detainees what to do. Especially in light of the increase in hunger strikes and other "strike"-type activity that is described in the Center for Constitutional Rights letter, we have a concern that Mr. Al Wady's "refusal" to meet with us, if that is what it is, is not so much his own independent decision as something he has been pressured to do by someone else.

15. The interpreter who went with us on our trip to Guantanamo Bay, Masud Hasnain, has told us that up until the beginning of 2007, the interpreter was allowed to go back to speak with the client directly when counsel were told that the client was refusing to see them. Mr. Hasnain told us that when he was allowed to do this, he had a 50-50 success rate in changing the client's mind about seeing counsel. While these contacts took place in interview rooms to which the clients had been taken, I see no reason why the success rate of such contacts would be different if the interpreter spoke with the client cellside. Alternatively and/or in addition, counsel being present at cellside would give us an opportunity to both explain our assistance directly to the detainee and evaluate whether he is really voluntarily refusing to see us and, if so, what his reasons are.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED:  <u>February 27</u> , 2009          By  ___<u>/S/</u>_____
                                                      CARLTON F. GUNN
                                                      Deputy Federal Public Defender