# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | **Misc. No. 08-442 (TFH)** |
| ) |  |
| **IN RE:** ) | **05-0763 (JDB)** |
| ) | **05-1646 (JDB)** |
| **GUANTANAMO BAY** ) | **05-2378 (JDB)** |
| **DETAINEE LITIGATION** ) |  |

**RESPONDENTS' MEMORANDUM REGARDING
THE GOVERNMENT'S DETENTION AUTHORITY RELATIVE
TO DETAINEES HELD AT GUANTANAMO BAY**

Dockets.Justia.com

**INTRODUCTION**

Through this submission, the Government is refining its position with respect to its authority to detain those persons who are now being held at Guantanamo Bay. The United States bases its detention authority as to such persons on the Authorization for the Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001). The detention authority conferred by the AUMF is necessarily informed by principles of the laws of war. *Hamdi v. Rumsfeld,* 542 U.S. 507, 521 (2004) (plurality). The laws of war include a series of prohibitions and obligations, which have developed over time and have periodically been codified in treaties such as the Geneva Conventions or become customary international law. *See, e.g., Hamdan v. Rumsfeld,* 548 U.S. 557, 603-04 (2006).

The laws of war have evolved primarily in the context of international armed conflicts between the armed forces of nation states. This body of law, however, is less well-codified with respect to our current, novel type of armed conflict against armed groups such as al-Qaida and the Taliban. Principles derived from law-of-war rules governing international armed conflicts, therefore, must inform the interpretation of the detention authority Congress has authorized for the current armed conflict. Accordingly, under the AUMF, the President has authority to detain persons who he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for the September 11 attacks. The President also has the authority under the AUMF to detain in this armed conflict those persons whose relationship to al-Qaida or the Taliban would, in appropriately analogous circumstances in a traditional international armed conflict, render them detainable.

Thus, these habeas petitions should be adjudicated under the following definitional framework:

> The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

There are cases where application of the terms of the AUMF and analogous principles from the law of war will be straightforward. It is neither possible nor advisable, however, to attempt to identify, in the abstract, the precise nature and degree of "substantial support," or the precise characteristics of "associated forces," that are or would be sufficient to bring persons and organizations within the foregoing framework. Although the concept of "substantial support," for example, does not justify the detention at Guantanamo Bay of those who provide unwitting or insignificant support to the organizations identified in the AUMF, and the Government is not asserting that it can detain anyone at Guantanamo on such grounds, the particular facts and circumstances justifying detention will vary from case to case, and may require the identification and analysis of various analogues from traditional international armed conflicts. Accordingly, the contours of the "substantial support" and "associated forces" bases of detention will need to be further developed in their application to concrete facts in individual cases.

This position is limited to the authority upon which the Government is relying to detain the persons now being held at Guantanamo Bay. It is not, at this point, meant to define the contours of authority for military operations generally, or detention in other contexts. A forward-looking multi-agency effort is underway to develop a comprehensive detention policy with respect to individuals captured in connection with armed conflicts and counterterrorism operations, and the views of the Executive Branch may evolve as a result. *See* Declaration of Attorney General Eric H. Holder, Jr., ¶¶ 3, 11. The effort has been undertaken at the direction of

the President and is a major priority of the Executive Branch. *Id.,* ¶ 3. The Government will apprise the Court of relevant developments resulting from this ongoing process.

**DISCUSSION**

In response to the attacks of September 11, 2001, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." AUMF, § 2(a). The September 11 attacks were carried out by al-Qaida, which was harbored by the Taliban regime in Afghanistan. In October 2001, under the authority of the AUMF, the United States launched Operation Enduring Freedom to remove the Taliban regime from power and to suppress al-Qaida. The United States and its coalition partners continue to fight resurgent Taliban and al-Qaida forces in this armed conflict. Below, we set out the Government's position regarding the detention authority provided by the AUMF as it applies to those captured during that armed conflict and held at Guantanamo Bay.

