## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————— x
 :
**IN RE:** :
 :
 :
**GUANTÁNAMO BAY** : Misc. No. 08-442 (TFH)
**DETAINEE LITIGATION** :
 :
———————————————————————— x
 :
**AL HALMANDY**, *et al.*, :
 :
    Petitioners, :
 :
    v. : No. 05-CV-2385 (RMU)
 :
**OBAMA**, *et al.*, :
 :
    Respondents. :
 :
———————————————————————— x

### PETITIONER KAMEEN'S OPPOSITION TO RESPONDENTS' MOTION FOR EXTENSION OF TIME TO FILE FACTUAL RETURN

  Mohammed Kameen (ISN 1045), one of the petitioners in the above-captioned action, by and through undersigned counsel, respectfully submits this opposition to the government's motion for an open-ended extension of time to file its factual return in this case. The government argues that its return, justifying the seven year detention in this case, should be due thirty days after petitioners' counsel provide evidence that the petition "was authorized by ISN 1045." Motion for Extension of Time, Dkt. 1656 (08-mc-442) (Feb. 27, 2009).

  Under the terms of the protective order entered in this case on September 11, 2008, counsel are entitled to at least two visits with a detainee before filing a statement regarding direct authorization. *See* Protective Order, ¶ 10.b (petitioner's counsel should ordinarily provide

Dockets.Justia.com

evidence of authority to represent petitioner "not later than ten days after the conclusion of a second visit with the detainee," but parties should agree on reasonable number of visits for such purpose, and may petition the Court for relief if agreement cannot be reached).

The status report filed in this case on March 6, 2009 indicates that petitioners' counsel are actively seeking to assign to this case a Federal Public Defender office capable of both taking responsibility for the habeas case and potentially defending criminal charges should they be brought in federal court. It also indicates that to this point habeas counsel have avoided attempting to meet with Petitioner in order "in part to avoid complicating his relationship with defense counsel during the active pendency of the military commission proceedings." Status Rep., Dkt. 214 (Mar. 6, 2009), at 1-2. Petitioner Kameen's mental health issues are well documented on the record of the commission proceedings. *See* Defense Response to Gov't Mot. for 120 Day Continuance (30 Jan. 2009), attached as Exhibit A, at ¶¶5.j, 5.l, 5.p (detailing still-unresolved proceedings relating to mental health evaluation of Petitioner). Rather than being a sign of "authorization problems" with his petition, Mot. at 9, the delays in attempting a first visit with Petitioner are a legitimate response to counsel's concern to ensure arrangements are in place for sustainable, stable long-term representation.

The habeas statute states that a return should be filed by the government within a matter of days from the filing of a petition. 28 U.S.C. § 2243 (writ or order to show cause shall issue forthwith and "shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed"). The statute makes no distinction between petitions initially filed based on a legitimate next-friend authorization or those initially filed based on a direct

authorization.[1] In contrast, the government's motion implies that counsel should visit and discuss the weather, our families, or perhaps our new President for two meetings or thirty days—in lieu of discussing the legal and factual basis for detention of Petitioner—and in the process somehow convince our client that his next friend had his best interests at heart when he authorized us to affect change in Petitioner's situation through this habeas proceeding, which has barely moved in three and a half years. The government's motion also implies that Petitioner, against whom no charges are moving forward in his military commission proceeding, intends to sit in detention without any judicial challenge to his indefinite detention, and that his decision to do so would represent a competent exercise of discretion on his part.

The delay the government seeks here is, as in all executive detention habeas cases, a substantive and not procedural matter. Delay means more indefinite detention, and that *itself* is the harm that this petition was filed to remedy *See Boumediene v. Bush*, 128 S. Ct. 2229, 2267 (2008) ("[C]ommon-law habeas was, above all, an adaptable remedy. ... It appears that the common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention."); *id.* at 2269 ("Where a person is detained by executive order, rather than, say, after being tried and convicted in a court, the need for collateral review is most pressing. ... The intended duration of the detention and the reasons for it bear upon the precise scope of the inquiry. ... [T]he writ must be effective."); *Rasul v. Bush*, 542 U.S. 466, 473-75 (2004); *INS v. St. Cyr*, 533 U.S. 289, 301 (2001); *Johnson v. Rogers*, 917 F.2d 1283, 1284 (10th Cir. 1990) (recognizing if delay in deciding habeas petitions were routinely permissible, absent good reason, "the function of the Great Writ would be eviscerated"). An open-ended delay would be unwarranted here. *Jones v.*

---

[1] The next-friend authorization in this case, from detainee Shaker Aamer on behalf of several other detainees, *see* Exh. B, has never been challenged by the government.

*Shell*, 572 F.2d 1278, 1280 (8th Cir. 1978); *Cross v. Harris*, 418 F.2d 1095, 1105 n.64 (D.C. Cir. 1969) ("This is a habeas corpus proceeding, and thus particularly inappropriate for any delay.").

The law is well-settled that the government bears a higher burden to justify delay in a habeas case than it would in an ordinary civil action. *See Boumediene*, 128 S. Ct. at 2275; *see also Yong v. INS*, 208 F.3d 1116, 1119 (9th Cir. 2000) (noting standard of review of district court decision to stay habeas proceeding "is somewhat less deferential than the flexible abuse of discretion standard applicable in other contexts"). The statutory provisions for prompt returns, immediate hearings, and summary disposition of habeas cases expressly require that petitions be heard and decided promptly. *See* 28 U.S.C. §§ 2241, 2243; *see also Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 490 (1973) (noting interests of prisoner and society in "preserv[ing] the writ of habeas corpus as a swift and imperative remedy in all cases of illegal restraint or confinement") (internal quotation marks omitted); *Yong*, 208 F.3d at 1120 ("[H]abeas proceedings implicate special considerations that place unique limits on a district court's authority to stay a case in the interests of judicial economy."); *Ruby v. United States*, 341 F.2d 585, 587 (9th Cir. 1965) ("The application for the writ usurps the attention and displaces the calendar of the judge or justice who entertains it and receives prompt action from him within the four corners of the application. ... One who seeks to invoke the extraordinary, summary and emergency remedy of habeas corpus must be content to have his petition or application treated as just that and not something else."); *Van Buskirk v. Wilkinson*, 216 F.2d 735, 737-38 (9th Cir. 1954) ("[The Writ] is a speedy remedy, entitled by statute to special, preferential consideration to insure expeditious hearing and determination."). The constitutional role of the writ as an ultimate safeguard for individual liberty mandates a process that will invariably be burdensome upon the jailer. This Court has acknowledged as much. *See* Tr. of Scheduling Conference (Jul. 8, 2008) at

90 (Judge Hogan: "the government has to understand, they're going to set aside every other case that's pending before them in their division, and address these cases first"). Given the small number of returns still due, and the extensive factual development of Petitioner's military commission case, it is inconceivable that the government would be unfairly burdened by the obligation to produce his return on an expeditious schedule here. *Cf.* Petitioner Kameen's Opp. to Resp's Motion to Dismiss, Dkt. 198 (Feb. 18, 2009), at 13 (noting that "over 1800 documents have been produced to defense counsel in Petitioner Kameen's military commission").

