~~SECRET~~

FILED WITH THE
COURT SECURITY OFFICER
CSO 
DATE _____

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE:
GUANTANAMO BAY
DETAINEE LITIGATION

Misc. No. 08-00442 (TFH)

### MEMORANDUM OPINION

Pending before the Court is Respondents' Motion to Amend and for Clarification of the

Court's January 14, 2010 Order Regarding Public Returns. The motion originally sought (1) an

extension of time until July 14, 2010, to complete the reprocessing of factual returns for public

release as required by the Court's January 14, 2010 Order, (2) a ruling that sensitive but

unclassified information in six proposed categories be designated as "protected" information

pursuant to the Protective Order and Procedures for Counsel Access to Detainees at the United

States Naval Base in Guantanamo Bay, Cuba (the "Protective Order") [08-mc-442, Docket No.

409], and (3) a determination that the government is not required to submit a legal memorandum

justifying designations of protected information in a proposed public factual return unless the

petitioner's counsel or the respective Merits Judge takes issue with a specific designation.

Resp'ts' Mot. to Amend 1. Because the parties agree that the first and third requests for relief

"have effectively been resolved," Joint Pre-Hearing Statement 3 [08-mc-442 Docket No. 1975],

the Court finds that these two requests are moot and will not be addressed herein. With respect

to the remaining request for a ruling that six categories of information may be deemed

"protected" pursuant to the Protective Order because they satisfy the first step of the analysis

~~SECRET~~

outlined in *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), the Court will grant this request for

the reasons that follow.

## BACKGROUND

The pending motion is the result of an ongoing effort to ensure that public versions of the

factual returns are filed in these important cases of significant national and international public

interest. On November 6, 2008, the Court issued a Case Management Order mandating that the

government file unclassified versions of each factual return within 14 days of the date of the Case

Management Order or the date the factual return was filed, whichever is later. Case Mgmt. Order

¶ I(C). On December 29, 2008, the government moved to designate all unclassified factual

returns as "protected" under the Protective Order until the government produced versions that

could be publicly released. On June 1, 2009, the Court issued an order denying the government's

motion and mandating:

> [T]hat on or before July 29, 2009, for each petitioner . . . the government is directed
> to either (i) publicly file a declassified or unclassified factual return or (ii) file under
> seal with the petitioner's counsel and the appropriate Merits Judge an unclassified
> factual return highlighting with a colored marker the exact words or lines the
> government seeks to be deemed protected, as well as a memorandum explaining why
> each word or line should be protected. If the government chooses to file a
> highlighted factual return under seal, the parties must first meet and confer pursuant
> to Local Rule of Civil Procedure 7(m); if an agreement cannot be reached, the
> government must file with the appropriate Merits Judge a motion to designate as
> protected each highlighted portion of the return. Until July 29, 2009, the unclassified
> factual returns are to remain protected, except that each petitioner shall have access
> to the unclassified factual return pertaining to himself, and counsel may disclose the
> unclassified factual return to the petitioner's witnesses and experts who have signed
> the Acknowledgment. If the government does not file an unprotected or highlighted
> factual return for a petitioner by July 29, 2009, that petitioner's unclassified factual
> return will be treated as unprotected, unless the appropriate Merits Judge rules to the
> contrary. In cases in which the government has not yet provided petitioner's counsel
> with an unclassified factual return, the government shall comply with this order

2

~~SECRET~~

within 60 days of the date on which the government provides the unclassified return. Order (June 1, 2009) [Docket No. 1781]. The Court further ordered that press organizations could file a motion before the presiding Merits Judge requesting a public factual return in cases involving petitioners who elected not to seek a public factual return. *Id.*

Four months later, The Associated Press, The New York Times Company, and USA Today – which were permitted to intervene in this case for the limited purpose of challenging the government's designation of unclassified factual returns as protected and hereinafter will be referred to as the "press intervenors" – moved to have the government held in contempt for violating the June 1, 2009 order by improperly filing redacted factual returns that withheld unclassified information without moving for permission to seal in accordance with paragraphs 34 and 35 of the Protective Order. Mot. By The Press Intervenors For An Order To Show Cause Why The Gov't Should Not Be Held In Contempt 1-2 [Docket No. 1868]. On January 14, 2010, the Court denied the press intervenors' motion but ordered the government to comply with the June 1, 2009 order by April 14, 2010. On that date, however, the government filed the pending Motion to Amend and for Clarification.

Relying on the D.C. Circuit's decisions in *Ameziane v. Obama*, No. 09-5236, slip. op. (D.C. Cir. Jan. 8, 2010) (under seal), 620 F.3d 1 (D.C. Cir. Oct. 6, 2010) (redacted), and *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), the government's seeks a ruling that sensitive but unclassified information falling within one of the following six categories may be designated as "protected" information pursuant to the Protective Order governing these habeas cases:

> 1.  Names and/or other information that would tend to identify certain U.S. government employees, FBI Joint Terrorism Task Force members, or

3

SECRET

contractors – specifically, law enforcement officers, agents, translators, intelligence analysts, or interrogators, all below the Senior Exectuive Service or General Officer level – of the family members of detainees.

2. Information that would reveal the existence, focus, or scope of law enforcement or intelligence operations, including the sources, witnesses, or methods used and the identity of persons of interest.

3. Information indicating the names or locations, including geo-coordinates, of locations of interest as they pertain to counter-terrorism intelligence gathering, law enforcement, or military operations, where the Government has not previously acknowledged publically its knowledge of those names or locations.

4. Information that would reveal the Government's knowledge of telephone numbers, websites, passwords, passcodes, and e-mail addresses used by known or suspected terrorists, or discussions of the manner in which known or suspected terrorists use these methods for communications with one another.

5. Information regarding the use, effectiveness, or details regarding the implementation of certain interrogation approaches and techniques approved by Executive Order 13491 and described in the Army Field Manual No. 2-22.3.

6. Certain administrative data, operational 'nicknames,' code words, dates of acquisition, including dates of interrogations, and FBI case names and file numbers, contained in the intelligence documents included in the factual returns.

Mem. of P&A In Supp. of Resp'ts' Mot. to Amend 22-23. The government contends that the Court's determination that these six categories constitute "protected" information pursuant to the Protective Order "would eliminate the need for case-by-case litigation over the protectability of each of the approved categories" and thereby would "promote judicial economy and efficiency." *Id.* at 17. According to the government, "[t]his Court's approval of the six categories will help eliminate many issues over the designation of protected information in the returns, and crystallize

4

SECRET

any issues that remain, so they may be dealt with efficiently and without requiring repetitive briefing and consideration of these categorical issues." *Id.* at 19.

The petitioners oppose the government's motion on the grounds that the government seeks the protective designations without first meeting and conferring with petitioners' counsel as required in the Protective Order, the government's motion seeks an advisory opinion from the Court, the six categories are vague, overbroad, exceed the justifications and vest the government with exclusive discretion to designate information within those categories as protected, and the government misinterprets the D.C. Circuit's decision in *Ameziane*. Joint Resp. In Opp'n to the Resp'ts' Mot. to Amend 3-5, 9-16 (hereinafter "Pet'rs' Br.").