**I.  THE AUMF GIVES THE EXECUTIVE POWER TO DETAIN CONSISTENT WITH THE LAW OF ARMED CONFLICT.**

The United States can lawfully detain persons currently being held at Guantanamo Bay who were "part of," or who provided "substantial support" to, al-Qaida or Taliban forces and "associated forces." This authority is derived from the AUMF, which empowers the President to use all necessary and appropriate force to prosecute the war, in light of law-of-war principles that inform the understanding of what is "necessary and appropriate." Longstanding law-of-war principles recognize that the capture and detention of enemy forces "are 'important incident[s] of war.'" *Hamdi,* 542 U.S. at 518 (quoting *Ex Parte Quirin,* 317 U.S. 1, 28 (1942)).

3

The AUMF authorizes use of military force against those "nations, organizations, or persons [the President] determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." AUMF, § 2(a). By explicitly authorizing the use of military force against "*nations, organizations, or persons*" that were involved in any way in the September 11 attacks (or that harbored those who were), the statute indisputably reaches al-Qaida and the Taliban. Indeed, the statute's principal purpose is to eliminate the threat posed by these entities.

Under international law, nations lawfully can use military force in an armed conflict against irregular terrorist groups such as al-Qaida. The United Nations Charter, for example, recognizes the inherent right of states to use force in self defense in response to any "armed attack," not just attacks that originate with states. United Nations Charter, art. 51. The day after the attacks, the United Nations Security Council adopted Resolution 1368, which affirmed the "inherent right of individual or collective self-defence in accordance with the Charter" and determined "to combat by all means threats to international peace and security caused by terrorist acts." U.N. General Assembly Security Council Resolution of Sept. 12, 2001 (S/RES/1368). "Since no one was seriously suggesting a State was behind the attacks, the Council was by definition implicitly acknowledging the acceptability of using military force against terrorists under the law of self-defense." Michael N. Schmitt, *U.S. Security Strategies: A Legal Assessment,* 27 Harv. J.L. & Pub. Pol'y 737, 748 (2004). The North Atlantic Treaty Organization and the Organization of American States treated the attacks as "armed attacks" for purposes of their collective self-defense provisions.[1] The AUMF invokes the internationally

---

[1] *See* Organization of American States, Meeting of Consultation of Ministers of Foreign Affairs, Terrorist Threat to the Americas (Sept. 21, 2001), http://www.oas.org/OASpage/

recognized right to self-defense. *See* AUMF, Preamble (it is "both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad"). Other nations joined or cooperated closely with the United States' military campaign against al-Qaida and the Taliban. *See* Schmitt, 27 Harv. J.L. & Pub. Pol'y at 748-49.

The United States has not historically limited the use of military force to conflicts with nation-states:

> [A] number of prior authorizations of force have been directed at non-state actors, such as slave traders, pirates, and Indian tribes. In addition, during the Mexican-American War, the Civil War, and the Spanish-American War, U.S. military forces engaged military opponents who had no formal connection to the state enemy. Presidents also have used force against non-state actors outside of authorized conflicts.

Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066-67 (2005) (citing U.S. use of military force in the Chinese Boxer Rebellion, against the Mexican rebel leader Pancho Villa, and in the 1998 cruise missile attacks against al-Qaida targets in Sudan and Afghanistan).

Thus, consistent with U.S. historical practice, and international law, the AUMF authorizes the use of necessary and appropriate military force against members of an opposing armed force, whether that armed force is the force of a state or the irregular forces of an armed group like al-Qaida. Because the use of force includes the power of detention, *Hamdi,* 542 U.S. at 518, the United States has the authority to detain those who were part of al-Qaida and Taliban forces. Indeed, long-standing U.S. jurisprudence, as well as law-of-war principles, recognize that members of enemy forces can be detained even if "they have not actually committed or

---

crisis/RC.24e.htm; North Atlantic Council, Statement by the North Atlantic Council (Sept. 12, 2001), http://www.nato.int/docu/pr/2001/p01-124e.htm; Statement by NATO Secretary General, Lord Robertson (Oct. 2, 2001), http://www.nato.int/docu/speech/2001/ s011002a.htm.