Finally, this Court should not allow the government to benefit from self-help. The government's partial reliance on the pendency of its Motion to Dismiss as a rationale for seeking an extension suggest that, as soon as it filed its Motion to Dismiss, it had no intention of meeting the Court's deadline for the submission of Petitioner Kameen's return. *Cf. id.* at 2, 16 (identifying Respondents' motion to dismiss as an attempt to set up a self-help extension). If that were the case, it was wholly inappropriate that the government waited to raise the issue of an extension until after 10 pm on the date on which the factual return was to be produced. Judge Hogan established the February 27, 2009 deadline for production of the factual return more than two months ago. *See* Minute Order (Jan. 2, 2009). The government had an opportunity to move reconsideration of that order but did not do so.

By filing its Motion for Extension so late, the government has already secured for itself in substantial measure the relief that it finally now formally seeks from this Court. As Justice Rehnquist, sitting as a Circuit Justice, stated in an analogous context, "[t]o use the technique of a last-minute filing as a sort of insurance to get at least a temporary stay when an adequate application might have been presented earlier, is, in my opinion, a tactic unworthy of our profession." *Evans v. Bennett*, 440 U.S. 1301, 1307 (1979) (Rehnquist, Cir. Justice); *see also*

*Ramos v. Ashcroft*, 371 F.3d 948, 949 (7th Cir. 2004) ("Filing motions in lieu of briefs, a form of self-help extension, has become increasingly common but is not authorized by any rule, either national or local."); *United States v. Lloyd*, 398 F.3d 978, 980-81 (7th Cir. 2005) (also criticizing practice).

Respondents should be ordered to produce Petitioner Kameen's factual return forthwith, and in no event later than March 31, 2009.

Dated:     Guantánamo Bay Naval Station
           March 12, 2009

Respectfully submitted,

_____/s/ sdk_____
Shayana D. Kadidal (D.C. Bar No. 454248)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6438
Fax:  (212) 614-6499

*Counsel for Petitioner Kameen*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | Misc. No. 08-442 (TFH) |
| GUANTÁNAMO BAY<br>DETAINEE LITIGATION | |
| AL HALMANDY, *et al.*, | |
| Petitioners, | |
| v. | No. 05-cv-2385 (RMU) |
| BARACK H. OBAMA, *et al.*, | |
| Respondents. | |

### [PROPOSED] ORDER

Upon the motion of Respondents for an extension of time to file a factual return for Petitioner Mohammed Kameen (ISN 1045) of February 27, 2009 (Dkt. 1656 in 08-mc-442), it is hereby:

ORDERED that Respondents' motion is denied, and

FURTHER ORDERED that Respondents shall produce Petitioner Kameen's factual return forthwith, and in no event later than March 31, 2009.

Date: _____

_____
HON. THOMAS F. HOGAN
UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

Defense Response to Gov't Mot. for 120 Day Continuance (30 Jan. 2009), *United States v. Kameen*

| | |
|---|---|
| UNITED STATES OF AMERICA | **P-001** |
| v. | **Defense Response** |
| MOHAMMED KAMIN | To the Government Motion for Appropriate Relief Seeking a 120-day Continuance of the Proceedings |
| | 30 January 2009 |

*"While some delay in fashioning new procedures is unavoidable, the cost of delay can no longer be borne by those who are held in custody."*
Justice Anthony Kennedy, *Boumediene v. Bush*, 128 S.Ct. 2229, 2275 (2008)

1.  **Timeliness:**   This Response is timely filed. *See* RC 3.6.b.

2.  **Relief Sought:**   Detailed defense counsel for Mr. Mohammed Kamin[1] respectfully requests the Commission abate the proceedings and order the charges withdrawn and dismissed.  In the alternative, if the Military Judge grants the government's requested relief for a continuance until 20 May 2009, the defense respectfully requests the Commission establish forthwith a trial schedule and set a date for the first hearing to be held on Thursday, 21 May 2009 in Guantanamo Bay, Cuba to litigate motions pending related to discovery.[2]

3.  **Overview:**

     a.   For Two Thousand Eighty-Seven (2087) days Mohammed Kamin has been a prisoner of the United States of America.  He has been not been convicted of a crime.  He has neither been evaluated for nor granted "Prisoner of War" status under the

---

[1] Detailed defense counsel files this Response solely under the authority provided by the Commission on 21 May 2008 that detailed defense counsel shall represent the accused in this case and engage in the discovery process.  The Commission ordered detailed defense counsel to represent Mr. Kamin because "the statute requires it" and because "discovery issues and all of the information that would be necessary for you to get your defense rolling."  *See Transcript* of Hearing ICO *United States v. Kamin*, May 21, 2008 (Draft), pg. 42.

[2] The prosecution correctly noted in P001 that the defense did not initially oppose the relief requested as the defense would be ineffective if it opposed a continuance of the proceedings when it is foreseeable that there will be no proceedings, or military commissions, at the conclusion of the review period.  However, detailed defense counsel believes that he is ethically required to respond to P001 as the law requires the proceedings be abated under the unique facts and circumstances of this case.

Geneva Conventions. His petition for writ of habeas corpus has not been adjudicated.[3] While the United States government engages in a policy debate as to "the appropriate disposition of individuals currently detained by the Department of Defense" in Guantanamo, Mr. Kamin remains confined in a windowless cell, surrounded by guards who speak a language he does not understand, on a remote island thousands of miles from his home.

b.　　The Executive Order (EO) signed by President Obama on 22 January 2009 directed the Secretary of Defense to refrain from swearing or referring new charges, and to ensure that all commissions proceedings where charges have been referred be "halted." *See* EO, § 7. The 20 January 2009 Memorandum from the Secretary of Defense may authorize the government to seek a continuance, but it does not grant this Commission the authority to "halt" proceedings under the rubric of a continuance in the "interests of justice." A plain reading of the Military Commissions Act of 2006 and the Rules for Military Commissions simply does not allow the course of action proposed by the prosecution in its Motion. The Military Judge has the authority to abate the proceedings and order the charges be withdrawn and dismissed. If the Commission were to interpret the EO as the prosecution requests and the Secretary of Defense has ordered, that "halted" means a continuance, the Military Judge would be required to make a finding that acknowledges that the President of the United States exerted unlawful influence over the action of the Military Commission and the professional judgment of the trial counsel. Also, if the Commission grants the requested halt/stay/continuance but does not abate the proceedings (resulting in the charges being withdrawn and dismissed), Mr. Kamin, or the detailed defense counsel ordered by the Commission to represent him, will not have the ability to adequately prepare his case.