The press intervenors take issue with the fact that "[t]he Government impermissibly filed both its motion to amend and its supporting memorandum completely under seal, then compounded the offense by purporting to rely upon a sealed opinion of the Court of Appeals." Press Intervenors' Mem. In Opp'n to Gov't's Mot. to Amend 7. Like the petitioners, the press intervenors also challenge the government's proposed categories as vague, overbroad and contrary to precedent. *Id.* at 11. The press intervenors specifically oppose categories B and E. The press intervenors state, however, that "[c]ategories A, C, D and F, with some revision, could be made consistent with the constitutional standard, but no change in procedure should be allowed if it will provide an excuse for any further delay." *Id.* at 16. The press intervenors also seek to have the Court impose sanctions for the "continuing pattern of conduct by the Government that has delayed disclosure of unclassified material in the court's records for months and years." *Id.* at 17. As a remedy, the press intervenors request that the Court (1) require the

5

SECRET

government to represent that it is not withholding unclassified information from its other court filings without obtaining the petitioners' consent or filing a motion to seal as required by the Protective Order and (2) pay the press intervenors' reasonable attorneys' fees and costs incurred to enforce the Court's orders. *Id.* at 18.

## LEGAL STANDARDS

The decisions in *Bismullah*, *Parhat*, and *Ameziane* are controlling and establish the legal standards that apply to the Court's consideration of the government's pending motion to have six categories of information designated as protected and subject to sealing. Accordingly, a brief review of these decisions is warranted to identify the criterion that govern this Court's analysis.

**A.** *Gates v. Bismullah*, **128 S.Ct. 2960 (2008)**

In *Bismullah*, the first decision in which the D.C. Circuit addressed the designation of protected material in habeas cases involving detainees at the United States Naval Base in Guantanamo Bay, Cuba, the court considered several procedural motions the parties filed to govern its review of the merits of eight detainees' legal challenges to Combatant Status Review Tribunal ("CSRT") determinations that they were enemy combatants. 501 F.3d at 180. Among other issues, both parties requested that a protective order be issued to address access to classified material. *Id.* The *Bismullah* court entered the protective order proposed by the government, with modifications, and noted that counsel for the petitioners were presumed to have a "need to know" all information the Combatant Status Review Tribunal was authorized to obtain and consider to make a determination about whether the detainees were enemy combatants. *Id.* at 188. The *Bismullah* court stated, however, that the presumption "is overcome

6

~~SECRET~~

to the extent the Government seeks to withhold from counsel highly sensitive information, or information pertaining to a highly sensitive source or to anyone other than the detainee but presents such evidence to the court ex parte and in camera." *Id.* The *Bismullah* court declined to require disclosure of such information "because, consistent with our rule of deference, '[i]t is within the role of the executive to acquire and exercise the expertise of protecting national security.'" *Id.* The court went on to remark that "[i]t is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role." *Id.* at 188-89.

The *Bismullah* court rejected, however, the government's attempt to make unilateral determinations about whether to designate information as "protected" and subject to sealing. *Id.* at 188. The court cited as examples the government's designation of information "'reasonably expected to increase the threat of injury or harm to any person' and information already designated by the Government to be 'For Official Use Only' or 'Law Enforcement Sensitive.'" *Id.* The court concluded its terse examination of this issue by emphasizing that only courts have the discretion to seal judicial records and a party seeking to protect unclassified information must proffer a valid basis for doing so. *Id.* The *Bismullah* court offered no framework to guide the parties or the district court about what constitutes a sufficient basis to withhold unclassified information.

**B.** *Parhat v. Gates*, **532 F.3d 834 (D.C. Cir. 2008)**

Almost a year after issuing the decision in *Bismullah*, the D.C. Circuit was confronted again with the issue of whether information should be deemed "protected" and subject to sealing.

7

~~SECRET~~

In *Parhat*, a case involving a detainee at Guantanamo Bay who a CSRT determined was an

enemy combatant, the D.C. Circuit considered the government's motion to designate as protected

"all nonclassified record information that it has labeled 'law enforcement sensitive,' as well as

the names and 'identifying information' of all U.S. government personnel mentioned in the

record." 532 F.3d at 836. The *Parhat* court complained that, although it had no doubt that some

information in these categories "warrants protection," the government's "generic" explanation

"provid[ed] no rationale specific to the information actually at issue . . . ." *Id.* As the *Parhat*

court explained:

> The government's rationale for protection is brief. In support of protecting [names
> and/or identifying information of United States Government personnel], the motion
> states: "It is appropriate to protect from public disclosure unclassified information
> identifying Government personnel because . . . [t]he risks to the safety of those
> personnel [, particularly those who often deploy to locations abroad,] would be
> heightened if their involvement in the detention of enemy combatants at Guantanamo
> were made public." In support of protecting [any sensitive law enforcement
> information], the motion states: "It is . . . appropriate to protect Law Enforcement
> Sensitive material" because public disclosure "could harm the Government's ongoing
> law enforcement activities related to the global war against al Qaeda and its
> supporters."

*Id.* at 852 (internal citations omitted). The *Parhat* court also pointed out problems with the

government's method of designating information as protected because the method was "less than

clear." *Id.* As examples, the court observed that some pages were marked as Law Enforcement

Sensitive without any indication whether the marking applied to the whole page, some pages

contained blackened text that was still legible, and some text was completely blackened so that

the court could not view it. *Id.*

Quoting *Bismullah*, the *Parhat* court further admonished the government that "[b]y

8

SECRET

resting its motion on generic claims, equally applicable to all of the more than one hundred other detainee cases now pending in this court, the government effectively 'proposes unilaterally to determine whether information is protected.'" *Id.* (quoting *Bismullah*, 501 F.3d at 188) (internal quotation marks omitted). The *Parhat* court went on to state that "[w]ithout an explanation geared to the information at issue in this case, we are left with no way to determine whether that specific information warrants protection – other than to accept the government's own designation." *Id.* The court therefore denied the government's motion and "direct[ed] it to file a renewed motion, accompanied by a copy of the record identifying the specific information it seeks to designate and pleadings explaining why protecting that specific information is required." *Id.* at 837.

When the government later renewed its motion a marked copy of the petitioner's CSRT record was provided to the court. Order, No. 06-1397 (Sept. 2, 2008) [hereinafter referred to as "*Parhat II*"]. The government "also supplie[d] two declarations explaining why protected status is required for the information that has been marked." Order at 2. Granting the government's renewed motion to designate information as protected, the *Parhat II* court explained that "[a]lthough the government makes no claim that Parhat himself poses any threat to the safety or privacy of the individuals who participated in his CSRT proceedings, the declarations explain the risks of releasing the designated names and case file number to the public at large, and the government's rationale is 'specific to the information actually at issue in this case.'" *Id.* Notably, Parhat's counsel did not object to protection of the categories identified in the renewed motion.

9

~~SECRET~~

**C.** ***Ameziane v. Obama*, No. 09-5236, Slip. Op. (D.C. Cir. Jan. 8, 2010) (under seal), 620 F.3d 1 (D.C. Cir. Oct. 6, 2010) (redacted)**

Finally, in *Ameziane*, the D.C. Circuit considered "what information ███████████ ███████████ can be protected from public disclosure when the detainee is anxious to reveal it." No. 09-5236, slip op. at 2 (D.C. Cir. Jan. 8, 2010) (Brown, J.). █████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

*Id.* The government ███████ moved to designate ███████████████

as protected information under the Protective Order. *Id.* To support its motion the government

submitted a declaration by ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ *Id.* at 3-4.