5

attempted to commit any act of depredation or entered the theatre or zone of active military operations." *Ex parte Quirin*, 317 U.S. at 38; *Khalid v. Bush*, 355 F. Supp. 2d 311, 320 (D.D.C. 2005), *rev'd on other grounds sub nom.*, *Boumediene v. Bush,* 128 S. Ct. 2229 (2008); *see also* Geneva Convention (III) Relative to the Treatment of Prisoners of War of Aug. 12, 1949, art. 4, 6 U.S.T.S. 3316 (contemplating detention of members of state armed forces and militias without making a distinction as to whether they have engaged in combat). Accordingly, under the AUMF as informed by law-of-war principles, it is enough that an individual was part of al-Qaida or Taliban forces, the principal organizations that fall within the AUMF's authorization of force.[2]

Moreover, because the armed groups that the President is authorized to detain under the AUMF neither abide by the laws of war nor issue membership cards or uniforms, any determination of whether an individual is part of these forces may depend on a formal or functional analysis of the individual's role. Evidence relevant to a determination that an individual joined with or became part of al-Qaida or Taliban forces might range from formal membership, such as through an oath of loyalty, to more functional evidence, such as training with al-Qaida (as reflected in some cases by staying at al-Qaida or Taliban safehouses that are

---

[2] Moreover, courts should defer to the President's judgment that the AUMF, construed in light of the law-of-war principles that inform its interpretation, entitle him to treat members of irregular forces as state military forces are treated for purposes of detention. *See* AUMF, § 2(a) (authorizing the President to use "all necessary and appropriate force" against those that "he determines" planned, authorized, committed, or aided the September 11 terrorist attacks or harbored those organizations); *The Paquete Habana*, 175 U.S. 677, 700 (1900) (court construes customary international law *de novo* only in the absence of a "controlling executive or legislative act or judicial decision"). A deferential approach in this context is consistent with the commonsense understanding that "[t]he war power of the national government 'is the power to wage war successfully,'" *Lichter v. United States*, 334 U.S. 742, 767 n.9 (1948) (citation omitted), as well as the Supreme Court's directive in *Boumediene* that "[i]n considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches," 128 S.Ct. at 2276 (2008) (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)).

6

regularly used to house militant recruits) or taking positions with enemy forces.  In each case, given the nature of the irregular forces, and the practice of their participants or members to try to conceal their affiliations, judgments about the detainability of a particular individual will necessarily turn on the totality of the circumstances.

Nor does the AUMF limit the "organizations" it covers to just al-Qaida or the Taliban.  In Afghanistan, many different private armed groups trained and fought alongside al-Qaida and the Taliban.  In order "to prevent any future acts of international terrorism against the United States," AUMF, § 2(a), the United States has authority to detain individuals who, in analogous circumstances in a traditional international armed conflict between the armed forces of opposing governments, would be detainable under principles of co-belligerency.

Finally, the AUMF is not limited to persons captured on the battlefields of Afghanistan.  Such a limitation "would contradict Congress's clear intention, and unduly hinder both the President's ability to protect our country from future acts of terrorism and his ability to gather vital intelligence regarding the capability, operations, and intentions of this elusive and cunning adversary."  *Khalid,* 355 F. Supp. 2d at 320; *see also Ex parte Quirin*, 317 U.S. at 37-38.  Under a functional analysis, individuals who provide substantial support to al-Qaida forces in other parts of the world may properly be deemed part of al-Qaida itself.  Such activities may also constitute the type of substantial support that, in analogous circumstances in a traditional international armed conflict, is sufficient to justify detention.  *Cf. Boumediene v. Bush,* 579 F. Supp. 2d 191, 198 (D.D.C. 2008) (upholding lawfulness of detaining a facilitator who planned to send recruits to fight in Afghanistan, based on "credible and reliable evidence linking Mr. Bensayah to al-Qaida and, more specifically, to a senior al-Qaida facilitator" and "credible and reliable evidence demonstrating Mr. Bensayah's skills and abilities to travel between and among countries using false passports in multiple names").