**4.**　　**Burden and Standard of Proof:**　　The defense concurs with the prosecution that, as the moving party, the government bears the burden of persuasion. *See* R.M.C. 905(c).

**5.**　　**Facts:**

a.　　The military commissions were first established by order of the President of the United States of 13 November 2001 for the purpose of trying members of al Qaeda who engaged in, aided or abetted, or conspired to commit acts of international terrorism in violation of the laws of war. *See* 66 Fed. Reg. 57833.

b.　　Mr. Mohammed Kamin is a native of Afghanistan. He was captured in the Khowst Region, Afghanistan on or about 14 May 2003. Shortly thereafter, he was transferred to Bagram Air Base, Afghanistan, where he was detained in the custody of the United States. In September 2004, Mr. Kamin was transferred to the U.S. Naval Station,

---

[3] Mr. Kamin exercised his constitutional privilege by filing a petition for writ of habeas corpus in the U.S. Federal District Court, District of Columbia, in the action titled *al Hamandy, et. al. v. George W. Bush, et. al.*, Civil Action No. 05-2385 (RMU). On 16 January 2009, the United States moved to dismiss the habeas petition without prejudice, or in the alternative, to hold the petition in abeyance pending completion of the military commission proceeding.

Guantanamo Bay, Cuba (GTMO) where he continues to be confined in isolation under the authority of the Commander, Joint Task Force Guantanamo (JTF-GTMO).

c.      On 28 June 2004, the Supreme Court issued an opinion that held that, although Congress authorized the detention of combatants in narrow circumstances when it issued the Authorization for Use of Military Force, 115 Stat. 224, "due process demands that a citizen held in the United States as an enemy combatant be given a meaningful opportunity to contest the factual basis for that detention before a neutral decision maker." *Hamdi v. Rumsfeld*, 124 S.Ct. 2633 (2004). That same day, the Supreme Court issued an opinion wherein it held that United States courts have jurisdiction to consider challenges to the legality of the detention of foreign nationals captured abroad in connection with hostilities and incarcerated at GTMO. *Rasul v. Bush*, 124 S.Ct. 2686 (2004).

d.      In response to the Supreme Court opinions in *Hamdi* and *Rasul*, the Deputy Secretary of Defense issued a Memorandum to the Secretary of the Navy on 7 July 2004 to establish Combatant Status Review Tribunals (CSRT) for purposes of determining the status of persons detained in GTMO and defined the term "enemy combatant." The Secretary of the Navy issued an Order to implement the CSRTs on 29 July 2004.

e.      On 23 November 2004, Mr. Kamin was designated as an "enemy combatant" by a CSRT held in GTMO. The government's CSRT procedures denied Mr. Kamin the right to be represented by counsel, to effectively call witnesses on his behalf, and to review any of the substantive evidence in support of the assertions because he lacked the prerequisite security clearance. He did not attend the CSRT. This cursory CSRT determination, affirmed by subsequent findings of Administrative Review Boards, has been the basis of the continued detention of Mr. Kamin in GTMO.

f.      On 29 June 2006, the United States Supreme Court held that the military commissions lacked power to proceed as the commission's structure and procedures were in violation of the Uniform Code of Military Justice and Common Article 3 of the Geneva Conventions. *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006).

g.      In October 2006, Congress responded to *Hamdan*, at the request of the President, with the passage of the Military Commissions Act of 2006 which established procedures to try alien unlawful enemy combatants engaged in hostilities against the United States for violations of the law of war and other offenses triable by military commissions. *See* 10 U.S.C. § 948a, *et. seq*.

h.      The Charge was preferred against Mr. Kamin on 11 March 2008 for six Specifications of Providing Material Support for Terrorism. *See* 10 U.S.C. § 950v(b)(25). The Charge and Specifications were referred for trial by Military Commission on 4 April 2008.

i.      Mr. Kamin was arraigned on the Charge on 21 May 2008.[4]  During the arraignment, Mr. Kamin was advised by the Military Judge concerning his right to counsel.  As he repeatedly stated during the arraignment, Mr. Kamin refused to be represented by his detailed defense counsel.[5]  Mr. Kamin also declined to represent himself, *pro se*, and further stated his intent not to attend future proceedings.

j.      On 29 August 2008, the defense filed a Motion (D-008) seeking an Order to appoint a Board to conduct an inquiry into the mental capacity or mental responsibility of Mr. Kamin.  *See* R.M.C. 706.  This Order was signed on 10 September.  The Board submitted its report to the parties on 3 October 2008.

k.      A hearing was held in GTMO on 23 October 2008.  The prosecution sought an order from the Military Judge that Mr. Kamin again be forcibly extracted from his cell to be present at the hearing.  The defense objected to the government request.  The Military Judge denied the request and noted, "the government controls Mr. Kamin.  If it's the government's desire to have Mr. Kamin here in court, they have every authority, I would think, to do that.  So that's a call we will let the government make."  *See Transcript* of Hearing ICO *United States v. Kamin*, July 31, 2008 (Draft), pg. 175.  Mr. Kamin did not attend the hearing.

l.      During the hearing on 23 October, the parties argued a Defense Motion for the appointment of an independent mental health expert to be a defense consultant (D-009).  As part of this argument, the defense objected to the lack of thoroughness of the inquiry conducted by the 706 Board.  During argument, the government concurred that a "redo" of the 706 Board would be appropriate.  The Commission deferred entering an order for a second 706 Board until after it entered a ruling on D-009, however, the Military Judge suggested that he intended to grant the defense the appointment of an expert consultant (leaving open whether that would be the person initially sought, Dr. Patricia Zapf, or a government proposed adequate substitute).

m.      During the hearing on 23 October, the parties argued a Defense Motion to Dismiss for Systemic Discovery Failures (D-012).  The Military Judge noted the historical perspective that within the United States government there has not always been efficient interagency cooperation.  *See e.g., id*. pg. 280 ("MJ: …you've got to put some historical perspective on this. … [a]nd I think the agencies that are involved here have never had to communicate with one another, and now they are being forced to.  And is it going as quickly as I would like for it to?  Absolutely not.  Am I going to do something about it if it doesn't pick up speed here really, really quick?  You better believe it."), pg. 281 ("MJ: …I just think the interagency workings of these things are taking time, but they are not going to take forever; and at some point there are going to be sanctions

---

[4] Mr. Kamin refused to voluntarily attend his arraignment.  A Forced Cell Extraction (FCE) was ordered by the Military Judge to ensure his presence, and he sat in the courtroom in a four-point restraint.  *See Transcript* of Hearing ICO *United States v. Kamin*, May 21, 2008 (Draft), pg. 1.