The district court denied the government's motion to ████████████████ protect

during a hearing at which the court found that ███████████ declaration "had 'nothing . . .

to do with this case in particular,' and protested that allowing Ameziane to disclose ██████

██████████████████████████████████████████████ *Id.* at 4.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

10

SECRET

*id.*, the district court issued an order and granted a one-week stay, which the government moved to extend for an additional week. *Id.* The district court denied the request to extend the stay and issued a written opinion that "stated '[t]he government's rationale for protecting [Ameziane's] ▮▮▮▮▮▮ was] riddled with contradictions.'" *Id.* at 4-5. The district court "disregarded the ▮▮▮▮ Declaration because it 'provide[d] no specificity ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* at 5. The district court further stated that it "was not 'convinced' by the government's 'speculative and conclusory' national security concerns." *Id.* The district court found "most important[]" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "'protecting ▮▮▮▮▮▮▮▮▮▮▮ would serve little purpose . . . .'" *Id.*

On appeal, the *Ameziane* court first observed that, while "[i]t is 'our customary policy' to accord 'deference to the President in matters of foreign affairs,'" the detainee cases are unique and "[b]ecause of the independent role carved out for the judiciary, and our concomitant obligation to balance the needs of the government against the rights of the detainee, and also to preserve to the extend feasible the traditional right of public access to judicial records grounded in the First Amendment, we exercise greater caution in deciding to defer." *Id.* at 10. The *Ameziane* court summarized the state of the precedent and reiterated that *Bismullah* requires the government to provide a basis for withholding unclassified information that is seeks to protect and *Parhat* establishes that "a valid 'basis for withholding' would include, at a minimum, a 'specific,' 'tailored' rationale for protecting a general category of information, and a precise

11

SECRET

designation of each particular item of information that purportedly 'falls within the categor[y] . . .

described.'" *Id.* at 11 (quoting *Parhat*, 532 F.3d at 853). Referring to *Parhat's* two-step

standard, the *Ameziane* court explained that "[i]n other words, the government first must

demonstrate *what kind* of information requires protection and *why*, and then must show exactly

*what* information in the case at hand it seeks to protect." *Id.* The *Ameziane* court cautioned,

however, that:

> *Parhat* did not require the government to provide a rationale for protection that was
> so specific as to preclude any generalized categorization. Rather, *Parhat* left room
> for categorized requests in appropriate circumstances. Of course, the narrower the
> category for which the government seeks protection, the more likely the
> government's rationale will be sufficiently tailored. But the district court erred by
> construing *Parhat* to require a specific and distinct rationale addressed to each
> detainee's situation.

*Id.* at 12-13.

Reversing the district court's decision, the *Ameziane* court found that the government met

the first step of *Parhat's* two-step standard by requesting protection for a "single, limited

category," ███████████████████████ and related or derivative documents, while

providing a "detailed rationale tailored specifically to the information in the narrow category" as

presented in ████████████ declaration, which "logically explained why failing to protect

███████████████████ was likely to harm the government's foreign relations and national

security interests." *Id.* at 13. The *Ameziane* court concluded that "[b]ecause this detailed

rationale was tailored specifically to the narrow category of information for which the

government requested protection, the government satisfied the first showing required by *Parhat*."

*Id.* at 14. In addition, the *Ameziane* court found that the second step of the *Parhat* standard was

satisfied "because [the court] face[d] no difficulty 'determin[ing] whether the information [the

SECRET

government] has designated properly falls within the categor[y] it has described." *Id.* The

*Ameziane* court explained that:

> The government designated for protection a precise item of information –
> ▮▮▮▮▮▮▮▮▮▮ – that indisputably falls into the narrow category of
> ▮▮▮▮▮▮▮▮▮▮ Indeed, this case fits squarely within the government's
> rationale for protection. Although the government has determined ▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As the ▮▮▮▮▮ Declaration explains
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮ Thus, the government met its burden for protection under *Parhat.*

*Id.* at 14-15. The court then emphasized that "[b]ecause the government satisfied *Parhat*, the

district court was required to defer to the government's assessment of the harm to foreign

relations and national security that would result from officially disclosing ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 15.

The *Ameziane* court warned that "*Parhat* did not free courts to substitute their own policy

judgments for those of the executive." *Id.* at 16. The *Ameziane* court further chided that "[t]he

district court's inability to 'understand' how permitting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 'will interfere in anything,' . . . did not license the court

to 'perform[] its own calculus as to whether or not harm to the national security . . . would result

from [the] disclosure' . . . ." *Id.* (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990)).

The *Ameziane* court concluded that the district court further erred by "elevating Ameziane's

interest ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 17.

SECRET

*Id.* at 18.

**D. Application of the Decisions in *Bismulla, Parhat,* and *Ameziane* – The Two-Step *Parhat* Test**

Upon reflection, the decisions in *Bismulla, Parhat* and *Ameziane* establish a fairly mechanical process to assess whether unclassified information should be sealed. Pursuant to *Parhat's* first step, the government must identify the categories of information it seeks to protect and provide a valid basis for withholding information in those categories. To satisfy this step, the government must proffer a specific, tailored rationale for protecting a general category of information. To be clear, the rationale must be tailored to the category for which protection is sought but need not necessarily be tailored to a particular case. *Ameziane*, No. 09-5236, slip op. at 12. It will not suffice for the government to identify broad categories for which the rationale for protection is brief, spare and generic. *Id.* at 11. On the other hand, the government's rationale need not be so specific that it precludes any generalized categorization. *Id.* at 12. Furthermore, "the narrower the category for which the government seeks protection, the more likely the government's rationale will be sufficiently tailored." *Id.* at 12-13.

With respect to *Parhat's* second step, the Court must determine whether the specific information the government has designated for protection properly falls within the category identified in the first step. *Id.* at 14. The D.C. Circuit's analysis in *Ameziane* suggests that determining whether the information falls within the protected category requires evaluating whether the rationale for protection asserted in the first step is implicated by the specific information the government has designated for protection in the second step. *Id.* This is an important point that appears to have eluded both parties. In *Ameziane*, the D.C. Circuit assessed

14

SECRET

whether the precise information designated for protection fell into the category for which protection was sought by considering whether the information "fit[] squarely within the government's rationale for protection." *Id.* Thus, determining whether designated information falls within a protected category requires the Court to evaluate whether the rationale for the category applies to the designated information.

Ultimately, *Ameziane* makes clear that, if the government satisfies the two-step test outlined in the *Parhat* decision, the district court is required to defer to the government's assessment of the harm to foreign relations and national security that would result from disclosure of the information the government seeks to protect. *Id.* at 15. "[T]he failure to give deference when it is due is error." *Id.* "*Parhat* did not free courts to substitute their own policy judgments for those of the executive." *Id.* at 16.

### ANALYSIS

**A.  Step one of *Parhat* – whether the respondents have demonstrated what kind of information requires protection and why**

With the foregoing legal standards in mind the Court turns to the merits of the government's motion, beginning with *Parhat's* first step, which involves identifying the categories of information the government seeks to protect and determining whether the government has proffered a valid basis for withholding information in the identified categories. To be clear, the information the government seeks to protect from public disclosure consists of unclassified information that the government deems to be sensitive because it "could cause harm to significant national security and law enforcement interests." Mem. of P&A In Supp. of Resp'ts' Mot. to Amend 22.