Accordingly, the AUMF as informed by law-of-war principles supports the detention authority that the United States is asserting with respect to the Guantanamo detainees.

## II. READ IN LIGHT OF THE LAWS OF WAR, THE AUMF AUTHORIZES THE NATION TO USE ALL NECESSARY AND APPROPRIATE MILITARY FORCE TO DEFEND ITSELF AGAINST THE IRREGULAR FORCES OF AL-QAIDA AND THE TALIBAN.

Petitioners have sought to restrict the United States' authority to detain armed groups by urging that all such forces must be treated as civilians, and that, as a consequence, the United States can detain only those "directly participating in hostilities."[3] The argument should be rejected. Law-of-war principles do not limit the United States' detention authority to this limited category of individuals. A contrary conclusion would improperly reward an enemy that violates the laws of war by operating as a loose network and camouflaging its forces as civilians.

It is well settled that individuals who are part of private armed groups are not immune from military detention simply because they fall outside the scope of Article 4 of the Third Geneva Convention, which defines categories of persons entitled to prisoner–of-war status and treatment in an international armed conflict. *See* Third Geneva Convention, art. 2, 4. Article 4 does not purport to define all detainable persons in armed conflict. Rather, it defines certain categories of persons entitled to prisoner-of-war treatment. *Id.,* art. 4. As explained below, other principles of the law of war make clear that individuals falling outside Article 4 may be detainable in armed conflict. Otherwise, the United States could not militarily detain enemy

---

[3] The "direct participation in hostilities" standard is taken from two additional protocols to the Geneva Conventions that the United States has not ratified. *See* Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 Aug. 1949 and Relating to the Protection of Victims of International Armed Conflicts (Additional Protocol I), art. 51(3), 1125 U.N.T.S 3 ("Civilians shall enjoy the protection afforded by this Section unless and for such time as they take a direct part in hostilities."); Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 Aug. 1949 and relating to the Protection of Victims of Non-International Armed Conflicts (Additional Protocol II), art. 13(3), 1125 U.N.T.S. 609. The United States recognizes the standard for targeting but its scope is unsettled.

8

forces except in limited circumstances, contrary to the plain language of the AUMF and the law-of-war principle of military necessity.

For example, Common Article 3 of the Geneva Conventions provides standards for the treatment of, among others, those persons who are part of armed forces in non-international armed conflict and have been rendered *hors de combat* by detention. Third Geneva Convention, art. 3. Those provisions pre-suppose that states engaged in such conflicts can detain those who are part of armed groups. Likewise, Additional Protocol II to the Geneva Conventions expressly applies to "dissident armed forces" and "other organized armed groups" participating in certain non-international armed conflicts, distinguishing those forces from the civilian population. Additional Protocol II, art. 1(1), 13.

Moreover, the Commentary to Additional Protocol II draws a clear distinction between individuals who belong to armed forces or armed groups (who may be attacked and, *a fortiori,* captured at any time) and civilians (who are immune from direct attack except when directly participating in hostilities). That Commentary provides that "[t]hose who belong to armed forces or *armed groups* may be attacked at any time." *See* ICRC, Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 Aug. 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts (Additional Protocol II), ¶ 4789, http://www.icrc.org/ihl.nsf/ COM/475- 760019?OpenDocument (emphasis added). Accordingly, neither the Geneva Conventions nor the Additional Protocols suggest that the "necessary and appropriate" force authorized under the AUMF is limited to al-Qaida leadership or individuals captured directly participating in hostilities, as some petitioners have suggested.