[5] Mr. Kamin made 18 such statements during the arraignment, statements such as "I do not want him" and "I do not need him."

involved, and I think we are starting to get close to that point."). Detailed defense counsel noted that further delay in the proceedings should not be to the prejudice of Mr. Kamin. *See id.* pg. 282.

n.     On 17 November 2008, the parties held a telephonic conference outside of the presence of the accused ("802 Conference") wherein the Military Judge informed the parties that D-012 was denied. In addition, he established deadlines for filings of pleadings related to discovery.

o.     On 5 December 2008, the defense filed eight Motions to Compel Discovery (D-014 through D-021).

p.     On 9 December 2008, the parties held a telephonic 802 Conference wherein they discussed the eight defense motions pending and an agenda for oral argument during a hearing scheduled to be held in GTMO on 17 December. In addition, the Military Judge informed the parties that the defense request for appointment of Dr. Zapf as an expert consultant (D-009, argued on 23 October) was denied, however, the government was directed to appoint an adequate substitute. There was no mention of an appointment of a second 706 Board.

q.     On 11 December 2008, the defense filed a Special Request for Relief (D-022) requesting the hearing scheduled for 17 December be continued until the week of 12-16 January 2009, with any additional pleadings to be filed by the parties by 30 December. The basis of this request was the government's stated intent to provide much of the discovery at issue thereby rendering moot several of the motions pending and that the parties awaited the written opinions, stated to be forthcoming, of several of the motions litigated in past hearings (D-006, D-009, D-011/D-013, and D-012) that may have a significant impact on the defense preparation. The government did not oppose the request. That same date, the Commission granted the requested relief, in part, cancelling the hearing on 17 December but stating that "[t]here will be additional information forthcoming regarding the new date for the hearing. The date requested by Defense is being considered." Email of Maj. Donna S. Rueppell, USAF, Attorney Advisor, Office of the Military Commissions Trial Judiciary, dated 11 December 2008.

r.     On 16 December 2008, the defense filed a Special Request for Relief for an enlargement of time, of seven days prior to the next scheduled hearing, to file Replies to the Government Responses to D-014 through D-021. The government did not object to the requested relief, however, it argued that only seven additional days from the original deadline should be provided.

s.     On 6 January 2009, the Trial Judiciary informed the parties that the Defense Special Request for Relief of 16 December was designated as D-023. However, no ruling on D-023 was provided. The next day, 7 January, the trial counsel sent a request to the Trial Judiciary wherein "[t]he Government respectfully requests a timeline as to when we can expect to receive a ruling from the Military Judge on the D-023 and the Government response to D-023."

t.　　On 23 January 2009, the government filed a Motion for Appropriate Relief (P-001), seeking a 120-day continuance of the proceedings "at the direction of the President of the United States and the Secretary of Defense."[6]

u.　　On 29 January 2009, a Pentagon spokesman, Mr. Geoff Morrell, said at a briefing that "this department will be in full compliance with the president's executive order. . . . And so while that executive order is in force and effect, trust me, there will be no proceedings continuing down at Gitmo with military commissions." *See* Peter Finn, "Guantanamo Judge Denies Obama's Request for Delay," *Washington Post*, 30 January 2009 [**Attachment A**].  Additionally, Mr. Morrell stated, "[b]ut the bottom line is, we all work for the president of the United States in this chain of command, and he has signed an executive order which has made it abundantly clear that until these reviews are done all [legal activity at Guantanamo] is on hiatus." Gerry J. Gilmore, "Military Commissions Must Obey President's Directive, Official Says," *American Forces Press Service*, 29 January 2009 [**Attachment B**].

v.　　As of the date of this filing, no ruling on D-023 has been received, no additional deadlines for pleadings issued, no trial schedule set, nor a date established for the next hearing.

**6.**　**Discussion:**

I.　　The Authority of the President of the United States to Effect the Military Commissions is Limited.

a.　　The Military Commissions Act of 2006, Public Law 109-366 ("M.C.A."), delegates from the Congress to the President of the United States the authority to establish military commissions for certain offenses. *See* 10 U.S.C. § 948b.  The M.C.A. also gives the Secretary of Defense the power to convene a military commission under the Code and establish rules of procedure consistent with the M.C.A. for that commission. *See* 10 U.S.C. §§ 948h, 949a(a).  Those rules of procedure, approved as the Rules for Military Commissions ("R.M.C."), give the Secretary of Defense or a designated convening authority the authority to consider charges and, if necessary, refer them for trial by military commission or dismiss them. *See* R.M.C. 601, 401(b).  Once charges are referred, the rules give the Secretary of Defense the authority to withdraw the charges, and withdrawn charges should be dismissed. *Id.*

b.　　Reading the M.C.A. and the R.M.C. together, the President and the Secretary of Defense have limited authority under Chapter 10, United States Code, Subtitle A, Chapter 47A – Military Commissions – to dismiss, refer, or withdraw charges to military commission.  Neither the M.C.A., nor the R.M.C., provides the President or the Secretary of Defense additional options unconditionally to delay or halt a proceeding once charges have been referred to commission. *See, e.g.,* M.C.A § 949e and R.M.C. 707 (listing criteria for granting a continuance only in the interests of justice); R.M.C. 703

---

[6] The defense concurs with the statement of facts contained within the Government Motion and incorporates them herein.

(giving the Commission authority to halt proceedings only where evidence or a given witness is unavailable).