As a preliminary matter, the Court notes that the government relies principally on the

15

SECRET

Second Declaration of ▉ [redacted] Mem. of P&A In Supp. of Resp'ts' Mot. to Amend Ex. 3

(herinafter cited as "Second ▉[redacted] Decl."), and the Declaration of James W. McJunkin, Assistant

Director, Counterterrorism Division Federal Bureau of Investigation, *id.* Ex. 4 (hereinafter cited

as "McJunkin Decl."), to support its contention that the categorized information should be sealed

from public disclosure. *Id.* at 22 (stating that "[t]he Second ▉[redacted] and McJunkin declarations

submitted with this motion establish that publicly releasing information falling into the following

six categories could cause harm to significant national security and law enforcement interests").

▉[redacted] is the Defense Intelligence Agency's ▉[redacted] of the Department

of Defense Security Classification/Declassification Review Team ("DoD SC/DRT") within the

Department of Defense ("DoD"), so[1][redacted] declaration provides the Department of Defense's

rationale for seeking to seal certain information in all six proposed categories. Second ▉[redacted]

Decl. ¶ 1. James McJunkin is the Assistant Director of the Counterterrorism Division at the

Federal Bureau of Investigation ("FBI"), so his declaration provides the FBI's rationale for

seeking to prevent the public disclosure of information covered by five of the six proposed

categories, namely categories A, B, D, E and F. McJunkin Decl. ¶¶ 1, 7. Both the Second ▉[redacted]

and McJunkin declarations are 25-28 pages long, describe the declarant's role, the respective

agency's protocol for protecting information, and contain detailed explanations about the specific

information within each category that the agency deems to be sensitive.[2] Both declarations are

classified, although redacted versions were provided to the press intervenors.

---

[1]     The government also submitted a First Declaration of ▉[redacted] that
addressed other matters not relevant to the question of whether the six categories designated by
the government should be sealed from public disclosure.

[2]     The Court notes that, upon examination, the explanations contained in the Second
▉[redacted] and McJunkin declarations are virtually identical in many, if not most, circumstances.

16

SECRET

**Category 1    Information tending to reveal the identities of certain government personnel, and family members of detainees, should be withheld from the public to ensure the safety and privacy of those individuals.**

The first category of information the government seeks to protect is "names and other information that would tend to identify certain U.S. Government employees or contractors – specifically, law enforcement officers, agents, translators, intelligence analysts, or interrogators, all below the Senior Executive Service or General Officer level – as well as members (state and local law enforcement personnel) of the FBI's Joint Terrorism Task Force ("JTTF"), and family members of detainees. Mem. of P&A In Supp. of Resp'ts' Mot. to Amend 24. The government does not seek to protect the names of more senior government officials who might have been identified in factual returns. *Id.* at 24-25.

The press intervenors concede that this "category is precisely defined to avoid the need for discretion" so they do not object to this category as proposed "so long as it is limited to information not previously acknowledged." Press Intervenors' Br. 16. The petitioners, however, urge the Court to reject this category as "vague, overbroad and merely a re-working of the first category rejected by the D.C. Circuit in *Parhat* and *Ameziane*." Pet'rs' Br. 16. The petitioners also complain that the category does not limit detainee family members to those whom the government alleges are facing threats or who have cooperated. *Id.* at 19.

For the sake of comparison, the category of information at issue in the original *Parhat* decision was described as "'any names and/or identifying information of United States Government personnel.'" 532 F.3d at 852. The rationale the government offered for protecting such a broad category was simply that "'[i]t is appropriate to protect from public disclosure unclassified information identifying Government personnel because . . . [t]he risks to the safety

17

SECRET

of those personnel [, particularly those who often deploy to locations abroad,] would be heightened if their involvement in the detention of enemy combatants at Guantanamo were made public." *Id.* The D.C. Circuit declined to seal this category of information because it found the government's rationale to be "spare," "generic," and not specific to the information the government designated. *Id.* at 853. Although the D.C. Circuit stated that it "did not doubt that the names and identifying information of some United States Government personnel should be designated as 'protected,'" "there are also some 'U.S. Government personnel' whose names appear in the record on review who are so publicly associated with Guantanamo that protected status would plainly be unwarranted." *Id.* After the government later renewed and revised its motion, however, the D.C. Circuit granted the government's request to protect "the names and identifying information of United States government personnel (agents, law enforcement officers, and translators) who are involved in law enforcement activities relating to the detention of enemy combatants." Order, No. 06-1397 (D.C. Cir. 2008).

The category the government now seeks to seal -- "names and other information that would tend to identify certain U.S. Government employees or contractors – specifically, law enforcement officers, agents, translators, intelligence analysts, or interrogators, all below the Senior Executive Service or General Officer level – as well as members (state and local law enforcement personnel) of the FBI's Joint Terrorism Task Force ("JTTF"), and family members of detainees" -- is somewhat similar to the category that ultimately was approved by the D.C. Circuit in *Parhat*, albeit it is narrower to the extent it is limited to employees and contractors below the Senior Executive Service or General Officer level but broader to the extent it includes

18

~~SECRET~~

intelligence analysts, interrogators, members of the Joint Terrorism Task Force and detainees' family members. The government's rationales for seeking to seal this information are that (1) 10 U.S.C § 130b exempts from public disclosure personally-identifying information about any employee whose duty station is with a unit involved in collecting, handling, disposing or storing classified information and materials,[3] (2) 10 U.S.C. § 424 exempts from disclosure the name, title, or other professional identifying information about people employed by the Defense Intelligence Agency, the National Reconnaissance Office and the National Geospatial-Intelligence Agency,[4] (3) publicly releasing information about covered individuals would

---

[3]      10 U.S.C. § 130b states:

Exemption from disclosure.--The Secretary of Defense and, with respect to the Coast Guard when it is not operating as a service in the Navy, the Secretary of Homeland Security may, notwithstanding section 552 of title 5, authorize to be withheld from disclosure to the public personally identifying information regarding--(1) any member of the armed forces assigned to an overseas unit, a sensitive unit, or a routinely deployable unit; and (2) any employee of the Department of Defense or of the Coast Guard whose duty station is with any such unit.

10 U.S.C. § 130b(a).

[4]      10 U.S.C. § 424 states:

(a) Exemption from disclosure.--Except as required by the President or as provided in subsection (c), no provision of law shall be construed to require the disclosure of-- (1) the organization or any function of an organization of the Department of Defense named in subsection (b); or (2) the number of persons employed by or assigned or detailed to any such organization or the name, official title, occupational series, grade, or salary of any such person.

(b) Covered organizations.--This section applies to the following organizations of the Department of Defense: (1) The Defense Intelligence Agency. (2) The National Reconnaissance Office. (3) The National Geospatial-Intelligence Agency.

19

SECRET

compromise their safety by making it possible for people or organizations sympathetic to the

detainees to commit retaliatory acts to harm them or their families, (4) █████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████ (5) public disclosure of

information identifying covered individuals could interfere with ongoing or future law

enforcement, military or intelligence operations by causing these individuals to be fearful for

their safety and their families' safety, which could discourage such individuals from willingly

getting involved in detainee or other sensitive matters and thereby diminish the effectiveness of

the government's counter-terrorism and national-security efforts, (6) telephone numbers, fax

numbers and addresses used by covered individuals pose the same concerns about harassment

that could interfere with military missions, national security or law enforcement duties,

(7) disclosing identifying information about covered individuals also subjects them to unwanted

public and media attention and scrutiny, which is an intrusion of their privacy, risks their and

their families' safety, and could expose them to embarrassment or harassment while conducting

---

5   1, 3 ████████████████████████████

████████████████████████████    Second[5]   Decl. ¶ 18.