Finally, for these reasons, it is of no moment that someone who was part of an enemy armed group when war commenced may have tried to flee the battle or conceal himself as a civilian in places like Pakistan. Attempting to hide amongst civilians endangers the civilians and

9

violates the law of war. *Cf.* ICRC, Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims of International Armed Conflicts (Additional Protocol I), ¶ 1944, http://www.icrc.org/ihl.nsf/ COM/470-750065?OpenDocument ("Further it may be noted that members of armed forces feigning civilian non-combatant status are guilty of perfidy."). Such conduct cannot be used as a weapon to avoid detention. A different rule would ignore the United States' experience in this conflict, in which Taliban and al-Qaida forces have melted into the civilian population and then regrouped to relaunch vicious attacks against U.S. forces, the Afghan government, and the civilian population.

### III. THE GOVERNMENT IS CONTINUING TO DEVELOP A COMPREHENSIVE DETENTION POLICY.

Through this filing, the Government has met the Court's March 13, 2009 deadline to offer a refinement of its position concerning its authority to detain petitioners. The Court should be aware, however, that the Executive Branch has, at the President's direction, undertaken several forward-looking initiatives that may result in further refinements. Although the Government recognizes that litigation will proceed in light of today's submission, it nevertheless commits to apprising the Court of any relevant results of this ongoing process.

On January 22, 2009, the President issued two Executive Orders initiating Reviews addressing issues related to prospective detention policy. *See* Exec. Order No. 13492, 74 Fed. Reg. 4897 (Jan. 22, 2009); Executive Order 13493, 74 Fed. Reg. 4901 (Jan. 22, 2009). This effort is a Government priority. *See* Holder Decl. ¶ 3.

Pursuant to Executive Order 13,493, the Government is undertaking "a comprehensive review of the lawful options available to the United States with respect to the apprehension, detention, trial, transfer, release, or other disposition of individuals captured or apprehended in

10

connection with armed conflicts and counterterrorism operations, and to identify such options as are consistent with the national security and foreign policy interests of the United States and the interests of justice." Exec. Order No. 13,493, § 1(e). Fully developing the Government's prospective detention policy implicates important national security interests, including diplomatic interests. Exec. Order No. 13,492, § 2(b); Holder Decl. ¶ 11. Because the detainees are citizens of foreign countries, these detentions and their legal justification necessarily affect the United States' relations with other nations. Cooperation of the country's international partners is central to the United States' anti-terrorism efforts. And detention policy raises important national security and humanitarian issues. *See id.* Such issues are also being considered in connection with Executive Order 13,492, pursuant to which the Government is examining "the factual and legal bases for the continued detention of all individuals currently held at [Guantanamo Bay]" on an ongoing basis. Exec. Order No. 13,492, § 2(d). Highlighting the urgency and importance of the Review, the Executive Order required that the Review process "commence immediately." *Id.* at § 4(a); *see also id.* at §§ 2(b), 2(d), 4(c)(1), 4(c)(2), 4(c)(4).

The Government commits to apprise the Court of any relevant results of these ongoing processes.

## **CONCLUSION**

For the foregoing reasons, the Government's new explication of who may be detained in this armed conflict is consistent with the AUMF and the laws of war that inform the scope of "necessary and appropriate" force the AUMF authorizes the President to use. If the judges of the Court desire oral argument relating to the scope of the Government's detention authority in these cases, the Government urges the Court to consider conducting a single argument in a consolidated manner before the Court and that the Court endeavor, to the extent possible, to reach a common ruling regarding the framework to apply to these cases.

11

Dated: March 13, 2009               Respectfully submitted,

                                    MICHAEL F. HERTZ
                                    Acting Assistant Attorney General

                                    JOSEPH H. HUNT
                                    Director

                                    TERRY M. HENRY
                                    Assistant Branch Director

                                    DAVID J. ANDERSON
                                    Counselor to the Assistant Attorney General


                                     /s/ *Christopher Hardee*
                                    PAUL AHERN
                                    CHRISTOPHER HARDEE (D.C. Bar No. 458168)
                                    United States Department of Justice
                                    Civil Division, Federal Programs Branch
                                    20 Massachusetts Avenue, N.W.
                                    Washington, D.C.  20530
                                    Tel:  (202) 305-8356
                                    Fax:  (202) 616-8470

                                    *Attorneys for Respondents*