II.      The Plain Language of the Executive Order Requires the Charges be
         Withdrawn and Dismissed

    a.      On 20 January 2009, President Barack Obama was inaugurated and conveyed an order to the Secretary of Defense to "halt[]" the military commissions.[7]  The Secretary of Defense then forwarded a memorandum ("SecDef Memo") dated 20 January 2009 to the Chief Prosecutor directing that the Chief Prosecutor seek a continuance for "120 days in any cases that have already been referred to military commissions."  *See* P001, Attachment B.  On 22 January 2009, President Obama signed an Executive Order ("EO") regarding the review and disposition of individuals detained at Guantanamo Bay Naval Base.  Section 7 of that EO directs the Secretary of Defense to refrain from swearing or referring new charges, and to ensure that all commissions proceedings where charges have been referred be "halted."

    b.      Nowhere does the EO direct the Secretary of Defense or the prosecution to seek a 120-day continuance, as the prosecution did in its 23 January 2009 Motion P001.  The prosecution requests a "continuance," "a halt," and a "stay" of proceedings until 20 May 2009 – casually and precariously interjecting terms that have vastly different legal meanings.  The government claims that it would be "in the interests of justice" for this Commission to grant such a continuance.  However, neither the EO nor the SecDef Memo authorize this Commission to continue the case in the manner requested.  The EO does not authorize a "continuance" but requires the proceedings be "halted."  The only means available to the Defense Secretary to give effect to the EO is to withdraw the charges.  Likewise, the SecDef Memo may authorize the government to seek a continuance, but it does not grant this Commission the authority to "halt" proceedings under the rubric of a continuance in the "interests of justice."  A plain reading of the M.C.A. and R.M.C. simply does not allow the course of action proposed by the SecDef Memo and government motion.

    c.      The language that "all proceedings of such military commissions . . . are halted" can have only one meaning consistent with the M.C.A. and the R.M.C. – that the referred charges shall be withdrawn and dismissed.  The word "halt" or "halted," as used in President Obama's 22 January 2009 EO, does not appear in Black's Legal Dictionary (8th ed. 2004) and has no independent legal significance.  The plain meaning of "halted," particularly considering that neither the President nor the Secretary of Defense expanded the authority of the Commission to grant a continuance, requires the proceedings be stopped or terminated.  This interpretation of the EO has recently been publicly acknowledged by a Pentagon spokesperson.  *See supra*, ¶ 5.u.  The Commission must effectuate this order by abating the proceedings and ordering the charges withdrawn and dismissed.

---

[7] This 20 January 2009 order from the President to the Secretary of Defense was presumably oral, with the Executive Order dated 22 January 2009 memorializing the order.  The language "halted" comes from the 22 January 2009 Executive Order.  The defense has not been provided the written order – if any exists – dated 20 January 2009 relaying the President's Order to the Secretary of Defense.

III.     The Military Judge has the Authority to Abate the Proceedings and Withdraw and Dismiss the Charges.

a.          "The military commission was not born of a desire to dispense a more summary form of justice than is afforded by court-martial; it developed, rather, as a tribunal of necessity to be employed when courts-martial lacked jurisdiction over either the accused or the subject matter." *Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2792 (2006).  In order to foster public confidence, it is vital that the military judges presiding over the commissions, like federal judges in Article III courts, be independent.  *See Boumediene v. Bush*, 128 S.Ct. 2229, 2269 (2008)("A criminal conviction in the usual course occurs after a judicial hearing before a tribunal disinterested in the outcome and committed to procedures designed to ensure its own independence.").  As the U.S. Federal District Court, District of Columbia, Judge James Robertson wrote in *Hamdan v. Gates*, Civil Action No. 04-1519 (JR) (2008):

> The eyes of the world are on Guantanamo Bay. Justice must be done there, and must be seen to be done there, fairly and impartially. But Article III judges do not have a monopoly on justice, or on constitutional learning. A real judge is presiding over the pretrial proceedings in Hamdan's case and will preside over the trial. He will have difficult decisions to make, as judges do in nearly all trials.

b.          The Military Judge shall exercise reasonable control over the proceedings to promote the purposes of the Rules for Military Commissions and the Manual for Military Commissions.  *See* R.M.C. 801(a)(3).  The Military Judge may prescribe the order in which the proceedings may take place.  *See id.*, Discussion.  Included within the responsibility and authority of the Military Judge is a judicial power to abate the proceedings.  *See United States v. Pruner*, 33 M.J. 272, 276 (C.M.A. 1991)(determining the procedure of the military judge to review *in camera* whether a denial of a security clearance to a defense counsel was arbitrary or unsupported by law and, upon such findings, take remedial action, including abatement).

c.          Mr. Kamin was arraigned on the charge on 21 May 2008.  After the referral of charges for trial by military commission, which triggers the detailing of a military judge and begins his/her jurisdiction over the sworn charges, the arraignment is the event that increases the authority the military judge has over the case and the responsibility to ensure the case proceeds at a reasonable pace.  *See United States v. Cooper*, 58 M.J. 54, 60 (C.A.A.F. 2003).  "[B]y the time an accused is arraigned, a change in the speedy trial landscape has taken place.  This is because after arraignment, 'the power of the military judge to process the case increases, and the power of the [Government] to affect the case decreases.'"  *Id.*; *quoting United States v. Doty*, 51 M.J. 464, 465-66 (C.A.A.F. 1999).  "The Military Judge has the power and responsibility to force the Government to proceed with its case if justice so requires."  *Id.*  A failure to comply with R.M.C. 707 will result in dismissal of the affected charges and dismissal can be with or without prejudice. *See* R.M.C. 707(d).

IV.  **An Abatement of the Proceedings and Ordering the Charges Withdrawn and Dismissed Allows the Commission to Avoid a Finding that the President of the United States and the Secretary of Defense have Unlawfully Influenced the Proceedings**.

a.     The M.C.A. prohibits the unlawful influence over the action of a military commission.  *See* 10 U.S.C. § 949b(a)(2).  The M.C.A. actually extends the scope of the prohibition against unlawful influence found in Article 37 of the Uniform Code of Military Justice (U.C.M.J.) to include "any person" – not only those subject to the U.C.M.J. – and also prohibits attempts to coerce or influence the "exercise of professional judgment by trial counsel or defense counsel" – not just the action of court-martial or military tribunals.  *See* 10 U.S.C. § 949b(a)(2)(C).  There could be no stronger evidence of the seriousness with which Congress viewed the threat of unlawful influence in connection with military commission proceedings and its desire to eliminate comprehensively this "mortal enemy of military justice."  *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986), cert. denied, 479 U.S. 1086, 107 S.Ct. 1289 (1987).

b.     The M.C.A. incorporated into the military commissions the shared responsibility of military commanders, military judges, and others involved in the administration of military justice to foster "public confidence in the actual and apparent fairness of our system of justice."  *United States v. Harvey*, 64 M.J. 13, 17 (C.A.A.F. 2006).  In fact, the necessity for the military judge to "avoid even the appearance of evil in his courtroom by establishing the confidence of the general public in the fairness" of the proceedings is significantly heightened where Congress has expressly afforded detainees greater protections against unlawful influence than those that are found in the U.C.M.J.. *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006); *quoting United States v. Stoneman*, 57 M.J. 35, 42 (C.A.A.F. 2002); *see also United States v. Rosser*, 6 M.J. 267, 271 (C.M.A. 1979).