In addition, the McJunkin Declaration states that █████████████████████████

█████████████████████████████    McJunkin Decl. ¶ 13. The

McJunkin Declaration also states █████████████████████████████

████████████████████████████████████████

█████ Id.

SECRET

their official duties and private affairs, ██████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████ (9) disclosure of identifying information about FBI agents who

prepared investigative reports poses safety, national security and privacy concerns, and might

compromise other sensitive, intelligence or law enforcement investigations in which the agent is

involved.[7] Second██ Decl. ¶¶ 14-24; McJunkin Decl. ¶¶ 11-16. The government also

correctly cites *Schrecker v. U.S. Dept. of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003),[8] which

states that D.C. Circuit "decisions have consistently supported nondisclosure of names or other

information identifying individuals appearing in law enforcement records, including

investigators, suspects, witnesses, and informants." Mem. of P&A In Supp. of Resp'ts' Mot. to

Amend 27.

The crux of the petitioners' complaint about this proposed category is that it is overly

inclusive because it fails to exclude government personnel who are so publicly associated with

Guantanamo Bay that protected status would be unwarranted, which was an issue in *Parhat*.



---

[7]    The McJunkin Declaration explains that, "[f]or example, intelligence sources with links to known or suspected terrorist groups may decide to disassociate themselves with the FBI and discontinue providing intelligence if their FBI agent contact is revealed to the public." McJunkin Decl. ¶ 15.

[8]    *Schrecker* was a case involving FOIA Exemption 7(C), which provides that an agency may withhold records or information compiled for law enforcement purposes in certain circumstances. 349 F.3d at 661.

21

~~SECRET~~

Pet'r's' Br. 17-19. The petitioners seem to misunderstand that, as discussed in Part II(D), *supra*, during step two of the *Parhat* analysis the determination of whether designated information falls within a protected category requires evaluating whether the rationale for protection asserted in step one is implicated by the information. In other words, if the rationale for protecting the identities of government personnel is based on the need to avoid putting their safety at risk and jeopardizing ongoing or future missions, then it might be the case that government personnel whose identities have already been wholly exposed will not qualify for protection because that rationale no longer applies to them. Their identity and the scope of their involvement might have been so publicly revealed that sealing their identities in particular documents will not ensure their safety or otherwise avoid jeopardizing ongoing missions. Accordingly, the identities of such personnel will not qualify for protection pursuant to *Parhat's* step two. To be clear, though, that is not to say that government personnel whose identities have been publicly revealed will never qualify for protection under the asserted rationale. To the contrary, it might be the case that the public disclosure of an individual's identity occurred in a narrow context such that the need to avoid further or more extensive disclosure is warranted to protect the individual's safety or the integrity of the mission. The government also raises a fair point that there is an important distinction between public disclosure of information that has been officially acknowledged by the government versus information that is merely publicly available. Resp'ts' Reply Br. 13 (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) (Sentelle, J.) (stating that "in the arena of intelligence and foreign relations there can be a critical difference between official and unofficial disclosure")). Regardless, in this case the Court finds the government's rationale to be sufficiently tailored to avoid the over inclusiveness that concerns the petitioners.

22

~~SECRET~~

this category must satisfy *Parhat's* step-two analysis, which means that the designated

information must comport with the rationales supporting the category to warrant sealing.

**Category 2    Information revealing the existence, focus, or scope of law enforcement or intelligence operations, including the sources, witnesses, or methods used and the identity of persons of interest.**

The second proposed category of information revealing the existence, focus, or scope of

law enforcement or intelligence operations, including the sources, witnesses, or methods used

and the identity of persons of interest.  The government's rationale for this category is that this

information "could provide current or potential subjects of investigation, including international

terrorists and terrorist organizations, with significant insight into the U.S. Government's

counterterrorism and law enforcement efforts, enabling persons suspected of terrorism-related

activities to avoid detection and evade prosecution, dramatically reducing the effectiveness of

current and future . . . efforts, and thereby compromising national security" and law enforcement

missions.  Second▮ ▮Decl. ¶ 25; McJunkin Decl. ¶ 17.  The government argues that revealing

this information would result in the subjects of investigations and their associates "likely"

concealing their activities, changing their methods of operation, or otherwise taking steps to

avoid and interfere with the government's ability to conduct investigations effectively.  Second

▮Decl. ¶ 26; McJunkin Decl. ¶ 18.

The government is ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮ Second▮ ▮Decl. ¶ 27; McJunkin Decl. ¶ 19.  As an

example, the government explains that ▮▮▮▮▮

▮▮▮▮▮▮▮

~~SECRET~~



Second[3] ████ Decl. ¶ 27; McJunkin Decl. ¶ 19. ████

████ Second[3] ████ Decl. ¶¶ 26-31; McJunkin Decl. ¶ 20-23. ████

████ Second[3] ████ Decl. ¶ 32; McJunkin Decl. ¶ 24. ████

████ Second[3] ████ Decl. ¶ 33; McJunkin Decl. ¶ 25. ████

████ Second[3] ████ Decl. ¶ 33; McJunkin Decl. ¶ 25.

Both the press intervenors and the petitioners object to the second proposed category. The press intervenors characterize this category as seeking "sweeping permission for the Government to withhold any unclassified information relating to 'law enforcement or intelligence operations.'" Press Intervenors' Br. 13-14. According to the press intervenors, "[t]his category is so vague and open-ended that it would provide the Government with justification to withhold almost any information likely to be found in a Factual Return – certainly every detainee must have been connected to a 'law enforcement or intelligence operation.'" *Id.*

~~SECRET~~

at 14. The press intervenors also contend that this category is like the "law enforcement

sensitive" category the D.C. Circuit rejected in *Parhat*. *Id.* Similarly, the petitioners argue that

this proposed category is "vague, overbroad, and merely a re-working of the first category

rejected by the D.C. Circuit in *Parhat* and *Ameziane*." Pet'rs' Br. 20. The petitioners are also of

the view that the government is improperly exercising discretion by inconsistently redacting

information in this category. *Id.* at 20-21.

    Permitting the government to withhold information that reveals intelligence or law

enforcement sources and methods that could undermine the effectiveness of operations is not

without precedent. Historically, courts have recognized that certain executive-branch

information may be protected from disclosure to ensure the viability of national-security and law-

enforcement operations:

> Since the beginnings of our nation, executive officials have claimed a variety of
> privileges to resist disclosure of information the confidentiality of which they felt was
> crucial to fulfillment of the unique role and responsibilities of the executive branch
> of our government. Courts ruled early that the executive had a right to withhold
> documents that might reveal military or state secrets. The courts have also granted
> the executive a right to withhold the identity of government informers in some
> circumstances, and a qualified right to withhold information related to pending
> investigations.

*See In re Sealed Case*, 121 F.3d 729, 736-37 (D.C. Cir. 1997) (Wald, J.). Thus, for example, it

has long been established that "when the disclosure of investigative reports obtained in large part

through promises of confidentiality would hamper the efficient operation of an important

Government program and perhaps even . . . impair the national security by weakening a branch of

the military, the reports should be considered privileged." *Machin v. Zuckert*, 316 F.2d 336, 339

(D.C. Cir. 1963) (Washington, J.). Similarly, under the Freedom of Information Act the

SECRET

government may withhold from disclosure, among other things, information compiled for law

enforcement purposes that:

> [C]ould reasonably be expected to disclose the identity of a confidential source,
> including a State, local, or foreign agency or authority or any private institution [that]
> furnished information on a confidential basis, and, in the case of a record or
> information compiled by criminal law enforcement authority in the course of a
> criminal investigation or by an agency conducting a lawful national security
> intelligence investigation, information furnished by a confidential source . . . or . . .
> could reasonably be expected to endanger the life or physical safety of any individual.