c.     If the Commission were to interpret the EO as the prosecution requests and the Secretary of Defense has ordered, that "halted" means a continuance, the Military Judge would be required to make a finding that acknowledges that the President of the United States exerted unlawful influence over the action of the Military Commission and the professional judgment of the trial counsel.  Essentially, the Military Judge would be forced to accept the "interests of justice" argument because the President has ordered him to do so.  The professional judgment of the prosecution was undoubtedly influenced because the prosecutors were *ordered* to seek a continuance by the Secretary of Defense. *See* P001, Attachment B.  The prosecution admits the influence as they filed the Motion "at the direction of the President of the United States and the Secretary of Defense." P001, ¶ 2.[8]  Such a result could not have been the intent of the President when he

---

[8] This admission is *prima facie* evidence of unlawful influence that easily allows the defense to meet its "initial burden of raising the issue of unlawful command influence." *United States v. Lewis*, 63 M.J. 405, 413 (C.A.A.F. 2006); *quoting United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999); *see also United States v. Harvey*, 64 M.J. 13, 18 (C.A.A.F. 2006); *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994).  The test is "some evidence" of facts "which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Harvey*, 64 M.J. at 18 (citation omitted).  Once the issue

"halted" the case.[9]  On the contrary, it is clear that the President desired that the charges in this case, and all cases pending trial before military commission, be withdrawn and dismissed so that the United States Executive Branch could undertake an "[i]mmediate review of all Guantanamo Detentions."  *See* EO, § 4.

       d.     The fact that the review process may result in changes that "inure to the benefit of the accused" does not change the analysis of the unlawful influence.  P001, ¶ 6.c.  The Commission cannot assume any changes will be made.  Rather, it is bound by the law as it currently exists not as it may change in the future.  This point is illustrated if one considers that the government may very well change the law to further deprive Mr. Kamin and other detainees of legal rights – a result that renders absurd the position that the "interests of justice" are served by granting the 120-day continuance without the charges being withdrawn and dismissed.

       V.     <u>Mr. Kamin will suffer Grave Prejudice if the Commission does not Abate the Proceedings while the Government conducts it Review.</u>

       a.     For the last eight years, the United States has toiled in a legal quagmire over detention policy of "enemy combatants" resulting in a legal "black hole" that has consumed the detainees confined in GTMO.  It is clear that the newly inaugurated President has every intent to "undertake a prompt and thorough review of the factual and legal bases" for continued detention in an attempt to restore and adhere to the rule of law.  However, the President's order has not been properly executed by the Secretary of Defense or the prosecution.  Additionally, the United States seeks to hold in abeyance Mr. Kamin's petition for writ of habeas corpus on the grounds that the Executive is actively prosecuting him in a trial by Military Commission, yet simultaneously now seeking to stall the Commission proceeding at the order of the Executive.  Such a result is unconscionable and darkens the legal "black hole" for Mr. Kamin.

       b.     The net effect is that the government's request for continuance will significantly prejudice Mr. Kamin if the continuance delays Commission rulings on outstanding defense motions D-014 through D-021 or delays the ongoing discovery schedule.  *See, e.g., United States v. Al-Nashiri*, Ruling on Government Motion to Continue Arraignment, dated 29 January 2009 (finding that a continuance does not serve the interests of justice).  A continuance under M.C.A. § 949e and R.M.C. 707 is appropriate where either party can adequately demonstrate to the military judge that additional time is necessary in the interests of justice to prepare their case for trial. *See United States v. Miller*, 47 M.J. 352, 358 (1997); R.M.C. 906(b)(1), Discussion (listing factors the military judge should consider on the appropriateness of a continuance).  Here, the government does not claim any of the R.M.C. 906(b)(1) factors - unavailability of a witness, the need to adjust the trial schedule in order to try a related case, or the

---

of unlawful influence has been raised, the burden shifts to the government to demonstrate *beyond a reasonable doubt* either that there was no unlawful influence or that the proceedings were untainted.  *See United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)(emphasis added).

[9] To further eliminate any doubt that the Commander-in-Chief did not intend to unlawfully influence the action of the Military Commission, it must be noted that such an intent and action could have criminal consequences as a punitive violation of the U.C.M.J., Article 98 ("Noncompliance with procedural rules").

unavailability of a party to this commission. Rather, the prosecution clings to the "interests of justice" language to mask the reality that its continuance request is based solely upon political factors and not a legal basis. This request is similar to the prosecution's request on 23 October 2008 that the Military Judge order that Mr. Kamin be forcibly extracted from his cell to attend the hearing – it is an attempt to force the Commission to make tough decisions on issues well within the authority of the government and to absolve the government of any responsibility for the consequences.

c.     Moreover, and more troubling, the government can offer the Commission no assurance that it will be prepared to move forward in Mr. Kamin's case at the conclusion of the requested 120-day period. A change in President and Executive administration does not relieve the United States of its obligation to act with reasonable diligence to prosecute or dismiss the referred charges against Mr. Kamin. The EO requires a "comprehensive interagency review." *See* EO, § 2(d). As the record of this case demonstrates, and the Military Judge has already stated, the interagency review process by the government has a history of failure that has infected this case. *See supra*, ¶ 5.m.

d.     In reviewing claims for speedy trial violations, courts have formulated the following factors to consider: (1) the length of delay; (2) the reasons for delay; (3) whether the accused made a demand for speedy trial; and (4) the prejudice to the accused. *See United States v. Cossio*, 64 M.J. 254, 256 (C.A.A.F. 2007); *quoting United States v. Mizgla*, 61 M.J. 122, 129; *citing Barker v. Wingo*, 407 U.S. 514, 530 (1972). Although the speedy trial rules applicable to trial by Military Commission may be different than a military court-martial or civilian judicial proceeding, the analysis as to prejudice upon the accused if a continuance is granted is germane to the present motion. The test for prejudice is:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. *Id*. at 257; *quoting Barker*, 407 U.S. at 532.

e.     If the Commission grants the requested halt/stay/continuance but does not abate the proceedings (resulting in the charges being withdrawn and dismissed), Mr. Kamin, or the detailed defense counsel ordered by the Commission to represent him, will not have the ability to adequately prepare his case. Outstanding discovery issues will not be adjudicated, a second 706 Board will not be conducted, detailed defense counsel cannot work with it appointed expert,[10] and Mr. Kamin will have no forum until 20 May

---

[10] The defense would also be unable to file a motion with the Commission arguing that the prosecution's proffered substitute for Dr. Zapf is not adequate. *See United States v. Warner*, 62 M.J. 114 (C.A.A.F. 2005).