5 U.S.C. § 552(b)(7). Indeed, no less an authority than the United States Supreme Court has

acknowledged that maintaining the confidentiality of intelligence sources is "'essential to the

effective operation of our foreign intelligence services'" and that "[i]f potentially valuable

intelligence sources come to think that [the government] will be unable to maintain the

confidentiality of its relationship to them, many could well refuse to supply information to [the

government] in the first place." *C.I.A. v. Sims*, 471 U.S. 159, 175 (1989) (Burger, J.). "Even a

small chance that some court will order disclosure of a source's identity could well impair

intelligence gathering and cause sources to 'close up like a clam.'" *Id.* It also is well recognized

that even disclosures of unclassified information might compromise classified information and

confidential sources. *Snepp v. United States*, 444 U.S. 507, 512 (1980) (per curiam). Looking

beyond disclosure of a human source's identity, the Supreme Court has cautioned that disclosures

of other non-human sources from which adversaries might infer the government's intelligence

interests and methods also could be detrimental. *Sims*, 471 U.S. at 177 (noting that adversaries

"can learn a great deal" about our government's intelligence operations simply by discovering the

public sources of information or research that interest United States intelligence agencies).

These are but some examples of the judicially- and statutorily-recognized privileges and

27

SECRET

exemptions from disclosure that illustrate the recognition that it is sometimes necessary to withhold from public disclosure information deemed sensitive because it patently, or by inference, could compromise intelligence and law enforcement operations, or place sources in danger, even though the information is not classified. As a matter of fact, the D.C. Circuit's decision in *Ameziane* expressly states that the framework established by its decisions in *Bismullah* and *Parhat* applies to "requests by the government to protect sensitive information." No. 09-5236, slip op. 10.

Neither the press intervenors nor the petitioners rebutted the government's citations to precedent establishing that "courts have traditionally recognized the importance of protecting law enforcement techniques and procedures from disclosure, 'to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.'" *Id.* (quoting *In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988)). The government also cited cases that deal with the protection of intelligence sources and methods, which neither the press intervenors nor the petitioners challenge. *Id.* at 31.

That being said, the petitioners' and press intervenors' complaints about the breadth and vagueness of this category are not wholly unfair given that, at first blush, nearly anything relating to Guantanamo Bay detainees could be deemed to reveal the existence of law enforcement or intelligence operations. The government's rationale, however, limits the information in this category to information that provides current or potential investigative subjects "significant insight into the U.S. Government's counterterrorism and law enforcement efforts" that would "enabl[e] persons suspected of terrorism-related activities to avoid detection and evade

SECRET

prosecution," *id.* at 28, [REDACTED]

[REDACTED] *id.* at

29-30. Although the category is not as narrowly defined as [REDACTED] in

*Ameziane*, the Court nevertheless finds the rationale to be sufficiently tailored to enable the Court

to determine whether designated information properly falls within the category. No. 09-5236,

slip op. at 12. Frankly, the Court cannot foresee a more explicit way of describing the

information to be covered by this category, or the rationale, without revealing the very

information it seeks to protect, actually identifying specific operations, sources or methods at

issue in a particular case, or otherwise making the rationale so tailored that it applies only to a

specific case. *Id.* at 14 (stating that "*Parhat* did not require the government to provide a rationale

for protection that was so specific as to preclude any generalized categorization"). Because the

government's category and rationale demonstrate what kind of information requires protection

and logically explains why failing to protect this information is likely to harm the government's

foreign relations and national security interests, the Court finds that it satisfies *Parhat's* step-one

requirement. *Id.* at 11, 13.

> **Category 3** **Names and locations** [REDACTED]
> **and other locations of interest as they pertain to counter-**
> **terrorism intelligence gathering, law enforcement, or military**
> **operations, where the government has not previously**
> **acknowledged publicly its knowledge of those names or locations.**

The third category of information for which the government seeks protection is names

and locations [REDACTED] and other locations of interest as they

pertain to counter-terrorism intelligence gathering, law enforcement, or military operations,

where the government has not previously acknowledged publicly its knowledge of those names

29

~~SECRET~~

or locations. The rationale for protecting this category of information is that ▮▮▮▮▮



▮▮▮▮▮ Second ▮▮ Decl. ¶ 34.[9] According to the government,▮▮

▮▮▮▮▮ Second ▮▮ Decl. ¶¶ 35-40. The government also asserts that

withholding this information is authorized by statute, namely 10 U.S.C. § 455(b). Second▮▮

Decl. ¶ 40. 10 U.S.C. § 455(b) provides that imagery, imagery intelligence, or geospatial

information in the Department of Defense's possession may be withheld from public disclosure

under three enumerated circumstances.

The press intervenors do not object to this category "so long as it is limited to information

not previously acknowledged." Press Intervenors' Br. 16. The petitioners question why this

information is not classified if it needs protection and complain that this category is too vague

and gives the government too much discretion to deem anything a "location of interest." Pet'rs'

Br. 23. The petitioners contend there is "no workable definition of what constitutes a 'location of

interest,'" the phrase is not limited to ongoing investigations, and this category would authorize

withholding that exceeds the proffered rationale. As an example, the petitioners claim the

---

[9]     The McJunkin declaration indicates that the F.B.I. does not consider this category
of information to apply to it. McJunkin Decl. ¶ 26 (stating that "[t]his category pertains to
information of concern to other agencies within the Executive Branch" and "the rationale for its
protection is described in a declaration from the Department of Defense").

30

~~SECRET~~

government could designate ███████████████████████████████

████████████████████████████████ *Id.*

The government responds by first addressing the contention that information should be classified to be protected, which the government disputes in light of precedent recognizing, for example, a state secrets privilege to safeguard information that is not classified but nevertheless poses a national security risk. Resp'ts' Reply Br. 18. The government again relies on *Ameziane* as authority for protecting categories of non-classified information that could harm national security. *Id.* The government also refutes the notion that it would protect information that has been previously acknowledged by the government, such as defunct guesthouses. *Id.* at 19. The government further notes that this category "is . . . limited to locations that 'pertain to counter-terrorism intelligence gathering, law enforcement, or military operations.'" *Id.* The government finally argues that the petitioners "have endeavored to demonstrate the supposed overbreadth of a category by reference to information that falls clearly outside its limiting terms." *Id.*

The Court finds that this category complies with *Parhat*. The government proffered a specific, tailored rationale for protecting this category that explains with sufficient detail why disclosure under this category would harm national security both apparently and by implication. The government's rationale limits this category to "names and locations ███████████████████

█████████, or other locations of interest as they pertain to counter-terrorism intelligence gathering, law enforcement, or military operations, where the Government has not previously acknowledged publically its knowledge of those names or locations." Second█ Decl. ¶ 34.

**Category 4**      **Information revealing the government's knowledge of terrorist phone numbers, websites, and other means of communication because disclosure of such information**

31

~~SECRET~~

**could lead terrorists to alter or improve their communications technology to better avoid detection.**

The fourth category for which the government seeks protection is information revealing the government's knowledge of terrorist phone numbers, websites, and other means of communication[1]



██████████ Second █[3]████ Decl. ¶¶ 42-47; McJunkin Decl. ¶¶ 28-31. The

████ Second █[3] Decl. ¶ 48, ████████████

████████ Second █[3]███ Decl. ¶ 49, McJunkin Decl. ¶ 32,█████████████

██████████████ Second █[3]████ Decl. ¶ 50; McJunkin Decl. ¶ 33.