2009 to seek relief when his legal rights are not being upheld. The "interests of justice" are not served by such a result, rather, an abatement of the proceedings and ordering the charges withdrawn and dismissed is the only equitable solution in alignment with the President's order that the proceedings be "halted."

VI. <u>If the Commission Grants the Prosecution's Requested Relief, it should also establish forthwith a trial schedule and set a date for the first hearing to be held on Thursday, 21 May 2009 in Guantanamo Bay, Cuba to litigate motions pending related to discovery</u>.

a. If the proceedings are continued until 20 May 2009, the defense respectfully requests that a hearing be scheduled for Thursday, 21 May 2009 in Guantanamo Bay, Cuba to litigate pending motions related to discovery, D-014 through D-021. This would necessitate a trial schedule being set forthwith. Additionally, the defense would request that it be provided the opportunity to have input on all additional dates and deadlines established thereafter.

**7.** <u>**Request for Oral Argument**</u>**:** The defense does not request oral argument, however, it joins the prosecution in its statement that it will be prepared to present argument should the Commission desire this matter be heard.

**8.** <u>**Witness Request**</u>**:** None.

**9.** <u>**Additional Information:**</u> "The Military Judge has the sole authority to determine whether or not any given matter shall be released." *See* RC 3.9.c; *see also* R.M.C. 801; Reg. ¶¶ 19-5, 19-6. The Commission should seek to strike a balance of protecting Mr. Kamin's right to a fair trial, the improper or unwarranted publicity pertaining to the case, and the public understanding of the Military Commissions. *See* Reg. ¶ 19-1. The release of pleadings and rulings is essential for the public, writ large, to be able to assess and evaluate the legitimacy of United States judicial proceedings being held on a military base overseas and in a fortified courtroom. At a minimum, providing the public the opportunity to read and evaluate the pleadings and rulings would contribute to Mr. Kamin being able to have a "public trial." *See* U.S. Constitution, Sixth Amendment. This is especially true of the present motion as the sole basis for the continuance sought by the government is the "interests of justice." The defense hereby respectfully requests that the Military Judge authorize the Assistant Secretary of Defense for Public Affairs (or designee) to release this pleading and any and all responses, replies, and/or rulings under the same designation to the public at the earliest possible date.

**10.** <u>**Attachments**</u>**:**

A. Peter Finn, "Guantanamo Judge Denies Obama's Request for Delay," *Washington Post*, 30 January 2009

B. Gerry J. Gilmore, "Military Commissions Must Obey President's Directive, Official Says," *American Forces Press Service*, 29 January 2009

Respectfully submitted,

By: _____
LT RICHARD E.N. FEDERICO, JAGC, USN
*Detailed Defense Counsel for*
*Mohammed Kamin*

Office of the Chief Defense Counsel
Office of Military Commissions
1600 Defense Pentagon, Room 3B688
Washington, DC 20301

# ATTACHMENT A

Washington Post
January 30, 2009
Pg. 14

# Guantanamo Judge Denies Obama's Request For Delay

By Peter Finn, Washington Post Staff Writer

A military judge threw a wrench yesterday into the Obama administration's plan to suspend legal proceedings at Guantanamo Bay, denying the government's request to delay the case of a detainee accused of planning the 2000 attack on the USS Cole.

To halt proceedings for 120 days -- as Obama wants in order to conduct a review -- the Pentagon may be forced to temporarily withdraw charges against Abd al-Rahim al-Nashiri and possibly 20 other detainees facing trial in military commissions, including Khalid Sheik Mohammed, the self-proclaimed mastermind of the Sept. 11, 2001, attacks.

The administration, which expected military judges to agree to its motions seeking suspension, was taken aback by yesterday's decision. Judges in other cases, including one involving five Sept. 11 defendants, had quickly agreed to the government's request.

"We just learned of the ruling here . . . and we are consulting with the Pentagon and the Department of Justice to explore our options in that case," White House spokesman Robert Gibbs said. Asked at a news conference whether the decision would hamper the administration's ability to evaluate detainees' cases, Gibbs replied: "Not at all."

Nashiri, a Saudi citizen of Yemeni descent, is facing arraignment Feb. 9 on capital charges relating to the al-Qaeda strike on the Cole in Yemen that killed 17 U.S. service members and injured 50 others in October 2000.

The chief military judge at the detention center at Guantanamo Bay, Cuba, Army Col. James Pohl, said that he found the government's arguments "unpersuasive" and that the case will go ahead because "the public interest in a speedy trial will be harmed by the delay in the arraignment."

The administration had argued that the "interests of justice" would be served by a delay that would allow the government to review the approximately 245 prisoners at Guantanamo to figure out who should be prosecuted and how, and who can be released.

"The Commission is unaware of how conducting an arraignment would preclude any option by the administration," Pohl wrote in an opinion obtained by The Washington Post. "Congress passed the military commissions act, which remains in effect. The Commission is bound by the law as it currently exists, not as it may change in the future."

The decision was lauded by some survivors of the attack on the Cole, who said it illustrated the independence of the military judiciary at Guantanamo.

"I'm absolutely delighted," said Navy Cmdr. Kirk Lippold, the former skipper of the Cole. "It proves the military commissions work without undue command influence, and this decision puts us back on track to see an accounting for al-Nashiri's terrorist acts."

But human rights activists said the administration should now withdraw charges, something it had seemed reluctant to do, to allow the option of preserving or reforming military commissions, albeit at a new location.

"Given that the Guantanamo order was issued on day two of the new administration, the president was clearly trying to make the immediate decisions needed while giving himself the flexibility to deal with the rest down the road," said Jennifer Daskal, senior counterterrorism counsel at Human Rights Watch. "That said, the only sure way to ensure that the commissions process is brought to a halt is to now withdraw the charges."

Susan J. Crawford, the Pentagon official who approves charges and refers cases to trial, can withdraw charges, an action that would stop proceedings without reference to the judge. Withdrawing charges "without prejudice" would let the government reinstate them later in a military commission. Or it could allow the cases to be moved to federal court or military courts-martial if Obama abolishes the existing system for prosecuting detainees.

Some military defense lawyers have urged the withdrawal of charges in all cases, saying it would be a clear indication from the administration that the military commissions are dead. If Crawford withdraws charges in the Nashiri case, said some lawyers in other cases, including the trial of five Sept. 11 suspects, they would cite the decision to seek the withdrawal of charges against their clients.