The press intervenors state that they "have no interest in obtaining the disclosure of specific telephone numbers, websites, passwords, etc., of identified individuals, but object to the extent this category would afford the Government discretion to withhold information about the types of communications surveillance undertaken by the Government, even where the Government has already publicly acknowledged its surveillance activities . . . ." Press Intervenors' Br. 17. According to the press intervenors, "[n]o purpose would be served by such redactions; disclosure would create no new risk to national security or law enforcement

32

~~SECRET~~

operations." *Id.* The petitioners object to this category because it "handicaps the ability of

petitioner's counsel to adequately investigate the allegations in the factual return." Pet'rs' Br. 24.

The petitioners further claim that a blanket designation is not warranted. *Id.*

The government responds to these complaints by emphasizing that protecting the manner

and modalities by which known or suspected terrorists communicate with one another is vital

"because its disclosure could lead terrorist groups to alter or improve their communications

technology to better avoid detection by the United States." Resp'ts' Reply Br. 20. The

government dismisses the petitioners claim that "protecting information within any of the six

categories will present insurmountable obstacles to the investigation of individual petitioners'

cases." *Id.* According to the government, "when individual petitioners' counsel have requested

that Respondents declassify information in returns or to permit disclosures of protected

information Respondents have endeavored to accommodate Petitioner's requests to the extent

possible consistent with law enforcement and national security interests." *Id.* The government

further asserts that it has met the requirements of *Ameziane*, in which case the Court "may not

require the Government to provide case-specific justifications for protecting information it has

identified as falling within the category." *Id.* at 20-21.

This is a fairly narrow category in terms of identifying what the government seeks to

protect and the government's rationale is sufficiently tailored to the category and logically

explains why protection is warranted. It therefore meets the requirements of *Parhat*. As far as

the press intervenors' concern that this category will permit the government to withhold

information that has already been publicly disclosed in some fashion, as the Court has explained

several times, information will not qualify for protection if the rationale for protecting the

~~SECRET~~

category of information does not apply. [redacted]

The petitioners offered no explanation about how protecting this information will prevent them from investigating their cases and, if such a situation should arise, the petitioner's certainly may seek the Court's assistance to ensure that they are able to adequately investigate the charges against them in accordance with the law. The petitioners' counsel have access to much of the information available in these cases, including classified material, and therefore should have the necessary facts to investigate their cases, albeit their ability to discuss all the facts with their clients or others is limited by the classification and protected status of certain information. Nevertheless, as the Court indicated, counsel for the petitioners may seek the Court's assistance if they find themselves in the position of being unable to adequately prepare a defense because of asserted limitations on information sharing, in which case the Court can address the matter appropriately.

**Category 5** **Information regarding the effectiveness of or details regarding the implementation of certain interrogation techniques and approaches approved by Executive Order 13491, 75 Fed. Reg. 4893 (Jan. 27, 2009)**

SECRET

In addition to the prior four categories, the government also seeks to protect information about the effectiveness of certain interrogation techniques and approaches approved by Executive Order 13491 and described in Army Field Manual No. 2-22.3, as well as details about the implementation of those techniques and approaches. The government does not seek to protect the types of approaches used, which are publicly available, but rather the "manner and strategy in which they are employed." Second▮ Decl. ¶ 52; McJunkin Decl. ¶ 35. ▮

▮

Second▮ Decl. ¶¶ 52-61; McJunkin Decl. ¶¶ 35-39. ▮

▮

▮ *Id.*

The press intervenors take issue with this category mainly because they assert detainee treatment and interrogation is a matter of public debate and concern. Press Intervenors' Br. 15. The press intervenors therefore challenge a category that results in the withholding of all information concerning interrogation techniques. *Id.* The petitioners question again why this information is not classified if it needs protection and also argue that this category is too broad. Like the press intervenors, the petitioners also assert that information about the use of certain interrogation techniques is a matter of public interest. Pet'rs' Br. 24. The petitioners are

35

SECRET

concerned that the government will be in a position to control the release of information in a way that distorts the facts and precludes an independent, judicial balancing of the competing interests. *Id.* at 25. The incorporation of interrogation credibility assessments into this category raises issues for the petitioners because this is "information that is vital to the public's understanding of that information." *Id.* at 26. From the petitioners' perspective, "[o]nce again, the Government's Motion would vest the government with the discretion to designate information within these categories as protected, rather than the Court – with the net result being that the government will be allowed to create a misleading public record by means of selective exercise of the categorical protection power it seeks." *Id.*

The government responds to the petitioners' and press intervenors' concerns by reiterating that this category is limited to techniques approved in Executive Order 13491, which "set new standards and practices for interrogations of persons in U.S. custody, and restricted interrogation techniques, approaches, and any treatment related to interrogation, to the techniques authorized by and listed in Army Field Manual 2-22.3." Resp'ts' Reply Br. 22. The government notes that Executive Order 13491 denounces torture so "any other such outrages upon personal dignity are not within the scope of the information that Respondents would seek to protect under [this category]." *Id.* The government asserts that pursuant to *Ameziane*, the other interests cited by the petitioners "may not be invoked as a reason to disregard the judgment of the Executive Branch that revealing information about the execution or effectiveness of . . . approved [interrogation] techniques could be harmful to national security. *Id.* at 23.

In this instance, like the others, the Court finds that the government's proposed category clearly describes what kind of information will be protected and the rationale is tailored to

36

SECRET

explain why protection is warranted. Without a doubt, the interrogation methods the government

has used against detainees have been the subject of vigorous public debate, interest and concern.

But at no point has the D.C. Circuit carved out an exception to the *Parhat* two-step test for

information that is a matter of public interest. What the government is required to do to satisfy

*Parhat* is "demonstrate what kind of information requires protection and why, and then [it] must

show exactly what information in the case at hand it seeks to protect." *Ameziane*, No. 09-5236,

slip op. 11. If the government's rationale logically explains why failing to protect the

information in a category is likely to harm foreign relations and national security interests, and

the government otherwise has complied with *Parhat*, then the Court is "required to defer to the

government's assessment of the harm to foreign relations and national security that would result"

from disclosing the information. *Id.* at 15. The Court can find no authority to suggest that it may

disregard the government's assessment of the harm to foreign relations and national security

simply because the matter involved is one of great public interest. To the contrary, the D.C.

Circuit has made clear that "the failure to give deference when it is due is error." *Id.* Although

the Court has not yet reached the ultimate question of whether both *Parhat* steps have been

satisfied, it nevertheless merits emphasis at this stage that there is no authority for the Court to

hold that the public interest in certain information outweighs the harm to national security or

foreign relations. For better or worse, that simply is not the applicable legal test.