"There should be a withdrawal of charges in all cases, and we will directly engage the prosecutors and [Crawford] on that," said Army Maj. Jon Jackson, who is defending Mustafa Ahmed al-Hawsawi, an alleged Sept. 11 conspirator.

If an arraignment goes ahead and Nashiri enters a plea, subsequent proceedings would be subject to double-jeopardy rules, according to defense lawyers. That could severely complicate the administration's ability to move Nashiri's case to federal court or courts-martial, lawyers said.

Nashiri's military defense attorney, Cmdr. Stephen C. Reyes, did not object to postponing the arraignment but requested that discovery and other issues go forward. "It's somewhat of a shock," he said, adding that the administration's only option appeared to be the withdrawal of charges.

Pentagon spokesman Geoff Morrell said at a briefing yesterday that "this department will be in full compliance with the president's executive order. . . . And so while that executive order is in force and effect, trust me, there will be no proceedings continuing down at Gitmo with military commissions."

Nashiri was captured in the United Arab Emirates in late 2002 and was turned over to the CIA. He is one of three detainees who the government has acknowledged were subjected to waterboarding, an interrogation technique that simulates drowning and has been described as torture by human rights groups and by Eric H. Holder Jr., the nominee to be attorney general.

Nashiri was transferred to Guantanamo Bay in September 2006 along with 13 other "high-value" detainees, including Mohammed.

*Staff researcher Julie Tate contributed to this report.*

# ATTACHMENT B

**Military Commissions Must Obey President's Directive, Official Says**
By Gerry J. Gilmore
American Forces Press Service

WASHINGTON, Jan. 29, 2009 – The military commissions system created in 2006 to try accused terrorists held at the U.S. detention center at Guantanamo Bay, Cuba, must comply with President Barack Obama's directive to suspend all legal proceedings there, Pentagon Press Secretary Geoff Morrell said at a news conference today.

A reporter asked for Morrell's reaction concerning news reports that say a military judge at Guantanamo today ordered that legal proceedings be continued against accused al-Qaida terrorist Abd al-Rahim al-Nashiri.

Nashiri is charged with planning the Oct. 12, 2000, bombing of the U.S. Navy destroyer USS Cole that was berthed in Aden, Yemen. Seventeen U.S. sailors died as a result of the attack.

All legal proceedings at Guantanamo are "on hold," Morrell said. A series of assessments and reviews of detainee operations at Guantanamo are now being conducted as part of Obama's Jan. 22 executive order to shut down the detention facility within the year.

Obama instructed Defense Secretary Robert M. Gates on Jan. 20 to cease referring any new cases through the military-commissions process at Guantanamo Bay and to request 120-day continuances on all ongoing active cases there. Two days later, the president issued three executive orders, one of which directs the closure of the U.S. detention center at Guantanamo Bay within the year.

Resolving the issue concerning Nashiri's legal proceedings at Guantanamo, Morrell said, is a matter for the military commissions convening authority.

"But the bottom line is, we all work for the president of the United States in this chain of command, and he has signed an executive order which has made it abundantly clear that until these reviews are done all [legal activity at Guantanamo] is on hiatus," Morrell said.

Obama signed three executive orders Jan. 22, one of which directs the closure of the U.S. detention center at Guantanamo Bay within the year. Another order signed by the president directs the stand up of a special interagency task force that will study the future disposition of present Guantanamo detainees who cannot be transferred to other countries and who pose a serious danger to the United States.

The third executive order signed by the president that day directs the U.S. military and other U.S. agencies to follow the Army Field Manual, which bans torture when interrogating detainees "to promote the safe, lawful and humane treatment of individuals in United States custody."

"This department will be in full compliance with the president's executive order,"

Morrell said at the news conference.

The Military Commissions Act of 2006 established procedures governing the use of military commissions to try alien unlawful enemy combatants engaged in hostilities against the United States for violations of the law of war and other offenses that can be tried by military commission, according to a military commissions fact sheet.

The detention center at Guantanamo Bay has housed nearly 800 suspected terrorists captured in Afghanistan, Iraq and other places since the start of the global war on terrorism that followed the Sept. 11, 2001, terrorist attacks on the United States.

About 250 people are being held at Guantanamo today, including Khalid Sheikh Mohammad, the alleged mastermind of the 9/11 attacks.

**EXHIBIT B**

Next-friend authorization for Petitioner Kameen (item 13, page 2)

① 

I SHAKER AAMER Born in 21-12-1966 understar
The meaning of (Best freinel) there for I wan
MY Attorney Clive A staffoDs smith to Be
the An Attorney For the following names
Becuse I know them by living with with ther
in Jail for 3 years And I care for them

| No | Name | I·S·N | Nashtionl |
|----|------|-------|-----------|
| ① | AdeL Benahmad aL-HaKeemy | ▮ | Tunisiar |
| | 216-1 | | |
| ② | Abdul Hadi IBn ELHATHiLy abHamamy | ▮ | Tunisi |
| ③ | Mohamad manie AL Qahtany ⟺ | ▮ | Suaolia A |
| | 9661-5456877 | 72-SA | |
| ④ | Abdullah AALiy AL-OtiaBY | ▮ | SuaoliaA |
| | Phone 9662-5423940-5492715 | | |
| ⑤ | IBraheem mahdy ziadan | ▮ | Jordan |
| ⑥ | Mohamed ahmad AL Kara'any | ▮ | CHAD |
| | 964828-6195 | | |
| ⑦ | Omar mohamed Khalifh | ▮ | LyBi |
| ⑧ | Ahmad AbdullAZiz | ▮ | MoRotainy |



9- BenJamin mohamed AL HaBashy    ▉    (E)    Ethiopin
   571-332-4480

10- Adel Hamily    ▉    ALGieria

11- Abdull Raheem Gulam Rabany    ▉    Pakistan

2- Ahmad Gulam Rabany    ▉    Pakistan

3- Mohamed Kameen    (E)    ▉    Afcanista

4- Omier Ba Atash    ▉    Yamni

5- Abdo Ali ALHaj    ▉    Yamni

6- AL Kazmy    ▉    Yamni

7  mohamado SAlaAH    ▉  40    moratanic

8- omar Ahmad    ▉    CANADIAN
   (Khaou?)

|·٧) كانم أحمد أحمد سفيان )    Abbar suFian AlHawar
   ١٩٧٠/٤/٢٩ = ٥ كانم )    ALGieria    ▉ 29 47

حمد ثابت (E) شاكر عامر
   ١٩٧٦/٧/٨٦    Shaker AAmer
   5-Feb-2005

JiHAD DHiab
Syrian (▉) 10/7/1971