**Category 6**     **Administrative data that, though unclassified standing alone, could in the aggregate reveal sources and methods used to investigate persons suspected of terrorism-related activity.**

The final category of information for which the government seeks protection is

"administrative data typically found in the intelligence reports appended as exhibits to the

37

SECRET

returns, including operational nicknames, code words, dates of acquisition (including dates of interrogations), and case file names and numbers." Mem. of P&A In Supp. of Resp'ts' Mot. to Amend 39. The government's general rationale for protecting this information is that "[t]hough unclassified standing on their own, these data could, if aggregated, reveal the sources and methods used to investigate persons suspected of terrorism-related activities, thereby enabling such persons to avoid detection and evade prosecution, and reducing the effectiveness of the sources and methods in the future." Second ███ Decl. ¶ 62; McJunkin Decl. ¶ 40. In addition, the information could reveal "collection priorities, intelligence asset allocation, and intelligence collectors' focus and capabilities." Second ███ Decl. ¶ 63.

The government's rationale also offers detailed explanations with respect to specific administrative data. ███████████████████████████

████████████████████████████████████████████

████████████████████████████████ McJunkin Decl.

¶ 41-42. In addition, operational "nicknames" and code words assigned to controlled access programs can reveal the existence, focus or scope of intelligence operations when connected with certain information or reports, or can enable adversaries to locate and associate documents in a factual return and potentially identify certain intelligence collection requirements or where the government lacks information. Second ███ Decl. ¶¶ 64-67. ████████████████

████████████████████ Second ███ Decl. ¶ 69, ████████

████████████████████ Second ███ Decl. ¶ 70. ████████

38

SECRET



Decl. ¶ 71.

Second[8] Decl. ¶ 72.

The press intervenors "do not object to the withholding of administrative data, operational 'nicknames,' code words, or FBI case names and file numbers . . . ." They do, however, object to a "blanket authorization" to withhold dates of acquisition and dates of interrogations. Press Intervenors' Br. 17. The press intervenors argue that "[d]isclosure of such information could well shed light on the actions [of] Government and therefore proposed redactions require review, in context, on a case by case basis." *Id.*

The petitioners concede that "[i]n the vast majority of cases, there will not be a dispute regarding the designation of information within this category as protected." Pet'rs' Br. 26. Even so, though, the petitioners object to the government being able to exercise any discretion about what is or is not protected. *Id.* at 27. The petitioners argue that "[t]his is particularly problematic because it could easily allow the government to create chronological confusion in the version of the record presented to the public by picking and choosing which interrogation dates to 'protect' from public view." *Id.*

It appears that this is the least contentious category proposed by the government given that all parties seem to agree that it would be appropriate to protect at least some of the information covered by the category. While the category is described in fairly general terms, the rationale is quite narrowly tailored and logically and rationally explains why the information in

39

SECRET

this category should be subject to protection. The Court therefore finds that this category meets

the requirements of step one of the *Parhat* analysis.

**B. Step Two – Whether The Government Has Shown Exactly What Information In The Case At Hand It Seeks To Protect**

As indicated above, the Court finds that the government has satisfied the first step of

*Parhat* by demonstrating, with respect to each proffered category, what kind of information

requires protection and why. *Ameziane*, No. 09-5236, slip op. 11. Considering the unique nature

of these cases, and the sheer volume of documents and information that is at issue, it is sensible

to conserve judicial resources and ensure consistency across all the cases by having a single

judicial determination about whether the government properly may seek protection for

information that falls within the enumerated categories presented in the pending motion. The

next question is whether the government has satisfied *Parhat's* second step.

Admittedly, it was not entirely clear to this Court whether the government was seeking a

judicial determination that *Parhat's* second step had been met as well. In the government's

motion, and during oral arguments, the government repeatedly asserted that it was not attempting

to bypass a judicial determination about whether specific designations within a document

properly fall within the enumerated categories. Instead, the government explained:

> Respondents wish to underscore that by making this request they are not asking the Court to cede to the Government unilateral "'discretion to seal . . . judicial record[s].'" *See* June 1, 2009 Mem. Op. at 5 (quoting *Bismullah v. Gates*, 501 F.3d 178, 188 (D.C. Cir. 2007)). Were the Court to approve Respondents' categorical approach, Respondents would still be required to highlight within individual returns each line or word that they seek to deem protected, including those lines and words falling into these six categories, and to submit highlighted factual returns first to petitioners' counsel and then to the individual merits judges for final approval of the proposed public returns. *See* June 1, 2009 Order at 1. If either the petitioner of the Merits Judge in an individual case took issue with the Respondents' designation of

<div align="center">40</div>

> particular pieces of information as protected, Respondents then would have to submit a memorandum explaining why each piece of disputed information actually falls within one or more of the six designated categories. And if in a particular return Respondents were to highlight information falling into another category outside of these six, and that designation were questioned by petitioners' counsel or the court, Respondents would then have to show both why the new category is protectable and that the information designated falls within the additional category. *This Court's approval of the six categories, however, would eliminate the need for case-by-case litigation over the protectability of each of the approved categories.*

Mem. of P&A In Supp. of Resp'ts' Mot. to Amend 17 (emphasis added). Based on this explanation, the Court interprets the government's motion as requesting, at this juncture, only a judicial determination about whether the six proposed categories qualify for protection because they comply with the first step of *Parhat.*

The fact of the matter is that the second step of *Parhat* requires the government to "show exactly *what* information in the case at hand it seeks to protect." *Ameziane,* No. 09-5236, slip op. 11 (emphasis in original). By limiting the second step to a consideration of the "exact" information "in the case at hand" that the government seeks to protect, the Court concludes that step two requires a case-specific or document-specific determination about whether information designated for protection properly falls in one of the six categories. As this Court interprets *Bismullah, Parhat* and *Ameziane,* step two cannot be satisfied by the government's production of "examples" of information it would designate in "sample" documents. That would result in the very situation the press intervenors and petitioners are concerned about, namely the government unilaterally designating information as protected in violation of *Bismullah* with no viable way for the press intervenors or petitioners to challenge the designations. Accordingly, although this Court finds that the respondents' proposed six categories satisfy step one of *Parhat,* the question of whether information the respondents actually designate for protection satisfies step two of

SECRET

*Parhat* will have to be determined by the merits judges presiding over the cases in which the government has or will file a proposed public factual return that contains such designated information.

This point should assuage the press intervenors' and petitioners' fear that they will have no real opportunity to challenge a designation they assert is improper and should remedy the contention that the government will be able to selectively redact information in a way that distorts the facts. Because, as the Court has explained several times, determinations about whether designations properly qualify for protection involve an assessment of whether the designations fall within the scope of a protected category – taking into account whether the rationale for the category applies to the designation or is implicated by it – many, if not most, of the press intervenors' and petitioners' opposing arguments should be resolved by this process. If the rationale the government proffered to justify why a category of information should be protected does not apply to a designation, then the designation will not qualify for protection.

## CONCLUSION

For the aforementioned reasons, the Court will grant in part Respondents' Motion to Amend and for Clarification of the Court's January 14, 2010 Order Regarding Public Returns. The respondents' request for an extension of time to complete the processing of proposed public factual returns will be denied as moot light of subsequent proceedings in this case. The Court will grant the respondents request for a ruling that the six categories of information specified in the motion qualify for protection to the extent the categories satisfy step one of *Parhat*. The Court will deny as moot the respondents' request for clarification about whether a legal memorandum justifying designations must be submitted in the absence of a dispute about the

42

SECRET

designations. Finally, the Court will deny the press intervenors' motion for sanctions because the

government's motion did not re-litigate issues that were already decided, the request for more

time to file the proposed public factual returns was granted during earlier proceedings, and there

is no indication that the government filed its motion in bad faith or for the purpose of delaying

these proceedings.

May 12th, 2011

Thomas F. Hogan
United States District Judge